**<u>EXHIBIT A</u>**

**AMERICAN ARBITRATION ASSOCIATION**
**COMMERCIAL ARBITRATION TRIBUNAL**
**Case No. 01-15-0005-9561**
**On Remand**

**LECLAIR RYAN, P.C.**

> **Claimant,**

**v.**

**MICHELE BURKE CRADDOCK,**

> **Respondent**

**REVISED FINAL AWARD ON REMAND PURSUANT TO THE ORDER OF THE
UNITED STATES DISTRICT COURT RICHMOND DIVISION**

This matter is before the arbitration panel on remand pursuant to the June 11, 2019 Order

and Memorandum Opinion of the United States District Court for the Eastern District of Virginia,

Richmond Division.

**1.    The parties are represented by:**

Burt H. Whitt, Esq.
Kaufman & Canoles, PC
150 West Main Street, Suite 2100
Norfolk, Va. 23514-3037
bhwhitt@kaufcan.com
Tel: (804) 648-4848
Fax: (804) 237-0413

John M. Bredehoft, Esq.
Kaufman & Canoles
150 West Main Street, Suite 2100
Norfolk, Va. 23514-3037
jmbredehoft@kaufcan.com
Tel: (804) 648-4848
Fax: (804) 237-0413

Randy C. Sparks, Jr, Esq.
Kaufman & Canoles, Pc
1021 East Cary Street, Suite 1400
Richmond, Va. 2321 9

rcsparks@kaufcan.com
Tel: (804) 648-4848
Fax: (804) 237-0413

*Counsel for Claimant*

Harris D. Butler, Esq.
Butler Royals, PLC
140 Virginia Street, Suite 302
Richmond, Va. 23219
harris.butler@butlerroyals.com
Tel: (804) 648-4848
Fax: (804) 237-0413

Paul M. Falabella, Esq.
Butler Royals, PLC
140 Virginia Street, Suite 302
Richmond, Va. 23219
p.falabella@butlerroyals.com
Tel: (804) 648-4848
Fax: (804) 237-0413

*Counsel for Respondent*

2.      **The parties appointed as Arbitrators:**

Linda R. Singer, Esq.
JAMS Resolution Center
1155 F Street, NW, Suite 1150
Washington, D.C. 20004
lsinger@jamsadr.com
Tel. (202) 942- 9180
Fax. (202) 942- 9186

Hon. Jerome Friedman (ret.)
One Colley Avenue, Apt. 1602
Norfolk, Va. 23510
sanderry68@cox.net
(757) 627-7111

Hon. F. Bradford Stillman (ret.)
340 College Place
Norfolk, VA 23510
fbstillman@mac.com
(Substituted for Arbitrator Friedman on December 29, 2017.

Hon. Rosemarie Annunziata (ret.)
JAMS Resolution Center
1155 F Street, NW, Suite 1150
Washington, D.C. 20004
rannunziata@jamsadr.com
Tel. (202) 942-9180
Fax. (202) 942-9186

**REVISED FINAL AWARD ON REMAND
PURSUANT TO THE ORDER OF THE UNITED
STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF VIRGINIA RICHMOND DIVISION**

In its June 11, 2019 Order, the U.S. District Court addressed Claimant's Amended Motion

to Confirm Arbitration Award, granted LeClair Ryan's Motion to Correct and Vacate Portion of

Arbitration Award, denied LeClair Ryan's Motion to Seal Arbitration Awards, vacated the

arbitration panel's Revised Final Award, and remanded to the arbitration panel "to properly apply the

Supreme Court's clear precedent on fee enhancements, the Initial Final Award and the Revised Final Award

(ECF No. 26-1) (collectively)."[1]

---

[1] The U.S. District Court's Order states:

> For The Reasons Set Forth In The Accompanying Memorandum Opinion, Having Considered PLAINTIFF'S
> AMENDED MOTION TO CONFIRM ARBITRATION AWARD {ECF No. 25), LECLAIRRYAN'S
> MOTION TO CORRECT AND VACATE PORTION OF ARBITRATION AWARD . . . And
> LECLAIRRYAN'S MOTION TO SEAL ARBITRATION AWARDS . . .  As Well As The Supporting,
> Opposing, And Reply Memoranda, It Is Hereby ORDERED That:
>
> (1) PLAINTIFF'S AMENDED MOTION TO CONFIRM ARBITRATION AWARD . . .Is Denied; And
>
> (2) LECLAIRRYAN'S MOTION TO CORRECT AND VACATE PORTION OF ARBITRATION AWARD
> . . . Is Granted; And
>
> (3) LECLAIRRYAN'S MOTION TO SEAL ARBITRATION AWARDS . . . Is Denied.

The U.S. District Court's Memorandum Opinion states:

> This matter is before the Court is PLAINTIFF'S AMENDED MOTION TO CONFIRM ARBITRATION
> AWARD (ECF No. 25), LECLAIRRYAN'S MOTION TO CORRECT AND VACATE PORTION OF
> ARBITRATION AWARD (ECF No. 27), and LECLAIRRYAN' S MOTION TO SEAL ARBITRATION
> AWARDS ECF No. 2 9) . . . [and the Court concludes]:  For the following reasons, the arbitration panel's
> Revised Final Award . . . will be vacated, the case will be remanded to the arbitration panel to properly apply
> the Supreme Court's clear precedent on fee enhancements, and the Initial Final Award, . . . and the Revised
> Final Award {ECF No. 26-1) (collectively, the "Awards") will be unsealed.

1.    **Governing Law and Rules**

The Arbitration process is governed by both the Federal Arbitration Act and the Virginia

Arbitration Act, to the extent that the Virginia statute does not conflict with the federal statute; and

by the American Arbitration Association's National Rules for the Resolution of Employment

Disputes, as amended and in effect November 1, 2009. Virginia state and federal substantive law

govern the merits of the Virginia and federal claims and defenses.

2.    **Pleadings**

The matter before this Tribunal was initiated by a Demand for Arbitration filed by

Claimant, LeClair Ryan, P.C. ("The Firm," "LR,") on December 11, 2015.  In its Demand,

Claimant sought a Declaratory Judgment seeking that the Panel declare that the provisions of Title

VII to the 1964 Civil Rights Act, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e,

*et seq.* including the   Lilly Ledbetter Fair Pay Act of 2009) and the Equal Pay Act of 1963, 29

U.S.C. § 209(d), ct seq ("EPA"), as well as the retaliation claim,  are not applicable to Respondent

Michele Burke Craddock ("Craddock") and that it is not liable for the relief Respondent sought in

her claims for relief pursuant to the claims she made  in her gender-based Equal Employment

Opportunity Commission and retaliation class charge. When a 'right to sue' notice was issued by

EEOC, the Firm asserted its claims in arbitration. Craddock filed gender discrimination claims in

federal district court, which litigation was stayed by decision of the Fourth Circuit Court of

Appeals pending arbitration.

Respondent's Answer and Counterclaim were filed on June 2, 2017.   Craddock's

Counterclaim alleges a long-standing pattern of favoritism to male attorneys in compensation and

promotion, perpetuated by the same, small, centralized group of male decision-makers

(Counterclaim at ¶¶ 1-3, 8-11); male dominated leadership of the Firm; (Counterclaim at ¶¶ 12-

16); disparate gender based treatment and disparate impact of compensation and promotion decisions, reflected in comparative times for elevation to shareholder status and compensation, primarily through discretionary awards of "origination credits," but including internal referral practices (Counterclaim at ¶¶ 17-22, 23, 26-32); and retaliation [Counterclaim at ¶¶86-102]. Craddock's pay disparity claims were brought both under the EPA and Title VII.

Claimant further disputed the arbitrability of any claims or defenses raised in this matter and raised the related question regarding the party responsible for the fees incurred in the arbitration.

3.    **Relevant Procedural History**

- Pursuant to Order No.1, the Tribunal conducted a Preliminary Conference with counsel for the parties by telephone on April 21, 2017 for the purpose of establishing appropriate procedures and schedules for the Arbitration.

- Pursuant to Order No. 2, entered on May 24, 2017, the Tribunal found Respondent bound by the Arbitration provision in the Shareholders Agreements, on the ground that Respondent was foreclosed from relitigating the issue in the arbitral forum, having sought judicial resolution of the issue in the United States District Court for the Eastern District of Virginia (Richmond Division) and the United States Court of Appeals for the Fourth Circuit District of Virginia (Richmond Division), both of which ruled in favor of Claimant.[2] Accordingly, no further consideration of the issue by the Tribunal was undertaken. Further, pursuant to AAA Administrative Rules and Rule 48 of the Employment Rules, the Tribunal determined that LeClair Ryan will be assessed the costs incurred in the arbitration proceedings, including the arbitrators' fees, on the ground that the parties' agreement, was an "employer-promulgated plan" and not one individually negotiated.

- Order No. 3, entered on May 30, 2017, set the conduct of discovery pursuant to an agreed Discovery plan, in which the Tribunal concurred, and scheduled the Arbitration Hearing to be held between October 23, 2017 and October 27, 2017 at the law offices of Kaufman and Canoles, PC, Two James Center, Suite 1400, Richmond Virginia, 23219. It also set the dates when each party's list of witnesses and exhibits, together with the party's objections to the admission of the opposing party's proposed exhibits or witnesses, were to be filed.

---

[2] On April 22, 2016, the District Court denied Respondent's Motion to Stay Arbitration and granted Claimant's Motion to Dismiss and to Compel Arbitration. The Court of Appeals dismissed the appeal on August 26, 2016 for lack of jurisdiction pursuant to 9 U.S.C §16 (b) (1) (2) (2012).

- Order No. 4, entered on June 15, 2017, denied Counterclaimant -Respondents' Request for Leave to File a Potentially Dispositive Motion pursuant to Rule 27 of the American Arbitration on the ground that the pleadings required determinations of fact and the motion was unlikely to dispose of or narrow the issues.

