Douglas M. Foley (VSB No. 34364)
Sarah B. Boehm (VSB No. 45201)
Shawn R. Fox (admitted *pro hac vice*)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
Telephone: (804) 775-1000

*Counsel to ABL Alliance, LLLP,*
*Senior Secured First Lien Lender*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| LECLAIRRYAN, PLLC | ) Case No. 19-34574-KRH |
| Debtor.[1] | ) |

**STATEMENT OF ABL ALLIANCE, LLLP IN SUPPORT OF MOTION OF UNITED STATES TRUSTEE TO CONVERT CASE TO CHAPTER 7**

ABL Alliance, LLLP ("**ABLA**"), the Virginia based senior secured first lien lender in the above-captioned case, by undersigned counsel, hereby files its statement in support of the Motion of the United States Trustee to Convert Case to Chapter 7 (the "**Motion**") and respectfully requests entry of an order converting the above-captioned chapter 11 case of LeClairRyan, PLLC (the "**Debtor**") to a chapter 7 proceeding. In support of the Motion, ABLA states as follows:

**I. PRELIMINARY STATEMENT**

Paramount amongst ABLA's decision to consent to the use of its cash collateral was the Debtor's assurance that continuity would aid in the collection of accounts receivable and that the Debtor's expenses would be reduced as soon as possible during the interim cash collateral period

---

[1] The last four digits of the Debtor's federal tax identification number are 2451.

1

so that an orderly liquidation of estate property could be accomplished as most cost effectively as possible. Unfortunately, the Debtor has underperformed in both collections and cost-saving measures since the bankruptcy filing. Therefore, at this juncture, ABLA is unwilling to consent to the Debtor's use of its Cash Collateral beyond September 26, 2019. However, ABLA is ready, willing and able to assist with a smooth transition to chapter 7 and collaborate with the chapter 7 trustee regarding consensual use of cash collateral in order to fund reasonable wind down expenses while the estate is liquidated.[2]

## II. FACTS

1. On or about December 29, 2017, the Debtor and ABLA entered into the Loan and Security Agreement (as amended, supplemented, modified or restated from time to time, the "**Loan Agreement**"). Pursuant to the Loan Agreement, ABLA provided the Debtor with a revolving loan for $15,000,000 and the Debtor granted ABLA a first priority interest and lien on all of its personal property. ABLA subsequently perfected its first priority lien in the personal property of the Debtor by recording a UCC-1 financing statement, a copy of which is attached hereto as **Exhibit A**.[3] Therefore, ABLA has a perfected first-priority lien over all of the Debtor's personal property, including without limitation, all of the Debtor's accounts receivable, accounts, general intangibles, other rights of payment, equipment, inventory, and the proceeds thereof.

---

[2] The parties are in discussions regarding the effective date of conversion to chapter 7 which may result in a short consensual extension of the interim cash collateral order subject to review and agreement upon a budget and review of projections. ABLA reserves all rights with respect thereto.

[3] In addition to the recording of the UCC-1, ABLA perfected its lien in cash by deposit account control agreements by and between Debtor, ABLA as secured party, and HSBC Bank USA, NA as the depository institution dated April 18, 2019.

2.     Pursuant to the terms of the interim cash collateral order, on September 8, 2019, the Debtor provided ABLA with its then current cash collection performance for the first week postpetition. Collections underperformed budget by approximately 43%.

3.     On September 15, 2019, the Debtor provided ABLA with its second weekly report. That report revealed that the Debtor remained 28% behind the budgeted cash collections for the postpetition period. Additionally, although the Debtor's handling and reporting of expenses is at best confusing, in the second week expenses were apparently 20% greater than the budgeted amount.[4]

4.     Due to poor collections and high expenses, the Debtor has failed to make the curtailment payments to ABLA in the amounts that were initially projected.

