## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re:<br><br>    **LeClairRyan PLLC,**<br><br>        **Debtor.** | **Case No.: 19-34574-KRH**<br><br>**Chapter 7** |
| **Lynn L. Tavenner, as Chapter 7 Trustee,**<br><br>        **Plaintiff,**<br>**v.**<br><br>**Elizabeth Atkinson,**<br><br>        **Defendant.** | Adv. Proc. No. 21-<br><br>**ORIGINAL COMPLAINT** |

### TRUSTEE'S ADVERSARY COMPLAINT

Lynn L. Tavenner, Trustee, and not individually but solely in her capacity as the Chapter 7 trustee (in such capacity, "Ms. Tavenner" and/or the "Trustee" and/or the "Plaintiff") of the bankruptcy estate (the "Estate") of LeClairRyan PLLC (the "LCR" and/or the "Debtor" and/or the "Firm"), in the above-referenced Chapter 7 case (the "Case"), by her undersigned counsel, brings this adversary proceeding against Elizabeth Atkinson (the "Defendant" or "Atkinson") seeking not less than $91,205 and alleges as follows:

### INTRODUCTION

1.      The Trustee files this lawsuit to recover distributions of substantial sums of money made to the Defendant, a shareholder of the Debtor while the Debtor was insolvent.  The Debtor was insolvent no later than September 3, 2014 and remained insolvent until it filed for bankruptcy on September 3, 2019 (the "Petition Date").  Despite the Debtor's insolvency and inability to pay general operating expenses and other creditors, it transferred millions of dollars to its shareholders and members.

2.      As a shareholder, the Defendant was privy to LCR's deteriorating financial condition, and knew or should have known that the Firm was insolvent.

3.      Despite the Firm's financial woes, LCR continued to make, and the Defendant continued to accept, fraudulent transfers that were specifically conditioned on the Firm achieving certain levels of profitability—levels which the Defendant knew or should have known LCR had failed to reach.  These payments, which were made to the Defendant in addition to her regular salary, were made (a) with specific fraudulent intent as evident by requisite badges of fraud; (b) in violation of operative agreements and applicable law; and (c) on account of equity, and therefore, were transferred for no consideration, less than fair consideration, or less than reasonably equivalent value to the Debtor.

4.      Accordingly, the Trustee seeks judgment against the Defendant to recover these payments, which equal not less than $91,205, plus interest, fees, and costs as allowed by law.

## JURISDICTION, VENUE, AND LEGAL PREDICATE

5.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtor's Case (under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")).  This adversary proceeding has been referred to this Court pursuant to 28 U.S.C § 157(a).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).  The Trustee confirms her consent, pursuant to Rule 7008 of the Bankruptcy Rules, to the entry of a final order by the Court in connection with this Complaint to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper in this District and this Division pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The legal predicates for the requested relief in this adversary proceeding are Sections 544, 548, and 550 of the Bankruptcy Code, Fed. R. Bankr. P. 7001(1), (2) and (8), and Sections 55.1-400 and 55.1-401 of the Virginia Code, among others.

## PARTIES

8.      On September 3, 2019, the Debtor commenced the Chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On October 4, 2019, the Court entered the *Order of Conversion of Chapter 11 to Chapter 7* [Docket No. 140].   On October 4, 2019, Ms. Tavenner was appointed as the Chapter 7 Trustee for the Debtor.[1]   As Trustee, Ms. Tavenner has the sole authority to bring these claims on behalf of the Debtor's Estate.

9.      At all relevant times, the Debtor was organized under the laws of the Commonwealth of Virginia.

10.      Defendant was at all relevant times a shareholder of the Debtor, from February 19, 2007 to December 31, 2018.

11.      Her relationship with the Debtor, including her compensation, was governed by several agreements (as described below).

12.       Defendant is an individual who may be served with process by any manner of service authorized by Rule 7004 of the Federal Rules of Bankruptcy Procedure.

