## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re:<br><br>　　　**LeClairRyan PLLC,**<br><br>　　　　　**Debtor.** | **Case No.: 19-34574-KRH**<br><br>**Chapter 7** |
| **Lynn L. Tavenner, as Chapter 7 Trustee,**<br><br>　　　　　**Plaintiff,**<br>**v.**<br><br>**Paul Burleigh,**<br><br>　　　　　**Defendant.** | Adv. Proc. No. 21-<br><br>**ORIGINAL COMPLAINT** |

## TRUSTEE'S ADVERSARY COMPLAINT

Lynn L. Tavenner, Trustee, and not individually but solely in her capacity as the Chapter 7 trustee (in such capacity, "Ms. Tavenner" and/or the "Trustee" and/or the "Plaintiff") of the bankruptcy estate (the "Estate") of LeClairRyan PLLC ("LCR" and/or the "Debtor" and/or the "Firm"), in the above-referenced Chapter 7 case (the "Case"), by her undersigned counsel, brings this adversary proceeding against Paul Burleigh (the "Defendant" or "Burleigh") seeking not less than $33,242,499 and alleges as follows:

## INTRODUCTION

1.　　The Trustee files this lawsuit to both recover improper distributions of substantial sums of money made to shareholders, employees, partners and other third parties and to recover the losses caused to the Debtor and its creditors by the breach of fiduciary duties by the Debtor's former officers and directors, including the Defendant.

2.　　The Debtor was insolvent no later than September 3, 2014 and remained insolvent until it filed for bankruptcy on September 3, 2019 (the "Petition Date"). Despite the Debtor's

insolvency and inability to pay general operating expenses and other creditors, it incurred immense debts and transferred tens of millions of dollars to shareholders, employees, partners, tax authorities and other third parties, including approximately $329,227 to the Defendant.

3.    As a shareholder, member and director of the Debtor, the Defendant owed a fiduciary duty to the Debtor. Moreover, once the Debtor entered the zone of insolvency, the Defendant owed a fiduciary duty to the Debtor's creditors.

4.    As a shareholder, member and director, the Defendant was privy to LCR's deteriorating financial condition and knew or should have known that the Firm was insolvent.

5.    In fact, at least between September 2017 and July 24, 2019, the Debtor's Board of Directors, later, the Board of Managers, (the "Board"), met on no less than 70 separate occasions. At these meetings, the Board was repeatedly informed of the Debtor's "poor" financial state that only deteriorated further throughout this period. Not only was the Debtor insolvent at this point but the Board was confronted with a continuing spiral of negative results, including shareholder departures, multiple breaches of loan covenants, decreasing lawyer utilization rates, rising office vacancies and accounts receivable write-offs. The logical result of this was a firm that accumulated negative cash flow of tens of millions of dollars on a year-by-year basis.

6.    Nevertheless, the Board and the Defendant repeatedly took actions that either favored their own personal interests or those of individual stakeholders. Rather than fulfilling their duty to the enterprise and its creditors, the Board worked against the best interests of the Firm, continually diminishing, transferring, and/or liquidating Firm assets, often enriching themselves or certain other shareholders/members, and leaving the Firm with millions in liabilities.

7.      Additionally, as the Firm continued to default on basic operational payments and watched collections and receivables plummet, over and over again the Board turned a blind eye—and even approved, in some cases—new ventures that saw the Debtor become more and more entangled with its new partner, United Lex Corporation ("UnitedLex"). Although UnitedLex was touted as a saving grace for the failing Firm, it would proceed to become nothing but a further drag on the Debtor's balance sheet. The Board also continuously fell victim to UnitedLex's interests, as in April 2019 when it converted a ULX Partners, LLC ("ULXP") accounts payable to a promissory note.

8.      Still, the Board and the Defendant proceeded to approve key structural changes the net effect of which was to facilitate certain payments and tax advantages to shareholders/members while saddling the Firm with a multi-million-dollar tax bill that it could not afford to pay.

9.      In particular, between 2017 and 2019, the Board and the Defendant approved improper expenditures and payments with respect to (i) the Firm's retirement plans, including a Deferred Compensation Plan (the "Deferred Compensation Plan "), a Supplemental Retirement plan (the "SERP") and a 401(k) plan, (ii) shareholder dividends, (iii) discretionary bonus payments, (iv) shareholder life insurance policies, (v) Soft Landing Contracts ("SLCs") for retiring shareholders and/or executives (vi) the Debtor's conversion from a C-Corporation to a PLLC, (vii) unnecessary lease agreements, and viii) the failed pursuit of a new venture to be titled Novellus Law Group ("NLG").

10.      At all times while these expenditures, payments and transactions were being pursued and/or incurred, the Board and the Defendant (i) owed a fiduciary duty to the Firm's creditors, (ii) breached this fiduciary duty by failing to discharge their duties with due prudence

3

and care in approving improper transfers and/or by other actions and inactions, and (iii) damaged the Firm and its creditors.

11.    Moreover, the Board and the Defendant approved distributions by the Debtor in excess of what was authorized under law and the Debtor's formational documents and approved retirement plans. These distributions were approved in violation of a director's standards of conduct pursuant to Section 13.1-690 of the Virginia Code.

12.    The Defendant's breach of fiduciary duty harmed the Debtor in an amount no less than $32,913,272.

13.    Moreover, the Defendant accepted, and continued to accept, fraudulent payments that were specifically conditioned on the Firm achieving certain levels of profitability—levels that the Defendant knew or should have known LCR would not be able to reach.

14.    These payments, which were made to the Defendant in addition to his regular salary, were made (a) with specific fraudulent intent as evident by requisite badges of fraud; (b) in violation of operative agreements and applicable law; and (c) on account of equity, and therefore, were transferred for no consideration, less than fair consideration, or less than reasonably equivalent value to the Debtor.

15.    Accordingly, in addition to damages arising out of the breach of fiduciary duty claims, the Trustee also seeks judgment against the Defendant to recover these payments, which equal not less than $329,227 plus interest, fees, and costs as allowed by law.

**JURISDICTION, VENUE, AND LEGAL PREDICATE**

16.    This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtor's Case (under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")). This

adversary proceeding has been referred to this Court pursuant to 28 U.S.C § 157(a). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2). The Trustee confirms her consent, pursuant to Rule 7008 of the Bankruptcy Rules, to the entry of a final order by the Court in connection with this Complaint to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

17.     Venue is proper in this District and this Division pursuant to 28 U.S.C. §§ 1408 and 1409.

18.     The legal predicates for the requested relief in this adversary proceeding are Sections 544, 547, 548, and 550 of the Bankruptcy Code, Fed. R. Bankr. P. 7001(1), (2) and (8), and Sections 55.1-400 and 55.1-401 of the Virginia Code, among others.

## PARTIES

19.     On September 3, 2019, the Debtor commenced the Chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On October 4, 2019, the Court entered the *Order of Conversion of Chapter 11 to Chapter 7* [Docket No. 140].  On October 4, 2019, Ms. Tavenner was appointed as the Chapter 7 Trustee for the Debtor.[1] As Trustee, Ms. Tavenner has the sole authority to bring these claims on behalf of the Debtor's Estate.

20.     At all relevant times, the Debtor was organized under the laws of the Commonwealth of Virginia.

---

[1]     *See* Appointment of Interim Trustee Lynn L. Tavenner. [Case No. 19-34574-KRH, Docket No. 175].

21.     Defendant was at all relevant times a shareholder or member of the Debtor, from 2014 until September 2019.  Defendant was also member of the Board from February 1, 2016 until August 1, 2019.

22.     The Defendant's relationship with the Debtor, including compensation, was governed by several agreements (as described below).

23.     Defendant is an individual who may be served with process by any manner of service authorized by Rule 7004 of the Federal Rules of Bankruptcy Procedure.

24.     On December 14, 2019, the Defendant filed a proof of claim in the amount of $100,000.  Case No. 19-34574-KRH**,** Claims Register No. 232.

## FACTUAL BACKGROUND

### I.      The Formation, Structure, and Conversion of the Debtor

25.     The Debtor was founded in 1988 by Dennis Ryan and Gary D. LeClair.  It initially operated as a regional corporate-focused law firm, headquartered in Richmond, Virginia. However, the Debtor rapidly expanded—ultimately opening offices or acquiring firms across the United States.  Prior to the Petition Date, the Debtor operated through approximately 25 offices throughout the United States, with offices in, among others, Richmond, Los Angeles, San Francisco, Newark, New Haven, Boston, Philadelphia, New York City, Dallas, Houston, Detroit and Washington, D.C.  At its peak, the Debtor had approximately 385 attorneys, including approximately 160 shareholders.

26.     Prior to March 31, 2018, the Debtor operated as a Virginia Professional Corporation ("PC").  On March 31, 2018, the Debtor converted (the "Conversion") from a PC to a Virginia Professional Limited Liability Company ("PLLC").

## II.    The Debtor's Downfall

### A.    The Debtor's Financial Mismanagement

27.    Fundamental issues of financial mismanagement plagued the Debtor for years, including, but not limited to, over-compensation of certain attorneys, declining revenues, which fell short of projections and budgets by millions of dollars, and improper and erroneous accounting for certain income and expense items.

28.    Beginning no later than January 1, 2014, the Debtor consistently missed its budget and its revenue fell short of expectations.

29.    By no later than September 3, 2014, the Debtor was insolvent, failing to pay its debts as they became due.

30.    In fact, there was only one year after 2011 that the Debtor generated an operating profit and positive cash flow. That year, 2013, the Debtor recorded approximately $23 million in non-recurring fees. This one-off influx of cash generated approximately $5 million in Net Income for 2013 and had no impact on future profitability. Rather than use these proceeds to fund working capital, pay off outstanding obligations, and/or improve the Debtor's financial viability, the Debtor distributed a vast majority of these funds to shareholders.

31.    The Firm's financials were not kept a secret from all shareholders, including the Defendant.

32.    For instance, in a September 3, 2013 email labeled "August 31, 2013 CEO's State of the Firm and Partnership 2020 Committee's Report," sent to all shareholders by David Freinberg, the Firm reported among other things that: (i) LCR underperformed financially "failing for a second consecutive year to collect the amount required to pay 100% of projected Shareholder Total Compensation;" (ii) that "Many Shareholders, and even some Firm Leaders,

were surprised by the projected magnitude of the 2012 revenue miss," and (iii) that "Too many Shareholders did not read our reports and insisted on repeating inaccurate facts."

33.     By no later than 2014, the Debtor's shareholder compensation system had become illusory.  Even though the Debtor did not meet the financial targets necessary for shareholders/ members to receive discretionary sums, the Debtor still distributed the same.  Rather than pay shareholders based on what the Debtor earned in the year, the Debtor burdened future years to pay current shareholders—essentially borrowing from creditors and future shareholders and in some instances even using client advanced funds to pay current shareholders.

34.     The Defendant knew or should have known that the Debtor's financial information overstated assets and limited the Debtor's ability to accurately forecast cash inflows.

35.     The Defendant knew or should have known of the Debtor's financial weaknesses and the issues referenced herein.

36.     Shareholders, including the Defendant, also received numerous reports and budget communications detailing that the Debtor was not meeting budgeted amounts and that the Debtor was not financially healthy.

37.     For example, an April 3, 2015 email from David Freinberg to all shareholders provided that "Our credit line has a $7.5 million outstanding balance.  Our vendor payables were $7.150 million (of which approximately $3.21 million were over 60 days)."

38.     Further, an April 15, 2015 Shareholder Meeting's presentation entitled "Disciplined Financial Management Project: Revenue Enhancement Plan" provided that "absent execution on this Plan," we "otherwise would have a projected deficiency of cash requirements in excess of cash receipts starting in July 2015" and would not be able to "pay in full the outstanding balance of the Wells Fargo line of credit until November 2015 (note that our Wells

Fargo loan agreement requires that we have a zero balance on the line of credit for at least 30

consecutive days during the 2015 calendar days)."

