**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Richmond Division)**

| | |
|---|---|
| In re:<br><br>LeClairRyan PLLC,<br><br>          Debtor.<br>_____<br><br>Lynn L. Tavenner, as Chapter 7 Trustee,<br><br>          Plaintiff,<br><br>v.<br><br>CVC Capital Partners, Daniel Reed, Nicholas Hinton, Josh Rosenfeld, and P. Douglas Benson,<br><br>          Defendants. | Chapter 7<br><br>Case No. 19-34574 (KRH)<br><br><br><br>Adv. Proc. No. |

## COMPLAINT

Plaintiff, Lynn L. Tavenner, Trustee, not individually but solely in her capacity as the Chapter 7 Trustee (in such capacity, the "Chapter 7 Trustee" or the "Trustee") of the bankruptcy estate (the "Estate") of LeClairRyan, PLLC ("LeClairRyan" or the "Debtor" and/or "LCR"), by her undersigned counsel, states the following in support of this adversary complaint against Defendants CVC Capital Partners ("CVC"), Daniel Reed, Nicholas Hinton, Josh Rosenfeld, and P. Douglas Benson (collectively, the "ULX Individuals"):

## NATURE OF THE CASE

1.  This action involves a multi-layered scheme designed to conceal LeClairRyan's true financial state while CVC and the ULX Individuals, along with United Lex Corporation ("UnitedLex"), ULX Manager LLC ("ULX Manager"), and ULX Partners ("ULXP," and together with UnitedLex and ULX Manager, the "ULX Entities"), and certain LeClairRyan insiders,

profited.  As a direct result of their active participation, CVC and the ULX Individuals were able to continue LeClairRyan as a going concern, buying themselves sufficient time to take over the law firm's assets and sell their "innovative" ideas to the legal marketplace.  Once the law firm served its purpose, it quickly failed.

2.        In June 2018, UnitedLex, a legal services provider, and LeClairRyan, a national law firm, created ULXP, a joint venture intended to "disrupt" the legal profession, building a "constellation" of partnerships to fuse the "business" of law with the "practice."  The original transaction, negotiated in December 2017, promised to provide LeClairRyan with as much as $33 million in funding from private equity sources, in exchange for intellectual property and LeClairRyan's back-office workforce.  However, by late March 2018, the terms of the deal drastically changed.  Instead of infusing LeClairRyan with much-needed cash, UnitedLex, with the help of CVC and the ULX Individuals, transformed the deal at the last minute, loading LeClairRyan with millions of dollars in additional debts.

3.        CVC, motivated by its planned majority stake ownership in UnitedLex, concealed its role in the transaction, both because, upon information and belief, it did not have regulatory clearance to invest in the ULXP structure, and because it knew that in the end, LeClairRyan would be nothing more than a stepping stone to growing a bigger and greater enterprise.  On March 22, 2018, CVC, with the assistance of Mr. Benson, a UnitedLex consultant who was promised "dividends," confirmed what it already knew:  there was "serious concern" with LeClairRyan as a going concern.  This 'news' caused CVC to pull its funding.  Yet days before Mr. Benson made this finding, questions were raised regarding CVC's "ability to close," with Mr. Reed assuring LeClairRyan that he would find a "work around" to taking a loan "direct from CVC."

4.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████

In place of cash, UnitedLex offered LeClairRyan a sixty-day 'advance' on back-office services

valued at $3.6 million per month ($125,000 more per month than it cost LeClairRyan to fund back-

office services directly). This was a critical step in carrying out the joint venture and the transfer

of assets to ULXP, as it gave officers, shareholders, and members of LeClairRyan the misguided

impression that without UnitedLex the law firm had no other options.

5.    Executives of the ULX Entities also performed key functions. In August 2018,

Messrs. Reed and LeClair jointly hired Mr. Hinton to serve as Chief Financial Officer at UnitedLex.

Mr. Hinton (under Mr. LeClair's guidance) managed the financial relationship among the ULX

Entities and LeClairRyan, enforcing payment provisions that ran against both the terms and spirit

of the joint venture. In October 2018, only days after CVC took majority ownership of UnitedLex,

Mr. Reed directed Mr. Hinton to be "as aggressive as possible" and "Gordon Gecko like" on

making partnership cuts. Mr. Hinton succeed in his mandate. By early 2019, LeClairRyan

continued to experience ███████████████████████████ partner defections

and plans were put in place to "take selected parts" of [LeClairRyan] but not the entire firm."

6.    Mr. Rosenfeld also played a vital role. Mr. Rosenfeld oversaw the workings of

ULXP, while also serving as Chief Operating Officer of LeClairRyan. Mr. Rosenfeld breached

his fiduciary duties to LeClairRyan by, among other things, exerting undue influence over

LeClairRyan's officers, shareholders and members, picking and choosing which parts of the firm

to take, and which to abandon. By February 2019, Mr. Rosenfeld was investigating how to "shed

liabilities and move forward with a select group of lawyers."  In September 2019, after

LeClairRyan entered bankruptcy, Mr. Rosenfeld identified potential "overcharges" owed to LeClairRyan. Rather than returning these payments, Mr. Rosenfeld decided to "say nothing."

7.    CVC and the ULX Individuals, in consultation with the ULX Entities and Mr. LeClair (who, at the time, was acting in his own personal self-interest), baited LeClairRyan with "carrots" guaranteeing partners access to "Fortune 500 clients" that they would never deliver. As a result of promotional efforts undertaken by Mr. Reed and other UnitedLex employees, and false information hyped to the media, UnitedLex became a "first mover" in efforts to transform the business of law, forming profitable relationships with other legal professionals along the way. Through ULXP, the ULX Individuals took control of LeClairRyan, strategically leading the firm to its demise. On July 22, 2019, individuals at the ULX Entities "unilaterally" told LeClairRyan's administrative staff (then employed by ULXP) that LeClairRyan was closing, before the LeClairRyan board had even voted to dissolve.

8.    The facts and party admissions found in the discovery taken to date, under Rule 2004 and in the related adversary proceeding pending before this Court titled *Tavenner, as Chapter 7 Trustee, v. ULX Partners, LLC, et al.*, Adv. Pro. No. 20-03142 (KRH), show that CVC and the ULX Individuals played a major role in colluding with the UnitedLex Entities and Mr. LeClair, securing LeClairRyan's legal "business" for themselves, while giving LeClairRyan nothing. The Trustee brings this action to hold all Defendants liable for their destructive actions and to recover the value that Defendants improperly received and are not entitled to keep.

## JURISDICTION AND VENUE

9.    This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(1), (2) and (8) to, among other things, determine the validity, priority, or extent of a lien or other interest in property, to disallow, recharacterize or subordinate claims, and to avoid and recover preferential and fraudulent obligations and transfers.

10.     This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtor's chapter 7 case (under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code")).

