## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re:<br><br>    **LeClairRyan PLLC,**<br><br>        **Debtor.** | **Case No.: 19-34574-KRH**<br><br>**Chapter 7** |
| **Lynn L. Tavenner, as Chapter 7 Trustee,**<br><br>            **Plaintiff,**<br>**v.**<br><br>**Michael Goldman**<br><br>            **Defendant.** | Adv. Proc. No. 21-<br><br>**ORIGINAL COMPLAINT** |

### TRUSTEE'S ADVERSARY COMPLAINT

Lynn L. Tavenner, Trustee, and not individually but solely in her capacity as the Chapter 7 trustee (in such capacity, "Ms. Tavenner" and/or the "Trustee" and/or the "Plaintiff") of the bankruptcy estate (the "Estate") of LeClairRyan PLLC (the "LCR" and/or the "Debtor" and/or the "Firm"), in the above-referenced Chapter 7 case (the "Case"), by her undersigned counsel, brings this adversary proceeding against Michael Goldman (the "Defendant" or "Mr. Goldman") seeking not less than $1,785,631 and alleges as follows:

### INTRODUCTION

1.      The Trustee files this lawsuit to recover distributions of substantial sums of money made to the Defendant, a shareholder and member of the Debtor, as applicable, while the Debtor was insolvent. The Debtor was insolvent no later than September 3, 2014 and remained insolvent until it filed for bankruptcy on September 3, 2019 (the "Petition Date"). Despite the Debtor's insolvency and inability to pay general operating expenses and other creditors, it transferred millions of dollars to its shareholders and members.

2.      As a shareholder and member, the Defendant was privy to LCR's deteriorating financial condition, and knew or should have known that the Firm was insolvent.

3.      Despite the Firm's financial woes, LCR continued to make, and the Defendant continued to accept, fraudulent transfers that were specifically conditioned on the Firm achieving certain levels of profitability—levels which the Defendant knew or should have known LCR had failed to reach.  These payments, which were made to the Defendant in addition to his regular salary, were made (a) with specific fraudulent intent as evident by requisite badges of fraud; (b) in violation of operative agreements and applicable law; and (c) on account of equity, and therefore, were transferred for no consideration, less than fair consideration, or less than reasonably equivalent value to the Debtor.

4.      Accordingly, the Trustee seeks judgment against the Defendant to recover these payments, which equal not less than $1,785,631, plus interest, fees, and costs as allowed by law.

**JURISDICTION, VENUE, AND LEGAL PREDICATE**

5.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtor's Case (under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")). This adversary proceeding has been referred to this Court pursuant to 28 U.S.C § 157(a). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2). The Trustee confirms her consent, pursuant to Rule 7008 of the Bankruptcy Rules, to the entry of a final order by the Court in connection with this Complaint to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper in this District and this Division pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The legal predicates for the requested relief in this adversary proceeding are Sections 544, 548, and 550 of the Bankruptcy Code, Fed. R. Bankr. P. 7001(1), (2) and (8), and Sections 55.1-400 and 55.1-401 of the Virginia Code, among others .

## PARTIES

8.      On September 3, 2019, the Debtor commenced the Chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On October 4, 2019, the Court entered the *Order of Conversion of Chapter 11 to Chapter 7* [Docket No. 140].  On October 4, 2019, Ms. Tavenner was appointed as the Chapter 7 Trustee for the Debtor.[1]  As Trustee, Ms. Tavenner has the sole authority to bring these claims on behalf of the Debtor's Estate.

9.      At all relevant times, the Debtor was organized under the laws of the Commonwealth of Virginia.

10.     Defendant was at all relevant times a shareholder or member of the Debtor, from December 10, 2010 to February 5, 2019.

11.     His relationship with the Debtor, including his compensation, was governed by several agreements (as described below).

12.      Defendant is an individual who may be served with process by any manner of service authorized by Rule 7004 of the Federal Rules of Bankruptcy Procedure.

13.     On December 10, 2019 the Defendant filed a proof of claim in the amount of $174,131.00.  Case No. 19-34574-KRH, Claims Register No. 70-2.

---

[1]      *See* Appointment of Interim Trustee Lynn L. Tavenner. [Case No. 19-34574-KRH, Docket No. 175].

## FACTUAL BACKGROUND

### A.    The Formation, Structure, and Conversion of the Debtor

14.    The Debtor was founded in 1988 by Dennis Ryan and Gary D. LeClair. It initially operated as a regional corporate-focused law firm, headquartered in Richmond, Virginia. However, the Debtor rapidly expanded – ultimately opening offices or acquiring firms across the United States. Prior to the Petition Date, the Debtor operated through approximately 25 offices throughout the United States, with offices in, among others, Richmond, Los Angeles, San Francisco, Newark, New Haven, Boston, Philadelphia, New York City, Dallas, Houston, Detroit, and Washington, D.C. At its peak, the Debtor had approximately 385 attorneys, including approximately 160 shareholders.

15.    Prior to March 31, 2018, the Debtor operated as a Virginia Professional Corporation ("PC"). On March 31, 2018, the Debtor converted (the "Conversion") from a PC to a Virginia Professional Limited Liability Company ("PLLC").

### B.    The Debtor's Downfall

#### a.    The Debtor's Financial Mismanagement

16.    Fundamental issues of financial mismanagement plagued the Debtor for years, including, but not limited to, over-compensation of certain attorneys, declining revenues, which fell short of projections and budgets by millions of dollars, and improper and erroneous accounting for certain income and expense items.

17.    Beginning no later than January 1, 2014, the Debtor consistently missed its budget and its revenue fell short of expectations. By no later than September 3, 2014, the Debtor was insolvent, failing to pay its debts as they became due.

18.    In fact, there was only one year after 2011 that the Debtor generated an operating profit and positive cashflow. That year, 2013, the Debtor recorded approximately $23 million in

non-recurring fees resulting from a combination of a client matter and an award in a non-client lawsuit. This one-off influx of cash only generated approximately $5 million in Net Income for 2013 and had no impact on future profitability. Rather than use these proceeds to fund working capital, pay off outstanding obligations, and/or improve the Debtor's financial viability, the Debtor distributed a vast majority of these funds to shareholders.

19.    The Firm's financials were not kept a secret from all shareholders, including but not limited to the Defendant.

20.    For instance, in a September 3, 2013 email labeled "August 31, 2013 CEO's State of the Firm and Partnership 2020 Committee's Report," sent to all shareholders by the Firm's CEO, David Freinberg, the Firm reported, among other things, that LCR underperformed financially "failing for a second consecutive year to collect the amount required to pay 100% of projected Shareholder Total Compensation"; that "Many Shareholders, and even some Firm Leaders, were surprised by the projected magnitude of the 2012 revenue miss"; and that "Too many Shareholders did not read our reports and insisted on repeating inaccurate facts."

21.    By no later than 2014, the Debtor's shareholder compensation system had become illusory. Even though the Debtor did not meet the financial targets necessary for shareholders to receive discretionary sums, the Debtor still distributed the same. Rather than pay shareholders based on what the Debtor earned in the year, the Debtor burdened future years to pay current shareholders—essentially borrowing from creditors and future shareholders to pay current shareholders.

22.    The Debtor's shareholders, including the Defendant, knew or should have known that the Debtor's financial information overstated assets and limited the Debtor's ability to accurately forecast cash inflows.

23.    The Debtor's shareholders, including the Defendant, knew or should have known of the Debtor's financial weaknesses and the issues referenced herein.

24.    Shareholders, including the Defendant, received numerous reports and budget communications detailing that the Debtor was not meeting budgeted amounts and that the Debtor was not financially healthy.

25.    For example, an April 3, 2015 email from David Feinberg to all shareholders provided that "Our credit line has a $7.5 million outstanding balance. Our vendor payables were $7.150 million (of which approximately $3.21 million were over 60 days)."