- Order No. 5, entered on July 3, 2017, further addressed the conduct of discovery in the proceedings, in particular the issue of what constituted relevant "comparables."

- Order No. 6, denied Respondents' Motion for Dispositive Relief in the Nature of a Summary Judgment under Fed. R. Civ. P. 56 and pursuant of Rule 37 of the AAA on the ground the issues raised by the parties require a determination of fact and such a motion was unlikely to dispose of or narrow the issues.

- Order No. 7, dated September 11, 2017, resolved a discovery dispute raised jointly by the parties regarding a claim of privilege.

- Order No 8 resolved the number of depositions permitted under Order No. 5, which linked the number of permitted depositions to whether they were "party" or "non-party."

- Order No. 9 resolved the permitted discovery time period and scope (such as gender, geographic locations, professional status and professional histories of Respondents' employees or shareholders.)

- Order No. 10 clarified the permitted discovery time period and scope as set forth in Order No. 9.

- Order No. 11 granted Claimant's Motion to Compel responses to Respondent's Interrogatory No. 7 and Document Request No. 5.

- Order No. 12 granted the parties' joint request to reschedule the Arbitration hearing form October 23, 2018 to an available time and date as would permit nine or ten consecutive days for hearing, setting the hearing to begin on January 15, 2018, and continuing through January 26, 2018, at the law offices of Kaufman & Canoles, PC, Two James Center 1021 Cary Street, Suite 1400, Richmond, Virginia 23219. The Panel also directed that Respondent's case be presented first, because she had the burden of proof on her claims of gender discrimination, promotion, constructive discharge, and unequal pay.

## 4.    The Evidentiary Hearing

The Arbitration Hearing was conducted on January 15, 2018 through January 25, 2018 at

the law offices of Kaufman & Canoles, PC, Two James Center, 1021 Cary Street, Suite 1400,

Richmond, Virginia 23219 with Harris D. Butler, Esq., and Paul M. Falabella, counsel for

Respondent, and John M. Bredehoft, Esq. and Randy C. Sparks, Esq, counsel for Claimant present.

Michelle Burke Craddock, Lori Thompson, Esq., the firm's General Counsel, and Stacy Beaulie,

were also present.

The Claimant submitted in evidence 133 exhibits.

Respondent submitted in evidence 134 exhibits.

The following witnesses testified:

- Steven Brown

- Curtis Colgate

- John Craddock

- Thomas Wolf

- Jennifer Mistal

- Lynn Ellen Queen

- Michael Hern

- Leslie Hailey

- Bruce Matson

- Michele Craddock

- Dr. Scott Sautter (expert)

- Erik Gustafson

- David Freinberg

- Janis Meyer

- Corey Booker

- Dr. Benjamin Carey (expert)

- Katja Hill

7

- Lisa Murphy

- Susan North

Before the submission of the evidence was closed, the Tribunal determined if either party sought to introduce additional material evidence. There being no additional material evidence proffered for admission by either party, the arbitration hearing was closed, with the exception of the submission of evidence establishing the attorney's fees and costs sought by Respondent were Respondent to prevail and the submission of post-hearing briefs, which were filed on April 2, 2018.

The panel issued its interim award on June 15, 2018. LeClair Ryan's Request for Declaratory Judgment seeking Declaration that the provisions of Title VII to the 1964 Civil Rights Act, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, et seq. including the Lilly Ledbetter Fair Pay Act of 2009) and the Equal Pay Act of 1963, 29 U.S.C. § 209(d), et seq ("EPA"), as well as the retaliation claim, are not applicable to Respondent Michele Burke Craddock was denied in part and granted in part, as further reflected in the following Interim Awards:

An Interim Award in favor of Michele Burke Craddock with respect to her claim of intentional discrimination in her 2014 compensation in violation of Title VII was entered on June 15, 2018, in the amount of Two Hundred Seventy-Four Thousand, Seven Hundred Forty-Eight Dollars ($274,748.00,)[3] plus interest, attorney's fees, and the costs incurred in this arbitration.

An Interim Award was entered in favor of LeClair Ryan, LLP with respect to Michele Burke Craddock's claim of intentional gender discrimination in her 2015 compensation claim.

---

[3] The AWARD for this claim in the amount of $274,748.00 is the difference between the loss Craddock's expert calculated she suffered for both the 2014 and 2015 fiscal years and the loss calculated for fiscal year 2015 alone, viz., ($325, 929.00 minus $51,183.00).

An Interim Award in favor of Michele Burke Craddock based on her claim of emotional distress suffered as a result of the intentional gender discrimination by LeClair Ryan, LLP was entered in the amount of Twenty Thousand Dollars ($20,000.00).

Following briefing on the issues of attorney's fees and costs, the arbitration panel issued the Initial Final Award on September 28, 2018. In the Initial Final Award, the arbitration panel held that Craddock had not shown a violation of the Equal Pay Act; that LeClair Ryan intentionally discriminated against Craddock based on her sex in her 2014 compensation, in violation of Title VII; and that LeClair Ryan did not intentionally discriminate against Craddock in her 2015 compensation. The panel awarded Craddock $274,748.00 for LeClair Ryan's Title VII violation. Further, it held that Craddock suffered emotional distress as a result of the intentional sex discrimination in the amount of $20,000. The panel also awarded Craddock's attorney's fees in the amount of $701,076.41 plus interest at a rate of 6% from the date of the Initial Final Award until the amount was paid in full. To come to that amount, the arbitration panel said that: (l} the lodestar analysis-which is determined by multiplying the number of reasonable hours expended by the attorneys times a reasonable rate dictated an amount of $769,050 in attorneys' fees;[4] (2) Craddock's attorneys' fees should be reduced to $678,899.50 because Craddock unnecessarily pursued a deposition of a witness and unsuccessfully tried to have her dispute determined in federal court; (3) the attorneys' fees should be reduced by a further 20% to $543,099.60 due to the lack of success on Craddock's Equal Pay Act claims and her Title VII

---

[4] The U.S. Supreme Court has held that an award of attorneys' fees and costs shall be determined using a "lodestar" analysis. The lodestar amount representing the proper attorneys' fee award made pursuant to statute is the product of the reasonable number of hours expended times the reasonable attorneys' hourly rates. *Perdue v. Kenny*, 559 U.S. 542, 130 S.Ct. 1662 (2010). In *Perdue*, the Supreme Court adopted the so called "lodestar method," or "lodestar approach," for determining an award of legal fees in cases involving fee-shifting statutes, counseling that it "produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue*, 559 U.S. at 550-552, 130 S.Ct. at 1671-72 (*italics in original*).

retaliation claim; and (4) an increase to the attorneys' fee award of 25% to $701,076.41 was appropriate due to Craddock's attorneys' success.

In its analysis, the Panel looked to the *Johnson* factors that relate to the skill required of the attorneys who prosecuted this case, their opportunity costs in pressing the instant litigation, and the undesirability of this case within the legal community, noting that Craddock chose to prosecute gender discrimination claims against the law firm where she was a female partner that her case was unique, that it presented difficult challenges, and that Craddock's success depended on securing highly skilled and experienced counsel who were willing to forgo other opportunities in order to represent claimant in this matter. The arbitration panel further found that such fee shifting provisions to which Craddock resorted in this case are intended to encourage counsel to accept cases that advance the public policy that underscores the remedial purpose of the federal statutory scheme.

The panel's Final Award was premised on its analysis of the evidence and the relevant law as set forth below.

## I.

### Entitlement To Protections Afforded To Employees Under The Equal Pay Act And Title VII To The 1964 Civil Rights Act

LeClair Ryan PC is a national law firm that currently has approximately 344 lawyers (56 of whom are in the Richmond office) and 121 total shareholders with 27 offices in 16 states. Michele Burke first came to LR as a summer associate in 2002, upon graduation from law school, and began work as an associate in September 2003. She voluntarily left the firm, to pursue other goals, but rejoined the Firm as an Associate in 2008. She was promoted to Officer effective January 2010, and to Shareholder effective January 2013.

Craddock alleges that the Firm is an "employer" within the meaning of Title VII and the EPA. LeClair, on the other hand, claims that Craddock is not entitled to the protections of federal employment laws because she is a shareholder, not an employee. We agree with Craddock.

In *Clackamas Gastroenterology Assoc., PC v. Wells,* 538 US 440 (2003), the Supreme Court set out the standards for determining whether a shareholder in a professional organization may be considered an employee under the discrimination statutes. Ruling that element of control is the principal guidepost to be followed in deciding whether the four director-shareholder physicians should be counted as employees, the Court listed six considerations that are relevant to such a decision:

1. whether the organization can hire or fire the individual or set the rules and regulations for her work.

2. whether and to what extent the organization supervises the individual's work

3. whether the individual reports to someone higher in the organization

4. whether, and to what extent, the individual is able to influence the organization

5. whether the parties intended that the individual be an employee, as expressed in written agreements

6. whether the individual shares in the profits, losses, and liabilities of the organization.

During the period Craddock was a Shareholder at LR, she clearly was treated as an employee. Several witnesses, including Erik Gustafson, the current CEO, testified that a small number of male leaders, primarily the CEO, controlled the firm. With some input from the small number of departmental team leaders, the CEO determined promotions to Shareholder, Shareholders' base salaries, origination credits, buy-ins, and permission to take on contingency fee cases. (Some of these decisions later were shared with a Board of Directors on which Craddock

never served.) Shareholders had no access to other shareholders' compensation, which was kept secret even from the Diversity Committee. Craddock had no influence on any of these decisions.