### III.  STATEMENT IN SUPPORT

5.     This case is a pure wind down and liquidation. ABLA has always asserted that conversion to chapter 7 was a matter of when, not if. The sole reason ABLA consented to the Debtor's use of its cash collateral at the outset of this case as a chapter 11 proceeding was the perceived benefit from the continuity in collection of the accounts receivable and the apparatus that was in place to do so. Indeed, this perceived benefit from continuity in collection was the "overarching reason" for the Debtor filing a chapter 11 case.[5]

---

[4] While the Debtor reported that expenses in week one were significantly lower than budget by $294,000 this appears driven largely by deferring payment of certain expenses relating to information technology vendors ("**IT Expenses**"). Upon information and belief, the Debtor has struggled to identify pre- versus post- petition IT Expenses and/or reconcile or negotiate various invoices relating to IT Expenses. Suffice it to say the budget has been somewhat unreliable when it comes to timing of payment and amount of various expenses, especially IT Expenses, which have been complex, contentious, and excessive for a long period of time.

[5] During the hearing on the first day motions before this Court on the petition date, counsel for the Debtor explained the reasoning for filing under chapter 11:

> It is the firm's firm belief, its sincere belief that it is in the best position, at least currently, to perform those -- the services required to collect those client files, to bill the outstanding [work-in-progress] to begin the collection process of the

3

6.       The Debtor's post-petition performance on collections of its accounts receivable—the largest asset of the estate—has been inconsistent since the petition date.  The unfortunate reality is that cumulative collections have faltered to unacceptable levels despite continuity with the debtor-in-possession in control under chapter 11.  Moreover, expenses are increasing due in part to excessive and highly compensated staffing by the Debtor, personnel inefficiencies, and excessive IT Expenses.  The expenses in chapter 11 could grow exponentially in the near term (if the case is not converted) by the administrative cost and expense of an official committee of unsecured creditors, which is completely unnecessary in this case.

7.       The combined underperformance on collections and high level of unnecessary expenses are not sustainable.  Absent conversion, it is highly unlikely that the Debtor will be able to pay the obligations due to ABLA and the administrative expenses in full.  Moreover, the appointment of an objective third-party, independent fiduciary in the form of a chapter 7 trustee is the most cost efficient way to wind down this estate and maximize recoveries to all creditors.

8.       Due to the lackluster collections and excessive personnel expenses and IT Expenses, ABLA is currently unwilling to consent to the Debtor's continued use of its cash collateral after the conclusion of the interim period.  Absent conversion, ABLA will seek to assert its rights for the Debtor's failure to adequately protect ABLA's interests.[6]

---

[work-in-progress] that's been converted into invoices, and then to overall wrap it up.
Now, having said that, there may come a time when that's not the right decision, that, for economic reasons, it may be important to use a different means of wrapping up the estate. But for now, we believe -- and our lender agrees -- that a process and a Chapter 11 is the right way to proceed. And so *I wanted to let you know we were keeping the options open.*

Sept. 3, 2019 Tr. 5:8-20 (emphasis added).

[6] The Debtor is not generating any new receivables and, based on recent performance, it is unlikely that there is a meaningful equity cushion in the accounts receivable portfolio to adequately protect ABLA.

9.  If converted to chapter 7, however, ABLA will work quickly and collaboratively with the chapter 7 trustee to provide use of cash collateral to pay necessary wind down expenses in the liquidation of the estate's assets. This will maximize value to all creditors of the Debtor, including unsecured creditors.

## IV. CONCLUSION

Based on the foregoing, ABLA supports the Motion and respectfully requests that this Court convert this case from a chapter 11 case to a chapter 7 case, with all rights preserved for the chapter 7 trustee as provided under the Bankruptcy Code, and grant such other relief as this Court deems to be just and appropriate.

Dated: September 23, 2019  
Richmond, Virginia

Respectfully Submitted,

/s/ Douglas M. Foley  
Douglas M. Foley (VSB No. 34364)  
Sarah B. Boehm (VSB No. 45201)  
Shawn R. Fox (admitted *pro hac vice*)  
McGuireWoods LLP  
Gateway Plaza  
800 East Canal Street  
Richmond, Virginia 23219  
Telephone: (804) 775-1000  
Email: dfoley@mcguirewoods.com  
sboehm@mcguirewoods.com  
sfox@mcguirewoods.com

*Co-Counsel to ABL Alliance, LLLP,  
Senior Secured First Lien Lender*

### Certificate of Service

The undersigned hereby certifies that on this 23rd day of September 2019, a true and correct copy of the foregoing was served via the Court's electronic case filing system (CM/ECF) to all parties registered to receive such notice in the above-captioned case, including the Office of the United States Trustee and Counsel for the Debtor.

/s/ Douglas M. Foley

5