---

[1]      *See* Appointment of Interim Trustee Lynn L. Tavenner. [Case No. 19-34574-KRH, Docket No. 175].

**FACTUAL BACKGROUND**

**A.**    **The Formation, Structure, and Conversion of the Debtor**

13.    The Debtor was founded in 1988 by Dennis Ryan and Gary D. LeClair.  It initially operated as a regional corporate-focused law firm, headquartered in Richmond, Virginia.  However, the Debtor rapidly expanded – ultimately opening offices or acquiring firms across the United States.  Prior to the Petition Date, the Debtor operated through approximately 25 offices throughout the United States, with offices in, among others, Richmond, Los Angeles, San Francisco, Newark, New Haven, Boston, Philadelphia, New York City, Dallas, Houston, Detroit, and Washington, D.C.  At its peak, the Debtor had approximately 385 attorneys, including approximately 160 shareholders.

14.    Prior to March 31, 2018, the Debtor operated as a Virginia Professional Corporation ("PC").  On March 31, 2018, the Debtor converted (the "Conversion") from a PC to a Virginia Professional Limited Liability Company ("PLLC").

**B.**    **The Debtor's Downfall**

   **a.**    **The Debtor's Financial Mismanagement**

15.    Fundamental issues of financial mismanagement plagued the Debtor for years, including, but not limited to, over-compensation of certain attorneys, declining revenues, which fell short of projections and budgets by millions of dollars, and improper and erroneous accounting for certain income and expense items.

16.    Beginning no later than January 1, 2014, the Debtor consistently missed its budget and its revenue fell short of expectations. By no later than September 3, 2014, the Debtor was insolvent, failing to pay its debts as they became due.

17.    In fact, there was only one year after 2011 that the Debtor generated an operating profit and positive cashflow. That year, 2013, the Debtor recorded approximately $23 million in

non-recurring fees resulting from a combination of a client matter and an award in a non-client

lawsuit.  This one-off influx of cash only generated approximately $5 million in Net Income for

2013 and had no impact on future profitability.  Rather than use these proceeds to fund working

capital, pay off outstanding obligations, and/or improve the Debtor's financial viability, the

Debtor distributed a vast majority of these funds to shareholders.

18.    The Firm's financials were not kept a secret from all shareholders, including but

not limited to the Defendant.

19.    For instance, in a September 3, 2013 email labeled "August 31, 2013 CEO's State

of the Firm and Partnership 2020 Committee's Report," sent to all shareholders by the Firm's

CEO, David Freinberg, the Firm reported, among other things, that LCR underperformed

financially "failing for a second consecutive year to collect the amount required to pay 100% of

projected Shareholder Total Compensation"; that "Many Shareholders, and even some Firm

Leaders, were surprised by the projected magnitude of the 2012 revenue miss"; and that "Too

many Shareholders did not read our reports and insisted on repeating inaccurate facts."

20.    By no later than 2014, the Debtor's shareholder compensation system had become

illusory.  Even though the Debtor did not meet the financial targets necessary for shareholders to

receive discretionary sums, the Debtor still distributed the same.  Rather than pay shareholders

based on what the Debtor earned in the year, the Debtor burdened future years to pay current

shareholders—essentially borrowing from creditors and future shareholders to pay current

shareholders.

21.    The Debtor's shareholders, including the Defendant, knew or should have known

that the Debtor's financial information overstated assets and limited the Debtor's ability to

accurately forecast cash inflows.

22.     The Debtor's shareholders, including the Defendant, knew or should have known of the Debtor's financial weaknesses and the issues referenced herein.

23.     Shareholders, including the Defendant, received numerous reports and budget communications detailing that the Debtor was not meeting budgeted amounts and that the Debtor was not financially healthy.

24.     For example, an April 3, 2015 email from David Feinberg to all shareholders provided that "Our credit line has a $7.5 million outstanding balance. Our vendor payables were $7.150 million (of which approximately $3.21 million were over 60 days)."