39.    On March 17, 2016, shareholders were informed that "[f]or 2014 and 2015, we

Shareholders paid ourselves, collectively, more than we earned.  We have borrowed to pay

ourselves, contrary to Partnership 2020 fundamentals and our long-standing conservative

principles of management. … Obviously, continued overpayment is not sustainable.  We are

going to have to reduce Shareholder compensation.  If we are able to increase production margin,

reductions to Shareholder compensation can be mitigated."

40.    In the March 17, 2016 Budget Oversight Committee report (the "2016 BOC

Report") provided to all shareholders, the Budget Oversight Committee stated:

> Our WIP and AR are cluttered with uncollectible accounts and
> worthless numbers.  We recommend that we clear all uncollectible
> AR and all aged and unbillable WIP from our working books.  Old
> AR and WIP clouds our view of financial reality, clutters the work
> desks of our billing and collection teams and provides false
> overstatement of "inventory."

41.    In an effort to address the Debtor's financial insolvency, the Debtor relied on

various sources of capital to fund general operations—sources that were improper, expensive,

and/or utilized in a fraudulent manner.

**B.    Utilizing CAPE Funds for General Operations**

42.    To fund the Debtor's general operations, the Debtor misappropriated for improper

purposes funds tendered by clients for specific expenses (the "CAPE Funds").

43.    The CAPE Funds were funds paid by the Debtor's clients for certain enumerated

purposes, including, but not limited to, filing fees, closing costs, third-party professional fees,

and other costs necessary to serve the Debtor's clients.

44.    The Debtor used over $3 million in CAPE Funds for general operating purposes during the period at issue.

45.    The Debtor utilized the CAPE Funds for general operating purposes with the knowledge that CAPE Funds were designated for a specific client purpose.

46.    The Defendant knew or should have known that this practice was occurring.

**C.    Reliance on Preferred Stock to Fund Operations**

47.    In an effort to raise working capital, the Debtor relied on expensive preferred stock ("Preferred Stock") offerings, carrying a dividend rate of 8% per annum.  This Preferred Stock became a massive burden on the Debtor's financial solvency, a burden that the Debtor was never able to recover from.

48.    In the 2016 BOC Report provided to all shareholders, the Budget Oversight Committee stated (emphasis added):

> We also increased our preferred stock outstanding for this purpose, ultimately. Insofar as the preferred stock bears a required dividend and must ultimately be repaid, we have burdened ourselves with carrying costs and repayment obligations *in order to pay ourselves now*.

49.    The Debtor utilized the proceeds from the Preferred Stock offerings primarily to fund shareholder compensation, not pay creditor balances.

50.    The Defendant knew or should have known that the Debtor was burdened by dividends owed on the Preferred Stock—further deteriorating the Debtor's financial health.

**D.    Decreasing Revenues and Utilizing Accounts Payable as a Line of Credit**

51.    To manage cash flows, the Debtor increasingly relied on its accounts payable as a line of unsecured credit to ensure that it could make payments to shareholders.  In violation of the Firm's unilateral policy requiring the Debtor to maintain accounts payable aging within 60 days (regardless of the actual terms of the invoice)—a policy adopted by the Debtor in 2013 as a

10

fortifying measure—the Debtor began to unilaterally extend payment terms with its suppliers and vendors well past 60 days.

52.     The following chart reflects the Debtor's leverage of its accounts payable and the balance of accounts payable that was more than 60 days outstanding.

| Year | Total Accounts Payable | Accounts Payable > 60 Days Outstanding | Amount of AP Aged > 60 Days |
|---|---|---|---|
| 12/31/2014 | $10,109,000 | $4,822,000 | 48% |
| 12/31/2015 | $10,668,000 | $6,057,000 | 57% |
| 12/31/2016 | $5,890,000 | $3,293,000 | 56% |
| 12/31/2017 | $9,067,000 | $5,892,000 | 65% |
| 12/31/2018 | $17,252,000 | $7,687,000 | 45% |
| 6/30/2019 | $12,364,000 | $6,345,000 | 51% |

53.     At the same time that the Debtor's liabilities were ballooning, and the Debtor was seeking capital, the Debtor's revenues were decreasing at an alarming rate.

54.     The Debtor's annual revenues decreased from approximately $200 million in 2013 to approximately $110 million in 2018.

55.     During this time, the Debtor did not have sufficient liquidity to pay even the most critical operating expenses. The Debtor implemented an internal waterfall scheme to manage priority of payments which prioritized payroll first, shareholder payments second, intellectual property client expense payments third, and then critical vendor payments fourth. All other vendors were paid on an as needed basis.

56.     The Defendant knew or should have known that the Debtor's annual revenues were decreasing at a rate greater than the Debtor's reduction in costs and that the Debtor could not pay debts as they became due.

### E.    Shrinking Headcount and Loss of Shareholders

57.    As a result of many factors, including but not limited to the Debtor's financial mismanagement, the Debtor experienced a shrinking number of attorneys, including the loss of revenue-positive shareholders and members.

58.    The Debtor's attorney attrition rate was over ten percent in all relevant years.

59.    Further, the number of shareholders and members, as applicable, decreased year-over-year as follows:

| Date | Number of Shareholders / Members | Approximate Percentage Change |
|---|---|---|
| December 31, 2015 | 156 | |
| December 31, 2016 | 138 | (11.5%) |
| December 31, 2017 | 121 | (12.3%) |
| December 31, 2018 | 80 | (33.9%) |
| June 30, 2019 | 44 | (45%) |

60.    The decrease of headcount left the Debtor with overhead expenses and office leases far larger than what was necessary for a law firm of the Debtor's size.

61.    The significant decrease in shareholders also resulted in significantly higher liabilities related to the redemption of the Debtor's common stock ("Common Stock") and Preferred Stock for the benefit of exiting equity holders.

62.    Beginning in 2015 and in each subsequent year thereafter, the Debtor redeemed more Common Stock and Preferred Stock than it issued through new capital infusions.  For example, in 2016, the Debtor redeemed over $4 million in Common Stock and Preferred Stock while only issuing approximately $2.5 million in new Common Stock and Preferred Stock.

63.    The Debtor did not have the financial ability to redeem equity holders, resulting in a substantial unpaid liability.  ABL Alliance LLLP, affiliated with and commonly referred to as Virginia Commercial Finance ("VCF") (after recognizing the problematic practice) ultimately

restricted the Debtor's ability to redeem Common Stock and Preferred Stock due to the Debtor's capital constraints.

**III.    Defendant and the Board Received Regular Financial Updates**

64.    The Defendant served as a director on the Board from February 2016 through April 2018 and then, after the Debtor's conversion to a PLLC, the Defendant served as a manager on the Debtor's Board of Managers from April 2018 through August 2019.

65.    The Defendant frequently attended meetings of the Board and otherwise received materials and briefings distributed to the Board.

66.    The Defendant received regular updates on the Firm's financial state including periodic reviews of cash flow statements, balance sheets, budget forecasts, lender covenants, accounts payable/receivable status as well as quarterly and annual financial statements. Additionally, the Defendant received regular updates on shareholder attrition, office vacancies, employee compensation and lawyer utilization.

67.    The reports to the Board were consistently negative. For example:

o    On June 27, 2017, the Debtor's CFO advised the Board that, as of May 2017, the Firm was no longer in compliance with a shareholder headcount covenant in its Wells Fargo line of credit and that the Board would need to restructure the debt and obtain a waiver from Wells Fargo.

o    On July 25, 2017, the Firm reported to the Board that its year-to-date cash losses had reached over $6,000,000.00, which amounted to approximately $2,100,000.00 below the approved budget.

o    On August 8, 2017, the Board was notified that the Debtor had exceeded the stock redemption cap under the Third A&R Shareholder Agreement, a threshold that would require the deferral of stock redemption payments to transferring shareholders.

o    On October 24, 2017, the Board received an update on the Firm's third quarter financials that showed "utilization performance was poor" and noted an accrual profit loss of $1,300,000 that increased the year-to-date accrual profit loss to $4,800,000.

o   On December 12, 2017, the Board approved a new $15,000,000 credit facility that was necessitated by a required $1,000,000 payment due to its previous lender, Wells Fargo, that the Debtor could not afford.

o   On January 3, 2018, the Firm CFO presented to the Board the preliminary 2017 financial results that showed that the Firm had failed to meet revenue targets.

o   On February 9, 2018, the Board received a briefing from its tax consultants that highlighted that the Firm's planned conversion to a PLLC would incur a federal and state tax liability of approximately $4,300,000 to the Firm.

o   On May 31, 2018, shortly after the transaction with UnitedLex, the Board was informed that the transaction—through favorable invoicing terms—had given the Firm a "cashflow float" of approximately $11,400,000. Still, the Board was notified that utilizing this additional "cashflow float" to address its priority creditors would leave a $3.9 million shortfall.

o   On June 22, 2018, the Board was notified of recent shareholder departures that brought the overall office vacancy percentage to over 30% firmwide.

o   On September 18, 2018, the Board viewed the previous month's results which noted continuing issues surrounding loan covenants, accounts payable to ULXP and deficits in required retirement plans. These same issues would appear at the October 23, 2018 meeting of the Board, with the additional problem of finding a way to pay the tax liability that was incurred by the PLLC transition.

o   On March 26, 2019, the Firm CFO alerted the Board that low collection rates were creating "potential cash flow issues," an issue that was repeated on April 8, 2019, when the Board was also informed of additional shareholder resignations and a malpractice suit.

o   On June 7, 2019, management reported to the Board that, amid further member resignations, a new tax liability with respect to the City of New York, and efforts to reduce liabilities, it was unlikely that other law firms would be interested in assuming any of the Debtor's liabilities in a merger.

68.   The Defendant was privy to all the Debtor's key financial information at all relevant times while the Debtor was insolvent.

## IV.   The Defendant and Board Approved Improper Payments to Shareholders, Company Employees and Favored Creditors

69.   Despite the Debtor's continuing insolvency and increasingly negative financial results, the Board and the Defendant continued to endorse payments the Firm could not afford (and in many instances was not obligated to make) to shareholders, employees, and favored

creditors. The Board and the Defendant also took actions to incur additional debts at the expense

of existing creditors.

    **A.**      **Early Termination, Continued Funding, and Early Distribution of Deferred Compensation Plan**

        **i.**      **Terms of the Deferred Compensation Plan**

    70.    The Deferred Compensation Plan was governed by the 2014 Amended and

Restated Shareholders Deferred Compensation Plan, adopted November 13, 2013 (the "Deferred

Compensation Plan Document").

    71.    Section 9.1 of the Deferred Compensation Plan Document stated that the:

> right of a Participant or his beneficiary to receive a distribution
> hereunder shall be an unsecured (but legally unenforceable) claim
> against the general assets of the Company, and neither the
> Participant nor his beneficiary shall have any rights in or against
> any amount credited to any Deferral Account or any other specific
> assets of the Company.  Thus, the Plan at all times shall be
> considered entirely unfunded for ERISA and tax purposes.  Any
> funds set aside by the Company for the purpose of meeting its
> obligations under the Plan, including any amounts held by a
> trustee, shall continue for all purposes to be part of the general
> assets of the Company and shall be available to its general
> creditors in the event of the Company's bankruptcy or insolvency.
> The Company's obligation under this Plan shall be that of an
> unfunded and unsecured promise to pay money in the future.  All
> Company Contributions attributable to services prior to 2014, all
> property and rights purchased with such contributions, and all
> earnings attributable to such contributions, property or rights shall
> be held in the Trust until distributed to the Participant or his
> beneficiary and shall remain subject to the claims of the
> Company's general creditors.