11.     This adversary proceeding has been referred to this Court pursuant to 28 U.S.C § 157(a).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Trustee confirms her consent, pursuant to Rule 7008 of the Bankruptcy Rules, to the entry of a final order by the Court in connection with this Complaint to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.     Venue is proper in this District and this Division pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

13.     On September 3, 2019 (the "Petition Date"), LeClairRyan commenced a chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On October 4, 2019, Lynn Tavenner was appointed as the Chapter 7 Trustee for LeClairRyan.  As Trustee, Ms. Tavenner has the sole authority to bring the claims sought herein on behalf of the Estate.

14.     LeClairRyan was a law firm organized under the laws of the Commonwealth of Virginia run, at different times, by a board of directors and/or managers.

15.     Defendant CVC Capital Partners is a private equity and investment advisory firm established in 1981, with $114.8 billion of assets under management.  It is headquartered in Luxembourg and has its main office in London, United Kingdom.  CVC also has offices in New York and San Francisco.

16.     Defendant Daniel Reed is the co-founder and Chief Executive Officer of UnitedLex, where he is also a Board Member.  Prior to founding UnitedLex, Mr. Reed served as a managing

director of Capgemini.  Mr. Reed began his legal career as a corporate law associate at Greenberg Traurig, the same law firm that advised UnitedLex in the CVC and ULXP transactions and that represents the ULX Entities in the related adversary proceeding pending before the Court.

17.    Defendant Nicholas Hinton joined UnitedLex in September 2018 as Chief Financial Officer.  Today, Mr. Hinton continues to serve as Chief Financial Officer of UnitedLex.

18.    Defendant Josh Rosenfeld was the Chief Operating Officer of ULXP, and the Chief Operating Officer and Chief Client Services Officer of LeClairRyan.  Mr. Rosenfeld also held himself out as  an employee authorized to enter into business transactions on behalf of UnitedLex. Prior to joining ULXP, Mr. Rosenfeld was the Chief Practice Officer at Orrick Herrington & Sutcliff LLP ("Orrick").

19.    Defendant Doug Benson is a partner at SB2 Consultants.  From 2002 to 2011, Mr. Benson served as Chief Operating Officer at the law firm, Orrick.  UnitedLex hired Mr. Benson as a consultant to assist in performing due diligence on LeClairRyan.  Later, Mr. Benson became a member of the ULXP Oversight Board.  The other members of the ULXP Oversight Board were Mr. Reed and Peter Krakaur (another UnitedLex employee), along with Erik Gustafson (the former CEO) and Christopher Lange from LeClairRyan.

## STATEMENT OF FACTS

### A.    Mr. Reed Forms UnitedLex

20.    On October 11, 2006, Mr. Reed and Ajay Agrawal formed UnitedLex.  Upon information and belief, UnitedLex specializes in providing a number of non-legal services for law firms and legal departments.  These non-legal services include "back-office" services, such as accounting, marketing, technology, and human resources support.  These non-legal services also include legal support services, like patent mining, document management, and electronic discovery.

21.     In the early days, UnitedLex did not provide clients with a pre-existing platform. Instead UnitedLex built technology to meet the specific needs of each client.  The business was "predominantly annuity driven," heavily reliant on long-term relationships.

22.     According to Mr. Agrawal, 2010 was a year of "massive dissappointment" for UnitedLex.  While certain relationships were going "swimmingly," other companies, such as IBM and Hewlett Packard ("HP"), were not impressed with UnitedLex's technology.  A "disillusioned" Mr. Agrawal sold out of his UnitedLex position in June 2011.

**B.     Mr. LeClair's Entrepreneurial Visions**

23.     Gary LeClair and Dennis Ryan formed LeClairRyan in 1988.  The firm initially had offices in Virginia and Washington, D.C.  Starting in 2006, Mr. LeClair implemented a strategy of rapid expansion, entering the New York market on October 12, 2006.

24.     At its peak, LeClairRyan had twenty-five offices across the country, and employed about 385 employees.

25.     In February 2008, LeClairRyan acquired the law firm Wright, Robinson, Osthimer & Tatum ("Wright Robinson"), which had an "international e-discovery and litigation management practice" located in, among other places, Richmond and New York.

26.     Upon information and belief, the discovery center became known within LeClairRyan as the Discovery Solutions Practice ("DSP").  Johnson & Johnson and Ford were among DSP's largest clients.

27.     In 2009, Mr. LeClair determined to become a "first mover" in attracting funding from "outside capital investors."  Around this time, Mr. LeClair issued the firm's "Partnership 2020 Report" detailing entrepreneurial visions for the firm over the next decade.  Those visions included changing ethical laws in the United States that prohibit non-lawyers from taking an economic interest in law firms, with hopes of eventually taking LeClairRyan public.

C.      **UnitedLex Takes LeClairRyan's E-Discovery Unit**

28.      An extremely close relationship has existed for many years between Messrs. Reed and LeClair at the business level, and on a social level, with documentation indicating that the two met as early as January 2011.  In addition, several former partners of LeClairRyan have become managing members of UnitedLex.

29.      On October 18, 2012, Mr. LeClair officially began discussing the formation of a joint partnership with Mr. Reed through a series of meetings and telephone calls.  On November 21, 2012, LeClairRyan entered into a confidentiality agreement with UnitedLex, which gave Mr. Reed access to LeClairRyan's most sensitive documents, including (i) the "Dewey Report," which detailed how LeClairRyan had the "exact same" risks as the defunct law firm, Dewey & LeBoeuf, and (ii) LeClairRyan's "Partnership 2020 Report," which detailed Mr. LeClair's plans to grow a massive legal enterprise by the year 2020.

30.      At the end of October 2014, LeClairRyan and UnitedLex announced the formation of the LeClairRyan Knowledge Center, which gave LeClairRyan guaranteed access to the e-discovery center for a period of at least five years.  In exchange, UnitedLex paid LeClairRyan $3.4 million and took over all of the "DSP technology."

31.      Shortly after their transition, certain members of the DSP group (LeClairRyan's former partners, now UnitedLex employees) were let go or replaced by UnitedLex (in consultation with Mr. LeClair).  Jeffrey Brown (a former LeClairRyan board member who transitioned to UnitedLex with the DSP group in 2014) is still employed at UnitedLex.

32.      After the LeClairRyan Knowledge Center was formed, Messrs. Reed and LeClair promoted their joint relationship to the media, causing some commentators to raise concerns as to the legal ethics of the arrangement.  Upon information and belief, even though UnitedLex and

LeClairRyan continued their e-discovery relationship well into 2017, UnitedLex stopped reporting the relationship to the press starting in January 2014 to avoid ethical scrutiny.

### D.      Messrs. LeClair and Reed Continue Their Business Dealings

33.      Following creation of the LeClairRyan Knowledge Center, LeClairRyan's legal practice continued to struggle.  At the same time, Messrs. LeClair and Reed continued to routinely discuss the "math" behind their plan and "actionable next steps in 'liberating the profession.'"