26.    Further, in an April 15, 2015 Shareholder Meeting's presentation entitled "Disciplined Financial Management Project: Revenue Enhancement Plan" provided that "absent execution on this Plan," we will "otherwise would have a projected deficiency of cash requirements in excess of cash receipts starting in July 2015" and would not be able to "pay in full the outstanding balance of the Wells Fargo line of credit until November 2015 (note that our Wells Fargo loan agreement requires that we have a zero balance on the line of credit for at least 30 consecutive days during the 2015 calendar days)."

27.    On March 17, 2016, shareholders were informed that "For 2014 and 2015, we Shareholders paid ourselves, collectively, more than we earned. We have borrowed to pay ourselves, contrary to Partnership 2020 fundamentals and our long-standing conservative principles of management. . . . Obviously, continued overpayment is not sustainable. We are going to have to reduce Shareholder compensation. If we are able to increase production margin, reductions to Shareholder compensation can be mitigated."

28.    In the March 17, 2016 Budget Oversight Committee report (the "2016 BOC Report") provided to all shareholders, the Budget Oversight Committee stated:

> Our WIP and AR are cluttered with uncollectible accounts and
> worthless numbers. We recommend that we clear all uncollectible
> AR and all aged and unbillable WIP from our working books. Old
> AR and WIP clouds our view of financial reality, clutters the work
> desks of our billing and collection teams and provides false
> overstatement of "inventory."

29.    In an effort to address the Debtor's financial insolvency, the Debtor relied on

various sources of capital to fund general operations—sources that were improper, expensive,

and/or utilized in a fraudulent manner.

**b.    Utilizing CAPE Funds for General Operations**

30.    To fund the Debtor's general operations, the Debtor misappropriated for improper

purposes funds tendered by clients for specific expenses (the "CAPE Funds").

31.    The CAPE Funds were funds paid by the Debtor's clients for certain enumerated

purposes, including, but not limited to, filing fees, closing costs, third party professional fees,

and other costs necessary to serve the Debtor's clients.

32.    The Debtor used over $3 million in CAPE Funds for general operating purposes

during the period at issue.

33.    The Debtor utilized the CAPE Funds for general operating purposes with the

knowledge that CAPE Funds were designated for a specific client purpose.

34.    The Debtor's shareholders, including the Defendant, knew or should have known

that this practice was occurring.

**c.    Reliance on Preferred Stock to Fund Operations**

35.    In an effort to raise working capital, the Debtor relied on expensive preferred

stock ("Preferred Stock") offerings, carrying a dividend rate of 8% per annum. This Preferred

Stock became a massive burden on the Debtor's financial solvency, a burden that the Debtor was

never able to recover from, shareholders continued to receive significant dividends on their Preferred Stock.

36.    In a 2016 BOC Report provided to all shareholders, the Budget Oversight Committee stated:

> For 2014 and 2015, we Shareholders paid ourselves, collectively, more than we earned. We have borrowed to pay ourselves *contrary to Partnership 2020 fundamentals* and our long-standing conservative principles of management. We also increased our preferred stock outstanding for this purposed, ultimately. Insofar as the preferred stock bears a required dividend and must ultimately be repaid, we have burdened ourselves with carrying costs and repayment obligations *in order to pay ourselves now*.

37.    The Debtor utilized the proceeds from the Preferred Stock offerings to primarily fund shareholder compensation, not pay creditor balances.

38.    The Defendant knew or should have known that the Debtor was burdened by dividends owed on the Preferred Stock – further deteriorating the Debtor's financial health.

**d.    Decreasing Revenues and Utilizing Accounts Payable as a Line of Credit**

39.    To manage cash flows, the Debtor increasingly relied on its accounts payable as a line of unsecured credit to ensure that it could make payments to shareholders.  In violation of the Firm's unilateral policy requiring the Debtor to maintain accounts payable aging within 60 days (regardless of the actual terms of the invoice)— a policy adopted by the Debtor in 2013 as a fortifying measure—the Debtor began to unilaterally extend payment terms with its suppliers and vendors well past 60 days.

40.    The following chart reflects the Debtor's leverage of its accounts payable and the balance of accounts payable that was more than 60 days outstanding.

| Year | Total Accounts Payable | Accounts Payable > 60 Days Outstanding | Amount of AP Aged > 60 Days |
|---|---|---|---|
| 12/31/2014 | $10,109,000 | $4,822,000 | 48% |
| 12/31/2015 | $10,668,000 | $6,057,000 | 57% |

| | | |
|---|---|---|
| 12/31/2016 | $5,890,000 | $3,293,000 | 56% |
| 12/31/2017 | $9,067,000 | $5,892,000 | 65% |
| 12/31/2018 | $17,252,000 | $7,687,000 | 45% |
| 6/30/2019 | $12,364,000 | $6,345,000 | 51% |

41.     At the same time that the Debtor's liabilities were ballooning and the Debtor was seeking capital, the Debtor's revenues were decreasing at an alarming rate.

42.     The Debtor's annual revenues decreased from approximately $200 million in 2013 to approximately $110 million in 2018.

43.     During this time, the Debtor did not have sufficient liquidity to pay even the most critical operating expenses. The Debtor implemented an internal waterfall scheme to manage priority of payments which prioritized payroll first, shareholder payments second, intellectual property client expense payments third, and then critical vendor payments fourth. All other vendors were paid on an as needed basis.

44.     The Debtor's shareholders, including the Defendant, knew or should have known that the Debtor's annual revenues were decreasing at a rate greater than the Debtor's reduction in costs and that the Debtor could not pay debts as they became due.

     **e.**     **Shrinking Headcount and Loss of Shareholders**

45.     As a result of many factors, including but not limited to the Debtor's financial mismanagement, the Debtor experienced a shrinking number of attorneys, including the loss of revenue-positive shareholders and members.

46.     The Debtor's attorney attrition rate was over ten percent in all relevant years.

47.     Further, the number of shareholders and members, as applicable, decreased year-over-year as follows:

| Date | Number of Shareholders / Members | Approximate Percentage Change |
|---|---|---|
| December 31, 2015 | 156 | |

| December 31, 2016 | 138 | (11.5%) |
| December 31, 2017 | 121 | (12.3%) |
| December 31, 2018 | 80 | (33.9%) |
| June 30, 2019 | 44 | (45%) |

48.    The decrease of headcount left the Debtor with overhead expenses and office leases far larger than what was necessary for a law firm of the Debtor's size.

49.    The significant decrease in shareholders also resulted in significantly higher liabilities related to the redemption of the Debtor's common stock ("Common Stock") and Preferred Stock for the benefit of exiting equity holders.

50.    Beginning in 2015 and in each subsequent year thereafter, the Debtor redeemed more Common Stock and Preferred Stock than it issued through new capital infusions.  For example, in 2016, the Debtor redeemed over $4 million in Common Stock and Preferred Stock while only issuing approximately $2.5 million in new Common Stock and Preferred Stock.

51.    The Debtor did not have the financial ability to redeem equity holders, resulting in a substantial unpaid liability.  ABL Alliance LLLP, affiliated with and commonly referred to as Virginia Commercial Finance ("VCF"), ultimately (after recognizing the problematic practice) restricted the Debtor's ability to redeem Common Stock and Preferred Stock due to the Debtor's capital constraints.

**f.    The Debtor's Dissolution**

52.    In 2017, the Debtor turned to a potential joint venture with a third party, the legal services provider UnitedLex Corporation ("UnitedLex"), as a way that some perceived would address the Debtor's financial difficulties (while others inside and outside of the Firm perceived it as a way to extract value from the Firm).  The transaction was consummated in 2018.