Two documents, from different time periods relevant to our decision, make clear Craddock's status as an employee. In 2012, CEO David Freinberg wrote to Craddock, then an office holder, together with John Craddock and Thomas Wolf, both of whom were Shareholders, concerning a bonus for their work on the *Colgate* matter: "The Applicant, like the Firm's other Officers and Shareholders, will continue to be an employee at will . . . subject to termination at any time with or without Cause . . . and other terms of employment subject to change . . . ."

And on January 19, 2015, CEO Freinberg sent Craddock, then a Shareholder, a memo establishing her annual compensation, which ended as follows:

"Notwithstanding anything in this memo to the contrary, (i) you, like the Firm's other attorneys, will be an employee at will, and your employment will be subject to termination at any time, with or without cause, and (ii) the terms of your employment (including, without limitations, compensation and benefits) like those of the Firm's other attorneys, will be subject to change by the Firm from time to time."

Finally, Michael Hern, the former, long-term CEO, testified that shareholders are at-will employees, who receive W-2 income.

Five of the six standards listed by the Supreme Court (the only exception to a very minor degree being the last one) establish Craddock as an employee entitled to the protection of the Equal Pay Act and Title VII.

## II.

### Gender Discrimination Under Title Vii To The 1964 Civil Rights Act
### Findings Of Fact And Conclusions Of Law

In 2009, the Firm brought in what would become known as the *Colgate* case. The credit for originating this work went to a male partner, Douglas Sbertoli, who had brought in the client. Litigation began in 2010 and Craddock was promoted to Officer *(i.e.,* non-equity' partner) effective January l of that same year. She was promoted to Shareholder, effective January 2013. A year early relative to the three-year interval that normally followed once achieving Officer status.

In the course of the *Colgate* litigation, the client fired the Firm, but, through Craddock's efforts with the client, the work was subsequently retained for the Firm. Notwithstanding Craddock's successful efforts to reinstate the Craddock matter with the Firm, under written Firm policy, the origination credits (including credit for an initial $3.5 million dollars paid under an hourly-fee arrangement before the case was converted to contingent fee) remained with Sbertoli. Craddock's appeal of the decision regarding the allocation of the *Colgate* origination credits was denied in the fall of 2011.

The litigation team consisted of Shareholders, Tom Wolfe and John Craddock, as well as Michele Burke, as she was known before her marriage to John Craddock. The team prepared and tried the case before Judge Jane Roush who entered judgment for the Firm's clients in August 2012. A comprehensive settlement was reached just before an appeal was heard in August 2013. The Firm was paid a contingent fee of about twenty million dollars.

As part of the Firm's efforts to address its failure to meet budget in 2012 and 2013, Sbertoli's compensation for 2013 was reduced substantially and he left the Firm that year. As a result, under Firm policy, approximately ten million dollars was credited as "origination fees" for Craddock. When the contingency fee for *Colgate* was paid to the Firm in 2013, each of the three attorneys working on the case received a million- dollar-plus bonus. Craddock also received another more modest bonus, as did other firm attorneys, and her salary for 2014 was increased but

not to the amount paid in compensation to male Shareholders. When she was also asked to accept a reduction in salary in 2015, she filed an EEOC claim based on gender discrimination and retaliation in January 20, 2018 and LeClair Ryan's Demand for Arbitration and Craddock's Counterclaim followed.

LeClair Ryan determines attorney compensation annually applying factors for evaluating Shareholder Performance as set forth in its Shareholder Compensation Policy adopted on July 12, 2012.[5]  In conducting a Shareholder's performance evaluation, the Firm applies both subjective and objective criteria; the latter, primarily, includes "rolling three-year averages for collections from (i) hours worked, (ii) originations, (iii) matter managements and (iv) team leadership.

The Firm's determination of compensation is described as a "relatocracy," --a term not defined, except to state that to achieve such a goal, a direct relationship should exist between a lawyer's contribution to [the Firm's] "Partnership 2020 Values and Goals and [the Firm's] execution of Strategy Map 2.0 and his or her compensation." The term "relatocracy" is further defined in a footnote that provides: "The aspiration is that each Shareholder will endeavor to contribute more to the Firm's Partnership 2020 Values and Goals and its execution of the Map 2.0 than he/she receives in compensation."  Moreover, the Policy provides that the relationship that should exist between a lawyer's compensation and his or her contribution to the Firm "is not determined by the rigid application of a formula.  It is determined through consideration of both (1) objective criteria . . . and (2) subjective criteria (i.e. the Shareholder's self-evaluation and the

---

[5] These provisions remain essentially the same in years 2013 and 2014, the latter year being the Fiscal year in which fiscal year 2015 compensation was determined. These factors are presented to the Firm's Chief Executive Officer, who forwards a recommendation to the Board for approval. Raises and bonuses are set within constraints imposed by a yearly Firm-wide bonus pool and raise pool.

recommendations from the CEO (which in turn should reflect the input from the appropriate Practice Area Term Leader and the appropriate Department Leader.)"

To apply the Firm's objective criteria, the focusses should be on Fiscal Review Year numbers for the last three completed Fiscal Review Years. As female Board member Katja Hill testified, the look at three-year averages is intended to "smooth out sort of minor to modest variations from year to year," but are not intended to allow a Shareholder to "coast" on one good year. Although characterized as "objective," under the Firm's Compensation Policy, the three-year rolling averages factors were subject to an overlay of "subjective" review and evaluation. Thus, according to testimony by Hill, in the exercise of subjective evaluation, "a single instance of superlative performance, attributable to a non-repeatable event," may be discounted by the Board for salary purposes. While that type of event is rewarded by a bonus, such a bonus is not automatic; it must be applied for and approved by the Board.

To recognize contributions of unique value, the Compensation Policy also provides that, where a lawyer's "performance is crucial to the success of the Firm and its clients, the value of that contribution must be simultaneously provided to the Firm, its clients and its "stars." Finally, in testimony, but not included in the Firm's printed Policy, the subjective factors were said to include the "durability" and "profitability" of a Shareholder's work and collections. As to subjective factors, Hill testified "[t]here's no specific place to find it. There's no standard . . . it is subjective to whoever the decision makers, including ultimately the board of director(s)."

The Firm's Compensation Policy affirms that the Firm does not have "a seniority-based, lockstep system," and that "material differences in contribution to Partnership 2020 Values and Goals and execution of Strategy Map 2.0, should result in material differences in compensation." However, the Firm's application of origination credits is essentially "lock step," in its virtually

undeviating application of the credit to the attorney "who gets the telephone call [from the client.]" With few exceptions that attorney "will forever be the OA for all matters for that client . . . unless [the] attorney leaves the Firm. In that event, the Chief Executive Officer based on the recommendation of the applicable Department Leader (with input from the original originating attorney if possible) will designate a new originating attorney or establish the client as a "Firm origination" (to be reflected in [the Firm's) financial reports as such) after considering appropriate input from the attorneys involved."   Disputes regarding the designation of originating attorney "will be determined by the Chief Executive Officer based on the recommendation of the applicable Department Leader, in his sole and absolute discretion (if the dispute involves an Executive Officer, the Board will make the determination).

On the face of it, the Firm's culture appears propitious for the employment and success of women lawyers. The Firm has a longstanding commitment to gender diversity. It exposed itself to critical analysis, including a comprehensive outside 2003 report and another in 2007. The Firm exceeds the national averages for women partners, women equity partners, and women associates, and is ranked in or close to the top ten percent of firms nationwide for women in Law 360 Rankings. The first two attorneys hired by the Firm out of law school, as opposed to laterals, were women – women who are still with the Firm and in management positions.[6] The Firm established and supported a Diversity Task Force, a Women's Task Force, and a more focused Women's Success Initiative. For more than a decade, the Firm has been an important member of the Partnership for Attorney Retention, now known as the Alliance for Diversity and Flexibility, a national organization dedicated to promulgating best practices for a gender-neutral and diverse

---

[6] Susan North is the long-serving head of the Firm's Williamsburg Office, which was opened by the Firm to entice her to return. Katja Hill was prominent in the 2013 Shareholder Realignment subcommittee, was offered the lead position in the Firm's Corporate Department and has been solicited for Lead Director of the Board of Directors

workplace. The Firm's CEO not only attended but spoke at the national meetings, and Firm Board

member Karol Corbin Walker – an African-American female Shareholder, long-time Firm Board

member, and former President of the New Jersey Bar – is also active on behalf of LeClair Ryan.

Finally, women have some presence in the meaningful positions of authority at LeClair

Ryan. Jennifer Mistal is the Chief Administrative Officer and was formerly Chief of Human

Resources. The firm historically has had two departments; when a third department was created,

it was headed by Anne Byrd.  Katja Hill, a rough contemporary of Craddock, has been with the

Firm her entire career; has been on the Board of Directors since 2011; is on the Firm Policy

Committee; on the Firm Communications Committee, and is the Managing Attorney ("Office

Leader") for the Richmond office of the Firm. She is on the Board of Trustees of the LeClair Ryan

Foundation and past Chair of the Board. Lori Thompson became General Counsel after Craddock

left, but has long been liaison to the Firm for an important nationwide referral network; Susan

North is firm liaison for another national network.

However, notwithstanding this culture, the application of the Firm's compensation policy

has had a demonstrable disparate effect on women lawyers. The Firm's gross compensation data

produced in this matter shows that, for years 2003-2016, the highest paid female shareholder each

year was paid significantly less than the highest paid male shareholder each year.  For the 5 years

before the 2013 *Colgate* fee recovery, the highest paid female shareholder in each year was paid

30% (2008), 25% (2009), 26% (2010), 27% (2011), 23% (2012) 41% (2014), 53% (2015) and

57% (2016) of what the highest paid male Shareholders were paid.