25.     Further, in an April 15, 2015 Shareholder Meeting's presentation entitled "Disciplined Financial Management Project: Revenue Enhancement Plan" provided that "absent execution on this Plan," we will "otherwise would have a projected deficiency of cash requirements in excess of cash receipts starting in July 2015" and would not be able to "pay in full the outstanding balance of the Wells Fargo line of credit until November 2015 (note that our Wells Fargo loan agreement requires that we have a zero balance on the line of credit for at least 30 consecutive days during the 2015 calendar days)."

26.     On March 17, 2016, shareholders were informed that "For 2014 and 2015, we Shareholders paid ourselves, collectively, more than we earned. We have borrowed to pay ourselves, contrary to Partnership 2020 fundamentals and our long-standing conservative principles of management. . . . Obviously, continued overpayment is not sustainable. We are going to have to reduce Shareholder compensation. If we are able to increase production margin, reductions to Shareholder compensation can be mitigated."

27.     In the March 17, 2016 Budget Oversight Committee report (the "2016 BOC Report") provided to all shareholders, the Budget Oversight Committee stated:

> Our WIP and AR are cluttered with uncollectible accounts and
> worthless numbers.  We recommend that we clear all uncollectible
> AR and all aged and unbillable WIP from our working books.  Old
> AR and WIP clouds our view of financial reality, clutters the work
> desks of our billing and collection teams and provides false
> overstatement of "inventory."

28.    In an effort to address the Debtor's financial insolvency, the Debtor relied on various sources of capital to fund general operations—sources that were improper, expensive, and/or utilized in a fraudulent manner.

### b.    Utilizing CAPE Funds for General Operations

29.    To fund the Debtor's general operations, the Debtor misappropriated for improper purposes funds tendered by clients for specific expenses (the "CAPE Funds").

30.    The CAPE Funds were funds paid by the Debtor's clients for certain enumerated purposes, including, but not limited to, filing fees, closing costs, third party professional fees, and other costs necessary to serve the Debtor's clients.

31.    The Debtor used over $3 million in CAPE Funds for general operating purposes during the period at issue.

32.    The Debtor utilized the CAPE Funds for general operating purposes with the knowledge that CAPE Funds were designated for a specific client purpose.

33.    The Debtor's shareholders, including the Defendant, knew or should have known that this practice was occurring.

### c.    Reliance on Preferred Stock to Fund Operations

34.    In an effort to raise working capital, the Debtor relied on expensive preferred stock ("Preferred Stock") offerings, carrying a dividend rate of 8% per annum.  This Preferred Stock became a massive burden on the Debtor's financial solvency, a burden that the Debtor was

never able to recover from, shareholders continued to receive significant dividends on their Preferred Stock.

35.    In a 2016 BOC Report provided to all shareholders, the Budget Oversight Committee stated:

> For 2014 and 2015, we Shareholders paid ourselves, collectively, more than we earned. We have borrowed to pay ourselves *contrary to Partnership 2020 fundamentals* and our long-standing conservative principles of management. We also increased our preferred stock outstanding for this purposed, ultimately. Insofar as the preferred stock bears a required dividend and must ultimately be repaid, we have burdened ourselves with carrying costs and repayment obligations *in order to pay ourselves now*.

36.    The Debtor utilized the proceeds from the Preferred Stock offerings to primarily fund shareholder compensation, not pay creditor balances.

37.    The Defendant knew or should have known that the Debtor was burdened by dividends owed on the Preferred Stock – further deteriorating the Debtor's financial health.

### d.    Decreasing Revenues and Utilizing Accounts Payable as a Line of Credit

38.    To manage cash flows, the Debtor increasingly relied on its accounts payable as a line of unsecured credit to ensure that it could make payments to shareholders.  In violation of the Firm's unilateral policy requiring the Debtor to maintain accounts payable aging within 60 days (regardless of the actual terms of the invoice)— a policy adopted by the Debtor in 2013 as a fortifying measure—the Debtor began to unilaterally extend payment terms with its suppliers and vendors well past 60 days.