    72.    The Deferred Compensation Plan utilized a rabbi trust (the "Rabbi Trust"), which

was governed by the Amended and Restated Rabbi Trust Document, dated February 13, 2014

(the "Rabbi Trust Agreement").

    73.    Section 3 of the Rabbi Trust Agreement provides, among other things, that:

> [t]rustee shall cease payments of benefits to Plan participants and
> their beneficiaries if the Company is Insolvent.  Company shall be
> considered "Insolvent" for purposes of this Trust Agreement if (i)
> Company is unable to pay its debts as they become due, or (ii)
> Company is subject to a pending proceeding as a debtor under the
> United States Bankruptcy Code.

(the "<u>Cease Payments When Insolvent Requirement</u>").

74.     Section 3(b) of the Rabbi Trust Agreement also states that "[a]t all times during

the continuance of this Trust, as provided in Section 1(d) hereof, the principal and income of the

Trustee shall be subject to the claims of general creditors of Company under federal and state

law as set forth below."

75.     The Rabbi Trust was funded by either a whole life insurance policy, variable life

insurance policies, or an investment in a long-term tax-exempt bond fund.

76.     The Rabbi Trust Agreement also provides, among other things, that

> The Board of Directors and the Chief Executive Officer of
> Company shall have the duty to inform Trustee in writing of
> Company's Insolvency. If a person claiming to be a creditor of
> Company alleges in writing to Trustee that Company has become
> Insolvent, Trustee shall determine whether company in [*sic*]
> Insolvent and, pending such determination, Trustee shall
> discontinue payment of benefits to Plan participants or their
> beneficiaries.

(the "<u>Insolvency Notification Requirement</u>").

77.     A participant became vested in the Deferred Compensation Plan after 15 full

calendar years as an employee and 10 full calendar years as a shareholder, or age 62.

78.     Shareholders of the Firm, including the Defendant, were aware that the assets

were available to satisfy creditors.

79.     For instance, in the 2015 Plan Year Enrollment Kit, all participants were told that

"assets held in the Rabbi Trust are considered Company assets and are available to satisfy the

16

claims of creditors of the Company.  In the event the Company becomes insolvent, you are an

unsecured general creditor of the Company with regard to your benefits under the Plan."

> **ii.        Terms of the SERP**

80.    The SERP was governed by the Amended and Restated LeClairRyan, a

Professional Corporation, Supplemental Retirement Plan, effective January 1, 2014 (the "SERP

Plan Document").

81.    The SERP designated amounts as being in either a Deferral Account or a Secular

Trust (together, the "SERP Accounts").

82.    Pursuant to the SERP, the Secular Trust received and held vested contributions

made by the Debtor to the SERP participant and contributions made by the SERP participant to

the Secular Trust.

83.    The funds held in the Secular Trust were not subject to the claims of the Debtor's

general creditors.

84.    By contrast, funds held in the Deferral Account were subject to the claims of the

Debtor's general creditors.

85.    In contravention of the SERP Plan Document, at times, the Debtor failed to

segregate the funds in the Deferral Account from the Debtor's general operating accounts and

made payments to the shareholders from the Deferral Account (the "Deferral Payments").

> **iii.        Early Termination of the Deferred Compensation Plan and the SERP**

86.    On September 27, 2016, the Retirement Plans Task Force issued a report

(the "Task Force Report") that recommended, among other things, the termination and payment

of the Deferred Compensation Plan assets to participants pursuant to Section 409A of the

Internal Revenue Code.

87.    Specifically, the Task Force Report stated that "[a]fter a number of meetings, thoughtful consideration and good discussion, the Task Force feels it is in the best interest of the Firm and the participants to take steps to terminate the [Deferred Compensation Plan and SERP] on or before January 1, 2019.  The Task Force understands this is the most expensive option and financial discipline is needed to get the Firm to the point where this is executable."  In explaining its recommendation, the report noted that the Deferred Compensation Plan and the SERP are "painfully complex, and there is no comfort surrounding the possibility of hidden pitfalls that may present themselves in the future."

88.    On November 17, 2016, the Debtor's Board approved the Task Force Report's recommendation to terminate the Deferred Compensation Plan on or before January 1, 2019.

89.    On December 9, 2016, the Debtor provided communication to shareholders stating that 100% vesting would occur upon the formal termination of the Deferred Compensation Plan and that distributions would be made to comply with Section 409A of the Internal Revenue Code.

90.    One issue that remained was that there was a significant "payment gap" of approximately $2 million dollars in the Deferred Compensation Plan.  Thus, terminating the plan meant that the Debtor had to find funding for this payment hole.

91.    From late 2016 to November 2017, the Firm's finances continued to decline and the Firm lacked the "financial discipline" needed to get the Firm to where executing termination of the Deferred Compensation Plan and the SERP would not harm creditors.

92.    However, on November 30, 2017, the Debtor's Retirement Plan Committee issued a memorandum to the Board that refused to endorse a plan to accelerate the termination of the Deferred Compensation Plan and the SERP to 2017.

93.    On December 4, 2017, the Board discussed the memorandum, noting that the Retirement Plan Committee had "concerns about the funding gap and likely administrative difficulties."

94.    The Board was also made aware that a termination of the plans in 2017 would trigger mandatory shareholder distributions before December 31, 2019.

95.    The Defendant and other members of the Board knew or should have known that the payments required by the termination of these plan would violate the Rabbi Trust, the Third A&R Shareholder's Agreement (as later defined) and divert funds away from the Firm.

96.    Nonetheless, on December 29, 2017, the Defendant and other members of the Board unanimously approved the early termination of the Deferred Compensation Plan.

97.    As a direct result of the Board's approval of the early termination of the Deferred Compensation Plan, the Firm made distributions to shareholders, including the Defendant and other members of the Board (the "Deferred Compensation Distributions"). These funds could have otherwise been available to the Firm's creditors.

### iv.    Continued Funding of the Deferred Compensation Plan

98.    Also, at its meeting on December 19, 2017, the Board was presented with a proposal to provide continued funding to the Deferred Compensation Plan to cover payments of certain insurance policies.  Such funding was not required by the Deferred Compensation Plan.

99.    The Board and the Defendant knew or should have known that the continued funding of the Deferred Compensation Plan would divert funding away from the Firm's creditors.

100.    However, with the Defendant's support, the Board unanimously approved the discretionary contributions to the Deferred Compensation Plan.

19

101.    As a direct result of the Board's approval of the 2017 contributions to the Deferred Compensation Plan the firm made additional discretionary payments for the benefit of certain shareholders, including Board members, (the "<u>Deferred Compensation Contributions</u>") in the amount of $180,270.47. These funds could have otherwise been available to the Firm's creditors.

### v.    Early Distribution of the Deferred Compensation Plan

102.    In December 2017, the decision by the Board to terminate the Deferred Compensation Plan created a requirement that the Debtor make the Deferred Compensation Distributions to the participating shareholders within two years of the termination, which became effective on December 31, 2017.  Therefore, the Board had the option to wait until December 31, 2019, to liquidate the Deferred Compensation Plan and order the Deferred Compensation Distributions.

103.    However, on December 11, 2018, with the Defendant's support, the Board unanimously approved a resolution directing the payment of all deferred compensation amounts due and owing to participating shareholders.  Recipients of the funds included the Defendant and members of the Board.

104.    As a direct result of the early payout of the Deferred Compensation Plan, the Firm made the Deferred Compensation Distributions, including the Deferred Compensation Contributions, in the amount of $9,753,000, which benefited certain shareholders and the Board and which funds could have otherwise been available to the Firm's creditors for an additional year.

**B.    Early Termination and Distribution of the Supplemental Retirement Plan**

**i.    Early Termination of the Supplemental Retirement Plan**

105.    As described above, the November 30, 2017 memorandum from the Debtor's

Retirement Plan Committee refused to endorse a plan to accelerate the termination of the SERP

to 2017.  In particular, the memorandum noted that, similar to the Deferred Compensation Plan,

terminating the SERP could result in funding gaps that could further impact the Firm's ability to

pay creditors.

106.    On December 4, 2017, the Board discussed the memorandum and deferred further

action.

107.    The Board was also made aware that a termination of the plans in 2017 would

trigger mandatory shareholder distributions before December 31, 2019. The Defendant and other

members of the Board knew or should have known that these shareholder distributions would

violate the terms of the SERP and the Third A&R Shareholder's Agreement (as hereafter

defined) and would divert funds away from the Firm's creditors.

108.    Nonetheless, on December 31, with the Defendant's support, the Board

unanimously approved the early termination of the SERP.

109.    As a direct result of the Board's approval of the early termination of the SERP,

the Firm was required to later make distributions to shareholders, including members of the

Board (the "SERP Distributions"). These funds could have otherwise been available to the

Firm's creditors.

**ii.    Early Distribution of the SERP**

110.    In December 2017, the decision by the Board to terminate the SERP created a

requirement that the Debtor make the SERP Distributions to the participating shareholders within

two years of the termination, which became effective on December 31, 2017. Therefore, the

Board had the option to wait until December 31, 2019, to liquidate the SERP and order the SERP Distributions.

111.    However, on December 11, 2018, with the Defendant's support, the Board unanimously approved a resolution directing the payment of the SERP Distributions to participating shareholders. Recipients of the funds included the Defendant and members of the Board.

112.    As a direct result of the Board's approval of the early termination of the SERP the firm made the SERP Distributions in the amount of $2,812,000. These payments not only benefited the Defendant and members of the Board, but these funds could have otherwise been available to the Firm's creditors.

C.    **Contributions to Debtor's 401(k) Plan**

113.    The Debtor created and maintained a 401(k)-retirement investment plan (the "401(k) Plan") for its professional staff and non-member attorneys.

114.    The 401(k) Plan was a qualified plan subject to Section 401(k) of the Internal Revenue Code.

115.    Pursuant to the 401(k) Plan, the Debtor, in its sole discretion, could elect to match certain contributions by its employees. Accordingly, the Board was periodically asked to approve the voluntary payment of matching contributions into the 401(k) Plan.

116.    On December 19, 2017, the Board unanimously approved the payment of approximately $350,000 of discretionary matching funds (the "2017 401(k) Contributions") into the 401(k) Plan for the 2017 calendar year.

117.    Over the course of the 2018 calendar year, the Debtor's discretionary matching contributions to the 401(k) fund became improperly disproportionate toward highly compensated

employees and could not meet nondiscrimination tests required by Section 401(k) of the Internal Revenue Code and associated regulations.

118.    In order to maintain compliance with relevant regulations, the Board was presented with the option of returning certain funds from the 401(k) Plan to highly compensated employees (i.e., attorneys) or paying an additional $219,940.23 into the 401(k) fund from company accounts. If the funds were returned from the 401(k) Fund to the highly compensated employees, such funds would have been subject to relevant income taxes for the concerned individuals.

119.    On February 19, 2019, the Board unanimously approved an additional discretionary payment of $219,940.93 into the 401(k) Plan. After further calculation the required discretionary amount was reduced to approximately $160,000 (the "2018 401(k) Contributions") which was paid into the Firm's 401(k) Plan. This was done to protect highly compensated individuals from additional taxation.

120.    As a result of the Board's approval of discretionary matching contributions into the 401(k) Plan the Firm made payments of approximately $510,000 that benefited highly compensated attorneys, among others.  These funds could have otherwise been available to the Firm's creditors.

**D.      Dividend Payments**

121.    The Debtor's Preferred Stock provided for the payment of significant dividends to shareholders, to be paid at the discretion of the Board and subject to financial solvency.

122.    As of September 16, 2017, the Firm was insolvent.

123.    Yet, on September 26, 2017, the Board, with the Defendant's support, unanimously approved the payment of 8% quarterly dividends to holders of the Debtor's Preferred Stock for the third quarter of 2017.