34.      In June 2017, Mr. Reed consulted with Mr. LeClair in partnering with Marshall Denning, a global law firm backed by UnitedLex.  Marshall Denning is based in the UK and, upon information and belief, provides legal services to entities in the UnitedLex network.[1]

35.      At this time, UnitedLex knew that LeClairRyan was struggling financially.  On June 15, 2017, Mr. Brown emailed Mr. Reed about "Connecting Next Week" stating:  "I've been wanting to talk with you about the [LeClairRyan Knowledge Center] MSA."  Mr. Reed replied "Will call you in about 30 minutes or so if that works - really quick, was not planning on discussing the [LeClairRyan Knowledge Center] with Gary - rather [DXC Technology ("DXC")[2]]/Marshall Denning and potential implications etc.…"

36.      Mr. Reed then added:  "Meant to add dealing with Eric and the LR team re: [the LeClairRyan Knowledge Center] reminds me of Jack Lemon in Glengarry Glen Ross."  Opting for an alternative deadbeat reference, Mr. Brown replied: "I never saw GGR.  I think it is like Weekend at Bernie's with Bernie as a metaphor for LeClairRyan."

---

[1]      In a memo dated September 4, 2017 to employees about the announcement of the relationship, UnitedLex explained:  "for those of you who are employees of UnitedLex but who work closely with Marshall Denning members on commercial transactions, please be advised that due to regulatory issues, you cannot be listed as a member of Marshall Denning…. The website has been designed to provide the right balance of detail and impressions of what Marshall Denning does and how we do it…."

[2]      DXC is an information technology service company founded in April 2017 through the merger of HP's services department and Computer Sciences Corporation ("CSC")—a long-time client of UnitedLex.

37.     In August 2017, Mr. Reed formally proposed the ULXP joint venture to Mr. Gustafson (CEO of LeClairRyan).  Before approaching Mr. Gustafson, Mr. Reed discussed his proposal with Mr. LeClair.  On August 3, 2017, Mr. Reed wrote to Mr. LeClair: "really enjoyed connecting today.… Much to think about."  The next day, Mr. Reed wrote to Mr. Brown:  "Jeff, Gary called me earlier today. Said he had spoken with [Erik] twice in 12 hours on our meeting yesterday [and] Erik is more stoked than even Gary.... Gary said no aspect is off limits" and to "set aggressive timelines, as lawyers will consume all the time given…."

38.     Messrs. Reed and Gustafson then spoke directly on August 5, 2017.  In connection with that discussion, Mr. Reed told Mr. Gustafson that Bill Deckelman, the Executive Vice President and General Counsel at DXC wanted to meet with him.  Upon information and belief, Mr. Reed did not disclose to Mr. Gustafson his prior relationship with Mr. Deckelman and/or his prior company, CSC.

39.     On August 23, 2017, Mr. Gustafson met with Messrs. Reed and Brown in person.  Mr. Reed followed up two days later, stating:  "I connected with Bill [at DXC] yesterday.… We have a partner in Bill, and he could be a good collaborator with us going forward.…"  Mr. Reed also clarified:  "To enable ease of gathering [financial information], it is fine if some responses are less than precise but nevertheless fully address the topic."

40.     On September 15, 2017, Mr. Reed again told Mr. Gustafson, "feel free to tell your finance team the data needed per the request does not have to be in the perfect format - as long as it is intelligible we can put into the right analytical format …."

41.     That same day, Mr. Gustafson asked Mr. Reed for the "ethical groundwork [UnitedLex had] already laid that confirms this [joint venture] can be done."  Mr. Reed replied: "you will have the opinion from Anthony Davis, David Keyco and Professor Bruce Green; the tax

structure document will come from Greenberg Traurig and will be provided subsequently."  Upon information and belief, none of these opinions addressed the arrangement between LeClairRyan and the ULX Entities under U.S. law.  In fact, neither the ULX Entities nor LeClairRyan received an ethical opinion with respect to the final terms of the ULXP structure.

### E.    Mr. LeClair Officially Takes Over Negotiations

42.    On October 3, 2017, Mr. Brown asked Mr. Gustafson if he would be "comfortable" inviting Mr. LeClair to a meeting, noting that some "of the concepts in the draft [ULXP] Term Sheet are ones Dan and Gary have discussed over the last few years."  Mr. Reed then emailed Mr. Brown directly, asking the obvious:  "Is your expectation that with Gary in the room it will be difficult for Erik or anyone else to slow walk the process?"

43.    From there, Mr. LeClair formally took over.  On October 10, 2017, Mr. Reed circulated a Draft – "UnitedLex-Marshall Denning-LeClairRyan Term Sheet 10.10.17."  Mr. Reed also noted that "[Mr. Brown] mentioned Gary may be joining us.  Feel free to forward the attached to him."  On October 25, 2017, Mr. LeClair then met with attorneys from Greenberg Traurig and Mr. Reed.  Mr. Gustafson did not attend that meeting.

44.    On November 2, 2017, Mr. Reed wrote to Greenberg Traurig and Mr. LeClair (again without copying Mr. Gustafson):  "I really appreciate the dynamic we are creating - in terms of both model development and quality of interaction. I am highly energized about what we are creating. Already looking forward to Monday."

### F.    UnitedLex Sends LeClairRyan Its Initial Proposal

45.    On December 29, 2017, UnitedLex sent LeClairRyan its original proposal for the joint venture.  Around this same time, UnitedLex consummated a deal with DXC, which was a "headline among in-house lawyers," resulting in "150 DXC lawyers and professional staff bec[oming] UnitedLex employees."

46.    The initial joint venture proposal generally had the following terms:

- LeClairRyan would contribute all of its non-legal intellectual property as well as back office and certain other non-legal staff to ULXP, which would then contract with the LeClairRyan to provide an array of services to the firm.

- LeClairRyan would pay a monthly Client Practice Management Services ("CPMS") fee in return for these services.

- LeClairRyan would receive an equity interest in ULXP that would be 5 times the average annual CPMS fees paid to ULXP within the first five years of the ten-year agreement.

- LeClairRyan would receive a $20 million loan from ULXP, which would mature in ten years with LeClairRyan "potentially making annual pre-payments of 10% of the loan amount provided [LeClairRyan] hits profitability benchmarks."

47.    Upon information and belief, the parties were also considering an additional $13 million infusion to replace LeClairRyan's then loan facilities with its lender, ABL Alliance LLLP, affiliated with and commonly referred to as Virginia Commercial Finance ("VCF").

48.    The proposal also included terms creating other financial incentives for LeClairRyan shareholders, including an immediate full redemption of their equity interest in LeClairRyan, the elimination of shareholder capital contribution requirements, and the possibility of receiving as much as $80 million in equity interests in UnitedLex through either annual or performance-based interests options.

**G.    CVC Actively Participates In Negotiations**

49.    On September 20, 2018, CVC announced that it had taken a majority stake in UnitedLex.  Even though CVC's investment was not formalized until September 2018, CVC actively negotiated the formation of ULXP with the ULX Individuals and Mr. LeClair, and CVC was a critical driver of its final terms.