53.      This "joint venture" with UnitedLex did not address the Debtor's financial issues and instead caused significant additional harm to the Debtor and its creditors.[2]

54.      On July 29, 2019, the Debtor's members voted to dissolve LCR and wind-down the Debtor's operations.

C.      **Shareholder and Member Compensation Paid Pursuant to Shareholder Agreements, Board Resolutions, and Compensation Policies**

55.      Shareholder and member compensation was determined in accordance with applicable shareholder agreements, resolutions by the Debtor's Board of Directors, and/or annual compensation policies (policies that were thereafter modified as needed to enable diverting millions of dollars of scarce funds to shareholders and/or members when the Firm failed to meet metrics contained in the initial policy).

a.      **Shareholder Agreements**

56.      While a PC, the Debtor's relationship with the Defendant was governed by, among other operative documents, the *Third Amended and Restated Shareholders Agreement of LeClairRyan, a Professional Corporation, effective as of December 31, 2013* (as amended, modified, or supplemented, the "Third A&R Shareholder Agreement").

57.      While a PLLC, the Debtor's relationship with the Defendant was governed by, among other operative documents, the *Fourth Amended and Restated Shareholders Agreement of LeClairRyan, a Professional Corporation and Operating Agreement of LeClairRyan PLLC, dated February 27, 2018* (as amended, modified, or supplemented, the "Fourth A&R

---

[2] The Trustee filed a complaint against UnitedLex and ULX Partners, LLC in the case captioned as *Lynn L. Tavenner, as Chapter 7 Trustee, v. ULX Partners, LLC and UnitedLex Corporation*, Adv. Pro. No. 20-03142-KRH (Bankr. E.D. Va.).

Shareholder Agreement," and together with the Third A&R Shareholder Agreement, the

"Shareholder Agreements").

    **b.**    **Board Resolutions**

58.    As further explained below, the shareholders were governed by compensation

policies and Resolutions of the Debtor's Board of Directors, dated January 24, 2013 (the "Board

Resolutions").

    59.    For the 2014 compensation year, the Board Resolutions:

> RESOLVED, that for the 2014 budget year, the Firm must have
> calendar year profits of at least the sum of 1% of fee revenues
> (determined on an accrual basis after making adjustments to deduct
> tax liabilities determined on a cash basis), inclusive of the amount
> of dividends paid, before Shareholder or Officer At-Risk Salaries,
> or lateral Shareholder and Officer contingent performance bonuses
> with respect to such calendar year (which are payable early in the
> next calendar year) could be paid.

    60.    For the 2015 compensation year and later years, the Board Resolutions resolved:

> Beginning in 2015, the Firm must have calendar year profits of at
> least the sum of 1% of fee revenues (determined as described
> above), plus the amount of dividends paid, before Shareholder or
> Officer At-Risk Salaries, or lateral Shareholder and Officer
> contingent performance bonuses with respect to such calendar year
> could be paid (the "Minimum Profit Guardrail").

    61.    Pursuant to the Board Resolutions, the Debtor was required to achieve a minimum

level of profits as a condition precedent before shareholders were entitled to the receipt of certain

amounts.

    **c.**    **Compensation Policies**

62.    In addition to being governed by the Shareholder Agreements and the Board

Resolutions, compensation for shareholders and members, including the Defendant's, was

governed by LCR's annual compensation policies, which set forth the various categories of

compensation paid to the Debtor's shareholders and members, as applicable (the "Compensation Policies").

63.     Among other things, the Compensation Policies set forth specific financial metrics and other factors that the Debtor had to satisfy to pay shareholders compensation in addition to their regular salary.  The additional compensation the Debtor paid shareholders, including the Defendant, was not a fixed amount and was not guaranteed (the "Contingent Income").

64.     Following its conversion to a PLLC on March 31, 2018, the Debtor paid members through Member Draws (the "Member Draws").

65.     LCR paid the Defendant $1,535872 in Contingent Income and Member Draws in violation of the Compensation Polices, the Shareholder Agreements, and the Board Resolutions.

66.     The Defendant knew or should have known that he was being paid Contingent Income and Member Draws while LCR was insolvent, that the conditions precedent to pay these amounts were not satisfied, and that the payments were made with an intent to hinder, delay, and/or defraud LCR's creditors.

#### i.   2014 Compensation Policy

67.     In 2014 and in addition to the Board Resolutions, shareholder compensation, including the Defendant's, was governed by the Shareholder and Officer Compensation Policy, effective January 1, 2014 and adopted November 26, 2013 (the "2014 Compensation Policy").

68.     The 2014 Compensation Policy stated that shareholders' compensation from the Debtor was comprised of (a) Regular Salary, (b) At-Risk Salary, and (c) Contingent Retention Incentive (each as defined in the 2014 Compensation Policy).

69.     The At-Risk Salary set forth in the 2014 Compensation Policy was Contingent Income subject to, among other things, the Debtor's financial performance during the year.

13

70.    The 2014 Compensation Policy stated that a failure to satisfy the necessary conditions for payment of the At-Risk Salary means that the shareholder's "right to receive a particular At-Risk Salary . . . installment payment, as applicable, shall not have vested or be payable."

71.    Payment of the At-Risk Salary and Contingent Retention Incentive was also subject to a waterfall payment structure set forth in the 2014 Compensation Plan, with five waterfalls set forth therein.

72.    At-Risk Salary was paid in Waterfalls 1, 4 and 5, and Contingent Retention Incentive was paid upon Waterfall 5 being fully funded.

73.    The Debtor did not satisfy the necessary conditions precedent for payment of the At-Risk Salary or the Contingent Retention Incentive.

74.    As the Debtor did not satisfy the necessary conditions precedent, the Defendant should not have received the At-Risk Salary payments under the 2014 Compensation Plan.

75.    Shareholders were told by management of LCR that the At-Risk Salary and the Contingent Retention Incentive were unearned in a presentation on October 24, 2014.

76.    In violation of the Board Resolutions and the 2014 Compensation Policy, the Defendant received $224,400 in At-Risk Salary.

77.    In October 2014, it was communicated to Shareholders that, as a result of the failure to meet 2014 performance thresholds, the 5% Contingent Retention Incentive scheduled to be paid in installments from May to September 2015 was unearned.

78.    However, Shareholders were told that as a result a new "2015 Retention Incentive" would be created, and the payments would be made on the same schedule as the unearned Contingent Retention Incentive.

79.    In November 2014, Shareholders voted to approve this 2015 Retention Incentive to ostensibly pay themselves the Contingent Retention Incentive that they did not earn based on 2014 performance.  At the time these 2015 Retention Incentive payments were made, the Debtor faced severe liquidity issues with a majority of its accounts payable past due and taking actions such as utilizing CAPE funds and making improper draws on construction loans to fund operations.

80.    Shareholders, including the Defendant, were or should have been aware that the Retention Incentives paid in 2015 were for the unearned 2014 Contingent Retention Incentive.

81.    For example, an April 15, 2015 shareholder communication explained that "Certain shareholders were paid $2.5 million of compensation in the first quarter of 2015 that the Firm delayed paying them from 2014 year end."

82.    As a result, the Defendant received $112,200 of 2015 Retention Incentive payments that were unearned based on the 2014 Compensation Policy.

### ii.  2015 Compensation Policy

83.    In 2015 and in addition to the Board Resolutions, shareholder compensation, including the Defendant's, was governed by the 2015 Shareholder and Officer Compensation Policy, adopted November 25, 2014 (the "2015 Compensation Policy").

84.    The 2015 Compensation Policy stated that shareholders' compensation from the Debtor was comprised of (a) Regular Salary, (b) the 2015 Retention Incentive (described above), (c) the Shareholder Equalization Payment, (d) the targeted Shareholder Performance Payment, and (e) the 2016 Contingent Retention Incentive (each as defined in the 2015 Compensation Policy).

85.    The Shareholder Equalization Payment and the targeted Shareholder Performance Payment were Contingent Income subject to, among other things, the Debtor's financial performance during the year.