Excerpted LeClair Ryan production data from October 2011, which includes data showing

working attorney, managing attorney hours and originating attorney production, when compared

with the 2012 total compensation data demonstrates that female shareholders with equal or better

2011 production numbers were paid less total compensation in the following 2012 year, than male shareholders with no better, or lesser, production.[7]

Review of the compensation paid to Craddock's two male peers in her 2013 entering shareholder class, Jeff Townes ($335,000) and Scott Bermack ($360,000), demonstrates that they were compensated more than Craddock ($212,000.) Male Shareholders who handled contingency fee work (including unsuccessful contingency work), were not asked to reduce their base compensation as Craddock was. Craddock's male teammates in *Colgate*, John Craddock and Tom Wolf, were not asked to reduce their base 2015 compensation.

The Firm's subjective evaluation of the objective components of the Firm's Compensation Policy, viz., Craddock's average 3-year performance metrics for working attorney collections, managing attorney collections, and originating attorney collections resulted in the Firm's discounting those factors in deciding her 2014 compensation.  In determining Craddock's compensation for 2014, the Firm also discounted Craddock's extraordinary performance in 2010-2013 with the *Colgate* case and refused to assign the Colgate origination credit to her when the

---

[7] Examples include:

| Name | 2011 Hours | Working | Managing | Originating | Total 2012 Comp |
|------|------------|---------|----------|-------------|-----------------|
| Karol Corbin-Walker | 1,750 | 666,000 | 1.2M | 1.8M | $338,000 |
| Steve Siller | 1,126 | 410,000 | 684,000 | 1M | $365,646 |
| Charles Sims | 1,830 | 951,000 | 1.6M | 373,000 | $523,000 |
| Steven Romine | 1,804 | 598,000 | 631,000 | 1.1M | $541,253 |
| ** | | | | | |
| Leslie Spasser | 1,668 | 600,000 | 635,000 | 397,000 | $228,586 |
| Robert Fletcher | 2,008 | 662,000 | 338,000 | 338,000 | $372,837 |
| James Kosch | 1,768 | 445,000 | 329,000 | 723,000 | $418,903 |
| ** | | | | | |
| Nancy Reimer | 2,321 | 466,000 | 1.1M | 1M | $203,600 |
| William Despo | 1,362 | 571,000 | 1M | 892,000 | $299,903 |
| Steven Siller | 1,126 | 684,000 | 684,000 | 1M | $365,646 |
| John Jessee | 2,095 | 438,000 | 1M | 1.4M | $400,551 |
| Steve Romine | 1,804 | 598,000 | 631,000 | 1.1M | $541,253 |

originating attorney Sbertoli was fired by the client. In 2013, when Sbertoli's compensation for the year was reduced substantially by the Firm and he left the Firm, Craddock was then given the origination credit, but only for the contingency portion of the case.

On this record, we conclude, as Craddock contends, that, had the Firm followed its compensation policy, Craddock would have received a substantial raise in 2014 and that her 2014 salary is the result of intentional discrimination based on gender.

In reaching this conclusion, we considered Craddock's claims under the *McDonnell Douglas* framework. Under that framework, the Craddock as plaintiff must first establish a *prima facie* case of discrimination. *See St. Mary's Honor Ctr.,* 509 U.S. at 506, 113 S.Ct. 2742.). Once the plaintiff establishes her *prima facie* case, the Firm must respond with evidence that it acted with a legitimate, non-discriminatory reason. *See id.* at 506–07, 113 S.Ct. 2742. If the defendant makes this showing, the plaintiff must then present evidence to prove the defendant's articulated reason was pretext for unlawful discrimination. *See id.* at 507–08, 113 S.Ct. 2742. Although the evidentiary burdens shift back and forth under the *McDonnell Douglas* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). As the Supreme Court has recently reiterated, the ultimate issue in any discrimination case alleging disparate treatment is whether there was intentional discrimination, *St. Mary's Honor Center, et al. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and the claimant must prove that gender was the determining factor; that "but for" the employer's intent to discriminate on the basis of sex, she would have not been adversely affected. *Clay,* 955 F.2d at 941; *Conkwright v. Westinghouse*

*Electric Co.,* 933 F.2d 231, 234 (4th Cir.1991). *Green v. Fairfax Cty. Sch. Bd.,* 832 F. Supp. 1032, 1036–37 (E.D. Va. 1993), *aff'd,* 23 F.3d 400 (4th Cir. 1994*) Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004)

Because Craddock established a *prima facie* case of gender discrimination with statistics, the burden shifts to the Firm to offer a legitimate, nondiscriminatory reason for Craddock's compensation. *Love-Lane v. Martin*, 355 F.3d 766, 786–89 (4th Cir. 2004), citing *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). See also *McDonnell Douglas, supra*.

Accordingly, in response to Craddock's *prima facie* case, the Firm proffered in defense of its 2014 decision on Craddock's compensation, the Firm's declining financial condition, the budgetary constraints it faced, and the need for "profitability," and "durability," which the Firm contends Craddock's collections and origination credits did not establish.

It pointed to the untenable results of its automatic "raise culture" years and the need to reconsider its practices. The Firm missed its budget for the first time in its history, in 2011 while the Colgate case was pending, and again in 2012, due in large but not exclusively to the large number of uncompensated hours dedicated to *Colgate.* Most Shareholders suffered the loss of some or all of their "at risk" compensation. Many Shareholders had their compensation cut by six figures, including Doug Sbertoli, who originally brought in the *Colgate* clients and who, after his compensation was cut by $200,000, left the Firm. The *Colgate* recovery allowed the Firm to pay some, but not all, of the compensation the Shareholders lost in 2012.

The Firm also pointed to issues relating the Craddock's declining productivity post *Colgate*. The Firm related that, since joining the Firm, Craddock had been a hard worker, almost always billing 2,200 hours per year or more. After the *Colgate* fee was paid in the middle of 2013,

and Craddock's work effort fell off significantly.  Craddock's working hours in 2013 dropped from 2,251 to 1,124 and she worked half of the hours in 2013 that she worked in 2012.

On this record, we conclude the Firm has met its burden of production, having introduced evidence which, *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the Firm's action to set Craddock's 2014 compensation that she challenges as discriminatory.  Its explanation is sufficient to shift the burden to Craddock, who must show that "the legitimate reasons offered by the defendant [s] were not [their] true reasons but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. As the U.S. Supreme Court explained, the *prima facie* case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981).

To address the Firm's proof of non-discriminatory reasons, Craddock again pointed to the data that establishes the Firm's compensation policy has had an established demonstrable disparate effect on female lawyers. The Firm's gross compensation data produced in this matter shows that, for years 2003-2016, the highest paid female shareholder each year was paid less than the highest paid male shareholder each year.

Craddock continued, pointing out that the Firm's budgetary problems and continuing financial shortfalls did not curtail its continuing payment of salaries to male lawyers whose collections did not cover overhead and expenses.  She points out, for example that, notwithstanding the Firm's policy to the contrary, the Firm consistently disregarded the unprofitability of Meyer's practice while it did not credit her profitable results in Colgate. The Firm's leadership

21

acknowledged that the "raise culture" of "paying more in compensation than [it] should be paying… resulted in (the Firm's financial) shortfalls."    Yet, Craddock's 3-year average rolling averages were discounted in favor of the subjective (yet unprofitable) durability factor in Meyer's practice, and Craddock's objective record of profitable collections was negatively compared to that of Meyer's years of $8M originations and unprofitable results.   The Firm's willingness to pay Meyer's $1M+ compensation continued even in the period after the Firm acknowledged the losses incurred in his practice and that his $8M in annual originations were not profitable.

Cradock's evidence further shows that the Firm's failure to credit Craddock's average 3-year rolling performance metrics essentially nullified the effect of her performance in the 2010-2013 Colgate matter on her salary. The failure to follow the Firm's policy on the application of the objective factors in setting compensation was a serious deviation from its accepted process. Nowhere in the Firm's Compensation policy is it stated that the 3-year rolling averages may be disregarded or discounted or under what circumstances.  Moreover, the Firm's policy that, where performance is crucial to the success of the Firm and its clients, the value of that contribution must be simultaneously provide to the Firm, its clients and its "stars," is a subjective factor that was likewise not applied in Craddock's favor.

Under Title VII, the plaintiff at all times bears the "ultimate burden of persuasion." *See, e.g., Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (citing *Burdine, supra,* at 256, 101 S.Ct. at 1095).   We conclude that Craddock's evidence has met that burden and establishes that the Firm's articulated "non-gender" reason for Craddock's 2014 pay reduction are pretext for gender discrimination. The Firm's discounting of the Compensation Policy's objective factors consisting of the 3-year rolling averages data recording working attorney, managing attorney, and origination credit collections,

not only affected the Firm's determination of Craddock's 2014 compensation, they are significant in the Firm's determination of the "durability" and "predictability" of Craddock's practice, two attributes that the Firm concluded, to Craddock's detriment, that her practice did not evidence.

Other than these objectives, measurable, factors, the origination credit is the only other objective factor used by the Firm to set compensation.  However, the Firm's origination credit policy requires the application of origination credits to the attorney who brings in the case. As testified by one woman partner, the policy makes it difficult for a more recently employed Shareholder to meet the durability and predictability standards that the Firm deems critical to both the determination of a Shareholder's compensation and the Firm's financial planning, particularly given the historic and current law practice environment, dominated by male participants with long-established practices. Such a policy may explain some of the disparate compensation effects on women lawyers that were documented in this case. Craddock was impacted by this policy in that she was not given credit for the *Colgate* case from the time that the clients fired the firm, refused to work with Sbertoli, the initial OA, and returned only with the assurance that Craddock would be responsible for the work as lead attorney.

When the objective 3-year rolling averages, policy was not applied in her case, it follows that the evaluation of Craddock's contributions to the Firm's Values and Goals was based on ill-defined subjective predicates. Yet, the important subjective measure regarding the critical contribution she made with the results in *Colgate* was not applied in her favor.  The only year the firm made its budget was the result of the huge recovery in the *Colgate* litigation and appeal.