39.    The following chart reflects the Debtor's leverage of its accounts payable and the balance of accounts payable that was more than 60 days outstanding.

| Year | Total Accounts Payable | Accounts Payable > 60 Days Outstanding | Amount of AP Aged > 60 Days |
|---|---|---|---|
| 12/31/2014 | $10,109,000 | $4,822,000 | 48% |
| 12/31/2015 | $10,668,000 | $6,057,000 | 57% |

| 12/31/2016 | $5,890,000 | $3,293,000 | 56% |
|---|---|---|---|
| 12/31/2017 | $9,067,000 | $5,892,000 | 65% |
| 12/31/2018 | $17,252,000 | $7,687,000 | 45% |
| 6/30/2019 | $12,364,000 | $6,345,000 | 51% |

40.     At the same time that the Debtor's liabilities were ballooning and the Debtor was seeking capital, the Debtor's revenues were decreasing at an alarming rate.

41.     The Debtor's annual revenues decreased from approximately $200 million in 2013 to approximately $110 million in 2018.

42.     During this time, the Debtor did not have sufficient liquidity to pay even the most critical operating expenses. The Debtor implemented an internal waterfall scheme to manage priority of payments which prioritized payroll first, shareholder payments second, intellectual property client expense payments third, and then critical vendor payments fourth. All other vendors were paid on an as needed basis.

43.     The Debtor's shareholders, including the Defendant, knew or should have known that the Debtor's annual revenues were decreasing at a rate greater than the Debtor's reduction in costs and that the Debtor could not pay debts as they became due.

**e.     Shrinking Headcount and Loss of Shareholders**

44.     As a result of many factors, including but not limited to the Debtor's financial mismanagement, the Debtor experienced a shrinking number of attorneys, including the loss of revenue-positive shareholders and members.

45.     The Debtor's attorney attrition rate was over ten percent in all relevant years.

46.     Further, the number of shareholders and members, as applicable, decreased year-over-year as follows:

| Date | Number of Shareholders / Members | Approximate Percentage Change |
|---|---|---|
| December 31, 2015 | 156 | |

| December 31, 2016 | 138 | (11.5%) |
| December 31, 2017 | 121 | (12.3%) |
| December 31, 2018 | 80 | (33.9%) |
| June 30, 2019 | 44 | (45%) |

47.　The decrease of headcount left the Debtor with overhead expenses and office leases far larger than what was necessary for a law firm of the Debtor's size.

48.　The significant decrease in shareholders also resulted in significantly higher liabilities related to the redemption of the Debtor's common stock ("Common Stock") and Preferred Stock for the benefit of exiting equity holders.

49.　Beginning in 2015 and in each subsequent year thereafter, the Debtor redeemed more Common Stock and Preferred Stock than it issued through new capital infusions.　For example, in 2016, the Debtor redeemed over $4 million in Common Stock and Preferred Stock while only issuing approximately $2.5 million in new Common Stock and Preferred Stock.

50.　The Debtor did not have the financial ability to redeem equity holders, resulting in a substantial unpaid liability.　ABL Alliance LLLP, affiliated with and commonly referred to as Virginia Commercial Finance ("VCF"), ultimately (after recognizing the problematic practice) restricted the Debtor's ability to redeem Common Stock and Preferred Stock due to the Debtor's capital constraints.

**f.　The Debtor's Dissolution**

51.　In 2017, the Debtor turned to a potential joint venture with a third party, the legal services provider UnitedLex Corporation ("UnitedLex"), as a way that some perceived would address the Debtor's financial difficulties (while others inside and outside of the Firm perceived it as a way to extract value from the Firm).　The transaction was consummated in 2018.