23

124.    Further, on December 19, 2017, the Board, with the Defendant's support, again approved the payment of quarterly dividends to holders of the Debtor's Preferred Stock for the fourth quarter of 2017.

125.    As a result of the Board's approval of quarterly dividends, the Firm made total payments of $167,259 to shareholders (the "2017 Dividend Payments"), payments that should have been subject to the Firm's creditors.

E.    **Extraordinary Bonus Payments and Member Distributions**

126.    Part of the Firm's compensation to employees, attorneys and members included the payment of extraordinary bonuses.

127.    The Debtor's Compensation Policy in effect in 2017 and 2018 stated, among other things, that:

> Members split whatever profit remains after payment of properly payable Firm expenses and a reserve for working capital and for a bonus pool.  The Firm cannot pay out more than it earns, nor can it borrow funds from future years and future partners to pay Members money that was not earned in a particular year.

i.    **2017 Bonuses**

128.    For the 2017 calendar year, the Debtor failed to make a profit and, in fact, was unable to pay its operating expenses or provide a reserve for working capital.

129.    On December 19, 2017, the Board was presented with a proposal to not only approve bonus payments to shareholders but to actually expand the size of the Shareholder Extraordinary Bonus pool from $1.7M to $2.5M. Although the Board deferred action that day, on January 10, 2019, the Board, with Defendant's support, approved a proposal to pay recommended bonus payments to shareholders from an increased bonus pool of over $2 million.

130.    As a result of the Board's approval of the payment of 2017 extraordinary bonuses,

the Firm made payments of $1,728,000 to shareholders (the "2017 Bonus Payments"), payments

that should have been subject to the Firm's creditors.

ii.    **2018 Bonuses**

131.    For the 2018 calendar year, the Debtor failed to make a profit and, in fact, was

unable to pay its operating expenses or provide a reserve for working capital.

132.    On January 21, 2019, the Board, with the Defendant's support, approved a

proposed bonus pool of $750,000 based on 2018 performance. As recipients of the payments,

members of the Board were self-interested parties to the transaction.

133.    As a result of the Board's approval of the payment of 2018 extraordinary bonuses,

the Firm made payments of $780,000 to shareholders (the "2018 Bonus Payments"), payments

that should have been subject to the Firm's creditors.

F.    **Excess Compensation to Firm Officers and Directors**

134.    Beginning in 2009 the Debtor began executing several so-called Soft Landing

Contracts with executives and firm leaders including Gary LeClair, Bruce Matson, Michael Hern

and David Freinberg (collectively, the "Firm Leaders"). These SLCs required significant cash

payments to the Firm Leaders purportedly in recognition of past service to the Firm and not as

compensation for current contributions. However, the Firm Leaders were exactly the individuals

whose acts and omissions first led the Debtor into insolvency.

135.    In 2016, the Board recognized that the SLCs were contributing to the Debtor's

liquidity issues and further acknowledged that one or more of the Firm Leaders could be

terminated for cause as a result of the Firm Leaders' actions that led to the Debtor's financial

troubles. Such a termination for cause would have relieved the Firm of any further payment

obligations under the SLCs. However, in 2016, the Board chose not to terminate any of the Firm

25

Leaders. Rather, on December 27, 2016, the Board, with the Defendant's support, approved renegotiated SLCs with the Firm Leaders.

136.    From January 2017 until the dissolution of the Firm, the Board had just cause to terminate the SLCs, yet the Board, with the Defendant's support, failed to take appropriate action and allowed the Debtor to continue making payments under the SLCs.

137.    By this omission, the Board allowed the renegotiated SLCs to constrain the Debtor's cash flow until the dissolution of the Firm, costing the Debtor at least $1,483,000 in overpaid and improper compensation.

138.    These funds (the "SLC Compensation"), which were distributed to the Firm Leaders, would have otherwise been available to creditors.

### G.    Continued Funding of Life Insurance Policy

139.    At the same time that the Debtor was funding SLC payments to the Firm Leaders, the Firm was also making continued life insurance payments for the benefit of one of the Firm Leaders.

140.    For example, throughout 2017, 2018 and until the firm's dissolution in 2019, the Debtor paid annual premiums on a life insurance policy with Banner Life Insurance Co. (the "Banner Policy") for Gary LeClair even though the Board and the Defendant were aware the Firm could terminate the life insurance policy or transfer payment responsibility to Mr. LeClair.

141.    In sum, between September 2017 and September 2019, the Firm paid approximately $50,000 in premiums on the Banner Policy.

142.    As a direct result of the Board's failure to terminate the Banner Policy and its allowance of the subsequent transfer of the Banner Policy caused at least $50,000 of damages (the "Banner Payments"). These funds could have been otherwise available to the Firm's creditors.

26

## H.      Conversion From PC to PLLC

143.     In late 2017, the Board began to entertain possible solutions to the Debtor's cash flow limitations, specifically through the formation of a joint venture with UnitedLex.  Through active negotiation by certain Board members and UnitedLex, by December 2017, the outlines of a "growth opportunity" that would eventually become the ULXP joint venture had been presented to the Board.

144.     Again on January 10, 2018, the Board was updated on the potential joint venture, this time directly by UnitedLex personnel.

145.     One critical part in the proposed process was the two-step conversion of the Debtor's corporate structure from a PC to a PLLC.  First, the Debtor would be converted from a cash-basis PC to an accrual-basis PC.  Then, the accrual-basis PC would be converted to a PLLC.

146.     As a due diligence action, the Debtor sought tax advice regarding the consequences of such a conversion.

147.     On February 9, 2018, Keiter CPAs ("Keiter"), the Debtor's external tax advisor, presented to the Board the implications of the ultimate conversion of the Firm to a PLLC. In particular, Keiter alerted the Board that while the conversion to a PLLC would have certain income tax benefits for individual shareholder compensation, the Firm would incur an estimated $4.3 million in federal and state tax liability.

148.     Although the ULXP transaction was pitched as a solution to the Debtor's cash flow problems, in fact, the promise of liquidity was illusory. Not only did UnitedLex renege on the redemption of $22 million of shareholder equity, but it offered cash relief only in the form of a temporary float through extended payment terms on invoices.

149.     Given its terms, the ULXP deal presented to the Board was damaging for the Debtor.  Nonetheless, on February 19, 2018, for the sole purpose of facilitating the investment in the ULXP joint venture, the Board, with the Defendant's support, approved the Firm's conversion to a PLLC, incurring the expected federal tax liability.

150.     Moreover, when the transaction was completed, the Debtor was not able to pay in full the required tax payments. The resulting interest and penalties brought the Debtor's total tax loss associated with the conversion to $3,786,000.

151.     Additionally, the Firm incurred $258,000 in professional fees related to the conversion, including tax and legal advisers.

152.     As a result of the Board's approval of the ULXP transaction, the Firm incurred $4,044,000 million in debts (the "ULXP Transaction Costs"), funds that should have been otherwise available to the Firm and its creditors.

**I.     Approval of Alexandria, Virginia Lease**

153.     In early 2019, the Debtor's financial state continued to worsen as the ULXP transaction had failed to provide anything more than superfluous hope and empty promises. The Firm had seen additional shareholder defections and, consequently, rising vacancy rates in its office space—which happened to be one of the Firm's most costly operating expenses.

154.     At this time, the Debtor held a lease on office space in Alexandria, Virginia which was not due to expire for several months. However, on February 19, 2019, the Board was presented with an informational proposal to extend the lease on the current Alexandria office space. One or more individuals in management specifically recommended that the Board not accept the lease extension at this time.

28

155.    However, less than one month later, on March 11, 2019, management urged the approval of entering into a new lease on the Alexandria property, with the alternative being to find new office space in January 2020.

156.    Concurrently, however, members of the Board and other leaders within the Firm, although acknowledging privately that liquidation of the Firm was inevitable, were seeking new "growth opportunities" for certain members of the Firm. In particular, the Firm was seeking potential partners for a "merger" as well as investigating ways to form a new law firm—the Novellus Law Group—using certain Firm assets while leaving behind the majority of liabilities other than obligations to UnitedLex/ULXP.

157.    The Board, with the Defendant's support, eventually approved the extended lease for the Alexandria property on March 11, 2019, more than eight months before its expiration.

158.    For an insolvent firm this decision can only logically be explained as an attempt to secure office space for the eventual Novellus Law Group.

159.    However, all that resulted from the extended lease was an additional $1.398 million liability for LCR (the "Alexandria Lease Debt").

**J.      The Pursuit of Novellus Law Group**

160.    With the ULXP transaction having provided no benefit to the Debtor, entering 2019, the Firm was still on the path to its eventual bankruptcy filing. Yet, rather than dissolve the Firm then, and, indeed, having failed to dissolve the Firm much sooner than that, the Defendant and others made yet another attempt to enrich themselves, at the Firm's expense and in breach of their fiduciary obligations.

161.    The Defendant and others schemed to partner once again with UnitedLex to form a new law firm—the Novellus Law Group ("NLG")—that would give a few select members a clean slate, while leaving the Firm saddled with the liabilities that years of mismanagement had

29

created. Compounding this wrongdoing, the Defendant and others misappropriated the Firm's

assets in pursuit of this plan—a plan that was in obvious disregard of the Firm's best interests.

162.    The Board and the Defendant knew or should have known about the potential

NLG transaction.

163.    NLG was not intended to simply be a continuation of LeClairRyan, but rather a

new entity that attempted to strip LeClairRyan of its assets and profitable members while leaving

debt and other liabilities, including but not limited to certain real estate leases and technology

costs, with the Firm.

164.    The purpose was to personally benefit the Defendant, among others. Financially

impaired, the Firm could not survive on its own, but it also could not find a merger partner

because of its dire financial condition. The Defendant and others nonetheless stalled the Firm's

inevitable dissolution just so that they and a select few could have time to try and take the Firm's

best assets to start a new law group for themselves, get a fresh start and "reboot" their individual

practices, all in derogation to their obligations to the Firm as a whole. The goal was undoubtedly

to take the new, unspoiled law firm and merge it with another firm at a later date or, having

partnered again with UnitedLex, even achieve a liquidity-like event if UnitedLex were to go

public.

165.    To help facilitate this transaction, the Firm made cash payments to ULXP and

entered into the ULXP Security Agreement (which among other things authorized related UCC

filings) (as described below in more detail).  The Board, with the Defendant's support, approved

the ULXP Security Agreement and was aware of payments to ULXP under the Master Services

Agreement between the Firm and ULXP.

166.    Under the proposal, the "debts" owed by the Firm to ULXP would be assumed by the newly-formed NLG, and the equity investments that UnitedLex purportedly made in connection with the prior joint venture with the Firm would be incorporated into the new entity's debt and/or equity structure.  UnitedLex would also be entitled to various fees and other streams of income including but not limited to profits generated by the new law firm.

167.    Expenditures by the insolvent Debtor towards this transaction were intended to jettison and ignore its existing creditors and is forbidden by law and contract.  Indeed, the proposed NLG transaction was expressly designed to hinder or delay the vast majority of the Firm's existing creditors while favoring some shareholders and one particular creditor, UnitedLex.

168.    Thus, from March 1, 2019, when the Board and the Defendant knew or should have known that the Debtor could not continue ongoing operations in its current state, any funds expended towards NLG or other pursuits to the detriment of the Firm's creditors was improper.

169.    Rather than protecting the Firm's existing assets and preparing the Debtor for an orderly wind-down and/or bankruptcy filing, the Board and the Defendant allowed further corporate waste.

170.    For example, on April 1, 2019, the Board, with the Defendant's support, approved the conversion of $8 million of the Debtor's accounts payable to ULXP into a promissory note to ULXP. The Board, with the Defendant's support, also approved granting ULXP a security interest in the Debtor's assets. Further, the Board, with the Defendant's support, allowed the Firm to expend professional fees in furtherance of the NLG scheme, some of which was in search of advice on successor liability and how to avoid claw backs of shareholder/member

funds, all of which was for the benefit of certain members and/or UnitedLex/ULXP to the detriment of the Firm and its creditors.