50.    On November 23, 2017 (before the initial proposal was even sent to LeClairRyan), Mr. Reed invited Mr. LeClair to a meeting in New York City with CVC bankers.  Mr. Reed noted

that Jennifer Weiss from Greenberg Traurig would also be in attendance "to go into more detail

on the tax structuring of our solution."  Mr. Gustafson was not present at that meeting.

51.    During the winter of 2018, UnitedLex and CVC engaged in additional due diligence.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

52.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

53.    On February 2 and 5, 2018, Messrs. Reed, Krakaur, and LeClair had calls with

Siddharth Patel (a partner at CVC) to discuss "Finance and Accounting."  ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

54.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

55. ████████████████████████████████████████████████████████

████████████████████████ Mr. Reed later assured certain individuals at LeClairRyan that "our collective alliance with CVC will be disruptive."

56. On March 10, 2018, Messrs. Reed and LeClair had a call with Amit Soni (a member of CVC's India team) and Greenberg Traurig to discuss "Market/Mathematics." Later that day, Greenberg flagged a "sudden issue" and a call was set for the following afternoon. Upon information and belief, the "sudden issue" related to CVC's inability to receive regulatory approval from authorities in India and the United States for its investment in the ULX Entities.

57. The next day, CVC noted that funding was needed for the "addition of multiple law firms." Messrs. Reed, LeClair, and Soni then had another call on March 13, 2018 to discuss these issues. This call did not include Mr. Gustafson.

58. During Mr. Benson's due diligence process, individuals within LeClairRyan reported that Mr. Benson appeared "bored," stating "[t]he whole exercise feels more check the box than critical engagement."

59. UnitedLex and CVC also refused to allow LeClairRyan to perform its own due diligence. On March 5, 2018, UnitedLex agreed to provide LeClairRyan access to a dataroom concerning CVC. However, on March 20, 2018, when a LeCairRyan shareholder noted that the "dataroom [did] not have documents related to [the] CVC deal," Mr. Reed declined to give LeClairRyan access, instead stating that "the CVC deal does not involve [ULXP]."

H.    **The Benson Report Purports To "Paint A Different Picture"**

60. Mr. Benson provided his initial consulting report to UnitedLex on March 21, 2018 (the "Benson Report"), which "paint[ed] a different picture than ... expected [regarding]

LeClairRyan's current liquidity."  The draft report went so far "as to raise a question of going concern given current obligations and being at the limit of [LeClairRyan's] credit line and partner stability."

61. 

62.    Mr. Reed then sent the Benson Report to Messrs. Gustafson and LeClair, ███ ████████████████████████  Mr. Reed wrote in the cover email that:  "Before the three of us speak with members of UnitedLex's board and/or CVC, I would like to confirm the points to be made in the face of [Mr. Benson's] report — and what modifications, if any, should be made to the report before submission."  Mr. Reed further noted that "CVC and my board will question why we would provide funds for any purpose other than to ensure sufficient liquidity to prove that the firm is in fact on the right path … we also need to discuss the potential of a tiered structure of cash infusion to ensure LeClairRyan has the fuel to expand…."

63.    Mr. Gustafson (taking direction from Mr. LeClair) responded to the issues identified in the draft Benson Report and the concerns raised by Mr. Reed, arguing that LeClairRyan's "future is more secure with more upside if we proceed with the JV;" specifically noting the need for the cash infusion to "immediately eliminate[] our bank debt and accelerate[] our cash generation."  Mr. Gustafson also wrote that unless LeClairRyan can address the payment

of debt and the return of partner capital, "we do not see how we could transfer our back office" to ULXP without signing an agreement by March 30, 2018.

64.     Understanding the urgency, the next day Mr. Reed asked Mr. Gustafson for "a pro forma cash analysis … asap so I can fully understand beyond our 'deal infusion', how much is needed to operate the firm without being in the perpetual red zone." Messrs. Reed, LeClair, Gustafson and Benson then had a conference call. That same day, Mr. Reed emailed Mr. Brown concerned about Mr. Gustafson's ability to "steward" the firm.

65.     In the days following, LeClairRyan provided additional information to Mr. Benson. After a call on March 23 regarding LeClairRyan's cash flow model, Mr. Benson noted that LeClairRyan's 2018 revenue projections were "too optimistic." Mr. Benson also wrote that: "After much discussion, I suggested that the 2018 revenue budget be reduced to $133M [from $142M] which is more in line with a normal RPL increase." LeClairRyan agreed.



66.

67.

68.

On March 29, 2018, Messrs. Reed, LeClair, Benson and Patel then had a call (Mr. Gustafson was not included). Later that day, Messrs. Reed, LeClair, and Patel had a follow up call (again, Mr. Gustafson was not included). Only after these conversations did Messrs. Reed and LeClair loop Mr. Gustafson in to the

conversation.  At the time, Mr. Gustafson acknowledged it is "difficult to tell if this is a last minute play by CVC to test our will/improve the deal."

69.  ███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████  Nonetheless, Mr. LeClair informed individuals within LeClairRyan that the "significant attrition of partners" is what caused CVC to back out of the investment.  ██████

████████████████████████  Mr. Reed informed Mr. Gustafson:  "CVC does not wish to engage in any aspect of the proposed ULX/LR relationship – their mindset has gone more negative."

70.  Despite CVC's "negative mindset," CVC and UnitedLex continued forward with the ULXP venture, ensuring that the law firm remained "operating" for the foreseeable future with enough time to secure LeClairRyan's back office and intellectual property assets, forming a temporary base for their planned "constellation.".

71.  Ultimately, the proposed transaction was restructured to reduce the financial benefits to LeClairRyan and to bestow more control over LeClairRyan's operations to the ULX Entities, to the detriment of LeClairRyan.  Among other things, CVC and UnitedLex immediately took the infusion of capital of up to $33 million off the table.  UnitedLex gave no new money to LeClairRyan as a part of the transaction.  Further, LeClairRyan's equity interest in ULXP was reduced to 1%.

## I.    CVC Hides Its Participation

72.  When the ULXP deal was announced to the public on June 13, 2018, CVC's role in negotiating the joint venture was entirely omitted.  To the contrary, Mr. Reed stated that UnitedLex was "venture-backed by JP Morgan."

73.    ███████████████████████████████████████████

██████████████████████████    CVC also continued to advise UnitedLex on the "fee

sharing" aspects of the ULXP arrangement in June 2018, months after the transaction had been

signed.  In addition, CVC sought to impose terms to protect its planned investment in UnitedLex,

including proposing a term saying that payments to ULXP would have priority over distributions

to LeClairRyan's members.  However, these terms were ultimately not included.

74.    On September 11, 2018, Mr. Reed also asked Mr. LeClair to comment on a draft of

the UnitedLex / CVC press release announcing CVC's investment "along the lines we discussed."