86.    The 2015 Compensation Policy stated that failure to satisfy the necessary conditions for payment of the 2015 compensation "shall mean that the Shareholder's right to receive a particularly payment shall not have vested or be payable."

87.    Payment of the Shareholder Equalization Payment and the targeted Shareholder Performance Payment were also subject to a waterfall payment structure set forth in the 2015 Compensation Plan, with four waterfalls set forth therein.

88.    The Shareholder Equalization Payment was included in Waterfall 1 and the targeted Shareholder Performance Payment was included in Waterfall 4.

89.    The Debtor did not satisfy the necessary financial performance to pay shareholders the Shareholder Equalization Payment, the Shareholder Performance Payment, and the 2015 Retention Incentive under the 2015 Compensation Policy in full.

90.    As the Debtor did not satisfy the necessary conditions precedent, the Defendant should not have received the Shareholder Equalization Payment and the targeted Shareholder Performance Payment payments under the 2015 Compensation Plan.

91.    In violation of the Board Resolutions and the 2015 Compensation Policy, the Defendant received a $118,200 Shareholder Equalization Payment and a $118,200 Shareholder Performance Payment.

### iii.    2016 Compensation Policy

92.    In 2016 and in addition to the Board Resolutions, shareholder compensation was governed by the Amended and Restated 2016 Shareholder Compensation Policy, adopted June 3,

2016, which amended and restated the policy adopted September 2, 2015 (the "2016 Compensation Policy").

93.     The 2016 Compensation Policy stated that shareholders' compensation from the Debtor was comprised of (a) Regular Salary, (b) the Shareholder Equalization Payment, and (c) the Targeted Pro-Rata Payments (each as defined in the 2016 Compensation Policy).

94.     The Shareholder Equalization Payment and the Targeted Pro-Rata Payments were Contingent Income subject to, among other things, the Debtor's financial performance during the year.

95.     The 2016 Compensation Policy stated that failure to satisfy the necessary conditions for payment of the 2016 compensation "shall mean that the Shareholder's right to receive a particularly payment shall not have vested or be payable."

96.     Payment of the Shareholder Equalization Payment and the Target Pro Rata Payments were also subject to a waterfall payment structure set forth in the 2016 Compensation Plan, with four waterfalls set forth therein.

97.     The Shareholder Equalization Payment was included in Waterfall 2 and the Target Pro Rata Payment was included in Waterfall 3.

98.     The Debtor did not make contingent Shareholder Equalization Payments or Targeted Pro-Rata Payments under the 2016 Compensation Plan.

### iv.   2017-18 Compensation Policy

99.     In 2017 and 2018 and in addition to the Board Resolutions, shareholder and member compensation, as applicable, was governed by the Member Compensation Policy, adopted June 13, 2017 (the "2017-2018 Compensation Policy").

100.    The 2017-18 Compensation Policy states that "[t]he Member compensation system set forth in this policy recognizes that, at the end of every calendar year, Members split whatever profit remains after payment of properly payable Firm expenses and a reserve for working capital and for a bonus pool.  The Firm cannot pay out more than it earns, nor can it borrow funds from future years and future partners to pay Members money that was not earned in a particular year."

101.    The Debtor did not earn a profit in either 2017 or 2018.

102.    Because the Debtor did not earn a profit in either 2017 or 2018, it was not entitled to distribute any Contingent Income or Member Draws in 2017 or 2018.

103.    In 2017, the Debtor incurred a net loss of about $2,743,993.

104.    In 2018, the Debtor incurred a net loss of about $16,890,705.

105.    In both 2017 and 2018, the Debtor paid out to shareholders and members, as applicable, more than the Debtor earned.

106.    In 2017, the Debtor transferred $0 in Contingent Income to the Defendant.

107.    In 2018, the Debtor transferred $844,410 in Contingent Income and Member Draws to the Defendant.

108.    The transfers of Contingent Income and Member Draws in 2017 and 2018 were made by the Debtor to the Defendant with the intent to hinder, delay, and/or defraud the Debtor's creditors and while the Debtor was insolvent.

109.    The Defendant knew or should have known that the Debtor paid the Contingent Income and Member Draws in 2017 and 2018 while the Debtor was insolvent, that the conditions precedent to pay these amounts were not satisfied, and that the payments were made with an intent to hinder, delay, and/or defraud the Debtor's creditors.

### v. 2019 Member Compensation Policy

110.    In 2019 and in addition to the Board Resolutions, member compensation was governed by the Member Compensation Policy, adopted February 18, 2019 (the "2019 Compensation Policy," and together with the 2014 Compensation Policy, the 2015 Compensation Policy, the 2016 Compensation Policy, and the 2017-18 Compensation Policy, the "Compensation Policies").

111.    The 2019 Compensation Policy states that "[t]he Member compensation set forth in this policy recognizes that Members split whatever profit remains after payment of properly payable Firm expenses and a reserve for working capital.  The Firm cannot distribute to Members more than it earns in profit in any particular calendar year, regardless of the manner in which profit that is distributed.  While the Firm may attribute portions of a current year profit pool based on past performance, it cannot borrow funds from future years or future partners to pay Members for profit that was not generated in a particular year."

112.    Pursuant to the 2019 Compensation Policy, the Debtor paid members through Member Draws.

113.    The Debtor did not earn a profit in 2019.  From January 1 to September 3, 2019, the Debtor incurred a net loss of over $13,000,000.

114.    In 2019, the Debtor paid out to members more than the Debtor earned.

115.    In 2019, the Debtor transferred $118,462 in Member Draws to the Defendant.

116.    The payment of the Member Draws in 2019 were made by the Debtor to the Defendant with the intent to hinder, delay, and/or defraud the Debtor's creditors and while the Debtor was insolvent.

117.    The Defendant knew or should have known the Debtor paid the Member Draws in 2019 while the Debtor was insolvent, that the conditions precedent to pay these amounts were not satisfied, and that the payments were made with an intent to hinder, delay, and/or defraud the Debtor's creditors.

### vi.    Wells Fargo Cash Covenant and the Cash Covenant Payments [

118.    A portion of the Contingent Income that the Defendant received from the Debtor were payments made in violation of the Debtor's agreement with Wells Fargo Bank, N.A. ("Wells Fargo") under the Second Amended and Restated Loan and Security Agreement between LeClairRyan and Wells Fargo (as amended, modified, or supplemented, the "Wells Fargo Loan Document").

119.    From the period of no later than September 3, 2014 to December 29, 2017, the Debtor borrowed funds from Wells Fargo pursuant to the Wells Fargo Loan Document.

120.    Pursuant to the Wells Fargo Loan Document, the Debtor was required to maintain positive cash flows as of each fiscal year end for such year (the "Wells Fargo Cash Covenant"). The Debtor, with fraudulent intent, manipulated certain payments made to the Debtor's shareholders so as to not violate the Wells Fargo Cash Covenant and to hinder, delay, and/or defraud the Debtor's creditors. Specifically, on December 31, 2014, the Debtor dated certain payments to shareholders, including the Defendant, for tax purposes but instructed its payroll provider to not release the shareholder compensation funds until January 6, 2015 (the "Initial Cash Covenant Payments" and each an "Initial Cash Covenant Payment").

121.    Again, on December 31, 2015, the Debtor dated certain payments to shareholders, including the Defendant, for tax purposes but did not distribute those payment to shareholders

until January 4, 2016 (collectively with the Initial Cash Covenant Payments, the "<u>Cash Covenant Payments</u>" and each, with the Initial Cash Covenant Payment, a "<u>Cash Covenant Payment</u>").

122.    The Cash Covenant Payments were delayed until January 6, 2015 and January 4, 2016 with the express purpose to avoid reporting the cash outflow for the Wells Fargo Cash Covenant. Otherwise, if it had made the Cash Covenant Payments on December 31, 2014 and December 31, 2015, the Debtor would have violated the Wells Fargo Cash Covenant at the end of each calendar year.