Accordingly, from the evidence regarding the way the Firm applied the compensation policy in Craddock's case, when viewed in the context of the data of long- established disparate impact Craddock presented in her *prima facie* case, it is reasonable to infer intentional gender

discrimination in the Firm's determination of her 2014 compensation.  As stated by the Supreme

Court, "*a prima facie* case and sufficient evidence of pretext may permit a trier of fact to find

unlawful discrimination, without additional, independent evidence of discrimination...." *Reeves v.*

*Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Proof that the defendant's explanation is not the actual reason for its action or is unworthy of

credence is simply one form of circumstantial evidence that is probative of intentional

discrimination, and it may be quite persuasive. See *St. Mary's Honor Center, et al. v. Hicks,* 509

U.S.at, at 517. Once the employer's justification has been eliminated, discrimination may well be

the most likely alternative explanation, especially since the employer is in the best position to put

forth the actual reason for its decision. Cf. *Furnco Constr. Corp. v. *148 Waters,* 438 U.S. 567,

577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[W]hen all legitimate reasons for rejecting an

applicant have been eliminated as possible reasons for the employer's actions, it is more likely than

not the employer, who we generally assume acts with *some* reason, based his decision on an

impermissible consideration").

In reaching this conclusion, we acknowledge and credit the Firm's evidence relating the

beneficial treatment it accorded Craddock, pointing out that she was favored by discretionary

decisions of the Firm, including her promotion to Shareholder status a year earlier than is

customary in the Firm and before any payment was received from *Colgate.*  Also, when Craddock

sought to return to the Firm after brief voluntary departure, she was re-hired with no loss of

seniority for promotion or compensation. In addition, after Sbertoli left the Firm in 2013, Craddock

received the origination credits for the contingent portion of the *Colgate* case and received her

$1.1-plus million bonuses as well, an exercise of the CEO's discretion.  However, that treatment,

as beneficial as it was, is not more compelling than the proved disparate effect of the compensation

24

policy at issue here and the discounting of the objective factors in setting her 2014 compensation. A system's reliance on subjective factors requires close scrutiny of a gender-neutral application of the system's provisions. *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 579 (8th Cir. 2006); *Kovacevich v. Kent State Univ*., 224 F.3d 806, 827-29 (6th Cir. 2000).

Although we find intentional gender discrimination in the 2014 compensation the Firm set for Craddock, we find the evidence does not establish it intentionally discriminated against her with respect to its 2015 compensation proposal for her. The Firm acted in consideration of its on-going budgetary problems and Craddock's deteriorating work record in the preceding three years. In 2012, Craddock had originating attorney credits of $22,719. Her originations fell by 98% from 2013 to 2014. In calendar year 2013 -- the year after the *Colgate* trial, Craddock's working hours dropped from 2,251 to 1,124. She worked half the hours in 2013 that she worked in 2012.[8] In 2014, Craddock was "rarely seen" in the office her originating attorney collections were $171,574, and her working hours dropped to 874. Craddock's collections were $118,000, the firm's overhead per attorney was approximately $180,000 and her total compensation was about $273,000. Therefore, LR lost about $340,000 on Craddock in 2014.

The Firm missed budget again in 2014 and many Shareholders again were not paid part or all of the contingent portion of their compensation. Several attorneys, including male Shareholders whose performance was comparable to Craddock's 2014 performance, were fired. Other male Shareholders saw their compensation cut by six figures.

In 2014, the Firm began using performance-based pay plans for Shareholders, which provided either a draw plus a percentage of collections, compensation based on hours worked, or

---

[8] Craddock and her team, including Tom Wolf and John Craddock, tried the Colgate matter during the period May - June, 2012, judgment in favor of the Colgates was entered on August 30, 2012, and final settlement completed on August 22, 2013.

compensation based solely on a percentage of collections. About seven to ten percent of the Firm's

Shareholders, most of them male, were already on similar plans.    In Craddock's submission of

her 2015 Individual Accountability for Revenue Metrics Used to Determine Revenues on October

14, 2014, Craddock estimated that she would collect $450,000 on her working attorney and

originating attorney time– however, adding the caveat, "provided I have the work" and noting that

it was "difficult to determine what her working attorney and origination attorney collections for

Calendar year 2015 would be."  She also testified that the productivity projections she provided

for 2015 were dependent on the outcome of her contingent fee cases.

    Given these circumstances, to determine Shareholders' compensation for 2015, the Firm

sought to address Craddock's compensation in light of the Firm's continuing financial difficulties,

Craddock's collections projections and the nature of her practice, which was primarily a

contingency fee-based practice at that time, as reflected in the 2014 Revenue Metrics form she

submitted for the Firm's consideration.   Craddock was asked to propose a mixed compensation

system that would combine a salary with a substantial upside if any of her contingent fee cases

resulted in substantial remuneration or if she began billing as many hours as she had before the

*Colgate* case.

    Craddock never responded to the Firm's request that she make a compensation proposal.

For its part, LeClair Ryan proposed in mid-January 2015, an "incentivized compensation" whereby

Ms. Craddock's 2015 Shareholder compensation would comprise a base salary augmented by a

percentage of all fees received as a result of her working collections and originations during 2015.

The proposal would have guaranteed her over $20,000 more than she actually received in 2014,

regardless of her effort or results. All "contingent" or "at-risk" factors were removed, and she

faced the possibility of a substantial upside with no limit, if she had a good year in 2015 – the

provisions for "additional compensation" kicked in at a level of work that she had often exceeded pre-*Colgate* and that were less than her own predictions for 2015. The 2015 compensation proposal to Craddock provided for the same regular salary -- $177,750 -- as was paid in 2014. It also guaranteed her a retention incentive payment of $23,700 in 2015 that Craddock did not receive in 2014. The 2015 compensation proposal only removed the at-risk components of Craddock's compensation; the at-risk payments were not received by Craddock (or any other Shareholders in 2014) because the firm did not meet its budget for the year.

This approach to Craddock's 2015 compensation was suggested by her friend, Tom Wolf, who had advised the Firm in 2014 that he believed Craddock had been treated unfairly with respect to the *Colgate* origination credits and believed the Firm should make an exception to the policy because "the *Colgate* case was so big, made so much money for the firm that even if her production was way off, . . . the firm should treat her differently than they would treat somebody else because she brought in --- she originated the fee that was twice as big as any fee in the history of the firm." He did not support a reduction in Craddock's compensation in 2015 and, instead, recommended the Firm propose the "incentivized compensation" approach that was ultimately presented to her. Craddock eventually appealed the 2015 proposal offered by the Firm but resigned from the Firm the next day, before the Appeal could be considered.

While Craddock believed her proposed 2015 compensation should have been higher, between one third and one half the Firm's Shareholders experienced a compensation reduction that year, and the result included the Firm's termination of two male Shareholders whose performance had dropped, along with two to three non-equity partners, and three to four associates

Under the "forward-looking" system the Firm had put in place and, considering the Firm's continuing financial constraints as well as Craddock's financial metrics and projections for

collections in 2015, the Firm's proposal of a compensation package that would have increased her guaranteed income and allowed for a flexible upside was reasonable. We, thus, find that the Firm's mixed compensation system in which Craddock would share both the risks and the benefits of her evolving practice was not an act of intentional gender discrimination.

We also find that Craddock proved that she suffered emotional distress as a result of the intentional gender discrimination she experienced in her employment in 2014. Expert witnesses for both parties agreed that her emotional distress was the effect of her employment. Craddock's expert, Scott W Sautter, a licensed Clinical Psychologist, described her condition as a "temporary adjustment disorder with anxious mood." In his report, Dr. Sautter concludes that Craddock had "few, if any, psychological concerns before the conflict at work began in early fall of 2014 with substantial increase in generalized anxiety, sleep disturbances and cognitive compromise through spring of 2015 . . ." At the time of his evaluation, he noted "a decrease in severity, but with remaining intrusive thoughts and defensive avoidance." Accordingly, an Award for the emotional distress Craddock experienced as a result of the Firm's gender discrimination in compensation will be made

### III

### Pay Discrimination Under The Equal Pay Act
### Findings Of Fact And Conclusions Of Law

Under the Equal Pay Act,

"[n]o employer having employees subject to any provisions of this section shall discriminate, within any establishment within which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production or (iv) a differential based on any other factor other than sex …."

29 U.S.C. § 206(d)(1).

The EPA is a 1963 amendment to the Fair Labor Standards Act, prohibiting unequal pay for equal work, that is, work requiring substantially equal skill, effort and responsibility. *Corning Glass Works v. Brennan*, 417 U.S. 188, 203 fn. 24 (jobs must be "substantially" similar to fall within the EPA). Proof of EPA violations requires that (1) different wages are paid to employees of the opposite sex; (2) the employees perform substantially equal work on jobs requiring equal skill, effort and responsibility and (3) the jobs are performed under similar working conditions. See B*rinkley v. Harbour Recreation Club*, 180 F.3d 598, 613 (4th Cir. 1999). At the EPA's enactment, Congress announced its "concern for the weaker bargaining position of women" in addressing pay structures that reflect an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman. See 29 CFR § 1620.1. The EPA must be "broadly construed" to achieve Congress' goal of remedying sexual discrimination in pay. *Corning Glass Works v. Brennan,* 417 U.S. 188, 208 (1974) The EPA has no intent requirement. It is a strict liability statute.[9] ).