52.     This "joint venture" with UnitedLex did not address the Debtor's financial issues and instead caused significant additional harm to the Debtor and its creditors.[2]

53.     On July 29, 2019, the Debtor's members voted to dissolve LCR and wind-down the Debtor's operations.

## C.   Shareholder and Member Compensation From the Debtor's Deferred Compensation and Supplemental Retirement Plans

### a.  The Deferred Compensation Plan

54.     The Debtor maintained a deferred compensation plan (the "Deferred Compensation Plan"), adopted by the Debtor in 1992.

55.     The Deferred Compensation Plan was governed by the 2014 Amended and Restated Shareholders Deferred Compensation Plan, adopted November 13, 2013 (the "Deferred Compensation Plan Document").

56.     Section 9.1 of the Deferred Compensation Plan Document stated that the:

> right of a Participant or his beneficiary to receive a distribution hereunder shall be an unsecured (but legally unenforceable) claim against the general assets of the Company, and neither the Participant nor his beneficiary shall have any rights in or against any amount credited to any Deferral Account or any other specific assets of the Company. Thus, the Plan at all times shall be considered entirely unfunded for ERISA and tax purposes. Any funds set aside by the Company for the purpose of meeting its obligations under the Plan, including any amounts held by a trustee, shall continue for all purposes to be part of the general assets of the Company and shall be available to its general creditors in the event of the Company's bankruptcy or insolvency. The Company's obligation under this Plan shall be that of an unfunded and unsecured promise to pay money in the future. All Company Contributions attributable to services prior to 2014, all property and rights purchased with such contributions, and all

---

[2] The Trustee filed a complaint against UnitedLex and ULX Partners, LLC in the case captioned as *Lynn L. Tavenner, as Chapter 7 Trustee, v. ULX Partners, LLC and UnitedLex Corporation*, Adv. Pro. No. 20-03142-KRH (Bankr. E.D. Va.).

earnings attributable to such contributions, property or rights shall be held in the Trust until distributed to the Participant or his beneficiary and shall remain subject to the claims of the Company's general creditors.

57.     The Deferred Compensation Plan utilized a rabbi trust (the "Rabbi Trust"), which was governed by the Amended and Restated Rabbi Trust Document, dated February 13, 2014 (the "Rabbi Trust Agreement").

58.     Section 3 of the Rabbi Trust Agreement provides, among other things, that:

[t]rustee shall cease payments of benefits to Plan participants and their beneficiaries if the Company is Insolvent. Company shall be considered "Insolvent" for purposes of this Trust Agreement if (i) Company is unable to pay its debts as they become due, or (ii) Company is subject to a pending proceeding as a debtor under the United States Bankruptcy Code.

(the "Cease Payments When Insolvent Requirement").

59.     Section 3(b) of the Rabbi Trust Agreement also states that "[a]t all times during the continuance of this Trust, as provided in Section 1(d) hereof, the principal and income of the Trustee shall be subject to the claims of general creditors of Company under federal and state law as set forth below."

60.     The Rabbi Trust was funded by either a whole life insurance policy, variable life insurance policies, or an investment in a long-term tax-exempt bond fund.

61.     The Rabbi Trust Agreement also provides, among other things, that

The Board of Directors and the Chief Executive Officer of Company shall have the duty to inform Trustee in writing of Company's Insolvency. If a person claiming to be a creditor of Company alleges in writing to Trustee that Company has become Insolvent, Trustee shall determine whether company in Insolvent and, pending such determination, Trustee shall discontinue payment of benefits to Plan participants or their beneficiaries.

(the "Insolvency Notification Requirement").

62.     A participant became vested in the Deferred Compensation Plan after 15 full calendar years as an employee and 10 full calendar years as a shareholder, or age 62.

63.     Shareholders of the Firm, including the Defendant, were aware, or should have been aware, that the assets were available to satisfy creditors.