171.    In all, the Board's pursuit of the NLG transaction cost the Firm at least $93,000 in direct expenditures (the "NLG Expenditures") and resulted in a diminution of the Debtor's assets in the amount of at least $12,899,000 (the "NLG Damages"). These funds should have been available to the Firm's creditors.

### K.    The Debtor's Dissolution

172.    Eventually, the Debtor's pursuit of the NLG transaction failed.

173.    On July 24, 2019, the Board unanimously approved the dissolution of the Firm as well as certain resolutions related to the wind-down of the Firm.

174.    Included in these resolutions was the formation of a Dissolution Committee and a release from liability (the "D&O Releases"). This supposed release from liability purported to absolve every current member of the Firm who served as, or as members of, "the Board of Managers, the Leadership Committees, the Pension/Benefits Committee, the Lead Manager, the Chief Executive Officer, Partnership Representative, and all other Executive Officers of the Firm and/or in any administrative role." The D&O Releases also sought to release from liability all members of the Dissolution Committee.

175.    This self-serving release sought to release all of the Firm's leaders, past and present, for any and all misconduct with the only exception being narrowly confined to a "Member's individual fraud or intentional misconduct."

176.    The Debtor received nothing of tangible or concrete value in exchange for the D&O Releases.

177.    On July 29, 2019, the Debtor's members voted to dissolve LCR and wind-down the Debtor's operations.

## V.    Shareholder and Member Compensation Paid Pursuant to Shareholder Agreements, Board Resolutions, and Compensation Policies

178.    Shareholder and member compensation was determined in accordance with applicable shareholder agreements, resolutions by the Debtor's Board and/or annual compensation policies (policies that were thereafter modified as needed to enable diverting millions of dollars of scarce funds to shareholders and/or members when the Firm failed to meet metrics contained in the initial policy).

### A.    Shareholder Agreements

179.    While a PC, the Debtor's relationship with the Defendant was governed by, among other operative documents, the *Third Amended and Restated Shareholders Agreement of LeClairRyan, a Professional Corporation, effective as of December 31, 2013* (as amended, modified, or supplemented, the "Third A&R Shareholder Agreement").

180.    While a PLLC, the Debtor's relationship with the Defendant was governed by, among other operative documents, the *Fourth Amended and Restated Shareholders Agreement of LeClairRyan, a Professional Corporation and Operating Agreement of LeClairRyan PLLC, dated February 27, 2018* (as amended, modified, or supplemented, the "Fourth A&R Shareholder Agreement," and together with the Third A&R Shareholder Agreement, the "Shareholder Agreements").

### B.    Board Resolutions

181.    As further explained below, the shareholders were governed by compensation policies and Resolutions of the Debtor's Board (the "Board Resolutions").

182.    For the 2014 compensation year, the Board Resolutions:

> RESOLVED, that for the 2014 budget year, the Firm must have calendar year profits of at least the sum of 1% of fee revenues (determined on an accrual basis after making adjustments to deduct tax liabilities determined on a cash basis), inclusive of the amount

33

of dividends paid, before Shareholder or Officer At-Risk Salaries, or lateral Shareholder and Officer contingent performance bonuses with respect to such calendar year (which are payable early in the next calendar year) could be paid.

183.    For the 2015 compensation year and later years, the Board Resolutions resolved:

Beginning in 2015, the Firm must have calendar year profits of at least the sum of 1% of fee revenues (determined as described above), plus the amount of dividends paid, before Shareholder or Officer At-Risk Salaries, or lateral Shareholder and Officer contingent performance bonuses with respect to such calendar year could be paid (the "Minimum Profit Guardrail").

184.    Pursuant to the Board Resolutions, the Debtor was required to achieve a minimum level of profits as a condition precedent before shareholders were entitled to the receipt of certain amounts.

## C.    Compensation Policies

185.    In addition to being governed by the Shareholder Agreements, and the Board Resolutions, compensation for shareholders and members, including the Defendant, were governed by LCR's annual compensation policies, which set forth the various categories of compensation paid to the Debtor's shareholders and members, as applicable (the "Compensation Policies").

186.    Among other things, the Compensation Policies set forth specific financial metrics and other factors that the Debtor had to satisfy in order to pay shareholders and members compensation in addition to their regular salary.  The additional compensation was not a fixed amount and was not guaranteed (the "Contingent Income").

187.    Between September 4, 2014 and the Petition Date, LCR paid the Defendant $261,743 in Contingent Income and Member Draws in violation of the Compensation Polices, the Shareholder Agreements, and the Board Resolutions.

34

188.    The Defendant knew or should have known (especially given the Defendant's role at the Firm) that the Defendant was being paid Contingent Income and Member Draws while LCR was insolvent, that the conditions precedent to pay these amounts were not satisfied, and that the payments were made with an intent to hinder, delay, and/or defraud LCR's creditors.

### i.        2014 Compensation Policy

189.    In 2014 and in addition to the Board Resolutions, shareholder compensation, including the Defendant's, was governed by the Shareholder and Officer Compensation Policy, effective January 1, 2014 and adopted November 26, 2013 (the "2014 Compensation Policy").

190.    The 2014 Compensation Policy stated that shareholders' compensation from the Debtor was comprised of (a) Regular Salary, (b) At-Risk Salary, and (c) Contingent Retention Incentive (each as defined in the 2014 Compensation Policy).

191.    The At-Risk Salary set forth in the 2014 Compensation Policy was Contingent Income subject to, among other things, the Debtor's financial performance during the year.

192.    The 2014 Compensation Policy stated that a failure to satisfy the necessary conditions for payment of the At-Risk Salary means that the shareholder's "right to receive a particular At-Risk Salary . . . installment payment, as applicable, shall not have vested or be payable."

193.    Payment of the At-Risk Salary and Contingent Retention Incentive was also subject to a waterfall payment structure set forth in the 2014 Compensation Policy, with five waterfalls set forth therein.

194.    At-Risk Salary was paid in Waterfalls 1, 4 and 5, and Contingent Retention Incentive was paid upon Waterfall 5 being fully funded.

195.    The Debtor did not satisfy the necessary conditions precedent for payment of the At-Risk Salary or the Contingent Retention Incentive.

196.    As the Debtor did not satisfy the necessary conditions precedent, the Defendant should not have received the At-Risk Salary payments under the 2014 Compensation Plan.

197.    Shareholders were told by management of LCR that the At-Risk Salary and the Contingent Retention Incentive were unearned in a presentation on October 24, 2014.

198.    In violation of the Board Resolutions and the 2014 Compensation Policy, the Defendant received $28,500 in At-Risk Salary.

199.    In October 2014, it was communicated to shareholders that, as a result of the failure to meet 2014 performance thresholds, the 5% Contingent Retention Incentive scheduled to be paid in installments from May to September 2015 was unearned.

200.    However, Shareholders were told that as a result a new "2015 Retention Incentive" would be created, and the payments would be made on the same schedule as the unearned Contingent Retention Incentive.

201.    In November 2014, Shareholders voted to approve this 2015 Retention Incentive to ostensibly pay themselves the Contingent Retention Incentive that they did not earn based on 2014 performance.  At the time these 2015 Retention Incentive payments were made, the Debtor faced severe liquidity issues with a majority of its accounts payable past due and taking actions such as utilizing CAPE funds and making improper draws on construction loans to fund operations.

202.    The Defendant was or should have been aware that the Retention Incentive paid in 2015 was for the unearned 2014 Contingent Retention Incentive.

203.    For example, an April 15, 2015 shareholder communication explained that "Certain shareholders were paid $2.5 million of compensation in the first quarter of 2015 that the Firm delayed paying them from 2014 year end."

204.    As a result, the Defendant received $19,000 of 2015 Retention Incentive payments that were unearned based on the 2014 Compensation Policy.

### ii.     2015 Compensation Policy

205.    In 2015 and in addition to the Board Resolutions, shareholder compensation, including the Defendant's, was governed by the 2015 Shareholder and Officer Compensation Policy, adopted November 25, 2014 (the "2015 Compensation Policy").

206.    The 2015 Compensation Policy stated that shareholders' compensation from the Debtor was comprised of (a) Regular Salary, (b) the 2015 Retention Incentive (described above), (c) the Shareholder Equalization Payment, (d) the targeted Shareholder Performance Payment, and (e) the 2016 Contingent Retention Incentive (each as defined in the 2015 Compensation Policy).

207.    The Shareholder Equalization Payment and the targeted Shareholder Performance Payment were Contingent Income subject to, among other things, the Debtor's financial performance during the year.

208.    The 2015 Compensation Policy stated that failure to satisfy the necessary conditions for payment of the 2015 compensation "shall mean that the Shareholder's right to receive a particular payment shall not have vested or be payable."

209.    Payment of the Shareholder Equalization Payment and the targeted Shareholder Performance Payment were also subject to a waterfall payment structure set forth in the 2015 Compensation Policy, with four waterfalls set forth therein.

210.    The Shareholder Equalization Payment was included in Waterfall 1 and the targeted Shareholder Performance Payment was included in Waterfall 4.

211.    The Debtor did not satisfy the necessary financial performance to pay shareholders the Shareholder Equalization Payment, the Shareholder Performance Payment, and the 2015 Retention Incentive under the 2015 Compensation Policy in full.

212.    As the Debtor did not satisfy the necessary conditions precedent, the Defendant should not have received the Shareholder Equalization Payment and the targeted Shareholder Performance Payment payments under the 2015 Compensation Policy.

213.    In violation of the Board Resolutions and the 2015 Compensation Policy, the Defendant received a $20,500 Shareholder Equalization Payment and a $10,250 Shareholder Performance Payment.

### iii.    2016 Compensation Policy

214.    In 2016 and in addition to the Board Resolutions, shareholder compensation was governed by the Amended and Restated 2016 Shareholder Compensation Policy, adopted June 3, 2016, which amended and restated the policy adopted September 2, 2015 (the "2016 Compensation Policy").

215.    The 2016 Compensation Policy stated that shareholders' compensation from the Debtor was comprised of (a) Regular Salary, (b) the Shareholder Equalization Payment, and (c) the Targeted Pro-Rata Payments (each as defined in the 2016 Compensation Policy).

216.    The Shareholder Equalization Payment and the Targeted Pro-Rata Payments were Contingent Income subject to, among other things, the Debtor's financial performance during the year.

217.    The 2016 Compensation Policy stated that failure to satisfy the necessary conditions for payment of the 2016 compensation "shall mean that the Shareholder's right to receive a particular payment shall not have vested or be payable."

38

218.    Payment of the Shareholder Equalization Payment and the Target Pro Rata Payments were also subject to a waterfall payment structure set forth in the 2016 Compensation Policy, with four waterfalls set forth therein.

219.    The Shareholder Equalization Payment was included in Waterfall 2 and the Target Pro Rata Payment was included in Waterfall 3.

220.    The Debtor did not make contingent Shareholder Equalization Payments or Targeted Pro-Rata Payments under the 2016 Compensation Policy.

### iv.    2017-18 Compensation Policy

221.    In 2017 and 2018 and in addition to the Board Resolutions, shareholder and member compensation, as applicable, was governed by the Member Compensation Policy, adopted June 13, 2017 (the "2017-2018 Compensation Policy").

222.    The 2017-2018 Compensation Policy states that "[t]he Member compensation system set forth in this policy recognizes that, at the end of every calendar year, Members split whatever profit remains after payment of properly payable Firm expenses and a reserve for working capital and for a bonus pool.  The Firm cannot pay out more than it earns, nor can it borrow funds from future years and future partners to pay Members money that was not earned in a particular year."