75.    After public announcement of CVC's investment in UnitedLex, individuals in

LeClairRyan observed:  "I'm not sure what to make of this. That type of [venture capital] firm will

definitely look to shed bad lines of businesses, so let's hope [LCR] isn't one of those…"  Another

LeClairRyan partner, replied, "What I am bothered by (candidly totally cynically) is the touting of

25% of Global Fortune 500 companies serviced by them.… [F]rom what I understand, the only

client we have so far is DXC - whom I think was a client prior to the JV…."

**J.    The ULX Entities Take LeClairRyan's Assets**

76.    The expansive Master Services Agreement (the "<u>MSA</u>") that LeClairRyan entered

on or about April 4, 2018 gave ULXP control over key business functions of LeClairRyan.

77.    The MSA also provided for fees to ULXP, which were calculated under a

combination of factors, including what the MSA described as "Invoice Fees" related to

"Operations Services" and "Production Services."  In relation to these fees, ULXP provided

LeClairRyan an $8 million 'advance' on payments to be made under the MSA.  This 'advance'

avoided restrictions established by U.S. law around the ownership of a U.S. law firm, while

allowing LeClairRyan to remain covenant-compliant under its loan facilities with VCF.

78.    The MSA also included a caveat that "the payment of the Invoiced Fees shall be adjusted from time to time in order to account for the cash flow needs of LeClairRyan."  Upon information and belief, no adjustments were ever made.

79.    Along with the MSA, the parties entered in the following additional agreements governing the arrangement (collectively, with the MSA, the "JV Agreements"): (1) Amended and Restated Limited Liability Company Agreement among ULXP, UnitedLex as the Class A Member and Managing Member, and LeClairRyan as the Class B Member (effective April 4, 2018); (2) Subscription Agreement between LeClairRyan and UnitedLex for LeClairRyan's purchase of Class B Common Interest (effective April 4, 2018 and including the Operating Agreement as Exhibit B); (3) Contribution Agreement between ULXP and LeClairRyan (effective April 4, 2018) (as may have thereafter been amended, the "Contribution Agreement"); and (4) Shared Personnel and Services Agreement ("Shared Personnel Agreement") between UnitedLex and ULXP (made as of April 4, 2018 and effective as of April 29, 2018).

80.    At the time the JV Agreements were executed, CVC and the ULX Individuals knew that LeClairRyan was insolvent.

81.    As part of the Contribution Agreement, LeClairRyan contributed to ULXP a back-office operation "sufficient to service a large, national law firm," along with other assets, including intellectual property.  LeClairRyan was also required to pay ULXP $3.6 million per month for use of its administrative staff (now employed by ULXP), which was $1.5 million more per year than the same services costs when done in-house by LeClairRyan.

82.    The intellectual property assets consisted of administrative resources for (i) lateral attorneys; (ii) training; (iii) personnel; (iv) marketing & business development; (v) pricing; (vi) program management; (vii) information technology and tools; (viii) legal industry collaboration &

insight; (ix) industry research & analysis (x) risk management in operations and templets; (xi) library and research services; (xii) operations; and (xiii) attorney development.  At the time, these assets had an assigned value of at least $18.5 million.

83.     In December 2018, UnitedLex sought to take an "outright assignment/transfer" of LeClairRyan's intellectual property.  Upon information and belief, LeClairRyan's assets were transferred to ULXP in 2019 (for the benefit of UnitedLex and CVC through their indirect ownership interests in ULXP), even though an amended agreement was never signed.

84.     From the beginning, UnitedLex intended to sell LeClairRyan's back office services to other law firms. ███████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████

**K.     Mr. Reed Gives LeClairRyan False Hopes Of "Fortune 500" Clients; UnitedLex Forms Its Own Strategic Relationships**

85.     To get (and keep) select shareholders in LeCairRyan on board, Mr. Reed made false and misleading promises of business opportunities, but none of those relationships ever matured. For example, on December 17, 2017, Mr. Reed wrote to Mr. Gustafson:  "Confidentially and based on some things we are working on with DXC and GE, there will be a good opportunity to enable LeClairRyan to reach into GE….let's discuss on Wednesday or Thursday."   Neither of these relationships resulted in meaningful opportunities for LeClairRyan.

86.     On August 18, 2018, "DXC agreed to move forward" with LeClairRyan, and Mr. Gustafson noted that "[LeClairRyan] could receive $24 million in annual billings from DXC." However, by October 2, 2018, the LeClairRyan / DXC relationship had ended in what Mr. Reed described as "a carnival gone bad," only two weeks after the CVC deal closed.

87.     In July 2018, another LeClairRyan partner wrote to Mr. Gustafson:  "I wonder—maybe they want to keep me out of the loop so if they get the Ford e-discovery work they will keep those revenues out of the JV? Too cynical?"  Mr. Gustafson responded:  "It is not too cynical."

88.     On September 1, 2018, yet another LeClairRyan partner wrote to Mr. Gustafson:

> Almost 2 months ago Dan Reed told me in our meeting in Newark that the UnitedLex people were finally going to get me into the loop ASAP on Ford. That was a lie. I've heard nothing from them other than Hendy's email about a meeting he set up on Sept 6 with not me, but others. Erik- you know I think the world of you but these folks are not for me. I don't want to pursue the co-lead Director as I think I should look into other firms where my Ford relationship is respected.

89.     By January 2019, UnitedLex reported that it had "inked deals worth an eventual $1.5 billion in revenue" in the last 18-month period, including with Ford.

90.     Lauren Hopwood at LeClairRyan, on January 10, 2019 wrote insightfully: "[T]hey are just using our firm and our reputation to benefit themselves in trying to win millions of dollars of work that they will keep all of."

91.     Through the joint venture, Mr. Reed also captured the attention of other law firms. Mr. Reed marketed ULXP as an entity designed to "disrupt[] the traditional law firm model with a new 'constellation' platform that fuses the business and the practice of law."

92.     In June 2018, Latham & Watkins expressed an interest in joining the structure.  Mr. Reed even sent the ULXP press release to Latham & Watkins ahead of its publication, noting: "The attached release (please treat as highly confidential) will be released next Tuesday or Wednesday. The content of the release relates to the platform I briefly discussed with you a few weeks back.… [CVC] has been a big part of the economic design."

93.     Six months later, in January 2019, Elizabeth Acee (LeClairRyan) wrote to Mr. Gustafson, "Interesting article. A bit disappointing that in the extensive piece, there is nothing

about the JV or LeClairRyan."  Mr. Wolf (LeCLairRyan) replied to Mr. Gustafson directly noting:

"Latham is identified as their 'strategic partner.'"

L.    **The ULX Entities "Mine" LeClairRyan's Business Relationships**

94.    Following the execution of the MSA and JV Agreements, certain individuals of the

ULX Entities worked as managing agents for LeClairRyan.