123.    Shareholders, including the Defendant, knew or should have known that the Cash Covenant Payments were a violation of the Wells Fargo cash covenant.

124.    For example, in a December 22, 2015 shareholder information meeting, shareholders were told that Shareholder Payments would be funded in 2015, but not paid until 2014 because of a "Wells Fargo cash covenant compliance issue. . . . Wells Fargo cash covenants regarding the Firm's cash profits/loss prohibit the payments of both . . . payroll and Shareholder Equalization payments . . . ." Despite failing to meet the necessary budget metrics, shareholders were told that some payments "will be paid December 31, 2015 via live check" and "available for pickup in the office January 4th, 2016."

125.    The Defendant received Cash Covenant Payments totaling $123,420, which were paid by the Debtor to the Defendant as part of his Contingent Income.

**D.    Shareholder and Member Compensation From the Debtor's Deferred Compensation and Supplemental Retirement Plans**

    **a. The Deferred Compensation Plan**

126.    The Debtor maintained a deferred compensation plan (the "<u>Deferred Compensation Plan</u>"), adopted by the Debtor in 1992.

127.    The Deferred Compensation Plan was governed by the 2014 Amended and Restated Shareholders Deferred Compensation Plan, adopted November 13, 2013 (the "<u>Deferred Compensation Plan Document</u>").

128.    Section 9.1 of the Deferred Compensation Plan Document stated that the:

> right of a Participant or his beneficiary to receive a distribution hereunder shall be an unsecured (but legally unenforceable) claim against the general assets of the Company, and neither the Participant nor his beneficiary shall have any rights in or against any amount credited to any Deferral Account or any other specific assets of the Company. Thus, the Plan at all times shall be considered entirely unfunded for ERISA and tax purposes. Any funds set aside by the Company for the purpose of meeting its obligations under the Plan, including any amounts held by a trustee, shall continue for all purposes to be part of the general assets of the Company and shall be available to its general creditors in the event of the Company's bankruptcy or insolvency. The Company's obligation under this Plan shall be that of an unfunded and unsecured promise to pay money in the future. All Company Contributions attributable to services prior to 2014, all property and rights purchased with such contributions, and all earnings attributable to such contributions, property or rights shall be held in the Trust until distributed to the Participant or his beneficiary and shall remain subject to the claims of the Company's general creditors.

129.    The Deferred Compensation Plan utilized a rabbi trust (the "<u>Rabbi Trust</u>"), which was governed by the Amended and Restated Rabbi Trust Document, dated February 13, 2014 (the "<u>Rabbi Trust Agreement</u>").

130.    Section 3 of the Rabbi Trust Agreement provides, among other things, that:

> [t]rustee shall cease payments of benefits to Plan participants and their beneficiaries if the Company is Insolvent. Company shall be considered "Insolvent" for purposes of this Trust Agreement if (i) Company is unable to pay its debts as they become due, or (ii) Company is subject to a pending proceeding as a debtor under the United States Bankruptcy Code.

(the "<u>Cease Payments When Insolvent Requirement</u>").

131.    Section 3(b) of the Rabbi Trust Agreement also states that "[a]t all times during the continuance of this Trust, as provided in Section 1(d) hereof, the principal and income of the Trustee shall be subject to the claims of general creditors of Company under federal and state law as set forth below."

132.    The Rabbi Trust was funded by either a whole life insurance policy, variable life insurance policies, or an investment in a long-term tax-exempt bond fund.

133.    The Rabbi Trust Agreement also provides, among other things, that

> The Board of Directors and the Chief Executive Officer of Company shall have the duty to inform Trustee in writing of Company's Insolvency. If a person claiming to be a creditor of Company alleges in writing to Trustee that Company has become Insolvent, Trustee shall determine whether company in Insolvent and, pending such determination, Trustee shall discontinue payment of benefits to Plan participants or their beneficiaries.

(the "Insolvency Notification Requirement").

134.    A participant became vested in the Deferred Compensation Plan after 15 full calendar years as an employee and 10 full calendar years as a shareholder, or age 62.

135.    Shareholders of the Firm, including the Defendant, were aware, or should have been aware, that the assets were available to satisfy creditors.

136.    For instance, in the 2015 Plan Year Enrollment Kit, all participants were told that "assets held in the Rabbit Trust are considered Company assets and are available to satisfy the claims of creditors of the Company. In the event the Company becomes insolvent, you are an unsecured general creditor of the Company with regard to your benefits under the Plan."

b.    **The Supplemental Retirement Plan**

137.    The Debtor also maintained a supplemental retirement plan (the "SERP"), adopted by the Debtor in 2004.

138.     The SERP was governed by the Amended and Restated LeClairRyan, a Professional Corporation, Supplemental Retirement Plan, effective January 1, 2014 (the "SERP Plan Document").

139.     The SERP designated amounts as being in either a Deferral Account or a Secular Trust (together, the "SERP Accounts").

140.     Pursuant to the SERP, the Secular Trust received and held vested contributions made by the Debtor to the SERP participant and contributions made by the SERP participant to the Secular Trust.

141.     The funds held in the Secular Trust were not subject to the claims of the Debtor's general creditors.

142.     To the contrary, funds held in the Deferral Accounts were subject to the claims of the Debtor's general creditors.

143.     In contravention of the SERP Plan Document, at times, the Debtor failed to segregate the funds in the Deferral Account from the Debtor's general operating accounts. Rather than depositing the funds into the SERP Accounts prior to distribution to shareholders and members, the Debtor utilized a practice of making these payments directly to shareholders and members and recorded them for accounting purposes only as payments from the Secular Trust (the "Deferral Payments").

144.     The Defendant received a total of $204,352 of Deferral Payments, *i.e.*, funds that were never held in the Secular Trust.

145.     The Deferral Payments were made by the Debtor to the Defendant with the intent to hinder, delay, and defraud the Debtor's creditors and while the Debtor was insolvent.

146.    The Defendant knew or should have known that the Deferral Payments occurred while the Debtor was insolvent, and that the payments were made with an intent to hinder, delay, and/or defraud the Debtor's creditors.

c.    **Termination of the Deferred Compensation Plan and the SERP**

147.    On September 27, 2016, the Retirement Plans Task Force issued a report (the "Task Force Report") that recommended, among other things, the termination and payment of the Deferred Compensation Plan assets to participants pursuant to Section 409A of the Internal Revenue Code.

148.    Specifically, the Task Force Report stated that "[a]fter a number of meetings, thoughtful consideration and good discussion, the Task Force feels it is in the best interest of the Firm and the participants to take steps to terminate the [Deferred Compensation Plan and SERP Plan] on or before January 1, 2019. The Task Force understands this is the most expensive option and financial discipline is needed to get the Firm to the point where this is executable."  In explaining its recommendation, the report noted that the "[Deferred Compensation and SERP [P]lan is painfully complex, and there is no comfort surrounding the possibility of hidden pitfalls that may present themselves in the future."

149.    On November 17, 2016, the Debtor's Board of Directors approved the Task Force Report's recommendation to terminate the Deferred Compensation Plan on or before January 1, 2019.

150.    On December 9, 2016, the Debtor provided communication to shareholders stating that 100% vesting would occur upon the formal termination of the Deferred Compensation Plan and that distributions will be made to comply with Section 409A of the Internal Revenue Code.

151.    One issue that remained was that there was a significant "payment gap" of approximately $2 million dollars in the Deferred Compensation plan. Thus, terminating the plan meant that the Debtor had to find funding for this payment hole.

152.    As described above, from September 2016 to November 2017, the Firm's finances continued to decline and there was not the "financial discipline" needed to get the Firm where executing termination of the Deferred Compensation Plan and SERP would not harm creditors.