Comparator analysis utilized to prove an EPA claim, is confined to comparisons between male and female employees in a single establishment, unless "unusual circumstances" require otherwise. 29 C.F.R. § 1620.9(b).  *Strag v. Board of Trs.,* 55 F.3d 943, 948,950 (4th Cir. 1995)(citing *Soble v. Univ. of Maryland*, 778 F.2d 164 (4th Cir. 1985)). Substantially equal skill, effort and responsibility should be an inquiry into the overall job content. The comparison is whether the jobs require equal skills, not whether the employees possess equal skills. See 29 C.F.R. § 1620.15(a). With respect to professionals, substantially equal skill, effort and responsibility can

---

[9] By comparison, Title VII requires proof of gender-based intent, but not the level of showing of substantial equality or the identification of a specific male comparator. See Gunther, 452 U.S. at 168. As such, an EPA plaintiff need not prove that the employer's asserted non-gender reasons are pretext, as that is a Title VII analysis and the EPA is a strict liability law

include professional certifications, but more importantly reviews the job requirements and performance." See 29 C.F.R. § 1620.13(e); *King v. University Healthcare Sys.,* 645 F.3d 713, 724 (5th Cir. 2011) (hospital violated EPA by failing to pay female anesthesiologist bonus similar to that paid to male colleague, where jobs required substantially equal skill, effort and responsibility, despite differing certifications and qualifications – relevant issue is "actual job requirements and performance"); see also *Brinkley v. Randolph Cent. Sch. Dist.,* 180 F.3d 598, 620 (4th Cir. 1999).

An employer may avoid EPA liability by proving one of the four statutory affirmative defenses, payments made pursuant to (i) a seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex […]. But the affirmative defenses of a bona fide incentive system based on quantity or quality of work and 'factors other than sex' must be actually and consistently applied for the defenses to apply – they must be proven to be gender neutral and require showings of substance over form. See 29 U.S.C. § 206(d)(1). Merit systems that rely heavily on subjective factors require closer scrutiny of the gender-neutral application of the system's provisions. See *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 579 (8th Cir. 2006) (rejecting employer's explanation that male bank officer's higher salary was justified by concern that he would be recruited by other employers); *Brock v. Georgia Southwest Col.,* 765 F.2d 1026, 1036 (11th Cir. 1985) (college's affirmative defense failed where merit system operated in unsystematic manner and allowed factors such as personal opinion and ill-informed views of experience to affect pay setting process); *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 827-29 (6th Cir. 2000) (rejecting employer's merit system defense where evidence showed that, rather than being based on a neutral system of merit based pay on anonymous peer evaluations, it was "driven largely by an opaque,

decision making process at the administrative level that did not necessarily reflect peers' assessment of performance and rewarded men disproportionately to women

On her Equal Pay Act claim, Michele Craddock bears the burden to claims that she has been subjected to unequal pay based on her sex, within an establishment, compared to male employees for equal work on jobs the performance of which requires equal skill, effort, and responsibility. These male employees are referred to as "comparators." *Strag v. Board of Trs., at* 948. It is well settled that, to meet her burden under the Equal Pay Act, Ms. Craddock "must identify a particular male 'comparator' for purposes of the inquiry and may not compare herself to a hypothetical or 'composite' male." *Id.* at 948; *see also Wheatley v. Wicomico Cty.*, 390 F.3d 328, 333 (4th Cir. 2004), *cert. denied,* 544 U.S. 1032 (2005) ("[t]he comparison to the male employee…cannot be made to a hypothetical male with a composite average of a group's skill, effort, and responsibility'); *Ford v. E-Systems, Melpar Div.*, No. 94-1013, 1994 U.S. App. LEXIS 25532, at *2 (4th Cir. Sep. 14, 1994) (the plaintiff must identify a particular male comparator; she may not compare herself to a hypothetical male); *Houck v. Virginia Polytechnic Inst.*, 10 F.3d 204, 206 (4th Cir. 1993) ("[t]he plaintiff may not compare herself to a hypothetical male with a composite average of a group's skill, effort, and responsibility, but must identify a particular male for the inquiry"); *EEOC v. Liggett & Myers, Inc.*, 690 F.2d 1072, 1076-78 (4th Cir. 1982). "In interpreting the EPA, 'equal means substantially equal.' In enacting the EPA, Congress chose the word 'equal' over the word 'comparable' in order to show that the jobs involved should be virtually identical …." *Wheatley,* 390 F.3d at 333 (4th Cir. 2004). Any disparity must be demonstrated by a "factor-by-factor" comparison to the specific male comparator. *Houck,* 10 F.3d at 206. Thus, when assessing comparators, job titles or positions are not dispositive. 29 C.F.R. § 1620.13(e). Even where jobs may have the same core responsibilities, they are not equal if the higher-paid job

"require[s] extra effort, consumes a significant amount of time … and [is] of an economic value commensurate with the pay differential." *Wheatley,* 390 F.3d at 333. Further, in interpreting the Equal Pay Act, "[s]kill includes such considerations as experience, training, education and ability." *EEOC v. Universal Underwriters Ins.,* 653 F.2d 1243, 1245 (8th Cir. 1981); 29 C.F.R § 1620.15(a). "Effort" includes such factors as the number of hours worked, and the total requirements of the job. 29 C.F.R. § 1620.16(a); *Collins v. Landmark Military Newspapers,* 2007 U.S. Dist. LEXIS 57572 (E.D. Va. Aug. 6, 2007). Additionally, the "relative supervisory responsibilities of the comparator and the Plaintiff affect whether the work performed is substantially equal." *Id.* In short, to be considered a proper comparator under the Equal Pay Act, the jobs must be "virtually identical." *Spencer v. Virginia State Univ.,* 2017 U.S. Dist. LEXIS 51673 (E.D. Va. April 4, 2017) Fringe benefits are to be considered as part of wages for Title VII wage comparison purposes. *Arizona Governing Comm'n v. Norris*, 463 U.S. 1073, 1079 ("There is no question that the opportunity to participate in a deferred compensation plan constitutes a '[condition] or [privilege] of employment.") As such, imposing a glass ceiling over which only males, and not females, may attain levels of compensation entitling shareholders to certain fringe benefits is unlawful.

Michele Craddock's claim under the Equal Pay Act is denied.  Craddock relied on composite data of male shareholders' compensation to establish the comparison of unequal compensation she sought to make. She did not "identify a particular male 'comparator' for purposes of the inquiry," *Strag v. Board of Trs., supra* at 948; see also *Wheatley v. Wicomico Cty.*, *supra* at 333 ("[t]he comparison to the male employee…cannot be made to a hypothetical male with a composite average of a group's skill, effort, and responsibility'"). As a matter of law, such evidence is insufficient to support a claim under the Equal Pay Act.

Furthermore, to the extent Craddock contends that Charlie Meyer and Doug Sbertoli are sufficiently identified to meet the legal definition of "comparators," we disagree. There is no evidence in the record from which we can determine that their skills, efforts or responsibilities were "substantially equal," as defined and required by the relevant law, to those that characterized Craddock's work as a lawyer in LeClair Ryan's firm. Moreover, "[i]solated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a *prima facie* inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees." *Houck V. Virginia Polytechnic Inst. & State Univ.*, 10 F.3d 204, 206–07 (4th Cir. 1993) ("As this court has recently pointed out in the title vii context, isolated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a *prima facie* inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees, citing *Cook V. CSX Transportation Corp.,* 988 F.2d 507, 511-512 (4th Cir.1993). In short, we find that Michele Craddock has not established she was discriminated against in violation of the equal pay act.

## IV.

### Craddock's Retaliation/Constructive Discharge Claim
### Findings Of Fact And Conclusions Of Law

Craddock claims LeClair Ryan retaliated against her and unlawfully constructively discharged her from employment premised on the following sequence of events. On November 7, 2014, Craddock sent an email to Eric Gustafson, the head of her department and Freinberg, the firm's CEO, asserting claims of gender-based discrimination resulting from a proposed reduction in her base pay. Craddock's email was in response to ongoing discussions regarding her compensation and the firm's acceptance of a new contingency case she brought to the Firm (the

Meuse contingency case). Thereafter, Craddock contends Gustafson, and Freinberg ceased contact with her, although she remained an employee and had pending issues requiring firm response. Craddock submitted her resignation on February 2, 2015, (effective March 4, 2015) and contends the resignation was not voluntary and that she was constructively discharged because the circumstances of her work had become intolerable.

Title VII makes it unlawful for an employer to retaliate against an employee because she has "opposed" any practice made an unlawful employment practice by Title VII or "participated" in the EEOC process by filing a Charge of Discrimination with the EEOC. See 42 U.S.C. § 2000e-3(a). The EPA, likewise, prohibits an employer from retaliating against an employee because they have made a complaint related to the EPA. See 29 U.S.C. § 215(a)(3).[10] Craddock's burden of proof is to show that but/for her protected activity, she would not have suffered adverse action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2515, 2528-29 (2013).   An internal complaint of gender discrimination made by an employee to an employer is "protected activity" within the meaning of Title VII and the EPA. *See Crawford v. Metro. Gov't of Nashville & Davidson Cty*., 555 U.S. 271, 276 (2009), *Minor v. Bostwick Labs., Inc*., 669 F.3d 428, 432 (4th Cir. 2012) (analyzing under FLSA, same retaliation section as EPA).

A *prima facie* case of retaliation may be established by showing: (i) that claimant engaged in protected activity, (ii) that her employer took adverse action against her, and (iii) that a causal relationship existed between the protected activity and the adverse employment activity. *See Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015). Retaliation under

---

[10] The doctrine of constructive discharge does not exist under the Equal Pay Act. *See Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1082 (8th Cir. 1999) (noting that "[u]nder the Equal Pact an employee may recover for…constructive discharge only when it is in retaliation for the employee's filing of a complaint); *Shields v. United States Postal Serv.*, No. 16-cv-02517-CBS, 2017 U.S. Dist. LEXIS 132384, at *5-6 (D. Colo. Aug. 18, 2017) (finding that a claim of constructive discharge "alone would…not justify relief under the Equal Pay Act).