64.     For instance, in the 2015 Plan Year Enrollment Kit, all participants were told that "assets held in the Rabbi Trust are considered Company assets and are available to satisfy the claims of creditors of the Company.  In the event the Company becomes insolvent, you are an unsecured general creditor of the Company with regard to your benefits under the Plan."

### a.     Termination of the Deferred Compensation Plan

65.     On September 27, 2016, the Retirement Plans Task Force issued a report (the "Task Force Report") that recommended, among other things, the termination and payment of the Deferred Compensation Plan assets to participants pursuant to Section 409A of the Internal Revenue Code.

66.     Specifically, the Task Force Report stated that "[a]fter a number of meetings, thoughtful consideration and good discussion, the Task Force feels it is in the best interest of the Firm and the participants to take steps to terminate the [Deferred Compensation Plan and SERP Plan] on or before January 1, 2019. The Task Force understands this is the most expensive option and financial discipline is needed to get the Firm to the point where this is executable."  In explaining its recommendation, the report noted that the "Deferred Compensation Plan "is painfully complex, and there is no comfort surrounding the possibility of hidden pitfalls that may present themselves in the future."

13

67.     On November 17, 2016, the Debtor's Board of Directors approved the Task Force Report's recommendation to terminate the Deferred Compensation Plan on or before January 1, 2019.

68.     On December 9, 2016, the Debtor provided communication to shareholders stating that 100% vesting would occur upon the formal termination of the Deferred Compensation Plan and that distributions will be made to comply with Section 409A of the Internal Revenue Code.

69.     One issue that remained was that there was a significant "payment gap" of approximately $2 million dollars in the Deferred Compensation Plan.  Thus, terminating the plan meant that the Debtor had to find funding for this payment hole.

70.     As described above, from September 2016 to November 2017, the Firm's finances continued to decline and there was not the "financial discipline" needed to get the Firm where executing termination of the Deferred Compensation Plan would not harm creditors.

71.     Thus, on November 30, 2017, the Retirement Plan Committee issued a memorandum to the Board of Directors that it was not endorsing a recommendation to accelerate the termination of the Deferred Compensation Plan to 2017.

72.     Specifically, the Retirement Plan Committee concluded that termination prior to 2017 "may result in the loss of flexibility the Firm may need to fund the [existing] shortfall [in the plans] needed to make distributions. Since a resolution to terminate the plans is irrevocable, if the Firm finds itself in a position to not fully fund the shortfall by December, 2019, the Firm will be obligated to payout the amounts, possibly in lieu of point value or increased accounts payable."

73.    Notwithstanding the Retirement Plan Committee's refusal to endorse an accelerated termination, on December 29, 2017, the Board formally voted to terminate the Deferred Compensation Plan, effective December 31, 2017.

74.    The termination allowed the Debtor to distribute the funds in the Deferred Compensation Plan to its members, diverting them away from the Firm's general unsecured creditors.

75.    The Board of Directors made this decision aware that it would "benefit high performing Shareholders," and made that a factor in trying to message the payments made to shareholders in the year ending 2017.

76.    At the time that this decision was made, the Board anticipated and represented that "The Firm will have to fund the payment gap in the [Deferred Compensation] Plan and that will be in the 2019 budget, but not a 2018 expense."

77.    Notwithstanding that the decision to accelerate the termination was made because the payments would be in the 2019 budget and not in the 2018 budget, and that the tax code allowed until December 2019 for the funds to be distributed to the members, the Board of Directors voted on December 28, 2017 to distribute the funds in December 2018.

78.    Such a decision was made to benefit the individual members of the firm, as a distribution from the termination of the Deferred Compensation Plan "ordinarily would be taxable to the Partners, but it is anticipated that the approximately $3 million in projected PLLC-related tax savings to Partners will effectively offset much of the tax."

79.    The Defendant received a distributions from the Rabbi Trust in a total amount of $91,205 on December 31, 2018 (the "Deferred Compensation Payment").