223.    Pursuant to the 2017-2018 Compensation Policy, the Debtor paid members through draws (the "Member Draws").

224.    The Debtor did not earn a profit in either 2017 or 2018.

225.    Because the Debtor did not earn a profit in either 2017 or 2018, it was not entitled to distribute any Member Draws in 2017 or 2018.

226.    In 2017, the Debtor incurred a net loss of about $2,743,993.

227.    In 2018, the Debtor incurred a net loss of about $16,890,705.

228.    In both 2017 and 2018, the Debtor paid out to shareholders and/or members, as applicable, more than the Debtor earned.

229.    In 2018, the Debtor transferred $101,955 in Contingent Income and Member Draws to the Defendant.

230.    The transfers of Contingent Income and Member Draws in 2018 were made by the Debtor to the Defendant with the intent to hinder, delay, and/or defraud the Debtor's creditors and while the Debtor was insolvent.

231.    The Defendant knew or should have known that the Debtor paid the Contingent Income and Member Draws in 2017 and 2018 while the Debtor was insolvent, that the conditions precedent to pay these amounts were not satisfied, and that the payments were made with an intent to hinder, delay, and/or defraud the Debtor's creditors

### v.    2019 Member Compensation Policy

232.    In 2019 and in addition to the Board Resolutions, member compensation was governed by the Member Compensation Policy, adopted February 18, 2019 (the "2019 Compensation Policy," and together with the 2014 Compensation Policy, the 2015 Compensation Policy, the 2016 Compensation Policy, and the 2017-2018 Compensation Policy, the "Compensation Policies").

233.    The 2019 Compensation Policy states that "[t]he Member compensation set forth in this policy recognizes that Members split whatever profit remains after payment of properly payable Firm expenses and a reserve for working capital. The Firm cannot distribute to Members more than it earns in profit in any particular calendar year, regardless of the manner in which profit that is distributed. While the Firm may attribute portions of a current year profit pool based on past performance, it cannot borrow funds from future years or future partners to pay Members for profit that was not generated in a particular year."

234.    Pursuant to the 2019 Compensation Policy, the Debtor paid members through Member Draws.

235.    The Debtor did not earn a profit in 2019.  From January 1 to September 3, 2019, the Debtor incurred a net loss of over $13,000,000.

236.    In 2019, the Debtor paid out to members more than the Debtor earned.

237.    In 2019, the Debtor transferred $81,538 in Member Draws to the Defendant.

238.    The payment of the Member Draws in 2019 were made by the Debtor to the Defendant with the intent to hinder, delay, and/or defraud the Debtor's creditors and while the Debtor was insolvent.

239.    The Defendant knew or should have known the Debtor paid the Member Draws in 2019 while the Debtor was insolvent, that the conditions precedent to pay these amounts were not satisfied, and that the payments were made with an intent to hinder, delay, and/or defraud the Debtor's creditors.

### vi.    Wells Fargo Cash Covenant and the Cash Covenant Payments

240.    A portion of the Contingent Income that the Defendant received from the Debtor were payments made in violation of the Debtor's agreement with Wells Fargo Bank, N.A. ("Wells Fargo") under the Second Amended and Restated Loan and Security Agreement between the Debtor and Wells Fargo (as amended, modified, or supplemented, the "Wells Fargo Loan Document").

241.    From the period of no later than September 3, 2014 to December 29, 2017, the Debtor borrowed funds from Wells Fargo pursuant to the Wells Fargo Loan Document.

242.    Pursuant to the Wells Fargo Loan Document, the Debtor was required to maintain positive cash flows as of each fiscal year end for such year (the "Wells Fargo Cash Covenant"). The Debtor, with fraudulent intent, manipulated certain payments made to the Debtor's

shareholders so as to not violate the Wells Fargo Cash Covenant and to hinder, delay, and/or defraud the Debtor's creditors. Specifically, on December 31, 2014, for tax purposes, the Debtor dated certain payments to shareholders, including the Defendant, but instructed its payroll provider to not release the shareholder compensation funds until January 6, 2015 (the "Initial Cash Covenant Payments" and each an "Initial Cash Covenant Payment").

243.    Again, on December 31, 2015, the Debtor dated certain payments to shareholders, including the Defendant, for tax purposes but did not distribute those payment to shareholders until January 4, 2016 (collectively with the Initial Cash Covenant Payments, the "Cash Covenant Payments" and each, with the Initial Cash Covenant Payment, a "Cash Covenant Payment").

244.    The Cash Covenant Payments were delayed until January 6, 2015 and January 4, 2016 with the express purpose to avoid reporting the cash outflow for the Wells Fargo Cash Covenant. Otherwise, if the Debtor had made the Cash Covenant Payments on December 31, 2014 and December 31, 2015, it would have violated the Wells Fargo Cash Covenant at the end of each calendar year.

245.    The Defendant knew or should have known that the Cash Covenant Payments were a violation of the Wells Fargo Cash Covenant.

246.    For example, in a December 22, 2015 shareholder information meeting, shareholders were told that Shareholder Payments would be funded in 2015, but not paid until 2016 because of a "Wells Fargo cash covenant compliance issue. … Wells Fargo cash covenants regarding the Firm's cash profits/loss prohibit the payments of both …payroll and Shareholder Equalization payments…" Despite failing to meet the necessary budget metrics, shareholders were told that some payments "will be paid December 31, 2015 via live check" and "available for pickup in the office January 4th, 2016."

247.    Defendant received Cash Covenant Payments totaling $9,500, which were paid by the Debtor to the Defendant as part of his Contingent Income.

## VI.    Shareholder and Member Compensation From the Debtor's Deferred Compensation and Supplemental Retirement Plans

248.    As discussed above, the Debtor maintained and funded the Deferred Compensation Plan and the SERP as additional compensation for shareholders. Among the improper Deferred Compensation Distributions and SERP Distributions were payments made to the Defendant.

### A.    Termination of the Deferred Compensation Plan and the SERP

249.    As detailed above, notwithstanding the Retirement Plan Committee's refusal to endorse an accelerated termination, on December 29, 2017, the Board, with the Defendant's support, formally voted to terminate the Deferred Compensation Plan and SERP, effective December 31, 2017.

250.    The termination allowed the Debtor to distribute the funds in the Deferred Compensation Plan to its members, diverting them away from the Firm's general unsecured creditors.

251.    The Board, with the Defendant's support, made this decision knowing that it would "benefit high performing Shareholders," and made that a factor in trying to message the payments made to shareholders in the year ending 2017.

252.    At the time that this decision was made, the Board anticipated and represented that "[t]he Firm will have to fund the payment gap in the [Deferred Compensation] Plan and that [it] will be in the 2019 budget, but not a 2018 expense."

253.    Notwithstanding that the decision to accelerate the termination was made because the payments would be in the 2019 budget, and not in 2018 budget and that the tax code allowed

until December 2019 for the funds to be distributed to the members, the Board voted on December 28, 2017, to distribute the funds on December 2018.

254.    Such a decision was made to benefit the individual members of the firm, as a distribution from the termination of the Deferred Compensation Plan or SERP would "ordinarily would be taxable to the Partners, but it is anticipated that the approximately $3 million in projected PLLC-related tax savings to Partners will effectively offset much of the tax."

255.    As described above, the Rabbi Trust Agreement had a Cease Payments When Insolvent Requirement and provided that the Rabbi Trust was subject to the claims of the general creditors of the Debtor.

256.    The Defendant was aware, or should have been aware, that the assets were available to satisfy creditors.

257.    For instance, in the 2015 Plan Year Enrollment Kit, all participants were told that "assets held in the Rabbi Trust are considered Company assets and are available to satisfy the claims of creditors of the Company.  In the event the Company becomes insolvent, you are an unsecured general creditor of the Company with regard to your benefits under the Plan."

**B.     Distributions from the Deferred Compensation Fund and SERP**

258.    The Defendant received distributions from the Rabbi Trust in a total amount of $67,484 between September 1, 2014 and December 31, 2018 (the "Deferred Compensation Payments").  That amount includes a distribution from the Rabbi Trust of $67,484 on December 31, 2018.

259.    Notwithstanding the expressed Insolvency Notification Requirement in the Rabbi Trust Agreement, upon information and belief, the Debtor, including the Defendant, failed to ever provide notice of its insolvency to the Rabbi Trust's trustee upon its insolvency or prior to the distribution of Rabbi Trust assets to shareholders/members.

260.    As the Debtor was insolvent at the time of the distribution from the Rabbi Trust to the Defendant, the Defendant was not entitled to receive a distribution from the Rabbi Trust because of the Cease Payments When Insolvent Requirement and the Rabbi Trust's assets should have been maintained for the benefit of the Debtor's general creditors.

261.    The payment of the distribution from the Rabbi Trust to the Defendant was made by the Debtor to the Defendant with the intent to hinder, delay, and defraud the Debtor's creditors and while the Debtor was insolvent.  The Defendant knew or should have known that distribution from the Rabbi Trust occurred while the Debtor was insolvent, and that the payments were made with an intent to hinder, delay, and/or defraud the Debtor's creditors.

262.    Additionally, shareholders received Deferral Payments.

263.    The Deferral Payments were made by the Debtor to the Defendant with the intent to hinder, delay, and defraud the Debtor's creditors and while the Debtor was insolvent.

## CLAIMS FOR RELIEF

**COUNT I**:    **Breach of Fiduciary Duty in Violation of Va. Code Ann. § 13.1–690**

264.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

265.    The Defendant was a director of LCR and owed LCR fiduciary duties of due care and loyalty.

266.    Beginning at least in 2014 and continuing until the Petition Date, the Debtor was insolvent. Consequently, the Defendant owed fiduciary duties of due care and loyalty to the Debtor's creditors.

267.    The Defendant failed to discharge these fiduciary duties to LCR and to the Firm's creditors by committing wrongful acts and omissions, and engaging in self-dealing. Included in these acts and omissions are the Defendant's approval of the early termination and payout of the

45

Deferred Compensation Distributions and SERP Distributions, the failure to notify the Rabbi

Trust of the Firm's insolvency, the approval of the 2017 401(k) Contributions, 2018 401(k)

Contributions, the approval of 2017 Dividend Payments, the approval of 2017 Bonus Payments

and 2018 Bonus Payments, the allowance of continued SLC Compensation, the approval of

Banner Payments, the approval of ULXP Transaction Costs, the approval of the Alexandria

Lease Debt, the waste of corporate assets resulting in the NLG Damages, and the associated

failure to dissolve the Firm in a timely fashion.

268.    As a direct and proximate cause of Defendant's foregoing breaches of fiduciary

duty and self-dealing, the Debtor and its creditors sustained damages of at least $32,913,272.

269.    Pursuant to Virginia Code Section 13.1–690, the Trustee is entitled to judgment

against the Defendant and recovery of the damages suffered by the Debtor and its creditors in an

amount to be proved at trial.

**COUNT II**:    **Common Law Breach of Fiduciary Duty**

270.    The Trustee repeats and re-alleges the allegations set forth in all preceding

paragraphs of this Complaint, as if set forth herein.

271.    The Defendant was a director of LCR and owed LCR fiduciary duties of due care

and loyalty.

272.    Beginning at least in 2014 and continuing until the Petition Date, LCR was

insolvent. Consequently, the Defendant owed fiduciary duties of due care and loyalty to the

Firm's creditors.

273.    The Defendant failed to discharge these fiduciary duties to the Debtor and to the

Debtor's creditors by committing wrongful acts and omissions, and engaging in self-dealing.

Included in these acts and omissions are the Defendant's approval of the early termination and

payout of the Deferred Compensation Distributions and SERP Distributions, the failure to notify

46

the Rabbi Trust of the Firm's insolvency, the approval of the 2017 401(k) Contributions, 2018

401(k) Contributions, the approval of 2017 Dividend Payments, the approval of 2017 Bonus

Payments and 2018 Bonus Payments, the allowance of continued SLC Compensation, the

approval of Banner Payments, the approval of ULXP Transaction Costs, the approval of the

Alexandria Lease Debt, the waste of corporate assets resulting in the NLG Damages, and the

associated failure to dissolve the Firm in a timely fashion.