95.    During a meeting on August 9, 2018, which included Messrs. Reed, Hinton,

Krakaur, and Rosenfeld, along with Jennifer Mistal (Chief Operating Officer of LeClairRyan and

ULXP), the decision was made to leave "[s]ome cash" with LeClairRyan "to keep partners paid

but otherwise sweep profit into ULX."  They also determined to "mine" existing LeClairRyan

clients and find "synergies" with clients of the ULX Entities.

96.    The next day, Mr. Krakaur emailed Messrs. Benson and Rosenfeld, along with Ms.

Mistal attaching a document titled "LeClairRyan PLLC's Management."  In the email, Mr.

Krakaur wrote, "I am taking a somewhat heavier hand in the management statement with respect

to ULXP involvement."

97.    A PowerPoint attached to the email illustrated the service arrangement employed

at that time alongside UnitedLex's ideal arrangement, which was to integrate ULXP and

LeClairRyan fully into UnitedLex's systems and processes.

98.    The diagram, reproduced below, shows a slow movement to full integration and

dominance by UnitedLex—despite noted "potential issues" that would result from such a course

of action.



99.     In explaining the illustration in the PowerPoint, Krakaur explicitly described the ULX Entities' plan:

> Slides 3+4 convey the concept of how ULXP is practically operating as it did pre April 29 when operations was part of [LeClairRyan].  We are slowly and necessarily integrating [ULXP] operations (including finance) with [UnitedLex]. That said, we still need to service [LeClairRyan] as a law firm. Over time, we will shift ULXP (and [LeClairRyan]) towards [UnitedLex] systems and processes.  The art is doing it in a way that pulls [LeClairRyan] partners along with us given cultural and other limitations we discussed earlier regarding law firm partners and their business acumen.

100.     As Mr. Krakaur stated in a subsequent August 10, 2018 email, "ULXP is now the owner of the business of law."

101.     Explaining further, Mr. Krakaur wrote, "[w]e all know law firms do not operate as a business. ULXP is designed to change that. Given the nature of the relationship, the agreements, and the practical aspects of us running the law firm, we need to consider carefully on how we communicate these specific actions and where and how we push partners to achieve our plan."

**M.     The ULX Entities Steadily Take Control**

102.     In August 2018, Messrs. LeClair and Reed also hired Nicholas Hinton to oversee the management of ULXP.  On September 17, 2018, Mr. Reed cautioned Mr. Hinton on how to exercise power over LeClairRyan:  "Nick … you make the final call … with Erik / LR attorneys.

Please set the tone … incorporating Gary's comments. We cannot be a bull in the china shop, even though we have the power to do so.…"

103.    Indeed, Mr. Hinton's September 16th  task list included ensuring that "our banking partners understand objectives … to not exit [the] investment prior to our determination that we need to exit our relationship with LCR."

104.    In a September 27, 2018 email to Messrs. Reed and Hinton, Mr. LeClair identified the "key influencers" in LeClairRyan, stating "I believe [Mr. Hinton's] plan will be quickly, unanimously and enthusiastically" approved.  ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

105.    On September 20, 2018, the CVC deal closed.  Shortly after on October 5, 2018, Mr. Reed told Mr. Hinton:  "I want to be as aggressive as possible in reforming LR and ULX Partners and 'feel' the impact in November. Given our first responsibility is ensuring the go forward viability of the organization, we need to be Gordon Gecko like on cuts, no or highly limited severance, etc."  Mr. Reed also continued to rely on guidance from Mr. LeClair, noting in an October 7, 2018 email: "Very interested in Doug's thoughts – AND Gary LeClair's. Gary's views and guidance are critical.…"

106.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

107. ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

108.    From there, the ULX Entities took complete control of key functions, such as accounting, marketing, conflict management, and business development, despite being advised of expected partnership departures. ██████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

109.    The ULX Entities also accessed LeClairRyan's financial and other confidential information essential to the operation of the law firm.   In November 2018, a LeClairRyan employee noted that "ULXP is now co-staffing people to help ULXP from UnitedLex, so UnitedLex people (who are not fully devoted to [LCR]) have access to [LCR's] systems (including document management)."   The ULX Individuals also made personnel decisions regarding LeClairRyan, analyzing which partners to keep and which to dismiss.

110.    Employees at one or more of the ULX Entities served the following operations at LeClairRyan: Chief Operating Officers/Chief Client Services Officers, SVP Human Resources, Director – Engagement Management, Director – Practice Management & Attorney Integration, and Director – Marketing and Business Development.   Upon information and belied, many employees of ULXP then became employees of UnitedLex.

111. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

112.    In addition, Mr. Rosenfeld regularly held himself out to the public as an employee and decision-maker of both ULXP and LeClairRyan (all the while reporting his activities to UnitedLex).  For instance, in February 2019, Mr. Rosenfeld held himself out to a key vendor of LeClairRyan, Proxios, as an employee authorized to enter into business transactions on behalf of both ULXP and LeClairRyan.

**N.    The ULX Individuals Prioritize Payments To UnitedLex**

113.    By the end of 2018, LeClairRyan was continuing to experience member defections and declining revenue.

114.    At the end of November 2018, LeClairRyan owed the ULX Entities approximately $16.4 million.  Loading the firm with even more debt, on December 1, 2018, ULXP transferred responsibility of the payment of its operational expenses to LeClairRyan, including an outstanding balance of $1.8 million.

115.    In or around January 2019, the ULX Entities began to convene regular meetings with LeClairRyan's CFO, Dwight Jones, and other LeClairRyan Board members and/or staff members to discuss cash flow.  In certain of these meetings, Mr. Jones would meet with Mr. Hinton to discuss 13-week cash flow forecasts and to address the payment installments for the ULX Entities.

116.    Mr. Hinton insisted that Mr. Jones prepare these 13-week cash flow forecasts, which showed weekly cash receipts and potential cash disbursements.  This type of cash flow forecast is most often used in situations where a company enters financial distress in order to provide visibility into the company's short-term options.

117.    In connection with these meetings and discussions, Mr. Hinton also decided which of the firm's key vendors needed to be paid.  These regular meetings became avenues for the ULX Entities to further exert their control and ensure that their invoices were paid ahead of other creditors.

118.    Based on pressure exerted by the ULX Individuals, insolvent LeClairRyan improperly prioritized payments to ULXP, to the detriment of other members, creditors and clients.

119.    Upon information and belief, there were also instances in which LeClairRyan did not pay expenses, such as client court fees or lease payments, at the direction of the ULX Individuals.

### O.    CVC And The ULX Individuals Attempt To Shed Dead Weight

120.    On or about early 2019, LeClairRyan's financial condition worsened precipitously.

121.    On January 12, 2019, CVC participated in negotiations regarding LeClairRyan's future.  On February 12, 2019, the "[p]referred approach" was for [Marshall & Denning] to take selected parts of LCR but not the entire firm."

122.    Meanwhile, Mr. Rosenfeld was investigating ways to "shed liabilities and move forward with a select group of lawyers in a new structure." █████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

123.    In a desperate attempt to save the dwindling value of LeClairRyan for the benefit of UnitedLex and CVC, along with select LeClairRyan partners, LeClairRyan and the ULX Entities embarked on an initiative known as "Project Modern."  Mr. LeClair was "fully 'in'" with Project Modern viewing it "as the ultimate fruition of his vision."