153.    Thus, on November 30, 2017, the Retirement Plan Committee issued a memorandum to the Board of Directors that it was not endorsing a recommendation to accelerate the termination of the Deferred Compensation Plan to 2017.

154.    Specifically, the Retirement Plan Committee concluded that termination prior to 2017 "may result in the loss of flexibility the Firm may need to fund the [existing] shortfall [in the plans] needed to make distributions. Since a resolution to terminate the plans is irrevocable, if the Firm finds itself in a position to not fully fund the shortfall by December, 2019, the Firm will be obligated to payout the amounts, possibly in lieu of point value or increased accounts payable."

155.    Notwithstanding the Retirement Plan Committee's refusal to endorse an accelerated termination, on December 29, 2017, the Board formally voted to terminate the Deferred Compensation Plan and the SERP, effective December 31, 2017.

156.    The termination allowed the Debtor to distribute the funds in the Deferred Compensation Plan to its members, diverting them away from the Firm's general unsecured creditors.

157.    The Board of Directors made this decision aware that it would "benefit high performing Shareholders," and made that a factor in trying to message the payments made to shareholders in the year ending 2017.

158.    At the time that this decision was made, the Board anticipated and represented that "The Firm will have to fund the payment gap in the [Deferred Compensation] Plan and that will be in the 2019 budget, but not a 2018 expense."

159.    Notwithstanding that the decision to accelerate the termination was made because the payments would be in the 2019 budget and not in the 2018 budget, and that the tax code allowed until December 2019 for the funds to be distributed to the members, the Board of Directors voted on December 28, 2017 to distribute the funds in December 2018.

160.    Such a decision was made to benefit the individual members of the firm, as a distribution from the termination of the Deferred Compensation Plan or the SERP "ordinarily would be taxable to the Partners, but it is anticipated that the approximately $3 million in projected PLLC-related tax savings to Partners will effectively offset much of the tax."

161.    The Defendant received distributions from the Rabbi Trust in a total amount of $45,407 between September 1, 2014 and December 31, 2018 (the "Deferred Compensation Payments").  That amount includes a distribution from the Rabbi Trust of

of $45,407 on December 31, 2018.

162.    Notwithstanding the expressed Insolvency Notification Requirement in the Rabbi Trust Agreement, upon information and belief, the Debtor failed to ever provide notice of its insolvency to the Rabbi Trust's trustee upon its insolvency or prior to the distribution of Rabbi Trust assets to shareholders/members.

163.    As the Debtor was insolvent at the time of the Deferred Compensation Payments from the Rabbi Trust to the Defendant, the Defendant was not entitled to receive a distribution from the Rabbi Trust because of the Cease Payments When Insolvent Requirement and the Rabbi Trust's assets should have been maintained for the benefit of the Debtor's general creditors.

164.    The payment of the Deferred Compensation Payments to the Defendant was made by the Debtor to the Defendant with the intent to hinder, delay, and defraud the Debtor's creditors and while the Debtor was insolvent.

165.    The Defendant knew or should have known that distribution of the Deferred Compensation Payments occurred while the Debtor was insolvent, and that the payment were made with an intent to hinder, delay, and/or defraud the Debtor's creditors.

## CLAIMS FOR RELIEF

**COUNT I:    Avoidance and Recovery of Transfers of Contingent Income and Member Draws Made in Violation of the Shareholder Agreements, the Board Resolutions, and the Compensation Policies as Actual Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(A) & 550.**

166.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

167.    The Debtor transferred $962,872 in Contingent Income and Member Draws to the Defendant within two years of the Petition Date.

168.    The Contingent Income and Member Draws constitute multiple transfers of property of the Debtor to the Defendant.

169.    The Defendant is an initial transferee of the Contingent Income and Member Draws for whose benefit the transfers were made.

170.    The transfers of Contingent Income and Member Draws were distributed to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

171.    The Debtor distributed the Contingent Income and Member Draws with the actual intent to hinder, delay, and/or defraud any entity which the Debtor was indebted or became indebted to on or after the date of each of the transfers of Contingent Income and Member Draws.

172.    The Trustee may rely on, and the circumstances reflect, several badges of fraud relating to the Contingent Income and Member Draws including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it made the transfers of Contingent Income and Member Draws; (b) the transfers of Contingent Income and Member Draws were distributed to the Defendant, a shareholder/member of the Debtor; (c) the transfers of Contingent Income and Member Draws were distributed to the Defendant in violation of the Shareholder Agreements, the Board Resolutions, and the Compensation Policies; and (d) the transfers of Contingent Income and Member Draws amount to significant portions of the Debtor's Estate.

173.    Furthermore, the Defendant knew or should have known that the Debtor made the transfers of Contingent Income and Member Draws while the Debtor was insolvent by virtue of the Defendant's position as a shareholder and member.  The Defendant had access to the Debtor's books and records and received frequent communication from the Debtor and its agents regarding the Debtor's financial position, and as a shareholder and member evaluating the Debtor's financial state is routine business practice in the legal industry.

174.    Pursuant to Section 548(a)(1)(A) and Section 550 of the Bankruptcy Code, the Trustee is entitled to judgment against the Defendant: (a) avoiding the transfers of Contingent Income and Member Draws, (b) directing the transfers of Contingent Income and Member Draws be set aside, and (c) requiring the Defendant, as the recipient of the transfers of

Contingent Income and Member Draws and/or the person for whose benefit the transfers of Contingent Income and Member Draws were given, to return the transfers of Contingent Income and Member Draws, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT II:    Avoidance and Recovery of Contingent Income and Member Draws Made in Violation of the Shareholder Agreements, the Board Resolutions, and the Compensation Policies as Actual Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544, 550, and Va. Code § 55.1-400.**

175.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

176.    The Debtor transferred $1,535,872 in Contingent Income and Member Draws to the Defendant between September 3, 2014 and the Petition Date.

177.    The transfers of Contingent Income and Member Draws constitute multiple transfers of property of the Debtor to the Defendant.

178.    The transfers of Contingent Income and Member Draws were distributed to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

179.    The Debtor transferred Contingent Income and Member Draws with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to on or after the date of each of the transfers of Contingent Income and Member Draws.

180.    The transfers of Contingent Income and Member Draws to the Defendant were accompanied by several badges of fraud, including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it made the transfers of Contingent Income and Member Draws ; (b) the transfers of Contingent Income and Member Draws were distributed to the Defendant, a shareholder of the Debtor; (c) the transfers of Contingent Income and Member Draws were distributed to the Defendant in violation of the

Shareholder Agreements, Board Resolutions, the Compensation Policies, and/or applicable Virginia law; (d) the transfers of Contingent Income and Member Draws amount to significant portions of the Debtor's Estate; and (e) the transfers of Contingent Income and Member Draws were distributed to the Defendant in secrecy or concealment—particularly as it relates to the Cash Covenant Payments.

181.    The transfers of Contingent Income and Member Draws were distributed to or for the benefit of the Defendant.

182.    Pursuant to Virginia Code Section 55.1-400, 11 U.S.C. § 544 and 11 U.S.C. § 550, the Trustee is entitled to judgment against the Defendant: (a) avoiding the transfers of Contingent Income and Member Draws , (b) directing the transfers of Contingent and Member Draws be set aside, and (c) requiring the Defendant, as the recipient of the transfers of Contingent Income and Member Draws and/or the person for whose benefit the transfers of Contingent Income and Member Draws were given, to return the transfers of Contingent Income and Member Draws, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT III: Avoidance and Recovery of Transfers of Contingent Income and Member Draws Made in Violation of the Shareholder Agreements, the Board Resolutions and Compensation Policies as Constructive Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(B) & 550.**

183.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

184.    The Debtor transferred $962,872 in Contingent Income and Member Draws to the Defendant within two years of the Petition Date.