Title VII is not limited to ultimate employment actions and includes any action a reasonable employee would find as materially adverse, that is, "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination…. Context matters…" *Burlington Northern and Santa Fe RR Co. v. White*, 548 U.S. 53, 68 (2006).   Under Title VII, a resignation may be treated as a termination of employment if the resignation is not "voluntary" – where an employer's intentional discriminatory conduct resulted in an employee being "subjected to circumstances 'so intolerable that a reasonable person would resign.'" *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 143-44 (4th Cir. 2017) (citing *Green v. Brennan*, 136 S. Ct. 1769, 1779, 195 L. Ed. 2d 44, 54 (2016)); see also *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004).

The standard is one of "objective intolerability." *Consol Energy, Inc.*, 860 F.3d at 143-45; *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006); *Matvia v. Bald Head Management*, 259 F.3d 261, 272 (4th Cir. 2001); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). Thus, a constructive discharge, if proved, satisfies the "adverse action" prong of the claim and is a critical element of proof in Craddock's claim of retaliation under Title VII s*ee Martin v. Cavalier Hotel Corp*., 48 F.3d 1343, 1354 (4th Cir. 1995). Although a claim of constructive discharge no longer requires that an employee show the employer intended to force a resignation, the employer's actions must still have been intentional and deliberately discriminatory. *See Stennis v. Bowie State Univ*., No. 17-1345, 2017 U.S. App. LEXIS 26672, at *4-5 (4th Cir. Dec. 27, 2017) (requiring employee to show deliberateness of employer's actions); *Melendez v. Bd. of Educ*., No. 17-1116, 2017 U.S. App. LEXIS 19773, at *5 (4th Cir. Oct. 10, 2017) (same); *Zarza v. Tallahassee Hous. Auth.*, 686 F. App'x 747, 753 (11th Cir. Apr. 26, 2017) (requiring that "an employer deliberately make [] an employee's working conditions…unbearable).

35

In analyzing intolerability, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *EEOC v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010).

Based on this record, Craddock's claims of being isolated from the firm's business and excluded from internal firm communications on matters she was engaged in are not sufficient to support a conclusion of "intolerability." "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (citations omitted) *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68, 126 S. Ct. 2405, 2414–15, 165 L. Ed. 2d 345 (2006). "[C]o-worker ostracism, denial of a management position," "dissatisfaction with work assignments, a feeling of being unfairly criticized," and "difficult or unpleasant working conditions" insufficient to establish objective intolerability. *Matvia*, 259 F.3d at 273; *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994).

We also do not find the evidence regarding how the Firm addressed what Craddock viewed as an "unwaivable conflict in the Yawkey matter" or the Firm's proposed reduction in compensation that followed her internal report of discrimination is sufficient to establish constructive discharge.

The ethical dilemma that arose in the Yawkey case was in the process of being resolved, both by Craddock and the Firm, when Craddock resigned. No evidence showed that LR's Chief Legal Officer Bruce Matson's actions in addressing the ethical issues in Yawkey that Craddock raised and her concerns about the risks she might be facing were intentionally discriminatory.

36

Further, we find the steps Matson took to determine the necessity and propriety of withdrawing from the Yawkey matter were reasonable and related to solving the ethics claim Craddock raised and do not reflect discriminatory animus against her. He retained ethics counsel to conduct an independent investigation of the matter and acted to withdraw the firm and Craddock from representation in the matter when the legal examination of the matter was concluded. Craddock had also retained ethics counsel with whom Respondent's ethics counsel conferred, but Craddock resigned before both ethics attorneys reached a conclusion on the Yawkey ethics issue.

Further, Craddock's contention that the 2015 compensation proposal the Firm offered made her continuing employment by the Respondent intolerable is also unavailing. The compensation proposal was never finalized. Craddock refused Respondent's November 2014 invitation to discuss the plan, which guaranteed Craddock a substantially higher total compensation than she received in 2014, was performance based, and in the process of being reviewed on appeal by one of LR's senior partners, whom Craddock described as a "neutral decision maker" and whom she had no reason to believe bore discriminatory animus based on gender. Craddock resigned on February 2, 2015, three days after she submitted her appeal of the plan.[11]

We find that the evidence submitted to establish that LR intentionally made Craddock's working conditions intolerable does not support the conclusion that a reasonable person in Craddock's employment position would have felt compelled to resign. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 148 (2004). We find that the evidence submitted in this issue does not establish the Respondent's conduct in responding to the ethical issues raised in Yawkey

---

[11] *See also Cooper v. Smithfield Packing Co.,* No. 17-1002, 2018 U.S. App. LEXIS 5572 (4th Cir. March 5, 2018) at 13-14 (resignation just days after complaint, before employer "could provide any meaningful redress;" no hostile environment claim, constructive discharge claim dismissed on other grounds).

were "intentional and deliberately discriminatory." See *Melendez v. Bd. of Educ.*, No. 17-1116,

2017 U.S. App. LEXIS 19773, at *5 (4th Cir. Oct. 10, 2017); Zarza *v. Tallahassee Hous. Auth.*,

686 F. App'x 747, 753 11th Cir. Apr. 26, 2017) (requiring that "an employer deliberately make

[] an employee's working conditions…unbearable").

## V.

### Attorneys' Fees And Costs

The panel concluded that the lodestar amount to which Craddock was entitled equaled

$769,050.50 (753,055.50, plus $15,995.00) minus a voluntary 10% reduction as Craddock

proposed,[12] which reduced her claim by $76,905.05, to $692,145.45. An additional deduction of

the attorneys' fees Craddock expended in her pursuit of the Marion Colgate deposition as well as

the attorneys' fees spent in her effort to have this dispute determined in the district court, reduced

her attorneys' fees claim to $678,899.50 ($769,050.50 minus $90,899.00).  Further, Craddock's

limited success on the claims asserted and the damages awarded justify an additional reduction in

claimed attorneys' fees of 20% lack of success is appropriate. Applying this factor to the lodestar

amount adjusted above, the number of attorneys' fees is $543,099.60 ($678,899.50 minus

135,779.90). The panel also considered Craddock's claim that she is entitled to an enhancement

of 25% of the lodestar amount, or $173,036.00 and awarded her a 25% enhancement of fees in the

amount of $701,076.41. Craddock was awarded this amount in the panel's Final Award. Her costs

in the amount of $50,937.13 were also awarded. (Craddock's costs total cost of $57,026 were

reduced by $6,089.50, the amount of costs associated with her legal ethics expert.)

---

[12] Craddock's proposed reduction was an across-the-board deduction untethered to the lodestar analysis and was not considered by the panel in calculating the original award. Nor has it been considered by the panel in its calculation of the attorneys' fees award in the Revised Final Award on remand of this date.

## VI.

## Post-Arbitral Award Claims And Issues

Subsequent to the transmittal of the Arbitration Panel's Final Award to the parties by the American Arbitration Association on September 28, 2018, counsel for Claimant filed a motion with the federal district court to confirm the Final Award, consistent with the Agreement of the Parties, the Federal Arbitration Act ("FAA") and the procedural posture of the previously filed federal litigation on October 1, 2018. Post-arbitral Award Motions and Responses were thereafter filed by both parties as follows

> 1. Craddock's October 2, 2018 Motion to Correct Final Award pursuant to AAA Employment Arbitration Rule 40, to reflect a back-pay award to Craddock of $274,746.00, plus interest at 6% compounded from January 1, 2015, and an award of attorney's fees to Craddock's counsel of $678,151.50, with interest at a rate of 6% from the date of the award.

> 2. LeClair Ryan's October 5, 2018 Confidential Motion to Modify Form of Final Award, seeking that an Award showing only a summary of the facts for each claim and the amount of damages awarded be issued in substitution for the Final Award, which will be then treated as the Reasoned Opinion in support of the Award.

> 3. In its Response to Craddock's Motion to Correct, LeClair Ryan joined in the Motion to Correct the computational errors in the Final Award cited by Craddock.

> 4. In her Response to LeClair Ryan's Motion to Modify Form of Final Award, Craddock opposed the Motion on the grounds of waiver and inconsistency with the parties' agreement to arbitrate, the American Employment Arbitration Rule 39 (c), and Section 9 of the Federal Arbitration Act.

After Craddock filed Plaintiff's Motion To Confirm Arbitration Award, the parties discovered certain calculation errors in the final award that needed correction. Craddock filed a motion to correct the final award before the arbitration panel and Plaintiff's Notice of Panel Motion to Correct Final Award in the U.S. District Court to advise the Court of the potential change to the final award. LeClair Ryan joined Craddock's motion before the arbitration panel, and it filed a motion with the arbitration panel to modify the form of the final award so that some of the factual and legal panel analysis of the arbitration panel remained confidential.

39

On October 10, 2018, the arbitration panel denied LeClair Ryan's Motion to Modify Form of Final Award, and granted Craddock's Motion to Correct, in which LeClair Ryan joined, and entered a Revised Final Award. Further determinations regarding attorneys' fees, costs, and interest, contained in the Final Award, were based on the parties' written submission and a Final Award entered on October 16, 2018.

On October 16, 2018, the arbitration panel issued a unanimous Revised Final Award, which awarded Craddock: (1) damages in the sum of $274,746.00 for backpay plus interest at rate of 6% from January 1, 2015 until payment; (2) compensatory damages in the amount of $20,000 plus interest at a rate of 6% from January 1, 2015 until payment; (3) attorneys' fees in the sum of $678,151.50 plus interest at a rate of 6% from the date of the Revised Final Order on October 16, 2019. The panel denied LeClair Ryan's Request for Declaratory Judgment seeking Declaration that the provisions of Title VII to the 1964 Civil Rights Act, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, et seq. including the Lilly Ledbetter Fair Pay Act of 2009) and the Equal Pay Act of 1963, 29 U.S.C. § 209(d), et seq ("EPA"), as well as the retaliation claim, did not apply to Ms. Craddock. The panel also awarded Craddock's attorney's fees in the amount of $701,076.41 plus interest at the rate of 6% from the date of the Initial Final Award until the amount was paid in full. To come to that amount, the arbitration panel found that: (l) the lodestar analysis, which is determined by multiplying the number of reasonable hours expended by the attorneys times a reasonable rate dictated an amount of $769,050 in attorneys' fees; (2) Craddock's attorneys' fees were reduced to $678,899.50 because Craddock unnecessarily pursued a deposition of a witness and unsuccessfully tried to have her dispute determined in federal court; (3) the attorneys' fees were reduced by a further 20% to $543,099.60 due to the lack of success on Craddock's Equal Pay Act claims and her Title VII retaliation claim; and (4) an

40

increase to the attorneys' fee award of 25% to $701,076.41 was appropriate due to Craddock's attorneys' success.