80.    Notwithstanding the expressed Insolvency Notification Requirement in the Rabbi Trust Agreement, upon information and belief, the Debtor failed to ever provide notice of its insolvency to the Rabbi Trust's trustee upon its insolvency or prior to the distribution of Rabbi Trust assets to shareholders/members.

81.    As the Debtor was insolvent at the time of the Deferred Compensation Payment from the Rabbi Trust to the Defendant, the Defendant was not entitled to receive a distribution from the Rabbi Trust because of the Cease Payments When Insolvent Requirement and the Rabbi Trust's assets should have been maintained for the benefit of the Debtor's general creditors.

82.    The payment of the Deferred Compensation Payment to the Defendant was made by the Debtor to the Defendant with the intent to hinder, delay, and defraud the Debtor's creditors and while the Debtor was insolvent.

83.    The Defendant knew or should have known that distribution of the Deferred Compensation Payment occurred while the Debtor was insolvent, and that the payment were made with an intent to hinder, delay, and/or defraud the Debtor's creditors.

## CLAIMS FOR RELIEF

### COUNT I:    Recovery Under Conversion

84.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

85.    The Debtor did not satisfy the necessary conditions precedent for the Defendant to receive the transfer of the Deferred Compensation Payment.   Accordingly, the Defendant's Deferred Compensation Payment was wrongfully paid to the Defendant.

86.    The Debtor is entitled to immediate possession of the Deferred Compensation Payment.

87.    The Trustee is entitled to recover the damages suffered by the Debtor in the amount to be proven at trial, but in no event less than the total amount of the Deferred Compensation Payment.

**COUNT II:    Recovery Under Unjust Enrichment**

88.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

89.    The Debtor did not satisfy the necessary conditions precedent for the Defendant to receive the Deferred Compensation Payment.

90.    The Debtor conferred a benefit on the Defendant through the conveyance of the Deferred Compensation Payment.

91.    The Defendant accepted and retained the benefit of the Deferred Compensation Payment without the Debtor satisfying the conditions precedent necessary to pay the Deferred Compensation Payment.

92.    The Defendant knew or should have known the Debtor did not satisfy the conditions precedent necessary for the Defendant to receive the Deferred Compensation Payment.

93.    Allowing the Defendant to retain the benefits he received would be unjust.

94.    As a direct and proximate result of the foregoing wrongful acts and Defendant's unjust enrichment, the Debtor sustained damages in the amount of the Deferred Compensation Payment and the Trustee is entitled to recover the same.

**COUNT III**: Avoidance and Recovery of the Deferred Compensation Payment Made in Violation of the Deferred Compensation Plan and Rabbi Trust Agreement as an Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A) & 550.

95.     The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

96.     Within two years prior to the Petition Date, the Debtor transferred $91,205 to the Defendant in the form of a Deferred Compensation Payment.

97.     The Deferred Compensation Payment was transferred to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

98.     The Deferred Compensation Payment was transferred to or for the benefit of the Defendant.

99.     The Debtor transferred the Deferred Compensation Payment with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to on or after the date of the Deferred Compensation Payment.

100.     The transfer of the Deferred Compensation Payment to the Defendant was accompanied by several badges of fraud, including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it made the Deferred Compensation Payment; (b) the Deferred Compensation Payment was transferred to the Defendant, a shareholder of the Debtor; (c) the Deferred Compensation Payment was transferred to the Defendant in violation of the Deferred Compensation Plan, the Deferred Compensation Plan Document, and the Rabbi Trust Agreement; and (d) the Deferred Compensation Payment amounts to significant portions of the Debtor's Estate.

101.     Pursuant to Section 548(a)(1)(A) and Section 550 of the Bankruptcy Code, the Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferred Compensation

Payment, (b) directing the Deferred Compensation Payment be set aside, and (c) requiring the Defendant, as the recipient of the Deferred Compensation Payment and/or the person for whose benefit the Deferred Compensation Payment was given, to return the Deferred Compensation Payment, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT IV:  Avoidance and Recovery of the Deferred Compensation Payment Made in Violation of the Deferred Compensation Plan and Rabbi Trust Agreement as an Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544, 550, and Va. Code § 55.1-400.**

102.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

103.    The Debtor transferred $91,205 to the Defendant as a Deferred Compensation Payment between September 3, 2014 to the Petition Date.