274.   As a direct and proximate cause of Defendant's foregoing breaches of fiduciary

duty and self-dealing, the Debtor and its creditors sustained damages of at least $32,913,272.

275.   The Trustee is entitled to judgment against the Defendant and recovery of the

damages suffered by the Debtor and its creditors in an amount to be proved at trial.

**COUNT III**:     **Unlawful Distribution in Violation of Va. Code Ann. §§ 13.1-653, 13.1-690
and 13.1–692**

276.   The Trustee repeats and re-alleges the allegations set forth in all preceding

paragraphs of this Complaint, as if set forth herein.

277.   Beginning at least in 2014 and continuing until the Petition Date, the Debtor was

insolvent.

278.   From February 2016 continuing until the August 1, 2019, the Defendant was a

director of LCR.

279.   In violation of Va. Code §§ 13.1-653 and 13.1-692 and without complying with

Va. Code § 13.1-690, the Defendant approved and/or caused shareholder distributions in the

form of member distributions, extraordinary bonuses, and contributions to and early termination

and payout of the Deferred Compensation Plan and the SERP at a time when, after giving effect

to all such shareholder distributions, LCR would be unable to pay its debts as they became due in

the usual course of business.

47

280.    Pursuant to Va. Code Va. Code §§ 13.1-653, 13.1-690 and 13.1-692 the Defendant is personally liable for these unlawful shareholder distributions.

281.    The Trustee is entitled to recover the unlawful shareholder distributions from the Defendant in an amount to be proved at trial.

**COUNT IV:**    **Avoidance and Recovery of Transfers of Contingent Income and Member Draws Made in Violation of the Shareholder Agreements, the Board Resolutions, and the Compensation Policies as Actual Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(A) & 550**

282.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

283.    The Debtor transferred $183,493 in Contingent Income and Member Draws to the Defendant within two years of the Petition Date.

284.    The Contingent Income and Member Draws constitute multiple transfers of property of the Debtor to the Defendant.

285.    The Defendant is an initial transferee of the Contingent Income and Member Draws for whose benefit the transfers were made.

286.    The transfers of Contingent Income and Member Draws were distributed to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

287.    The Debtor distributed the Contingent Income and Member Draws with the actual intent to hinder, delay, and/or defraud any entity which the Debtor was indebted or became indebted to on or after the date of each of the transfers of Contingent Income and Member Draws.

288.    The Trustee may rely on, and the circumstances reflect, several badges of fraud relating to the Contingent Income and Member Draws including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it

made the transfers of Contingent Income and Member Draws; (b) the transfers of Contingent Income and Member Draws were distributed to the Defendant, a shareholder/member of the Debtor; (c) the transfers of Contingent Income and Member Draws were distributed to the Defendant in violation of the Shareholder Agreements, the Board Resolutions, and the Compensation Policies; and (d) the transfers of Contingent Income and Member Draws amount to significant portions of the Debtor's Estate.

289.    Furthermore, the Defendant knew or should have known that the Debtor made the transfers of Contingent Income and Member Draws while the Debtor was insolvent by virtue of the Defendant's position as a [shareholder and member].   The Defendant had access to the Debtor's books and records and received frequent communication from the Debtor and its agents regarding the Debtor's financial position, and as a [shareholder and member evaluating the Debtor's financial state is routine business practice in the legal industry.

290.    Pursuant to Section 548(a)(1)(A) and Section 550 of the Bankruptcy Code, the Trustee is entitled to judgment against the Defendant: (a) avoiding the transfers of Contingent Income and Member Draws, (b) directing the transfers of Contingent Income and Member Draws be set aside, and (c) requiring the Defendant, as the recipient of the transfers of Contingent Income and Member Draws and/or the person for whose benefit the transfers of Contingent Income and Member Draws were given, to return the transfers of Contingent Income and Member Draws, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT V:**    **Avoidance and Recovery of Contingent Income and Member Draws Made in Violation of the Shareholder Agreements, the Board Resolutions, and the Compensation Policies as Actual Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544, 550, and Va. Code § 55.1-400**

291.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

49

292.    The Debtor transferred $261,743 in Contingent Income and Member Draws to the Defendant between September 3, 2014 and the Petition Date.

293.    The transfers of Contingent Income and Member Draws constitute multiple transfers of property of the Debtor to the Defendant.

294.    The transfers of Contingent Income and Member Draws were distributed to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

295.    The Debtor transferred Contingent Income and Member Draws with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to on or after the date of each of the transfers of Contingent Income and Member Draws.

296.    The transfers of Contingent Income and Member Draws to the Defendant were accompanied by several badges of fraud, including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it made the transfers of Contingent Income and Member Draws; (b) the transfers of Contingent Income and Member Draws were distributed to the Defendant, a shareholder of the Debtor; (c) the transfers of Contingent Income and Member Draws were distributed to the Defendant in violation of the Shareholder Agreements, Board Resolutions, the Compensation Policies, and/or applicable Virginia law; (d) the transfers of Contingent Income and Member Draws amount to significant portions of the Debtor's Estate; and (e) the transfers of Contingent Income and Member Draws were distributed to the Defendant in secrecy or concealment—[particularly as it relates to the Cash Covenant Payments].

297.    The transfers of Contingent Income and Member Draws were distributed to or for the benefit of the Defendant.

298.    Pursuant to Virginia Code Section 55.1-400, 11 U.S.C. § 544 and 11 U.S.C. § 550, the Trustee is entitled to judgment against the Defendant: (a) avoiding the transfers of Contingent Income and Member Draws, (b) directing the transfers of Contingent Income and Member Draws be set aside, and (c) requiring the Defendant, as the recipient of the transfers of Contingent Income and Member Draws and/or the person for whose benefit the transfers of Contingent Income and Member Draws were given, to return the transfers of Contingent Income and Member Draws, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT VI:**    **Avoidance and Recovery of Transfers of Contingent Income and Member Draws Made in Violation of the Shareholder Agreements, the Board Resolutions and Compensation Policies as Constructive Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(B) & 550**

299.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

300.    The Debtor transferred $183,493 in Contingent Income and Member Draws to the Defendant within two years of the Petition Date.

301.    The transfers of Contingent Income and Member Draws constitute multiple transfers of property of the Debtor's Estate to the Defendant.

302.    The transfers of Contingent Income and Member Draws were distributed to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

303.    The transfers of Contingent Income and Member Draws were distributed to or for the benefit of the Defendant.

304.    The Defendant did not provide reasonably equivalent value in exchange for the transfers of Contingent Income and Member Draws.

305.    Pursuant to Section 548(a)(1)(B) and Section 550 of the Bankruptcy Code, the Trustee is entitled to judgment against the Defendant: (a) avoiding the transfers of Contingent

Income and Member Draws, (b) directing the transfers of Contingent Income and Member Draws be set aside, and (c) requiring the Defendant, as the person for whose benefit the transfers of Contingent Income and Member Draws were given, to return the transfers of Contingent Income and Member Draws, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT VII:    Recovery Under Conversion for Transfers of Contingent Income and Member Draws**

306.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

307.    The Debtor did not satisfy the necessary conditions precedent for the Defendant to receive the transfers of Contingent Income and Member Draws to the Defendant in all relevant years.  Accordingly, the transfers of Contingent Income and Member Draws were wrongfully paid to the Defendant.

308.    The Debtor is entitled to immediate possession of Contingent Income and Member Draws transferred to the Defendant.

309.    The Trustee is entitled to recover the damages suffered by the Debtor in the amount to be proven at trial, but in no event less than the total amount of transfers of Contingent Income and Member Draws made to the Defendant.

**COUNT VIII:  Recovery Under Unjust Enrichment for Transfers of Contingent Income and Member Draws**

310.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

311.    The Debtor did not satisfy the necessary conditions precedent for the Defendant to receive the transfers of Contingent Income and Member Draws to the Defendant in all relevant years.

312.    The Debtor conferred a benefit on the Defendant through the conveyance of the transfers of Contingent Income and Member Draws.

313.    The Defendant accepted and retained the benefit of the transfers of Contingent Income and Member Draws without the Debtor satisfying the conditions precedent necessary to pay the Defendant the Contingent Income and Member Draws.

314.    The Defendant knew or should have known the Debtor did not satisfy the conditions precedent necessary for the Defendant to receive the transfers of Contingent Income and Member Draws.

315.    Allowing the Defendant to retain the benefits he received would be unjust.

316.    As a direct and proximate result of the foregoing wrongful acts and Defendant's unjust enrichment, the Debtor sustained damages in the amount of the transfers of Contingent Income and Member Draws and the Trustee is entitled to recover the same.

**COUNT IX:**    **Recovery Under Violation of Virginia Limited Liability Company Statute Va. Code § 13.1-1035 for the Transfers of Member Draws While the Debtor was a PLLC pursuant to 11 U.S.C. §§ 544, 550, and Va. Code. § 13.1-1035**

317.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

318.    During the time in which the Debtor was a Virginia PLLC, the Debtor transferred $183,493 in Member Draws to the Defendant.

319.    The Defendant was a member of the Debtor at the time it was a PLLC.

320.    As a PLLC, the Debtor was subject to the laws of the Virginia Limited Liability Company Act.

321.    During its time as a PLLC, the Debtor transferred the Member Draws to the Defendant while the Debtor was not able to pay its debt as they became due in the ordinary course of business.

322.    During its time as a PLLC, the Debtor's total assets were less than the sum of the Debtor's total liabilities.

323.    The transfers of Member Draws from the Debtor to the Defendant was in violation of the Virginia Limited Liability Company Act.

324.    Pursuant to Virginia Code Section 13.1-1035, the Trustee is entitled to judgment avoiding the transfers of Member Draws and ordering the Defendant to return such amount or the value thereof to the Debtor's Estate.

**COUNT X:**    **Avoidance and Recovery of the Deferred Compensation Payments Made in Violation of the Deferred Compensation Plan and Rabbi Trust Agreement as an Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A) & 550**

325.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

326.    Within two years prior to the Petition Date, the Debtor transferred $67,484 to the Defendant in the form of Deferred Compensation Payments.

327.    The Deferred Compensation Payments were transferred to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

328.    The Deferred Compensation Payments were transferred to or for the benefit of the Defendant.

329.    The Debtor transferred the Deferred Compensation Payments with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to on or after the date of the first Deferred Compensation Payment.

330.    The transfer of the Deferred Compensation Payments to the Defendant was accompanied by several badges of fraud, including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it made the Deferred

Compensation Payments; (b) the Deferred Compensation Payments was transferred to the Defendant, a shareholder of the Debtor; (c) the Deferred Compensation Payments was transferred to the Defendant in violation of the Deferred Compensation Plan, the Deferred Compensation Plan Document, and the Rabbi Trust Agreement; and (d) the Deferred Compensation Payments amounts to significant portions of the Debtor's Estate.

331.    Pursuant to Section 548(a)(1)(A) and Section 550 of the Bankruptcy Code, the Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferred Compensation Payments, (b) directing the Deferred Compensation Payments be set aside, and (c) requiring the Defendant, as the recipient of the Deferred Compensation Payments and/or the person for whose benefit the Deferred Compensation Payments was given, to return the Deferred Compensation Payments, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT XI:**    **Avoidance and Recovery of the Deferred Compensation Payments Made in Violation of the Deferred Compensation Plan and Rabbi Trust Agreement as an Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544, 550, and Va. Code § 55.1-400**

332.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

333.    The Debtor transferred $67,484 to the Defendant as a Deferred Compensation Payments between September 3, 2014 to the Petition Date.