124.    Project Modern morphed into the concept of a new law firm called the Novellus Law Group ("NLG"), which involved forming a new partnership with UnitedLex in which certain

of LeClairRyan's members would flip back to a W-2 compensation model, with only modest personal capital requirements and bonuses based on specific and personalized management objectives.

125.    NLG was not intended to simply be a continuation of LeClairRyan, but rather a new entity that attempted to strip LeClairRyan of its assets and profitable members while leaving debt and other liabilities, including but not limited to certain real estate leases and technology costs, with LeClairRyan, which would have collapsed under its own weight and inevitably been wound down.  To help facilitate this transaction, LeClairRyan made cash payments to ULXP and entered into the ULXP Security Agreement (which among other things authorized related UCC filings).

126.    Under the proposal, the "debts" owed by LeClairRyan to ULXP would be assumed by the newly-formed NLG, and the equity investments that UnitedLex purportedly made in connection with the prior joint venture with LeClairRyan would be incorporated into the new entity's debt and/or equity structure.  UnitedLex would also be entitled to various fees and other streams of income including but not limited to profits generated by the new law firm.

127.    Other debt, including, but not limited to, debt to former shareholders and certain landlords, would not have been assumed by NLG—that debt would be "restructured" (or liquidated in bankruptcy or otherwise).

128.    To incentivize them to join NLG, certain of LeClairRyan's members were promised equity in UnitedLex, which still hoped to grow by working with other law firms (which, upon information and belief, UnitedLex succeeded at doing with LeClairRyan's business model).  In March 2019, Messrs. Hinton and Rosenfeld set up a "half hour check in every other day" to "keep momentum and focus."

129.    While the NLG model seemed promising, any new entity formed from LeClairRyan would still need operating capital.  Accordingly, on or about June 20, 2019, in connection with efforts to enact the NLG plan, Messrs. Hinton and Reed began negotiating directly with LeClairRyan's lender, VCF, to provide more financing for NLG.

130.    Upon information and belief, Messrs. Hinton and Reed sought financial backing from VCF because neither CVC nor UnitedLex wanted to invest further money in this law firm. VCF refused to provide the level of funding Messrs. Hinton and Reed were seeking.

131.    At the same time, LeClairRyan's members were leery of the new compensation model given the unfulfilled promises of UnitedLex.  This, in conjunction with the impasse between UnitedLex and VCF on how to handle the Debtor's debt with this new law firm structure, meant that NLG would not come to fruition.

**P.      LeClairRyan Enters Dissolution; CVC And The ULX Individuals Continue To Exert Pressure**

132.    On July 29, 2019, LeClairRyan's members voted to formally wind-down the firm. Even after this decision was made, CVC and the ULX Individuals continued to extract value.

133.    ██████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████

134.    ████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

135.    During this time, Mr. Rosenfeld continued to breach his fiduciary duties to LeClairRyan in favor of UnitedLex.  For example, on September 5, 2019, the day after LeClairRyan filed for bankruptcy, Mr. Rosenfeld informed UnitedLex that LeClairRyan was likely owed a refund for "staffing" overcharges.  Instead of informing LeClairRyan that it was owed these payments, Mr. Rosenfeld chose not to "say anything."

**COUNT I**
**Unjust Enrichment**
**(Against CVC And Mr. Reed)**

136.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

137.    CVC and Mr. Reed, through their investments in UnitedLex, received valuable assets from LeClairRyan, including a back-office workforce, intellectual property, which they used, along with the ULX Entities, to form business relationships with other entities.

138.    CVC and Mr. Reed knew that LeClairRyan was insolvent when this value was transferred.

139.    Allowing CVC and Mr. Reed to retain the benefits they received, through their ownership interests in the ULX Entities, would be unjust.

140.    As a direct and proximate result of CVC's and Mr. Reed's unjust enrichments, the Debtor sustained damages in an amount to be proven at trial.

**COUNT II**
**Misappropriation of Trade Secrets Under The Virginia Uniform Trade Secrets Act,**
**Va. Code §§ 59.1-336 *et seq.***
**(Against CVC And Mr. Reed)**

141.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

142.    CVC and Mr. Reed, through their investments in the ULX Entities, had access to valuable trade secrets and confidential information belonging to the Debtor as the term "Trade Secrets" is defined under the Virginia Uniform Trade Secrets Act, Va. Code §§ 59.1-336 *et seq.*, including access to LeClairRyan's documents and systems following the transfer of LeClairRyan's back-office group to ULXP.  These trade secrets include business plans detailed in the Partnership 2020 Report and intellectual property assets listed in the Contribution Agreement.

143.    These trade secrets are information from which the Debtor derived actual or potential independent economic value, from their not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure or use.  These trade secrets are the subject of efforts that are reasonable under circumstances to maintain secrecy.

144.    Through the ULXP transaction, CVC and Mr. Reed caused the Debtor's trade secrets to be disclosed, and otherwise misappropriated, for the benefit of the ULX Entities, without the Debtor's full knowledge and consent.

145.    CVC and Mr. Reed knew or had reason to know that the Debtor's trade secrets had been acquired by improper means.

146.    As a result of this misappropriation, the Debtor has been damaged in an amount to be determined at trial.

147.    Upon information and belief, this misappropriation has been willful and malicious, warranting punitive damages under Va. Code §§ 59.1-338, and entitling the Debtor, and now the Trustee, to attorneys' fees under Va. Code §§ 59.1-338.1.

## COUNT III
### Statutory Conspiracy, Va. Code § 18.2-499, *et seq.*
### (Against CVC And Mr. Reed)

148.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

149.    From at least 2017 to 2019, CVC and Mr. Reed, along with the ULX Entities and Mr. LeClair, acted in concert, agreed, associated, mutually or combined to accomplish, by concerted action, unlawful, illegal and oppressive acts that caused injury and damage to the Debtor and creditors of the Debtor.

150.    CVC and Mr. Reed violated Virginia Code § 18.2-499 by combining, associating, agreeing, mutually undertaking or concerting together, and with others for the purpose of willfully and maliciously injuring the Debtor in its reputation, trade, business or profession.

151.    CVC and Mr. Reed conspired to cause breaches of fiduciary duties owed to the Debtor and its officers, shareholders, members, clients, and creditors, by among other things, participating in the ULXP joint venture which gave control of LeClairRyan to non-lawyers, facilitating the transfer of assets to ULXP, misappropriating funds tendered to the Debtor by its clients for specific expenses, and/or using LeClairRyan's confidential information to steal assets and recruit profitable partners to join NLG.  CVC and Mr. Reed also conspired to take over LeClairRyan's legal business by making misleading or false statements to LeClairRyan's officers, shareholders and members.