185.    The transfers of Contingent Income and Member Draws constitute multiple transfers of property of the Debtor's Estate to the Defendant.

186.    The transfers of Contingent Income and Member Draws were distributed to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

187.    The transfers of Contingent Income and Member Draws were distributed to or for the benefit of the Defendant.

188.    The Defendant did not provide reasonably equivalent value in exchange for the transfers of Contingent Income and Member Draws.

189.    Pursuant to Section 548(a)(1)(B) and Section 550 of the Bankruptcy Code, the Trustee is entitled to judgment against the Defendant: (a) avoiding the transfers of Contingent Income and Member Draws, (b) directing the transfers of Contingent Income and Member Draws be set aside, and (c) requiring the Defendant, as the person for whose benefit the transfers of Contingent Income and Member Draws were given, to return the transfers of Contingent Income and Member Draws , or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT IV:  Recovery Under Conversion**

190.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

191.    The Debtor did not satisfy the necessary conditions precedent for the Defendant to receive the transfers of Contingent Income, Member Draws, Deferral Account Payments, and Deferred Compensation Payments (together, the "Defendant's Fraudulent Transfers") in all relevant years.  Accordingly, the Defendant's Fraudulent Transfers were wrongfully paid to the Defendant.

192.    The Debtor is entitled to immediate possession of the Defendant's Fraudulent Transfers.

193.    The Trustee is entitled to recover the damages suffered by the Debtor in the amount to be proven at trial, but in no event less than the total amount of the Defendant's Fraudulent Transfers.

**COUNT V:**    **Recovery Under Unjust Enrichment**

194.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

195.    The Debtor did not satisfy the necessary conditions precedent for the Defendant to receive the Defendant's Fraudulent Transfers in all relevant years.

196.    The Debtor conferred a benefit on the Defendant through the conveyance of the Defendant's Fraudulent Transfers.

197.    The Defendant accepted and retained the benefit of the Defendant's Fraudulent Transfers without the Debtor satisfying the conditions precedent necessary to pay the Defendant's Fraudulent Transfers.

198.    The Defendant knew or should have known the Debtor did not satisfy the conditions precedent necessary for the Defendant to receive the Defendant's Fraudulent Transfers.

199.    Allowing the Defendant to retain the benefits he received would be unjust.

200.    As a direct and proximate result of the foregoing wrongful acts and Defendant's unjust enrichment, the Debtor sustained damages in the amount of the Defendant's Fraudulent Transfers and the Trustee is entitled to recover the same.

**COUNT VI:  Recovery Under Violation of Virginia Limited Liability Company Statute Va. Code § 13.1-1035 for the Transfers of Member Draws While the Debtor was a PLLC pursuant to 11 U.S.C. §§ 544, 550, and Va. Code. § 13.1-1035.**

201.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

202.    During the time in which the Debtor was a Virginia PLLC, the Debtor transferred $937,872 in Member Draws to the Defendant.

203.    The Defendant was a member of the Debtor at the time it was a PLLC.

204.    As a PLLC, the Debtor was subject to the laws of the Virginia Limited Liability Company Act.

205.    During its time as a PLLC, the Debtor transferred the Member Draws to the Defendant while the Debtor was not able to pay its debt as they became due in the ordinary course of business.

206.    During its time as a PLLC, the Debtor's total assets were less than the sum of the Debtor's total liabilities.

207.    The transfers of Member Draws from the Debtor to the Defendant was in violation of the Virginia Limited Liability Company Act.

208.    Pursuant to Virginia Code Section 13.1-1035, the Trustee is entitled to judgment avoiding the transfers of Member Draws and ordering the Defendant to return such amount or the value thereof to the Debtor's Estate.

**COUNT VII:  Avoidance and Recovery of Transfers of Deferral Payments as Actual Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(A) & 550.**

209.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

210.    Within two years of the Petition Date, the Debtor transferred $204,352 in Deferral Payments to the Defendant.

211.    The Deferral Payments constitute multiple transfers of property of the Debtor to the Defendant.

212.    The Debtor was insolvent at the time of the Deferral Payments.

213.    The Debtor made the Deferral Payments with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to on or after the date of such Deferral Payments.

214.    The Trustee may rely on, and the circumstances reflect, several badges of fraud relating to the Deferral Payments including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it made the Deferral Payments; (b) the Deferral Payments were distributed to the Defendant, a shareholder and member of the Debtor; (c) the Deferral Payments were distributed to the Defendant in violation of the SERP and the SERP Plan Document, and (c) the Deferral Payments amount to significant portions of the Debtor's Estate.

215.    Furthermore, Defendant knew or should have known that the Debtor made the Deferral Payments while the Debtor was insolvent by virtue of the Defendant's position as shareholder and member. The Defendant had access to the Debtor's books and records and received frequent communication from the Debtor and its agents regarding the Debtor's financial position, and as a shareholder and member evaluating the Debtor's financial state is routine business practice in the legal industry.

216.    The Defendant is an initial transferee of such transfer for whose benefit the transfer was made.

217.    Pursuant to Section 548(a)(1)(A) and Section 550 of the Bankruptcy Code, the

Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferral Payments,

(b) directing the Deferral Payments be set aside, and (c) requiring the Defendant, as the recipient

of the Deferral Payments and/or the person for whose benefit the Deferral Payments were given,

to return the Deferral Payments, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT VIII: Avoidance and Recovery of Transfers of Deferral Payments as Actual
Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544, 550, and Va. Code § 55.1-400.**

218.    The Trustee repeats and re-alleges the allegations set forth in all preceding

paragraphs of this Complaint, as if set forth herein.

219.    The Debtor transferred $204,352 to the Defendant as Deferral Payments between

September 3, 2014 and the Petition Date.

220.    The Deferral Payments were transferred to the Defendant while the Debtor was

insolvent and unable to pay its debts as they became due.

221.    The Debtor transferred the Deferral Payments with the actual intent to hinder,

delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to

on or after the date of each of the Deferral Payments.

222.    The Deferral Payments to the Defendant were accompanied by several badges of

fraud, including, but not limited to the following: (a) the Debtor was insolvent and unable to pay

its debts as they became due when it made the Deferral Payments; (b) the Deferral Payments

were distributed to the Defendant, a shareholder/member of the Debtor; (c) the Deferral

Payments were distributed to the Defendant in violation of the SERP and the SERP Plan

Document, and (c) the Deferral Payments amount to significant portions of the Debtor's Estate.

223.    The Deferral Payments were distributed to or for the benefit of the Defendant.

224.     Pursuant to Virginia Code Section 55.1-400, 11 U.S.C. § 544 and 11 U.S.C. § 550, the Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferral Payments, (b) directing the Deferral Payments be set aside, and (c) requiring the Defendant, as the recipient of the Deferral Payments and/or the person for whose benefit the Deferral Payments were given, to return the Deferral Payments, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT IX: Avoidance and Recovery of the Deferred Compensation Payments Made in Violation of the Deferred Compensation Plan and Rabbi Trust Agreement as an Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A) & 550.**

225.     The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

226.     Within two years prior to the Petition Date, the Debtor transferred $45,407 to the Defendant in Deferred Compensation Payments.

227.     The Deferred Compensation Payments were transferred to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

228.     The Deferred Compensation Payments were transferred to or for the benefit of the Defendant.

229.     The Debtor transferred the Deferred Compensation Payments with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to on or after the date of the first Deferred Compensation Payment.

230.     The transfer of the Deferred Compensation Payments to the Defendant was accompanied by several badges of fraud, including, but not limited to the following: (a) the Debtor was insolvent and unable to pay its debts as they became due when it made the Deferred Compensation Payments; (b) the Deferred Compensation Payments were transferred to the

Defendant, a shareholder of the Debtor; (c) the Deferred Compensation Payments were transferred to the Defendant in violation of the Deferred Compensation Plan, the Deferred Compensation Plan Document, and the Rabbi Trust Agreement; and (d) the Deferred Compensation Payments amount to significant portions of the Debtor's Estate.