## VII.

## Issues On Remand

After the U.S. District Court entered its June 11, 2019, Order denying in part and granting in part the parties' Motions, Respondent filed a letter Motion to the American Arbitration Association requesting that the arbitration panel be reconstituted. The Panel was reconstituted on July 26, 2019 and, by agreement of the parties, a telephone conference with the Chair of the Panel was held on August 5, 2019 with counsel for both parties and the AAA representative attending.

On August 2, 2019, prior to the scheduled telephone conference with the parties, counsel for Respondent filed a Motion seeking the panel's consideration of the following issues:

(1)  Clarification of the compound interest portion of Ms. Craddock's award.

(2)  Recalculation of all awarded fees under current rates due to delay in payment.

(3)  Reaffirmation of that portion of the Revised Final Award questioned by the district court with reference to the record supporting same.

(4) Supplementation of the fee award to address Craddock 's attorneys' fees associated with time opposing LeClair Ryan's Motions to Seal the Award and Revised Final Award (both at arbitration and before the district court) and other relief obtained in this matter: and

(5)  An order compelling production of the Employer Practices Liability Insurance policy which LeClair Ryan has represented covers the claim and Award.

(6) Clarification of compound interest award. The Revised Final Award provides that Ms. Craddock shall receive damages in the sum of $274,746.00, representing an award of back pay, and compensatory damages in the sum of $20,000, plus interest on these sums compounded at a rate of 6% from January 1, 2015.

(7)  Supplementation of the Award to allow for current rates as part of the mathematical review.

(8)   Reaffirmation of the enhanced fee portion of the Revised Final Award. Counsel for
Craddock took the position that the Panel considered and applied applicable standards for
statutory fee awards and enhancements.

(9)   Supplementation of fee award for post-Award litigation.

(10)   Order for LeClair Ryan to produce all applicable policies of insurance, including
Employer Practices Liability Insurance (ELPI) on this claim and October 16, 2018 Revised
Final Award, as supplemented.

On August 5, 2019, in consideration of the District Court's Order and accompanying
Memorandum Opinion, Respondent's August 2, 2019 request for consideration of certain
additional matters and the argument the parties' counsel presented in the course of the telephone
conference with the panel Chair, the Chair established a briefing schedule to address the panel's
jurisdiction to address the issues on remand.

# VIII.

## The Arbitration Panel's Jurisdiction on Remand

The Panel concludes that the arbitration panel's jurisdiction in this matter is determined by
the mandate of the U.S. District Court's Order, its accompanying Memorandum Opinion and the
principles of law that inform a determination of the scope of review on remand to an arbitration
panel.

Accordingly, we find that the arbitration panel's jurisdiction is confined to correcting the
computational errors in the Final Award and vacating the incentive portion of the attorneys' fees
Award. The panel was not ordered by the U.S. District Court to do anything more on remand.  *See.
LLT Int'l, Inc. v. MCI Telecommunications Corp*., 69  F.Supp.2d  510,  515  (S.D.N.Y.1999).
"[W]hen an award is remanded for clarification, the arbitrator is limited in his review to the specific
matter remanded for clarification and may not rehear or redetermine those matters not in

question;" *M & C Corp. v. Erwin Behr GmbH & Co.*, KG, 326 F.3d 772, 782 (6th Cir.2003) (quoting *Green v. Ameritech Corp.*, 200 F.3d 967, 977 (6th Cir. 2000)) ("A remand is proper, both at common law and under the federal law of arbitration contracts, to clarify an ambiguous award or to require the arbitrator to address an issue submitted to him but not resolved by the award." The doctrine of *functus officio* further defines the panel's jurisdiction. *See Hilb, Rogal & Hobbs Co. v. Golub*, No. 3:05CV574, 2006 WL 2403390, at *7 (E.D. Va. Aug. 18, 2006)) (Payne, J.). (It is a "fundamental common law principle that once an arbitrator has made and published a final award his authority is exhausted and he is *functus officio* and can do nothing more in regard to the subject matter of the arbitration." Id, (quoting *La Vale Plaza, Inc. v. R.S. Noonan, Inc.,* 378 F.2d 569, 572 (3rd Cir.1967). "The arbitrator is not empowered to redetermine the merits of any claim already decided." *Id.* ("While there are a very few recognized exceptions to this doctrine,[13] it is well-settled that, even when an award is remanded, the arbitrator "may not rehear or redetermine those matters not in question," quoting *LLT Int'l, Inc. v. MCI Telecommunications Corp.,* 69 F.Supp.2d 510, 515 ((S.D.N.Y.1999). Consistent with these principles of law, the AAA Employment Arbitration Rule 40 provides a process for a party to request the arbitrator to correct any clerical, typographical, technical, or computational errors in a final award and for the arbitrator to address such a request.[14]

---

[13] As LeClair Ryan discussed in its opening Brief, a court can remand to the arbitrator to correct clerical or mathematical mistakes apparent on the face of the award. *See Barranco v. 3D Systems Corp.*, 734 Fed. Appx. 885, 888-889 (4th Cir. 2018); *In re Rollins, Inc. (Black)*, 552 F. Supp. 2d 1318, 1325 (M.D. Fla. 2004), *aff'd in part, rev'd in part on other grounds* 167 Fed. Appx. 798 (11th Cir. 2006). A court can also remand to the arbitrator to require the arbitrator to address an issue that was submitted to, but not resolved by, the arbitrator or to seek clarification of an ambiguous award. *Id.*; *see also, Golub*, 2006 WL 2403390 at *7. The only exception at issue in this matter is the correction of errors apparent on the face of the Revised Final Award. Craddock agrees that the Court did not remand for clarification or for determination of an issue submitted to, but not decided by, the Panel.

[14] It follows that the additional issues Claimant seeks the arbitration panel to resolve in its letter of August 2019, are beyond our jurisdiction and will not be addressed.

43

## IX.

### CONCLUSION AND AWARD

Taking into account the Award previously published in this matter, the U.S. District Court's Order and Memorandum Opinion directing that the panel correct the computational errors and vacate the Incentive Award, the panel issues a Revised Final Award on remand as follows:

1. Damages in the sum of $274,746.00, representing an award of back pay, and compensatory damages in the sum of $20,000, plus interest on these sums compounded at a rate of 6% from January 1, 2015 until paid.

2. The Enhanced Fee Award is vacated.[15] Attorneys' fees in the sum of $542, 441.20[16] and costs in the sum of $48,492.64[17] with interest at a rate of 6% from the date of this revised award until paid.

DATE: September 18, 2019

*Rosemarie Annunziata*

Hon. Rosemarie Annunziata (ret)
Chair

---

[15] Were the enhanced fee award not vacated and an enhanced fee awarded by the panel, the attorneys' fees would total $678,041.00 ($542,411.20 x 25% = $135,602.80; $542,411.20 plus $135,602.80)

[16] The calculation of the attorneys' fees award is comprised of the lodestar amount of $768,950.50 ( Butler ($500 X 1055 = $527,500); Falabella ($315 X 529.4 = $166,761); paralegals ($135 X 280.7 = $37,894.50); law clerks ($135 X 208 = $20,800).reduced by $90,899, leaving a total of $678,051.50, further reduced by the panel's 20% reduction for lack of success, but not applying the 10% reduction Craddock proposed which was not considered or applied either in the original award of attorneys' fees or in the recalculation of attorneys' fees in the Revised Final Award on remand of this date. ($678,051.50 x 20% = $135,610.30.). Thus, the revised award, without enhancement, is $542,441.20 ($678,051.50 - $135,610.30 = $542,441.20).

[17] The amount is comprised of Craddock's stated costs of $57,026.63 ($56,846.63, plus $180.00 in estimated additional estimate costs), voluntarily reduced by $6,089.50, for costs associated with her legal ethics expert, leaving a total amount of costs in the sum of $50,937.13, further reduced by the panel by $2,444.49 (comprised of: $65.22 (costs related to the attempt to take Marion Colgate's deposition) and $2,379.27 (costs related to Craddock's attempt to defeat the arbitration clause in the employment agreement).

_____
Linda R. Singer, Esq.


_____
Hon. F. Bradford Stillman (ret.)

Linda R. Singer, Esq.

Hon. F. Bradford Stillman (ret.)

### PROOF OF SERVICE BY E-Mail

Re: LeClairRyan, A Professional Corporation vs. Craddock, Michele Burke (AAA)
Reference No. 1410007364

I, Erika Holland, not a party to the within action, hereby declare that on  September 18, 2019, I served the attached Revised Final Award on Remand Pursuant to the Order of the United States District Court Richmond Division on the parties in the within action by electronic mail at Washington, DISTRICT OF COLUMBIA, addressed as follows:

Mr. Bryan Corbett
American Arbitration Association
2200 Century Parkway
Suite 300
Atlanta, GA   30345-3203
Phone: 404-325-0101
CorbettB@adr.org

I declare under penalty of perjury the foregoing to be true and correct. Executed at Washington, DISTRICT OF COLUMBIA on September 18, 2019.

Erika Holland
JAMS
EHolland@jamsadr.com