104.    The Deferred Compensation Payment was transferred to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

105.    The Debtor transferred the Deferred Compensation Payment with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to on or after the date of the Deferred Compensation Payment.

106.    The Deferred Compensation Payment to the Defendant was accompanied by several badges of fraud, including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it made the Deferred Compensation Payment; (b) the Deferred Compensation Payment was transferred to the Defendant, a shareholder of the Debtor; (c) the Deferred Compensation Payment was distributed to the Defendant in violation of the Deferred Compensation Plan, the Deferred Compensation Plan Document, and the Rabbi Trust Agreement; and (d) the Deferred Compensation Payment amounts to significant portions of the Debtor's Estate.

107.     The Deferred Compensation Payment was distributed to or for the benefit of the Defendant.

108.     Pursuant to Virginia Code Section 55.1-400, 11 U.S.C. § 544  and 11 U.S.C. § 550, the Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferred Compensation Payment, (b) directing the Deferred Compensation Payment be set aside, and (c) requiring the Defendant, as the recipient of the Deferred Compensation Payment and/or the person for whose benefit the Deferred Compensation Payment was given, to return the Deferred Compensation Payment, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT V: Avoidance and Recovery of the Deferred Compensation Payment Made in Violation of the Deferred Compensation Plan and Rabbi Trust Agreement as a Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) & 550.**

109.     The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

110.     Within two years prior to the Petition Date, the Debtor transferred $91,205 to the Defendant as a Deferred Compensation Payment.

111.     The Deferred Compensation Payment was transferred to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

112.     The Deferred Compensation Payment was transferred to or for the benefit of the Defendant.

113.     The Defendant did not provide reasonably equivalent value in exchange for the Deferred Compensation Payment.

114.     Pursuant to Section 548(a)(1)(B) and Section 550 of the Bankruptcy Code, the Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferred Compensation Payment, (b) directing the Deferred Compensation Payment be set aside, and (c) requiring the

Defendant, as the recipient of the Deferred Compensation Payment and/or the person for whose benefit the Deferred Compensation Payment was given, to return the Deferred Compensation Payment, or the value thereof, to the Trustee for the benefit of the Estate.

## **PRAYER**

WHEREFORE, the Trustee respectfully requests and prays that the Court:

A.     On Counts I and II, awarding the Trustee damages in an amount to be proven at trial, but in no event less than $91,205;

B.     On Counts III and V, awarding judgment to the Trustee, pursuant to Section 548 of the Bankruptcy Code, in an amount of the transfer of the Deferred Compensation Payment, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $91,205, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

C.     On Count IV, awarding judgment to the Trustee, pursuant to Section 544 and 550 of the Bankruptcy Code, Va. Code Sections 55.1-400, or pursuant to other applicable state fraudulent conveyance or fraudulent transfer law, in an amount of the transfer of the Deferred Compensation Payment, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $91,205, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

D.     Awarding the Trustee her costs incurred in connection with this Adversary Proceeding, including but not limited to her reasonable attorneys' fees and costs;

E.     Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full, plus costs;

F.     Directing the Defendants to pay forthwith all amounts awarded; and

G.      Granting such other and further relief as this Court deems just and appropriate.


Respectfully submitted,

LYNN L. TAVENNER, CHAPTER 7 TRUSTEE

/s/ *Brittany J. Nelson*
Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
(202) 538-8334 (telephone)
erikamorabito@quinnemanuel.com
brittanynelson@quinnemanuel.com


*Special Counsel to Lynn L.*
*Tavenner, the Chapter 7 Trustee*
*of the Estate of LeClairRyan*
*PLLC*