334.    The Deferred Compensation Payments were transferred to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

335.    The Debtor transferred the Deferred Compensation Payments with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to on or after the date of the Deferred Compensation Payments.

336.    The Deferred Compensation Payments to the Defendant was accompanied by several badges of fraud, including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it made the Deferred Compensation Payments; (b) the Deferred Compensation Payments was transferred to the Defendant, a shareholder of the Debtor; (c) the Deferred Compensation Payments was distributed to the Defendant in violation of the Deferred Compensation Plan, the Deferred Compensation Plan Document, and the Rabbi Trust Agreement; and (d) the Deferred Compensation Payments amounts to significant portions of the Debtor's Estate.

337.    The Deferred Compensation Payments were distributed to or for the benefit of the Defendant.

338.    Pursuant to Virginia Code Section 55.1-400, 11 U.S.C. § 544 and 11 U.S.C. § 550, the Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferred Compensation Payments, (b) directing the Deferred Compensation Payments be set aside, and (c) requiring the Defendant, as the recipient of the Deferred Compensation Payments and/or the person for whose benefit the Deferred Compensation Payments were given, to return the Deferred Compensation Payments, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT XII:    Avoidance and Recovery of the Deferred Compensation Payments Made in Violation of the Deferred Compensation Plan and Rabbi Trust Agreement as a Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) & 550**

339.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

340.    Within two years prior to the Petition Date, the Debtor transferred 67,484 to the Defendant as Deferred Compensation Payments.

56

341.    The Deferred Compensation Payments were transferred to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

342.    The Deferred Compensation Payments were transferred to or for the benefit of the Defendant.

343.    The Defendant did not provide reasonably equivalent value in exchange for the Deferred Compensation Payments.

344.    Pursuant to Section 548(a)(1)(B) and Section 550 of the Bankruptcy Code, the Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferred Compensation Payments, (b) directing the Deferred Compensation Payments be set aside, and (c) requiring the Defendant, as the recipient of the Deferred Compensation Payments and/or the person for whose benefit the Deferred Compensation Payments were given, to return the Deferred Compensation Payments, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT XIII:  Avoidance of Preferential Transfers under 11 U.S.C. § 547(b)**

345.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

346.    Between the Petition Date and one year before the Petition Date, the Debtor made preferential transfers to or for the benefit of the Defendant of no less than $67,484.

347.    These preferential transfers were for or on account of an antecedent debt owed by the Debtor before the transfers were made.

348.    The Defendant was a statutory insider of the Debtor, within the meaning of Section 101(31)(F) of the Bankruptcy Code.

349.    The Defendant was also a non-statutory insider of the Debtor.

350.    The Debtor was insolvent at all times within one year of the Petition Date.

351.    To the extent any portion of any transaction is deemed not recoverable pursuant to sections 544 or 548 of the Bankruptcy Code, such portion is plead here, in the alternative, as the preferential transfers.

352.    The preferential transfers enabled the Defendant, as a creditor, to receive more than the Defendant would have received had the transfers not been made and the creditor received payment of such debt under chapter 7.

353.    The preferential transfers are avoidable and recoverable as preferences under sections 547 and 550 of the Bankruptcy Code.

354.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional preferential transfer that she later discovers.

355.    The Trustee is entitled to the full amount of the preferential transfers totaling not less than $67,484, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these amounts.

**COUNT XIV:   Disallowance of Claims under 11 U.S.C. § 502(d)**

356.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

357.    As alleged above, the Defendant was a recipient of transfers of Contingent Income, Member Draws, and the Deferred Compensation Payments, which are avoidable pursuant to sections 544 and 548 of the Bankruptcy Code, and which are recoverable pursuant to section 550 of the Bankruptcy Code.

358.    Despite a demand, the Defendant has not returned the transfers of Contingent Income, Member Draws, and the Deferred Compensation Payments to the Trustee.

359.    Pursuant to section 502(d) of the Bankruptcy Code, the Court shall disallow any claims of any entity from which property avoidable under section 544 or 548 of the Bankruptcy Code, or that is recoverable under section 550(a) of the Bankruptcy Code.

360.    Because the Defendants has not paid or returned the transfers of Contingent Income, Member Draws, and the Deferred Compensation Payments, the Defendant's claims must be disallowed unless and until the Defendants return to the Trustee an amount equal to each such transfer that is avoided.

361.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 502(d) that all of the claims asserted by the Defendant against the Estate are disallowed.

**COUNT XV:    Disallowance of D&O Releases under 11 U.S.C. §§ 548 and 550**

362.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

363.    The Debtor provided the D&O Releases to the Defendant.

364.    The Debtor received no tangible or concrete value in exchange for granting the Defendant the D&O Releases.

365.    The D&O Releases were a transfer of interest in the Debtor's property under section 548 of the Bankruptcy Code.

366.    The D&O Releases were granted while the Debtor was insolvent, or became insolvent as a result of the transfer of the D&O Releases to the Defendant.

367.    The D&O Releases were transferred with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted to or became indebted to on or after the date of the granting of the D&O Releases.

368.    The D&O Releases were accompanied by several badges of fraud, including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they

59

became due when it granted the D&O Releases; (b) the D&O Releases were granted to the Defendant, a shareholder of the Debtor; and (c) the D& O Releases constitute a significant portions of the Debtor's Estate.

369.    When the D&O Releases were granted, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

370.    At the time of, or as a result of the D&O Releases, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

371.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of section 502 of the Bankruptcy Code.

372.    The Debtor received less than a reasonably equivalent value in exchange for the D&O Releases.

373.    The D&O Releases were made within two (2) years prior to the Petition Date and are avoidable transfers pursuant to section 548(a)(1) of the Bankruptcy Code.

374.    Pursuant to section 550 of the Bankruptcy Code the transfer of the Debtor's rights are voidable by the Trustee.

375.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

376.    The Trustee is entitled to avoid the transfer of the D&O Releases to and for the benefit of the Defendant, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

**COUNT XVI**:  Avoidance of D&O Releases under 11 U.S.C. §§ 544 and 550 and Applicable State Law

377.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

378.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

379.    The D&O Releases granted to the Defendant were transfers in the Debtor's property.

380.    The D&O Releases were transferred with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted to or became indebted to on or after the date of the granting of the D&O Releases.

381.    The D&O Releases were accompanied by several badges of fraud, including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it granted the D&O Releases; (b) the D&O Releases were granted to the Defendant, a shareholder of the Debtor; and (c) the D& O Releases constitute a significant portions of the Debtor's Estate.

382.    At all relevant times, the Debtor had at least one creditor holding an unsecured claim that is allowable under section 502 of Bankruptcy Code that arose before or within a reasonable time after the transfer was made.

383.    The Debtor received no tangible or concrete value in exchange for the D&O Releases.

384.    The D&O Releases were transfers of interest in the Debtor's property.

385.    The D&O Releases were granted while the Debtor was insolvent, or became insolvent as a result of the D&O Releases to the Defendant.

386.    When the D&O Releases were granted, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

387.    At the time of, or as a result of the D&O Releases, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

388.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of section 502 of the Bankruptcy Code.

389.    The Debtor received less than a reasonably equivalent value in exchange for the D&O Releases.

390.    The D&O Releases were granted to or for the benefit of the Defendant.

391.    The D&O Releases were granted within the five (5) years before the Petition Date should be avoided pursuant to applicable provisions section 544(b) and 550 of the Bankruptcy Code.

392.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

393.    The Trustee is entitled to avoid the transfer of the D&O Releases to and for the benefit of the Defendant, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## **PRAYER**

WHEREFORE, the Trustee respectfully requests and prays that the Court:

A.      On Count I, awarding judgment to the Trustee, pursuant to § 13.1-690, in an amount of the sum of the Deferred Compensation Distributions, SERP Distributions, 2017 401(k) Contributions, 2018 401(k) Contributions, 2017 Dividend Payments, 2017 Bonus

Payments, 2018 Bonus Payments, SLC Compensation, Banner Payments, ULXP Transaction
Costs, Alexandria Lease Debt, NLG Damages, and the damages associated with the failure to
dissolve the Firm in a timely fashion, and directing the Defendant to pay the Trustee an
amount to be determined at trial, totaling not less than $32,913,272, plus interest, plus her
reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code.

B.      On Count II, awarding judgment to the Trustee, pursuant to common law
principles of fiduciary duty, in an amount of sum of the Deferred Compensation Distributions,
SERP Distributions, 2017 401(k) Contributions, 2018 401(k) Contributions, 2017 Dividend
Payments, 2017 Bonus Payments, 2018 Bonus Payments, SLC Compensation, Banner
Payments, ULXP Transaction Costs, Alexandria Lease Debt, NLG Damages, and the damages
associated with the failure to dissolve the Firm in a timely fashion, and directing the Defendant
to pay the Trustee an amount to be determined at trial, totaling not less than $32,913,272, plus
interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the
Bankruptcy Code;

C.      On Count III, awarding judgment to the Trustee, pursuant to §§ 13.1-653, 13.1-
690 and 13.1-692, in an amount of the sum of the Deferred Compensation Distributions, SERP
Distributions, 2017 Bonus Payments, 2018 Bonus Payments and member distributions, and
directing the Defendant to pay the Trustee an amount to be determined at trial, plus interest,
plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy
Code;

D.      On Counts IV and VI, awarding judgment to the Trustee, pursuant to Section
548 of the Bankruptcy Code, in an amount of the transfers of Contingent Income and Member
Draws, and directing the Defendant to pay the Trustee an amount to be determined at trial,

totaling not less than $183,493, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

E.       On Count V, awarding judgment to the Trustee, pursuant to Section 544 and 550 of the Bankruptcy Code, Va. Code Sections 55.1-400 and 55.1-401, or pursuant to other applicable state fraudulent conveyance or fraudulent transfer law, in an amount of the transfers of Contingent Income and Member Draws, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $261,743, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

F.       On Counts VII and VIII, awarding the Trustee damages in an amount to be proven at trial, but in no event less than $329,227;

G.       On Count IX, awarding judgment to the Trustee, pursuant to Section 544 and 550 of the Bankruptcy Code, and Va. Code. § 13.1-1035, or pursuant to other applicable state law, in an amount of the transfers of Contingent Income and Member Draws, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $183,493, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

H.       On Count X and XII, awarding judgment to the Trustee, pursuant to Section 548 of the Bankruptcy Code, in an amount of the transfer of the Deferred Compensation Payments, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $67,484, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

I.       On Count XI, awarding judgment to the Trustee, pursuant to Section 544 and 550 of the Bankruptcy Code, Va. Code Sections 55.1-400 and 55.1-401, or pursuant to other

applicable state fraudulent conveyance or fraudulent transfer law, in an amount of the transfer of the Deferred Compensation Payments, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $67,484, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

J.      On Count XIII, awarding the Trustee the full amount of the preferential transfers to the Defendant, totaling not less than $67,484, plus interest, plus the Trustee's reasonable attorneys' fees and costs;

K.      On Count XIV, disallowing any claim of the Defendant pursuant to section 502(d) of the Bankruptcy Code;

L.      On Count XV, disallowing the D&O Releases under sections 548 and 550 of the Bankruptcy Code;

M.      On Count XVI, avoiding the D&O Releases;

N.      Awarding the Trustee her costs incurred in connection with this Adversary Proceeding, including but not limited to her reasonable attorneys' fees and costs;

O.      Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full, plus costs;

P.      Directing the Defendant to pay forthwith all amounts awarded; and

Q.      Granting such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

LYNN L. TAVENNER, CHAPTER 7 TRUSTEE

*/s/ Brittany J. Nelson*
Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
(202) 538-8334 (telephone)
erikamorabito@quinnemanuel.com
brittanynelson@quinnemanuel.com

*Special Counsel to Lynn L. Tavenner, the*
*Chapter 7 Trustee of the Estate of*
*LeClairRyan PLLC*