152.    The unlawful acts of CVC and Mr. Reed, undertaken willfully, intentionally, purposefully, and without lawful justification, have injured the Debtor and its creditors.

153.    CVC and Mr. Reed's wrongful conduct was aimed directly at damaging the Debtor and the Debtor's other creditors.

154.    As a direct and proximate result of the conspiracy and agreement among CVC, Mr.

Reed, the ULX Entities and Mr. LeClair, the Debtor and its creditors suffered significant damages,

including but not limited to the decline in enterprise value.

155.    The Defendants' wrongful conduct constitutes a violation of the Virginia Business

Conspiracy Act (the "VBCA").

156.    The Debtor suffered injuries from its extended existence and the further dissipation

of its assets.  As such, the Debtor lost assets that would have otherwise been available to satisfy

creditor claims.

157.    As a direct and proximate result of the conspiracy, the Trustee is entitled to recover

from the CVC and Mr. Reed the damages suffered by the Debtor and its creditors in an amount to

be proven at trial.

158.    The Trustee is also entitled to (and seeks to) recover three times the damage the

Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs,

pursuant to Section 18.2-500 of the Virginia Code.

**COUNT IV**
**Common Law Conspiracy**
**(Against CVC And Mr. Reed)**

159.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

160.    From at least 2017 until 2019, CVC and Mr. Reed, along with the ULX Entities

and Mr. LeClair, acted in concert, agreed, associated, mutually undertook, or combined to

accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to

the Debtor and the creditors of the Debtor.

161.    CVC and Mr. Reed conspired to cause breaches of fiduciary duties owed to the Debtor and its officers, shareholders, members, clients, and creditors, by among other things, participating in the ULXP joint venture which gave control of LeClairRyan to non-lawyers, facilitating the transfer of assets to ULXP, misappropriating funds tendered to the Debtor by its clients for specific expenses, and/or using LeClairRyan's confidential information to steal assets and recruit profitable partners to join NLG.  CVC and Mr. Reed also conspired to take over LeClairRyan's legal business by making misleading or false statements to LeClairRyan's officers, shareholders and members.

162.    CVC and Mr. Reed, along with Mr. LeClair, intentionally combined to accomplish these unlawful purposes, or even if determined to be lawful purposes, accomplish them through illegal and unlawful means.

163.    As a direct and proximate result of the conspiracy and agreement among CVC, Mr. Reed, and one or more of the ULX Entities and Mr. LeClair, the Debtor and its creditors, sustained significant damages, including but not limited to millions of dollars of unpaid obligations.

164.    As a result of the conspiracy, the Trustee is entitled to recover from CVC and Mr. Reed the damages suffered by the Debtor and its creditors in an amount to be proven at trial.

**COUNT V**
**Breach of Fiduciary Duty**
**(Against Mr. Rosenfeld)**

165.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by references as if set forth in their entirety.

166.    As the sole officer of ULXP and as the Chief Operating Officer of LeClairRyan, Mr. Rosenfeld owed the Debtor a fiduciary duty of loyalty and care to, among other things, (i) preserve, maximize, and equitably distribute profits generated with respect to the ULXP joint

venture; (ii) refrain from dealing with a party adverse to or competing with the ULXP joint venture;

and (iii) refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or

a knowing violation of law.

167.    Mr. Rosenfeld breached his duties of loyalty and care to the Debtor by, among other

things, (i) mismanaging the joint venture; (ii) usurping the Debtor's business opportunities and

relationships, (iii) pursuing and securing other business deals using the Debtor's assets and

intellectual property, (iv) exerting undue control over the Debtor, and (v) engaging in the

unauthorized practice of law.

168.    As a direct result of Mr. Rosenfeld's breaches, the Debtor suffered injury from its

extended existence and the further dissipation of its assets.  As such, the Debtor lost assets that

would have otherwise been available to satisfy creditor claims.  The Trustee is entitled to damages

from Mr. Rosenfeld as a result of his breaches in an amount to be proved at trial, including in the

amount of any value improperly transferred away from the Debtor during Mr. Rosenthal's tenure

as an officer of the Debtor.

## COUNT VI
## Constructive Fraud
## (Against All Defendants)

169.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

170.    CVC and the ULX Individuals made false and misleading statements of material

fact to officers, shareholders, and members of LeClairRyan.  Among other things, CVC and the

ULX Individuals (i) made false promises of new business opportunities for LeClairRyan officers,

shareholders, and members; (ii) made misrepresentations of material fact to manipulate the final

terms of the ULXP transaction; and (iii) helped hide information regarding LeClairRyan's

financial state to continue the firm as a going concern while CVC and the ULX Individuals promoted the success of their strategic alliance.

171.    At the time these statements were made, CVC and the ULX Individuals knew that their statements were false and misleading.

172.    On the basis of these statements, LeClairRyan entered into the ULXP transaction on terms that were materially different from those originally proposed and transferred to ULXP the law firm's assets for no value.  LeClairRyan also continued operating as a going concern based on a false impression that CVC and the ULX Individuals were acting to grow LeClairRyan's practice, when, in fact, the ULX Individuals had plans to shrink the Debtor's existence.

173.    LeClairRyan relied on these material misrepresentations, causing LeClairRyan significant damage, including an extended existence, dissipation of assets, and lost business opportunities in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter an Order and Judgment as follows:

(a)    On Counts I (Unjust Enrichment) and II (Misappropriation of Trade Secrets), awarding the Trustee damages from CVC and Mr. Reed as a result of their breaches in an amount to be proven at trial, including in the amount of any profits that CVC or the ULX Entities received in connection with the ULXP joint venture and any gains CVC or the ULX Entities received and/or continue to receive in connection with the "constellation" formed directly and/or indirectly by UnitedLex;

(b)    On Count III (Statutory Conspiracy), awarding the Trustee damages from CVC and Mr. Reed in an amount to be proven at trial, as well as three times the damage the

Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to Section 18.2-500 of the Virginia Code

(c)   On Count IV (Common Law Conspiracy), awarding the Trustee damages from CVC and Mr. Reed in an amount to be proven at trial.

(d)   On Count V (Breach of Fiduciary Duty), awarding the Trustee damages from Mr. Rosenfeld in an amount to be proven at trial.

(e)   On Count VI (Constructive Fraud), awarding the Trustee damages from all Defendants in an amount to be proven at trial.

(f)   Awarding the Trustee her costs incurred in connection with this Adversary Proceeding, including but not limited to her reasonable attorneys' fees and costs;

(g)   Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full, plus costs;

(h)   Directing the Defendants to pay forthwith all amounts awarded; and

(i)   Granting such other relief as the Bankruptcy Court deems just and proper.

Dated:  September 2, 2021                    Respectfully submitted,


By: */s/ Erika L. Morabito*  _____

Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
(202) 538-8334 (telephone)
Email:  erikamorabito@quinnemanuel.com
          brittanynelson@quinnemanuel.com

*Special Counsel to Lynn L. Tavenner, Chapter 7 Trustee*