231.    Pursuant to Section 548(a)(1)(A) and Section 550 of the Bankruptcy Code, the Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferred Compensation Payments, (b) directing the Deferred Compensation Payments be set aside, and (c) requiring the Defendant, as the recipient of the Deferred Compensation Payments and/or the person for whose benefit the Deferred Compensation Payments were given, to return the Deferred Compensation Payments, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT X:    Avoidance and Recovery of the Deferred Compensation Payments Made in Violation of the Deferred Compensation Plan and Rabbi Trust Agreement as an Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544, 550, and Va. Code § 55.1-400.**

232.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

233.    The Debtor transferred $45,407 to the Defendant as Deferred Compensation Payments between September 3, 2014 to the Petition Date.

234.    The Deferred Compensation Payments were transferred to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

235.    The Debtor transferred the Deferred Compensation Payments with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to on or after the date of the Deferred Compensation Payments.

236.    The Deferred Compensation Payments to the Defendant were accompanied by several badges of fraud, including, but not limited to the following: (a) the Debtor was insolvent

38

and unable to pay its debts as they became due when it made the Deferred Compensation Payments; (b) the Deferred Compensation Payments were transferred to the Defendant, a shareholder of the Debtor; (c) the Deferred Compensation Payments were distributed to the Defendant in violation of the Deferred Compensation Plan, the Deferred Compensation Plan Document, and the Rabbi Trust Agreement; and (d) the Deferred Compensation Payments amount to significant portions of the Debtor's Estate.

237.    The Deferred Compensation Payments were distributed to or for the benefit of the Defendant.

238.    Pursuant to Virginia Code Section 55.1-400, 11 U.S.C. § 544 and 11 U.S.C. § 550, the Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferred Compensation Payments, (b) directing the Deferred Compensation Payments be set aside, and (c) requiring the Defendant, as the recipient of the Deferred Compensation Payments and/or the person for whose benefit the Deferred Compensation Payments were given, to return the Deferred Compensation Payments, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT XI: Avoidance and Recovery of the Deferred Compensation Payments Made in Violation of the Deferred Compensation Plan and Rabbi Trust Agreement as a Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) & 550.**

239.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

240.    Within two years prior to the Petition Date, the Debtor transferred $45,407 to the Defendant as Deferred Compensation Payments.

241.    The Deferred Compensation Payments were transferred to the Defendant while the Debtor was insolvent and unable to pay its debts as they became due.

242.    The Deferred Compensation Payments were transferred to or for the benefit of the Defendant.

243.    The Defendant did not provide reasonably equivalent value in exchange for the Deferred Compensation Payments.

244.    Pursuant to Section 548(a)(1)(B) and Section 550 of the Bankruptcy Code, the Trustee is entitled to judgment against the Defendant: (a) avoiding the Deferred Compensation Payments, (b) directing the Deferred Compensation Payments be set aside, and (c) requiring the Defendant, as the recipient of the Deferred Compensation Payments and/or the person for whose benefit the Deferred Compensation Payments were given, to return the Deferred Compensation Payments, or the value thereof, to the Trustee for the benefit of the Estate.

**COUNT XII: Disallowance of Claims under 11 U.S.C. § 502(d)**

245.    The Trustee repeats and re-alleges the allegations set forth in all preceding paragraphs of this Complaint, as if set forth herein.

246.    As alleged above, the Defendant was a recipient of the Defendant's Fraudulent Transfers, which are avoidable pursuant to sections 544 and 548 of the Bankruptcy Code, and which are recoverable pursuant to section 550 of the Bankruptcy Code.

247.    Despite a demand, the Defendant has not returned the Defendant's Fraudulent Transfers to the Trustee.

248.    Pursuant to section 502(d) of the Bankruptcy Code, the Court shall disallow any claims of any entity from which property avoidable under section 544 or 548 of the Bankruptcy Code, or that is recoverable under section 550(a) of the Bankruptcy Code.

249.    Because the Defendants has not paid or returned the Defendant's Fraudulent Transfers, the Defendant's claims must be disallowed unless and until the Defendants return to the Trustee an amount equal to each such transfer that is avoided.

250.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 502(d) that all of the claims asserted by the Defendant against the Estate are disallowed.

## PRAYER

WHEREFORE, the Trustee respectfully requests and prays that the Court:

A.    On Counts I and III, awarding judgment to the Trustee, pursuant to Section 548 of the Bankruptcy Code, in an amount of the transfers of Contingent Income and Member Draws, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $962,872, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

B.    On Count II, awarding judgment to the Trustee, pursuant to Section 544 and 550 of the Bankruptcy Code, Va. Code Sections 55.1-400 and 55.1-401, or pursuant to other applicable state fraudulent conveyance or fraudulent transfer law, in an amount of the transfers of Contingent Income and Member Draws, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $1,535,872 , plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

C.    On Counts IV and V, awarding the Trustee damages in an amount to be proven at trial, but in no event less than $1,785,631;

D.    On Count VI, awarding judgment to the Trustee, pursuant to Section 544 and 550 of the Bankruptcy Code, and Va. Code. § 13.1-1035, or pursuant to other applicable state law, in an amount of the transfers of Contingent Income and Member Draws, and directing the

Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $937,872, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

E.      On Count VII, awarding judgment to the Trustee, pursuant to Section 548 of the Bankruptcy Code, in an amount of the transfers of the Deferral Payments, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $204,352, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

F.      On Count VIII, awarding judgment to the Trustee, pursuant to Section 544 and 550 of the Bankruptcy Code, Va. Code Sections 55.1-400, or pursuant to other applicable state fraudulent conveyance or fraudulent transfer law, in an amount of the transfers of the Deferral Payments, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $204,352, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

G.      On Count IX and XI, awarding judgment to the Trustee, pursuant to Section 548 of the Bankruptcy Code, in an amount of the transfer of the Deferred Compensation Payments, and directing the Defendant to pay the Trustee an amount to be determined at trial, totaling not less than $45,407, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

H.      On Count X, awarding judgment to the Trustee, pursuant to Section 544 and 550 of the Bankruptcy Code, Va. Code Sections 55.1-400, or pursuant to other applicable state fraudulent conveyance or fraudulent transfer law, in an amount of the transfer of the Deferred Compensation Payments, and directing the Defendant to pay the Trustee an amount to be

determined at trial, totaling not less than $45,407, plus interest, plus her reasonable attorneys'

fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

  I.   On Count XII, disallowing any claim of the Defendant pursuant to section

502(d) of the Bankruptcy Code;

  J.   Awarding the Trustee her costs incurred in connection with this Adversary

Proceeding, including but not limited to her reasonable attorneys' fees and costs;

  K.   Awarding post-judgment interest at the maximum legal rate running from the

date of the Judgment until the date the Judgment is paid in full, plus costs;

  L.   Directing the Defendants to pay forthwith all amounts awarded; and

  M.   Granting such other and further relief as this Court deems just and appropriate.


      Respectfully submitted,

      LYNN L. TAVENNER, CHAPTER 7 TRUSTEE

      /s/ *Brittany J. Nelson*
      Erika L. Morabito (VSB No. 44369)
      Brittany J. Nelson (VSB No. 81734)
      QUINN EMANUEL URQUHART & SULLIVAN LLP
      1300 I Street, N.W., Suite 900
      Washington, DC 20005
      (202) 538-8334 (telephone)
      erikamorabito@quinnemanuel.com
      brittanynelson@quinnemanuel.com


      *Special Counsel to Lynn L.*
      *Tavenner, the Chapter 7 Trustee*
      *of the Estate of LeClairRyan*
      *PLLC*