## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Richmond Division)

| | |
|---|---|
| In re:<br><br>**LECLAIRRYAN PLLC,**<br><br>　　　　　Debtor. | **Chapter 7**<br><br>**Case No. 19-34574 (KRH)** |
| **Lynn L. Tavenner, as Chapter 7 Trustee,**<br>**Plaintiff,**<br>vs.<br><br>**ULX Partners, LLC, UnitedLex**<br>**Corporation, and ULX Manager, LLC**<br><br>　　　　　**Defendants.** | **Adv. Proc. No. 20-03142-KRH** |
| **Lynn L. Tavenner, as Chapter 7 Trustee,**<br>**Plaintiff,**<br><br>vs.<br><br>**CVC Capital Partners, et al.**<br>**Defendants.** | **Adv. Proc. No. 21-03095-KRH** |

### FINAL ORDER TO SEAL OMNIBUS SETTLEMENT AGREEMENT AND RELATED DOCUMENTS, INFORMATION, AND HEARINGS

This matter is before the Court on ULX Partners, LLC ("**ULXP**"), UnitedLex Corporation

("**UnitedLex**"), and ULX Manager, LLC's ("**ULXM**") (collectively, the "**Defendants**") *Motion*

*to Seal Settlement Agreement and Related Documents, Information, and Hearings* [ Main Docket

David G. Barger (VSB No. 21652)
Thomas J. McKee, Jr. (VSB No. 68427)
J. Gregory Milmoe (admitted *pro hac vice*)
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Telephone:  (703) 749-1300
Fax:　　　 (703) 749-1301
Email:  mckeet@gtlaw.com

*Counsel to ULX Partners, LLC, UnitedLex Corp., and ULX Manager, LLC*

No. 1325, ULX Docket No. 207][1], (the "**Sealing Motion**").[2]  The Court having previously granted

the Sealing Motion on an interim basis pursuant to this Court's *Order to Seal Omnibus Settlement*

*Agreement and Related Documents, Information, and Hearings* [Main Docket No. 1382] (the

"**Interim Sealing Order**"), and upon consideration of the Sealing Motion on a final basis, the

*Objection of the United States Trustee to Defendants' Motion to Seal Settlement Agreement and*

*Related Documents, Information, and Hearings* (the "**UST Sealing Objection**") [Main Docket

No. 1332, ULX Docket No. 215], Defendants' *Supplement to Their Previously-Filed Motion to*

*Seal Settlement Agreement and Related Documents, Information, and Hearings* [Main Docket No.

1479, ULX Docket No. 269] (the "**Defendants' Supplement**"), the *Declaration of ULX Partners,*

*LLC, UnitedLex Corporation, and ULX Manager LLC in Support of Motion to Seal* (the "**ULX**

**Declaration**") [Main Docket No. 1486, ULX Docket No. 270], and the arguments and evidence

presented by the parties with respect to the Motion to Seal in Court on May 25, 2022, May 26,

2022, June 28, 2022, and July 14, 2022 and finding that this Court, pursuant to 28 U.S.C. § 107(b),

Fed. R. Bankr. P. 9018, Local Rule 9019-1, the Court's *Mediation Order Regarding*

*Confidentiality* (the "**Mediation Confidentiality Order**") [ULX Docket No. 195], and this

Court's inherent authority, has the authority to grant the relief requested in the Sealing Motion and

Defendants' Supplement, and that cause exists to support the requested relief and that such relief

is appropriate for the reasons stated on the record at the July 14, 2022 hearing on this matter,

including without limitation that the material at issue is scandalous and constitutes confidential

---

[1] References to "ULX. Docket No.___" shall mean docket numbers in Adversary Proceeding 20-03142-KRH.  References to "Main Docket No. ___" shall mean docket numbers in Case No. 19-34574.  References to "CVC Docket No. ___" shall mean docket numbers in Adversary Proceeding 21-03095.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Sealing Motion and in Defendants' Supplement.

mediation subject matter, as well as for the reasons set forth in the Court's accompanying memorandum opinion, it is hereby ORDERED as follows:

1.      The Sealing Motion and Defendants' Supplement are hereby GRANTED on a final basis as expressly provided herein.

2.      The following documents shall remain SEALED on a final basis, absent further Order of this Court, and subject to the re-filing of such documents in redacted form as set forth below in this Order:

    a.  The 9019 Motion and all exhibits thereto [Main Docket No. 1328, 1396, ULX Docket No. 211, 254, and CVC Docket No. 56, 78].

    b.  The April 19th Transcript [ULX Docket No. 200].

    c.  The *Supplemental Objection of the United States Trustee to Trustee's Motion and Memorandum of Law for Entry of an Order (I) Approving (A) Judicially Mediated Settlement and (B) Compensation to Counsel Including an Improvident Payment Under Section 328(A); and (II) Granting Related Relief* (the "**UST 9019 Objection**") [Main Docket No. 1370, ULX Docket No. 243, CVC Docket No. 69].

    d.  The *Declaration of Lynn L. Tavenner, Trustee* regarding the 9019 Motion (the "**Tavenner Declaration**") [Main Docket No. 1374].

    e.  The *Declaration of Brittany J. Nelson* regarding the 9019 Motion, and all exhibits thereto (the "**Nelson Declaration**") [Main Docket No. 1380, ULX Docket No. 249, CVC Docket No. 73].

    f.  The *Reply in Support of Trustee's Motion and Memorandum of Law for Entry of an Order (I) Approving (A) Judicially Mediated Settlement and (B) Compensation to Counsel Including an Improvident Payment Under Section 328(A); and (II)*

3

*Granting Related Relief* (the "**9019 Reply**") [Main Docket Nos. 1386, 1396, ULX

Docket Nos. 252, 254, CVC Docket Nos. 77, 78].

g.   The Defendants' Supplement [Main Docket No. 1479, ULX Docket No. 269]

h.   The ULX Declaration [ Main Docket NO. 1486, ULX Docket No. 270].

3.      The following documents shall be, and hereby are, redacted on a final basis, absent

further Order of this Court:

a.   The April 19th Transcript shall be, and hereby is, redacted on a final basis in the

form docketed at ULX Docket No. 266, absent further Order of this Court.

b.   The 9019 Motion shall be, and hereby is, redacted on a final basis as provided for

in Attachment A to this Order, absent further Order of this Court.

c.   The UST 9019 Objection shall be, and hereby is, redacted on a final basis as

provided for in Attachment B to this Order, absent further Order of this Court.

d.   The May 25th Transcript shall be, and hereby is, redacted on a final basis as

provided for in Attachment C to this Order, absent further Order of this Court.

e.   The May 26th Transcript shall be, and hereby is, redacted on a final basis as

provided for in Attachment D to this Order, absent further Order of this Court.

f.   The Tavenner Declaration shall be, and hereby is, redacted on a final basis as

provided for in Attachment E to this Order, absent further Order of this Court.

g.   The Nelson Declaration shall be, and hereby is, redacted on a final basis as provided

for in Attachment F to this Order, absent further Order of this Court.

h.   The 9019 Reply shall be, and hereby is, redacted on a final basis as provided for in

Attachment G to this Order, absent further Order of this Court.

4

  i. The transcript for the hearing on the 9019 Motion held before this Court on June 8, 2022 (the "**June 8th Transcript**") shall be, and hereby is, redacted on a final basis as provided for in <u>Attachment H</u> to this Order, absent further Order of this Court.

  j. The Court's Memorandum Opinion as docketed at Main Docket No. 1450 shall be, and hereby is, redacted on a final basis as reflected therein.

  k. The Defendants' Supplement shall be, and hereby is, redacted on a final basis as provided for in <u>Attachment I</u> to this Order, absent further Order of this Court.

  l. The ULX Declaration shall be, and hereby is, redacted on a final basis as provided for in <u>Attachment J</u> to this Order, absent further Order of this Court.

  m. The transcript for the final hearing on the Sealing Motion held before this Court on July 14, 2022 (the "**July 14th Transcript**) shall be, and hereby is, redacted on a final basis as provided for in <u>Attachment K</u> to this Order, absent further Order of this Court.

 4. Within seven (7) days of the docketing of this Order, the above referenced redacted documents shall be re-docketed as follows:

  a. The Trustee shall re-docket in the case(s) where such document was originally-filed, the following attachments to this Order: Attachment 1, Attachment 5, Attachment 6, and Attachment 7.

  b. The US Trustee shall re-docket in the case(s) where such document was originally-filed, the following attachments to this Order:  Attachment 2.

  c. The ULX Defendants shall re-docket in the case(s) where such document was originally-filed, the following attachments to this Order:  Attachment 9 and Attachment 10.

   d.   The Court will see to the re-docketing of the transcripts attached to this Order as

        Attachment 3, Attachment 4, Attachment 8, and Attachment 11.

5.   The following documents which were previously filed under seal shall be, and

hereby are, UNSEALED by the Clerk of this Court:

   a.   The Foley Objection to the 9019 Motion, and all exhibits thereto [Main Docket No.

        1365, 1397, ULX Docket No. 240]

   b.   The *Supplemental Declaration of Lynn L. Tavenner, Trustee* regarding the 9019

        Motion and related exhibits (the "**Tavenner Supplemental Declaration**") [Main

        Docket No. 1387, 1388]

   c.   The *Defendants' Statement in Support of Approval of the Settlement Agreement*

        [Main Docket No. 1389, ULX Docket No. 253].

6.   Unredacted copies of any and all documents and material sealed and/or redacted by

this Order (collectively, the "**Unredacted Material**") may be provided to the parties to the

Omnibus Settlement Agreement, their counsel, and members of the Office of the United States

Trustee, all of whom shall maintain the confidentiality of such documents.  For the avoidance of

doubt, and subject to all applicable rules governing the same, this Order does not prohibit any

appellate court of competent jurisdiction from reviewing the Unredacted Material.

7.   Subject to the ULX Defendants' discretion, the ULX Defendants may also provide

the Unredacted Material to an insurer of a ULX Defendant (and/or such insurer's counsel) as well

as to any mediator/arbitrator retained and/or selected by the ULX Defendants with respect to any

dispute between the ULX Defendants and an insurer of a ULX Defendant, only upon a written

commitment of such insurer, counsel, and mediator/arbitrator to keep such Unredacted Material

confidential.

8.      Notwithstanding anything to the contrary herein or any prior order of this Court, only an unredacted copy of the 9019 Motion (including its Exhibits A, B, C, and D attached thereto, as well as the Omnibus Settlement Agreement[3]), may be provided to any Person (as defined by Section 101(41) of the Bankruptcy Code) holding a claim against the Estate evidenced by (i) a proof of claim, which claim is not otherwise subject to dispute pursuant to the Bankruptcy Code and/or the Bankruptcy Rules and/or (ii) an order of the Bankruptcy Court, only upon written receipt by Paula S. Beran, Esquire at pberan@tb-lawfirm.com of a commitment of any Persons to keep such information in the unredacted 9019 Motion confidential (collectively, an "**Authorized Creditor**").  To the extent an Authorized Creditor timely filed with the Court an objection to the 9019 Motion on or before June 1, 2022, and upon a written request of such objecting Authorized Creditor, the Trustee may provide such Authorized Creditor with a copy of the Tavenner Declaration and the Nelson Declaration upon written receipt by Paula S. Beran, Esquire at pberan@tb-lawfirm.com of a commitment to keep such declarations confidential. For the avoidance of doubt, the Trustee, directly or through counsel, may discuss with any Authorized Creditor, directly or through counsel, any and all information on the Court's docket that has not been redacted as well as the information in the unredacted 9019 Motion (and its Exhibits A, B, C, and D) and the Omnibus Settlement Agreement. The seal/limited access provided for herein solely with respect to the Omnibus Settlement Agreement (located at Main Docket No. 1396) shall remain in full force and effect through the earlier of the date (a) upon which the Trustee submits to this Court her Chapter 7 Trustee's Final Report or (b) of further Order of this Court.  All other

---

[3] The complete Omnibus Settlement Agreement is located at Main Docket No. 1396.

documents and materials sealed and/or redacted by this Order shall remain under seal and/or

redacted absent further Order of this Court.

9.      The terms and conditions of this Order shall be immediately effective and

enforceable upon its entry.  To the extent the terms of this Order conflict with the terms of the

Interim Sealing Order, any other previously-entered Order of this Court, or the Omnibus

Settlement Agreement, the terms of this Order govern provided however actions previously taken

pursuant to the Interim Sealing Order, the Mediation Confidentiality Order, any other previously-

entered Order of this Court, or the Omnibus Settlement Agreement are governed by the controlling

document at the time the actions were taken.

10.      This Court shall retain exclusive jurisdiction over any and all matters arising from

or related to the implementation or interpretation of this Order.

IT IS SO ORDERED.


ENTERED: _____, 2022          /s/ Kevin R Huennekens
Aug 25 2022                              THE HONORABLE KEVIN R. HUENNEKENS
                                         UNITED STATES BANKRUPTCY JUDGE

                                          Entered On Docket:  Aug 26 2022

WE ASK FOR THIS:

*/s/ David G. Barger*
David G. Barger (VSB No. 21652)
Thomas J. McKee, Jr. (VSB No. 68427)
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, VA  22102
Telephone: (703) 749-1300
Facsimile: (703) 749-1301
Email:  bargerd@gtlaw.com
        mckeet@gtlaw.com

and

J. Gregory Milmoe (admitted pro hac vice)
Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA 02110
Telephone: (617) 310-6064
Email:  milmoeg@gtlaw.com

*Counsel to Defendant ULX Partners, LLC,
ULX Manager LLC, UnitedLex Corporation,*


SEEN AND NO OBJECTION:

*/s/ Paul S. Beran*
Paula S. Beran, Esquire (Va. Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Facsimile: (804) 783-0178
        *Counsel for Lynn L. Tavenner, Chapter 7 Trustee*

SEEN AND OBJECTED TO FOR THE REASONS STATED IN THE OPPOSITION TO THE
MOTION TO SEAL (Main Docket No. 1332) AND ON THE RECORD AT HEARINGS ON
MAY 25, 2022, MAY 26, 2022, JUNE 8, 2022, AND JULY 14, 2022:

*/s/ Kathryn R. Montgomery*
Kathryn R. Montgomery (VSB 42380)
Assistant United States Trustee
Office of the United States Trustee
701 E. Broad Street, Suite 4304
Richmond, VA 23219
Ph: (804) 771-2310
Fax: (804) 771-2330
Kathryn.Montgomery@usdoj.gov

## LOCAL BANKRUPTCY RULE 9022-1 CERTIFICATION

      I hereby certify that, pursuant to Local Rule 9022-1, the foregoing proposed Order has been endorsed and/or served on all necessary parties.

 

*/s/ David G. Barger*
David G. Barger (VSB No. 21652)
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Telephone:  (703) 749-1300
Facsimile:   (703) 749-1301
Email: bargerd@gtlaw.com

*Counsel to ULX Partners, LLC, UnitedLex*
*Corporation, and ULX Manager, LLC*

Attachment A

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Richmond Division)**

|  |  |
|---|---|
| In re:<br><br>    LeClairRyan, PLLC,[1]<br><br>        Debtor. | Case No. 19-34574-KRG<br><br>Chapter 7 |

|  |  |
|---|---|
| Lynn L. Tavenner, as Chapter 7 Trustee,<br><br>        Plaintiff,<br><br>v.<br><br>ULX Partners, LLC, UnitedLex Corporation,<br>and ULX Manager LLC,<br><br>        Defendants. | Adv. Proc. No. 20-03142 (KRH) |

**TRUSTEE'S MOTION AND MEMORANDUM OF LAW FOR ENTRY OF AN ORDER (I) APPROVING (A) JUDICIALLY MEDIATED SETTLEMENT AND (B) COMPENSATION TO COUNSEL INCLUDING AN IMPROVIDENT PAYMENT UNDER SECTION 328(A); AND (II) GRANTING RELATED RELIEF**

Lynn L. Tavenner, Trustee, not individually, but solely in her capacity as the Chapter 7

trustee (in such capacity, the "**Trustee**") of the bankruptcy estate (the "**Estate**") of LeClairRyan

---

[1] The principal address of the Debtor as of the Petition Date was 4405 Cox Road, Glen Allen, Virginia 23060, and the last four digits of the Debtor's federal tax identification number are 2451.

---

Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
(202) 538-8334 (telephone)
Email:  erikamorabito@quinnemanuel.com
        brittanynelson@quinnemanuel.com

*Special Counsel to Lynn L. Tavenner, Chapter 7 Trustee*

PLLC ("**LeClairRyan**" and/or the "**Debtor**" and/or "**LCR**")), in the above-referenced Chapter 7

case, by counsel, respectfully states as follows in support of this motion (the "**Motion**"):

## PRELIMINARY STATEMENT

1.      After months of intense, hard fought arm's-length negotiations, and with the

significant assistance and critical involvement of a judicial mediator, the Trustee, all of the

defendants in two separate adversary proceedings, and certain insurers, have reached a global,

comprehensive agreement that is a fair and reasonable compromise of the claims and causes of

action asserted by the Trustee in those two separate adversary proceedings.  Among other things,

this settlement agreement avoids the lengthy, complex, and expensive litigation of myriad disputed

issues among these parties, and it is undoubtedly in the best interest of the Estate.

2.      More specifically, this Motion seeks the entry of an order (1) approving the

Settlement (as hereafter defined) by and among the Trustee, on the one hand and ULX Partners,

LLC, ULX Manager LLC, and UnitedLex Corporation (collectively, the "**ULX Defendants**"),

CVC Advisers (India) Private Limited and/or CVC Capital Partners ("**CVC**"), Daniel Reed,

Nicholas Hinton, Josh Rosenfeld, and P. Douglas Benson (collectively, with the ULX Defendants,

the "**Defendants**"), Travelers Casualty and Surety Company of America ("**Travelers**"),

Continental Casualty Company ("**Continental**"), and Columbia Casualty Company ("**Columbia**")

(collectively, Continental and Columbia are referred to as "**CNA**" and Travelers and CNA are

referred to as the "**Insurers**");[2] (2) authorizing the effectiveness of the Settlement Agreement (as

hereafter defined and attached hereto as **Exhibit A**) on behalf of the Estate; (3) approving a

Contingency Payment (as hereafter defined) and authorizing the Trustee to pay the same; and (4)

---

[2]   The Trustee, the Defendants, and the Insurers may be referred to hereinafter collectively as the "**Parties**."

approving the Improvident Payment (as hereafter defined) in an amount to be determined by the Court and authorizing the Trustee to pay the same.

3.      Thus, for the reasons set forth herein, the Trustee respectfully submits that the Settlement satisfies the standards for approval under applicable law and that the Court should therefore approve the Settlement pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019 and grant other relief requested in this Motion.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the Eastern District of Virginia has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are sections 105(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 9019, and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia.

## BACKGROUND

### A.  The Bankruptcy Proceeding and Prosecution of Certain Claims

8.      On September 3, 2019 (the "**Petition Date**"), the Debtor filed for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101-1532 (as thereafter amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**").  Pursuant to §§ 1007 and 1108 of the Bankruptcy Code, the Debtor operated as a debtor-in-possession.

3

9.      Per agreement between the Debtor, the United States Trustee, and ABL Alliance, LLP, the Debtor's Chapter 11 case was converted to a case under Chapter 7 of the Bankruptcy Code on October 4, 2019.  Upon conversion, Lynn L. Tavenner was appointed interim trustee, and no trustee having been elected at the meeting of creditors, she continues to serve as the Trustee.

10.     Consistent with her duties, the Trustee began investigating potential causes of action on behalf of the Estate.  Initially, the Trustee, with the assistance of her counsel, filed a *Motion for an Order Establishing Procedures Regarding the Prosecution of Actions Involving Former Attorneys and Certain Others and Memorandum in Support Thereof* (the "**FAO Procedures Motion**") (Main Dkt No. 457).[3]  The FAO Procedures Motion was approved by Order of this Court (Main Dkt No, 533), as amended/supplemented by additional Orders of this Court (Main Dkt No. 929 and 982) (collectively, the "**FAO Order**").

11.     On October 26, 2020, the Trustee filed an adversary proceeding against ULX Partners, LLC and UnitedLex Corporation, Adversary Proceeding No. 20-03142 (as amended, the "**UnitedLex Adversary Proceeding**").[4]

12.     Thereafter, the Trustee also issued demand letters to more than 200 other potential defendants, including defendants Hinton, Reed, Rosenfeld, Benson, and CVC.  The FAO Order established procedures that, among other things, allowed for a potential defendant to elect mediation prior to the Trustee filing a lawsuit.

---

[3]  "Main Dkt" refers to the docket in the main Bankruptcy Case.  "Dkt." refers to the docket in the United Lex Adversary Proceeding, while "Reed Dkt" refers to the docket in the Reed Adversary Proceeding (as hereafter defined).

[4]  On December 12, 2019 ULX Partners, LLC filed Proof of Claim No. 174 in the amount of $8,563,288 and Proof of Claim No. 175 in the amount of $3,952,025 (collectively, the "**ULX Partners Proofs of Claim**").

13.     On September 2, 2021, the Trustee filed a separate adversary proceeding (No. 21-03095-KRH) (the "**Reed Adversary Proceeding**")[5] against CVC as well as UnitedLex's Chief Executive Officer Daniel Reed and its Chief Financial Officer Nicholas Hinton. In the Reed Adversary Proceeding, the Trustee also asserted claims against Josh Rosenfeld and P. Douglas Benson.  In the Reed Adversary Proceeding, the Trustee asserted claims for, among other things, breach of fiduciary duty, statutory and common law conspiracy, and constructive fraud (the "**Reed Adversary Claims**").[6]

### B.  The UnitedLex Adversary Proceeding

14.     Since the filing of the UnitedLex Adversary Proceeding, the Trustee and the ULX Defendants have been engaged in complex and substantial litigation, including a very active motions practice, as well as extensive discovery consisting of written discovery, the exchange of hundreds of thousands of pages of documents, depositions of more than a dozen witnesses, and the retention of various experts.  In addition, throughout this case, the Court entered several pre-trial orders governing the litigation between the Trustee and the ULX Defendants.

15.



---

[5]  The Reed Adversary Proceeding and the UnitedLex Adversary Proceeding are collectively referred to herein as the "**Two Adversary Proceedings**."

[6]  The Trustee has actively pursued the Reed Adversary Proceeding since its inception. While discovery has not yet begun, there has been an active motions practice. For example, CVC filed a Motion to Withdraw the Reference [Reed Dkt No. 19].  In addition, CVC, Reed, Hinton, Rosenfeld, and Benson have filed separate Motions to Dismiss [Reed Dkt Nos. 8, 9, 23, and 39].  These motions have been stayed while, among other things, the Motion to Withdraw the Reference was being decided by the District Court.

[7]  At the time, the only defendants in the case were United Lex and ULXP.  ULX Manager LLC was subsequently added as a defendant on August 25, 2021, with the filing of the Amended Complaint.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██   █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

17.     On August 6, 2021, the Trustee filed a Motion for Leave to Amend Complaint and to Modify Pretrial Scheduling Order [Dkt No. 70] (the "**First Motion to Amend**") and on August 16, 2021, the Defendants filed an Objection to the Trustee's Motion for Leave to Amend Complaint and to Modify Pretrial Scheduling Order [Dkt No. 75] (the "**Opposition to First Motion to Amend**").

18.     On August 24, 2021, the Bankruptcy Court granted the Trustee's Motion to Amend the Complaint [Dkt No. 85] resulting in the Trustee filing a First Amended Complaint in the UnitedLex Adversary Proceeding on August 25, 2021 [Dkt No. 86] (the "**Amended Complaint**"), which added ULX Manager LLC and Gary LeClair as defendants.[8]   The First Motion to Amend,

---

[8]   The claims against Gary LeClair have since been resolved (the "**D&O Settlement**") pursuant to an Order [Dkt No. 121] entered on December 3, 2021, granting a separate Motion for Approval of Compromise and Settlement and Memorandum of Law [Dkt No. 119].

the Opposition to First Motion to Amend, and the Amended Complaint are incorporated as if fully

set forth herein.

19.     The First Amended Complaint asserted, among other things, the following causes

of action against ULX Partners, LLC, ULX Manager LLC, and/or UnitedLex Corporation:

> (1)  avoidance of preferential and/or fraudulent transfers under sections 544, 547,
>      548 and 550 of the Bankruptcy Code;
> (2) disallowance of claims under Section 502(d) of the Bankruptcy Code;
> (3) lack of consideration for intellectual property under the contribution agreement;
> (4) re-characterization of debt as equity;
> (5) misappropriation of trade secrets;
> (6) breach of fiduciary duty;
> (7) statutory and common law conspiracy;
> (8) an accounting;
> (9) conversion;
> (10) unjust enrichment; and
> (11) alter ego liability.[9]

20.     After the granting of the Motion to Amend, a two-week trial in the UnitedLex

Adversary Proceeding was scheduled to begin on April 14, 2022.  [Dkt No. 144].

21.     On January 28, 2022, the ULX Defendants filed a Motion for Summary Judgment

[Dkt No. 133] (the "**Motion for Summary Judgement**") and associated documents, seeking to

dismiss certain of the UnitedLex Claims. The Trustee opposed the Motion for Summary Judgment

[Dkt No. 152] (the "**Opposition to Summary Judgment**") and the Bankruptcy Court has not yet

ruled on the Motion for Summary Judgment. The Motion for Summary Judgment, the Opposition

to Summary Judgment, and associated pleadings are incorporated as if fully set forth herein.

---

[9]   The claims asserted in the First Amended Complaint as set forth therein against the ULX Defendants are referred
to herein as the "**UnitedLex Claims**."   The Reed Adversary Claims and the UnitedLex Claims are collectively
referred to herein as the "**Claims**."

22.     On February 11, 2022, the Trustee filed a Motion for Leave to Amend the First

Amended Complaint [Dkt No. 147] (the "**Second Motion to Amend**") and associated documents

under seal, which sought to add an additional count against UnitedLex Corporation and ULX

Manager LLC.  The United Lex Defendants opposed the Motion to Amend [Dkt No. 168] (the

"**Opposition to Second Motion to Amend**") and the Bankruptcy Court has not yet ruled on the

Second Motion to Amend. The Second Motion to Amend and the Opposition to the Second Motion

to Amend are incorporated as if fully set forth herein.[10]

### C.  Judicial Mediation

23.     On February 4, 2022, at the joint request of the Trustee and the ULX Defendants,

the Court entered an Order in the United Lex Adversary Proceeding (the "**Mediation Order**")

[Dkt No. 142] appointing the Honorable Frank J. Santoro, the Chief Judge of the United States

Bankruptcy Court for the Eastern District of Virginia, as the judicial mediator (the "**Mediator**"),

to conduct a mediation (the "**Mediation**") among the Trustee, the ULX Defendants, Mr. Reed and

Mr. Hinton in their individual capacities, and Travelers, "[u]nless otherwise ordered by the

Mediator in the Mediator's sole discretion."

24. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████

---

[■]  At the request of the Mediator, the Bankruptcy Court continued the hearings on both the Motion for Summary
Judgment and the Second Motion to Amend to allow the Parties sufficient time to continue negotiations in an
attempt to fully resolve the pending disputes between them.

25. 

26.    On March 5 and March 6, 2022, certain of the Parties, their respective counsel, and the Mediator participated in a two-day in-person mediation in Richmond, Virginia.  This initial mediation session lasted approximately a day and a half but was ultimately terminated by the Mediator with specific instructions given to the participating mediation parties.

27.    On March 8, 2022, the Mediator entered the "Order Directing Defendants to Produce Insurance-Related Information" [Dkt No. 177] (the "**March 8 Insurance Order**").  The March 8 Insurance Order directed the ULX Defendants, Hinton and Reed to provide the Trustee with, among other things, (1) a "full and complete copy of any and all insurance policies (including but not limited to insurance policies of Defendants' subsidiaries, parent companies, or affiliated companies) that may provide any coverage (in full or in party) for any judgments awarded against the [ULX Defendants] in this case, and/or against Mr. Hinton and/or Mr. Reed in the [Reed Adversary Proceeding] and/or settlement amounts paid by any Defendants and/or by Mr. Hinton and/or Mr. Reed in this case and/or the [Reed Adversary Proceeding]; or any fees, costs, and expenses paid or incurred in this case by any Defendant, Mr. Hinton, and/or Mr. Reed in this case and/or the [Reed Adversary Proceeding].  Such policies should also include any policies to which

any [ULX Defendant], Mr. Hinton, and/or Mr. Reed tendered coverage for the claims at issue herein or the [Reed Adversary Proceeding], including all excess policies regardless of the coverage position taken by the relevant insurance company"; and (2) "all coverage letters and/or denial of coverage letters from any insurance company regarding coverage under any of the policies provided [pursuant to the March 8 Insurance Order], including but not limited to coverage positions taken by the insurance company, and any non-privileged or otherwise protected response to such insurance company by the [ULX Defendants], Mr. Hinton, and/or Mr. Reed thereto."

28.    Also on March 8, 2022, the Mediator entered an "Order Directing the Exchange of Information Between the Defendants, Nicholas Hinton, Daniel Reed, the Insurance Companies and the Chapter 7 Trustee" [Dkt No. 178] (the "**Information Exchange Order**").  The Information Exchange Order required, among other things, the Trustee to provide "the identity of the Trustee's anticipated trial expert with respect to the damages the Trustee alleges were proximately caused by the [ULX Defendants, Reed and Hinton], as well as a summary of the expert's opinions to date as to the amount of such alleged damages and the basis therefore (the "**Trustee's Damages Report**").    Additionally, the Information Exchange Order required the ULX Defendants, Reed, and Hinton to identify the ULX Defendants' "anticipated expert as to damages, along with a summary of that expert's opinions to date rebutting the Trustee's Damage Report."  Finally, the Information Exchange Order also directed that the ULX Defendants provide the Mediator for his "*en camera review*, their year-end financial statements for the last two years, as well as financial statements indicating their current financial condition."

29.    On March 9, the Bankruptcy Court entered an order that the trial in this matter be continued until May 17 and also continued other pending motions in the case.  *See* Dkt No. 184.

30. 



35.     On April 13, 2022, after continued hard fought and arm's-lengths negotiations, a global and comprehensive proposal was made by the Mediator to fully and finally resolve all of the pending Claims in the Two Adversary Proceedings (the "**Mediator's Proposal**").  At the direction of the Mediator, the Defendants and the Insurers had until no later than 12 p.m. on April 19, 2022, to (a) accept or reject the Mediator's Proposal in total and (b) if accepted, provide specifics as to the manner, timing, and related security for payments and/or promises to pay (collectively, the "**Settlement Payment Nuances**").

36.     The hearing on the Second Motion to Amend was to be heard by the Bankruptcy Court at 11:00 a.m. on April 19, 2022.  Approximately thirty minutes before that hearing, however, the Defendants and the Insurers agreed to the Mediator's Proposal and provided the Settlement Payment Nuances. The Trustee was asked to immediately accept or reject the Mediator's Proposal that had been accepted by the Defendants and the Insurers.  In the exercise of her business judgement, the Trustee determined that the Mediator's Proposal was in the best interest of the Estate and as such accepted the same (the "**Settlement**").  Subsequently, the Mediator directed the

Trustee, through counsel, to inform the Court at the impending hearing of the material terms of the Settlement reached between the Parties.  As such, the material terms of the Settlement were set forth on the record at the April 19, 2022, hearing with the participation of counsel for the ULX Defendants, Mr. Hinton, and Mr. Reed. Thereafter, the Second Motion to Amend was continued to allow the Parties to document the Settlement.

### D.  The Global Settlement Agreement

37.    In addition to the terms being articulated on the record at the April 18, 2022, hearing, the Settlement is further memorialized in a certain settlement agreement (the **"Settlement Agreement"**) (attached hereto as **Exhibit A**) and is incorporated as if fully set forth herein. The key terms of the Settlement Agreement between the Parties, subject to the Bankruptcy Court's approval, are as follows:[12]

   a.  **Continental Payment:**    In consideration of the mutual releases, covenants, representations, and undertakings of the Trustee, the Defendants, and the Insurers, Continental shall pay the Trustee a sum of five million dollars ($5,000,000) on or before the Closing Date.[13]

   b.  **Columbia Payment:**    In consideration of the mutual releases, covenants, representations, and undertakings of the Trustee, the Defendants, and the Insurers, Columbia shall pay the Trustee a sum of seven million two hundred and fifty thousand dollars ($7,250,000) on or before the Closing Date.

   c.  **Travelers Payment**:    In consideration of the mutual releases, covenants,

---

[12]   The summary set forth in this section is qualified by the specific provisions of the Settlement Agreement.  To the extent there is any inconsistency between this summary and the Settlement Agreement, the Settlement Agreement governs.

[13]   All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Settlement Agreement.

representations, and undertakings of the Trustee, the Defendants, and the Insurers, Travelers shall pay the Trustee a sum of five hundred thousand dollars ($500,000) on or before the Closing Date.

d. **<u>Defendants' Payment and Pledge of Security</u>:**  In consideration of the mutual releases, covenants, representations, and undertakings of the Trustee and the Defendants, the Defendants shall pay to the Trustee a total sum of eight million two hundred and fifty thousand dollars ($8,250,000).  This sum is scheduled to be paid in three installments.  The first installment of at least two million dollars ($2,000,000) will be paid on or before the Closing Date.  The second installment of three million dollars ($3,000,000) will be paid on or before the first anniversary of the Closing Date, and the third installment of three million two hundred and fifty thousand dollars ($3,250,000) will be paid on or before the second anniversary of the Closing Date. Both the Second Defendants' Payment and the Third Defendants' Payment are fully secured by Notes and Irrevocable Letters of Credit.

e. **<u>Starr Policy Proceeds</u>:** As part of the Settlement Agreement, neither the Defendants nor the Trustee release Starr from any obligations under the Starr Policy.  If any of the Defendants receive any proceeds from Starr under the Starr Policy related to this matter, the proceeds (net any costs of reasonable attorneys' fees incurred in pursuit of the collection of the proceeds) must be turned over and paid to the Trustee.

f. **<u>Waiver of Proofs of Claim</u>:** ULX Partners, LLC agrees to waive the ULX Partners Proofs of Claim, the present value of which is estimated by the ULX Defendants (and not the Trustee) to be $2.4 million.

g. **Consensual Releases:**  The Settlement Agreement includes certain consensual releases of Claims amongst the Parties.

h. **Compensation of Counsel:** Consistent with the Order entered by the Bankruptcy Court on June 28, 2021 [Main Dkt. No. 937], Quinn Emanuel shall be entitled to receive 35% of the Total Settlement Payment as provided in the Quinn Retention Order (the "**Contingency Payment**").   In addition, the Settlement Agreement contemplates an Improvident Payment of an aggregate amount not to exceed $3,150,000 (the "**Improvident Payment**") to Quinn Emanuel.  By this Motion, the Trustee seeks approval of this Improvident Payment on account of the fact that, among other things, the terms of the Quinn Retention Order have proven to be improvident in view of circumstances in this matter that were not capable of being anticipated at the time of entry of the Quinn Retention Order.  The Improvident Payment is subject to the Estate receiving the Total Settlement Payment and the Defendants do not object to the Improvident Payment.  Furthermore, the Trustee maintains that Quinn Emanuel provided necessary additional non-contingent services (the "**Additional Services**") that arose from the Two Adversary Proceedings that otherwise would have been compensated on an hourly basis had the Trustee and Quinn Emanuel known all of the facts and circumstances regarding this matter.  Notwithstanding the fact that Quinn Emanuel asserts that the value of the Additional Services exceeds the amount of the Improvident Payment, the Settlement Agreement provides that Quinn Emanuel agrees to limit the amount of the Improvident Payment to $3,150,000 or such other amount otherwise approved by the Bankruptcy Court.

15

    i.   **No Admission of Liability By Any of the Parties**

    j.   **Dismissal:**  The Two Adversary Proceedings will be dismissed with prejudice.

38.    The Settlement, as documented in the Settlement Agreement, was the product of an arms-length negotiation, and globally resolves, on terms beneficial to the Estate, complicated litigation in the Two Adversary Proceedings, the continued pursuit of which would be costly and time consuming and pose the risk of an unfavorable result.

## MEMORANDUM OF LAW

39.    The Trustee believes, in her business judgment and after substantial analysis, that entering into the Settlement Agreement is reasonable under these circumstances and respectfully requests that the Court approve the Settlement (and related Settlement Agreement), including the Improvident Payment, and all other relief requested in this Motion.  The Settlement (as documented in the Settlement Agreement) will allow the Estate and all interested parties to avoid the uncertainty and costs of extensive litigation to determine the recovery on the Claims and eliminates the uncertainty of litigation and the risks of collectability of any judgment that may be obtained.  Most importantly, the Settlement will allow the Estate to proceed towards a meaningful distribution to creditors on a more expedited timeline.  Accordingly, for the following reasons, the Trustee believes that entry into the Settlement Agreement is in the best interests of the Estate, its creditors, and other parties in interest and that the Settlement (and related Settlement Agreement) should be approved by the Bankruptcy Court.

### A. Entry into the Settlement Agreement Is Fair and Equitable and in the Best Interest of the Estate

40.    Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  The United States Supreme Court has noted that "[c]ompromises are a 'normal part

of the process of reorganization.'" *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (citing *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).  In *TMT Trailer*, the Supreme Court stated that compromises and settlements must be "fair and equitable." 390 U.S. at 424; *see also In re Loudoun Heights, LLC*, No. 13-15588, 2014 WL 2928110, at *8 (Bankr. E.D. Va. June 27, 2014) (same); *Shaia v. Three Rivers Wood, Inc. (In re Three Rivers Wood, Inc.*), No. 98-38685, 2001 WL 720620, at *6 (Bankr. E.D. Va. Mar. 20, 2001) (same); *In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997) (same); *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995) (same).

41.    Compromises are tools for expediting the administration of the case and reducing administrative costs and are favored in bankruptcy. *See In re Bond*, 16 F.3d 408 at *3 (4th Cir. 1994) (unpublished table decision) ("To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy") (citations omitted).  The Trustee, in her business judgment, believes that the Settlement Agreement represents a fair and reasonable compromise of the disputed issues regarding the Claims, as set forth in greater detail herein.

42.    The decision whether to approve a compromise under Rule 9019 is committed to the discretion of the Court, which must determine if the compromise or settlement is "fair and equitable".  *In re Health Diagnostic Lab., Inc*., 2016 Bankr. LEXIS 3724 (Bankr. E.D. Va. Oct. 14, 2016); *In re Alpha Nat. Res. Inc.*, 544 B.R. 848, 856 (Bankr. E.D. Va. 2016); *In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997).  The Court is not required to conduct a "mini-trial" of the underlying case, but instead must only decide whether the settlement proposed falls "below the lowest point in the range of reasonableness." *In re Austin*, 186 B.R. at 400 (citations omitted); *accord In re Alpha Nat. Res. Inc.*, 544 B.R. at 857.

43.     Factors that the Court should consider when evaluating a settlement under Bankruptcy Rule 9019 include: (a) "the probability of success in litigation;" (b) "potential collection struggles;" (c) "the complexity, time and expense involved in litigating the matter;" and (d) whether the proposed compromise is fair and equitable to the debtor, its creditors, and other parties in interests. *Loudoun Heights*, 2014 WL 2928110, at *9 (citations omitted); *see also TMT*, 390 U.S. at 424; *Three Rivers Wood*, 2001 WL 720620, at *6 (same); *In re Alpha Nat. Res. Inc.*, 544 B.R. at 857; *In re Frye*, 216 B.R. at 174.

44.     Additionally, the Court must determine whether the proposed settlement is in the best interests of the Estate. *Three Rivers Wood*, 2001 WL 720620, at *6 ("a compromise or settlement will most likely gain approval if it is both 'fair and equitable,' as well as representative of the best interests of the estate as a whole") (citations omitted); *Frye*, 216 B.R. at 174 ("In order to approve a compromise, this court must look at various factors and determine whether the compromise is in the best interest of the estate and whether it is fair and equitable."); *In re Energy Coop. Inc.*, 886 F.2d 921, 927 (7th Cir. 1989) ("The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate.").

45.     The factors that courts consider in determining whether a settlement is in the best interests of a bankruptcy estate are similar to the factors examined to determine whether the settlement is fair and equitable. *See Parker v. Bullis* (*In re Bullis*), 515 B.R. 284, 288 (Bankr. E.D. Va. 2014) ("The best interests of the estate are met by considering the same factors a court considers in reviewing any proposed settlement: (1) the probability of success on the merits in the litigation; (2) possible difficulties of collecting any judgment which might be obtained; (3) the complexity, expense, and likely duration of any ensuing litigation; and (4) the interests of the creditors, giving proper deference to their reasonable views.") (citations omitted).

46.     Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." *TMT*, 390 U.S. at 425. However, "the settlement may be approved even if the court finds it likely that the trustee would ultimately succeed in the litigation." *In re Austin*, 186 B.R. at 400.

47.     When reviewing a proposed settlement, the Court may consider the Trustee's business judgment and the opinions of the other parties to such settlement, and the Court should not substitute its judgment for that of the Trustee. Instead, the Court must determine "whether the settlement falls below the lowest point in the range of reasonableness." *Three Rivers Wood*, 2001 WL 720620, at *6 (citing *Austin*, 186 B.R. at 400). Where a proposed settlement is not below the lowest point of what is fair and reasonable and represents the best interests of the estate as a whole, the court should approve it pursuant to Bankruptcy Rule 9019. *Id*.

48.     In this case, the Trustee believes that the Settlement is fair, equitable, in the best interests of the Estate, appropriate in the Trustee's business judgment, and easily falls within the reasonable range of outcomes. As set forth above, the Settlement (as documented in the Settlement Agreement) is the culmination of more than several months of negotiations among the parties, with the Mediator's assistance and direction, and represents a global resolution of the Claims. The Trustee, in the exercise of her business judgment and in consultation with her professionals and the Mediator, believes that the Settlement (as documented in the Settlement Agreement) is a fair, reasonable, and responsible compromise and resulted in maximum value to the Estate for the reasons that follow.

49.     First, the Settlement (as documented in the Settlement Agreement) is the result of extensive good faith and arms-length negotiations among the Trustee, the Defendants, and the Insurers. It was aided and directed by the substantial participation and input of the Mediator and

19

represents a result well above the lowest bound of the range of reasonableness.  It in fact is the Mediator's Proposal. This Settlement is not collusive and represents a fair compromise of the disputes.

50.    Assuming this Court approves this Motion and authorizes the Trustee to enter into the Settlement, the Trustee will receive (i) fourteen million seven hundred fifty thousand dollars ($14,750,000) on or before the Closing Date; and (ii) an additional six million two hundred fifty thousand dollars ($6,250,000) after the Closing Date (collectively, the "**Settlement Payment Cash Funds**").  These amounts, which are a sum certain, are potentially greater than any recovery the Estate would ultimately receive even if the Two Adversary Proceedings proceeded to judgement and is well above the lowest bound of the range of reasonableness.

51.    Second, both before and during the Mediation, the Trustee conducted due diligence on the enforcement and ultimate collectability of potential judgments against the Defendants. With the assistance of the Mediator and her counsel, the Trustee determined, among other things, that proceeds from the Insurance Policies for a settlement and the payments received from the Defendants were the best source of payment to compensate the Estate for damages associated with the Claims.  Significantly, the majority of the Settlement Payment Funds are available to the Trustee on the Closing Date, allowing the Trustee and her professionals to focus time and effort on other important matters in this Bankruptcy case, including but not limited to the review, analysis and resolution of alleged administrative expenses and pre-petition claims.

52.    Third, the consideration in the Settlement Agreement represents a fair and reasonable compensation to the Estate for the Claims in light of the uncertainty and risk associated with time-consuming and expensive litigation that could result in an unfavorable outcome. Specifically, the Trustee preserves additional Estate resources that would have been spent on,

among other things, a two-week trial in the United Lex Adversary Proceeding, prosecuting the

Reed Adversary Proceeding, and any associated appeals.   Given the scope and complexity of the

United Lex Adversary Proceeding, the Trustee and her counsel had anticipated that the Reed

Adversary Proceeding could have been equally time-consuming and complicated. Moreover, in

agreeing to the releases provided for in the Settlement Agreement, the Trustee and all Parties

contemplated the value of the Claims being released.

53.    Fourth, the Settlement as directed by the Mediator and memorialized in the

Settlement Agreement is fair and equitable to the Estate, its creditors, and other parties in interest.

The value of the Settlement, which includes the Settlement Payment Cash Funds and the waiver

of the ULX Partners Proof of Claims, represents a result well above the lowest bound of the range

of reasonableness and does not prejudice other creditors or parties in interest.   To the contrary,

the Settlement should allow the Trustee to make a meaningful distribution to creditors.   Most

importantly, the Settlement will allow the Estate to proceed towards a more expeditious resolution,

rather than prolonged litigation (and potential appeals) in the Two Adversary Cases.

54.    Finally, the Improvident Payment was unilaterally directed by the Mediator as part

of the Mediator's Proposal as a material and integral term of the Settlement and as such is in the

best interest of the Estate.  Absent approval of the Settlement Agreement, Quinn Emanuel would

otherwise seek compensation on an hourly basis by the Estate in an amount that would exceed

$3,150,000.  Furthermore, Quinn Emanuel has agreed to limit the amount of the Improvident

Payment to the lesser of $3,150,000 or an amount otherwise approved by the Bankruptcy Court

As such, the Settlement provides a sum certain to be recovered by the Estate and defers to this

Court as to the ultimate allowance of the Improvident Payment to Quinn Emanuel in an amount as

determined by this Court but in no instance greater than $3,150,000.

21

55.     Therefore, for the foregoing reasons, the Trustee respectfully submits that the Settlement satisfies the standards for approval under applicable law and that the Court should therefore approve the Settlement Agreement pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019.

**B.  The Improvident Payment is Permissible Under the Bankruptcy Code**

56.     In addition to the Improvident Payment being directed by the Mediator and being a material and integral part of the Settlement, the Trustee further maintains that Quinn is entitled to the Improvident Payment pursuant to section 328(a) of the Bankruptcy Code.   The Improvident Payment meets the standards of section 328(a) ████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████ More specifically, neither Quinn Emanuel nor the Trustee could have anticipated certain developments in this case that required Quinn Emanuel to invest significantly more hours and expenses without any assurance of compensation.   Further, the Improvident Payment was part of the Mediator's Proposal and the Mediator, a sitting bankruptcy judge, would not have proposed anything that was contrary to the provisions of the Bankruptcy Code.

57.     These circumstances satisfy the requirements of Bankruptcy Code Section 328. Courts have recognized that their "power to modify a compensation agreement under § 328 includes the power to increase as well as decrease the agreed-upon compensation." *In re Colorado Mountain Cellars, Inc.*, 139 F.3d 911 (10th Cir. 1998) (citations omitted).   Historically, courts have done so "where the parties did not foresee 'the time, the pressures, or the complexity of [the] case or the phenomenal results achieved.'" *In re Omegas Grp., Inc.*, 195 B.R. 875, 880 (Bankr. W.D. Ky. 1996) (citing *In re Warrior Drilling & Eng'g Co.*, 9 B.R. 841, 847 (Bankr.N.D.Ala.),

modified on other grounds, 18 B.R. 684 (Bankr. D.C. Ala.1981)).  While case law is not abundant, the legislative history of section 328 specifically confirms that fees may be increased under the statute. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 328-29 ("The Court's power includes the power to increase as well as decrease the agreed upon compensation.").

58.     Here, there were unique and unpredictable circumstances justifying the Improvident Payment. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████ *See, e.g., In re Home Exp. Inc.*, 213 B.R. 162, 167 (Bankr. N.D. Cal. 1997) (increasing professionals' fees because Debtor's "managerial vacuum" was not capable of being anticipated); *In re Western Monetary Consultants, Inc.*, 143 B.R. 780, 782 (Bankr. D. Colo. 1992) (awarding additional fees to accountant under Section 328 where certain necessary documentation was not provided in the correct form).

59.     In awarding an increase in attorney fees' pursuant to section 328(a), courts also consider several other factors, including but not limited to, whether (1) the results obtained went beyond reasonable expectations, (2) the attorney assumed great risk in taking on representation of the case, (3) the attorney persevered where others would have curtailed their efforts, (4) the attorney's efforts resulted in significant infusion of funds into the debtor's estate, and/or (5) the

litigation was voluminous and complex. *See, e.g., In re Malcon Developers,* 138 B.R. 677, 680-81 (Bankr. N.D. NY 1992); *In re Warrior,* 9 B.R. at 847; *In re Land,* 138 B.R. 66,71 (D. Neb. 1992). Several of these additional factors were met in this case as well, and therefore weigh in favor of the Bankruptcy Court approving the Improvident Payment set forth in the Settlement Agreement. The Trustee, in the exercise of her business judgment, believes, among other things, that Quinn persevered where others would have curtailed their efforts. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Notwithstanding the foregoing, should the Bankruptcy Court approve this Motion, Quinn's substantial efforts will cause significant infusion of funds into the Estate.

60.    Finally, although not a requirement of section 328(a) and not in any way to detract from the authority of this Court, the Trustee, in the exercise of her business judgment, believes the amount of the Improvident Payment to be reasonable given her understanding of the time expended to persevere where others would have not, especially in consideration of the amount to now be recovered by the Estate.[14]

61.    Thus, the Trustee respectfully requests that the Court authorize (a) the Improvident Payment to Quinn Emanuel in an amount of $3.15 million or an amount otherwise determined by this Bankruptcy Court and (b) the Trustee to pay the same as provided for in the Settlement Agreement.

---

[14]    The Trustee anticipates filing declaration(s) at the appropriate time to sufficiently enable the Bankruptcy Court to, among other things, perform its own gatekeeping role in connection with determining the reasonableness of the Improvident Payment.

62.    Judge Phillips' reasoning in approving a global settlement agreement in *In re Toys "R" US, Inc*., et. al., No. 17-34665 ("**TRU**") is instructive here as to certain threshold issues. Specifically, the settlement agreement in TRU included a provision that awarded a substantial contribution payment to counsel of an ad hoc group of creditors.  *See* TRU Dkt No. 4803 ("**TRU Order**"), attached as **Exhibit C**.[15]  In approving the substantial contribution, Judge Phillips found that it was a "material and integral portion" of the TRU settlement agreement and that the settlement was "fair and reasonable and adequately supported by the declarations and exhibits submitted by members of the group which have sufficiently enabled the Court to perform any gatekeeping role it may have in connection with determining the reasonableness" of the substantial contribution payment.  *See* TRU August 7, 2018 Transcript at p. 221, attached as **Exhibit D**. Alternatively, Judge Phillips also held that the payment was authorized pursuant to section 503(b) of the Bankruptcy Code.  *See* TRU August 7, 2018 Transcript at p. 221; TRU Order at 6-7.

63.    Likewise, in this case, payment of the Improvident Payment is a material and integral part of the Settlement Agreement.  As described above, the Improvident Payment was part of the Mediator's Proposal; it is a critical component of the Settlement Agreement.[16]  Further, just like in TRU, the Bankruptcy Court here may exercise its own gatekeeper role of determining whether the Improvident Payment is warranted and reasonable.  Thus, pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019, the Bankruptcy Court should approve the Settlement Agreement, regardless of whether the Improvident Payment separately qualifies as a

---

[15]   While the Trustee recognizes that a substantial contribution claim is brought under section 503(b) and Quinn is seeking to be paid through the Settlement Agreement under section 328(a), the analysis of approving these extraordinary payments as a material and integral part of a settlement agreement is similar in both cases.

[16]   The Settlement Agreement makes clear that, while the Improvident Payment is a critical component of the Settlement, both the allowance and the amount of the Improvident Payment is left to the discretion of the Bankruptcy Court.  Settlement Agreement at ¶ 3(h).

payment under section 328(a) of the Bankruptcy Code.  But, even if the Bankruptcy Court rejects this contention, as set forth above, the Improvident Payment should be approved because the payment also meets the standards set forth in section 328(a).

## **CONCLUSION**

64.    All Defendants support the approval of the Settlement, and the Trustee, in the exercise of her business judgment, supports all of the relief sought herein.


**WHEREFORE**, the Trustee respectfully requests that the Court grant the Motion and thereby (a) approve the Settlement; (b) authorize the effectiveness of the Settlement Agreement on behalf of the Estate; (c) approve the Contingency Payment and authorize the Trustee to pay the same; (d) approve the Improvident Payment in an amount to be determined by the Court and authorize the Trustee to pay the same; and (e) provide such other relief as is just and proper.


DATED:    May 18, 2022                    Respectfully submitted,


                            _/s/ Erika L. Morabito_____
                            Erika L. Morabito (VSB No. 44369)
                            Brittany J. Nelson (VSB No. 81734)
                            QUINN EMANUEL URQUHART & SULLIVAN
                            1300 I Street, N.W., Suite 900
                            Washington, DC 20005
                            (202) 538-8334 (telephone)
                            Email:       erikamorabito@quinnemanuel.com
                                        brittanynelson@quinnemanuel.com

                            *Special Counsel to Lynn L. Tavenner, Chapter 7
                            Trustee*

## CERTIFICATE OF SERVICE

I certify that on this 18th day of May 2022, a true copy of the foregoing Motion was filed under seal pending this Court's ruling on the request by the United Lex Defendants to seal aspects of the 9019 Motion.  Thereafter, the foregoing Motion will be served as provided in said ruling.

*/s/ Erika L. Morabito*
Erika L. Morabito

# AMENDED

# EXHIBIT A

Execution Copy

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "**Agreement**") is made this ___ day of May, 2022 by and between Lynn L. Tavenner in her capacity as the Chapter 7 Trustee (the "**Trustee**") of the bankruptcy case (the "**Bankruptcy Case**") of LeClairRyan PLLC on behalf of the bankruptcy estate (the "**Estate**") of LeClairRyan PLLC, which was formerly known as LeClairRyan, P.C. (collectively, "**LeClairRyan**"), and ULX Partners, LLC, ULX Manager, LLC, and UnitedLex Corporation (collectively, the "**ULX Defendants**"), CVC Advisers (India) Private Limited and/or CVC Capital Partners ("**CVC**"), Daniel Reed, Nicholas Hinton, Josh Rosenfeld, and P. Douglas Benson (collectively, with the ULX Defendants and CVC, the "**Defendants**"), Travelers Casualty and Surety Company of America ("**Travelers**") and Continental Casualty Company ("**Continental**"), and Columbia Casualty Company ("**Columbia**") (collectively, Continental and Columbia are referred to as "**CNA**") (collectively, Travelers and CNA are referred to as the "**Insurers**"). The Trustee, the Defendants, and the Insurers may be referred to hereinafter collectively as the "**Parties**."

## RECITALS

WHEREAS, on September 3, 2019 (the "**Petition Date**"), LeClairRyan filed for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-l532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**"), Case No. 19-34574-KRH. Pursuant to §§ 1007 and 1108 of the Bankruptcy Code, LeClairRyan operated as a debtor-in-possession;

WHEREAS, per agreement between LeClairRyan, the United States Trustee, and ABL Alliance, LLP, LeClairRyan's Bankruptcy Case was converted to a case under Chapter 7 of the Bankruptcy Code on October 4, 2019;

WHEREAS, upon conversion, Lynn L. Tavenner was appointed interim trustee, and no trustee having been elected at the meeting of creditors, she continues to serve as Trustee;

WHEREAS, LeClairRyan's Bankruptcy Case is presently pending in the Bankruptcy Court;

WHEREAS, on December 12, 2019 ULX Partners, LLC filed Proof of Claim No. 174 in the amount of $8,563,288 and Proof of Claim No. 175 in the amount of $3,952,025 (collectively, the "**ULX Partners Proofs of Claim**");

WHEREAS, on October 26, 2020, the Trustee filed an adversary proceeding against ULX Partners, LLC and UnitedLex Corporation, Adversary Proceeding No. 20-03142 (KRH) (as amended, the "**UnitedLex Adversary Proceeding**");

WHEREAS, on August 24, 2021, the Bankruptcy Court granted the Trustee's Motion to Amend the Complaint resulting in the Trustee filing a First Amended Complaint in the

UnitedLex Adversary Proceeding on August 25, 2021, which added ULX Manager, LLC and Gary LeClair as defendants;[1]

WHEREAS, the First Amended Complaint asserted, among other things, the following causes of action against ULX Partners, LLC, ULX Manager, LLC, and/or UnitedLex Corporation:

(1)  avoidance of preferential and/or fraudulent transfers under sections 544, 547, 548 and 550 of the Bankruptcy Code;

(2) disallowance of claims under Section 502(d) of the Bankruptcy Code;

(3) lack of consideration for intellectual property under the contribution agreement;

(4) re-characterization of debt as equity;

(5) misappropriation of trade secrets;

(6) breach of fiduciary duty;

(7) statutory and common law conspiracy;

(8) an accounting;

(9) conversion;

(10) unjust enrichment; and

(11) alter ego liability;[2]

WHEREAS, on January 28, 2022, the ULX Defendants filed a Motion for Summary Judgment [Docket No. 133]  (the **"Motion for Summary Judgment"**) and associated documents (partially under seal), seeking to dismiss all of the UnitedLex Claims;

WHEREAS, on February 11, 2022, the Trustee filed a Motion for Leave to Amend the First Amended Complaint [Docket No. 147] (the "**Motion to Amend**") and associated documents under seal, which sought to add a single count of fraudulent inducement against UnitedLex Corporation and ULX Manager LLC;

WHEREAS, the UnitedLex Adversary Proceeding was initially set for a two-week trial beginning on April 18, 2022, and subsequently rescheduled to begin on May 16, 2022;

WHEREAS, on September 2, 2021, the Trustee filed an adversary proceeding against CVC, Daniel Reed, Nicholas Hinton, Josh Rosenfeld, and P. Douglas Benson in the United States Bankruptcy Court for the Eastern District of Virginia, Adversary Proceeding No. 21-

---

[1]  The claims against Gary LeClair have since been resolved.

[2]  The claims asserted in the First Amended Complaint, as set forth therein against the ULX Defendants are referred to herein as the "**UnitedLex Claims**."

03095 (the "**Reed Adversary Proceeding**") (collectively, with the UnitedLex Adversary Proceeding, the "**Two Adversary Proceedings**"), asserting claims for unjust enrichment, misappropriation of trade secrets, breach of fiduciary duty, statutory and common law conspiracy, and constructive fraud;[3]

WHEREAS, certain Defendants sought coverage for the Claims under Policy Number ███ ███████ (the "**Travelers Policy**") issued to Titan Investment Holding, L.P. by Travelers for the policy period from November 1, 2019 to November 1, 2020, and Travelers advanced defense expenses subject to a reservation of rights;

WHEREAS, certain Defendants sought coverage for the Claims under both EPS+ Policy No. 596618014 issued by Columbia to UnitedLex Corporation for the November 1, 2019 to November 1, 2020 policy period (the "**Columbia Policy**") and Excess Policy No. ███████ issued by Continental to Titan Investment Holding, L.P. for the November 1, 2019 to November 1, 2020 policy period (the "**Continental Policy**") (collectively, the Columbia Policy and the Continental Policy shall be referred to as the "**CNA Policies**");

WHEREAS, certain Defendants also assert that they are entitled to indemnification from an insurance policy (Policy No. ███████████) (the "**Starr Insurance Policy**") issued by Starr Surplus Lines Insurance Company ("**Starr**");

WHEREAS, on February 4, 2022, the Trustee and the UnitedLex Defendants jointly requested judicial mediation from the Bankruptcy Court which was so ordered on the same date, and Chief Judge Santoro was appointed as the mediator (the "**Mediator**");

WHEREAS, certain of the Parties, along with the Mediator participated in lengthy mediation sessions on March 5 and 6, 2022 and again on April 12 and 13, 2022 in an effort to fully and satisfactorily resolve the Claims;

WHEREAS, after extensive negotiations through their respective counsel, along with consideration and discussion regarding proposed settlement terms recommended by the Mediator (the "**Mediator's Proposal**"), the Trustee, the Defendants, and the Insurers seek to fully and finally resolve the Claims against the Defendants on the terms set forth herein without admission of liability; and

WHEREAS, with the assistance, advice, recommendations, and direction of the Mediator, the Trustee, the Defendants, and the Insurers have negotiated and reached this Agreement in good faith.

---

[3]   The claims asserted against CVC, Mr. Reed, Mr. Hinton, Mr. Rosenfeld, and Mr. Benson in the Reed Adversary Proceeding are referred to herein as the "**Reed Adversary Claims.**" Collectively, the UnitedLex Claims and the Reed Adversary Claims, as well as the claims the Trustee sought to assert in the Motion to Amend, are referred to herein as the "**Claims.**"

# THE AGREEMENT

**NOW, THEREFORE,** in consideration of the mutual releases set forth herein and the payment of certain sums and waiver of certain proofs of claim as provided herein by the Defendants and the Insurers to the Trustee and the Defendants, which the Trustee, the Defendants and the Insurers agree is good and valuable consideration for the various covenants and understandings set forth in this Agreement, it is hereby agreed by the Parties as follows:

1.    **Court Approval.**  Upon execution of this Agreement, the Trustee shall file a motion seeking Bankruptcy Court approval of this Agreement pursuant to the *Order Approving Procedures and Permitting Trustee to Prosecute and Compromise FAO Action* [Docket No. 533] (the "**FAO Order**") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**9019 Motion**").  The Defendants and the Insurers agree to reasonably cooperate with the Trustee in obtaining approval of this Agreement.

2.    **Closing Date.**  This Agreement shall become effective upon the exchange of consideration described in Section 4 hereof at a closing (the "**Closing**") held on the fifteenth business day (the "**Effective Date**" or "**Closing Date**") following the entry a final and non-appealable order (the "**9019 Order**") by the Bankruptcy Court approving the terms and conditions of the Agreement as set forth in the 9019 Motion.  A motion seeking approval of the 9019 Order shall be filed by no later than May 18 , 2022 and a hearing on the motion will be held on June 8, 2022, unless the Bankruptcy Court orders otherwise.  The proposed 9019 Order submitted with the 9019 Motion shall include language authorizing the Insurers to make the Travelers Payment and the CNA Payments (as defined below).  The 9019 Motion (including this Agreement and any related exhibits) shall preliminarily be filed under seal at the direction of the Mediator and its terms kept confidential pending the Bankruptcy Court's ruling on a motion to seal this Agreement, or similar motion, to be filed by certain of the Defendants.

3.    **Settlement Payment.**  The Defendants and the Insurers shall pay, in accordance with the severable obligations set forth below, the total sum of twenty-one million dollars ($21,000,000) to Lynn L. Tavenner, Trustee of the Estate of LeClairRyan and the ULX Partners Proofs of Claim shall be waived (the "**Total Settlement Payment**").  The Total Settlement Payment shall be made as follows:

    a.    **CNA Payment:** On the Closing Date, Continental shall pay to the Trustee a sum of five million dollars ($5,000,000) (the "**Continental Payment**"), and Columbia shall pay to the Trustee a sum of seven million two hundred and fifty thousand dollars ($7,250,00) (the "**Columbia Payment**") (collectively the "**CNA Payment**").[4]

---

[4]    To the extent not otherwise provided herein, all payments referenced in this Agreement shall be sent via ACH transfer pursuant to the wire instructions and the Trustee's W-9, both of which are to be provided separately and verbally confirmed by counsel for the Trustee to counsel for the Defendants and counsel for the Insurers no later than June 8, 2022.  Any payment by the

b. **Travelers Payment:** On the Closing Date, Travelers shall pay the Trustee a sum of five hundred thousand dollars ($500,000) (the "**Travelers Payment**").

c. **First Defendants' Payment:** On the Closing Date, the Defendants shall pay the Trustee a total sum of not less than two million dollars ($2,000,0000). In addition, if Travelers fails to pay the total sum of $500,000 as required above in 3(b), the First Defendants' Payment shall also include any deficiency amount that Travelers fails to pay timely as part of the Traveler's Payment set forth above (the "**First Defendants' Payment**").

d. **Second Defendants' Payment:** No later than one (1) year from the Closing Date, the Defendants shall pay the Trustee an additional amount of three million dollars ($3,000,000), plus interest at the rate of one (1) percent annually, which shall accrue from the Closing Date until the full amount due and owing under this Agreement is paid to the Trustee (the "**Second Defendants' Payment**"). The Second Defendants' Payment shall be evidenced by a note of UnitedLex Corporation (the "**First Note**") in the form of Exhibit A attached hereto, the payment of which shall be secured pursuant to an irrevocable letter of credit (the "**First Letter of Credit**") issued in favor of the Trustee by Wells Fargo Bank, N.A. in the form attached to the First Note.

e. **Third Defendants' Payment:** No later than two (2) years from the Closing Date, the Defendants shall pay the Trustee an additional three million, two hundred and fifty thousand dollars ($3,250,000), plus interest at the rate of one (1) percent annually, which shall accrue from the Closing Date until the full amount due and owing under this Agreement is paid to the Trustee (the "**Third Defendants' Payment**"). The Third Defendants' Payment shall be evidenced by a note of UnitedLex Corporation (the "**Second Note,**" and together with the First Note, the "**Notes**") in the form of Exhibit B attached hereto, the payment of which shall be secured pursuant to an irrevocable letter of credit (the "**Second Letter of Credit**") issued in favor of the Trustee by BNP Paribas in the form attached to the Second Note. The First Letter of Credit and the Second Letter of Credit shall be referred to collectively herein as the "**Irrevocable Letters of Credit**".

f. 

---

Defendants or the Insurers is conditioned on the receipt of valid wire instructions and a W-9 for the Trustee.

g. **Waiver of ULX Partners Proofs of Claim:** ULX Partners, LLC agrees to waive the ULX Partners Proofs of Claim, the present value of which is estimated by the ULX Defendants (and not the Trustee) to be $2.4 million. The Trustee is not providing any estimate of the value of the waiver of the ULX Partners Proofs of Claim. Further, none of the Defendants nor the Insurers shall be entitled to file any claim under Section 502 or any other provision of the Bankruptcy Code.

h. **Quinn Emanuel Compensation:** Consistent with the Order entered by the Bankruptcy Court on June 28, 2021 [Docket No. 937] (the "**Quinn Retention Order**"), Quinn Emanual shall be entitled to receive seven million, three hundred fifty thousand dollars ($7,350,000) from the Total Settlement Payment as provided in the Quinn Retention Order. In addition, at the direction of the Mediator as part of his Mediator's Proposal and pursuant to Section 328(a) of the Bankruptcy Code, Quinn Emanuel shall be entitled to receive an additional amount of three million one hundred and fifty thousand dollars ($3,150,000) (the "**Improvident Payment**") from the Estate given that the Trustee understands that the terms of the Quinn Retention Order have proven to be improvident in view of circumstances in this matter that were not capable of being anticipated. The Improvident Payment is subject to the Estate receiving the Total Settlement Payment and the Defendants do not object to the Improvident Payment. The Trustee asserts that the circumstances of this specific matter warrant compensation for Quinn Emanuel that may be different from the compensation provided by the Quinn Retention Order. Among other things, the Trustee contends that neither Quinn Emanuel nor the Trustee could have anticipated certain developments in this case that required Quinn Emanuel to invest significantly more hours and expenses without any assurance of compensation.

Furthermore, the Trustee maintains that Quinn Emanuel provided necessary additional non-contingent services (the "**Additional Services**") that arose from the Two Adversary Proceedings that otherwise would have been compensated on an hourly basis had the Trustee and Quinn Emanuel known all of the facts and circumstances regarding this matter. Notwithstanding the fact that Quinn Emanuel asserts that the value of the Additional Services exceeds the amount of the Improvident Payment, Quinn Emanuel agrees to limit the amount of the Improvident Payment to $3,150,000 or an amount otherwise approved by the Bankruptcy Court. The 9019 Motion will specifically seek approval of the Agreement and the Improvident Payment. The Parties will follow the direction of the Bankruptcy Court with respect to the form of any evidence that may be appropriate regarding the Improvident Payment.

4. **Deliveries at the Closing.** At or before the Closing, the Parties will do the following:

    a. CNA will deliver to the Trustee the CNA Payment.

    b. Travelers and UnitedLex will deliver cash to the Trustee in an aggregate amount equal to the Travelers's Payment.

    c. UnitedLex and/or CVC will deliver cash to the Trustee in the aggregate amount of the First Defendants' Payment.

    d. UnitedLex will deliver to the Trustee executed versions of the First Note and the Second Note and fully executed and effective versions of the First Letter of Credit and the Second Letter of Credit.

5. **Release by Trustee of Defendants.** In exchange for the consideration reflected in this Agreement and upon receipt of the CNA Payment, the Travelers Payment, the First Defendants' Payment, the Notes, and the Irrevocable Letters of Credit, the Trustee, on behalf of herself, the Estate, LeClairRyan, and the Trustee's Released Parties (as hereafter defined) hereby releases and forever discharges (a) the Defendants and (b) each of the Defendants', as well as the CVC Network[5] and its, respective current or former, family members, relatives, agents, officers, directors, consultants, insurers, employees, experts, attorneys, accountants, financial advisors, parents, subsidiaries, shareholders, heirs, direct and indirect affiliates or entities to which they are affiliated, and each fund, account, portfolio company, or other vehicle advised or managed directly or indirectly by any of them, each investor with whom any of the foregoing have a relationship, and any of its or their respective direct and indirect members, partners, investment managers, employees, principals, existing and prospective investors, predecessors, successors, assigns, representatives of any kinds, agents, and new Group Companies (collectively, the "**Defendants'**

[5]



**Released Parties**" or as to any particular Defendant(s), its or their respective "**Released Parties**")[6] (the Defendants' Released Parties and the Defendants are collectively referred to as the "**Releasees**") from each and every right, claim, debt, cause of action, demand, suit for damages, liability, legal fee, sanction, act or right of action of any nature whatsoever, whether asserted or unasserted, known, unknown, or yet to be discovered, liquidated or unliquidated, fixed or contingent, direct or indirect, that LeClairRyan, the Estate, and/or the Trustee has made, could have made, and/or is able to make against any of the Releasees at any time from the beginning of the world until the Closing Date. Except for the releases provided above, nothing in this Agreement shall be deemed a waiver, release or discharge by the Trustee of any claims, rights, or actions that the Trustee (on behalf of the Estate) or the Defendants may have against Starr or against any former attorney, advisor, consultant, agent, employee, director, owner, member or officer of LeClairRyan as listed in Schedule A. Notwithstanding anything else herein, solely as to the Defendants' Released Parties (and not Defendants themselves), the foregoing release and discharge shall apply only to each and every right, claim, debt, cause of action, demand, suit for damages, liability, legal fee, sanction, act or right of action of any nature whatsoever, whether asserted or unasserted, known, unknown, or yet to be discovered, liquidated or unliquidated, fixed or contingent, direct or indirect, that has been made, could have been made, and/or is able to be made against, any of the Defendants' Released Parties at any time from the beginning of the world until the Closing Date, directly or indirectly arising out of, related in any way to, based upon, or by reason of, the Two Adversary Proceedings, the Estate, LeClairRyan, the Bankruptcy Case, ULX Partners, LLC, and/or the creation of or negotiation of or operation of any aspect of the joint venture relating to ULX Partners, LLP. Nothing contained in this paragraph is intended to be or shall be deemed to be a release of Defendants' obligations contained in this Agreement, the Notes, or the Irrevocable Letters of Credit.

      **6.**     **Release by Defendants of Trustee.** In exchange for the consideration reflected in this Agreement and upon the receipt by the Trustee of the CNA Payment, Travelers Payment, First Defendants' Payment, the Notes, and the Irrevocable Letters of Credit, each of the Defendants, on behalf of themselves and the Defendants' Released Parties, hereby release and forever discharge (i) the Trustee, (ii) the Estate, (iii) LeClairRyan, and (iv) any current or former, family members, relatives, agents, officers, directors, consultants, employees, experts, attorneys, accountants, financial advisors, and representatives of any kind of the Estate and/or the Trustee (collectively, the "**Trustee's Released Parties**") (collectively, with the Trustee, the Estate, LeClairRyan, and the Trustee's Released Parties, the "**Trustee's Releasees**"), from each and every right, claim, debt, cause of action, demand, suit for damages, liability, legal fee, sanction, act or right of action of any nature whatsoever, whether asserted or unasserted, known, unknown, or yet to be discovered, liquidated or unliquidated, fixed or contingent, direct or indirect, that Defendants made, could have made, and/or are able to make against the Trustee, the Estate, LeClairRyan, and/or the Trustee's Released Parties, at any time from the beginning of the world until the Closing Date. Notwithstanding anything else herein, solely as to the Trustee's Released Parties (and not the Trustee, the Estate, or LeClairRyan), the foregoing release and discharge shall apply only to each and every right, claim, debt, cause of action, demand, suit for damages, liability, legal fee, sanction, act or right of action of any nature whatsoever, whether asserted or unasserted, known, unknown,

---

[6] When referred to herein in connection with CVC, its particular Released Parties include those related to both CVC and to the CVC Network, as well as the CVC Network itself.

or yet to be discovered, liquidated or unliquidated, fixed or contingent, direct or indirect, that has been made, could have been made, and/or is able to be made against, any of the Trustee's Released Parties at any time from the beginning of the world until the Closing Date, directly or indirectly arising out of, related in any way to, based upon, or by reason of, the Two Adversary Proceedings, the Estate, LeClairRyan, the Bankruptcy Case, ULX Partners, LLC, and/or the creation of or negotiation of or operation of any aspect of the joint venture relating to ULX Partners, LLP.. Nothing contained in this paragraph is intended to be or shall be deemed to be a release of the Trustee's obligations contained in this Agreement, the Notes, or the Irrevocable Letters of Credit.

7. **Release by Trustee and Defendants of Travelers.** In exchange for the consideration reflected in this Agreement and upon the Trustee's receipt of the Travelers Payment, the Trustee, on behalf of herself, the Estate, LeClairRyan, and the Trustee's Released Parties, and Defendants, on behalf of themselves and the Defendants' Released Parties, hereby discharge and release Travelers and its respective affiliates, parents, subsidiaries, predecessors, successors, agents, officers, directors, employees, attorneys, reinsurers, representatives and agents, heirs, beneficiaries, and assigns and any person acting on its behalf from each and every right, claim, debt, cause of action, demand, suit for damages, liability, legal fee, sanction, act or right of action of any nature whatsoever, whether asserted or unasserted, known, unknown, or yet to be discovered, liquidated or unliquidated, fixed or contingent, direct or indirect, that they now have or hereafter may have (including but not limited to any claim for coverage, insurance benefits, "Defense Expenses" as defined in the Travelers Policy, as well as any claim for misrepresentation, fraud, indemnity, contribution, breach of contract, breach of duty, negligence, "bad faith," violation of statute or regulation, unfair claims handling, attorneys' fees, or damages of any kind whatsoever) arising out of, related to, based upon, or by reason of either (1) the Travelers Policy or (2) the Claims or the Two Adversary Proceedings. The Defendants acknowledge that, when the Travelers' Payment is made, the entire aggregate limit of liability of the Travelers' Policy is exhausted with respect to the Two Adversary Proceedings, and Travelers has no further obligations under the Travelers' Policy. Nothing contained in this paragraph is intended to be or shall be deemed to be a release of Travelers's obligations contained in this Agreement.

8. **Release by Travelers of Defendants and Trustee.** In exchange for the consideration reflected in this Agreement and upon the Trustee's receipt of the Travelers Payment, Travelers hereby discharges and releases the Releasees and Trustee's Releasees from each and every right, claim, debt, cause of action, demand, suit for damages, liability, legal fee, sanction, act or right of action of any nature whatsoever, whether asserted or unasserted, known, unknown, or yet to be discovered, liquidated or unliquidated, fixed or contingent, direct or indirect, that Travelers now has or hereafter may have against any of the Releasees or any of the Trustee's Releasees (including but not limited to any claim for misrepresentation, fraud, indemnity, contribution, breach of contract, breach of duty, negligence, "bad faith," violation of statute or regulation, unfair claims handling, attorneys' fees, or damages of any kind whatsoever) arising out of, related to, based upon, or by reason of the Claims or the Two Adversary Proceedings. Nothing contained in this paragraph is intended to be or shall be deemed to be a release of Defendants' or the Trustee's obligations contained in this Agreement.

9. **Release by Trustee and Defendants of CNA.** In exchange for the consideration reflected in this Agreement and upon the Trustee's receipt of the CNA Payment, the Trustee, on behalf of herself, the Estate, LeClairRyan, and the Trustee's Released Parties, and Defendants, on

behalf of themselves and the Defendants' Released Parties, hereby discharge and release CNA and its respective affiliates, parents, subsidiaries, predecessors, successors, agents, officers, directors, employees, attorneys, reinsurers, representatives and agents, heirs, beneficiaries, and assigns and any person acting on its behalf from each and every right, claim, debt, cause of action, demand, suit for damages, liability, legal fee, sanction, act or right of action of any nature whatsoever, whether asserted or unasserted, known, unknown, or yet to be discovered, liquidated or unliquidated, fixed or contingent, direct or indirect, that they now have or hereafter may have (including but not limited to any claim for coverage, insurance benefits, "Defense Expenses" as defined in the Travelers Policy, "Claim Expenses," as defined in the Columbia Policy, or any other amounts under the CNA Policies, as well as any claim for misrepresentation, fraud, indemnity, contribution, breach of contract, breach of duty, negligence, "bad faith," violation of statute or regulation, unfair claims handling, attorneys' fees, or damages of any kind whatsoever) arising out of, related to, based upon, or by reason of either (1) the Continental Policy or (2) the Claims or the Two Adversary Proceedings. Nothing contained in this paragraph is intended to be or shall be deemed to be a release of CNA's obligations contained in this Agreement.

10.     **Release by CNA of Defendants and Trustee.**  In exchange for the consideration reflected in this Agreement and upon the Trustee's receipt of the CNA Payment, CNA hereby discharges and releases the Releasees and the Trustee's Releasees from each and every right, claim, debt, cause of action, demand, suit for damages, liability, legal fee, sanction, act or right of action of any nature whatsoever, whether asserted or unasserted, known, unknown, or yet to be discovered, liquidated or unliquidated, fixed or contingent, direct or indirect, that CNA now has or hereafter may have against any of the Releasees or any of the Trustee's Releasees (including but not limited to any claim for misrepresentation, fraud, indemnity, contribution, breach of contract, breach of duty, negligence, "bad faith," violation of statute or regulation, unfair claims handling, attorneys' fees, or damages of any kind whatsoever) arising out of, related to, based upon, or by reason of either (1) the Continental Policy or (2) the Claims or the Two Adversary Proceedings. Nothing contained in this paragraph is intended to be or shall be deemed to be a release of Defendants' or the Trustee's obligations contained in this Agreement.

11.     **Release by Josh Rosenfeld and P. Douglas Benson of the ULX Defendants, Mr. Reed, Mr. Hinton, and CVC.**  In exchange for the consideration reflected in this Agreement and upon the Trustee's receipt of the CNA Payment, Traveler's Payment, First Defendants' Payment, the Notes, and the Irrevocable Letters of Credit, Josh Rosenfeld and P. Douglas Benson, each on their own behalf and on behalf of their respective Released Parties, hereby release and forever discharge (i) the ULX Defendants, (ii) Mr. Reed, (iii) Mr. Hinton, (iv) CVC, and (v) each of the foregoing's Released Parties from each and every right, claim, debt, cause of action, demand, suit for damages, liability, legal fee, sanction, act or right of action of any nature whatsoever, whether asserted or unasserted, known, unknown, or yet to be discovered, liquidated or unliquidated, fixed or contingent, direct or indirect, Josh Rosenfeld and/or P. Douglas Benson has made, could have made, and/or is able to make against any of the persons/entities released in this paragraph at any time from the beginning of the world until the Closing Date.

12.     **Release by the ULX Defendants, Mr. Reed, Mr. Hinton and CVC of Josh Rosenfeld and P. Douglas Benson.**  In exchange for the consideration reflected in this Agreement and upon the Trustee's receipt of the CNA Payment, Traveler's Payment, First Defendants'

Payment, the Notes, and the Irrevocable Letters of Credit, the ULX Defendants, Mr. Reed, Mr. Hinton, and CVC, each on their own behalf and on behalf of their respective Released Parties, hereby releases and forever discharges Josh Rosenfeld and P. Douglas Benson, and each of their respective Released Parties, from each and every right, claim, debt, cause of action, demand, suit for damages, liability, legal fee, sanction, act or right of action of any nature whatsoever, whether asserted or unasserted, known, unknown, or yet to be discovered, liquidated or unliquidated, fixed or contingent, direct or indirect, that the ULX Defendants, Mr. Reed, Mr. Hinton, and/or CVC has made, could have made, and/or is able to make against Josh Rosenfeld and/or P. Douglas Benson at any time from the beginning of the world until the Closing Date.

**13.  No Release of Starr.**  For the avoidance of doubt, Starr is not receiving a release pursuant to this Agreement.  Nothing set forth in this Agreement is intended to be or shall be deemed to be a release by any of the Defendants or the Trustee as to Starr.  The Defendants and the Trustee preserve any and all claims against Starr with respect to its obligations under the Starr Insurance Policy and applicable law. The Parties further agree that the mediation shall remain open solely with respect to any dispute between the ULX Defendants and Starr, and for no other purpose, through the entry of the 9019 Order.

**14.  Dismissal.** Within ten (10) calendar days of receipt of the CNA Payment, the Travelers Payment, the First Defendants' Payment, the Notes, and the Irrevocable Letters of Credit, the Trustee shall file all necessary pleadings to effectuate the dismissal with prejudice of the Two Adversary Proceedings. Notwithstanding the foregoing, nothing herein shall release the Parties from any liability under this Agreement resulting from a Party's failure to comply with any and all of the terms and conditions of this Agreement, the Notes, or the Irrevocable Letters of Credit.

**15.  Representation and Warranty as to Coverage.**  CVC represents and warrants that CVC has no applicable insurance that is providing coverage to Defendants for liability or defense costs arising out of the allegations in the Two Adversary Proceedings and that it will not seek coverage for any portion of the Total Settlement Payment under any insurance policy issued to CVC.  Defendants further represent and warrant that they will not seek coverage for any portion of the Total Settlement Payment under any insurance policy issued to CVC.

**16.  Predecessors, Successors, and Assigns.**  All persons or business entities granting releases hereby include any predecessor in interest or successor in interest of the respective grantor. All persons or business entities released hereby include any predecessor in liability or successor in liability for the released liability.

**17.  Understanding and Counsel.**  The Parties represent and warrant that (i) they have read and understand the terms of this Agreement, (ii) they have been (or had the opportunity to be) represented by counsel with respect to this Agreement and all matters covered by and relating to it, (iii) they have entered into this Agreement for reasons of their own and not based upon representations of any other party hereto, and (iv) they have full authority and right (provided, however, the Trustee's authority is subject to obtaining the approval referenced in paragraph 1 herein) to grant the releases expressed in this Agreement and to bind the parties in all respects to this Agreement.

18. **Legal Fees and Costs.** Except as noted herein, each of the Parties shall not be responsible for any other Party's respective costs and attorneys' fees incurred or to be incurred, including but not limited to in connection with this Agreement, settlement conferences, mediation, and/or attendance at any hearing in connection with this Bankruptcy Case or any related adversary proceedings (except as otherwise ordered by the Bankruptcy Court). For the avoidance of doubt, nothing in this paragraph or this Agreement shall preclude the ULX Defendants, Daniel Reed, and/or Nicholas Hinton from making a claim for costs and attorneys' fees against Starr.

19. **Entire Agreement.** This Agreement (including, by reference, the Notes and the Irrevocable Letters of Credit) constitute the entire agreement with respect to the subject matter addressed in this Agreement and supersedes any prior written and/or verbal agreements between the Parties with respect to the Two Adversary Proceedings and the Bankruptcy Case.

20. **Amendments.** This Agreement may not be orally modified. This Agreement may only be modified in a writing signed by all of the Parties.

21. **Headings and Recitals.** All headings and captions in this Agreement are for convenience only and shall not be interpreted to enlarge or restrict the provisions of the Agreement. The Recitals, or any portion thereof (including, without limitation, defined terms), are incorporated by reference.

22. **Construction.** As used in this Agreement, the plural shall include the singular, and the singular shall include the plural, unless the context or intent indicates to the contrary. "Person" shall include natural persons, corporations, partnerships, and/or any other entity, which by law is treated as or has the rights of a natural person.

23. **Waiver and Modification.** The failure of the Parties to insist, in any one or more instances, upon the strict performance of any of the covenants of this Agreement, or to exercise any option contained in this Agreement, shall not be construed as a waiver, or a relinquishment for the future of such covenant or option, but the same shall continue and remain in full force and effect. Further, nothing in this Agreement shall be deemed to be a release of the Trustee, Defendants, and/or the Insurers for their breach of any terms and conditions of this Agreement.

24. **Jurisdiction.** By this Agreement, each of the Parties submits to the jurisdiction of the Bankruptcy Court for any action to enforce or interpret this Agreement.

25. **Counterparts and Electronic Signatures.** This Agreement may be executed in counterparts and all such counterparts when so executed shall together constitute the final Agreement as if all of the Parties had signed one document. This Agreement may be executed by facsimile or PDF copy and each signature thereto shall be and constitute an original signature, again as if all Parties had executed a single original document.

26. **Survival.** In the event any provision of this Agreement should be held to be void, voidable, unlawful, or for any reason unenforceable, the remaining portions hereto shall remain in full force and effect.

27.     **Further Necessary Actions.**  To the extent that any document is required to be executed by any Party to effectuate the purposes of this Agreement, the Party will execute and deliver such document or documents to the requesting Party.

28.     **Actions to Enforce.**  Should any action be brought by one of the Parties to enforce any provision of this Agreement, the non-prevailing party to such action shall reimburse the prevailing party for all reasonable attorneys' fees and court costs and other expenses incurred by the prevailing party in said action to enforce.

29.     **Applicable Law.**  This Agreement shall be construed and interpreted in accordance with the laws of the Commonwealth of Virginia. This Agreement shall not be construed against any of the Parties, but shall be given a reasonable interpretation.

30.     **No Admission of Liability**.  Each of the Parties understands and acknowledges that this Agreement constitutes a compromise and settlement of the claims as described in this Agreement.  No action taken by any of the Parties hereto, either previously or in connection with this Agreement, shall be deemed or construed to be an admission of the truth or falsity of any allegations, claims, or other potential claims or an acknowledgment or admission by any Party (including any person or entity receiving a release through this Agreement) of any fault, wrongdoing or liability by such Party and/or any of its affiliates, employees, attorneys, agents or representatives, and the Agreement will not be offered or used for any of these purposes.

31.     **Confidentiality**.  Any of the Parties may request that the Bankruptcy Court enter an order providing that this Agreement and/or any terms of this Agreement be kept confidential, and the other Parties agree not to object to any such request.   To the extent that such order is granted, the Parties agree that thereafter they will keep the terms and conditions of the Agreement confidential and will not thereafter disclose directly or indirectly the substance or contents thereof, to any person or persons outside of the Parties, provided however that the Parties may disclose the terms and conditions (a) to their attorneys, accountants, financial institutions, directors, officers, agents, employees, insurers, reinsurers and auditors (provided such persons are advised of this confidentiality requirement and will maintain such information as confidential); (b) pursuant to a court order or a subpoena issued by a court of competent jurisdiction; (c) in order to enforce the Agreement, Notes, or Irrevocable Letters of Credit   d  as may be required to comply with the reporting requirements and duties of the Trustee; (e) ███████ ███████████████████████████████████████████ (f) as otherwise required by law.  In addition, the ULX Defendants assert that the motions, responses, pleadings, and exhibits previously filed under seal in the UnitedLex Adversary Proceeding with the Bankruptcy Court relating to the Motion to Amend and the Motion for Summary Judgment should remain confidential. Notwithstanding anything to contrary herein, a copy of this Agreement, the 9019 Motion, and all documents used to support the same (collectively, the "**Settlement Pleadings**") may be provided to any Person (as defined by Section 101(41) of the Bankruptcy Code) holding a claim against the Estate evidenced by (i) a proof of claim, which claim is not otherwise subject to dispute pursuant to the Bankruptcy Code and/or the Bankruptcy Rules and/or (ii) an order of the Bankruptcy Court, only upon written receipt by Paula S. Beran, Esquire at pberan@tb-

lawfirm.com of a commitment of any Persons to keep such Settlement Pleadings confidential. To the extent the ULX Defendants or any other Party request that the Bankruptcy Court maintain all such pleadings under seal as part of this Agreement, the Trustee and/or the other Parties will not object.


**[THIS PAGE IS INTENTIONALLY LEFT BLANK.  SIGNATURE PAGES TO FOLLOW]**

The Parties hereby knowingly and voluntarily enter into this Agreement as of the date set forth below.

By:    Lynn L. Tavenner
Title:  Chapter 7 Trustee of the Estate of LeClairRyan PLLC

Date: 05/16/2022

By:    ULX Partners, LLC
Name: Eric Kelly
Its:    Secretary of ULX Manager, LLC, the
       Managing Member of ULX Partners,
       LLC

Date: _____

By: ULX Manager LLC
Name: Eric Kelly
Its:    Secretary

Date: _____

By:    UnitedLex Corporation
Name: Eric Kelly
Its:    Vice President – Corporate Counsel &
       Secretary

Date: _____

By: CVC Advisers (India) Private Limited
Name: [ ]
Its [ ]

Date: _____

The Parties hereby knowingly and voluntarily enter into this Agreement as of the date set forth below.

By:    Lynn L. Tavenner                               Date: _____

Title:   Chapter 7 Trustee of the Estate of LeClairRyan PLLC

By:    ULX Partners, LLC                       Date: 16 May 2022

Name: Eric Kelly

Its:    Secretary of ULX Manager, LLC, the
        Managing Member of ULX Partners,
        LLC

By:  ULX Manager LLC                       Date: 16 May 2022

Name: Eric Kelly

Its:    Secretary

By:    UnitedLex Corporation                Date: 16 May 2022

Name: Eric Kelly

Its:    Vice President – Corporate Counsel &
        Secretary

By:  CVC Advisers (India) Private Limited      Date: _____

Name:  [ ]

Its [ ]

The Parties hereby knowingly and voluntarily enter into this Agreement as of the date set forth below.

_____     Date: _____
By:     Lynn L. Tavenner
Title:   Chapter 7 Trustee of the Estate of LeClairRyan PLLC


_____     Date: _____
By:     ULX Partners, LLC
Name: Eric Kelly
Its:     Secretary of ULX Manager, LLC, the
         Managing Member of ULX Partners,
         LLC


_____     Date: _____
By:  ULX Manager LLC
Name: Eric Kelly
Its:     Secretary


_____     Date: _____
By:     UnitedLex Corporation
Name: Eric Kelly
Its:     Vice President – Corporate Counsel &
         Secretary


_____     Date: _____
By:  CVC Advisers (India) Private Limited
Name: [ ] AMIT SONI
Its [ ] DIRECTOR

Date: 5/17/22

By: Travelers Casualty and Surety Company of
America
Name:  Steven R. Srenaski
Its:    Managing Director

Date: _____

By: Continental Casualty Company
Name: Camille Cribaro-Mello, Esq.,
Its:    Claim Consulting Director

Date: _____

By:    Columbia Casualty Company
Name: Michael S. Franklin
Its:    AVP, Financial Line Claims

Date: _____

By:    Nicholas Hinton

Date: _____

By:    Daniel Reed

Date: _____

By:    Joshua Rosenfeld

Date: _____

By:    Douglas Benson

By:  Travelers Casualty and Surety Company of
America
Name:  [  ]
Its:    [  ]

Date: _____

*Camille Cribaro-Mello*

By:  Continental Casualty Company
Name: Camille Cribaro-Mello, Esq.,
Its:     Claim Consulting Director

Date: 5/11/22 _____

By:     Columbia Casualty Company
Name: Michael S. Franklin
Its:     AVP, Financial Line Claims

Date: _____

By:     Nicholas Hinton

Date: _____

By:     Daniel Reed

Date: _____

By:     Joshua Rosenfeld

Date: _____

By:     Douglas Benson

Date: _____

By: Travelers Casualty and Surety Company of
America
Name:  [ ]
Its:      [ ]

Date: _____

By: Continental Casualty Company
Name: Camille Cribaro-Mello, Esq.,
Its:       Claim Consulting Director

Date: _____

By:     Columbia Casualty Company
Name: Michael S. Franklin
Its:      AVP, Financial Line Claims

Date: 05/11/2022

By:     Nicholas Hinton

Date: _____

By:     Daniel Reed

Date: _____

By:     Joshua Rosenfeld

Date: _____

By:     Douglas Benson

Date: _____

_____     Date: _____

By:  Travelers Casualty and Surety Company of
America
Name:  [  ]
Its:      [ ]


_____     Date: _____

By:  Continental Casualty Company
Name: Camille Cribaro-Mello, Esq.,
Its:      Claim Consulting Director


_____     Date: _____

By:      Columbia Casualty Company
Name: Michael S. Franklin
Its:      AVP, Financial Line Claims


_____     Date:  May 13, 2022

By:      Nicholas Hinton


_____     Date: _____

By:      Daniel Reed


_____     Date: _____

By:      Joshua Rosenfeld


_____     Date: _____

By:      Douglas Benson

By:  Travelers Casualty and Surety Company of America
Name:  [  ]
Its:     [ ]

Date: _____

By:  Continental Casualty Company
Name: Camille Cribaro-Mello, Esq.,
Its:      Claim Consulting Director

Date: _____

By:     Columbia Casualty Company
Name: Michael S. Franklin
Its:      AVP, Financial Line Claims

Date: _____

By:     Nicholas Hinton

Date: _____

By:     Daniel Reed

Date:     13 May 2022

By:     Joshua Rosenfeld

Date: _____

By:     Douglas Benson

Date: _____

_____     Date: _____

By: Travelers Casualty and Surety Company of
America
Name: [ ]
Its:    [ ]


_____     Date: _____

By: Continental Casualty Company
Name: Camille Cribaro-Mello, Esq.,
Its:    Claim Consulting Director


_____     Date: _____

By:    Columbia Casualty Company
Name: Michael S. Franklin
Its:    AVP, Financial Line Claims


_____     Date: _____

By:    Nicholas Hinton


_____     Date: _____

By:    Daniel Reed


_____     Date: May 11, 2022

By:    Joshua Rosenfeld


_____     Date: _____

By:    Douglas Benson

By: Travelers Casualty and Surety Company of
America
Name: [ ]
Its:    [ ]

Date: _____

By:  Continental Casualty Company
Name: Camille Cribaro-Mello, Esq.,
Its:    Claim Consulting Director

Date: _____

By:   Columbia Casualty Company
Name: Michael S. Franklin
Its:    AVP, Financial Line Claims

Date: _____

By:    Nicholas Hinton

Date: _____

By:    Daniel Reed

Date: _____

By:    Joshua Rosenfeld

Date: _____

By:    Douglas Benson

Date: 5/12/22

**Schedule A**

Lee Albanese
Alan Albert
Jeffrey L. Alitz
Richard W. "Deke" Bowerman
Paul Burleigh
Thomas Butler
John H. Cahill, Jr.
Thomas Curran
Mark  Dombroff
Niclas  Ferland
Janice  Grubin
Brian Inamine
Kevin Kenneally
ChristyKostich
Christopher J.  Lange
Leslie  Machado
Vija Mago
Jason Medley
Charles Meyer
Lisa  Murphy
Kelvin Newsome
Jeffrey O'Hara
Clint Robison
Charles Seyfarth
Charles M. Sims
Michele L. Smith
J. Lori  Thompson
Michael Von Diezelski
Karol Corbin Walker
Thomas Wolf
Andrew Zappia

EXHIBIT A

## FIRST PROMISSORY NOTE

**$3,000,000.00**                                                                 **June   , 2022**

UnitedLex Corporation, a Delaware corporation **("Maker"),** has been a defendant in an adversary proceeding pending in the United States Bankruptcy Court for the Eastern District of Virginia entitled *Lynn L. Tavenner, as Chapter 7 Trustee v. ULX Partners, LLC et al. (In re LeClairRyan PLLC)* (the "Case"). The Maker and the plaintiff in the Case, Lynn L. Tavenner, not individually but solely in her capacity as the Chapter 7 Trustee (the "Trustee"), have agreed to settle and resolve all the disputes set forth in the Case  as well as in a related case brought by the Trustee against CVC Capital Partners and others (together with the Case, collectively referred to herein as the "Cases") pursuant to a global settlement agreement dated as of the date hereof (the "Settlement Agreement") entered into by the Trustee on behalf of the Chapter 7 estate of LeClairRyan (the "Estate"). The Maker is making this Note together with a second note dated the date hereof in the principal amount of $3,250,000 (the "Second Note") as part of the consideration specified in the Settlement Agreement.

The undersigned Maker hereby promises to pay to the order of the Estate the aggregate principal sum of **THREE MILLION DOLLARS ($3,000,000.00)** as set forth below with simple interest accruing on the outstanding principal amount at the rate of 1 % per annum, payable in accordance with the terms set forth below.

**Payment Schedule and Payments: T**his Note shall be payable on June __ , 2023 (the "**Maturity Date**"). Provided that the Second Note has first been paid in full, the Maker may prepay this Note at any time in whole or in part from time to time. The Trustee will notify the Letter of Credit Bank (as defined below) of the amount of any repayment no later than three business days after receipt thereof and any prepayments of  this Note will result in a reduction of the Letter of Credit (as defined below) on a dollar for dollar basis. If the Maker receives any payments relating to the Cases from Starr Surplus Lines Insurance Company ("STARR") as a result of claims made under Policy Number 100063417 (net of any costs of collection, the "**Starr Payment**"), within ten (10) business days of the actual receipt of such payment from Starr, the Maker shall make a prepayment on the Note equal to the  excess, if any, of the Starr Payment over the amount of the Starr Payment allocated to prepay the Second Note.

**Letter of Credit:** Unless previously paid by Maker, payment shall be made by the Trustee's presentation of a Certificate of Entitlement pursuant to a standby irrevocable letter of credit issued by Wells Fargo Bank, NA (the " **Letter of Credit Bank**") in favor of the Trustee in the amount of $3,050,000 in the form attached hereto as Exhibit 1 (the "**Letter of Credit**"). Both the principal and interest are payable to the Trustee in lawful money of the United States in the manner set forth below.

**Waivers.**  Except as expressly set forth herein, the Maker hereby waives presentment for payment, protest and demand and notice of protest, demand, dishonor, nonpayment, intent to

1

accelerate and acceleration of this Note, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time before, at or after maturity, without in any way affecting the liability of the Maker hereunder.

**Notices:** All notices, consents, requests, approvals, demands, or other communication (collectively, "Communication") with respect hereto must be in writing, shall be delivered by email to the respective parties at their e-mail addresses set forth below and shall be deemed delivered upon transmission, provided, however, that notices to the Letter of Credit Bank shall be delivered as set forth in the Letter of Credit. Any of the parties receiving notice hereunder may change its e-mail address or other address by giving the other notice parties written notice of such change in accordance with the provisions of this paragraph.

### If to the Maker:

UnitedLex Corporation

Nicholas Hinton,

Chief Financial Officer

Nicholas.hinton@unitedlex.com

With  copies to:

Eric Kelly, Chief Legal Officer

UnitedLex Corporation

Eric.kelly@unitedlex.com

J. Gregory Milmoe

Greenberg Traurig, LLC

milmoeg@gtlaw.com

### If to the Trustee:

Lynn L. Tavenner, Chapter 7 Trustee

ltavenner@tb-lawfirm.com


With copies to:

Paula S. Beran, Esquire

Tavenner & Beran PLC

2

pberan@tb-lawfirm.com

Erika L. Morabito, Esquire

Quinn Emanuel Urquhart & Sullivan LLP

erikamorabito@quinnemanuel.com

**Modifications.** This Note may only be amended by an instrument in writing signed by the party against whom enforcement of the change or amendment is sought.

**Successors and Assigns.** This Note shall be binding upon the Maker and upon the Maker's successors and assigns and shall inure to the benefit of the Trustee and her successors and assigns.

**Severability.** In the event that any provision hereof shall be deemed to be invalid by reason of the operation of any law, or by reason of the interpretation placed thereon by any court or any governmental body, this Note shall be construed as not containing such provision and the invalidity of such provision shall not affect the validity of any other provisions hereof, and any and all other provisions hereof which otherwise are lawful and valid shall remain in full force and effect.

**Time of the Essence.** Time is of the essence for the performance of the obligations of the Maker under this Note.

**Costs of Collection.** If any suit or action is instituted or attorneys are employed to collect this Note or any part hereof, the Maker promises and agrees to pay all costs of collection, including all court costs and reasonable attorneys' fees and expenses.

**GOVERNING LAW; VENUE. This Note shall be construed in accordance with and governed by the laws and decisions of the State of New York, without giving effect to any conflict of law provisions thereof.** The Maker and the Trustee consent to the continuing jurisdiction  in any action, claim or other proceeding arising out of any dispute in connection with this Note or the obligations hereunder of the United States Bankruptcy Court for the Eastern District of Virginia as the venue for the resolution of any disputes regarding this Note, and, if for any reason such court does not exercise jurisdiction , of the state courts located in the borough of Manhattan, New York City, New York or any Federal court in the Southern District of  New York, and waive any objection thereto on the grounds of *forum non conveniens*.

**[Signature Page Follows]**

3

**IN WITNESS WHEREOF,** this Note has been executed and delivered by Maker by its duly authorized officer on the date first set forth above.

<div align="center">

**UNITEDLEX CORPORATION**

</div>

By: _____

     Name:

     Title:

ADMIN 63462283v7

EXHIBIT 1 to EXHIBIT A

IRREVOCABLE STANDBY LETTER OF CREDIT
NO.[INSERT]

DATE: [INSERT]

APPLICANT:
TITAN INVESTMENT COMPANY INC.
6130 SPRINT PARKWAY, SUITE 300
OVERLAND PARK, KS 66211

BENEFICIARY:
LYNN L. TAVENNER, CHAPTER 7 TRUSTEE
TAVENNER & BERAN, PLC
20 N. 8TH STREET
RICHMOND, VA 23219

AMOUNT: USD 3,050,000.00 (THREE MILLION FIFTY THOUSAND AND 00/100 UNITED STATES
DOLLARS ONLY)

EXPIRATION DATE: JUNE  , 2023]

WE, WELLS FARGO BANK, N.A.("ISSUING BANK"), HEREBY ESTABLISH OUR IRREVOCABLE
STANDBY LETTER OF CREDIT NO.[INSERT NUMBER] ("LETTER OF CREDIT") IN YOUR FAVOR
WHICH WE ARE INFORMED BUT DO NOT INDEPENDENTLY VERIFY THAT THIS LETTER OF CREDIT
IS TO SERVE AS SECURITY FOR THAT CERTAIN FIRST PROMISSORY NOTE DATED [INSERT
DATE] ("NOTE"), ISSUED BY UNITEDLEX CORPORATION (A SUBSIDIARY OF TITAN INVESTMENT
COMPANY INC.) IN CONNECTION WITH THE SETTLEMENT AND RESOLUTION OF THE ADVERSARY
PROCEEDING PENDING IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT
OF VIRGINIA ENTITLED LYNN L. TAVENNER, AS CHAPTER 7 TRUSTEE V. ULX PARTNERS, LLC
ET AL.(IN RE LECLAIRRYAN PLLC).

WE ARE FURTHER INFORMED THAT THIS LETTER OF CREDIT HAS BEEN ISSUED TO COVER THE
PRINCIPAL SUM AS SPECIFIED IN THE NOTE FOR THE AMOUNT OF USD3,000,000.00 TOGETHER
WITH ANY INTEREST (1% PER ANNUM) ACCRUED ON THE PRINCIPAL PAYABLE ON JUNE  , 2023
(THE "MATURITY DATE").

THIS LETTER OF CREDIT IS AVAILABLE AT OUR COUNTERS UPON PRESENTATION OF THE
FOLLOWING DOCUMENTS:

1. A DRAFT DRAWN ON US AT SIGHT MARKED "DRAWN UNDER WELLS FARGO BANK, N.A.
   STANDBY LETTER OF CREDIT NO. [INSERT REF NUMBER]."

2. THE ORIGINAL LETTER OF CREDIT AND ANY AMENDMENT(S), IF ANY.

3. BENEFICIARY'S CERTIFICATE OF ENTITLEMENT IN THE FORM OF ATTACHMENT A.

FULL OR PARTIAL DRAWS ARE ALLOWED.

THE AGGREGATE AMOUNT OF THIS LETTER OF CREDIT AVAILABLE TO BE DRAWN MAY BE
REDUCED BY ANY PREPAYMENT(S) MADE BY UNITEDLEX CORPORATION TO THE TRUSTEE AS

EVIDENCED THROUGH THE BENEFICIARY'S PRESENTATION OF ATTACHMENT B TO THE ISSUING
BANK.

THIS LETTER OF CREDIT SHALL BE AUTOMATICALLY EXTENDED FOR AN ADDITIONAL PERIOD OF
ONE YEAR, WITHOUT AMENDMENT, FROM THE PRESENT OR EACH FUTURE EXPIRATION DATE
UNLESS AT LEAST 30 CALENDAR DAYS PRIOR TO THE THEN CURRENT EXPIRATION DATE WE
SEND YOU A NOTICE BY OVERNIGHT COURIER SERVICE AT THE ABOVE ADDRESS THAT THIS
LETTER OF CREDIT WILL NOT BE EXTENDED BEYOND THE CURRENT EXPIRATION DATE. IN THE
EVENT OF SUCH NOTICE OF NON-EXTENSION, YOU MAY DRAW THE FULL AVAILABLE AMOUNT
HEREUNDER ON PRESENTATION OF THE FOLLOWING DOCUMENTS:

1. A DRAFT DRAWN ON US AT SIGHT MARKED "DRAWN UNDER WELLS FARGO BANK, N.A.
   STANDBY LETTER OF CREDIT NO. [INSERT REF NUMBER]."

2. THE ORIGINAL LETTER OF CREDIT AND ANY AMENDMENT(S), IF ANY.

3. YOUR SIGNED AND DATED STATEMENT WORDED AS FOLLOWS (WITH THE INSTRUCTIONS IN
   BRACKETS THEREIN COMPLIED WITH):

   "THE UNDERSIGNED, AN AUTHORIZED REPRESENTATIVE OF THE BENEFICIARY OF WELLS
   FARGO BANK, N. A. LETTER OF CREDIT NO. [INSERT REF NUMBER], HEREBY CERTIFIES
   THAT BENEFICIARY HAS RECEIVED NOTIFICATION FROM WELLS FARGO BANK, N.A. THAT
   THIS LETTER OF CREDIT WILL NOT BE EXTENDED PAST ITS CURRENT EXPIRATION DATE.
   THE UNDERSIGNED FURTHER CERTIFIES THAT (I) AS OF THE DATE OF THIS STATEMENT,
   BENEFICIARY HAS NOT RECEIVED A LETTER OF CREDIT OR OTHER INSTRUMENT
   ACCEPTABLE TO BENEFICIARY AS A REPLACEMENT; AND (II) [INSERT NAME OF
   APPLICANT] HAS NOT BEEN RELEASED FROM ITS OBLIGATIONS."

IN NO EVENT SHALL THIS LETTER OF CREDIT BE AUTOMATICALLY EXTENDED BEYOND THE
FINAL EXPIRATION DATE OF JUNE   , 2024 (THE "FINAL EXPIRY DATE") WHICH WILL BE
CONSIDERED THE FINAL EXPIRATION DATE.   ANY REFERENCE HEREIN TO A FINAL
EXPIRATION DATE DOES NOT IMPLY THAT WE ARE OBLIGATED TO EXTEND THIS LETTER OF
CREDIT BEYOND THE INITIAL OR ANY EXTENDED DATE THEREOF.

THIS IRREVOCABLE STANDBY LETTER OF CREDIT TERMINATES UPON THE EARLIEST TO OCCUR
OF (I) OUR RECEIPT OF A NOTICE OF CANCELLATION IN THE FORM OF ATTACHMENT C; OR
(II) OUR HONORING OF ANY PRESENTATION HEREUNDER IN THE MAXIMUM AGGREGATE AMOUNT
OF THE LETTER OF CREDIT, OR (III) THE CLOSE OF BUSINESS AT OUR AFORESAID OFFICE
ON THE INITIAL EXPIRY DATE OR ANY FUTURE EXPIRY DATE EXPIRATION HERETO; OR
(IV)THE FINAL EXPIRY DATE.

WE HEREBY ENGAGE WITH YOU THAT ALL DOCUMENT(S) DRAWN UNDER AND IN COMPLIANCE WITH
THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED THREE DAYS AFETR
PRESENTATION DATE ACCORDING TO YOUR REIMBURSEMENT INSTRUCTIONS IF DRAWN AND
PRESENTED FOR PAYMENT AT OUR OFFICES LOCATED AT WELLS FARGO BANK, N.A., 401 N.
RESEARCH PKWY, 1ST FLOOR, MAC D4004-017, WINSTON-SALEM, NC 27101, ATTN: U.S.
TRADE SERVICES, STANDBY LETTERS OF CREDIT DEPARTMENT ON OR BEFORE THE CURRENT
EXPIRY DATE.

DRAWINGS MAY BE PRESENTED TO US AT OUR ABOVE OFFICE BY HAND DELIVERY OR DELIVERED
TO US BY U.S. POSTAL SERVICE MAIL, REGISTERED MAIL OR CERTIFIED MAIL, OR BY
EXPRESS COURIER OR OVERNIGHT CARRIER.  DRAWINGS MAY ALSO BE PRESENTED TO US BY

FACSIMILE TRANSMISSION TO FACSIMILE NUMBER 844-879-5593 (EACH SUCH DRAWING, A "FAX DRAWING"); PROVIDED, HOWEVER, THAT A FAX DRAWING WILL NOT BE EFFECTIVELY PRESENTED UNTIL YOU CONFIRM BY TELEPHONE OUR RECEIPT OF SUCH FAX DRAWING BY CALLING US AT TELEPHONE NUMBER 1-800-776-3862 (OPTION 2). IF YOU PRESENT A FAX DRAWING YOU DO NOT NEED TO PRESENT THE ORIGINAL OF ANY DRAWING DOCUMENTS, AND IF WE RECEIVE ANY SUCH ORIGINAL DRAWING DOCUMENTS THEY WILL NOT BE EXAMINED BY US. IN THE EVENT OF A FULL OR FINAL DRAWING THE ORIGINAL LETTER OF CREDIT MUST BE RETURNED TO US AT OUR ABOVE OFFICE BY OVERNIGHT COURIER.

LETTER OF CREDIT IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES (ISP98) ICC PUBLICATION NR 590 OF THE INTERNATIONAL CHAMBER OF COMMERCE, AND AS TO MATTERS NOT GOVERNED BY THE INTERNATIONAL STANDBY PRACTICES (ISP98), SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

ATTACHMENT A:
CERTIFICATE OF ENTITLEMENT

DATE:

TO:
WELLS FARGO BANK, N.A.
401 N. RESEARCH PKWY, 1ST FLOOR
MAC D4004-017
WINSTON-SALEM, NC 27101
ATTN: U.S. TRADE SERVICES, STANDBY LETTERS OF CREDIT DEPARTMENT

LYNN L. TAVENNER, SOLELY IN HER CAPACITY AS CHAPTER 7 TRUSTEE AND NOT IN HER INDIVIDUAL CAPACITY, HEREBY CERTIFIES AS FOLLOWS:

1.    SHE IS THE BENEFICIARY NAMED IN LETTER OF CREDIT NO. ____ISSUED BY WELLS FARGO BANK, N.A.

2.    THE ENTIRE AMOUNT OF THE FIRST PROMISSORY NOTE DATED [INSERT DATE]IS DUE AND [NO PREPAYMENTS HAVE BEEN RECEIVED FROM UNITEDLEX CORPORATION WHICH REDUCE SUCH AMOUNT.] [OR] [I HAVE RECEIVED USD_____ OF PREPAYMENTS FROM UNITEDLEX CORPORATION AND ACCORDINGLY THE AMOUNT DUE UNDER THE FIRST PROMISSORY NOTE DATED [INSERT DATE]IS USD_____.

3.    ON MAY   , 202_ PLEASE SEND USD_____BY WIRE TRANSFER TO [INSERT BENEFICIARY'S ACCOUNT INFORMATION] .

BY: _____
NAME: LYNN L. TAVENNER

TITLE: CHAPTER 7 TRUSTEE
DATE: _____


ATTACHMENT B
ADJUSTMENT OF LETTER OF CREDIT AMOUNT

DATE:

TO:
WELLS FARGO BANK, N.A.
401 N. RESEARCH PKWY, 1ST FLOOR
MAC D4004-017
WINSTON-SALEM, NC 27101
ATTN: U.S. TRADE SERVICES, STANDBY LETTERS OF CREDIT DEPARTMENT

LYNN L. TAVENNER, SOLELY IN HER CAPACITY AS CHAPTER 7 TRUSTEE AND NOT IN HER
INDIVIDUAL CAPACITY, HEREBY CERTIFIES AS FOLLOWS:

1.    SHE IS THE BENEFICIARY NAMED IN LETTER OF CREDIT NO. _____ISSUED BY
WELLS FARGO BANK, N.A.

2.    I HAVE RECEIVED USD_____ OF PREPAYMENT FROM UNITEDLEX CORPORATION AND
ACCORDINGLY THE AMOUNT DUE UNDER THE FIRST PROMISSORY NOTE DATED [INSERT DATE]IS
USD_____ AND AS SUCH I AUTHORIZE THE AMOUNT OF THE LETTER OF CREDIT TO BE REDUCED
TO [_____] TO REFLECT SAME.


BY: _____
NAME: LYNN L. TAVENNER
TITLE: CHAPTER 7 TRUSTEE
DATE: _____

ATTACHMENT C
NOTICE OF CANCELLATION
DATE:

TO:
WELLS FARGO BANK, N.A.
401 N. RESEARCH PKWY, 1ST FLOOR
MAC D4004-017
WINSTON-SALEM, NC 27101
ATTN: U.S. TRADE SERVICES, STANDBY LETTERS OF CREDIT DEPARTMENT

LYNN L. TAVENNER, SOLELY IN HER CAPACITY AS CHAPTER 7 TRUSTEE AND NOT IN HER
INDIVIDUAL CAPACITY, HEREBY CERTIFIES AS FOLLOWS:

1.    SHE IS THE BENEFICIARY NAMED IN LETTER OF CREDIT NO. _____ISSUED BY WELLS
FARGO BANK, N.A.

2.    I HAVE RECEIVED PAYMENT(S) FROM UNITEDLEX CORPORATION THAT HAVE MET THEIR
PAYMENT OBLIGATIONS AS SPECIFIED IN THAT CERTAIN FIRST PROMISSORY NOTE DATED
[INSERT DATE] AND AS SUCH I AUTHORIZE THE LETTER OF CREDIT TO BE CANCELLED.


BY: _____
NAME: LYNN L. TAVENNER
TITLE: CHAPTER 7 TRUSTEE

DATE: _____

EXHIBIT B: DEFINITIVE FORM

## SECOND PROMISSORY NOTE

**$3,250,000.00**                                                        **June__, 2022**

UnitedLex Corporation, a Delaware corporation **("Maker"),** has been a defendant in an adversary proceeding pending in the United States Bankruptcy Court for the Eastern District of Virginia entitled *Lynn L. Tavenner, as Chapter 7 Trustee v. ULX Partners, LLC et al. (In re LeClairRyan PLLC)* (the "Case"). The Maker and the plaintiff in the Case, Lynn L. Tavenner, not individually but solely in her capacity as the Chapter 7 Trustee (the "Trustee"), have agreed to settle and resolve all the disputes set forth in the Case as well as in a related case brought by the Trustee against CVC Capital Partners and others (together with the Case, collectively referred to herein as the "Cases") pursuant to a global settlement agreement dated as of the date hereof (the "Settlement Agreement") entered into by the Trustee on behalf of the Chapter 7 estate of LeClairRyan (the "Estate"). The Maker is making this Note together with another note (the "First Note") as part of the consideration specified in the Settlement Agreement.

The undersigned Maker hereby promises to pay to the order of the Estate the aggregate principal sum of **THREE MILLION TWO HUNDRED FIFTY THOUSAND DOLLARS ($3,250,000.00)** as set forth below with simple interest accruing on the outstanding principal amount at the rate of [1] % per annum, payable in accordance with the terms set forth below.

**Payment Schedule and Payments: T**his Note shall be payable on June __ , 2024 (the "**Maturity Date").** The Maker may prepay this Note at any time in whole or in part from time to time. The Trustee will notify the Letter of Credit Bank (as defined below) of the amount of any repayment no later than three (3) business days after receipt thereof and any prepayments of the principal balance of this Note will result in a reduction of the Letter of Credit ( as defined below) on a dollar for dollar basis. If the Maker receives any payments relating to the Cases from Starr Surplus Lines Insurance Company ("STARR") as a result of claims made under Policy Number 100063417 (net of any costs of collection, the "Starr Payment'), within ten (10) business days of the actual receipt of such payment from Starr, the Maker shall make a prepayment on the Note equal to the Starr Payment. Both principal and interest are payable to the Trustee in lawful money of the United States in the manner set forth below.

**Letter of Credit:** Unless previously paid by the Maker, payment shall be made by the Trustee's presentation of a Certificate of Entitlement pursuant to a standby irrevocable letter of credit issued by PNB Paribas (the " **Letter of Credit Bank**") in favor of the Trustee in the amount of $3,315,000 in the form attached hereto as Exhibit 1 (the "**Letter of Credit**").

**Waivers.** Except as expressly set forth herein, the Maker hereby waives presentment for payment, protest and demand and notice of protest, demand, dishonor, nonpayment, intent to accelerate and acceleration of this Note, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time before, at or after maturity, without in any way affecting the liability of the Maker hereunder.

**Notices:** All notices, consents, requests, approvals, demands, or other communication

1

(collectively, "Communication") with respect hereto must be in writing, shall be delivered by email to the respective parties at their e-mail addresses set forth below and shall be deemed delivered upon transmission, provided, however, that notices to the Letter of Credit Bank shall be delivered as set forth in the Letter of Credit. Any of the parties receiving notice hereunder may change its e-mail address by giving the other notice parties written notice of such change in accordance with the provisions of the paragraph.

**If to the Maker:**

UnitedLex Corporation

Nicholas Hinton,

Chief Financial Officer

Nicholas.hinton@unitedlex.com

With  copies to:

Eric Kelly, Chief Legal Officer

UnitedLex Corporation

Eric.kelly@unitedlex.com

J. Gregory Milmoe

Greenberg Traurig, LLC

milmoeg@gtlaw.com

**If to the Trustee:**

Lynn L. Tavenner, Chapter 7 Trustee

ltavenner@tb-lawfirm.com


With copies to:

Paula S. Beran, Esquire

Tavenner & Beran, PLC

pberan@tb-lawfirm.com

Erika L. Morabito, Esquire

2

Quinn Emanuel Urquhart & Sullivan LLP

erikamorabito@quinnemanuel.com

**Modifications.** This Note may only be amended by an instrument in writing signed by the party against whom enforcement of the change or amendment is sought.

**Successors and Assigns.** This Note shall be binding upon the Maker and upon the Maker's successors and assigns and shall inure to the benefit of the Trustee and her successors and assigns.

**Severability.** In the event that any provision hereof shall be deemed to be invalid by reason of the operation of any law, or by reason of the interpretation placed thereon by any court or any governmental body, this Note shall be construed as not containing such provision and the invalidity of such provision shall not affect the validity of any other provisions hereof, and any and all other provisions hereof which otherwise are lawful and valid shall remain in full force and effect.

**Time of the Essence.** Time is of the essence for the performance of the Maker's obligations under this Note.

**Costs of Collection.** If any suit or action is instituted or attorneys are employed to collect this Note or any part hereof, the Maker promises and agrees to pay all costs of collection, including all court costs and reasonable attorneys' fees and expenses.

**GOVERNING LAW; VENUE. This Note shall be construed in accordance with and governed by the laws and decisions of the State of New York, without giving effect to any conflict of law provisions thereof.** The Maker and the Trustee consent to the continuing jurisdiction in any action, claim or other proceeding arising out of any dispute in connection with the Note or the obligations hereunder of the United States Bankruptcy Court for the Eastern District of Virginia, and if such court does not exercise such jurisdiction, of the state courts located in the Borough of Manhattan, New York City, New York, or any Federal court in the Southern District of New York, and waives any objection thereto on the grounds of *forum non conveniens.*

**[Signature Page Follows]**

3

**IN WITNESS WHEREOF,** this Note has been executed and delivered by Maker by its duly authorized officer on the date first set forth above.

**UNITEDLEX CORPORATION**

By: _____

     Name:

     Title:

EXHIBIT 1 to EXHIBIT A

BNP PARIBAS
TRADE FINANCE SERVICES
787 SEVENTH AVENUE
NEW YORK, NY 10019

BENEFICIARY:     LYNN L. TAVENNER, CHAPTER 7 TRUSTEE
                 IN RE LECLAIRRYAN PLLC
                 C/O/ TAVENNER & BERAN, PLC
                 20 N. 8TH STREET
                 RICHMOND, VA 23219
ATTENTION:       LYNN L. TAVENNER, CHAPTER 7 TRUSTEE

APPLICANT:        UNITEDLEX CORPORATION
                 6130 SPRINT PARKWAY, SUITE 300
                 OVERLAND PARK, KS 66211

4

IRREVOCABLE STANDBY LETTER OF CREDIT

STANDBY LETTER OF CREDIT NUMBER:
STANDBY LETTER OF CREDIT AMOUNT:  USD 3,315,000.00
ISSUE DATE: JUNE   , 2022
EXPIRY DATE: JUNE   , 2023
EXPIRY PLACE: AT OUR COUNTERS

WE HEREBY ESTABLISH OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO.
IN YOUR FAVOR AT THE REQUEST OF UNITEDLEX CORPORATION UP TO THE
AGGREGATE AMOUNT OF USD 3,315,000 (THREE MILLION, THREE HUNDRED
FIFTEEN THOUSAND AND 00/100 UNITED STATES DOLLARS) AVAILABLE FOR
SIGHT PAYMENT AT OUR COUNTERS AT BNP PARIBAS, EQUITABLE TOWER, 787
SEVENTH AVENUE, NEW YORK, NY 10019, ATT: TRADE FINANCE SERVICES OF
BNP C/O BNP PARIBAS RCC, INC., NEWPORT TOWER-SUITE 188, 525 WASHINGTON
BOULEVARD, JERSEY CITY, NJ 07310  ATTN: TRADE FINANCE SERVICES BY
PRESENTATION OF A DATED STATEMENT SIGNED BY AN AUTHORIZED
REPRESENTATIVE OF THE BENEFICIARY, READING AS FOLLOWS:

" I, LYNN L. TAVENER, HEREBY CERTIFY THAT I AM THE BENEFICIARY
AUTHORIZED TO EXECUTE THIS STATEMENT. I HAVE RECEIVED [NO] [ $_____]
OF PREPAYMENTS FROM UNITEDLEX CORPORATION AND ACCORDINGLY
DEMAND PAYMENT OF USD [ INSERT AMOUNT] UNDER BNP PARIBAS LETTER OF
CREDIT NO. ISSUED PURSUANT TO THE SECOND PROMISSORY NOTE DATED JUNE
___, 2022 BY UNITEDLEX CORPORATION. "

DRAWINGS MAY BE PRESENTED TO US AT OUR ABOVE OFFICE BY HAND
DELIVERY OR DELIVERED TO US BY U.S. POSTAL SERVICE MAIL, REGISTERED
MAIL OR CERTIFIED MAIL, OR  OVERNIGHT CARRIER. DRAWINGS MAY ALSO BE
PRESENTED TO US BY FACSIMILE TRANSMISSION TO FACSIMILE NUMBER (973)
988 – 4471 (EACH SUCH DRAWING A "FAX DRAWING"). IF YOU PRESENT A FAX
DRAWING YOU DO NOT NEED TO PRESENT THE ORIGINAL OF ANY DRAWING
DOCUMENTS. IN THE EVENT OF A FULL OR FINAL DRAWING, THE ORIGINAL
LETTER OF CREDIT MUST BE RETURNED TO US AT OUR ABOVE OFFICE BY
OVERNIGHT COURIER.

THIS LETTER OF CREDIT EXPIRES AT OUR COUNTERS AT 5:00 PM EASTERN TIME
ON JUNE __, 2023.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT WILL BE
AUTOMATICALLY EXTENDED WITHOUT AMENDMENT TO THE FINAL EXPIRY
DATE OF JUNE ___, 2024, UNLESS WE SEND YOU NOTICE IN WRITING BY
REGISTERED OR CERTIFIED MAIL, OR OVERNIGHT COURIER AT LEAST THIRTY
(30) DAYS PRIOR TO THE CURRENT OR ANY FUTURE EXPIRATION

5

DATE THAT WE ELECT NOT TO EXTEND THIS LETTER OF CREDIT FOR SUCH AN ADDITIONAL PERIOD. UPON RECEIPT OF SUCH NOTICE YOU MAY DRAW HEREUNDER BY PRESENTATION OF A STATEMENT ON YOUR LETTERHEAD SIGNED BY YOU READING AS FOLLOWS:

"I, LYNN L. TAVENNER, CHAPTER 7 TRUSTEE IN THE CASE IN RE LECLAIRRYAN PLLC, HEREBY CERTIFY THAT I AM AUTHORIZED TO EXECUTE THIS STATEMENT AND DEMAND PAYMENT OF USD$ [INSERT AMOUNT] UNDER BNP PARIBAS LETTER OF CREDIT NO. _____ WHICH REPRESENTS FUNDS DUE TO US AS WE HAVE BEEN NOTIFIED THAT BNP PARIBAS HAS ELECTED NOT TO FURTHER EXTEND THIS LETTER OF CREDIT, AND WE HAVE NOT RELEASED UNITEDLEX CORPORATION FROM THEIR OBLIGATIONS TO US AND WE HAVE NOT RECEIVED A REPLACEMENT LETTER OF CREDIT SATISFACTORY TO US."

PARTIAL AND MULTIPLE DRAWINGS(S) MAY BE MADE UNDER THIS LETTER OF CREDIT.

THIS LETTER OF CREDIT IS NOT TRANSFERABLE.

THIS LETTER OF CREDIT IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES 1998, THE INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 590.

WE HEREBY ENGAGE WITH YOU THAT DRAWINGS PRESENTED UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT WILL BE DULY HONORED IF PRESENTED TO US AT THIS OFFICE ON OR BEFORE THE EXPIRY DATE, OR ANY AUTOMATICALLY EXTENDED EXPIRY DATE.

CERTAIN ADMINISTRATIVE SERVICES FOR BNP PARIBAS MAY BE PROVIDED BY BNP PARIBAS RCC, INC., BNP PARIBAS, THROUGH ITS CANADA BRANCH, OR ANY DIRECT OR INDIRECT MAJORITY OWNED SUBSIDIARY OF BNP PARIBAS.

BNP PARIBAS
BY: BNP PARIBAS RCC, INC., AS AUTHORIZED AGENT


_____           _____
AUTHORIZED SIGNATURE              AUTHORIZED SIGNATURE

6

# EXHIBIT B

| Insurer | Type of Policy | Policy No. |
|---|---|---|
| Travelers | Primary D&O | Policy No █████████ |
| Continental | Excess D&O | Policy No ███████ |
| ██████ | | Policy ████████ |
| Columbia | E&O | Policy No. █████████ |
| Starr Surplus Lines Insurance Company | Excess E&O | Policy No. ██████████ |
| ████████████ | ███████ | Policy No. ████████ |
| | | Policy No. ████████ |
| ██████ | █████████ | Policy No ██████████ |

Attachment B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| In re: | |
| LECLAIRRYAN PLLC, | Chapter 7 |
| Debtor. | Case no. 19-34574 (KRH) |
| Lynn L. Tavenner, as Chapter 7 Trustee, | |
| Plaintiff, | Adv. Pros. 20-03142 (KRH) and |
| v. | 21-03095 (KRH) |
| ULX Partners, LLC, UnitedLex Corporation, and ULX Managers, LLC | |
| Defendants. | |
| Lynn L. Tavenner, as Chapter 7 Trustee, | |
| Plaintiff, | |
| v. | |
| CVC Capital Partners, Daniel Reed, Nicholas Hinton, Josh Rosenfeld, P. Douglas Benson | |
| Defendants. | |

Kathryn R. Montgomery, AUST (VSB No. 42380)
Shannon Pecoraro, Esq. (VSB No. 46864)
Jason B. Shorter, Esq. (VSB No. 80929)
Office of the United States Trustee
701 East Broad Street, Suite 4304
Richmond, VA 23219
Telephone: (804) 771-2310
Facsimile: (704) 771-2330

**SUPPLEMENTAL OBJECTION OF THE UNITED STATES TRUSTEE TO
TRUSTEE'S MOTION AND MEMORANDUM OF LAW FOR ENTRY OF AN ORDER
(I) APPROVING (A) JUDICIALLY MEDIATED SETTLEMENT AND (B)
COMPENSATION TO COUNSEL INCLUDING AN IMPROVIDENT PAYMENT
UNDER SECTION 328(A); AND (II) GRANTING RELATED RELIEF**

John P. Fitzgerald, III, Acting United States Trustee for Region Four (the "United States

Trustee"), by and through the undersigned counsel, files this Objection to the Chapter 7 Trustee's

Motion and Memorandum of Law for Entry of an Order (I) Approving (A) Judicially Mediated

Settlement and (B) Compensation to Counsel Including an Improvident Payment Under Section

328(a); and (II) Granting Related Relief (Main Dkt. 1328 and Dkt. 211) (the "9019 Motion"). [1]

The United States Trustee asks that the Court strike the Improvident Payment term from the

Settlement Agreement and 9019 Motion and approve the remainder of the Settlement Agreement

and 9019 Motion and grant such other and further relief as the Court deems appropriate.  In support

hereof, the United States Trustee respectfully states as follows: [2]

## INTRODUCTION

The $21 million dollar settlement appears to be an excellent result, and the United States

Trustee does not object to, or question the Chapter 7 trustee's business judgment as to the amount

of the settlement or the mutual releases contained therein.  But there is one term of the settlement

as currently structured that is inconsistent with the Bankruptcy Code and to which the United States

Trustee does strongly object.  Under the terms of the settlement as presented, up to $10.5 million

dollars—50% of the settlement proceeds—would be paid to the Chapter 7 trustee's counsel, Quinn

---

[1]  "Main Dkt." refers to the docket in the main Bankruptcy Case.  "Dkt." refers to the docket in the United Lex
Adversary Proceeding, while "Reed Dkt." refers to the docket in the Reed Adversary Proceeding (both as defined
herein and, collectively, the "Adversary Proceedings").

[2]  Capitalized terms not defined herein shall have the meaning ascribed to them in the 9019 Motion.

Emanuel ("Quinn"), despite this Court's previous Order approving Quinn's 35% contingency fee for litigation matters.

To date, Quinn has received $5,777,138.00 in fees on its retention in the LeClairRyan bankruptcy case. Foley & Larder, LLP ("Foley"), the predecessor firm where two lawyers for the Chapter 7 Trustee previously practiced, has received $2,102,086.00 in fees representing the Chapter 7 Trustee in the case. Should Quinn be compensated at its Court-approved 35% contingency fee for this settlement, it would be entitled an additional $7.35 million dollars in fees. However, this settlement contains an additional term that would provide Quinn up to an additional $3.15 million dollars over and above the $7.35 million dollar contingency fee—*in a case that settled before trial.*

The justification for the additional payment to Quinn—termed the "Improvident Payment"- is that the ███████████████████████████████████████████████████████████ ████████████████, as incorporated by the Federal Rules of Bankruptcy Procedure. The Chapter 7 Trustee, through counsel, argues in the 9019 Motion that ████████████████ ██████████████████████ could not have anticipated it when it agreed to represent the Chapter 7 Trustee on a 35% contingency fee basis. As a consequence, the Chapter 7 Trustee further argues that Quinn's lawyers had to work longer and harder than they envisioned when they entered into an attorney-client relationship with the Chapter 7 Trustee and thus should receive an additional $3.15 million dollars more in fees from the proceeds of this settlement.

To be clear, the United States Trustee is not asserting that Quinn is not entitled to its 35% contingency fee from this settlement nor does the United States Trustee ████████████ ██████████████████████████████████████. To the contrary, the Chapter 7 Trustee's ███████████████████████████████████████████████████

3



This Court approved Quinn's retention on June 28, 2021, and in that time, Quinn has taken no cases to trial and has received $5,533,500.00 in fees.  Quinn has and continues to reap the rewards of its fee arrangement.  Just because the ULX litigation has taken longer and required more effort than the other matters settled in the LeClairRyan bankruptcy case does not mean that Quinn struck a bad deal with the Chapter 7 Trustee and should receive an additional $3.15 million dollars from the estate.

During the May 25, 2022, sealed portion of the hearing before this Court, there was a discussion regarding whether the Improvident Payment ████████████████████████████

██████████████████████████████████. ██████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

As set forth in more depth below, the United States Trustee objects to the 9019 Motion to the extent that it provides for the Improvident Payment for the following reasons:

- The Settlement May Be Approved Without Awarding the Improvident Payment

- The Improvident Payment Must Analyzed Under the Standards of § 328(a) of the Bankruptcy Code, Not Bankruptcy Rule 9019

- The Chapter 7 Trustee and Quinn Have Not Established that the Improvident Payment Is Warranted Under § 328(a) of the Bankruptcy Code

- Even if the Requirements of § 328(a) Were Met, There is Insufficient Evidence as to the Appropriate Amount of the Improvident Payment

- ███████████████████████████████████

- The Improvident Payment Provision of the Settlement Agreement Is Outside the Scope of the FAO Procedures

## JURISDICTION

1.      This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§157 and 1334, and the delegation made by the United States District Court by Order dated August 15, 1984.

2.      The United States Trustee files this Objection in furtherance of his duties and responsibilities pursuant to 28 U.S.C. §586 and 11 U.S.C. § 307.

## FACTUAL BACKGROUND

3.      On September 3, 2019 (the "Petition Date"), the Debtor filed for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as thereafter amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court").

4.      On October 4, 2019, the Debtor's Chapter 11 case was converted to a case under Chapter 7 of the Bankruptcy Code.  (Main Dkt. 140).  Lynn L. Tavenner was appointed Chapter 7 Trustee (the "Chapter 7 Trustee").

*Special Counsel Retention Applications and Fees Awarded to Date*

5.      On October 4, 2019, this Court entered an Order approving the retention of Tavenner & Beran PLC to represent the Chapter 7 Trustee on an hourly basis. (Main Dkt. 142 (retention application), 152 (order)).

6.      On February 10, 2020, the Court entered an Order approving the retention of the law firm of Foley as special counsel, pursuant to § 327(e) of the Bankruptcy Code, to represent the Chapter 7 Trustee in litigation matters. The Court ordered that Foley be compensated on an hourly basis for legal services performed during the "Investigative Phase," and that, pursuant to § 328(a), Foley be compensated on a 30% contingency fee basis for legal services performed during the "Litigation Phase." (Main Dkt. 300 (retention application), 342 (order)).

7.      Subsequently, on May 18, 2021, the primary Foley lawyers handling the representation of the Chapter 7 Trustee, Erika L. Morabito and Brittany Nelson, moved their practice to the law firm of Quinn.

8.      On June 7, 2021, the Chapter 7 Trustee filed an application to retain Quinn as her special counsel to replace Foley to investigate and pursue various causes of action. (Main Dkt. 908 (retention application), 937 (order)). [3] More specifically, the Chapter 7 Trustee was seeking to retain Quinn on a contingency fee basis on certain matters (the "Contingency Matters"):[4]

---

[3] As to the prior representation by Foley, the Quinn retention application noted that "Quinn Emanuel and Foley understand the necessity to, and have agreed to, coordinate with each other to transition the designated matters to Quinn Emanuel. Said transition shall result in no additional cost to the Estate." Main Dkt. 908 at ¶17. Moreover, the two firms acknowledged that to the extent that Foley was entitled to any renumeration for services rendered in connection with Contingency Matters, the compensation to be awarded (together with the fees provided Foley) would not exceed the 35% contingency fee. Main Dkt. 908 at ¶20.

[4] The Contingency Matters include the following:
    a. Investigation of the Estate's claims and causes of action (collectively the "Claims" and each a "Claim") against certain individuals, entities, and/or former attorneys of the Debtor and/or those

9.      The Chapter 7 Trustee also sought to retain Quinn on an hourly basis in connection with other related matters that may have required legal services, "including but not limited to, proceedings to enforce a judgment including with respect to liens, probate proceedings, disputes with the Debtor's insurance company regarding coverage, and/or preparation for, and attendance at, omnibus hearings before the Bankruptcy Court if said attendance is not solely related to pursuit of one or more claims" (the "Non-Contingency Matters").  Main Dkt. 908 at ¶ 15.[5]

10.     As to Contingency Matters, the retention application contemplated a contingency fee of 35% – 5% higher than what the Chapter 7 Trustee had previously agreed to with Foley (the "Contingency Fee").  Main Dkt. 908 at ¶ 19.  The Contingency Fee was to be calculated based on:

> any recovery of funds actually received by the Estate with respect to a particular Claim, whether such recovery of funds actually received by the Estate is by way of settlement, judgment, compromise or otherwise (including from proceeds of insurance) after deduction of the amount of costs and expenses (other than the Trustee's own fee and any fees charged by the Trustee's law firm and/or any other professional employed by the Trustee except as otherwise provided in the Engagement Letter) paid by the Trustee (or by Quinn Emanuel on behalf of the Trustee, to the extent Quinn Emanuel agrees to do so as a convenience) in connection with such Claim.

*Id.*

---

acting in concern with them, including but not limited to ULX Partners, LLC and UnitedLex Corporation, and possibly others;
b.   Determining responsible parties;
c.   Preparing, filing, and/or prosecuting one or more lawsuits;
d.   Settlement procedures and negotiations;
e.   Prosecution of claim(s) until settlement, award, or judgment is obtained; and
f.   If judgment is obtained in the Trustee's favor, opposing an opposing party's motion for new trial (if any);
g.   Negotiations regarding possible settlement with any Defendant.

Main Dkt. 908 at ¶ 14.

[5] The Engagement Letter attached to the Quinn retention application further provided:
This Agreement does not cover other related matters that may arise and may require legal services (for example, disputes with the Debtor's insurance company regarding coverage or preparation for, and attendance at, omnibus hearings before the Bankruptcy Court if said is attendance is not solely related to pursuit of one of more Claims).

11.     The Quinn retention application further emphasized that "[f]or Contingency

Matters, **in no event** will the total amount paid by the Estate to any and all special counsel exceed

the Fee for each such matter." Main Dkt. 908 at ¶ 20.

12.     For Non-Contingency Matters, Quinn would charge its standard hourly rates,

subject to a 10% discount. *Id.* The Engagement Letter attached to the Quinn retention application

listed the 2021 hourly billing rates for the engagement to range between $1660.50 (for senior

partners) to $441.00 (for first-year law clerks), taking into account the 10% discount. Main Dkt.

908, Exhibit 1, Section (d).

13.     On June 28, 2021, the Court entered the Order authorizing the retention and

employment of Quinn in the various litigation matters pursuant to §§ 327(a), 327(e), and 328(a)

of the Bankruptcy Code.  Main Dkt. 937.  As set forth in the retention application, the retention

order approved the dual fee structure described above whereby Quinn would bill the estate (a) on

a 35% contingency fee basis for the Contingency Matters and (b) on an hourly basis for the Non-

Contingency Matters.

14.     As for the hourly rates awarded for the Non-Contingency Matters, the Order

expressly provided that "Quinn Emanuel and the Trustee shall mutually agree **in writing** before

any services are provided for Non-Contingency Matters." *Id.* at ¶ 4 (emphasis added).  Moreover,

the order emphasized that "[a]pproval of Quinn Emmanuel's fees shall be subject to further order

of the Court." *Id.* at ¶ 6.

15.     Between 2020 and 2021, Foley filed a total of four interim fee application seeking

both hourly and contingency fees, and was awarded a total of $2,203,634.00 (including expenses),

as set forth below:

| Date | Main Dkt. No. | Hourly/Investigative | Contingency | Expenses |
|---|---|---|---|---|
| 6/24/21 | 931 | 146,957.00 | 960,429.00 | 34,577.00 |
| 2/10/21 | 779 | 163,266.00 | 75,254.00 | 30,528.00 |
| 10/16/20 | 657 | 433,213.00 | 41,040.00 | 26,658.00 |
| 8/5/20 | 587 | 271,222.00 | 10,705.00 | 9,785.00 |
| Total | | 1,014,658.00 | 1,087,428.00 | 101,548.00 |

16.     Between 2021 and 2022, Quinn also filed three interim fee applications seeking

both hourly and contingency fees, and was awarded a total of $5,932,521.00 (including

expenses), as set forth below:

| Date | | Hourly/Investigative | Contingency | Expenses |
|---|---|---|---|---|
| 4/12/22 | 1282[6] | 66,354.00 | 200,550.00 | 98,341.00 |
| 12/22/21 | 1168 | 93,541.00 | 4,527,600.00 | 29,096.00 |
| 10/13/21 | 1075 | 83,743.00 | 805,350.00 | 27,946.00 |
| Total | | 243,638.00 | 5,533,500.00 | 155,383,.00 |

17.     On March 15, 2022, Quinn filed a Supplement to its third interim fee application

seeking additional fees (the "Supplemental Third Interim Fee Application").   Main Dkt. 1249.

More specifically, in addition to the fees and costs sought in its third interim fee application, Quinn

sought an additional $24,150.17 in hourly fees and $6,942.27 in costs arising from the Mediation

(as defined herein) and pleadings that the Chapter 7 Trustee intended to file with the Court related

to the Mediation.  As set forth in more detail in the Supplemental Third Interim Fee Application:

> The Additional Fees and Additional Costs were incurred in connection with a
> mediation held on March 5 and March 6, and pleadings that the Trustee prepared

---

[6] A fee application (Main Dkt. 1245) and a supplemental fee request (Main Dkt. 1249) were filed. The fee app
sought $48,063.00 in fees.  The supplemental fee application sought $24,150.00 in fees, for a total of $72,213.00.
Following discussion with the United States Trustee, Quinn reduced the amount sought by $5,859.00.  The total
approved by this Court was $66,354.00.

and intended on filing with this Court on Friday, March 11, 2022. These pleadings were also related to this Court's March 7, 8, and 10 orders [Dkt. Nos 177. 178, and 183] in [this Adversary Proceeding] . . . . Prior to filing the pleadings referenced herein (which included a motion, exhibits, and several declarations related thereto), and pursuant to Bankruptcy Rule 7037 and Local Rule 26, the parties held a meet and confer on the afternoon of March 11, 2022 (the "Meet and Confer"). As part of the Meet and Confer, counsel for the Trustee explained the contents of her motion and the relief being requested therein. Shortly after the Meet and Confer, the parties were able to reach a resolution regarding the relief sought in the motion, thereby eliminating the Trustees need to file said motion. The Additional Fees and Additional Costs being sought . . . will be reimbursed to the Estate by Greenberg Traurig and/or United Lex Corporation.

*Id.* at ¶ 4.

18.     Notably, in the Supplemental Third Interim Fee Application, Quinn notes that while the firm had incurred $69,416.30 of fees that it could seek as additional hourly fees, it was only seeking $24,150.17 on an hourly basis in conjunction with the supplement, while reserving the right "to seek the remainder of these fees from the Estate in future fee applications as Contingent Fees sought" in connection with the UnitedLex Adversary Proceeding (as defined herein).[7]

19.     No objections were filed to the Supplemental Third Interim Fee Application, and on April 12, 2022, the Court entered an Order approving Quinn's third interim fee application approving Quinn's fees and expenses, including the supplemental fees requested. Main Dkt. 1282.

**FAO Procedures**

20.     On May 14, 2020, the Chapter 7 Trustee filed a *Motion for an Order Establishing Procedures Regarding the Prosecution of Actions Involving Former Attorneys and Certain Others and Memorandum in Support Thereof* (the "FAO Procedures Motion") (Main Dkt. 457). The FAO Procedures Motion was approved by Order of this Court (Main Dkt. 533), as

---

[7] For purposes of full disclosure, the Supplemental Third Interim Fee Application did note, however, that "nothing herein shall prevent the Trustee from seeking additional fees and costs on behalf of the Estate for additional matters not raised in the Meet and Confer."

amended/supplemented by additional Orders of this Court (Main Dkt. 929 and 982) (collectively, the "FAO Order").

21.     The FAO Order established procedures for matters involving, among others, former attorneys of the Debtor, persons receiving transfers for the benefit of former attorneys, ULX Partners, UnitedLex Corporation, and various insurance companies.  Main Dkt. 457 at ¶ 9.

22.     Among other things, the FAO Order established a mediation process for all matters covered by the FAO Order.  Main Dkt. 533.

### *Adversary Proceedings and Mediation Process*

23.     On October 26, 2020, the Chapter 7 Trustee filed the current adversary proceeding against ULX Partners, LLC and UnitedLex Corporation (as amended, the "UnitedLex Adversary Proceeding").  ULX Partners, LLC, UnitedLex Corporation and ULX Manager, LLC, shall be referred to collectively as the "ULX Defendants."

24.     On September 2, 2021, the Chapter 7 Trustee filed a separate adversary proceeding (No. 21-03095-KRH) (the "Reed Adversary Proceeding") against CVC Capital Partners as well as UnitedLex Corporation's Chief Executive Officers, Daniel Reed, its Chief Financial Officer, Nicholas Hinton, as well as Josh Rosenfeld and P. Douglas Benton (collectively the "Reed Defendants").  The ULX Defendants and the Reed Defendants shall be referred to collectively as the "Defendants." The UnitedLex Adversary Proceeding and Reed Adversary Proceeding shall be referred to collectively as the "Adversary Proceedings."

25.     After the Court granted a motion to amend the complaint in the UnitedLexAdversary Proceeding, a two-week trial in that adversary proceeding was scheduled to begin on April 14, 2022.  Dkt. 144.

26.    On January 28, 2022, the ULX Defendants filed a Motion for Summary Judgment (Dkt. 133) (the "Motion for Summary Judgment") and associated documents, seeking to dismiss certain claims.  The Chapter 7 Trustee opposed the Motion for Summary Judgment.  Dkt. 152.

27.    On February 4, 2022, at the joint request of the Chapter 7 Trustee and the ULX Defendants, the Court entered an Order in the United Lex Adversary Proceeding (the "Mediation Order") appointing the Honorable Frank J. Santoro, the Chief Judge of the United States Bankruptcy Court for the Eastern District of Virginia, as the judicial mediator (the "Mediator"), to conduct a mediation (the "Mediation") among the Chapter 7 Trustee, the ULX Defendants, Mr. Reed and Mr. Hinton in their individual capacities, and insurance carriers for the Defendants.  Dkt. 142.

28.    The Mediation Order expressly provided that "[a]ny resolution that is reached will be subject to Court approval after notice and opportunity for hearing in accordance with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules."  Dkt. 142 at ¶8.

29.    On February 11, 2022, the Chapter 7 Trustee filed a Motion for Leave to Amend the First Amended Complaint (Dkt. 147) (the "Second Motion to Amend") and to place the associated documents under seal.  The Second Motion to Amend sought to add an additional count against United Lex Corporation and ULX Manager LLC.  The ULX Defendants opposed the Motion to Amend (Dkt. 168). The Second Motion to Amend was held in abeyance pending the Mediation and the now pending 9019 Motion.

30.    Between March 5 and April 13, 2022, the parties engaged in the Mediation in an effort to resolve the Adversary Proceedings.

31.    On March 8, 2022, the Mediator entered the "Order Directing Defendants to Produce Insurance-Related Information" (Dkt. 177) (the "March 8 Insurance Order") and the

"Order Directing the Exchange of Information Between the Defendants, Nicholas Hinton, Daniel

Reed, the Insurance Companies and the Chapter 7 Trustee" (Dkt. 178).

32.    On March 9, 2022, the Bankruptcy Court entered an order that the trial in this matter

be continued until May 17, 2022, and also continued other pending motions in the case. Dkt. 184.

33.    On March 18, 2022, the ULX Defendants and Reed and Hinton produced

approximately 5,000 pages of documents pursuant to the March 8 Insurance Order.  Dkt. 211 at ¶

30.  Following various conferences, additional documents were produced on March 24 and March

28, 2022 (the "Supplemental Production").  *Id.* at ¶ 31.

34.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

### *Settlement Agreement*

35.    On April 13, 2022, after continued negotiations and sharing of information, a global

and comprehensive proposal was made by the Mediator to resolve all of the pending claims in the

Adversary Proceedings.  *Id.* at ¶ 35.

36.    The hearing on the Second Motion to Amend was scheduled for April 19, 2022;

however, right before the scheduled hearing, the parties involved in the Adversary Proceedings

agreed to the Mediator's proposal (the "Settlement Agreement").  *Id.* at ¶ 36.

37.    At the April 19, 2022, hearing before this Court, the parties announced that a

collective Settlement Agreement had been reached in the Adversary Proceedings; and the material

terms of the Settlement Agreement were set forth on the record with the participation of counsel

for the Chapter 7 Trustee and counsel for the Defendants, including special insurance counsel for ULX Partners.

38.    On May 11, 2022, the ULX Defendants filed a Motion to Seal. (Main Dkt. 1325 and Dkt. 207), seeking to file under seal the Settlement Agreement, the 9019 Motion, the transcript of the April 19, 2022, hearing, and various other documents related to the Adversary Proceedings (the "Motion to Seal").  The Motion to Seal further sought that the hearing concerning the Motion to Seal and the 9019 Motion be held *in camera*.

39.    The United States Trustee filed an objection to the Motion to Seal.  Dkt. 215.  A hearing on the Motion to Seal was held on May 25, 2022.  The Court granted the Motion to Seal on an interim basis, with final decision deferred until June 8, 2022, to be heard on the same date as the 9019 Motion.

40.    On May 18, 2022, the Chapter 7 Trustee filed the 9019 Motion. (Dkt. 211).

41.    The 9019 Motion seeks the entry of an order (a) approving the Settlement Agreement; (b) authorizing the effectiveness of the Settlement Agreement on behalf of the Estate; (c) approving the Contingency Fee payment to Quinn; and (d) approving the Improvident Payment to Quinn.  *Id.* at ¶ 2.

42.    The key terms of the Settlement Agreement, as summarized in the 9019 Motion, are as follows: (a) Continental Casualty Company (a CNA entity) shall pay the estate  the sum of $5,000,000.00; (b) Columbia Casualty Company (also a CNA entity) shall pay the estate  the sum of $7,250,000.00; (c) Travelers Casualty and Surety Company of America shall pay the estate the sum of $500,000.00; (d) the ULX Defendants, CVC, Mr. Reed, Mr. Hinton and other defendants named in the Adversary Proceedings shall pay  the estate  the sum of $8,250,000.00, which sum would be paid in three separate installments; (f) various consensual releases amongst parties to the

15

Settlement Agreement; and (g) ULX Partners, LLC agreed to waive the ULX Partners' Proofs of Claim. *Id.* at ¶ 37.

43.    Notably, the Settlement Agreement also seeks approval of a payment to Quinn of its Contingency Fee of 35% of the total amount of the payments that the estate is to receive -- $21,000,000.00 (the "Total Settlement Payment"). *Id*. In addition, the 9019 Motion seeks authority for the Chapter 7 Trustee to pay Quinn the Improvident Payment in an amount not to exceed $3,150,000.00 based on the assertion that "the terms of the Quinn Retention Order have proven to be improvident in view of circumstances in this matter." *Id*.

## **LEGAL ARGUMENT**

## I.    **The Settlement May Be Approved Without Awarding the Improvident Payment**

The United States Trustee does not object to the Chapter 7 Trustee settling the Adversary Proceedings which have spanned almost over a two-year period and have been extremely contentious and agrees that the Total Settlement Payment of $21 million is an overall good result for the estate. The United States Trustee also does not contest the payment of the 35% Contingency Fee to be paid to Quinn, as previously approved by the Court under § 328(a) upon the firm's retention. The United States Trustee does contest, however, that under the terms of the Settlement Agreement, Quinn stands to receive 50% of the Total Settlement Payment – a 15% increase of its agreed-upon Contingency Fee.

Disallowing the Improvident Payment would not be fatal to this settlement. Under the express terms of the 9019 Motion, the settlement can be approved even if this Court does not approve the Improvident Payment:

> Further, just like in TRU, the Bankruptcy Court here may exercise its own gatekeeper role of determining whether the Improvident Payment is warranted and reasonable. Thus, pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019, the Bankruptcy Court should approve the Settlement Agreement,

16

regardless of whether the Improvident Payment separately qualifies as a payment under section 328(a) of the Bankruptcy Code.

(9019 Motion, Para. 63.)

As the 9019 Motion specifically provides that approval of the Improvident Payment is not necessary for approval of the Settlement Agreement, for the reasons set forth below, this Court should disallow the Improvident Payment and approve the Total Settlement Payment to the estate and compensate Quinn according to the terms upon which this Court previously approved its employment.

## II.    The Improvident Payment Must Analyzed Under the Standards of § 328(a) of the Bankruptcy Code, Not Bankruptcy Rule 9019

The United States Trustee does not dispute the Rule 9019 standard that applies to the approval of settlement agreements as articulated by the Chapter 7 Trustee. In evaluating whether to approve a settlement under Bankruptcy Rule 9019, the Court should consider: (1) the probability of success in the litigation; (2) the complexity expense and likely duration of the litigation; (3) all other factors relevant to making a full and fair assessment of the wisdom of the proposed compromise, including potential difficulties in collection, if any; and (4) whether the proposed compromise is fair and equitable to the debtor, its creditors, and other parties in interest. *Fotner v. Hotel Street Capital, LLC,* 2021 WL 1022585, *3 (E.D. Va. Feb. 5, 2021) (c*iting In re Austin*, 186 B.R. 397, 400) (Bankr. E.D. Va. 1995)). *See also* 9019 Motion at ¶ 42.

The Improvident Payment, however, must be analyzed under the more stringent standard articulated in Bankruptcy Code § 328(a). Bankruptcy Rules, such as Rule 9019, shall not abridge, enlarge, or modify any substantive right. 28 U.S.C. § 2075. Moreover, the "general language of a [Bankruptcy Code] statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." *RadLAX Gateway*

*Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (holding that general authorizations in the Bankruptcy Code cannot be used to avoid specific statutory provisions). This rule "is particularly true where … Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id.* (internal quotation and citation omitted); *see also In re Keren Ltd. P'ship*, 189 F.3d 86 (2d Cir. 1999). The strict requirements imposed by § 328(a) must be the standard upon which the Improvident Payment is reviewed – not the factors used to review Rule 9019 settlements. The plain meaning of the Bankruptcy Code's text is clear and determinative. Where Congress has enacted § 328(a) to govern administrative expense paid to professionals from the bankruptcy estate, the broader "fair and equitable" standard governing Rule 9019 settlements should not apply. *See In re Lehman Bros. Holdings, Inc.*, 508 B.R. 283, 289 (S.D.N.Y. 2014). For the reasons set forth in greater detail below, neither the Chapter 7 Trustee nor Quinn has met the requirements of § 328(a); accordingly, the Improvident Payment should not be awarded.

Even if the Court were to review the Improvident Payment under the Bankruptcy Rule 9019 standard – which it should not – the Court should deny that any additional fee be paid to Quinn. In the case of *In re Hale-Halsell Co.*, the court denied a settlement agreement with respect to a request for a fee enhancement under the standard of Rule 9019. *In re Hale-Halsell Co.*, 391 B.R 459 (Bankr. N.D. Okla. 2008). In that case, Hale Halsell Company filed a Chapter 11 proceeding. A committee of unsecured creditors was appointed, and it employed two law firms. At the end of the case, one of the committee's law firms filed a final fee application seeking a blended hourly rate of $325.00 per hour, rather than the $275.00 hourly rate that it had agreed to in the original retention application. The firm argued that the request for the fee enhancement was warranted because (a) the bankruptcy case was more complex than originally anticipated and (b)

while it was originally determined that most of the work could be performed by more junior attorneys, it was later determined that the services to be performed required attorneys at a more senior level.   Ultimately, a settlement was reached whereby parties agreed to an enhancement fee of $25,000.00, rather than the $52,320.00 originally sought; and the firm sought court approval of the proposed compromise.

Despite there being no objections to the settlement, the court in *Hale-Halsell Co.* considered the standards for approval of a compromise generally applicable to motions seeking the approval of settlements pursuant to Bankruptcy Rule 9019.   In considering the "likelihood of success on the merits," the court noted that the complexity of the case, the claim that the firm expected the case to be handled by less experienced and less expensive attorneys, and the substantial return to unsecured creditors were foreseeable at the time; accordingly, the likelihood of the firm prevailing on the "improvident" standard of § 328(a) was not likely.   *Id.* at 467.   As to the "whether the settlement promotes the integrity of the judicial system," the court noted:

> This Court is troubled by the prospect of a system that allows the compensation arrangements to be changed after the fact, absent the most exception of circumstances.  Bankruptcy is designed to be a transparent process, where creditors and the public can easily view and understand what is going on in any particular case.  Fee arrangements between professionals and a bankruptcy estate are to be equally transparent.  This transparency is clouded, if not made completely opaque, if fee arrangements can be routinely adjusted after the fact.  The Committee and the Court had the right to rely upon [the firm's] representation that its blended rate would not exceed $275 per hour, and the public had the right to rely upon the Court's retention order to that effect.  Modifying that order on the facts of this case would not promote the integrity of the bankruptcy system.

*Id.* at 469.   Finally, as to the "interests of the creditors" factor, the court stated that the interests of creditors in bankruptcy center upon maximum recovery; accordingly, if the fee enhancement was not paid, there would be more money paid to creditors.   *Id.*   Moreover, the court noted that the creditors had a right to rely upon the representation made by the firm as it sought employment in

the case, just as they had the right to rely upon the order of the court that approved the firm's

retention.

Ultimately, in denying the motion seeking the approval of the compromise on the fee

enhancement, the court concluded:

> This Court is well aware of and agrees with the principle that compromises are to
> be favored in bankruptcy cases.  However, the principle is not without its
> exceptions.  The compromise presently before the Court fails to meet the standards
> contained in §328(a).  It runs contrary to the representations made by [the firm] in
> its employment application and the order of the Court that authorized said
> employment.  As such, it should not be approved.

*Id.* at 470.  Similarly, here, even if the Court were to review the Settlement Agreement – and in

particular the Improvident Payment – under the standards for approval of a settlement pursuant to

Rule 9019, the factors weigh against its approval.

## III.    The Chapter 7 Trustee and Quinn Have Not Established that the Improvident Payment Is Warranted Under § 328(a) of the Bankruptcy Code

The 9019 Motion characterizes the Improvident Payment as "being directed by the

Mediator and being a material and integral part of the Settlement." The 9019 Motion further argues

that Quinn is entitled to the Improvident Payment pursuant to § 328(a).  While making broad

arguments about Quinn having to spend a substantial amount of time that it could not have

anticipated to deal with ███████████████ and the unanticipated developments resulting

therefrom, the justifications provided for the Improvident Payment, an increase of the Contingency

Fee by over 15%, falls short of meeting the high hurdles of § 328(a).

Section 328(a) provides that "the court may allow compensation different from the

compensation provided under such terms and conditions after the conclusion of such employment,

[only] if such terms and conditions prove to have been improvident in light of developments not

capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. §

328(a).  Section 328(a) operates to limit risk against being paid less than agreed when in hindsight the amount appears excessive.  However, it also applies with equal force to limit the risk that professionals will seek to be paid more than they agreed to accept when they obtain a better result than anticipated.  *See* 3 Collier On Bankruptcy 328.03[4][b], at 328-30 (2020) ("Section 328(a) thus operates as a two-way ratchet: it may preclude reduction of compensation that in hindsight appears excessive, but it also may preclude an increase of compensation that in hindsight appears inadequate. Section 328(a) ultimately provides a device whereby a debtor and its professionals may allocate risk and reward on an *ex ante* basis and generally have that allocation respected *ex post*.").

"[I]f the terms of their compensation are approved as part of their retention under § 328(a), professionals largely lock in how they will be paid, with no later second-guessing as to reasonableness unless such terms prove to have been improvident in the light of developments not capable of being anticipated when they were fixed by the retention order." *In re Frontier Commc'ns Corp.*, 623 B.R. 358, 362 (Bankr. S.D.N.Y. 2020). Varying compensation after approval under § 328(a) presents a "high hurdle" as the standard requires "show[ing] not merely that a compensation adjustment is appropriate considering subsequent developments that were previously unforeseen or unanticipated by the parties; instead, the movant is tasked with the weightier burden of proving that the subsequent developments were **incapable of being anticipated** at the time the engagement was approved." *In re ASARCO, L.L.C. (ASARCO)*, 702 F.3d 250, 258 (5th Cir. 2012) (emphasis added); *but see In re Janata*, 395 B.R. 496, 498 (Bankr. S.D. Fla. 2008) (holding that considering the remarkable results achieved by counsel in this "highly bizarre" case, where the estate ultimately realized sufficient funds to pay all general unsecured creditors, as well as a residue capable of satisfying in part the claims of various subordinated

21

creditors, a fee enhancement of $30,000 was warranted).  There is no mention in the 9019 Motion of potential payout to general unsecured creditors.

The burden of proof to establish any new compensation terms rests with the applicant.  In *ASARCO*, the Fifth Circuit rejected the investment banker's "proffered excuse that it had no way – and, therefore, could not have anticipated – the full extent of ASARCO's internal disarray . . ." *ASARCO*, 702 F.3d at 265.  In a complex case, a professional is generally capable of anticipating that "plans for a quick pit-stop reorganization" could be slowed by such factors of which it is aware, as well as "other foreseeable problems—such as inadequate leadership, management, internal controls, and reporting systems—that it had not yet discovered.  *Id.* at 264; *In re Smart World Technologies, LLC*, 552 F.3d 228, 235 (2d Cir. 2009) ("[T]he prospect of prolonged litigation always exists, and was clearly anticipated by the parties, who made [the attorneys'] contingent fee a function of the length of the litigation.").

To show entitlement to an enhancement, an applicant must produce "specific evidence" that an award based on its approved rates does not fairly compensate the applicant for the work done.  *In re Manoa Fin. Co.,* 853 F.2d 687, 688 (9th Cir. 1988); *In re Brous,* 370 B.R. 563, 570 (Bankr. S.D.N.Y. 2007) (quotation omitted) ("'The party advocating such a departure bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee.'").  As one court has stated:

> The requirement of "improvidence in light of developments not capable of being anticipated at the time" makes it difficult, as a practical matter, for a court to vary the compensation even when it thinks that it was improvident at the outset.  Whether development were capable of being anticipated is fertile ground for debate in virtually every case.

*In re Yablon*, 136 B.R. 88, 92 (Bankr. S.D.N.Y. 1992).

In the 9019 Motion, the Chapter 7 Trustee states that it is not until after the Mediation

commenced – ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████.  As a result of this, the Chapter 7 Trustee argues that "the

unanticipated circumstances ██████████████████████████████████████

████████████████████████████████████████████████████████████,

as well as the unanticipated developments resulting therefrom, were not capable of anticipating by

either the Trustee or Quinn Emanuel." *Id.* at ¶ 58.  What the Chapter 7 Trustee and Quinn appear

to argue is ████████████████████████████████████████  required

Quinn to spend more time than it could have anticipated and that the Adversary Proceedings could

have been settled much earlier ████████████████████████████.  *Id.* at ¶ 59.  That,

however, simply does not rise to the "improvident" standard of not capable of being anticipated.

     As set forth above, and with some limited exceptions for matters falling under hourly

compensation, Quinn was retained to represent the Chapter 7 Trustee in various matters, including

the Adversary Proceedings, on a 35% contingency basis.  Notably, the 35% Contingency Fee was

a flat percentage that would apply regardless of whether the Adversary Proceedings had settled

immediately after the Rule 26 initial disclosures were made or whether the case proceeded to a full

and prolonged trial.  Accordingly, the Chapter 7 Trustee and Quinn's assertions that an

unanticipated amount of time was spent dealing with the case as a result of ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████



██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████ – Quinn would be paid an additional 15% over and above the previously

ordered Contingency Fee agreement – for a total of 50% of the Total Settlement Payment – for its

work. Quinn should not be entitled to such a windfall under the terms of the Settlement Agreement

as nothing in the Bankruptcy Code would allow such fee enhancement. If the Adversary

Proceedings had been settled for the same Total Settlement Payment within months of their

commencement, Quinn would have earned the Contingency Fee of 35%; and an argument that

Quinn's fee should be reduced because otherwise Quinn would receive a windfall would have had

no merit because settlement is always a possibility even in the early weeks of a case. Alternatively,

if the parties had engaged in lengthy discovery disputes (albeit with no party failing to disclose

relevant information), lengthy and contested litigation pre-trial motions, unsuccessful mediation,

and ultimately fully litigating the Adversary Proceedings to trial, with post-trial motions, all

resulting in the same Total Settlement Payment after prolonged and extensive litigation, under the

pre-approved retention agreement, Quinn would receive the same Contingency Fee of 35%. Any

argument for a fee enhancement would fail. Employment and a pre-approved compensation

structure pursuant to § 328 provides fee certainty on both sides of the coin for the benefit of

professionals as well as other parties in interest.

Adversary proceedings can get litigious; and some are more contested and prolonged than

others. That is simply the nature of litigation; and discovery disputes are common in many

adversaries. Said differently, the reasons that the 9019 Motion offers as to why Quinn is entitled

to a significant increase in their fees could have been anticipated, the parties should not "Monday

morning quarter back" the previously approved fee agreement to the detriment of the estate, and

the Improvident Payment is not and should not be an integral part of the Settlement Agreement.

The 9019 Motion cites to some cases that are distinguishable.   In the case of *In re Home Exp., Inc.*, 213 B.R. 162 (Bankr. N.D. Cal. 1997), the court adjusted the fees previously agreed upon pursuant to § 328(a).  In adjusting the professionals' fees, the court rejected arguments that the fees were improvident in light of the fact that (a) the debtor's reorganization took longer than originally anticipated and (b) the difficulties with reclamation claimants and other trade creditors proved more nettlesome to resolve than could have reasonable been expected.  *Id.* at 167.  The court held that "the only real surprise that might justify a fee adjustment for the professionals under § 328(a) centers on a pervasive managerial vacuum."  *Id.* ("The managerial vacuum not only left the professionals stranded in this case with no leadership or direction, but also required them to attempt to fill the void."). In *In re Western Monetary Consultants, Inc.*, 143 B.R. 780 (Bankr. D. Colo. 1992), an accountant sought fees of $18,651.75, notwithstanding a cap on fees in the order granting its retention application. The bankruptcy court had adjusted the debtor's accountant's fees upward because the accounting firm had to reconstruct manually many files that had been lost when the debtor's computer was removed. The accountant requested additional fees; and the bankruptcy court's approval of such fees was appealed by the debtor.  The accounting firm filed a motion for sanctions under Rule 11 and 28 U.S.C. § 1927 alleging that the appeal was filed to frustrate the firm's collection efforts. The district court affirmed the lower court, finding that the bankruptcy court's approval of the accountant's increased fees under the § 328(a) "improvident" standard was not clearly erroneous and awarded additional sanctions under Rule 11. ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████. Furthermore, the additional fees sought in these cases were very modest

compared to the Improvident Payment sought in this case.

The 9019 Motion also draws the Court's attention to the settlement reached in the *Toys R Us* case which provided for, among other things, a substantial contribution payment to counsel of an ad hoc group of creditors (notably, the same counsel who is representing the Chapter 7 Trustee in this case). In that case, as the Rule 9019 Motion points out, Judge Phillips overruled the United States Trustee's objection and found that the substantial contribution payment of $2 million dollars was an integral and material part of the settlement agreement and should thus be approved pursuant to §§ 105, 363, and Rule 9019. *See* TRU August 7, 2018 Transcript at p. 221. Alternatively, the Court found that based on the motions, the declarations, the pleadings filed as well as the arguments and all evidence submitted in court, the vendor fee payment met the standards of § 503(b)(3)(D) and (4), "due to the substantial and concrete contributions that the ad hoc vendor group and vendor committee members have made towards reaching a settlement that is beneficial to the debtor's estates and their creditors."

As set forth in his objection to the settlement in *Toys R Us*, the United States Trustee objected to, among other things, the substantial contribution payment and argued, in pertinent part, that "sections 330(a) and 503(b) contain none of the evidence-avoidance privileges or presumption of Bankruptcy Rule 9019(a)." *Toys R Us, Inc. et al*, No. 17034665 (Dkt. 3979). His position remains unchanged today – Rule 9019 is not and cannot be a run-around for more specific sections of the Bankruptcy Code. Accordingly, the United States Trustee respectfully disagrees with Judge Phillips's decision that the substantial contribution payment could be approved under §§ 105, 363 and Rule 9019 and further would argue that that order is not binding on this Court. Second, as the Chapter 7 Trustee herself recognizes in footnote 9 of the 9019 Motion, the standard that applies to a substantial contribution is governed by § 503 – not under § 328(a). Accordingly, the proposed

comparison is tantamount to the proverbial "comparing apples to oranges." Thus, reliance on the

Toys R Us settlement does not provide strong support for the Chapter 7 Trustee's position.

## IV.    Even if the Requirements of § 328(a) Were Met, There is Insufficient Evidence as to the Appropriate Amount of the Improvident Payment

Should this Court find that Quinn's 35% Contingency Fee is improvident in light of

developments not capable of being anticipated—a finding with which the United States Trustee

strongly disagrees—the Court must then determine the amount of the Improvident Payment to be

paid to Quinn over and above its 35% Contingency Fee on the appropriate settlement figure.

### A.    The Improvident Payment Improperly Provides for Fees-on-Fees

The Improvident Payment as structured pursuant to the terms of the Settlement Agreement

and 9019 Motion provides Quinn with an improper windfall. The Total Settlement Payment to the

estate is $21 million dollars. From that amount, based on its retention application, Quinn would

be entitled to receive the Contingency Fee calculated as "any recovery of funds actually received

by the Estate with respect to a particular Claim . . . after deduction of the amount of costs and

expenses (other than the Trustee's own fee and any fees charged by the Trustee's law firm and/or

any other professional employed by the Trustee except as otherwise provided in the Engagement

Letter)". *See supra* at ¶ 19.

As proposed in the 9019 Motion, without providing for a deduction of any "costs and

expenses," Quinn would earn a Contingency Fee of $7.35 million dollars, which is 35% of the

Total Settlement Payment, without subtracting any amount first for payment of the Improvident

Payment. In essence, what is proposed is to pay fees-on-fees. Quinn should not receive a 35%

Contingency Fee on the Improvident Payment. At a minimum, the amount to the Improvident

Payment should be subtracted from the Total Settlement Payment so that the 35% percent

Contingency Fee is calculated based on the Total Settlement Payment <u>minus</u> the Improvident

Payment awarded.[9]

**B.**    **There Is Insufficient Evidence for the Court to Make a Determination of the Amount of Any Improvident Payment Award**

The United States Trustee agrees that fees approved under § 328(a) need not be reviewed for reasonableness under § 330; instead, the contract governs. *In re ASARCO, L.L.C. (ASARCO)*, 702 F.3d 250, 268 (5th Cir. 2012) ("In disputes governed by § 328(a), the contractual arrangement is supreme, and we shall enforce the contract as written.") But here, the 9019 Motion contemplates that Quinn will receive the § 328(a) Contingency Fee—a fee which the United States Trustee does not dispute (as it stands alone)- plus an Improvident Payment, the amount of which this Court must determine. To the extent this Court determines that the standards under § 328(a) have been met, this Court must also have facts to employ a methodology to determine the appropriate amount of an improvident fee under this provision. Here, such facts are absent from the record.

In the Fourth Circuit, the methodology for determining an appropriate fee are the Johnson factors, which are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *Johnson v. Georgia Highway Express,*

---

[9]To illustrate, if the Court were to award an Improvident Payment of $3,150,000.00, the calculation of the contingency fee would be as follows: ($21,000,000.00 minus $3,150.000.00 = $17,850,000.00) multiplied by 35% = $6,247,500.00. Total payment to Quinn would be $6,247,500.00 + $3,150,000.00 = $9,397,500.00.

*Inc.,* 488 F.2d 714 (5th Cir. 1974).  There is insufficient evidence upon which this Court can apply

the *Johnson* factors to determine the proper amount of any Improvident Payment.  Quinn has not

filed a fee application under Bankruptcy Rule 2016(a).  In order to determine the appropriate

amount of the Improvident Payment, the Court should have the benefit of a fee application or at

least time records and an explanation of what additional services Quinn provided that it would not

have otherwise been required to provide as part of its Contingency Fee representation.  Without a

factual basis, this Court cannot determine the appropriate amount of the Improvident Payment, and

as such, should not award an Improvident Payment.

>    C.    **The Chapter 7 Trustee and Quinn Have Failed to Demonstrate How Quinn
>          Would  Be Entitled to the Improvident Payment on an Hourly Basis.**

In further support of the request for approval of an Improvident Payment, the 9019 Motion

provides that "[a]bsent approval of the Settlement Agreement, Quinn Emanuel would otherwise

seek compensation on an hourly basis by the Estate in an amount that would exceed $3,150,000."

*Supra* at ¶ 54.  It is unclear, for several reasons, how that alternate argument would allow Quinn

to prevail on its request for a fee enhancement.  First, the hourly rate structure only applies to a

limited category of services; and it is not clear that any of the work for which Quinn is now seeking

an increased fee fits into any of those categories.  Second, as for the hourly rates awarded for the

Non-Contingency Matters, the Quinn retention order expressly provides that "Quinn Emanuel and

the Trustee shall mutually agree **in writing** before any services are provided for Non-Contingency

Matters." *See supra* at ¶ 4 (Emphasis added).  Upon information and belief, it does not appear that

Quinn received any pre-approval by the Chapter 7 Trustee for the work it now tries to fit into the

Non-Contingency Matters category.  To that end, if that were the case, it is not clear why Quinn

would not simply have filed an appropriate fee application for those hourly fees, subject to § 330.

Even more importantly, it bears emphasis that Quinn has filed fee applications already for hourly work under the Non-Contingency Matters. In March of 2022, just a couple of months ago, it sought and was awarded additional hourly fees for time spent on the Mediation. Moreover, as to any amounts of hourly work related to the Mediation, as set forth above at Paragraph 17, Quinn already filed a supplemental fee application indicating that it had incurred $69,416.30 of fees that it could seek as additional hourly fees, and noting that it was only seeking $24,150.17 on an hourly basis in conjunction with the supplement, while reserving the right "to seek the remainder of these fees from the Estate in future fee applications as **Contingent Fees.**" Dkt. 1249, pg, 2, fn 2 (emphasis added).

**V.**   ██████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████



## VI.    The Improvident Payment Provision of the Settlement Agreement Is Outside the Scope of the FAO Procedures

At the May 25, 2022, hearing, this Court inquired why the FAO Procedures do not govern this settlement. (FAO procedures found at Main Dkt. 533 and 929 (as amended)).  The United States Trustee's position is that Rule 9019 and the FAO Procedures do govern the settlement as it relates to the $21 million dollar Total Settlement Payment and the mutual releases, but do not govern as it relates to the Improvident Payment.   This position is set forth in the United States Trustee's Opposition to the Motion to Seal, incorporated herein by reference.  (Dkt. 215 at Sections B and C, pages 11-15).  In sum, the United States Trustee asserts that the FAO Procedures were put in place for judicial economy and to preserve resources of the estate as well as defendants.  The procedures allowed for more expeditious resolution of the numerous actions asserted by the Chapter 7 Trustee against various parties by including confidentiality provisions, but with certain

terms to allow the Chapter 7 Trustee to still comply with her fiduciary duties.  In no way did the

FAO Procedures include such confidentiality provisions or considerations for increased fees or

payment of an enhancement to counsel for the Chapter 7 Trustee.  In fact, to allow the request and

any alleged justification for increased fees over and above those on the public record to her own

counsel under any form of seal puts the Chapter 7 Trustee in a very precarious position with those

she is duty-bound to serve.  The Chapter 7 Trustee owes a duty to all creditors in the case, not just

those few who receive notice under the FAO Procedures.  In essence, it is the inclusion of the

Improvident Payment in this Settlement Agreement that puts it beyond the scope of the previously

approved FAO Procedures.

## CONCLUSION

WHEREFORE, the United States Trustee requests that the Court strike the Improvident

Payment term from the Settlement Agreement and the 9019 Motion and approve the remainder of

the Settlement Agreement and the 9019 Motion and grant such other and further relief as the Court

deems appropriate.

Respectfully Submitted,

Dated: June 3, 2022                                  JOHN P. FITZGERALD, III
                                                     Acting United States Trustee Region 4


                                                     By:  /s/Kathryn R. Montgomery_____
                                                     Kathryn R. Montgomery (VSB 42380)
                                                     Assistant United States Trustee
                                                     Office of the United States Trustee
                                                     701 E. Broad St., Ste. 4304
                                                     Richmond, VA 23219
                                                     Ph: (804) 771-2310
                                                     Fax: (804) 771-2330
                                                     Kathryn.Montgomery@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2022, I caused a copy of the foregoing pleading to be served by email on the Chapter 7 Trustee, her counsel, and counsel for the parties in the Adversary Proceedings.

/s/     Kathryn R. Montgomery
Kathryn R. Montgomery, Esq.

Attachment C

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF VIRGINIA (RICHMOND)
 2
    In Re:                          )  Case No. 19-34574-KRH
 3                                  )  Richmond, Virginia
    LECLAIRRYAN PLLC,               )
 4                                  )
            Debtor.                 )  May 25, 2022
 5                                  )  11:51 a.m.
    TRANSCRIPT PORTION UNDER SEAL   )
 6  -------------------------------  )  Adv. Proc. 20-03142-KRH
    LYNN L. TAVENNER, AS CHAPTER 7  )
 7  TRUSTEE,                        )
                                    )
 8           Plaintiff,             )
    v.                              )
 9                                  )
    ULX PARTNERS, LLC, ET AL.,      )
10                                  )
             Defendants.            )
11  -------------------------------
```

```
12            TRANSCRIPT OF SEALED PORTION OF HEARING ON
    MOTION TO RESTRICT PUBLIC ACCESS TO SENSITIVE CASE INFORMATION
13      FILED BY ULX MANAGER LLC, ULX PARTNERS, LLC, UNITEDLEX
                          CORPORATION;
14   MOTION TO FILE DOCUMENTS(S) UNDER SEAL FILED BY ULX MANAGER
            LLC, ULX PARTNERS, LLC, UNITEDLEX CORPORATION;
15     MOTION TO FILE DOCUMENTS(S) UNDER SEAL FILED BY LYNN L.
                  TAVENNER, AS CHAPTER 7 TRUSTEE;
16  MOTION TO AMEND FILED BY LYNN L. TAVENNER, AS CHAPTER 7 TRUSTEE
               BEFORE THE HONORABLE KEVIN R. HUENNEKENS
17                 UNITED STATES BANKRUPTCY JUDGE
```

```
18  APPEARANCES: (All present by video or telephone)

19  For the Chapter 7 Trustee:     PAULA S. BERAN, ESQ.
                                   LYNN L. TAVENNER, ESQ.
20                                 TAVENNER & BERAN PLC
                                   20 North Eighth Street
21                                 Second Floor
                                   Richmond, VA 23219
22
                                   ERIKA L. MORABITO, ESQ.
23                                 BRITTANY NELSON, ESQ.
                                   QUINN EMANUEL URQUHART &
24                                 Sullivan, LLP
                                   1300 I Street NW, Suite 900
25                                 Washington, DC 20005
```

2

```
 1
    For the Chapter 7 Trustee:      DAVID M. GRABLE, ESQ.
 2                                  QUINN EMANUEL URQUHART &
                                    Sullivan, LLP
 3                                  865 S. Figueroa Street
                                    10th Floor
 4                                  Los Angeles, CA 90017

 5
    For ULX Partners, LLC and       THOMAS J. MCKEE, ESQ.
 6  UnitedLex Corporation:          DAVID G. BARGER, ESQ.
                                    GREENBERG TRAURIG, LLP
 7                                  1750 Tysons Boulevard
                                    Suite 100
 8                                  McLean, VA 22102

 9                                  J. GREGORY MILMOE, ESQ.
                                    GREENBERG TRAURIG, LLP
10                                  One International Place
                                    Suite 2000
11                                  Boston, MA 02110

12  For the Department of Justice: KATHRYN R. MONTGOMERY, AUSA
                                    JASON B. SHORTER, ESQ.
13                                  SHANNON F. PECORARO, ESQ.
                                    OFFICE OF THE U.S. TRUSTEE
14                                  701 East Broad Street
                                    Suite 4304
15                                  Richmond, VA 23219

16

17

18  Transcription Services:         eScribers, LLC
                                    7227 North 16th Street
19                                  Suite #207
                                    Phoenix, AZ 85020
20                                  (973) 406-2250

21  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

22  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

23

24

25
```

1        THE COURT:  All right.  So now, Mr. Barger, would you

2   please just take a look and make sure that there's nobody on

3   the participant list that should not be in here?

4        I'm going to ask Ms. Montgomery to please do the same

5   thing now as well.

6        MR. BARGER:  None from ULX, Your Honor.

7        UNIDENTIFIED SPEAKER:  Jason Shorter.

8        MR. BARGER:  Jason Shorter is with the U.S. Trustee's

9   office.

10       MS. MONTGOMERY:  I agree, Your Honor.  I don't see any

11  extra people.

12       THE COURT:  Okay.  Thank you very much.  All right.

13  So now, Ms.  Montgomery, you may proceed and you may speak

14  freely.

15       MS. MONTGOMERY:  Thank you, Your Honor.  And what Mr.

16  Barger is referring to, he did send me an email yesterday

17  noting that he thought that many portions of our objection that

18  were filed, and other filings that we made on Monday, needed to

19  be rectified.  And in light of the Court's bridge order that

20  prohibited public viewing of the transcript, we disagreed with

21  that, and certainly in drafting our objection, we certainly

22  were very mindful that the parties are seeking to keep the

23  terms confidential until this hearing.

24       But Your Honor, like we said, the transcript was out

25  in the public for a month for anyone to view, the transcript of

Colloquy                                                                    4

1   the April 19th hearing.  And members of the press did view it.

2   Whether other people viewed it or not, we don't know.  I don't

3   know.  But in order for us -- you know, and so in our

4   opposition, we did not reference any dollar amounts, any

5   specifics.

6           But one thing that we did reference, which has been a

7   concern of the United States Trustee from the beginning, is the

8   improvident payment to the Chapter 7 trustee's counsel.  And so

9   we have not talked about the dollar amounts of that, the

10  reasons for that.  We've just mentioned it because it is a term

11  of the settlement, and it is something that we believe is

12  within our duties to review any fees paid to professionals.

13  And so that's why it's in our motion, we've referenced it in

14  our motion, but we don't feel that referencing it was certainly

15  any violation of this Court's bridge order or any orders of

16  this Court.

17          And I would ask that, in an unsealed hearing, that I'd

18  be able to refer to the improvident payment, so that we can

19  make our argument before the Court, this argument that should

20  be heard by the public, because many of the reasons and many of

21  our arguments are based upon the fact that this settlement

22  agreement is very different from other settlement agreements in

23  this case because of the improvident fee payment.  And so I

24  need to be able to discuss that without mentioning any more

25  than it is improvident fee payment.  And I would ask -- I would

Colloquy                                                                          5

1  move that that be allowed in an unsealed hearing so that we may

2  move forward in that manner.

3           THE COURT:  All right.  I've got, I guess, some

4  questions and a disclosure I would like to make to you.  ███

███  ███████████████████████████████████████████████████████

███  █████████████████████     ████████████████████████████████████

███  ████████████████████████████████████████████████

███  ████████████████████████████████████████████████████

███  ████████████████████████████████████████████████████

███  ████████████████████████████████████████████████████

███  ████████████████████████████████████████████████████

███  ███████████████████████████████████████████████████

███  ████████████████████████████████████████████████████

███  ████████████████████████████████████████████████████

███  ██████████████████   ███████████████████   █████████████

███  ██████████████████   ███████████████████   █████████████████

17               █████████████████████████████████████████

███  ████████████████████████████████████████████████████

███  ██████████████████████████████████████████████████████

███  █████████████████████████████████████████████████████

███  ██████   ██████████████████████   ████████████████████

███  ████████████████████████████████   ████████████████████

███  ████   ████████████████████   ███████████████████████████

███  ████████████████████████████████████████████

███  ████████████████████████████████████████████

1  ████████

2  ████████████████████████████████

████████████████████████████  ████

████████████████████████████████

████████████████████  ██████████████

████████████████████████

████████████  ████████████████████

████████████████████████

████████████████  ████████████████

████████████████

11      Now, are you talking about the same thing I am, Ms.

12  Montgomery?

13          MS. MONTGOMERY:  I think so, but I'm not sure.  I

14  mean, what we're talking about is what has been termed in the

15  9019, the compensation to counsel, the Chapter 7 trustee's

16  counsel, including an improvident payment under Section 328(a).

17  That is the term of the settlement that's different from other

18  settlements, and it's because that term is different it's part

19  of the bases that we're arguing that it should not be sealed

20  because it involves compensation to a professional, the Chapter

21  7's professional, and for the integrity of the system and the

22  Chapter 7 trustee, that this should be something that is not

23  done under seal, that it should be out so that creditors and

24  the public can understand why the Chapter 7 trustee believes

25  it's in her business judgment to pay her attorney an additional

1    fee beyond what was negotiated as a contingency fee under

2    328(a).

3            THE COURT:  Okay.  I think we are talking about the

4    same thing.  So let me ask this question to you, Ms.

5    Montgomery.  If I was to conduct a -- ███████████████████

     ██████████████████████████████████████████████████████████

     █████████████████████████████████████████████    ███████████

     ███████████████████████████

9            MS. MONTGOMERY:  Under seal?

10            THE COURT:  -- in case you're wondering.  And so why

11   is this different than that?

12            MS. MONTGOMERY:  Because this ███████████████; it's

13   an improvident fee payment under 328(a).  That's how it is in

14   the 9019 motion that has been filed under seal.

15            ███████████  ██████████████  █████████████████

     ████████████████████████████████

     ██████████████    ██████████████████████████████████

     ████████████████████████████████████████████████████

     ██████████████    █████████████████████████████████

     ████████████████████████████████████████████████

     █████████████████████████    ████████████████

     ████████████████████████████████████████████████

     █████████████████████████

     ██████████████    █████████████████████████

     ████████████████████████████████████████    ███████████

1

6        MS. MONTGOMERY:  Your Honor, my arguments would remain

7   the same.

8        THE COURT:  Okay.  I understand your argument.  Okay.

9   So what you're arguing today is that you want to be able to say

10  what -- argue what on the record that's not under seal?

11       MS. MONTGOMERY:  Yes, Your Honor.  My argument today

12  will follow the objection that we have filed with the Court.

13       THE COURT:  Which I've read, yes.

14       MS. MONTGOMERY:  Yes.

15       THE COURT:  Okay.  All right.

16       MS. MONTGOMERY:  Yes, Your Honor.

17       THE COURT:  Very good.  Mr. Barger, do you wish to

18  reply?

19       MR. BARGER:  Yes, Your Honor.  Let me start with the,

20  sort of, last topic first.  And I appreciate that we are under

21  seal because it does allow for a little more fulsome

22  discussion.  Without waiving -- I don't think it's like

23  attorney-client privilege, where if I talk about one of the

24  things we spoke about with a mediator, it doesn't mean that

25  everything you speak about with the mediator is open.  I don't

1    think this process works that way, but I would want to clarify

2    that, in speaking with the judicial mediator, ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████

          ███████████  ████████████████████████████

          █████████   ████████████

          ███████████  ████████████████████████

██████████████████████████   █████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████

16        ██████████   █████████████████

          ██████████████   ████████████████████   ██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████

          ██████████   █████████

          ██████████████   ██████████████████████████

██████████████   ██████████████████████████████   ██

██████████████████████████

          ██████████   █████████

1          MS. MORABITO:  Sorry to interrupt.

2          MR. BARGER:  And Your Honor, just as to flesh this out

3     a little bit more.  Of course, I think Ms. Morabito covered

4     this in broad strokes at the April 19th hearing.  This was a

5     judicial mediator's proposal that was a -- again, I'm not

6     holding the other side to this.  Our perspective was this was a

7     binary approach.  This is the mediator's proposal; take it or

8     leave it.  If you don't agree to this, we're going to trial.

9     And essentially that was twenty-one million dollars.  And then,

10    of course, the terms are put on the record in terms of how much

11    ULX had to contribute and how much one of the insurers

12    contributed and -- or two of the insurers contributed.  And we

13    reserved rights on the third insurer that we're pursuing.

14          As the Court just recognized, ███████████████

      ████████████████████████████████████████████.  And it

16    wasn't until really, Your Honor, the day of the settlement, and

17    shortly before that, that the judicial mediator raised this --

18    he didn't -- I don't think was called an improvident payment;

19    it was called an equalizer, which I think is the term Ms. Beran

20    used at the April 19th hearing, which is consistent with my

21    recollection of how the judge characterized it.  But the

22    mediator did not explain to us how he arrived at that

23    calculation.

24          It was our side agreed to twenty-one million dollars,

25    how that was going to be apportioned, and in the business

1  judgment of the Chapter 7 trustee and her counsel, and the
2  estate, that was really their decision.  We agreed to a number,
3  and how it got carved up was left to them.

4        I don't want to -- we don't -- I just want it clear,
5  because we're settling and we're not admitting liability on
6  anything, our view is there are two sides to the discovery
7  process, and the parties have resolved this and don't have to
8  litigate it.  And so that was an important consideration for us
9  in resolving this case.  We're done with litigation.  It could
10 be very costly, very lengthy.

11       And I just wanted to make that point.  I don't know if
12 I'd made it more clear or more obscure, Your Honor, but I
13 wanted to at least some of that on the record and our position.
14 And I'll pause for any questions from the Court, but I think
15 that's all I had on that particular point.

16       Briefly, with regard to briefly Ms. Beran's point
17 about the 9019 motion, she's correct that they did send us a
18 draft of what they thought could be unsealed.  We have not
19 responded yet.  That motion is not yet in total, because we
20 don't have the declarations that will go with it yet.

21       So we just -- we didn't ignore you; we just weren't
22 ready to respond on what our view was of how much the 9019 is
23 sealed and how much is unsealed.  I believe that's an
24 unresolved matter that will require some discussions with the
25 parties and the U.S. Trustee, whether we can reach an agreement

1   or not.  Then it'll be submitted to the Court to decide how

2   much gets unsealed.  But as I mentioned before, I do think it's

3   premature.  It's not necessary to decide whether to unseal the

4   9019, and what portions to unseal, nor the settlement

5   agreement.

6            MS. BERAN:  Your Honor, if I may just --

7            THE COURT:  Okay.

8            MS. BERAN:  And I'm glad Mr. Barger brought that up,

9   because I do want to clarify, and maybe I'll clarify this on

10  the additional record.  When I gave paragraph numberings, I now

11  realize that they are not the same as to what Your Honor will

12  be looking at.  On May 13th, I sent the email, and as Your

13  Honor is aware, the 9019 wasn't actually filed until May 18th,

14  so paragraphs got moved around.  So on May 18th, it was

15  paragraph 34(a) through (f), 47, parts of it.  The document

16  that actually was filed on May 18th, because there were certain

17  additional paragraphs, what we're talking about now with the

18  one that is on file, it's paragraph 37(a) through (f), and then

19  parts of paragraph 50.

20           I am a little at loss from the argument that Mr.

21  Barger just made as to it's premature, because that's the 9019

22  motion that's going to be heard.  And I thought what we were

23  determining today is what is and is not going to be sealed in

24  connection with moving forward with this process.  So without

25  those clear demarcations, the trustee is just left to say,

1  don't know, don't know, don't know.  And that's the point of

2  the sealed hearing today is let's make a determination what is

3  going to be sealed, what isn't going to be sealed.

4           I understand that if there is something in the future,

5  we can't sit here today, that if we haven't seen the final

6  draft, say that is or isn't going to be sealed; let's wait and

7  see that.  But we have the 9019 motion in front of us.  And so

8  to say it's premature, I don't follow that argument.  And that

9  really does put the trustee back in that precarious position.

10          THE COURT:  All right.  Thank you.

11          MS. MORABITO:  Your Honor, Erika Morabito, real quick

12  again.  And I hate that we're all jumping on this.  I didn't

13  intend on actually speaking, but there was one thing that Mr.

14  Barger said that I do think is important and requires

15  clarification.

16          He stated that they understood that they were putting

17  twenty-one million dollars in, and that it would then be up to

18  the U.S. Trustee and her council, in the exercise of her

19  business judgment, to divide it up.  That's categorically not

20  the case.  The way that it was structured and put on the

21  record, and how the twenty-one was to be divided up, was one

22  hundred percent dictated by the mediator and the mediator's

23  proposal.  There was no discretion on that twenty-one by either

24  Ms. Tavenner or her counsel.

25          THE COURT:  That's what he told me.

1          MS. MORABITO:  Thank you.

2          MR. BARGER:  I apologize.  I was -- I didn't mean to

3   interrupt.  Sorry.  I think I was speaking too loosely; you're

4   correct.  Really what I meant was that there hadn't been, what

5   was raised with us, the topic of the improvident payment,

6   whether that gets paid or not is -- you know, that's outside of

7   our, meaning, my client's bailiwick.  So I apologize that I

8   wasn't precise.  Thank you for cleaning that up.

9          THE COURT:  All right.

10         MR. MILMOE:  Your Honor?  It's Greg Milmoe.  Ms.

11  Morabito wasn't intending to speak, and neither was I, but if I

12  may add just a note.  Until a few minutes ago, I had no idea

13  what it was that Judge Santoro, who conducted a master class in

14  mediation, said to the trustee's side of things with respect,

15  particularly, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████   ████████████████████   ████████████████████

████   ████████████████████████████████████████████

████   ████████████████████████████   As someone who's

20  been a mediator, as I said, it was a master class.  It was

21  presented to us, as Mr. Barger said, a take-it-or-leave-it

22  whole.

23         And Ms. Morabito was exactly right; the components

24  were identified, that the last component about what's now been

25  called the improvident payment was -- we were made aware of at

```
 1   the very end.  But it was a take-it-or-leave-it proposition,
 2   the whole thing, done as a whole, without our ability or
 3   anybody else's ability to cherry pick it and take the parts
 4   they liked and/or continue to fight about the parts we didn't
 5   like.
 6          It can't come as a surprise to Your Honor that there's
 7   very little that we've agreed about during the course of this
 8   litigation with the trustee, and again, Judge Santoro near
 9   miraculously was able to get both of us to agree to the terms
10   of this settlement.  And indeed, what I think we're principally
11   objecting to, now that the -- I guess the phrase today is the
12   cat's out of the bag, with respect to the numbers terms, is we
13   do not believe it appropriate to have a public discussion of
14   the rationale for the trustee's accepting this settlement.
15          Lord knows I'm sure she has appropriate reasons, but
16   short of finding out ████████████████ how that factored into
17   things is something we don't particularly want to discuss in a
18   public forum, nor did we anticipate that we ever would have to.
19          THE COURT:  I understand that.  That was the point, I
20   think.  Okay.
21          So Ms. Montgomery, I think we were all interrupting
22   you.
23          MS. MONTGOMERY:  Thank you, Your Honor.  So where was
24   I?  I'll just follow up on what Mr. Milmoe just said.  His view
25   is the exact opposite of the United States Trustee, as we
```

1    stated in our objection, and would like to state at a public

2    hearing before you that it cannot be -- for the integrity of

3    this Court and the integrity of the Chapter 7 trustee, it

4    cannot be that, under seal, there is a payment to the Chapter 7

5    trustee's counsel that is outside of the parameters of what has

6    been publicly available for years, that this is a contingency

7    fee arrangement.  If that arrangement is to be changed for the

8    good of the system, that cannot be under seal.  It invites

9    questions from the public, it invites all sorts of speculation.

10   And that's the reason that this program, the United States

11   trustee's program, was created.  And we're here to try to do

12   our job to make sure that there is transparency and to protect

13   the integrity of the system.

14            THE COURT:  All right.  Thank you.  What about the

15   other points that Mr. Barger had raised with regard to the

16   April 19th transcript?  I think he said now that he was going

17   to review the redacted version that he had submitted and

18   eliminate further redactions and then suggest something to the

19   Court.  And you have suggested all of it be unredacted.  Do you

20   have a problem with that, as a procedure, that the Court could

21   consider that at a future time?

22            MS. MONTGOMERY:  Well, Your Honor, before I respond,

23   if I may, I feel like I should at least ask that this hearing

24   no longer be sealed, that we've had the discussion about the

25   improvident payment.  As far as redacting the April 19th

1    transcript, I would ask that that be discussed at an open

2    hearing, and I'd be happy to answer your question, certainly

3    understand --

4              THE COURT:  That makes some sense.

5              Mr. Barger, any objection?

6              MR. BARGER:  No, Your Honor.  We would request that

7    the portion that has been under seal remain under seal until

8    the parties have had a chance to review the transcript, and

9    then if it needs to have further discussion with the Court, we

10   can do that, but as long as what we've just discussed is under

11   seal, we don't have a problem with going back on the record.

12             I did have one response briefly, if I could, Your

13   Honor, to Ms. Beran's point.

14             THE COURT:  You may.

15             MR. BARGER:  Sorry, Your Honor.  Thank you.  I

16   understand her point that we thought today was going to be a

17   discussion about how much of the 9019 is unsealed.  At the time

18   we filed ours motion to seal, we were directed to file that, by

19   the mediator, promptly, which we did.  And things were still

20   fluid, meaning we hadn't yet seen final 9019, we still have

21   declaration to be submitted.  That's why I'm recommending that

22   we put that process off.  We're just not in a position to have

23   a fully formed view of the entire motion, since it refers to,

24   or is going to have attached to it the declaration.  That's why

25   there is a change in the approach I took today.  That was the

1   only response I needed to make on that.  And with that, I

2   would --

3            MS. BERAN:  Your Honor?

4            THE COURT:  Are you able, Mr. Barger, to communicate

5   to Ms. Tavenner, in your world view, what she can disclose,

6   because she is being bombarded with a query from the public

7   about the terms of what has already been released.

8            MR. BARGER:  Your Honor, we will provide, by the end

9   of today -- well, in order to be safe, how about the first

10  thing in the morning, our proposed redactions on the currently

11  filed 9019.

12           And I may have misunderstood; I didn't realize she was

13  getting inquiries from the public about what's in the 9019.  I

14  thought it was inquiries from creditors where there is a

15  process where they can get it.  I may have misunderstood.  If

16  it's inquiry from the public, then we, as I said, by the end

17  of -- by first thing in the morning, we will provide our

18  proposed redactions to the 9019.  I suspect ours will be

19  broader than theirs.  In fact, I know they will.  But we will

20  get those to them.

21           THE COURT:  Okay.

22           MS. BERAN:  Your Honor?

23           THE COURT:  Ms. Beran?

24           MS. BERAN:  If I may jump in here, though, I

25  understand Mr. Barger's position as it relates to what is out

1    there, ultimately out there in public and what isn't, █████

█  ████████████████████████████████████████████████████

█   ███████████████        But right now, let's look at really -- I'm

4    one -- I don't mince words.  I just grab the bull by the horn

5    and put it out there.  I mean, what we're talking about here

6    is, in looking at the improvident payment provision, as

7    referenced in the 9019 motion, it is -- you know, it is one of

8    the provisions that we said should not be sealed, should not be

9    redacted.

10           It says:  "Compensation of counsel: Consistent with

11   the order entered by the bankruptcy court on June 28, 2021,

12   Quinn Emanuel shall be entitled to receive thirty-five percent

13   of the total settlement as provided in the Quinn retention

14   order."   And then, "In addition, the settlement agreement

15   contemplates an improvident payment of an aggregate amount not

16   to exceed 3.15 to Quinn Emanuel.  By this motion, the trustee

17   seeks approval of the improvident payment on account of the

18   fact that, among other things, the terms of the Quinn retention

19   order have proven to be improvident, in view of circumstances

20   in this matter that were not capable of being anticipated at

21   the time of entry of the Quinn retention order.  The

22   improvident payment is subject to the estate receiving the

23   total settlement payment, and the defendants do not object to

24   the improvident payment.  Furthermore, the trustee maintains

25   that Quinn Emanuel provided necessary additional noncontingent

1   services, 'the additional services', that arose from the two

2   adversary proceedings that otherwise would have been

3   compensated on an hourly basis, had the trustee and Quinn

4   Emanuel known all of the facts and circumstances regarding this

5   manner.  Notwithstanding the fact that Quinn Emanuel asserts

6   that the value of the additional services exceeds the amount of

7   the improvident payment, the settlement agreement provides that

8   Quinn Emanuel agrees to limit the amount of the improvident

9   payment to 3.15 or such other amount otherwise approved by this

10  court."

11          So in connection with that, Your Honor, all the

12  underlying facts that Mr. Barger is talking about, agree to

13  disagree, that's not in that 9019 document paragraph that we're

14  talking about right now.  So it is important, from the

15  trustee's perspective, that that is out there for the world to

16  know because, first and foremost, as the world already knows,

17  this was directed, unilaterally directed by the judicial

18  mediator.  I think the improvident payment term wasn't put on

19  the record of the last hearing, but that's out there.

20          And now we have to clarify and make it abundantly

21  clear it's not fair to the Chapter 7 trustee, it's not fair to

22  Quinn Emanuel, it's not fair to the Office of the United States

23  Trustee, it's not fair to the bankruptcy system in general for

24  it to be some appearance out there that this is just going from

25  thirty-five to fifty percent with no basis whatsoever.

1          Now, we can get into an argument after the fact, or

2     down the road, about the actual declarations or evidence to

3     support that, and what is or isn't sealed as it relates to the

4     support for those statements.  But those statements don't

5     contain anything that's disputed.  Those statements don't --

6     that paragraph should be out there for the world to see.

7     Otherwise, there's this -- there is a misconception.  We've

8     already heard the misconception.  The Office of the United

9     States Trustee, I believe, has heard the misconception.  The

10    Office of the United States Trustee is concerned about the

11    misconception.  And that misconception -- I mean, I just -- we

12    don't want it to appear because it was not a money grab by

13    Quinn.  It was in no way, shape, or form a money grab by Quinn.

14    That has to be put to bed from all people's perspective.  And

15    that is why --

16          THE COURT:  Okay.

17          MS. BERAN:  -- the trustee maintains that that should

18    be out there.  And I still haven't heard Mr. Barger indicate

19    why that can't be out there.

20          THE COURT:  Okay.  But what he has said is that he

21    would like to be able to discuss that with you and see what can

22    be agreed upon, and that he would give you a redacted version

23    in the morning.  And what I would like to do is let the two of

24    you talk about that, see if you can agree to it.  If you cannot

25    agree to it, I'll have another hearing in this matter tomorrow.

 1   Okay?

 2          I'll have the hearing at noon tomorrow.  I've got -- I

 3   just looked at my calendar.  I've got that available, and I

 4   will then make the decision, because then I'll have right in

 5   front of me what he says, what you say.  I'll decide.  And the

 6   Office of the U.S. Trustee obviously weighs in as well.  And we

 7   can decide on it, and I will make the decision.

 8          But the problem is I don't have everything right in

 9   front of me right now.  And I feel like I'm in Aesop's Fables,

10   you know, trying to tell what the animal is.  So let's do it

11   that way.  And then I'll have exactly what the dispute is

12   framed up.

13          Mr. Barger, is that okay with you?

14          MR. BARGER:  Sorry, Your Honor.  I was delayed in

15   getting unmuted.  It is, of course all right with us.  Thank

16   you for making time for us tomorrow, if necessary.  I suspect

17   it will be -- I can't imagine we'll fully agree with the

18   Chapter 7 trustee.  So we appreciate you making time.

19          THE COURT:  Well, I would like to say I look forward

20   to seeing you tomorrow then.

21          But Ms. Montgomery, does that time work for you,

22   ma'am?

23          MS. MONTGOMERY:  Yes, the time works for me.  And Your

24   Honor, I would state that the U.S. Trustee's position is that

25   the transcripts should not be -- or that everything should be

 1  unsealed, that none of it should be redacted.

 2           THE COURT:  I know that.

 3           MS. MONTGOMERY:  But that being said, I would reserve

 4  our rights, to the extent that the Court rules otherwise, that

 5  we would be able to object to certain redactions and what would

 6  be in and what would be out.

 7           THE COURT:  And I think that that's appropriate as

 8  well.

 9           Okay.  So we will then take up the issue of the 9019

10  transcript tomorrow at noon.  But I'm still hoping that the

11  parties will agree that the sun will come out today and that

12  everything will be resolved.  But we'll see.  And I'll have it

13  right there in front of me.  And I can make a decision once I

14  have the appropriate redactions that are being suggested to me.

15  And I do understand the position of the Office of the U.S.

16  Trustee.

17           So Ms. Montgomery, what I would ask you to do then is,

18  once you see, first thing in the morning, what Mr. Barger is

19  proposing, if you think that there are certain parts of his --

20  knowing that your argument is going to be all of it should be

21  out there, but if there are certain specific parts that you

22  really think should be out there, I want to know what those are

23  too.  Okay?

24           MS. MONTGOMERY:  Yes, Your Honor.

25           THE COURT:  Thank you very much.  All right.  So that

1    resolves then the 9019 transcript issue until tomorrow.  And

2    with then regard to the other matters, there was the motion --

3    the pleadings on the motion to amend and the exhibit, Mr.

4    Barger, are moot.  My question, I guess, to you, Mr. Barger, is

5    why do I need to amend the motion -- I mean, delete or seal the

6    motion?  Why can't I just seal the exhibit that was the amended

7    complaint.  And then we would have on the record that there was

8    a motion at least to amend.  But I don't think the motion to

9    amend said anything terribly awful that would affect your

10   client.  Is there something in that that is bothersome?

11            MR. BARGER:  Your Honor, I do trust the Court's

12   memory, but it's been a long time since I looked at the motion

13   to amend.  If we could look at that today and see if the motion

14   itself can be unsealed, but the exhibit, meaning the proposed

15   amended complaint, remains sealed.  We will look critically at

16   that and see if we can agree with the Court, or if there's some

17   middle ground.  But if the Court's memory is as good as I

18   think, it will probably be okay, but I just can't commit until

19   I look at it again, if that's all right.

20            THE COURT:  Okay.  Well, here's the standard by which

21   I measure it, okay, is that -- and Ms. Montgomery said it

22   correctly.  It should be on the record unless there's something

23   that is confidential or scandalous that is in the document.

24   And that portion, the scandalous part or the confidential part

25   could be redacted, but otherwise we should put it on the

1  record.

2          MR. BARGER:  Yes, sir.

3          THE COURT:  And so look at it from that point of view

4  and tell me whether or not we can we can do that.  Okay?

5          MR. BARGER:  Yes, sir.

6          THE COURT:  And --

7          MR. BARGER:  Yes, sir.  We'll be ready to do that by

8  tomorrow as well.

9          THE COURT:  Okay.  Thank you, sir.

10          And then with regard to the actual hearing and such

11  that Mr. Barger said was premature at this point, we can just

12  adjourn that until the actual hearing on the 9019 motion and do

13  it that way.  And then I'll take it up then.

14          MR. BARGER:  Yes, sir.

15          THE COURT:  All right.  Now, I think we've resolved

16  things, Ms. Montgomery, without unsealing the courtroom,

17  unfortunately.  But I'll go ahead and put my ruling on the

18  record, when we come out of here.  And all of you can correct

19  me if I say it incorrectly, which I know you will.  And then

20  hopefully we'll be able to move on with the rest of the hearing

21  today.  Is that satisfactory to everyone?

22          MS. BERAN:  Your Honor, may I just ask one

23  clarification?

24          THE COURT:  Yes.

25          MS. BERAN:  You have indicated the 9019 and

Colloquy                                              26

1 | transcript, and at another point in time you said 9019

2 | transcript.  It's two different things.  It's the 9019

3 | motion --

4 |         THE COURT:  Yes.

5 |         MS. BERAN:  -- and the transcript, correct?  I just

6 | want to make -- okay.

7 |         THE COURT:  Yes.  Yes.

8 |         All right.  So Ms. Greenleaf, let's unseal the

9 | courtroom and allow the other parties back in, if you would,

10 | please.

11 |         THE CLERK:  Yes, Your Honor.  I'll let you know when

12 | everyone has been added.

13 |         THE COURT:  Thank you, ma'am.

14 |     (Whereupon the sealed portion of this hearing concluded at

15 | 12:28 PM)

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                                I N D E X

2

3      RULINGS:                                    PAGE   LINE

4      Motion to amend and the attached complaint    23      9
       is carried until noon tomorrow.   Parties
5      are to propose what portions can be
       redacted in lieu of sealing everything.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3          I, Sharona Shapiro, the court-approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the proceedings

6    in the above-entitled matter.

7

8

9                                    May 30, 2022

10   _____    _____

11   SHARONA SHAPIRO                     DATE

12   AAERT Certified Electronic Transcriber CET-492

13

14

15

16

17

18

19

20

21

22

23

24

25

Attachment D

```
 1                 IN THE UNITED STATES BANKRUPTCY COURT
                   EASTERN DISTRICT OF VIRGINIA (RICHMOND)
 2
     In Re:                          )  Case No. 19-34574-KRH
 3                                   )  Richmond, Virginia
     LECLAIRRYAN PLLC,               )
 4                                   )
              Debtor.                )  May 26, 2022
 5                                   )  12:09 p.m.
     TRANSCRIPT PORTION UNDER SEAL   )
 6   ------------------------------- )  Adv. Proc. 20-03142-KRH
     LYNN L. TAVENNER, AS CHAPTER 7  )
 7   TRUSTEE,                        )
                                     )
 8            Plaintiff,             )
     v.                              )
 9                                   )
     ULX PARTNERS, LLC, ET AL.,      )
10                                   )
              Defendants.            )
11   -------------------------------
```

12          TRANSCRIPT OF SEALED PORTION OF HEARING ON
     MOTION TO RESTRICT PUBLIC ACCESS TO SENSITIVE CASE INFORMATION
13        FILED BY ULX MANAGER LLC, ULX PARTNERS, LLC, UNITEDLEX
                             CORPORATION;
14          BEFORE THE HONORABLE KEVIN R. HUENNEKENS
                   UNITED STATES BANKRUPTCY JUDGE
15

     APPEARANCES: (All present by video or telephone)
16

     For the Chapter 7 Trustee:     PAULA S. BERAN, ESQ.
17                                   LYNN L. TAVENNER, ESQ.
                                     TAVENNER & BERAN PLC
18                                   20 North Eighth Street
                                     Second Floor
19                                   Richmond, VA 23219

20                                   ERIKA L. MORABITO, ESQ.
                                     BRITTANY NELSON, ESQ.
21                                   QUINN EMANUEL URQUHART &
                                     Sullivan, LLP
22                                   1300 I Street NW, Suite 900
                                     Washington, DC 20005
23

24

25

```
 1
 2   For ULX Partners, LLC and      THOMAS J. MCKEE, ESQ.
     UnitedLex Corporation:         DAVID G. BARGER, ESQ.
 3                                    GREENBERG TRAURIG, LLP
                                      1750 Tysons Boulevard
 4                                    Suite 100
                                      McLean, VA 22102
 5
                                    J. GREGORY MILMOE, ESQ.
 6                                    GREENBERG TRAURIG, LLP
                                      One International Place
 7                                    Suite 2000
                                      Boston, MA 02110
 8
     For the Department of Justice: KATHRYN R. MONTGOMERY, AUSA
 9                                    JASON B. SHORTER, ESQ.
                                      SHANNON F. PECORARO, ESQ.
10                                    OFFICE OF THE U.S. TRUSTEE
                                      701 East Broad Street
11                                    Suite 4304
                                      Richmond, VA 23219
12
13
14
15
16
17
18
19
20
     Transcription Services:         eScribers, LLC
21                                    7227 North 16th Street
                                      Suite #207
22                                    Phoenix, AZ 85020
                                      (973) 406-2250
23
     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
24
     TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
25
```

1          THE COURT:  Mr. Barger, you have the floor.

2          MR. BARGER:  Thank you.  Thank you, Your Honor.  In

3    terms of ones that I think are somewhat easy -- easier to

4    resolve, as I mentioned yesterday, there is a pending motion by

5    the Chapter 7 trustee to file a one-count amended complaint or

6    cause of action.  And that motion and the proposed complaint

7    are under seal.

8          There is already filed a redacted version of the

9    Chapter 7 trustee's motion in support of the proposed amended

10   complaint that is already in the public record.  And so we

11   think, with that redacted motion already present, that that

12   matter could be resolved, and the unredacted motion and the

13   proposed amended complaint should remain sealed.

14         And Your Honor, I don't know if you want to take this

15   seriatim or if you want me to walk through all of them.  It

16   might be easier this time to do them seriatim.  But I

17   respect --

18         THE COURT:  I agree with that.  I'd like to take them

19   one at a time, and we can get them out of the way and then move

20   on, so we can get things resolved.

21         Okay.  So the first item is the motion to file the

22   amended complaint and the proposed amended complaint.  And of

23   course, the amended complaint is going to be withdrawn.

24         Any objection to that proposal?

25         MS. BERAN:  Your Honor, it's Kathryn Montgomery for

Colloquy                                                        4

 1 | the United States Trustee's office.

 2 |        Just reserving our right for overall opposition to the

 3 | motion to seal for both this amended complaint and the motion

 4 | for summary judgment.  The United States Trustee's office, at

 5 | the time they were sealed, did not file an objection, and so we

 6 | will not be -- we have less concerns about that.

 7 |        THE COURT:  Okay.  Thank you very much.  All right.

 8 | Now, Mr. Barger, did you --

 9 |        MS. BERAN:  And Your Honor?

10 |        THE COURT:  Yes.

11 |        MS. BERAN:  I apologize.  For the record -- I

12 | apologize.  My microphone was not turned on.  This is Paula

13 | Beran, for the record, on behalf of the Chapter 7 trustee.

14 |        In connection with today's matters, I did just want to

15 | state for the record, so the record is clear, that as I'm sure

16 | Your Honor has seen in connection with the settlement motion,

17 | there is a provision that the Chapter 7 trustee will not

18 | object.

19 |        Similarly, Your Honor can see there is a

20 | confidentiality provision in the settlement agreement, and in

21 | connection with the confidentiality provision, there is

22 | specifically a carve-out as it relates to confidentiality on

23 | behalf of the trustee.  And that carve-out is "as may be

24 | required to comply with the reporting requirements and duties

25 | of the trustee".

Colloquy                                                                          5

1         So it has always been contemplated that the trustee,

2    notwithstanding any seal, notwithstanding anything, would be

3    able to meet her duties.  And as indicated yesterday, Your

4    Honor, the trustee is in a very precarious position, and she's

5    just seeking -- we're not objecting today; we are just seeking

6    to make sure that there are clear demarcations as to what the

7    trustee can and can't do.  We'd rather do it ahead of the time

8    as opposed to after the fact.

9         So while Mr. Barger did remind me again this morning

10   of our agreement not to object, I completely agree; we are not

11   here to object, but we are here to remind all parties that the

12   trustee does specifically have a carve-out as it relates to

13   reporting requirements and duties of the trustee.  And

14   therefore, we believe, and we would maintain, that it would be

15   better, on the front end, to have the demarcations of what can

16   be out there as opposed to doing it after the fact and fighting

17   about it.

18        So with respect to all of my comments going forward,

19   they should not be viewed or interpreted as an objection, but

20   rather that a position stated that the trustee believes that

21   this could impact her duties and therefore is seeking a clear

22   demarcation.

23        As it relates to Mr. Barger's comments on the motion

24   to amend, we are in agreement as to everything he indicated on

25   that because we do not believe that impacts or affects the

1  trustee's duties.

2          THE COURT:  Very good, Ms. Beran.

3          Now, the Court is going to make rulings today.  We're

4  going to take these one at a time so that we can be very clear.

5  As I understand it, the trustee's duties are set forth in

6  Section 704 of the Bankruptcy Code.  And the duty that we're

7  talking about, or that you were just addressing, is the duty

8  set forth in Section 704(a)(7), which requires the trustee to

9  "furnish such information concerning the estate and estate's

10 administration as requested by a party-in-interest".

11         And of course, that is preceded by the phrase "unless

12 the Court orders otherwise".  And so I will clearly order what

13 we're going to do.  And if there is any ambiguity in what my

14 ruling is at any time, then please let me know, because I do

15 want to make sure the trustee has clear parameters.  I do not

16 want to put the trustee in a precarious situation where she

17 does not know what her reporting authority or ability or

18 requirements are.

19         Is that clear, Ms. Beran?

20         MS. BERAN:  Yes, thank you, Your Honor.

21         THE COURT:  You're welcome.  All right.

22         So I've got the issue of the motion, the amended

23 complaint, and the motion to file the amended complaint.  We've

24 already got a redacted version of the motion, and the Court is

25 satisfied with the redacted version of the motion.

Colloquy                                                        7

1        With regard to the amended complaint, let me ask this

2   question, Mr. Barger.

3        MR. BARGER:  Yes, sir.

4        THE COURT:  The amended complaint contains additional

5   facts, and it contains an additional count.  Otherwise, it's

6   exactly the same as the other ones.  Why can't we just redact

7   those portions of the amended complaint so that they are not on

8   the record, but the rest of the amended complaint could be on

9   the record?

10        MR. BARGER:  Your Honor, that's fine.  I don't know

11   that any of us necessarily thought of that.  So that's a good

12   point.  I will say, in our conversations this morning with Ms.

13   Beran, and I do appreciate those conversations that we did

14   have, the Chapter 7 trustee -- and I'm not holding them to

15   this, but my understanding is they were willing that that

16   proposed amended complaint -- and by that I mean that

17   additional count -- would remain sealed even after the report

18   is filed, because it's not necessary to our reporting

19   obligations.  And we can work on a proposed order once the

20   rulings are made today.  But we are fine, Your Honor, with

21   redacting that portion of the proposed amended complaint that

22   was new.

23        THE COURT:  That's what I would like to do and have

24   the rest of it on the record so that the record reflects the

25   amended complaint otherwise.  And it would be exactly the same

1    as what had been previously filed.  But the new facts that were

2    alleged and the new count that was alleged would remain under

3    seal and appear in a redacted form.

4              MR. BARGER:  Yes, sir.

5              THE COURT:  And then as far as the trustee's reporting

6    requirements are concerned, she does not need to report on that

7    because the Court has sealed that.  And so she's not under an

8    obligation to reveal that.  So I think that takes care of that

9    one.

10             Any questions from any of the parties on that issue?

11             All right.  Let's move on to the next one, then, Mr.

12   Barger.

13             MR. BARGER:  Yes, Your Honor.  Ms. Montgomery alluded

14   to the next one, that it may also be fairly easy to resolve,

15   and that was the ULX defendant's motion for summary judgment.

16   There is a motion that's already in the public record for our

17   motion for summary judgment, but the memorandum in support and

18   the exhibits in support were filed under seal.

19             And so we would propose that the already public motion

20   for summary judgment is satisfactory for our purposes.  There's

21   no information in there that would require a response, for

22   example.  So our motion for summary judgment, the exhibits, and

23   the trustee's opposition to the motion for summary judgment,

24   which was also filed under seal, can remain under seal.  That

25   would be our proposal.

1           THE COURT:  All right.  Any objection?

2           Okay.  Hearing no objection, that motion is granted.

3           MR. BARGER:  Your Honor, moving on to -- if I may move

4    on to the next item?

5           THE COURT:  Please do.

6           MR. BARGER:  And this one is fairly narrow, so I don't

7    think it will require a great deal of discussion about what can

8    be redacted or what not and allows the Court to rule.  And that

9    is the April 19th transcript that we talked briefly about

10   yesterday.

11          I went through the transcript again in some detail

12   yesterday, and I compared it, as I mentioned that I would, and

13   promised that I would, on the four news articles that had

14   reported on the settlement, to compare what was in the articles

15   versus what was in the transcript.

16          And what we provided to the Court this morning

17   generally proposes only two items to be sealed.  One is a

18   reference to the ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████   And the other was a question by the Court

21   on page 10, and a response by counsel for the Chapter 7

22   trustee.  Those are the two items that we would propose to

23   remain sealed.

24          And to explain how I got here, as I mentioned, I

25   looked at every news report that we had, which were the four,

1    and compared that to the transcript, and any time there was a

2    reference in the news article to something that I could find in

3    the transcripts, I recommended that that be unsealed.

4             We also looked at portions of the transcript where the

5    topic wasn't controversial, that there was no particular reason

6    to seal it.  And so therefore, the vast majority of the

7    transcript we are comfortable proposing be unsealed, except for

8    those two items.

9             The first one that I mentioned, the discussion

10   regarding the ████████████████ is on page 6 of the

11   transcript.  And I'm fine -- just take a second.  It's all of

12   page 6 that we would propose to be redacted.

13            Number one, there was no reference ██████ in any of

14   the articles that I found.  And secondly, ██████

██ ████████████████████████████████████ And so

16   I think that can properly continue to be under seal.

17            And then the second one, Your Honor, page 10,

18   beginning at line 17 through line 25, going over to line 1 on

19   page 11, my rationale for proposing that, Your Honor, was this.

20   In the Court's question, the Court states:  ██████  ██

██ ████ ████████████████████████████████████

██ ██████████████████████

23            That word "equalizer" did appear in one of the

24   articles.  In the lines above that, on page 10, Ms. Beran also

25   uses the word "equalizer" because that was the word that Judge

 1   Santoro used in describing the payment.  So there was one -- I
 2   think there was one story that used that term "equalizer".  It
 3   didn't give attribution; it didn't say from where it got it,
 4   whether it was for me or Ms. Beran.  And so, after reflecting
 5   on it, we were comfortable proposing that the comments by Ms.
 6   Beran be unsealed, but sealing your comment and question and
 7   then the answer, because if I were -- and I initially thought I
 8   should leave your question unsealed, but I think the more
 9   prudent and principled approach for us is the comment by the
10   Court, if that's sealed, then there's not a need to unseal the
11   response by Ms. Morabito.
12        And the response by Ms.  Morabito ████████████████
     ████████████████████████████████████████████████████████
     ███████████████████████████████████  None of the
15   articles that I saw made any reference to the statements by Ms.
16   Morabito.  So using, again, that criteria of what was reported,
17   I was comfortable suggesting that these should be sealed.  I
18   believe the U.S. Trustee disagrees with that, and perhaps the
19   Chapter 7 trustee has a different position, but that is my
20   rationale for proposing those two redactions that I did.
21        THE COURT: All right.  Thank you, Mr. Barger.
22        Now, let me turn to the Office of the U.S. trustee
23   first.
24        MS. MONTGOMERY:  Yes, I'm here.
25        THE COURT:  Hi, Ms. Montgomery.

Colloquy                                                    12

 1            MS. MONTGOMERY:  Thank you.  Kathryn Montgomery.

 2            As far as page 6 -- well, first, again, reserving our

 3    rights because we think nothing should be sealed.

 4            As far as the references ███████ on page 6, I

 5    believe it's just on page 6, we are less concerned about that.

 6    However, with regard to the language on page 10 and a little

 7    bit of 11, I believe it's your question about ██████████

 8    ██████████████████.  We very much are concerned and think

 9    that that should not be sealed because it does provide the

10    evidentiary support for the improvident fee payment.  And we

11    believe that it's important that that be transparent for the

12    good of the integrity of the system as well as the Chapter 7

13    trustee.

14            THE COURT:  All right.  Well, why won't that be part

15    of the evidence that's put on at the hearing that's coming up

16    in two weeks?

17            MS. MONTGOMERY:  Well, Your Honor, it would be.  And

18    we believe that none of that evidence should be sealed and that

19    that hearing should not be sealed.

20            THE COURT:  I understand.  And I've deferred that

21    until the hearing date.  And so what -- okay.  Anything else,

22    Ms. Montgomery, on that?

23            MS. MONTGOMERY:  No, thank you, Your Honor.

24            THE COURT:  Okay.  Ms. Morabito, does the trustee wish

25    to be heard on this?

1            MS. BERAN:  Your Honor, this is Ms. Beran.  I'm going

2    to be handling this as well, even though it was Ms. Morabito's

3    words.

4            In connection with the first thing, as it relates to

5    ███████████████, or what Mr. Barger referred to ██████

6    ███████, the trustee, in reviewing that, doesn't believe that

7    that impacts her reporting and/or duties in any way, shape, or

8    form, and so therefore takes no position and doesn't believe

9    that it needs to be redact -- I mean, doesn't need that it

10   should be out there and is fine with the redaction.

11           In connection with the next proposed redactions, the

12   trustee takes the position that she does have some

13   responsibilities and duties as it relates to reporting on the

14   compensation and payment of her professionals.  But for the

15   reasons Your Honor just articulated, in connection with what

16   may come down the road, the trustee wasn't adamant that that

17   had to stay in there, but didn't want it to be viewed or

18   interpreted as that, down the road, she won't be adamant about

19   what may or may not need to be done in connection with her

20   reporting and duties.

21           The one thing the trustee did want to make sure was --

22   initially, it was just going to be Your Honor's question was

23   not going to be redacted, and then the response was going to be

24   redacted.  And we thought that was not beneficial.  But as it

25   is now, the trustee does not believe it impacts her duty and is

 1  fine with this.

 2           THE COURT:  Very good.

 3           MS. BERAN:  With reserving future rights.

 4           THE COURT:  All right.  So the Court then, as far as

 5  ruling on this, is going to do -- he Court is going to redact

 6  page 6 of the transcript.  And so that will be placed under

 7  seal and redacted.  With regard to page 10, and the first line

 8  of page 11, that the Court is going to defer until the hearing

 9  next week.  It will be redacted now, for the time being, on a

10  limited basis.  And the Court will, after the evidentiary

11  support is put on at the hearing, as part of the hearing,

12  determine what will be sealed, what will not be sealed with

13  regard to the hearing on approving the settlement agreement.

14           Any questions regarding the Court's ruling?

15           MS. MONTGOMERY:  Your Honor, this is Kathryn

16  Montgomery.  I do have a question.

17           THE COURT:  Yes.

18           MS. MONTGOMERY:  To the extent that the Court is

19  deferring ruling on this, and perhaps I'm getting ahead of

20  myself, but to the extent that the Court does intend to defer

21  the ruling on the evidence that supports the improvident fee

22  payment, I would have a question of -- you know, our objection

23  would be due before the Court would rule on it.  And so, to the

24  extent that we need to talk about this in our objection, would

25  we need to file that under seal until you rule or --

1            THE COURT:  Yes, ma'am.  File that under seal.

2            MS. MONTGOMERY:  Okay.  Thank you.

3            THE COURT:  And thank you for that question.  What I

4    would like to do, because I'm seeing this come to me piecemeal,

5    everybody else has been living this, and living this settlement

6    with Judge Santoro, and knows what's going on.  I'm going to be

7    presented with evidence and know what's going on at the hearing

8    next week.  And once I know and I see how everything fits

9    together and know what's going on, then I'm going to be able to

10   make a determination about whether or not it should remain

11   under seal or not remain under seal.  And that's when the Court

12   will make its determination.  Thank you.

13           Any questions, Mr. Barger?

14           MR. BARGER:  No, Your Honor.

15           THE COURT:  Okay.  Please proceed then with the next

16   item.

17           MR. BARGER:  Yes, Your Honor.  I think that brings us

18   to -- I think this brings us to the last item, the 9019 motion.

19   There are two components to that.  One is the anticipated

20   filing of the declarations and related exhibits, which I think

21   are to be provided tomorrow.  My assumption is, as with the

22   9019 motion, those will be filed under seal.  I believe that's

23   what the intention is.  And in discussions with Ms. Beran this

24   morning, our, meaning ULX's, expectations would be, once we

25   receive those documents and exhibits and declarations, we will

1   proceed to go through those and see what of those we would be

2   open to being on the public record, recognizing that the U.S.

3   Trustee and others might disagree, but that, at least as to

4   that component of the 9019, the anticipated declarations and

5   exhibits will be filed under seal until, as the Court just

6   discussed, the Court has had an opportunity to hear the

7   evidence and make a determination what should be unsealed.

8           The second component, of course, is the 9019 motion

9   itself.  We did provide to the Court our proposed redactions of

10  that.  And while I'm sure others will disagree, we generally

11  were open to unsealing a substantial portion of the motion.

12  There are certain paragraphs we highlighted that we think

13  should remain sealed.  And perhaps the way to approach this,

14  Your Honor, is similar to what you discussed just a minute ago.

15  And that is, until the Court, again, has the benefit of the

16  full record, it may be better to keep those portions of the

17  9019 that we proposed under seal until the hearing, and perhaps

18  the conclusion of the hearing, to determine what, if anything,

19  additional can be unsealed.

20          I'm happy to discuss my reasons for why we generally

21  propose what we do.  But I wanted to start there with the

22  proposal and, sort of, the mechanical aspects of it.

23          THE COURT:  Okay.  Thank you, Mr. Barger, and I'll

24  make sure to come back to you, sir.

25          Okay.  So let's go to Ms. Montgomery first.  Do you

1    wish to be heard on this?

2         MS. MONTGOMERY:  Your Honor, for the same reasons and

3    rationale that I stated earlier regarding those comments in the

4    transcript, anything -- and certainly all the highlighted areas

5    that counsel for ULX has provided the Court prior to this

6    hearing, and which we got a copy of, we would object to any of

7    those being under seal because they support the evidentiary

8    support for the improvident payment.

9         THE COURT:  All right.  Thank you very much.  All

10   right.  Thank you.

11        I guess Ms. Beran is handling this for the trustee

12   rather than Ms. Morabito.  So I'll turn to Ms. Beran.

13        MS. BERAN:  Thank you, Your Honor.  But not to really

14   confuse you, I understand that Ms. Morabito would like to

15   clarify one thing that Mr. Barger said, and I'm not sure what

16   it is.  So I'm going to hand the baton off.  I apologize for

17   the tag team nature, but Ms. Morabito did need to clarify

18   something.  And then I will go to the substance.

19        THE COURT:  Okay.  Ms. Morabito?

20        MS. MORABITO:  Thank you, Your Honor.  Just one point

21   of clarification from what Mr. Barger said, and I don't believe

22   it was advertant.  Just to be clear, pursuant to Your Honor's

23   ruling yesterday, the declarations and the exhibits, just to

24   remind Your Honor, are being provided solely in draft form to

25   the defendants and to the United States Trustee.  They are not

1  being filed on Friday, tomorrow, the 27th.  So that doesn't

2  have to do with when they do get filed, if they will be under

3  seal.  But I did want to clarify that for the Court so there's

4  no confusion or expectation that they will, in fact, be filed

5  tomorrow.

6       THE COURT:  I did not have that expectation.  Believe

7  it or not, I can actually remember all the way to yesterday.

8  If we go much beyond that, it gets it gets a little bit fuzzy.

9  But thank you very much for the clarification.

10      All right, Ms. Beran?

11      MS. BERAN:  Your Honor, thank you.  As it relates

12  to -- I'll take it in the order that Mr. Barger took it in, in

13  connection with future evidence, including but not limited to

14  the declaration and other exhibits in connection with the same,

15  Mr. Barger is correct that the trustee's position is let's let

16  everybody see them.  Let's let people look to see what they

17  would propose to be redacted.  And the trustee also, though,

18  would then reserve her rights to indicate what she believes

19  would be necessary and not redacted in connection, once again,

20  with her duties and reporting requirements.

21      THE COURT:  All right.  Thank you.  Okay.  And --

22      MS. BERAN:  And --

23      THE COURT:  -- then as to the second?

24      MS. BERAN:  Then the second one, Your Honor -- Your

25  Honor, I did hear you loud and clear, in connection with the

Colloquy                                                        19

1   last thing regarding the transcript, about how we have lived it

2   and Your Honor has not, so Your Honor does not have the

3   intimate familiarity with it, and so is at a little bit of a

4   disadvantage and is taking it piecemeal.

5        In connection with this, Your Honor, the trustee does

6   believe that certain of the information should not be redacted

7   as proposed, because she does believe that that could impact

8   her duties and reporting requirements.  And to the extent, Your

9   Honor, after seeing it all, says it does not impact her duties

10  and/or reporting requirements, then we don't take a position.

11  But we reserve the rights.  And at this point in time, we would

12  say that some of that should not be redacted because it does

13  impact reporting and other duties.  But we did hear Your Honor

14  say that it's difficult for you to make those determinations

15  now, so I defer to Your Honor.

16       THE COURT:  All right.  Thank you very much.

17       All right.  Mr. Barger, I said I would return to you,

18  sir.  Anything further?

19       MR. BARGER:  Your Honor, just a couple of small items.

20  First, apparently I can't remember all the way to yesterday.

21  So I appreciate Ms. Morabito's clarification.  I apologize, but

22  I wasn't, again, precise that we're just getting the draft

23  copies, and the to-be filed copies will happen later.

24       I don't -- Your Honor, again, I could go through some

25  of the reasons for our position on the 9019.  I don't think

Colloquy                                                             20

1   it's necessary today, in the interest of efficiency, given

2   where I think we are, which is that it'll be -- those portions

3   we recommended be sealed for now until the Court has the

4   benefit of all the evidence and the ability to reflect on this.

5   And so that's where I -- if where we are is where I think we

6   are, I don't have anything further.  But if I need to provide

7   more support, I'm happy to do it.

8          THE COURT:  All right.  Thank you very much.  So you

9   are correct, as far as the Court's current thinking is

10  concerned, that I want the future evidentiary supporting

11  documents to be filed under seal, once they are filed, and we

12  go forward, and then the Court can make the determination at

13  the hearing itself.  So both of these matters will be under

14  seal for the time being, subject to whatever we decide after I

15  have gotten all the evidentiary support.

16          Now, I do want to forecast one thing for everybody,

17  because going through this, it seems to me that -- well, at

18  that hearing, I'm going to ask you this question.  So I'm going

19  to forecast it now, and you can all be prepared for a response.

20  But it appears to me that the FAO procedures orders, and we've

21  had amended provisions in that as well, govern this.  This is a

22  settlement agreement, just like the other settlement agreement.

23  And I'm having difficulty trying to figure out why we're

24  treating this one differently.

25          And so I am going to ask that at the next hearing.

1  You do not need to respond now.  I just wanted the parties to

2  know that we did adopt those procedures.  I know that the

3  Office of the U.S. Trustee signed off on those procedures.  I

4  know that the trustee -- well, it was the trustee's proposed

5  procedures.  And the Court obviously approved the procedures.

6  And believe it or not, I can remember all the way back to

7  there, too.

8          So that's what I'm thinking.  And I will ask that

9  question next time.  I'm not making a ruling on that, but I

10 didn't want to take people by surprise or anything on that

11 either.  So I'm just saying that's what I'm thinking.  And I'm

12 going to ask that question at the hearing in two weeks, when we

13 get to the point of whether we should keep things under seal or

14 not under seal, et cetera.

15         All right.  Now, having made all the rulings today --

16 I think I've made everything.  There's something else we have

17 today, Mr. Barger?

18         MR. BARGER:  No, Your Honor.

19         THE COURT:  Okay, so I want --

20         MR. BARGER:  Not that I recall.

21         THE COURT:  Oh, excellent.  Excellent.  So now I'm

22 going to turn back to Ms. Tavenner, and I want to make sure

23 that she understands what her reporting duties are, in light of

24 the Court's rulings today, so that she's not in an untenable

25 position.

1        MS. TAVENNER:  Good morning, Your Honor.

2        THE COURT:  Good afternoon.

3        MS. TAVENNER:  Actually it's afternoon.

4        THE COURT:  Yes.

5        MS. TAVENNER:  This is Lynn Tavenner.  Thank you for

6    asking.  And I do understand, for today's purposes.  Thank you.

7        THE COURT:  Thank you very much, Ms. Tavenner.

8        All right.  Any other questions before we adjourn?

9        MS. MONTGOMERY:  Yes, Your Honor.  It's Kathryn

10   Montgomery.

11       I would ask -- you said at the beginning of this

12   hearing that you would consider unsealing it at the end of the

13   hearing.  I don't think we've talked about anything today that

14   you've ruled would stay sealed.  The things that would stay

15   sealed would be the evidentiary support of the improvident fee

16   payment, and there's been no presentation of what that is other

17   than what you've already said would be redacted.  So I would

18   ask that today's hearing be unsealed.

19       THE COURT:  Except that Mr. Barger read into the

20   record the thing that he wanted sealed.  And that's the kind of

21   thing I'm concerned about.  So again, I'm going to defer that

22   ruling until next time, so that you can all look at the

23   transcript of this hearing today and see it, and then you can

24   mark it up, Ms. Montgomery, as you think it is appropriate,

25   because I quite agree with you, if there are parts of this that

1    don't make any difference, they should be on the public record.

2    That should be the default.  But where we have -- but I can't

3    just unseal it, because I know we've talked about some things.

4    That one I just mentioned is one that comes to mind.  And there

5    may be others that I have forgotten.  But in any event, we'll

6    do it next week when we've all had a chance to look at the

7    transcript and see.  And then we can be sure what we're going

8    to be marking out and what we'll keep.  Okay?

9            MS. MONTGOMERY:  Thank you, Your Honor.

10           THE COURT:  And I would anticipate most of it would be

11   on the public record.  Thank you.

12           MS. MONTGOMERY:  All right.

13           THE COURT:  All right.  Anything else?

14           MR. BARGER:  Your Honor?

15           THE COURT:  Yes, Mr. Barger.

16           MR. BARGER:  One question.

17           THE COURT:  Yes.

18           MR. BARGER:  With permission, we'll prepare a draft

19   order for circulation.

20           THE COURT:  Okay.  Thank you, sir.  Please do.  All

21   right.  And then I will certainly entertain that upon receipt.

22           MR. BARGER:  Thank you, Judge.

23           THE COURT:  All right.  Anything else?

24           MR. BARGER:  Not from ULX defendants, Your Honor.

25           THE COURT:  All right.  I want to thank --

1            THE CLERK:  Your Honor?

2            THE COURT:  Yes.

3            THE CLERK:  Before we adjourn, we have to unseal the

4    courtroom.

5            THE COURT:  Oh, okay.  We're going to officially

6    unseal the courtroom.

7        (Whereupon the sealed portion of this hearing concluded at

8    12:42 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3   RULINGS:                                    PAGE   LINE

4   Redacted version of the motion will be        3      21
    part of the public record while the rest
5   of the motion will remain under seal.

6   New evidentiary allegations and the           8      1
    new count in the complaint will be under
7   seal while the rest of the complaint will
    be unsealed as part of the public record.
8
    Pleadings and associated documents regarding  9      2
9   ULX motion for summary judgment will
    remain under seal.
10
    April 19th hearing transcript, page 6 is     14      4
11  redacted, parts of page 10 and 11
    are temporarily sealed.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    C E R T I F I C A T I O N

 2

 3          I, Sharona Shapiro, the court-approved transcriber, do

 4   hereby certify the foregoing is a true and correct transcript

 5   from the official electronic sound recording of the proceedings

 6   in the above-entitled matter.

 7

 8

 9                                    May 30, 2022

10   _____    _____

11   SHARONA SHAPIRO                      DATE

12   AAERT Certified Electronic Transcriber CET-492

13

14

15

16

17

18

19

20

21

22

23

24

25

Attachment E

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| In re: | Case No. 19-34574-KRH |
|     LeClairRyan, PLLC,[1] | |
| Debtor | Chapter 7 |

## <u>DECLARATION OF LYNN L. TAVENNER, TRUSTEE</u>

I, Lynn L. Tavenner, Trustee, not individually but solely in my capacity as the Chapter 7 trustee (in such capacity, the "**Chapter 7 Trustee**" and/or the "**Trustee**") of the bankruptcy estate (the "**Estate**") of LeClairRyan PLLC ("**LeClairRyan**" and/or the "**Debtor**" ) in the above-referenced Chapter 7 case (the "**Case**"), pursuant to 28 U.S.C. § 1746, hereby declare as follows under penalty of perjury to the best of my knowledge, information, and belief:

1.    I am the duly appointed Chapter 7 Trustee in the LeClairRyan Case.

2.    I submit this declaration in support of the Trustee's Motion and Memorandum of Law for Entry of an Order (I) Approving (A) Judicially Mediated Settlement And (B) Compensation to Counsel Including an Improvident Payment Under Section 328(A); and (II) Granting Related Relief (the "**9019 Motion**" and/or "**Motion**"), filed on May 18, 2022.[2]

---

[1] The principal address of the Debtor as of the petition date was 4405 Cox Road, Glen Allen, Virginia 23060, and the last four digits of the Debtor's federal tax identification number are 2451.

[2]  All capitalized terms not defined herein have the meanings ascribed to them in the 9019 Motion.

Paula S. Beran, Esquire (Va. Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy: (804) 783-0178

*Counsel for Lynn L. Tavenner, Chapter 7 Trustee*

3.      The statements in this Declaration are, except where specifically noted, based on my personal knowledge of information that I have obtained in connection with my role as the Trustee. If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis.

4.      The relief requested in the 9019 Motion is based upon a valid exercise of my business judgment and is in the best interests of the Estate. The 9019 Motion seeks the entry of an order approving a settlement by and among me, on the one hand and  ULX Partners, LLC, ("**ULXP**") ULX Manager LLC, ("**ULX Manager**") and UnitedLex Corporation ("**United Lex**" and, together with ULXP and ULX Manager, the "**ULX Defendants**"), CVC Advisers (India) Private Limited and/or CVC Capital Partners ("**CVC**"), Daniel Reed ("**Mr. Reed**"), Nicholas Hinton ("**Mr. Hinton**"), Josh Rosenfeld ("**Mr. Rosenfeld**", and P. Douglas Benson ("**Mr. Benson**" and together with Mr. Reed, Mr. Hinton, Mr. Rosenfeld and the ULX Defendants, the "**Defendants**"), Travelers Casualty and Surety Company of America ("**Travelers**"), Continental Casualty Company ("**Continental**"), and Columbia Casualty Company ("**Columbia**") (collectively, Continental and Columbia are referred to as "**CNA**" and Travelers and CNA are referred to as the "**Insurers**")

5.      As part of my administration of this Estate and as I began investigating potential causes of action, I determined in the exercise of my business judgment that it was in the best interest of the Estate to request that this Court establish procedures for prosecuting and/or settling matters.  As such, I, through counsel,  proposed to this Court certain procedures, including but not limited to those in my Motion for an Order Establishing Procedures Regarding the Prosecution of Actions Involving Former Attorneys and Certain Others and Memorandum in Support Thereof

2

(the "**FAO Procedures Motion**"), which were approved by three orders of this Court (collectively,

the "**FAO Order**").

6.    On December 12, 2019 ULXP filed Proof of Claim No. 174 in the amount of

$8,563,288 and Proof of Claim No. 175 in the amount of $3,952,025 (collectively, the "**ULX**

**Partners Proofs of Claim**").

7.    On October 26, 2020, I, through counsel, filed an adversary proceeding against

ULXP and UnitedLex, Adversary Proceeding No. 20-03142 (as amended, the "**UnitedLex**

**Adversary Proceeding**"), which in addition to asserting numerous claims against ULXP and

UnitedLex also objected to the ULX Partners Proofs of Claim.

8.    Thereafter, I also issued demand letters to more than 200 other potential

defendants, including defendants Mr. Hinton, Mr. Reed, Mr. Rosenfeld, Mr. Benson, and CVC.

The FAO Order established procedures that, among other things, allowed for a potential

defendant to elect mediation prior to the filing a lawsuit and many Persons (as defined in the

Bankruptcy Code) chose that path.

9.    On June 7, 2021, I, through counsel, filed *Trustee's Application to Retain and*

*Employ Quinn Emanuel Urquhart & Sullivan, LLP as Special Counsel* (the **"Quinn** **Retention**

**Application**"), seeking to employ Quinn Emanuel Urquhart & Sullivan, LLP ("**Quinn**

**Emanuel**"). On June 28, 2021, this Court entered its *Order Authorizing the Retention and*

*Employment of Quinn Emanuel Urquhart & Sullivan, LLP as Special Counsel* (the "**Quinn**

**Retention Order**"), retroactive to May 18, 2021.

10.    On September 2, 2021, I, through counsel, filed a separate adversary proceeding

(No. 21-03095-KRH) (the "**Reed Adversary Proceeding**" and together with UnitedLex

Adversary Proceeding, the "**Two Adversary Proceedings**") against CVC as well as UnitedLex's

3

Chief Executive Officer, Mr. Reed, and its Chief Financial Officer, Mr. Hinton. In the Reed

Adversary Proceeding, I also asserted claims against Mr. Rosenfeld and Mr. Benson.  In the

Reed Adversary Proceeding, I asserted claims for, among other things, breach of fiduciary duty,

statutory and common law conspiracy, and constructive fraud (the "**Reed Adversary Claims**").

11.    Since the filing of the UnitedLex Adversary Proceeding, the Estate and the ULX

Defendants have been engaged in complex and substantial litigation, including a very active

motions practice, as well as extensive discovery consisting of written discovery, the exchange of

hundreds of thousands of pages of documents, depositions of more than a dozen witnesses

(including myself), and the retention of various experts.  In addition, throughout the ULX

Adversary Proceeding, this  Court entered several pre-trial orders governing the litigation

between the Estate and the ULX Defendants.

12.



---

[3]  At the time, the only defendants in the case were United Lex and ULXP.  ULX Manager was subsequently added
as a defendant with the filing of the Amended Complaint.



13.     On August 6, 2021, I, through counsel, filed a Motion for Leave to Amend Complaint and to Modify Pretrial Scheduling Order (the "**First Motion to Amend**") and on August 16, 2021 the ULX Defendants filed an Objection to the Trustee's Motion for Leave to Amend Complaint and to Modify Pretrial Scheduling Order (the "**Opposition to First Motion to Amend**").

14.     On August 24, 2021, this Court granted my Motion to Amend the Complaint resulting in the filing a First Amended Complaint in the UnitedLex Adversary Proceeding on August 25, 2021 (the "**Amended Complaint**"), which added ULX Manager and Gary LeClair as defendants.[4]

15.     After the granting of the Motion to Amend, a two-week trial in the UnitedLex Adversary Proceeding was scheduled to begin on April 14, 2022.

16.     

---

[4]   The claims against Gary LeClair have since been resolved (the "**D&O Settlement**") pursuant to an Order entered on December 3, 2021 granting a separate Motion for Approval of Compromise and Settlement and Memorandum of Law.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

17.     On January 28, 2022, the ULX Defendants filed a Motion for Summary Judgment (the **"Motion for Summary Judgement"**) and associated documents, seeking to dismiss certain of the UnitedLex Claims. I opposed the Motion for Summary Judgment (the "**Opposition to Summary Judgment**").  On February 11, 2022, I, through counsel, filed a Motion for Leave to Amend the First Amended Complaint (the "**Second Motion to Amend**") and associated documents under seal, which sought to add a single count of fraudulent inducement against UnitedLex and ULX Manager.  The ULX  Defendants opposed the Motion to Amend (the "**Opposition to Second Motion to Amend**").  At the request of the Mediator (as hereafter defined), this Court continued the hearings on both the Motion for Summary Judgment and the Second Motion to Amend to allow the Parties sufficient time to continue negotiations in an attempt to fully resolve the pending disputes between them.  As such this  Court has ruled on neither the Motion for Summary Judgment nor the Second Motion to Amend.

18.     On February 4, 2022, at the joint request of myself and the ULX Defendants, this Court entered an Order in the United Lex Adversary Proceeding (the "**Mediation Order**") appointing the Honorable Frank J. Santoro, the Chief Judge of the United States Bankruptcy Court for the Eastern District of Virginia, as the judicial mediator (the "**Mediator**"), to conduct a mediation ("**Mediation**") among me, the ULX Defendants, Mr. Reed and Mr. Hinton in their individual capacities, and Travelers, "[u]nless otherwise ordered by the Mediator in the

Mediator's sole discretion." ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████.

     19.     Between February 4 and March 5, at the direction of the Mediator, I (personally

and/or through counsel), the ULX Defendants, Mr. Hinton, Mr. Reed, Travelers, and CNA

participated in multiple lengthy conferences with the Mediator, exchanged mediation statements,

and/or provided the Mediator with certain information and/or supplemental written submissions.

     20.     On March 5 and March 6, 2022, I, along with the ULX Defendants, Mr. Hinton,

Mr. Reed, (all of whom I understood were represented by Greenberg Traurig██████████████████

████████████████████████████████ Travelers, and CNA, their respective counsel, and the

Mediator participated in a two-day in-person mediation in Richmond, Virginia.  This initial

mediation session lasted approximately a day and a half over a weekend but was ultimately

terminated by the Mediator with specific instructions given to the participating mediation parties.

     21.     On March 8, 2022, the Mediator entered the "Order Directing Defendants to

Produce Insurance-Related Information" (the "**March 8 Insurance Order**").  The March 8

Insurance Order directed the ULX Defendants, Mr. Hinton and Mr. Reed to provide to me,

among other things, 1) a "full and complete copy of any and all insurance policies (including but

not limited to insurance policies of Defendants' subsidiaries, parent companies, or affiliated

companies) that may provide any coverage (in full or in part) for any judgments awarded against

the [ULX Defendants] in this case, and/or against Mr. Hinton and/or Mr. Reed in the [Reed

7

Adversary Proceeding] and/or settlement amounts paid by any Defendants and/or by Mr. Hinton

and/or Mr. Reed in this case and/or the [Reed Adversary Proceeding]; or any fees, costs, and

expenses paid or incurred in this case by any Defendant, Mr. Hinton, and/or Mr. Reed in this

case and/or the [Reed Adversary Proceeding].   Such policies should also include any policies to

which any [ULX Defendant], Mr. Hinton, and/or Mr. Reed tendered coverage for the claims at

issue herein or the [Reed Adversary Proceeding], including all excess policies regardless of the

coverage position taken by the relevant insurance company"; and 2) "all coverage letters and/or

denial of coverage letters from any insurance company regarding coverage under any of the

policies provided [pursuant to the March 8 Insurance Order], including but not limited to

coverage positions taken by the insurance company, and any non-privileged or otherwise

protected response to such insurance company by the [ULX Defendants], Mr. Hinton, and/or Mr.

Reed thereto."

        22.      Also on March 8, 2022, the Mediator entered an "Order Directing the Exchange

of Information Between the Defendants, Nicholas Hinton, Daniel Reed, the Insurance

Companies and the Chapter 7 Trustee" (the "**Information Exchange Order**").  The Information

Exchange Order required, among other things, the Estate to provide "the identity of the Trustee's

anticipated trial expert with respect to the damages the Trustee alleges were proximately caused

by the [ULX Defendants, Mr. Reed and Mr. Hinton], as well as a summary of the expert's

opinions to date as to the amount of such alleged damages and the basis therefore (the

"**Trustee's Damages Report**")" given expert reports had not been exchanged as the same were

not yet due pursuant to this Court's various pre-trial order.   Additionally, the Information

Exchange Order required the ULX Defendants, Mr. Reed, and Mr. Hinton to identify the ULX

Defendants' "anticipated expert as to damages, along with a summary of that expert's opinions

to date rebutting the Trustee's Damage Report." Finally, the Information Exchange Order also

directed that the ULX Defendants provide the Mediator for his "*en camera review*, their year-end

financial statements for the last two years, as well as financial statements indicating their current

financial condition."

23.     On March 9, this Court entered an order that the trial in this matter be continued

until May 17 and also continued other pending motions in the ULX Adversary Proceeding.

24.



25.     Thereafter, the Mediator requested additional information from me

26.     Quinn Emanuel reviewed and analyzed _____ to

determine how best to position  the litigation to maximize the amount of recovery

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████ Accordingly, the

Estate, through Quinn Emanuel, was left with no other option but to conduct this ████████

████████ analysis on its own in order to aid the upcoming mediation discussions, as well as

advise me on strategic decisions.

27.    In addition, in light of ████████████████, the Estate, through primarily

Quinn Emanuel, was forced to also devote significant resources during this time to research

certain legal and damage theories to enable me to assert the strongest arguments for causes of

actions (and associated damages) that ██████████████████████████

████. This was a careful and detailed exercise because Quinn Emanuel  had to find pathways

to proceed ███████████████████████████████████████

████████████████████████████████████████████████

████████ this was a time-consuming, but critical, step, including extensive legal analysis, factual

analysis, and work with experts.

28.    After additional extensive research and analysis, my counsel diligently provided

all information that was requested by the Mediator.  The Estate, through Quinn Emanuel, also

took steps to ████████████████████████████████. In light of

additional detailed analysis and information provided by my counsel to the Mediator, ████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████.

29.     On April 13, 2022, after continued hard fought and arm's-lengths negotiations, a global and comprehensive proposal was made by the Mediator to fully and finally resolve all of the pending Claims in the Two Adversary Proceedings (the "**Mediator's Proposal**").   At the direction of the Mediator, the Defendants and the Insurers had until no later than noon on April 19, 2022 to (a) accept or reject the Mediator's Proposal in total and (b) if accepted, provide specifics as to the manner, timing, and related security for payments and/or promises to pay (collectively, the "**Settlement Payment Nuances**").

30.     The hearing on the Second Motion to Amend was to be heard by this Court at 11:00 a.m. on April 19, 2022. Approximately 30 minutes before that hearing, the Defendants and the Insurers agreed to the Mediator's Proposal and provided the Settlement Payment Nuances. The Mediator immediately conveyed the same to my counsel with the instruction that I, before the 11:00 a.m. hearing, either accept or reject the Mediator's Proposal (and related Settlement Payment Nuances)  that had been accepted by the Defendants and the Insurers.  In the exercise of my business judgement, I determined that the Mediator's Proposal (and related Settlement Payment Nuances) was in the best interest of the Estate and, as such, accepted the same (the "**Settlement**").  Thereafter, the Mediator directed me, through counsel, to inform this Court at the impending hearing of the material terms of the Settlement.  Thereafter, the material terms of the Settlement were set forth on the record at the April 19, 2022 hearing with the participation of counsel for the ULX Defendants, Mr. Hinton, and Mr. Reed. And, the hearing on the Second Motion to Amend was continued to allow time to document the Settlement.

31.     In addition to the terms being articulated on the record at the April 19, 2022

hearing, the Settlement is further memorialized in a certain settlement agreement (the

"**Settlement Agreement**").  While I encourage creditors to review the Settlement Agreement for

the specific terms of the Settlement (creditors may obtain a copy of the same by written request

to Paula S. Beran, Esquire at pberan@tb-lawfirm.com and written agreement to keep the terms of

the Settlement confidential) and a further understanding as to why the Settlement is in the best

interest of the Estate, I perceive the following as the salient terms:[5]

   a.  **Continental Payment:**   In consideration of the mutual releases, covenants,
       representations, and undertakings, the Defendants, and the Insurers, Continental
       shall pay the Estate a sum of five million dollars ($5,000,000) on or before the
       Closing Date.

   b.  **Columbia Payment:**   In consideration of the mutual releases, covenants,
       representations, and undertakings, the Defendants, and the Insurers, Columbia shall
       pay the Estate a sum of seven million two hundred and fifty thousand dollars
       ($7,250,000) on or before the Closing Date.

   c.  **Travelers Payment**:   In consideration of the mutual releases, covenants,
       representations, and undertakings,  the Defendants, and the Insurers, Travelers shall
       pay the Estate a sum of five hundred thousand dollars ($500,000) on or before the
       Closing Date.

   d.  **Defendants' Payment and Pledge of Security:**  In consideration of the mutual
       releases, covenants, representations, and undertakings, Defendants, the Defendants

---

[5]  The summary set forth in this section is qualified by the specific provisions of the Settlement Agreement.  To the
extent there is any inconsistency between this summary and the Settlement Agreement, the Settlement Agreement
governs.

shall pay to the Estate a total sum of eight million two hundred and fifty thousand dollars ($8,250,000).  This sum is scheduled to be paid in three installments.  The first installment of at least two million dollars ($2,000,000) will be paid on or before the Closing Date.  The second installment of three million dollars ($3,000,000) will be paid on or before the first anniversary of the Closing Date, and the third installment of three million two hundred and fifty thousand dollars ($3,250,000) will be paid on or before the second anniversary of the Closing Date. Both the Second Defendants' Payment and the Third Defendants' Payment are fully secured by Notes and Irrevocable Letters of Credit.

e.  **Starr Policy Proceeds:** As part of the Settlement Agreement, neither the Defendants nor the Estate release Starr from any obligations under the Starr Policy. If any of the Defendants receive any proceeds from Starr under the Starr Policy related to this matter, the proceeds (net any costs of reasonable attorneys' fees incurred in pursuit of the collection of the proceeds) must be turned over and paid to the Estate.

f.  **Waiver of Proofs of Claim:** ULX Partners, LLC agrees to waive the ULX Partners Proofs of Claim, the present value of which is estimated by the ULX Defendants (and not me) to be $2.4 million.

g.  **Consensual Releases:** The Settlement Agreement includes certain consensual releases of Claims amongst the Parties.

h.  **Compensation of Counsel:** Quinn Emanuel shall be entitled to receive 35% of the Total Settlement Payment as provided in the Quinn Retention Order (the "**Contingency Payment**").  In addition, the Settlement Agreement contemplates an

13

additional payment of an amount not to exceed $3,150,000 (the "**Improvident Payment**") to Quinn Emanuel.  The Improvident Payment is subject to the Estate receiving the Total Settlement Payment and the Defendants do not object to the Improvident Payment.  Furthermore, Quinn Emanuel provided necessary additional non-contingent services (the "**Additional Services**") that arose from the Two Adversary Proceedings that otherwise would have been compensated on an hourly basis had I and Quinn Emanuel known all of the facts and circumstances regarding this matter. Notwithstanding the fact that Quinn Emanuel asserts that the value of the Additional Services exceeds the amount of the Improvident Payment, the Settlement Agreement provides that Quinn Emanuel agrees to limit the amount of the Improvident Payment to the lesser of $3,150,000 or such other amount otherwise approved by this Court.

     i.   **No admission of liability by any of the Parties**

     j.   **Dismissal:**  The Two Adversary Proceedings will be dismissed with prejudice.

32.    The Settlement, as documented in the Settlement Agreement, was the product of an arms-length negotiation, and globally resolves, on terms beneficial to the Estate, complicated litigation in the Two Adversary Proceedings, the continued pursuit of which would be costly and time consuming and pose the risk of an unfavorable result.

33.    I believe that the Settlement is fair, equitable, in the best interests of the Estate, appropriate in my business judgment, and easily falls within the reasonable range of outcomes. As set forth above, the Settlement is the culmination of more than several months of negotiations among the parties, with the Mediator's assistance and direction, and represents a global resolution of the Claims.  I, in the exercise of my business judgment and in consultation with my

14

professionals and the Mediator, believe that the Settlement is a fair, reasonable, and responsible compromise and resulted in maximum value to the Estate for the reasons that follow.

34.    First, the Settlement is the result of extensive good faith and arms-length negotiations among me, the Defendants, and the Insurers.  It was aided and directed by the substantial participation and input of the Mediator and represents a result well above the lowest bound of the range of reasonableness.  The Settlement is, in fact, the Mediator's Proposal. This Settlement is not collusive and represents a fair compromise of the disputes.

35.    If the Court approves the 9019 Motion and authorizes me to enter into the Settlement via the Settlement Agreement, the Estate will receive (i) fourteen million seven hundred fifty thousand dollars ($14,750,000) on or before the Closing Date; and (ii) an additional six million two hundred fifty thousand dollars ($6,250,000) after the Closing Date (collectively, the "**Settlement Payment Cash Funds**").   These amounts, which are a sum certain, are potentially greater than any recovery the Estate would ultimately receive even if the Two Adversary Proceedings proceeded to judgement and is well above the lowest bound of the range of reasonableness. In addition, there is a monetary value to the waiver of the ULX Partners Proof of Claims; however, the same is minimal and uncertain at this time given the status of the current claims pool in this Case.

36.    Second, both before and during the Mediation, I conducted due diligence on the enforcement and ultimate collectability of potential judgments against the Defendants.  ███████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

Significantly, the majority of the Settlement Payment Funds are available on the Closing Date,

allowing me and my professionals to focus time and effort on other important matters in this

Bankruptcy Case including but not limited to the review, analysis and resolution of alleged

administrative expenses and pre-petition claims.

      37.    Third, the consideration identified in the Settlement Agreement represents a fair

and reasonable compensation to the Estate for the Claims in light of the uncertainty and risk

associated with time-consuming and expensive litigation that could result in an unfavorable

outcome. Additional Estate resources that would have been spent on, among other things, a two-

week trial in the United Lex Adversary Proceeding, prosecuting the Reed Adversary Proceeding,

and any associated appeals are preserved for the benefit of creditors.   Given the scope and

complexity of the United Lex Adversary Proceeding, I anticipated that the Reed Adversary

Proceeding could have been equally time-consuming and complicated. Moreover, in agreeing to

the releases provided for in the Settlement Agreement, we all contemplated the value of the

Claims being released.

      38.    Fourth, the Settlement as directed by the Mediator and memorialized in the

Settlement Agreement is fair and equitable to the Estate, its creditors, and other parties in

interest.  The value of the Settlement, which includes the Settlement Payment Cash Funds and

the waiver of the ULX Partners Proof of Claims, represents a result well above the lowest bound

of the range of reasonableness and does not prejudice other creditors or parties in interest.   To

the contrary, the Settlement should allow me to make a meaningful distribution to creditors,

subject to of course the ultimate amount of allowed administrative expenses and pre-petition

claims.  Most importantly, the Settlement will allow the Estate to proceed towards a more

expeditious resolution, rather than prolonged litigation (and potential appeals) in the Two

Adversary Proceedings.

39.    Finally, the Improvident Payment was unilaterally directed by the Mediator as part of the Mediator's Proposal as a material and integral term of the Settlement and as such is in the best interest of the Estate.  Until receiving the Mediator's Proposal, I had never heard mentioned or contemplated the Improvident Payment.  Absent approval of the Settlement, I understand that Quinn Emanuel now would otherwise seek compensation on an hourly basis by the Estate in an amount that Quinn Emanuel estimated would exceed $3,150,000.   Furthermore, Quinn Emanuel has agreed to limit the amount of the Improvident Payment to the lesser of $3,150,000 or an amount otherwise approved by this Court.   As such, the Settlement provides a sum certain to be recovered by the Estate and defers to this Court as to the ultimate allowance of the Improvident Payment to Quinn Emanuel in an amount as determined by this Court but in no instance greater than $3,150,000.

40.    Therefore, for the foregoing reasons, I respectfully submit that the Settlement satisfies the standards for approval under applicable law and that the Court should therefore approve the Settlement Agreement pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019.

41.    I recognize that increasing compensation under section 328(a) of the Bankruptcy Code is an extraordinary request. In the 25 years of serving as a Chapter 7 trustee, this is the first time that I have approved of any such request.  In addition to the Improvident Payment being directed by the Mediator as a material and integral part of the Settlement in connection with his Mediator's Proposal, I also maintain that Quinn Emanuel is entitled to the Improvident Payment pursuant to section 328(a) of the Bankruptcy Code.  After all, the Improvident Payment was part of the Mediator's Proposal and the Mediator, a sitting bankruptcy judge, would not have proposed anything that was contrary to the provisions of the Bankruptcy Code.  And, the terms of the Quinn

17

Retention Order have proven to be improvident in view of circumstances in this matter that were not capable of being anticipated and thus the circumstances warrant compensation for Quinn Emmanuel that may be different from the compensation provided in the Quinn Retention Order. Neither Quinn Emanuel nor I could have anticipated certain developments in the United Lex Adversary Proceeding that required Quinn Emanuel to invest significantly more hours and expenses without any assurance of compensation.

42.     There were unique and unpredictable circumstances justifying the Improvident Payment.  While I was not privy to the exact circumstances the Mediator considered in unilaterally directing the Improvident Payment as part of the Mediator's Proposal, the unanticipated circumstances ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

were not capable of anticipation by either me or Quinn Emanuel at the time the Quinn Retention Order was entered by this Court. At the time the Quinn Retention Order was entered, neither I nor Quinn Emanuel were capable of anticipating that ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

18

██████████ (collectively, the "**Unforeseen Events**").  These were all unique and unpredictable circumstances that justify the Improvident Payment and were not capable of being anticipated. Further, it was not possible for me or Quinn Emanuel to anticipate the resulting significant change of circumstances that fundamentally altered the trajectory of the Two Adversary Proceedings, including, among other things, the prosecution of the Claims and calculation of damages resulting therefrom.

43.    In furtherance of the Estate's litigation strategy, I relied to the Estate's detriment on ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████

44.    I understand that Quinn Emanuel will provide pertinent details to this Court regarding the timekeepers, rates, hours, and other key information that will enable this Court to use its own gatekeeper function to meaningfully review and approve the reasonableness of the amount of the Improvident Payment that was unilaterally directed by the Mediator.  Furthermore, I, in the exercise of my business judgment, believe the amount of the Improvident Payment to be reasonable given a) the same was part of the Mediator's Proposal, b) my understanding of the time expended to persevere where others would have not, especially in consideration of the amount to now be recovered by the Estate and c) the amount of fees Quinn Emanuel actually incurred between ████████████████████████████████████████████████, through April 19, 2022, the date that the Settlement was put on the record.

19

45.     My examination of the time expended by Quinn Emanuel to persevere where others would have not revealed that the value of the Additional Services likely exceeds $3,150,000 as represented by Quinn Emanuel.  First and foremost, a review of raw time records demonstrates $2,548,566 of value from February  4, 2022  (the point in time when the Parties sought joint mediation ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████ ) through April 19, 2022 (the date the Settlement was placed on this Court's record).  Additionally, the $2,548,566 represents  only the time billed by  Quinn Emanuel to the UnitedLex Adversary Proceeding internal billing number  I understand that there were other internal Quinn Emanuel billing numbers where time was recorded and certain of said time relates to Additional Services due to the Unforeseen Events.  For example, there is a separate matter number whereby time was also recorded for items related to the UnitedLex Adversary Proceeding, such as to interview attorney defendant witnesses, obtain cooperation and, in the instance of one attorney, have him assist in a damages analysis as a result of the Unforeseen Events.  I understand that the value of recorded hours to that separate matter number from February 4, 2022 through April 19, 2022 is approximately $235,000, bringing the estimated value of the Additional Services from $2,548,566 to $2,783,566.  I also have confirmed that the value of the Additional Services is even greater during this time period because there became a point where certain timekeepers did not record their time because it was a contingency matter.  For example, I reviewed the time records and confirmed that no time was recorded by the insurance expert at Quinn Emanuel for any services during the Mediation in April. I was in the room when there were multiple calls with her so I know she spent significant time on the matter but for which she recorded nothing on the Quinn Emanuel internal billing number for

the UnitedLex Adversary Proceeding.  This is only one example that easily jumps out at me.  In

addition to the unrecorded time, the $2,783,566 amount attributed to the Additional Services is

even greater because the services as currently recorded were billed at discounted rates.  But for the

Unforeseen Events causing extreme time constraints and forcing us to target all resources on

preserving value for the Estate, there would have been a budget approval process for me to actually

authorize Quinn Emanuel to perform additional services that were not included as part of the

contingency aspect ██████████████ .  I am confident that as part of that process, the budget

would have included rates that were not discounted; removing a 10% discount results in a number

of $3,061,922.60.  Similarly, the time would have been based upon 2022 rates given Quinn

Emanuel had the right under the Quinn Retention Order to increase its rates periodically but had

not officially done so in January (since everything was contingent).  In looking at just one

individual (and there were over 25 timekeepers), said increased 2022 rates would have increased

the value by approximately $24,000.  So for all of these reasons, I in the exercise of my business

judgment, believe that Quinn Emanuel's representation that the value of the Additional Services

exceeds $3,150,000 is reasonable and accurate.

46.    In addition to valuing the Additional Services that occurred because of the

Unforeseen Events, I also maintain that a reasonable person could conclude that another measure

of the reasonableness of the amount of the Improvident Payment is the amount of fees Quinn

Emanuel actually incurred between ████████████████████████

███████ , through April 19, 2022, the date that the Settlement was put on the record. ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

21

███████████████████████████████████████████████ Based on

raw time records that I have seen, the amount of fees Quinn Emanuel actually incurred between

█████████ and April 19, 2022 exceeds $3,150,000 by more than two fold.

47.    I,  in the exercise of my business judgment and in consultation with my

professionals, believe that the Settlement (a) is fair and equitable and in the best interests

of the Estate and (b) results in maximum value to the Estate.

48.    To the best of my knowledge, information, and belief, I declare under penalty of

perjury that the foregoing is true and correct.

LYNN L. TAVENNER, CHAPTER 7 TRUSTEE

Dated: June 3, 2022                By: /s/ *Lynn L. Tavenner*
  Richmond, Virginia                   Lynn L. Tavenner, Chapter 7 Trustee



Respectfully submitted,

**LYNN L. TAVENNER, CHAPTER 7 TRUSTEE**

Dated: June  3, 2022               By: */s/ Paula S. Beran*
  Richmond, Virginia                 Paula S. Beran, Esquire (VSB No. 34679)
                                     PBeran@TB-LawFirm.com
                                     Tavenner & Beran, PLC
                                     20 North 8th Street
                                     Richmond, Virginia 23219
                                     Telephone: (804) 783-8300
                                          *Counsel for Lynn L. Tavenner, Chapter 7 Trustee*

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of June 2022, a true copy of the foregoing Declaration was
filed under seal pending this Court's final ruling on the request by the United Lex Defendants to
seal aspects of the 9019 Motion.  Thereafter, the foregoing Declaration will be served as
provided in said ruling.

*/s/ Paula S. Beran*
Paula S. Beran, Esquire
*Counsel for Lynn L. Tavenner, Chapter 7 Trustee*

Attachment F

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Richmond Division)

| | |
|---|---|
| In re:<br><br>**LeClairRyan PLLC,**[1]<br><br>Debtor. | **Chapter 7**<br><br>**Case No. 19-34574 (KRH)** |
| **Lynn L. Tavenner, as Chapter 7 Trustee,**<br><br>Plaintiff,<br><br>v.<br><br>**ULX Partners, LLC, ULX Manager, LLC, UnitedLex Corporation, and Gary LeClair,**<br><br>Defendants. | **Adv. Proc.: 20-03142(KRH)** |
| **Lynn L. Tavenner, as Chapter 7 Trustee,**<br><br>Plaintiff,<br><br>v.<br><br>**CVC Capital Partners, Daniel Reed, Nicholas Hinton, Josh Rosenfeld, P. Douglas Benson,**<br><br>Defendants. | **Adv. Proc.: 21-03095 (KRH)** |

## <u>DECLARATION OF BRITTANY J. NELSON</u>

---

[1] The principal address of the Debtor as of the petition date was 4405 Cox Road, Glen Allen, Virginia 23060, and the last four digits of the Debtor's federal tax identification number are 2451.

Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
(202) 538-8334 (telephone)
Email:  erikamorabito@quinnemanuel.com
        brittanynelson@quinnemanuel.com

*Special Counsel to Lynn L. Tavenner, Chapter 7 Trustee*

I, Brittany J. Nelson, pursuant to 28 U.S.C. § 1746, hereby declare as follows under penalty of perjury to the best of my knowledge, information, and belief:

1.      I submit this declaration in support of the Trustee's Motion and Memorandum of Law for Entry of an Order (I) Approving (A) Judicially Mediated Settlement and (B) Compensation to Counsel Including an Improvident Payment Under Section 328(A); and (II) Granting Related Relief (the "**9019 Motion**") [Dkt No.[2] 211].[3]

2.      I joined Quinn Emanuel Urquhart & Sullivan, LLP ("**Quinn**" or "**Special Litigation Counsel**") as a lateral partner on May 18, 2021.  While at Quinn, I have been staffed continuously on Quinn's representation of the Trustee since May 2021.  It has been, and continues to be, a large part of my responsibilities and duties to manage, supervise, and/or work on the UnitedLex Litigation, the Reed Adversary Proceeding, and other proceedings in the Bankruptcy Case.  Most recently, I have been heavily involved in the settlement negotiations between the Trustee, the Insurers, and the Defendants and I have personal knowledge of the facts and issues described herein.

**Quinn's Retention Application**

3.      Quinn is one of the most respected and feared law firms in the world, specializing in litigation.  It enters into contingency fee arrangements only on rare occasions, after great scrutiny by a Contingency Fee Committee.  Absent special and unique circumstances, Quinn generally does not advise clients on insurance-coverage related matters on a contingency basis.  In agreeing to enter into the Engagement Letter, Quinn carefully considered the potential strengths

---

[2]  All "Dkt" references are to the Docket in the UnitedLex Adversary Proceeding, unless otherwise indicated herein.

[3]  All capitalized terms not defined herein have the meanings ascribed to them in the 9019 Motion.

2

and weaknesses of the case and carved out certain tasks from the contingency matter in the Engagement Letter (as hereafter defined), including insurance related matters in this case. Quinn Retention Order at ¶ 15.

4.    On June 7, 2021, the Trustee filed *Trustee's Application to Retain and Employ Quinn Emanuel Urquhart & Sullivan, LLP as Special Litigation Counsel* [Main Dkt No. 908] (the "**Quinn Retention Application**").  On June 28, 2021, the Court entered its *Order Authorizing the Retention and Employment of Quinn Emanuel Urquhart & Sullivan, LLP as Special Litigation Counsel* [Main Dkt No. 937] (the "**Quinn Retention Order**"), retroactive to May 18, 2021.  The Quinn Retention Order is attached hereto as **Exhibit 1**.

5.    The terms of the Quinn Retention Application, as reflected in the both the Quinn Retention Order and the Engagement Letter (as defined in the Quinn Retention Order), allow the Trustee to employ Quinn for both "Contingency Matters" and "Non-contingency matters."  Quinn Retention Order at ¶¶ 3-4.

6.    For the reasons set forth in 9019 Motion, the Trustee is seeking authorization to pay Quinn seven million, three hundred and fifty thousand dollars ($7,350,000) consistent with the terms of the Quinn Retention Order, the Engagement Letter, and with previous applications submitted by Quinn and approved by the Bankruptcy Court.  In addition, pursuant to the terms of the Settlement Agreement, the Trustee is also seeking authorization to pay Quinn an Improvident Payment of $3,150,000, or an amount to be determined by the Court (collectively, the "**ULX Contingency Payment**").

7.    Quinn has not made any prior request for the ULX Contingency Payment.  Except as provided in the Quinn Retention Application and the Quinn Retention Order, Quinn has also not

received any payments on account of the fees requested in the 9019 Motion, including the ULX Contingency Payment.

8.      No agreement or understanding exists between Quinn and any other person for the sharing of compensation received or to be received for services rendered in connection with this Case.[4]

**The UnitedLex Adversary Proceeding**

9.      As part of Quinn's role as the Trustee's special litigation counsel, Quinn has been involved with prosecuting individuals under the FAO Order including but not limited to serving as counsel for the Trustee in the UnitedLex Adversary Proceeding, the Reed Adversary Proceeding, and other adversary proceedings against former attorneys and others associated with LeClairRyan (the "**FAO Defendants**").

10.     In the UnitedLex Adversary Proceeding, Greenberg Traurig, LLC ("**Greenberg**") represented the ULX Defendants, Hinton, and Reed and employed what I would describe as a "scorched earth" litigation strategy, litigating practically every issue in the UnitedLex Adversary Proceeding.

11.     More specifically, since the filing of the UnitedLex Adversary Proceeding on October 26, 2020, the Trustee and the ULX Defendants have been engaged in complex and substantial litigation.  There has been an active motions practice, which has included, among other things, briefing three separate motions to dismiss [Dkt Nos. 17, 88, 104], two motions to amend the complaint [Dkt Nos. 73, 149], as well as a Motion to Withdraw the Reference which was

---

[4] This statement is consistent with the representations made by Quinn in all of its previous applications to the Bankruptcy Court.  *See* Main Dkt Nos. 992, 1120 and 1245.  Despite Foley having filed a Limited Objection to the 9019 Motion [Main Dkt No. 1365] (the "**Foley Limited Objection**"), there is no agreement at this time to split any fee, including but not limited to the ULX Contingency Fee, with Foley, and that issue is not properly before this Court.

appealed to the District Court [Dkt No. 16]. In addition, there has been extensive discovery, consisting of written discovery, the exchange of hundreds of thousands of pages of documents, discovery disputes (including numerous meet and confers) and related discovery motions, depositions of more than a dozen witnesses, and the retention and utilization of various experts.

12.    Following the close of discovery on January 24, 2022, the litigation shifted heavily into a very labor-intensive and complex ███████████ █ ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████. Moreover, multiple insurers floated various defenses to potential coverage once confronted with a demand for payment, requiring the Trustee and her counsel to continually shift its litigation strategy.

13.    Initially, the Trustee filed the ULX Adversary Proceeding against only UnitedLex and ULXP. Pursuant to Federal Rule of Civil Procedure 26 (made applicable by Bankruptcy Rule 7026) and the Bankruptcy Court's Pretrial Order entered on December 17, 2020 [Dkt No. 9], UnitedLex and ULXP served their initial disclosures on December 31, 2020 (the "**Initial Disclosures**"). The Initial Disclosures are attached hereto as **Exhibit 2**.

14.    ██████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████

15.    ██████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████.

16.     When the Initial Disclosures were made, the only defendants in the UnitedLex
Adversary Proceeding were UnitedLex and ULXP.  On August 24, 2022, the Bankruptcy Court
granted the Trustee's Motion to Amend the Complaint [Dkt 85].  Thereafter, on August 25, 2021,
the Trustee filed the Amended Complaint [Dkt No. 86], which, among other things, added ULX
Manager as a defendant.

17.     As a result of the filing of Amended Complaint, the Bankruptcy Court entered a
new pre-trial order, the Third Amended and Restated Pretrial Order [Dkt No. 100] (the "**Third
Pretrial Order**") (which is attached hereto as **Exhibit 3**).  That order specifically mandated that
"[t]o the extent not already provided, the parties shall make the pretrial disclosures required under
Rule 7026(a)(1) of the Federal Rules of Bankruptcy Procedure within 14 days following the
Court's entry of this Pre-Trial Order."  *Id.* at ¶ 3.

18.     On October 4, 2021, ULX Manager filed its initial disclosures (the "**ULX Manager
Initial Disclosures**") (which is attached hereto as **Exhibit 4**).   In the ULX Manager Initial
Disclosures, ULX Manager "adopt[ed] as their own the Rule 7026(a)(1)(A) Initial Disclosures
served by Defendants ULX Partners, LLC and UnitedLex Corporation on December 31, 2020, as
supplemented by ULX Partners, LLC's and UnitedLex Corporation's responses to the Trustee's
interrogatories and requests for production of documents in this matter."  UnitedLex and ULXP
did not serve or update the Initial Disclosures at this time. ████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████.

19.    ███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

20.    Between October 4, 2021 and the close of discovery on January 21, 2022, the Trustee and the ULX Defendants engaged in extensive discovery, including but not limited to taking more than a dozen depositions in December and January.

21.    Following the close of discovery, on February 1, 2022, the ULX Defendants' counsel and the Trustee's counsel held a meet and confer regarding the Trustee's desire to amend the Amended Complaint.  I participated on that call, as well as certain of my colleagues at Quinn including Ms. Morabito and Mr. Grable ("**February 1 Meet and Confer**").

22.    ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

7



23.

24.



25.

26.    At the February 4 Hearing, which I attended on behalf of the Trustee, my colleague Ms. Morabito represented to the Court that the Trustee had made it a condition that any D&O carrier was required to attend the mediation.  Following that hearing, the Bankruptcy Court ordered that "Unless otherwise ordered by the Mediator in the Mediator's sole discretion, the Trustee, the Parties, Daniel Reed, Nicholas Hinton, Travelers Insurance Company and each of the foregoing's counsel shall attend the mediation." [Dkt. No. 142].  The Bankruptcy Court also made clear at the hearing that regardless of the decision to engage in mediation, the trial scheduled on April 18, 2022 would go forward.

27.







35. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

36.    On March 5 and March 6, 2022, certain of the Parties, their respective counsel, and the Mediator participated in a two-day in-person mediation in Richmond, Virginia. I attended this mediation (the "**First Mediation**"). Among other things, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

37. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

38. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



39.

40.

41.

42.

_____
[5] Counsel for CNA also represents both Columbia and Continental.

43. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

44.     Thereafter, on March 8, 2022, the Mediator entered the March 8 Insurance Order and the Information Exchange Order.

45.     Also on March 8, 2022, the Bankruptcy Court held a status conference and explained that the Mediator had asked the Court to continue the trial to allow mediation to continue.  The Bankruptcy Court rescheduled the trial for May 16. █████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████████.

46.     Based on the information that the Trustee learned at the First Mediation regarding

████████████████████████████████████████████████████████████



**The Insurance Related Production**

47.	On March 18, 2022, the ULX Defendants produced approximately 5,000 pages of documents responsive to the March 8 Order (the "**March 18 Production**").

48.	The Special Litigation Counsel spent considerable time reviewing and analyzing the documents in the March 18 Production.

49.





50.

51.    The Special Litigation Counsel, including myself, and counsel for the ULX

Defendants, Mr. Reed and Mr. Hinton, participated in several telephone conferences to meet and

confer

52.

53.

---

[7]



56.    In addition, in light of the ███████████████████████, and the extraordinary tight timeframe before the beginning of trial, the Trustee requested that her Special Litigation Counsel devote significant time and resources to researching and analyzing ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

57.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

**The Mediation Continues and the Parties Agree to the Mediator's Proposal**

58.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



59.

60.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

61.    In addition, between the First Mediation and the Second Mediation, the Special

Litigation Counsel also devoted a significant amount of resources and effort to: ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

62.    After further exchanges of substantive information between the ULX Defendants,

the Trustee, and/or the Mediator, certain of the Parties continued the in-person mediation on

April 12 and 13, 2022 in Richmond, Virginia.  I, along with several of my colleagues, attended the

Second Mediation.

63.    During the Second Mediation, it became clear to the Trustee that the best path

forward would be a global resolution of all claims (and potential claims) ██████████████████

████████████████████████████████████████████████████[8]██████████████████

---

[8] ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

64.     On April 13, 2022, after continued hard fought and arm's-lengths negotiations between all of the Parties (that I personally was involved in), the Mediator made a global and comprehensive proposal to fully and finally resolve all of the pending Claims in the Two Adversary Proceedings (the "**Mediator's Proposal**").   The Mediator's Proposal included the Improvident Payment.  This proposal was made entirely at the direction of the Mediator.  Neither Quinn nor the Trustee had any input into the Mediator's Proposal, nor did they make any request (directly or indirectly) for the Improvident Payment.   In addition, the Mediator's Proposal was presented to all of the Parties as a "take it or leave it" proposition.  It was my understanding from the Mediator that the Improvident Payment was a material and integral part of the Mediator's Proposal. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

65.     At the direction of the Mediator, the Defendants and the Insurers had until no later than 12 p.m. on April 19, 2022 to (a) accept or reject the Mediator's Proposal in total; and (b) if accepted, provide specifics as to the manner, timing, and related security for payments and/or promises to pay (collectively, the "**Settlement Payment Nuances**").

21

66.    Prior to the Mediator advising the parties of the Mediator's Proposal, which included among other things the Improvident Payment, no one from Quinn had any discussions with anyone (including but not limited to the Mediator, the Trustee, or any of the Parties) as to the actual Mediator's Proposal (or the Improvident Payment contained therein).    Additionally, the Improvident Payment in no way impacted Quinn's advice to the Trustee as to whether the Trustee should accept or reject the Mediator's Proposal.

67.    The hearing on the Second Motion to Amend was to be heard by the Bankruptcy Court at 11:00 a.m. on April 19, 2022.  Approximately 30 minutes before that hearing, however, the Defendants and the Insurers agreed to the Mediator's Proposal and provided the Settlement Payment Nuances, and the same was immediately conveyed to Special Litigation Counsel.  The Trustee thereafter was asked to accept or reject the Mediator's Proposal with the Settlement Payment Nuances that had been already accepted by the Defendants and the Insurers.  In the exercise of her business judgement the Trustee determined that the Mediator's Proposal with the Settlement Payment Nuances was in the best interest of the Estate and as such accepted the Settlement.  Thereafter, the Mediator directed the Trustee, through counsel, to inform the Court at the impending hearing of the material terms of the Settlement reached between the Parties.  As such, the material terms of the Settlement, including the Improvident Payment, were set forth on the record at the April 19, 2022 hearing with the participation of counsel for the ULX Defendants, Mr. Hinton, and Mr. Reed.  I, along with several of my colleagues, attended that hearing on behalf of the Trustee.

**The Settlement is Fair and Equitable and in the Best Interest of the Estate**

68.     Following the receipt of the Mediator's Proposal and the Settlement Payment Nuances, and in consultation with the Trustee, Quinn and the Trustee agreed that entry into the Settlement on those terms was fair, equitable, and in the best interest of the Estate.  I participated in this analysis and multiple discussions with the Trustee regarding the same.

69.     ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████.

70.     The Special Litigation Counsel and the Trustee contend that the Settlement preserves additional Estate resources that would have been spent on, among other things, a two-week trial in the UnitedLex Adversary Proceeding, prosecuting the Reed Adversary Proceeding, and associated appeals.  Given the scope and complexity of the UnitedLex Adversary Proceeding, the Special Litigation Counsel had anticipated that the Reed Adversary Proceeding could have been equally time-consuming and complicated.

71.     Finally, absent approval of the Settlement, Quinn would seek compensation on an hourly basis from the Estate (consistent with the terms of the Engagement Letter) in an amount that could likely exceed the amount of the Improvident Payment that was directed solely by the Judicial Mediator.  Furthermore, despite the Mediator declaring it a material and integral part of the Settlement (as set forth on the record on April 19, 2022), Quinn voluntarily agreed to limit the amount of the Improvident Payment to $3,150,000 or an amount otherwise approved by the

Bankruptcy Court, as reflected in the Settlement Agreement. As such, the Settlement Agreement provides a sum certain to be recovered by the Estate.

**The Unforeseen Events** ████████████████████████████████████████

72.     At the time the Quinn Retention Order was entered, neither the Trustee nor the Special Litigation Counsel were capable of anticipating that ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ (5) other unanticipated developments resulting therefrom (collectively, the "**Unforeseen Events**"). These were all unique and unpredictable circumstances that were not capable of being anticipated and further support the Improvident Payment directed by the Mediator.

73.     In light of the Unforeseen Events, the Special Litigation Counsel and the Trustee followed a litigation path that was consistent with the representation ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Moreover, the Special Litigation Counsel and the Trustee proceeded litigating until on or about

24

March 18, 2022 ███████████████████████████████████████████████

████████████████████████████████████████████████████████████.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

74.    **Earlier  Resolution**: ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████. ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



75.    **Pursuit of Different Causes of Action**:

). More specifically, there are at least two large strategic issues on which the Special Litigation Counsel may have given different advice to the Trustee had it been capable of anticipating the Unforeseen Events. First, the Special Litigation Counsel may not have recommended to the Trustee to file the Second Motion to Amend.

Further, the cost-benefit analysis of filing such a motion that was discussed with the Trustee would likely have been drastically different had the Special Litigation Counsel been capable of anticipating the Unforeseen Events. Second, another large strategic litigation decision for the Special Litigation Counsel involved prosecuting a conspiracy cause of action against UnitedLex and others, given the Bankruptcy Court's ruling on the motion to dismiss [Dkt No. 57] on July 20, 2021 and other subsequent facts uncovered during discovery.

it is likely that the Special Litigation Counsel and the Trustee

would have chosen a different course of action for the conspiracy claims than the one adopted for strategic purposes, efficiency, time, costs, and risk.

76.    **Reed Adversary Proceeding:**  The Special Litigation Counsel also may have advised the Trustee differently regarding the filing and prosecution of the Reed Adversary Proceeding against the multiple defendants (including CVC, Reed, Hinton, and other directors and officers of UnitedLex) had it been capable of anticipating the Unforeseen Events, including pursuing different defendants or different causes of actions.  Or, alternatively, the Reed Adversary Proceeding may have been resolved much sooner had the Special Litigation Counsel and the Trustee been capable of anticipating the Unforeseen Events and negotiated a global settlement at the outset of the litigation, as described above.

77.    **Settlement Discussions with Other FAO Defendants:**  In addition, the Special Litigation Counsel advised the Trustee on a global strategy as to all FAO Defendants.  This included not only the UnitedLex Adversary Proceeding and the Reed Adversary Proceeding, but also other adversary proceedings with former directors and officers of LeClairRyan. ███ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████.  Such settlements were made, at times and with certain individuals, for cooperation value in conjunction with the UnitedLex Adversary Proceeding and the Reed Adversary Proceeding.  The Special Litigation Counsel may not have expended the time necessary on these cooperation clauses had the Two Adversary Proceedings been resolved earlier, ██████████████████████████████ ██████████████████████████████████ and capable of anticipating the Unforeseen Events that followed.

**The Reasonableness of the Improvident Payment**

78.     After consultation with the Trustee, the Trustee's General Counsel, and the various partners who worked on the matter, Quinn and the Trustee maintain that Quinn is entitled to the the Improvident Payment in an amount of $3,150,000 as directed by the Mediator and pursuant to section 328(a) of the Bankruptcy Code.

79.     As more fully described below, the reasonableness of the Improvident Payment can be justified in at least three different ways: (1) the Improvident Payment was a material and integral part of the Mediator's Proposal (as described above); (2) the amount of fees Quinn billed between October 4, 2021 (the date of the ULX Manager Initial Disclosures) through April 19, 2022 (the date that the Settlement was put on the record) exceeded the $3,150,00 by more than two-fold; and (3) the amount of the Additional Services (as hereafter defined) provided by Quinn to persevere when others would not is greater than $3,150,000.

80.     The Trustee, the Trustee's General Counsel, and Quinn maintain that a reasonable person could conclude that one conservative measure of the reasonableness of the amount of the Improvident Payment is the amount of fees Quinn actually incurred between October 4, 2021 ███ through April 19, 2022 (the date that the Settlement was put on the record).   The ████████

██████████████████████████████████████████████████████████████████

████████████████████████ .

81.     Between October 4, 2021 and April 19, 2022, in addition to the work described above, Quinn also conducted various tasks, including but not limited to:  (a) conducting discovery, including engaging with the ULX Defendants on open discovery issues and preparing, taking, and defending dozens of depositions; (b) researching, drafting, and filing the lengthy Opposition to Summary Judgment [Dkt No. 150] and preparing to argue the Summary Judgment Hearing; (c) briefing a Motion to Amend, including drafting a Second Amended Complaint, Motion in Support of the Motion to Amend, and Reply in Support of the Second Amended Complaint; (d) numerous witness interviews and negotiation with potential FAO Defendants for cooperation clauses; (e) preparing witnesses and other testimony in light of the impending trial; (f) preparing expert witness disclosures and other theories regarding damages; and (g) strategizing regarding the strengths and weaknesses of the case in light of discovery, damages, legal theories, and insurances.

82.     In addition, the Trustee also prepared for and participated in the Mediation, which included providing additional services that could not have been anticipated.  Given the Unforeseen Events described above, the Special Litigation Counsel was forced to prepare differently for the First Mediation and the Second Mediation.  This included, among other things, now having to negotiate regarding ████████████████████ ; preparing (and re-preparing) for the mediation in light of the new information learned ████████████████ ; legal research and analysis regarding ████████████████████ the impact of those ████████████████ the causes of action asserted by the Trustee in the Two Adversary Proceedings; analyzing, reviewing and revising damage models ████████████████

███████████, including multiple conferences with the Trustee's expert regarding the same; additional witness interviews in light of the new focus on different causes of actions ████████

████████████████████████████████████████████

████████████████████████████████████████████, certain of the Defendants, and certain of the Insurers regarding the Trustee's claims, damages, and positions on coverage; negotiating various issues, including confidentiality concerns, with the mediation parties; analyzing potential conflicts; and traveling to and attending the First Mediation and the Second Mediation (the "**Additional Services**").

83.    My careful review of the Quinn time records from October 4, 2021 through April 19, 2022 (the date that the terms of the Settlement were stated on the record), using discounted standard hourly rates, determined that Quinn timekeepers expended 6,929.90 hours with an approximate value of $6,663,015.90,[10] an amount that far exceeds the amount of the Improvident Payment directed by the Mediator.   While not required to do so, Quinn nonetheless provided 1696 unedited and unredacted time entries to the Office of the United States Trustee showing time billed by Quinn during this period.

84.    Furthermore, using an even more conservative date range, my careful review of the Quinn time records from February 4, 2022 (the point in time when the ████████



April

---

[10]  This amount does not include any amount attributable to work in other adversary proceedings, including but not limited to the Reed Adversary Proceeding, or other amounts attributable to negotiating with other FAO Attorneys and others ( the "**Necessary Ancillary Services**").  As set forth herein, Quinn estimates that the time billed to for the Necessary Ancillary Services that would not have been necessary but for the Unforeseen Events is approximately $235,000 for the period from February 4 to April 19 and $350,000 for the period from October 4 to April 19.

19, 2022 (the date the Settlement was placed on this Court's record) shows the value of Quinn's services exceed $3,150,000 after factoring in the following: (1) inclusion of the Necessary Ancillary Services; (2) 2022 rate increases; (3) standard hourly rates; and (4) unbilled time.

85.   The primary timekeepers for Quinn in connection with its representation of the Trustee from October 4, 2021 to April 19, 2022, including their title and hourly rates, are as follows:

| Name of Professional | Title | 2021 Hourly Rate (With 10% Discount) | 2022 Hourly Rate (With 10% Discount)[11] | 2022 Standard Hourly Rate | Total Hours Billed | Total Fees (based on 2021 Discounted Hourly Rate) |
|---|---|---|---|---|---|---|
| Danielle Gilmore | Partner | $1,377.00 | $1,516.50 | $1,685.00 | 25.70 | $35,388.90 |
| Dave M. Grable | Partner | $1,246.50 | $1,372.50 | $1,525.00 | 312.00 | $388,908.00 |
| Erika L. Morabito | Partner | $1,377.00 | $1,516.50 | $1,685.00 | 915.60 | $1,260,781.20 |
| Brittany J. Nelson | Partner | $1,080.00 | $1,188.00 | $1,320.00 | 813.90 | $879,012.00 |
| Matthew R. Scheck | Partner | $1,143.00 | $1,255.50 | $1,395.00 | 457.70 | $523,151.10 |
| K. John Shaffer | Partner | $1,660.50 | $1,827.00 | $2,030.00 | 1.70 | $2,822.85 |
| Rex Lee | Of Counsel | $1,053.00 | $1,156.50 | $1,285.00 | 478.10 | $503,439.30 |
| Bennett Murphy | Of Counsel | $1,143.00 | $1,255.50 | $1,395.00 | 323.10 | $369,303.30 |
| Michael Smith | Of Counsel | $1,053.00 | $1,156.50 | $1,285.00 | 787.70 | $829,448.10 |
| Rafe Andrews | Associate | $855.00 | $999.00 | $1,110.00 | 121.70 | $104,053.50 |
| Daniel Loud | Associate | $441.00 | $801.00 | $890.00 | 201.50 | $88,861.50 |
| Jaclyn Palmerson | Associate | $958.50 | $1,089.00 | $1,210.00 | 3.80 | $3,642.30 |
| Isabel Peraza | Associate | $729.00 | $859.50 | $955.00 | 333.50 | $226,561.50 |
| Ari Roytenberg | Associate | $958.50 | $1,089.00 | $1,210.00 | 318.90 | $305,665.65 |
| Kyra Simon | Associate | $958.50 | $1,089.00 | $1,210.00 | 302.10 | $289,562.85 |
| Lindsay M. Weber | Associate | $1,021.50 | $1,125.00 | $1,250.00 | 354.70 | $362,326.05 |
| Samantha Yantko | Associate | $958.50 | $1,089.00 | $1,210.00 | 83.80 | $80,322.30 |
| Eva Korol | Contract Atty | $342.00 | $382.50 | $425.00 | 121.10 | $41,416.20 |
| Nathalie Pierre | Contract Atty | $342.00 | $382.50 | $425.00 | 327.50 | $112,005.00 |
| Michael Alexander | Paralegal | $373.50 | $409.50 | $455.00 | 1.20 | $448.20 |
| Alex Baselga Garriga | Paralegal | $373.50 | $409.50 | $455.00 | 252.10 | $94,159.35 |
| Connie Kim | Paralegal | $373.50 | $409.50 | $455.00 | 44.60 | $16,658.10 |
| Leana Lorenzana | Paralegal | $373.50 | $409.50 | $455.00 | 19.10 | $7,133.85 |
| Dave Scholz | Graphics Director | $373.50 | $409.50 | $455.00 | 22.00 | $8,217.00 |
| Nicole Molee | Law Clerk | $441.00 | $486.00 | $540.00 | 151.80 | $66,943.80 |
| Eugenia Jones | Litigation Support | $423.00 | $423.00 | $470.00 | 0.50 | $211.50 |
| Morgan Brady | Staff Atty | $405.00 | $445.50 | $495.00 | 154.50 | $62,572.50 |
| **TOTAL** | | | | | **6,929.90** | **$6,663,015.90** |

---

[11]  Although the Quinn Retention Order allowed Quinn to increase all of its rates (on thirty days' notice) and associate rates as of January 2022, Quinn elected not to do so prior to the hearing on the 9019 Motion given this matter was billing as a contingency case.  If Quinn had raised its rates, the value of the time billed for the Unforeseen Events would have been even greater.

86.    As indicated above, the "Total Fees" indicated in the chart are calculated using Quinn's 2021 standard hourly rate, less a 10 percent discount, as provided for in the Quinn Retention Order.  Those rates were set at a level designed to fairly compensate Quinn for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses.  The chart also includes Quinn's 2022 standard hourly rates and discounted rates.

87.    Quinn and the Trustee maintain that many of the necessary non-contingent Additional Services that arose from the Two Adversary Proceedings would have been compensated on an hourly basis had the Trustee and Quinn known all of the Unforeseen Events and where Quinn persevered where others would have not.  Based on my careful review of the time records, discussions with other partners at Quinn, and in consultation with the Trustee and the Trustee's General Counsel, as stated above, Quinn has concluded that the value of the Additional Services exceeds $3,150,000.  Therefore, the Improvident Payment as directed by the Mediator is a reasonable amount and meets the standards set forth in section 328(a).

88.    Thus, absent approval of the Settlement, Quinn will seek compensation on an hourly basis from the Estate in an amount that will exceed $3,150,000.

**Other 328(a) Factors Also Support the Award of the Improvident Payment**

89.    In addition, the Improvident Payment is also supported by section 328(a) of the Bankruptcy Code because, among other things, as the Trustee and the Mediator acknowledged, the results obtained in the Two Adversary Proceedings were extraordinary and exceeded reasonable expectations.  Quinn further assumed great risk in taking on such representation and never could have anticipated the Unforeseen Events and the continual impact of same on the litigation.  The Settlement is a fantastic result for the Estate.  It brings in a sum certain for the

Estate and ends what could have been years of protracted and costly litigation. Significantly, there is no collectability issues with the significant amount that the Estate is receiving. The Estate is receiving most of its funds at the Closing Date. And, even for the amounts that it is receiving after the Closing Date, the Trustee and the Special Litigation Counsel carefully negotiated for certainty regarding the collectability of the remainder of the payments. Given the range of reasonable recoveries, the amount of the net settlement proceeds to the Estate is more than what could have been expected under numerous other scenarios. Further, and while not directed by the Mediator, Quinn voluntarily agreed as part of the Settlement Agreement that the Improvident Payment will only be paid after the Estate receives the Total Settlement Payment.

90.    Moreover, as the Trustee acknowledged and as more fully set forth herein, Quinn persevered where other attorneys would have curtailed their efforts in light of the voluminous and complex litigation, and certainly in light of the Unforeseen Events. Because Quinn was not capable of anticipating the Unforeseen Events, Quinn had to persevere in the face of tremendous adversity. It is not reasonable for Quinn to have anticipated that ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ Furthermore, Quinn could not have anticipated the impact that such behavior would have on the litigation path pursued throughout the case, ██████████████████████████████████████ ████████████████████ Indeed, I have not faced such a unique situation in my fifteen-year career. Moreover, many of my partners with longer careers had never found themselves in this situation either. This is truly a unique and unusual circumstance.

91.     Despite the Unforeseen Events, Quinn persevered in achieving a settlement under very difficult circumstances and in an extraordinarily tight time frame leading up to a two-week trial. ████████████████████████████████████████████

██████████ Quinn was able to marshal its resources, pivot its litigation strategy on a dime, and use the information ████████████████████████████████████ to effectuate a remarkable result for the Estate.   The Trustee and the Mediator have all acknowledged in my presence the extraordinary result that was ultimately achieved for the Estate by Quinn in their role as Special Litigation Counsel to the Trustee, despite the Unforeseen Events.

92.     The statements contained herein may be supplemented at any time prior to the hearing on the 9019 Motion.

93.     To the best of my knowledge, information, and belief, I declare under penalty of perjury that the foregoing is true and correct.

**BRITTANY J. NELSON**

Dated:  June 3, 2022                  By:    *Brittany J. Nelson*
                                              Brittany J. Nelson

Dated:  June 3, 2022                  Respectfully submitted,

                                      */s/ Erika L. Morabito*
                                      Erika L. Morabito (VSB No. 44369)
                                      Brittany J. Nelson (VSB No. 81734)
                                      QUINN EMANUEL URQUHART
                                       & SULLIVAN, LLP
                                      1300 I Street, NW, Suite 900
                                      Washington, DC  20005
                                      (202) 538-8000 (telephone)
                                      (202) 538-8100 (facsimile)
                                      erikamorabito@quinnemanuel.com

                                      *Special Counsel to Lynn L. Tavenner, the Chapter 7
                                      Trustee of the Estate of LeClairRyan PLLC*

34

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 3rd day of June, a true copy of the foregoing Declaration was filed under seal pending this Court's final ruling on the request by the United Lex Defendants to seal aspects of the 9019 Motion.  Thereafter, the foregoing Declaration will be served as provided in said ruling.

<div style="margin-left: 40%;">

*/s/ Erika L. Morabito*
Erika L. Morabito, Esq.
*Special Counsel to Lynn L. Tavenner, the Chapter 7*
*Trustee of the Estate of LeClairRyan PLLC*

</div>

Attachment G

**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Richmond Division)**

| | |
|---|---|
| In re:<br><br>  LeClairRyan, PLLC,[1]<br><br>            Debtor. | Case No. 19-34574-KRG<br><br>Chapter 7 |
| Lynn L. Tavenner, as Chapter 7 Trustee,<br><br>            Plaintiff,<br>v.<br><br>ULX Partners, LLC, UnitedLex Corporation,<br>and ULX Manager LLC,<br><br>            Defendants. | Adv. Proc. No. 20-03142 (KRH) |
| Lynn L. Tavenner, as Chapter 7 Trustee,<br><br>            Plaintiff,<br>v.<br><br>CVC Capital Partners, et al.,<br><br>            Defendants. | Adv. Proc. No. 21-03095 (KRH) |

**REPLY IN SUPPORT OF TRUSTEE'S MOTION AND MEMORANDUM OF LAW FOR
ENTRY OF AN ORDER (I) APPROVING (A) JUDICIALLY MEDIATED
SETTLEMENT AND (B) COMPENSATION TO COUNSEL INCLUDING AN
IMPROVIDENT PAYMENT UNDER SECTION 328(A); AND (II) GRANTING
<u>RELATED RELIEF</u>**

---

[1] The principal address of the Debtor as of the Petition Date was 4405 Cox Road, Glen Allen, Virginia 23060, and the last four digits of the Debtor's federal tax identification number are 2451.

Lynn L. Tavenner, Trustee, not individually, but solely in her capacity as the Chapter 7

trustee (in such capacity, the "**Trustee**") of the bankruptcy estate (the "**Estate**") of LeClairRyan

PLLC ("**LeClairRyan**" and/or the "**Debtor**" and/or "**LCR**")), in the above-referenced Chapter 7

case, by counsel, respectfully submits this Reply (the "**Reply**") in support of the *Trustee's Motion*

*and Memorandum of Law for Entry of an Order (I) Approving (A) Judicially Mediated Settlement*

*and (B) Compensation to Counsel Including an Improvident Payment under Section 328(a); and*

*(II) Granting Related Relief* [Dkt No. 211][2] (the "**Motion**"), and in response to the objections (the

"**Objections**") filed by the United States Trustee [Dkt Nos. 219 and 243] (the "**US Trustee**

**Objection**") and Foley & Lardner [Dkt No. 240] (the "**Foley Objection**") (collectively, the

"**Objections**").[3]

In support of the Motion and this Reply, the Trustee incorporates by reference the

Declaration of Ms. Lynn Tavenner, dated June 3, 2022 [Main Dkt No. 1374] (the "**Tavenner**

**Declaration**") and the Declaration of Ms. Brittany Nelson, dated June 3, 2022 [Dkt No. 249]

(the "**Nelson Declaration**"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.        After mediating for more than two and a half months, litigating for over a year and

a half, and engaging in hard fought, arms-length negotiations with the multiple Parties to the

Settlement Agreement, aided in large part by a significant amount of hours (more than 100)  put in

by the judicial mediator in this case (who happens to be the Chief Bankruptcy Judge in this District),

---

[2]  All "Dkt" references are to the Docket in the UnitedLex Adversary Proceeding, unless otherwise indicated herein.

[3]  Collectively, John P. Fitzgerald, III, Acting United States Trustee for Region Four (the "**US Trustee**") and Foley & Lardner LLP ("**Foley**") are referred to herein as the "**Objectors**".  Capitalized terms used but not otherwise defined in this Reply shall have the meanings ascribed to them in the Motion.

the Trustee, in the exercise of her business judgment strongly believes that the relief requested in the Motion is in the best interest of the Estate. *See, e.g.,* Tavenner Declaration at ¶¶ 4, 30, 33, and 37. Notwithstanding the foregoing, and the overwhelming evidence contained in the Tavenner Declaration and the Nelson Declaration supporting the relief requested in the Motion, there are still two parties (the US Trustee and Foley) who are objecting to certain parts of the comprehensive and global settlement reached by the Parties whereby the material terms of the Settlement were put on the record on April 19, 2022, as directed by the Mediator. Simply put, these two Objectors want it both ways – on one hand, applauding the amount of the Settlement and the efforts by the Trustee and her counsel, while on the other hand seeking to eliminate a material and integral term of the Settlement. In light of the substantial evidence supporting the Settlement, these two Objectors cannot, no matter how hard they try, rewrite Rule 9019 and section 328(a) of the Bankruptcy Code. They also cannot substitute their judgment for that of the business judgment of the Trustee, who has been living this case for almost two years.

2.    Tellingly, both of the Objectors actually support approval of the 9019 Motion (absent one provision) and neither provide any case law that supports striking one material provision from the Settlement Agreement.[4] The Objectors do not oppose the Settlement because the Settlement Agreement unquestionably satisfies the governing standards under Bankruptcy Rule 9019. In fact, neither of the Objections even attempt to show that the terms of the Settlement fall

---

[4] With little to no analysis or evidence, Foley labels the Improvident Payment as "gratuitous," and urges this Court to rely on Foley's judgment regarding what is or is not a material and integral term of the Settlement. Rather, the Court can make this determination on its own and/or rely on the judgment of the Parties to the Settlement Agreement. *See* Foley Objection at ¶ 53. This is particularly egregious given that Foley has not been involved in this litigation since approximately June 2021 and never participated in any of the discussions that resulted in the Settlement that is now being asked to be approved by this Court.

outside the range of reasonableness.  The Objections also fail to show how the Settlement terms are unfair or somehow not in the best interest of the Estate.

3.        Simply put, neither the Trustee, in the exercise of her business judgment, nor the Mediator, believe that they can deliver better or more certain value by incurring the time, expense, and uncertainty of litigation, in lieu of this Settlement.  For these reasons, the reasons set forth in the Motion, and the reasons set forth below, the Trustee respectfully requests that the Court overrule the Objections and grant the relief requested in the Motion in its entirety.

## **ARGUMENT**

**I.**      **The US Trustee and Foley Praise the Settlement and Provide No Valid Reason Why the Improvident Payment Cannot Be Approved as an Integral and Material Part of the 9019 Settlement as Directed By The Mediator**

4.        As a fiduciary for all creditors of the Estate, the Trustee has negotiated in good faith a very favorable result that satisfies the Bankruptcy Rules and applicable law.  In fact, the Objections actually laud the Settlement, calling it an "excellent result,"[5] a "commendable accomplishment by both the Trustee and Quinn,"[6] and noting that it provides "substantial recoveries for the Debtor's estates and its creditors."[7]  And, Foley even concedes that "Questioning the business judgment of the Trustee or the efforts of Quinn, led by Ms. Morabito, is ***not*** the crux of this Objection."  Foley Objection at ¶ 1.  Yet, the Objections ask this Court to reject one material and integral term, the Improvident Payment, as if it could be "blue penciled" or otherwise rewritten

---

[5]    *See* US Trustee's Objection at p. 2 ("The $21 million dollar settlement appears to be an excellent result, and the United States Trustee does not object to, or question the Chapter 7 trustee's business judgment as to the amount of the settlement or the mutual releases contained therein.").

[6]    Foley Objection at ¶ 1.

[7]    *Id.*

by them or the Court.  The Improvident Payment was a material and integral term of the Settlement

directed solely by the Mediator.  While none of the Parties liked every aspect of the Settlement,

all of the Parties agreed to the Settlement in full as a comprehensive global settlement to resolve

all of the claims and potential claims of the Parties in exchange for the mutual releases provided

in the Settlement Agreement.  And, significantly, none of the Parties agreed selectively to forego

elements of the bargain but instead agreed to be bound by all of its terms.  Simply because the

Objectors do not like a certain term of the Settlement does not mean that they get to rewrite the

Settlement for their own purposes.

5.      As set forth in the Motion at paragraphs 56 to 63, it is undisputed that the

Improvident Payment was a "material and integral term" of the Settlement Agreement.  And, the

Parties put on the record the material terms of the Settlement, which included the Improvident

Payment and the specifics of the Mediators' Proposal that were accepted by all Parties.  Nelson

Declaration at ¶ 67.  The Settlement Agreement was intended to be a global resolution of multiple

claims and causes of action in exchange for certain general releases provided by all Parties.  *Id.*

The Trustee further confirmed in her declaration that the Improvident Payment is a material and

integral term of the Settlement Agreement.  Tavenner Declaration at ¶¶ 39, 41.  And, most

significantly, the Mediator himself recognized that this was a material and integral term of the

Settlement. He even stated that if the Improvident Payment was not included as part of the

Settlement (in the amount proposed by the Mediator), he would release all Parties to the Settlement

Agreement from any and all obligations to perform thereunder.  Nelson Declaration at ¶ 64.  This

is true in large part because the Settlement resolved not only the Two Adversary Proceedings

before this Court, but it also resolved and disposed of the contested matter currently pending in

the District Court (Case No. 22-00121(E.D. Va.)) ███████████████████████

███████████████████. The Mediator made it clear to all Parties that in exchange for the

general releases to be granted and received via a comprehensive global settlement, that there

needed to be finality with all pending and potential future litigation by and among the Parties.

Simply put, absent agreement by all Parties to each and every term of the Mediators' Proposal,

there would be no Settlement.

      6.     In the face of this overwhelming evidence, neither the US Trustee nor Foley

should be allowed to declare that Section 3(h) of the Settlement Agreement was a "gratuitous

inclusion" (Foley Objection at p. 24) and request that the Improvident Payment term be stricken

from the Settlement (see Foley Objection at ¶ 53; US Trustee Objection at p. 33).  Such a request

is contrary to well established Virginia law, which prohibits modification of settlements by

courts.  *See, e.g., Pitchford v. Oakwood Mobile Homes, Inc.*, 124 F. Supp. 2d 958, 965 (W.D. Va.

2000) ("Although Virginia courts will look to the intent of the parties to determine severability

of clauses or provisions, they will not 'blue pencil' a contract to make it enforceable."); *In re

Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab.

Litig.*, 27 F. 4th 291, 308 (4th Cir. 2022) (recognizing that a court cannot "refashion a

settlement" in some way by blue penciling the agreement), 27 F. 4th 291, 308 (4th Cir. 2022);

*Cap. Com. Properties, Inc. v. Vina Enterprises, Inc.*, 250 Va. 290, 295 (Va. 1995) ("we must

interpret the agreement as written and we are not free to rewrite its terms").[8]  This is even more

true because, as stated above, the Settlement does not just resolve the United Lex Adversary

---

[8]   For the same reasons, the Court should reject the US Trustee's arguments regarding the Improvident
Payment. *See, e.g.,* US Trustee Objection at pp. 28, 33.  The amount of the Improvident Payment was directed by the
Mediator and is a reasonable amount, as set forth below.

Proceeding; it was a global resolution that resolved several matters before different Courts, as well as future claims that the Trustee could have brought against certain of the Insurers, the ULX Defendants, and/or Greenberg.   Moreover, Quinn would not have been obligated to prosecute and/or defend these claims on behalf of the Trustee and/or would have been able to request payment of Quinn's fees on an hourly basis.

7.    Here, just like in TRU, the Bankruptcy Court can determine on its own that the Improvident Payment is a material and integral term of the Settlement pursuant to Rule 9019 and section 105.   As such, this Court can (and should) find that the Improvident Payment is a "material and integral" term of the Settlement.   *See* Motion at ¶ 63.

8.    Despite the US Trustee's suggestion to do so, there is absolutely no reason for this Court to ignore Judge Phillips' opinion in *In re Toys "R" US, Inc.*, et. al., No. 17-34665 ("**TRU**") simply because (1) the US Trustee also objected to the TRU settlement agreement; (2) the US Trustee still disagrees with Judge Phillips' opinion in TRU, which overruled the US Trustee's objection; and (3) the US Trustee has not changed its policy as to settlement or fees since its objection in TRU.   *See* US Trustee's Objection at pp. 27-28.   While the Trustee acknowledges that a substantial contribution agreement is governed by section 503 (and not section 328(a)), the reasoning remains instructive, and the Court here can likewise approve the Improvident Payment as a material and integral part of the Settlement Agreement, which it is.

9.    The US Trustee also fails to provide any specific authority that a payment under section 328(a) (or analogous situations) is prohibited by law from inclusion as part of a settlement approved pursuant to Bankruptcy Rule 9019.   *See* Trustee's Objection at ¶¶ 17-18.   Rather, the US Trustee relies primarily on cases standing only for general principles.   This case law, however, can

easily be distinguished.  In *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, the Supreme

Court held that a debtor may not confirm a chapter 11 "cramdown" plan that provides for the sale

of collateral free and clear of existing liens and does not permit a secured creditor to credit-bid.

566 U.S. 639, 649 (2012).  In so holding, the Supreme Court, as the Sixth Circuit recognized,

specifically addressed only § 1129(b)(2)(A) of the Code and did not rule any broader.  *See* 566

U.S. at 641; *In re Connolly North America, LLC*, 802 F.3d 810, 818 (6th Cir. 2015) (specifically

holding that the *RadLAX Gateway Hotel* holding is limited to interpretation of section 1129).

Likewise, *In re Lehman Bros Holdings, Inc*, 508 B.R. 283, 289 (S.D.N.Y. 2014) stands only for

the proposition that payment of administrative expenses to individual committee members may

not be simply included in a plan of reorganization; rather, they must meet the standards of section

503(b).    Neither of these cases deal with the interpretation of the interplay between Rule 9019

and 11 U.S.C.§ 328(a).

10.    The one case that the US Trustee cites that does address both Rule 9019 and section

328(a), *In re Hale-Halsell Co*, 31 B.R. 459 (Bankr N.D. Okla. 2008), actually stands for the

proposition that a Bankruptcy Court ***does have*** the requisite authority to approve section 328

payments pursuant to a Rule 9019 motion.  In that case, a bankruptcy court applied the Rule 9019

standard to a settlement requesting an increased payment under section 328(a).  While it ultimately

ruled that the payment was not appropriate under the facts and circumstances of that specific case,

the Court did so under the standard set forth by Rule 9019, primarily because it found that the firm

requesting the increase was not likely to prevail on the "improvident" standard of section 328(a).

*Id*. at 469.   The present facts and circumstances here, however, differ immensely from those in

*Hales-Halsell*.  There, the Court found that the simple need to use senior attorneys, instead of more

junior attorneys, due to the complexity of the case "was not apparent or capable of being anticipated at the outset of the case." *In re Hale-Halsell Co.*, 391 B.R. at 467. The unique facts and circumstances in this case are extraordinarily different than the mundane staffing issues described in *Hale-Halsell Co.*

11.    Here, for the reasons set forth below, in the Nelson Declaration at ¶ 72, and in the Tavenner Declaration at ¶ 42, and as the Mediator himself recognized in directing the Improvident Payment, the Unforeseen Events were not capable of being anticipated at the outset of this case. Thus, the Court should approve the Settlement, including the Improvident Payment, pursuant to Rule 9019 and section 105.

## II.    The US Trustee Adopts a Narrow Interpretation of Section 328(a), Which If Adopted Would Eliminate The Discretion of the Bankruptcy Court to Evaluate Each Case on the Facts, Taking All Circumstances Into Account

12.    The US Trustee's advocation of inflexible position on Rule 328(a) has been repudiated by the Fourth Circuit Court of Appeals and therefore should not be validated by the Bankruptcy Court here. As the Fourth Circuit specifically recognized, the Bankruptcy Code is not an area of absolutes or bright-line rules and rather should take the individual facts and circumstances of each case into consideration:

> Because the few absolute disqualifications Congress has established are carefully delineated and narrowly tailored, the courts must take care not to fashion absolute prohibitions beyond those legislatively mandated without some measure of assurance that the purposes of the Bankruptcy Code always will be served thereby. Just as the bankruptcy court cannot use its equitable powers to ignore legal requirements set out by Congress in the Bankruptcy Code, see *IRS v. Levy* (*In re Landbank Equity Corp.*),973 F.2d 265, 271 (4th Cir. 1992), it is our opinion that the court similarly must not abdicate the equitable discretion granted to it by establishing rules of broad application which fail to take into account the facts of a particular case and the overall

> objectives of the bankruptcy system. *See In re Martin,* 817 F.2d at 182; *see also In re BHP*, Inc., 949 F.2d 1300, 1315 (3d Cir. 1991) ("[C]ourts have generally declined to formulate bright-line rules concerning the criteria for disqualification but have favored instead an approach which gives the bankruptcy court discretion to evaluate each case on the facts, taking all circumstances into account.")

*In re Harold Williams Development Co*., 977 F. 2d 906, 909-10 (4th Cir. 1992).  It is simply not consistent with the Bankruptcy Code for the US Trustee in this case to elevate the standards of 328(a) and impose stricter standards than that of the Bankruptcy Code in considering the Improvident Payment.  To do so in this case would create a slippery slope and possibly dangerous precedent.  The Bankruptcy Court should therefore decline an invitation from the US Trustee to formulate a bright-line rule concerning professional fees being earned and awarded in unique and extraordinary cases such as this.  It is critical that the Bankruptcy Court not renounce its very important equitable discretion, requiring it to consider unique facts of a particular case and the overall objectives of the bankruptcy system in deciding important issues such as this.

13.    The Trustee does not disagree that section 328 is a stringent standard or that the burden of proof is on the Trustee to prove that the standards for compensation are met.  *See* US Trustee Objection at pp. 17, 21.    Indeed, the Trustee specifically acknowledges in the Tavenner Declaration that the Improvident Payment is an "extraordinary request."  Tavenner Declaration at ¶ 41.  The Trustee further states that "In the 25 years of serving as a Chapter 7 trustee, this is the first time that I have approved of any such request."  *Id*.    Moreover, the fact that the 328(a) payment was suggested by the Mediator, and not any of the Parties, further attests that the circumstances in this case were truly extraordinary, warranting the Improvident Payment.

14.    Under the standard the US Trustee urges this Court to apply, however, it appears that there would never be a sufficient reason for the US Trustee to support an increased payment

to a professional under section 328 due to improvident circumstances.  *See* US Trustee Objection

at p. 22 (acknowledging that there is "ground for debate in virtually every case" whether there was

improvident circumstances (citing *In re Yablon*, 136 B.R. 88, 92 (Bankr. S.D.N.Y. 1992).  That

simply is not the law.

15.    Moreover, even if the Court does not approve the Improvident Payment pursuant

to Rule 9019 and section 105, for the reasons set forth herein, it should approve the Improvident

Payment pursuant to section 328(a).

### III.    The Evidence Will Overwhelmingly Demonstrate that the Unique Attributes of this Case Fulfill the Requirements of Section 328 (a)

16.    As set forth in more detail in the Motion, the Court should approve the Improvident

Payment because it meets the strict standards set forth in section 328(a), that the initial "terms and

conditions prove to have been improvident in light of developments not capable of being

anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a).  Applicable

case law makes clear that to meet this standard courts should look at a variety of factors, including

(1) whether the results obtained went beyond reasonable expectations, (2) the attorney assumed

great risk in taking on representation of case, (3) the attorney persevered where others would have

curtailed their efforts, (4) the attorney's efforts resulted in significant infusion of funds into the

debtor's estate, (5) the attorney faced strong adversary and unforeseen pressures, and (6) the

litigation was voluminous and complex.  See Motion at ¶ 5; *In re Malcon Developers,* 138 B.R.

677 at 680-81 (Bankr. N.D.N.Y. 1992).  In light of this standard, the Objectors only attempt to

argue that there is no evidence establishing that the Unforeseen Events were "not capable of being

anticipated at the time" of the entry of the Quinn Retention Order.

17.    Despite the US Trustee's repeated assertions that there is not "specific evidence" to warrant the Improvident Payment (*see, e.g,* US Trustee Objection at p. 22) and that the actions described by the Trustee simply do "not rise to the improvident standard of not capable of being anticipated" (US Trustee Objection at p. 23), the US Trustee fails to acknowledge that the US Trustee was provided with an exorbitant amount of information and documents from the Trustee, well in advance of the filing of this pleading, that included "specific evidence" to warrant the Improvident Payment.[9]

18.    As described in the 9019 Motion, the Nelson Declaration, and the Tavenner Declaration, the ample evidence demonstrates that the Unforeseen Events went far beyond that of a discovery dispute and fundamentally changed the trajectory of the Two Adversary Proceedings. *See, e.g.,* Nelson Declaration at ¶ 72; Tavenner Declaration at ¶ 42.    Specifically, the evidence describes that at the time the Quinn Retention Order was entered, neither the Trustee nor the Special Litigation Counsel were capable of anticipating, among other things, that ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[9] ██████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

other unanticipated developments resulting therefrom (collectively, the "**Unforeseen Events**").

These were all unique and unpredictable circumstances that were not capable of being anticipated

and support the Improvident Payment directed by the Mediator. *See, e.g.*, Nelson Declaration at ¶

73; Tavenner Declaration at ¶ 42.

19.    In addition, the evidence demonstrates that in light of the Unforeseen Events, the

Special Litigation Counsel and the Trustee followed a litigation path ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ changed

the trajectory of (1) the Trustee's litigation of the Two Adversary Proceedings and (2) other matters

that were pursued against the FAO Defendants. Nelson Declaration at ¶ 74; Tavenner Declaration

at ¶ 42. Thus, the Trustee and her counsel both recognized that this was far more substantial and

had far greater consequence than that of a run-of-the-mill (or even complex) discovery dispute.

20.    These facts were readily apparent to the Mediator when he ordered the Improvident

Payment. He had spent countless hours and more than two months mediating with the Parties and

was well aware of the impact that the ███████████████████████████ had on the

fundamental trajectory of the case. *See* April 19 Transcript at 12:6-12 (Judge Huennekens noting

that he had seen the Mediator's "report" to the Fourth Circuit on the number of hours dedicated to

the mediation "and it looks to me like I'm eternally indebted to him for the time he has spent with

regard to this"). ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████    *See* Nelson Declaration at ¶ 91.

21.    In the face of all of this evidence, the US Trustee still argues that all the Trustee has

shown in this case is that there was a mere discovery dispute between the parties, citing to

numerous cases ████████████████████████████████████

US Trustee Objection at p. 24 & n. 8. Preliminarily, such a statement fundamentally ignores the

Trustee's business judgment and her counsel's judgment, as well as the Mediator's own

assessment of the facts before him. As this Court has previously held, the Trustee is also entitled

to "rely on [her] counsel and [her] counsel's judgment in reaching a determination whether or not

to proceed with [the] settlement agreement." *In re Health Diagnostic Laboratory,* 2016 WL 6068812, at *5 (Bankr. E.D. Va. Oct. 14, 2016) (internal citations omitted).

22.    Instead of deferring to the Trustee, the Trustee's counsel, or the Mediator (those parties who lived the events and actually attended the mediation), the US Trustee instead relies on a string-cite of ten citations (Trustee Objection at fn. 8) that establish nothing more than the fact that at least ten parties have litigated the issue of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇ Such a proposition says nothing about whether the specific circumstances and impact of the Unforeseen Events ***in this case*** could have been anticipated at the time of the Quinn Retention Order. The US Trustee does nothing to compare the context of its cited cases to the context here, including the ▇▇▇▇▇▇▇▇▇▇▇▇▇ or the impact on the litigation or alternative dispute resolution. Moreover, it does not appear that any of the cases cited by the US Trustee involved a circumstance where a judicial mediator—the Chief Bankruptcy Judge—who spent hundreds of hours on this matter, independently recognized the uniqueness of the situation and solely directed a change in fee structure due to the Unforeseen Events

23.    As demonstrated above, in the Nelson Declaration, and in the Tavenner Declaration, the evidence demonstrates that the Unforeseen Events were extraordinary events that were not capable of being anticipated at the time the Quinn Retention Order was entered into, thus justifying the Improvident Payment pursuant to section 328(a) in this unique and extraordinary circumstance.

IV.     **The Evidence Overwhelmingly Demonstrates that the Directed Amount of the Improvident Payment is Reasonable**

24.     The Trustee has provided a plethora of evidence that the directed amount of the Improvident Payment, $3,150,000, is reasonable.  Based on this evidence, the Bankruptcy Court can use its own gate-keeping function to determine the reasonableness of the Improvident Fee. *See* TRU Order, Motion at ¶ 62, Exhibit C.  As more fully described below, the Trustee contends that such reasonableness of the Improvidence Payment can be justified in at least three different ways: (1) the Improvident Payment was a material and integral part of the Mediator's Proposal; (2) the amount of fees Quinn billed between ████████████████████████████████ ██████████ through April 19, 2022 (the date that the Settlement was put on the record) exceeded the $3,150,00 by more than two-fold; and (3) the amount of the Additional Services (as hereafter defined) provided by Quinn to persevere when others would not have is greater than $3,150,000. Nelson Declaration at ¶ 79; Tavenner Declaration at ¶ 45.

25.     Significantly, the Bankruptcy Court should not apply the stricter standards of section 330 review to its inquiry regarding the reasonableness of the Improvident Payment.  *See, e.g., In re Omegas Grp., Inc.*, 195 B.R. 875, 880 (Bankr. W.D. Ky. 1996) (awarding an increased payment under section 328 based on the factors outlined in, among other cases, *In re Malcon Developers*, without regard to the lodestar or *Johnson* reasonableness factors).  The US Trustee however, urges this Court to apply its internal policy rather than the law.  The US Trustee asks this Court to instead evaluate the reasonableness of the Improvident Payment using a 330 standard, the *Johnson* factors.  *See* US Trustee Objection at p. 29.  The US Trustee cites no caselaw for this proposition, nor could it, because that is simply not the law. *See, e.g., Pitrat v.Reimers*, 972 F.2d 1127 (9th Cir. 1992) (holding that the bankruptcy court erred in "assum[ing] that section 330 gave

it the power to make a general reasonableness review, despite the express language of section

328.").[10]    Instead, the Bankruptcy Court should carefully consider all of the evidence before

determining whether the amount of the Improvident Payment is reasonable under the unique

circumstances of this case.

26.    First, as more fully described in the Nelson Declaration and the Tavenner

Declaration, the Court can rely on the fact that the Improvident Payment was a material and

integral part of the Mediator's Proposal and he determined that this was the correct amount to

award Quinn in light of the Unforeseen Events. Nelson Declaration at ¶ 79; Tavenner Declaration

at ¶ 45.

27.    Second, as detailed in the Nelson Declaration and the Tavenner Declaration, the

Trustee, the Trustee's General Counsel, and Quinn maintain that a reasonable person could

conclude that one conservative measure of the reasonableness of the amount of the Improvident

Payment is the amount of fees Quinn actually incurred between ███████████████████

███████████████████    through April 19, 2022 (the date that the Settlement was put on

the record). ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[10]    The *Johnson* lodestar factors cannot be applied rigidly in cases arising under section 328.  By its very nature, Quinn was not able to anticipate that it would need the detailed time records necessary to meet the *Johnson* factors for the Improvident Payment because it was incapable of anticipating that it would need detailed, hourly time records to apply for an Improvident Payment for a contingency matter.  That said, the information that Quinn has provided in the Nelson Declaration and the Tavenner Declaration meets many of the factors of the *Johnson* lodestar test, including but not limited to the novelty and difficulty of the questions raised; the skill required to properly perform the legal services rendered; the attorney's opportunity costs in pressing the instant litigation; the attorney's expectations at the outset of the litigation; the time limitations imposed by the client or circumstances; the amount in controversy and the results obtained; and the experience, reputation and ability of the attorney.

███████████████████████████████████████████████████████

████████. Nelson Declaration at ¶ 80; Tavenner Declaration at ¶ 46. A detailed description of this work, totaling more than $6.6 million dollars (or more than double the Improvident Payment) is set forth in the Nelson Declaration. The Nelson Declaration also includes, among other things, a disclosure of the number of hours that Quinn timekeepers expended for the work, standard hourly rates, and the total number of hours billed. Nelson Declaration at ¶¶ 80-88.

28.    Third, the Nelson Declaration and the Tavenner Declaration also quantify the amount of the Additional Services that Quinn provided that could have been compensated on an hourly basis had the Trustee and Quinn known all of the Unforeseen Events. As described in those declarations, which include a detailed description of the work performed, timekeeper rates, and other methodologies, Quinn could have sought at least $3,150,000 for the Additional Services provided to the Estate. *See* Nelson Declaration at ¶¶ 87-88; Tavenner Declaration at ¶ 46.

29.    Thus, relying on any one of these methods, the Court can use its gate-keeping role to determine that there is more than sufficient evidence in the record to determine that $3,150,000 is a reasonable amount for the Improvident Payment. *See* Motion at ¶ 63.

**V.    The Additional Arguments of the US Trustee Should Have No Impact on Whether the Court Grants the Relief Requested in the Motion**

30.    The US Trustee also makes several extraneous arguments that should have no bearing on whether the Court grants the relief requested in the Motion, because none of them address the merits of whether the Trustee has met her burden as required in the 9019 Motion.

31.    ████████████████████████████████████████████████

████████████████████ Repeatedly, the Motion indicates that it is brought pursuant to Rule

9019, section 105, and section 328(a) and that the Improvident Payment was unilaterally directed

by the Mediator as part of a global Settlement. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ While it may be true that no case exists standing for that narrow proposition, the assumption

underlying the statement is simply not applicable here.  In this case, no one disputes that the Estate

will benefit immensely from the extraordinary work done by Quinn, who persevered when others

would have not have.  Further, it is simply not true that the Improvident Payment will be to the

detriment of Quinn's client, the Trustee.  Additionally, contrary to the US Trustee's assertion, █████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████

32.    Second, the US Trustee focuses on the total amount of funds that Quinn has

received in this case, inferring that somehow Quinn is not entitled to the amount of the Improvident

Payment based on other fees Quinn has earned in this case.  *See* US Trustee Objection at p. 31.

This amount is simply irrelevant to whether the Improvident Payment is justified in this case. Moreover, it ignores the total value of work that Quinn has done on behalf of the Trustee to date and the substantial amount of proceeds that Quinn has recovered for the Estate.

33.     Third, Quinn has not sought any fees that it seeks in this Motion previously on an hourly basis.  As a result of the resolution of the Meet and Confer, and as described at the Nelson Declaration at paragraph 46, the Estate was reimbursed a small portion of the fees ▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  To account for this payment to the Estate, and as disclosed previously to the US Trustee, Quinn submitted a Supplemental Fee Application whereby these fees were disclosed and approved by the Court, and ultimately paid to the Trustee.  *See Supplement to Third Interim Application of Quinn Emanuel Urquhart & Sullivan, LLP as Special Counsel to the Trustee, for Allowance of Compensation and Reimbursement of Expenses Incurred* [Main Dkt No. 1249] ("**Supplemental Application**").  None of these fees are included herein.  Moreover, as the US Trustee pointed out at the US Trustee Objection at p. 31, the Supplemental Application contained a reservation of rights.

## VI.    The Motion Complies with Rule 2016

34.     Foley complains that "Quinn has entirely failed to follow Rule 2016" and boldly contends that the "Court cannot allow this gambit."  Foley Objection at ¶ 41.  But this is far from some "gambit," as the information that Quinn has provided in the Motion (and accompanying declarations) complies with Rule 2016.   Foley Objection at ¶ 42.

35.     While the Motion is not a traditional application brought under Rule 2016, numerous courts have recognized that such a formal fee application is not necessary as long as the court has sufficient information to assess reasonableness of the fees. For example, in *In re Cascade Oil Co., Inc.*, the court explained the "requirement of detail and specificity serves to provide the information needed for the court to decide whether a particular fee or expense is both actual and necessary" but that "[t]his requirements is not an end in and itself" and should "be enforced in a manner that services its purpose or function." 126 B.R. 99 105 (D. Kan. 1991); *see also Matter of Evangeline Ref. Co.,* 890 F.2d 1312, 1326 (5th Cir. 1989) (explaining "an application must be sufficiently detailed and accurate that, ***in conjunction with any proceeding in connection therewith and the record in the case,*** a court can make an independent evaluation as to what level of fees are actual, necessary and reasonable" and that applications falling below "the ideal level of completeness" are thus still permissible) (emphasis added); *In re Young*, 285 B.R. 168, 173 (Bankr. D. Md. 2002) ("Although the facts of the instant case arise in the absence of such court guidelines or general orders, this court finds that the purposes of Rule 2016(a) are satisfied without the filing of a separate document entitled application for compensation, where the fee is a flat fee, and is fully disclosed by the original Rule 2016(b) disclosure.").

36.     In this case, the Motion, as supported by the Nelson Declaration and the Tavenner Declaration, provides the Court with sufficiently detailed explanation of the fees being sought to satisfy the requirements of Rule 2016, especially when the amount sought is for a contingency case. *See Am. Ctr. for Civ. Just., Religious Liberty & Tolerance, Inc. v. Katchen*, 2020 WL 4060178, at *5 (D.N.J. July 20, 2020) (requiring that an application for compensation include a "narrative explaining the nature of the work performed and the results achieved ... and any

circumstances ... the applicant wishes to emphasize ... [including] reasons for substantial time billed for a particular activity").  The Nelson Declaration also includes other pertinent disclosures under Rule 2016, including disclosures regarding the lack of any sharing agreements and the fact that no other compensation for the amounts sought herein have been made.  *See* Nelson Declaration at ¶ 83.   This information overwhelmingly demonstrates that the Contingency Payment to Quinn (in an amount of $7,350,000) is consistent with the terms of the Quinn Retention Order and the Engagement Letter and should be approved by the Court pursuant to Rule 9019, section 105, and/or section 328(a).  In addition, the evidence overwhelmingly demonstrates that the Improvident Payment (in an amount of $3,150,000) is reasonable and should be approved by the Court pursuant to Rule 9019, section 105, and/or section 328(a).

37.    Moreover, the information furnished in the Motion to justify the Contingency Payment and the Improvident Payment is consistent with (or greater than) Rule 2016 submissions in other cases in this district seeking contingency cases, including previous applications for contingency payments in this case.   Significantly, Foley itself has included similar (or even not as detailed) descriptions in its own applications for payments of contingency fees ***in this case***. *See*, *e.g.*, Foley's First Interim Application for Compensation [Main Dkt No.  451]; Foley's Second Interim Application for Compensation [Main Dkt No. 625]; Foley's Third Interim Application for Compensation [Main Dkt No. 736]; Foley's Fourth Interim Application for Compensation [Main Dkt. No. 845].  For Foley to argue that it somehow needs more information than what it itself has previously provided to this Court and others is simply disingenuous.

## VII.    The Foley Objection is Premature and Not Procedurally Proper

38.    As set forth above, Foley is only objecting to one material and integral term of the Motion that seeks authorization to pay compensation to Quinn.  Besides not being able to "blue pencil" the Settlement Agreement to suit its own self-serving purposes (as described above), the Foley Objection should also be rejected because it is procedurally premature and improper as it seeks affirmative relief.

39.    As this Court is well aware, Quinn has applied for and been granted interim compensation from this Court on three different occasions.  [Main Dkt Nos. 1075, 1168, 1282]. On two of these occasions, Foley asked for, and received, a reservation of rights in the orders granting the interim compensation.  [Main Dkt Nos. 1168, 1282].[11]  Nothing in the Foley Objection stands for the proposition that the payment requested to Quinn in the Motion should be treated any differently.

40.    The Foley Objection is premised on the fact it is somehow entitled to fees awarded to Quinn in the Settlement.  But Foley has never brought an affirmative adversary proceeding to adjudicate the complaints in its objection or its own fee application seeking these (or other fees). Seeking a ruling from the Court through the Foley Objection that it is entitled to affirmative relief

---

[11]  The reservation of rights in both of these orders provided that Foley "has asserted that it is entitled to some portion of the Contingent Fees awarded herein but has consented to postpone any hearing resolving any dispute on that issue. Quinn and the Trustee object or may object to such assertion. Notwithstanding anything in this order, nothing herein will prohibit Foley from later asserting that some portion of the fees related to this Fee Application, or any other fees paid to Quinn during the pendency of this case should instead be payable to Foley. Moreover, nothing herein shall act as a bar for either the Trustee, Quinn or the Office of the United States Trustee to oppose any request by Foley for fees related to this Fee Application or any other fees paid to Foley during the pendency of this case. The payment of the amounts to Quinn set forth in this order shall not limit, preclude or impact in any way Foley's right to seek recovery from Quinn for any fees sought and/or paid to Quinn during the pendency of this case. No rights are waived by Foley, Quinn, the Trustee, or the Office of the United States Trustee with respect to this Order and all parties' rights are expressly reserved."

to any fees, including the fees in the Settlement, is simply improper.  *See*, *e.g.*, *In re Whitlock-Young*, 571 B.R. 795, 811 (Bankr. N.D. Ill. 2017) ("Requests for affirmative relief should be brought by motion, not combined with objections"); *Garner v. Select Portfolio Servicing, Inc.*, 2015 WL 871402, at *1 (E.D. Mich. Feb. 27, 2015) ("[C]ombining objections ... with a motion for affirmative relief is improper").

41.    Foley must file a fee application or otherwise affirmatively seek the relief it requests, which will allow Quinn and/or the Trustee to object as appropriate.[12]  Indeed, Foley itself has acknowledged to this Court that it will seek such relief.  *See, e.g.,* Reservation of Rights To Quinn's Employment Application  [Main Dkt No. 922] ("Foley reserves all of its rights with respect to the Foley Fee Claims, including, but not limited to, (a) asserting charging liens on the relevant actions pursuant to Virginia Code § 54.1-3932(A); (b) pursuing a *quantum meruit* action to recover against the Estate for services rendered in connection with any Foley Fee Claim; and (c) ***seeking Court approval of compensation and reimbursement of expenses*** incurred in connection with any Foley Fee Claims.") (emphasis added).

42.    Until Foley seeks this affirmative relief from the Court, it can only reserve its rights, as it has done in connection with Quinn's prior fee applications and the Quinn Retention Application.  Accordingly, the Court should overrule the Foley Objection, and instead include in

---

[12]    Quinn and the Trustee reserve all rights to object to any and all affirmative relief that Foley may seek for any compensation, including but not limited to compensation related to the Settlement. Because the issue of whether Foley is entitled to any affirmative relief or compensation is not properly before the Court, the Trustee has not addressed any of Foley's substantive arguments at this time but will do so when it is properly before the Court.   Likewise, neither the Trustee nor Quinn is not addressing Foley's inaccurate factual assertions at this time but reserve all rights to do in the future.

the order the same reservation of rights regarding Foley's ability to seek affirmative relief that has been included in other Quinn fee applications.[13]

## CONCLUSION

For the reasons set forth above and in the Motion, the Trustee respectfully requests that this Court enter an order (a) approving the Settlement; (b) authorizing the effectiveness of the Settlement Agreement on behalf of the Estate; (c) approving the Contingency Payment and authorizing the Trustee to pay the same as provided in the Quinn Retention Order; (d) approving the Improvident Payment in an amount to be determined by the Court and authorizing the Trustee to pay the same; and (e) providing such other relief as is just and proper.

DATED:       June 7, 2022                    Respectfully submitted,


                                             _/s/ Erika L. Morabito_____
                                             Erika L. Morabito (VSB No. 44369)
                                             Brittany J. Nelson (VSB No. 81734)
                                             QUINN EMANUEL URQUHART & SULLIVAN
                                             1300 I Street, N.W., Suite 900
                                             Washington, DC 20005
                                             (202) 538-8334 (telephone)
                                             Email:       erikamorabito@quinnemanuel.com
                                                          brittanynelson@quinnemanuel.com

                                             *Special Counsel to Lynn L. Tavenner, Chapter 7
                                             Trustee*

---

[13]   Foley also complains that it did not receive proper service. *See* Foley Objection at ¶ 7.  Such an argument is a factually accurate. Foley has received notice of every fee application filed by Quinn Emanuel and received a copy of the Notice of Motion and Hearing Thereon (the "**9019 Notice**") for the 9019 Motion by the Trustee's General Counsel. In addition, Ms. Susan Poll Klaessy receives ECF notifications in this Case. Any suggestion that Foley is not receiving notices and/or other pleadings in this Case is wrong.  Furthermore, consistent with the procedures identified in the 9019 Notice, Foley has received copies of all sealed pleadings. Moreover, Foley has appeared at numerous hearings regarding this Motion and timely filed the Foley Objection.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 7th day of June, a true copy of the foregoing was filed under seal, consistent with this Court's Order to Seal Omnibus Settlement Agreement and Related Documents, Information and Hearing [Main Dkt No. 1382] and will be provided to those individuals identified in paragraph 9 of such order.  Thereafter, the foregoing Motion will be served as provided by the Court.

*/s/ Erika L. Morabito*
Erika L. Morabito

Attachment H

```
 1                   IN THE UNITED STATES BANKRUPTCY COURT
                      EASTERN DISTRICT OF VIRGINIA (RICHMOND)
 2
     In Re:                             )  Case No. 19-34574-KRH
 3                                      )  Richmond, Virginia
     LECLAIRRYAN PLLC,                  )
 4                                      )
               Debtor.                  )  June 8, 2022
 5                                      )  1:07 p.m.
     ------------------------------- )
 6   LYNN L. TAVENNER, AS CHAPTER 7   )  Adv. Proc. 20-03142-KRH
     TRUSTEE,                          )
 7                                      )
               Plaintiff,              )
 8   v.                                 )
                                        )
 9   ULX PARTNERS, LLC, ET AL.,         )
                                        )
10             Defendants.              )
     ------------------------------- )
11

12             TRANSCRIPT OF SEALED PORTION OF HEARING ON
     MOTION TO RESTRICT PUBLIC ACCESS TO SENSITIVE CASE INFORMATION
13       FILED BY ULX MANAGER LLC, ULX PARTNERS, LLC, UNITEDLEX
                            CORPORATION
14           BEFORE THE HONORABLE KEVIN R. HUENNEKENS
                   UNITED STATES BANKRUPTCY JUDGE
15
     APPEARANCES: (All present by video or telephone)
16   For Chapter 7 Trustee:        PAULA S. BERAN, ESQ.
                                    TAVENNER & BERAN PLC
17                                  20 North Eighth Street
                                    Second Floor
18                                  Richmond, VA 23219

19                                  ERIKA L. MORABITO, ESQ.
                                    BRITTANY NELSON, ESQ.
20                                  ISABEL PERAZA, ESQ.
                                    QUINN EMANUEL URQUHART &
21                                  SULLIVAN, LLP
                                    1300 I Street NW
22                                  Suite 900
                                    Washington, DC 20005
23

24

25
```

```
 1  APPEARANCES (CONT'D):
    Special Counsel for Trustee     DAVID M. GRABLE, ESQ.
 2  Lynn L. Tavenner:               QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP
 3                                  864 South Figueroa Street
                                    10th Floor
 4                                  Los Angeles, CA 90017

 5  For ULX Partners, LLC and       DAVID G. BARGER, ESQ.
    UnitedLex Corporation:          GREENBERG TRAURIG, LLP
 6                                  1750 Tysons Boulevard
                                    Suite 100
 7                                  McLean, VA 22102

 8                                  J. GREGORY MILMOE, ESQ.
                                    GREENBERG TRAURIG, LLP
 9                                  One International Place
                                    Suite 2000
10                                  Boston, MA 02110

11  For Foley & Lardner LLP:        SUSAN POLL KLAESSY, ESQ.
                                     GEOFFREY S. GOODMAN, ESQ.
12                                  FOLEY & LARDNER LLP
                                    321 North Clark Street
13                                  Suite 3000
                                    Chicago, IL 60654
14
    For CVC Capital Partners:       MICHAEL E. HASTINGS, ESQ.
15                                  WOOD ROGERS PLC
                                    901 East Byrd Street
16                                  Suite 1550
                                    Richmond, VA 23219
17
                                    ERIN ROSENBERG, ESQ.
18                                  WHITE & CASE LLP
                                    111 South Wacker Drive
19                                  Suite 5100
                                    Chicago, IL 60606
20
    For Corporate counsel for ULX   ERIC KELLY, ESQ.
21  Partners, LLC:                  ULX PARTNERS, LLC
                                    6130 Sprint Parkway
22                                  Suite 300
                                    Overland Park, KS 66211
23

24

25
```

3

```
 1   APPEARANCES (CONT'D):
     For the Office of the U.S.     KATHERYN R. MONTGOMERY, ESQ.
 2   Trustee:                       DEPARTMENT OF JUSTICE
                                     701 East Broad Street
 3                                   Suite 4304
                                     Richmond, VA 23219
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   Transcription Services:        eScribers, LLC
                                     7227 North 16th Street
22                                   Suite #207
                                     Phoenix, AZ 85020
23                                   (973) 406-2250

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

1           THE CLERK:  Your Honor, I believe all of the parties

2    have been moved to the waiting room, but there are a number of

3    new folks attending this hearing.

4           THE COURT:  Okay.  So now there are a number of new

5    parties.  So I'm going to ask them to identify themselves so

6    that we've got -- I know Ms. Montgomery is from the Office of

7    the U.S. Trustee.  Kate Ashley is my law clerk.  She's with me.

8    Jason Shorter is with the Office of the U.S. Trustee.

9           Isabel Peraza, who do you represent?

10          MS. PERAZA:  I'm with Quinn Emanuel, Your Honor.

11          THE COURT:  Okay.  Thank you very much.  Greg Milmoe I

12   know is with Quinn.  Mr. Goodman is with Foley.  FTR is the

13   recording system.

14          Eric Kelly, with whom are you with, sir?

15          MR. KELLY:  I'm corporate Counsel for UnitedLex.

16          THE COURT:  Okay.  Thank you very much, sir.  All

17   right.

18          Brittany Nelson is with Quinn.  Dave Grable, remind me

19   who you are with.

20          MR. GRABLE:  I'm with Quinn, Your Honor.

21          THE COURT:  Okay.  Thank you very much, Mr. Grable.

22          Rachel Greenleaf is my law clerk.  Lisa Gary is

23   courtroom deputy.  So it appears the only parties that have an

24   interest in the outcome of this matter are present today.  Does

25   anyone take issue with anybody that's on 00 the participants

Colloquy                                                                    5

 1   that are on the call?

 2           THE CLERK:  Your Honor, I've received a request from

 3   Mike Hastings and Erin Rosenberg as Counsel for CVC.  Should

 4   they be permitted to join?

 5           THE COURT:  I would think they would be able to.  Mr.

 6   Barger?

 7           MR. BARGER:  Yes, Your Honor.  CVC, of course, is a

 8   settling defendant.  And Ms. Rosenberg just sent me an email

 9   asking if she could be readmitted.  So I think that was just an

10   oversight.  So -- and I think Mr. Hastings is local counsel for

11   CVC with -- I apologize.  I forget the -- I know the firm's

12   name.

13           THE COURT:  He's previously noted his appearance in

14   this case.

15           MR. BARGER:  Yes.

16           THE COURT:  In that case.  So I'm aware of his

17   involvement.  All right.  So please readmit them.

18           THE CLERK:  So admitted.

19           THE COURT:  Thank you.

20           Is anyone else requesting admission, Ms. Greenleaf?

21           THE CLERK:  No, Your Honor.

22           THE COURT:  Okay.  All right.  Are we prepared to

23   proceed then?

24           MS. MORABITO:  I am, Your Honor.

25           MS. BERAN:  Yes, Your Honor.

Colloquy                                                                    6

1          THE COURT:  Okay.  Ms. Morabito?

2          MS. MORABITO:  Good afternoon, Your Honor.  Can you

3    hear me okay?

4          THE COURT:  Yes, I can.  Now you're going to be

5    presenting.  Are you make an opening?  And then I'll have your

6    evidence.  I'll let the others make their opening.  After

7    you've made your opening.

8          MS. MORABITO:  Yes, Your Honor.  I'm fine proceeding

9    in that manner.  We were going to suggest, as we had done

10   previously, to do the oral argument section then move to the

11   evidence section at the end of the presentation.  But if Your

12   Honor would rather me do an opening first and then do the

13   evidence and then proceed with oral argument, I'm happy to do

14   that as well.

15         THE COURT:  I would like to do that because I'd like

16   to know what we're going to have in evidence.  I've read the

17   declarations, so I'm reasonably confident.  I don't know what

18   other evidence you might be offering.  But you may proceed.

19         MS. MORABITO:  Thank you, Your Honor.  Good afternoon.

20   Erika Morabito, Quinn Emanuel, special litigation counsel to

21   the Chapter 7 Trustee.

22         With me today, Your Honor, I have two of my

23   colleagues.  I have Mr. David Grable, and I have Ms. Brittany

24   Nelson.  And then I also wanted to introduce to the Court to

25   Isabel Peraza.  She is a first-year associate at Quinn Emanuel.

1  She's also my mentee.  So hopefully she stays at Quinn Emanuel.

2  But she is interested in bankruptcy law.  She's shadowing

3  today.  So there's no charge, of course, to the estate.  And

4  she has assisted in this case throughout.  So she is excited,

5  if you will, to be before Your Honor today at least to be able

6  to observe.

7            THE COURT:  Okay.  And she understands the obligations

8  with regard to the Court's order sealing these proceedings?

9            MS. MORABITO:  Yes, she does, Your Honor.

10            THE COURT:  All right.  Thank you very much.  Okay.

11  Proceed.

12            MS. MORABITO:  Also, Your Honor, as Ms.  Beran already

13  noted, our client is in the -- in on the virtual screen.  So

14  Ms.  Tavenner is here is the Chapter 7 Trustee.  And obviously

15  her general counsel, Ms.  Beran, is also here today.

16            THE COURT:  All right.  Thank you.

17            MS. MORABITO:  For purposes of today, Your Honor, I am

18  going to refer to a series of docket numbers.  As Your Honor

19  knows, it gets a little confusing because there's been multiple

20  pleadings filed in multiple cases because the two adversary

21  proceedings are also involved.  So if ease of record -- or ease

22  of reference for the record, when I refer to a docket number, I

23  will be referring to the main case.

24            THE COURT:  All right.

25            MS. MORABITO:  Okay.  Your Honor, we're very pleased

Colloquy                                                                    8

1    to be before you today on the trustee's motion and memorandum

2    of law.  We're requesting an entry of an order that would

3    approve the judicially mediated settlement as well as

4    compensation to counsel, including the improvident payment

5    under Section 328(a) of the Bankruptcy Code.

6         There has been one minor change that I believe Ms.

7    Greenleaf updated the Court on this morning, and we appreciate

8    her assistance with that.  It's a housekeeping matter.  The

9    settlement -- the motion that was filed to approve the

10   settlement was filed at docket number 1328 on May 18th.  That

11   motion included a copy of the settlement agreement, and that's

12   the settlement agreement that was executed by all the parties

13   that we're seeking to have approved today.

14        What we realized this morning was that there were

15   three exhibits that were attached to that settlement agreement.

16   Two of them are form documents.  They were form promissory

17   notes, promissory note 1, promissory note 2, and form letters

18   of credit.  So we don't think that there's any negative impact

19   or need to renotice this motion.

20        And then the other one was a list of released parties

21   that is identified as schedule A, and it can be found on page

22   26 of 42 of the newly filed settlement agreement.  So this

23   morning we did an amended Exhibit A, which is the settlement

24   agreement.  It was filed today at docket number 1396.  And it

25   contained three things.  It contained schedule A, which was the

Colloquy                                                                              9

1  list of the parties who are being released, and then it also

2  contained form documents, which are also identified as exhibit

3  A and Exhibit B.  And again, those are form documents that are

4  referenced in the settlement agreement related to the

5  promissory notes and letters of credit.

6          So I just want to make sure, Your Honor, you have the

7  correct settlement agreement with the exhibits before you this

8  afternoon.

9          THE COURT:  All right.  Thank you.

10          MS. MORABITO:  Okay.  Your Honor, notice that this

11  motion was proper.  It can be found at docket number 1329.

12  Schedule A to that notice can also be found at docket 1395.

13  All required parties were served, including Foley & Lardner,

14  who does, in fact, appear on schedule A.

15          As Your Honor knows, we're pleased to report that

16  we're only two objections that were filed to this motion,

17  Foley's objection and the United States Trustee.  These can be

18  found at docket number 1365 for Foley and 1333 and 1370 for the

19  U.S. Trustee's objection and supplemental objections.  Both

20  objections, however, describe the settlement here as an

21  excellent result, and both state that they do not question the

22  Chapter 7 Trustee's business judgment, nor do they challenge

23  the amount of the settlement or mutual releases that are

24  contained therein.

25          The Foley objection further states that the settlement

1   is commendable accomplishment by both the trustee and Quinn.

2   Yet for reasons I will address shortly, both of the objections

3   seek merely to strike one provision of the settlement

4   agreement.  And that's paragraph 3H.

5           Additionally, Your Honor, a statement in support was

6   filed by UnitedLex.  And that can be -- and that is that docket

7   number 1389.

8           Your Honor, this settlement can best be summed up by

9   something Tommy Lasorda once said.  The difference between the

10  impossible and the possible lies in a person's determination.

11  And while not here with us today in the courtroom, the judicial

12  mediator who was appointed in this case, Chief Judge Santoro,

13  lived and breathed this case for the past two and a half

14  months, and he's still living it.  He's committed more than 100

15  hours of his time helping the parties achieve a remarkable

16  settlement.  And he did that by approaching each day of this

17  mediation, not by saying this is impossible, I won't succeed

18  here, but instead by saying, oh, yeah, watch me.

19          As evidenced by the settlement before, Your Honor

20  today, which was borne out of the mediator's proposal and in

21  fact is the mediators proposal, Judge Santoro helped make the

22  impossible possible.  And on behalf of all the parties, we do

23  want to thank him on the record for his hard work, his

24  dedication, his determination, and in some instances, his

25  shouting at us and putting us in our place, which was not fun

1   but clearly worked because we're here.

2         Simply put, Your Honor, without Judge Santoro's model

3   of determination in this case, we simply would not be before

4   you today asking you to approve this settlement.  This is

5   especially true given the complexity of this litigation.  The

6   scope and breadth of our litigation, other litigation that was

7   impacted by this specific litigation, the obvious adversity

8   that existed between many of the parties, much of which Your

9   Honor also observed firsthand in the more than a year and a

10  half that we've been litigating this case before you.

11        And finally, Your Honor, the truly unique

12  circumstances that unfolded in this case, making a settlement

13  of this magnitude, twenty-one million dollars, is truly

14  extraordinary, something Your Honor will hear more about today.

15        I'm confident, Your Honor, as you always do, that

16  you've carefully read all the pleadings that have been filed in

17  connection with this matter, including not only the 9019 motion

18  filed by the Chapter 7 Trustee but also the reply in support of

19  the trustee 9019 motion that was filed yesterday and can be

20  found at the docket at number 1386.

21        Additionally, Your Honor, a declaration of Brittany

22  Nelson, docket number 1380; a declaration of Ms.  Tavenner,

23  docket number 1374; and a supplemental declaration of Ms.

24  Tavenner, docket number 1387 with exhibits to that same

25  declaration were filed at docket 1388.  These were filed on

 1  June 3rd and June 7th in support of the 9019 motion.

 2          Your Honor, at this time, we would like to move into

 3  evidence those declarations.  There are three of them total.

 4  The declaration on Ms. Brittany Nelson, docket 1380;

 5  declaration of Ms.  Tavenner, number 1374; and the supplemental

 6  declaration of Ms. Lynn Tavenner at docket number 1387 with

 7  exhibits at docket number 1388.

 8          Your Honor, as I stated previously, Ms. Brittany

 9  Nelson and Ms. Tavenner are here today on the Zoom.  They're

10  prepared to testify, answer any questions.  And so at this

11  time, I'd like to make them into evidence.

12          THE COURT:  Does any party object to the admissibility

13  of the Nelson declaration?

14          MS. MONTGOMERY:  This is Katheryn Montgomery for

15  United States Trustee.

16          We have no objection to the admission of this

17  declaration or Ms. Tavenner's declaration.

18          THE COURT:  All right.  Do you intend to cross-examine

19  either of these parties today?

20          MS. MONTGOMERY:  Yes, sir.

21          THE COURT:  Okay, very good.  Your right to cross-

22  examine is reserved.

23          MS. MONTGOMERY:  Thank you.

24          THE COURT:  Now, I'm sorry.  Does anybody else object

25  to -- does anybody -- is there anybody else that wishes to be

1  heard with regard to the Nelson declaration?  All right.  The

2  Nelson declaration is admitted subject to the parties' right to

3  cross-examine.

4     (Declaration of Brittany Nelson was hereby received into

5  evidence as Trustee's Exhibit, as of this date)

6          THE COURT:  Does any party wish to be -- object to the

7  admissibility of the Tavenner declaration?

8          MS. KLAESSY:  Your Honor, Susan Poll Klaessy on behalf

9  of Foley & Lardner.  No objection to the admission of these

10 declarations with, of course, the caveat that Your Honor has

11 started the hearing out with that Foley reserves all of its

12 rights and that there will be an evidentiary hearing as to the

13 allocation of the fees at a later date in which we can respond

14 to any of the statements in those declarations.

15         THE COURT:  Agreed.

16         MS. KLAESSY:  Thank you.

17         THE COURT:  Ms. Morabito, to what extent am I going to

18 be considering -- or what is the purpose of having the

19 supplemental declaration admitted in connection with this

20 hearing today if we're going to take that up at a later date?

21         MS. MORABITO:  So, Your Honor, that's a great

22 question.  We obviously saw the supplemental declaration come

23 in.  And we were proposing to obviously have it be resolved by

24 reservation of rights.  There are three provisions in the -- in

25 Ms. Tavenner's declaration.  I'm sorry, three paragraphs in the

1  supplemental declaration that we would still ask the Court to
2  admit for purposes of today's hearing.  And there is would be,
3  if Your Honor, has the declaration in front of him -- okay.
4  Those would be paragraphs 1, paragraphs 2, and paragraph 15.
5  Paragraph 1 and 2 are standard provisions that you would see in
6  any declaration.

7          Paragraph 15 has to do with her support of the fee
8  applications and where she is indicating that one of the things
9  that she wants to make sure that the Court is aware of is that
10  there will be certain adjustments to future fee applications,
11  to the Quinn fee applications as provided for in the Quinn
12  retention order, and that notwithstanding the fact that there
13  is a contingency payment here, that those same reductions that
14  were agreed to as part of the Quinn retention order will be
15  applied as if they have been in every other fee application.

16          THE COURT:  I understand.  Okay.  I'm going to admit
17  it for that purpose.

18      (Declaration of Lynn Tavenner was hereby received into
19  evidence as Trustee's Exhibit, as of this date)

20          THE COURT:  I think that's appropriate.  And again,
21  subject to anybody's right to cross-examine.

22          All right.  Any other evidence that you wish to offer?

23          MS. MORABITO:  No, Your Honor.  Obviously, we reserve
24  our right to submit any witnesses as rebuttal witnesses to the
25  extent needed if either parties wish to call the witnesses.

Colloquy                                          15

 1            THE COURT:  Okay.  Very good.  All right.

 2            Now, first, does any party wish -- and I know Ms.

 3   Montgomery wishes to.  Does any other party wish to cross-

 4   examine Ms. Nelson?

 5            MR. BARGER:  Your Honor, Mr. Barger on behalf of ULX

 6   defendants.

 7            We do not intend to cross-examine Ms. Nelson.  At some

 8   point I'll just want to put some points on the record as to our

 9   reasons why we don't feel it necessary for our clients to

10   participate as we're not a party from whom relief has been

11   sought.  So I just want to make clear I'm not cross-examining,

12   but I want to put a couple of our reasons on the record later.

13            THE COURT:  And you'll be able to, I promise.

14            MR. BARGER:  Thank you, Judge.

15            THE COURT:  All right.  So --

16            MS. ROSENBERG:  Your Honor?

17            THE COURT:  Yes.

18            MS. ROSENBERG:  Erin Rosenberg with White & Case for

19   CVC Advisers India Private Limited. I'm here with my local

20   counsel, Mike Hastings from Woods Rogers.

21            Just a similar point that Mr. Barger raised.  We do

22   not intend to cross-examine.  We might want to make a brief

23   statement later on, perhaps not if the points are sufficiently

24   covered by Mr. Barger.  But because CVC is a separate defendant

25   from the ULX defendants, I just wanted to make that point very

 1   briefly.

 2            THE COURT:  Okay.  Thank you very much.  And then --

 3            MS. ROSENBERG:  Thank you.

 4            THE COURT:  -- you get that right, too.

 5            All right.  So, Ms. Montgomery, you may proceed with

 6   your cross-examination of Ms. Nelson.

 7            Ms. Nelson, are you present?

 8            MS. NELSON:  I am, Your Honor.  Can you see me?

 9            THE COURT:  Okay.  Please raise your right hand.

10       (Witness sworn)

11            THE COURT:  Thank you, ma'am.  All right.  Please

12   proceed, Ms. Montgomery.

13            MS. MONTGOMERY:  Your Honor, I'm wondering if I might

14   make a brief, preliminary statement before questioning Ms.

15   Nelson.

16            THE COURT:  Of course.  Go ahead.

17            MS. MONTGOMERY:  Thank you, Your Honor.  I just wanted

18   to say echo to Ms.  Morabito's thanking the Court for your time

19   and your consideration.  Would also like to express on the

20   record our appreciation of Judge Santora's great assistance as

21   a judicial mediator in this case, that he truly went above and

22   beyond what mediators traditionally do.  Would like to say that

23   we appreciate the Chapter 7 Trustee and her counsel

24   cooperating, providing documents and answering the United

25   States Trustee's questions through hours of dialog since April

Colloquy                                                    17

1   19th.

2          Would like to say that our office highly respects Lynn

3   Tavenner and her counsel.  We work daily with Tavenner and

4   Beran.  And we hold them in the highest regard.  The LeClair --

5   excuse me.  The LeClairRyan bankruptcy is very complex.  It has

6   been difficult legally but also emotionally for our community

7   and that Lynn Tavenner has borne her responsibility with great

8   intelligence, courage, and grace.

9          We highly respect Quinn, who has and continues to work

10  hard for the trustee and respectfully Foley previous counsel

11  and Greenberg counsel for the defendants.  All of these

12  attorneys are highly regarded nationally.  They're known for

13  their great experience and knowledge.

14         And we understand that the parties want the

15  settlement, that they want finality.  And the United States

16  Trustee does not want to undo the settlement.  Our role here is

17  to see that the settlement is consistent with the Code and does

18  not set bad precedent.  And we believe that the settlement can

19  be preserved in a way that is consistent with the Code.

20         We are here with an objection not to assail the

21  integrity of any party but because we simply disagree with the

22  improvident payment term in the settlement agreement.  And we

23  disagree that any of these proceedings or settlement papers

24  should be sealed.

25         And I repeat, we're not objecting to antagonize any

1   party, especially not the Court or the judicial mediator.  But

2   it's our job when we believe, after careful consideration and

3   analysis, that a party is seeking relief that does not comply

4   with the Code that we alert the Court and provide the Court

5   with our legal analysis and argument to assist the Court in

6   reaching the right decision.  And that's how we see our role

7   here today to assist the Court, because it's the Court's

8   decision to decide whether or not to grant the motion to seal,

9   to approve the settlement, to approve the improvident payment,

10  and what legal standards apply.  So thank you.

11          THE COURT:  You understand that I've sealed this just

12  as a preliminary matter, and you're going to get a chance to

13  argue why it should be unsealed later.  But I can't do it in a

14  reverse fashion because then everything is out on the record.

15  And so -- and that's why we're proceeding this way.  But I do

16  note your objection.  You will get a chance to argue that.  And

17  I will take that under consideration.  And I anticipate that

18  we'll have redacted versions of a lot of this stuff filed on

19  the record.

20          Okay.  Please proceed.  I'm sorry to have interrupted

21  you.

22          MS. MONTGOMERY:  No problem.  Thank you, Your Honor,

23  for allowing me to say that.

24          THE COURT: All right.  Thank you.

25          MS. MONTGOMERY:  So to my cross of Ms.  Nelson.

1    CROSS-EXAMINATION

2    BY MS. MONTGOMERY:

3    Q.  Good afternoon, Mr. Nelson.

4    A.  Good afternoon.

5    Q.  You would agree that Quinn is an experienced litigation

6    counsel trained and was retained here as special litigation

7    counsel?

8    A.  Absolutely.

9    Q.  And you describe your firm as respected and feared?

10   A.  Yes.  That's exactly how I would describe them and how they

11   describe themselves.

12   Q.  And you're certainly zealous advocates for your litigation

13   clients?

14   A.  Indeed.

15   Q.  And you agree that the law firm for the defendants,

16   Greenberg Traurig, is well-respected and experienced?

17   A.  I don't have any basis to disagree with that statement, but

18   I don't have any personal knowledge other than this case.

19   Q.  And you would agree -- in fact, you said in your

20   declaration that this has been a hard-fought litigation, and

21   you described it as scorched earth litigation?

22   A.  Yes, I would describe this as scorched earth litigation.

23   Q.  And it's important for you as special litigation counsel

24   for the estate to bring money into the estate, as much as you

25   possibly could, correct?

1   A.   Yes, we have -- that's our fiduciary duty to our client,

2   and that's our charge.  And that's what we've done quite

3   successfully I would add.



MR. GRABLE: And I --

 1          THE WITNESS:  And as --

 2          MR. GRABLE:  Oh, I'm sorry.  Go ahead.

 3

 6     Q.  Okay.  So you would --

 7          MR. GRABLE:  And, Your Honor, I'm sorry.  I'm sorry,

 8     Ms. Montgomery.  I apologize.  This is Dave Grable, Your Honor.

 9     I apologize.

10          I will be defending Ms. Nelson to the extent it's

11     necessary.  I'm going to try not to interrupt at all.  I will

12     just ask though if there are -- we would request that if there

13     are going to be documents referenced and quotes from documents,

14     if those documents could be -- please be presented to the

15     witness so she can review the language that she's being

16     questioned about.  Thank you.

17          THE COURT:  That'll be great.

18          MS. MONTGOMERY:  Yes.

19     Q.  And to that end, Ms. Nelson, if you could please have

20     before you declaration which attaches the document.  I'll be

21     asking you about your declaration.

22          THE COURT:  Do you have your declaration in front of

23     you, Ms.  Nelson?

24          THE WITNESS:  I do.

25          THE COURT:  Okay.  All right.  Which exhibit do you

 1  wish her turn to, Ms. Montgomery, for the record?

 2          MS. MONTGOMERY:  That would be exhibit -- let's see

 3  which one.

 4          THE WITNESS:  I believe that's Exhibit 2, if you're

 5  pointing to the --

 6          MS. MONTGOMERY:  I think you're right.  Yes.  I'm sure

 7  she knows it better than I.

 8          THE WITNESS:  I am very familiar.

 9          THE COURT:  Just want to make sure our record is clear

10  what we're talking about as we go through all this.

11          MS. MONTGOMERY:  Yes, Your Honor.  Yes.  I'll --

12          THE COURT:  Thank you.

13          MS. MONTGOMERY:  I'll try to be more clear.

14  BY MS. MONTGOMERY:

15  ████ ████████████████████████████████████████████████

████ ██████████████████████████████████████████████

████ ██████████████████████████████

████ ████ ██████████████████████████████████████████████████

████ ██████████████████████████████████████████

████ ████ ████████████████████████████████████████

████ ██████████████████████████████████

████ ████ ██████████████████████████████████

████ ████████████████████████████████████████████

████ ████████████████████████████████████████

████ ████████████













Q.  I'd like to turn to the terms of the settlement that are

set forth in the 9019 motion.

A.  I'm turning there.  Just a second.

Q.  Okay, that's fine.  Take your time.

A.  Okay.  I have it.

Nelson - Cross                                      30

1   Q.   Okay.   So the settlement is being paid by Travelers, D&O w

2   policy, 500,000 dollars.   That was a five-million-dollar waning

3   policy, correct?

4   A.   Correct.   And the reason that's only a 500,000-dollar

5   payment is that 4.5 of that or whatever other number, there's a

6   mechanism within the settlement agreement to make sure that's

7   trued up, has already been paid for defense costs.

8   Q.   Right.   

16  A.   Excuse me.   Exactly, 2022.   It's been a long year.

17  Q.   I'm sure it has been.   And also Continental, which is the

18  DNA entity, which was the excess carrier for Travelers D&O,

19  they're paying into the settlement, correct?

20  A.   Correct.

22  Q.   But it operated as an excess policy over Travelers?

23  A.   Correct.

24  Q.   Okay.   And --

25  A.   That's my understanding.

1    Q.   Okay.   I'm sorry.   I didn't mean to interrupt you.

2         And the Columbia policy, which is a CNA policy is also

3    paying into the settlement?

4    A.   Correct.

5    Q.   ███████████████████████████████████████████████████████

     ███████████████████

     ██  ████████████████████████████████████████████████████████

     ████████████████████████████████████████████████████████████

     ██████████████████████████████████████████████████

     ████████████████████████████████████████████████

     ██  ████     ███████████████████████████████████████████████

     ██████████████████████████████████████████████████████████

     █████████████████████████████████████████████████████████████

     ██████████████████████████

     ██  ██████████████████████████     ██████████████████████████

     ████████████████     ██████████████████

     ██  ██████████████████████████

     ██  █████████████████████████████████████████████

     ██████████████████████     █████████████████████████████████

     █████████████████     █████████████████████████

     ██████████████████████████████████

     ██  █████████████████████████████████     █████████████████████

     ██     ██████████████████████████████████████████████

     ████████     ██████████████████████████████████████

     ██  ████████████

1  Q.  Okay.  All right.  I'd like to turn your attention to

2  paragraph 88 of your declaration.

3  A.  Just a second.  Let me get back there.

4  Q.  Okay.  And for this next line of questioning, I am going to

5  be asking about Quinn's retention application, which can be

6  found in the main case at ECF 908.  So I'll give you a minute

7  to get --

8  A.  I don't have that in front of me, but let me pull that up.

9  Q.  Okay.

10  A.  This case is making me go blind, so my apologies.  Okay.  I

11  have it up.

12  Q.  Okay.  And here in paragraph 88, you say, "Thus, absent

13  approval of the supplement, Quinn will seek compensation on an

14  hourly basis from the estate in the amount that will exceed

15  3,150,000 dollars."

16  A.  That's correct.

17  Q.  Okay.  In paragraph 64 of your declaration, you said that

18  Quinn never asked for or expected the improvident payment and

19  never even thought about it until it was directed by the

20  judicial mediator.  Is that correct?

21  A.  That's correct.

22  Q.  And in your retention application, which is at ECF 908,

23  paragraph 15, it says that, quote, when --

24  A.  Hold on just a second.  There's an error on the --

25  Q.  I'm sorry.  I'm sorry.  Let me know when you're ready.

1    A.   And what paragraph did you want me to look at?

2    Q.   I wanted you to look at paragraph 15.

3    A.   Okay.  I'm there.

4    Q.   Okay.  So this retention application in paragraph 15 talks

5    about billing for noncontingency matters on an hourly basis.

6    And it says Quinn may bill hourly for disputes with the -- to

7    collect a judgment, enforce liens, probate proceedings, for

8    disputes with the debtor's insurance company.  ███████████████

     ██████████████████████████████████████████████████████████

     ████████████████████████████████████████████████

11   A.   No, it's not correct.  I would point you to the entire

12   language of paragraph 15, which starts that the trustee may

13   also utilize Quinn on an hourly basis at agreed-to rates in

14   connection with other related matters that may arise and may

15   require legal services, including but not limited to

16   proceedings to enforce a judgment.  And then there's a list

17   that are defined as noncontingency matters.

18   Q.   █████████████████████████████████████████████████████████

     ████████████████████████████████████████████████████████████

     █████████████████████████

     █ ██████████████████████████████████████████████████

     █████████████████████████████████████████████████████████████

     ████████████████████████████████████████████████████████

     ████████████████████████████████████████████████████████

     █████████

1      But again, I would say that -- and I would say that
2   paragraph 15 would still allow that because it's not limited to
3   the matters that are listed there therein.  It's in connection
4   with anything that's not pursuing a claim for a contingency
5   matter which is then described above in 14.  You have to read
6   14 or 15 together.
7   Q.  And you would agree with me that the contingency matter
8   would have been the discovery in this case.  That was covered
9   by the contingency matter, correct?
10  A.  What's your definition of discovery?
11  Q.  Well, you issued a lot of discovery in this case, correct?
12  You didn't bill for that hourly, did you?
13  A.  Of course.  No.  Yeah, of course.
14  Q.  Okay.  So for --
15  A.  Because that was anticipated -- I mean, Quinn is a very
16  sophisticated litigation firm, would have anticipated that they
17  would issue discovery and respond to discovery and participate
18  in ordinary discovery disputes.
19  Q.  And certainly any motions to compel would be in terms of
20  ordinary discovery?
21  A.  Any motions to compel that would have been included as part
22  of the typical -- the typical litigation that you would see --
23  Q.  Right.
24  A.  -- would have been covered under the contingency matter
25  under paragraph 14.  Certainly.

1  Q.  Right, right.  You would agree -- I mean, a motion to

2  compel are not extraordinary, not unheard of in litigation?

3  A.  Yeah.  They're disfavored in the Bankruptcy Court.  And we

4  try not to bring them here, obviously --

5  Q.  Right.

6  A.  -- because this is -- this is somewhere where they

7  definitely want and expect that everyone provides all the

8  discovery.  You know, courts, especially I think the Bankruptcy

9  Courts and especially this jurisdiction in my fifteen years of

10  practicing here, probably more like ten, have expected that

11  everyone provides all the information.  They don't -- it's an

12  open kimono policy.

13  Q.  So I want to -- I'm sorry, I did not -- I wanted to ask you

14  also about the retention order.  And I did not direct you to

15  that, Quinn's retention order.  It's at ECF 937 in the main

16  case.

17  A.  Okay.  I'm there.

18  Q.  Okay.  And for paragraph 4, in that order --

19  A.  Correct.

20  Q.  -- the last sentence says, "Quinn Emanuel and the trustee

21  shall mutually agree in writing before any services are

22  provided for noncontingency matters."  Correct?

23  A.  Correct.

24  Q.  you'll agree that there is no mutual agreement in writing

25  between Quinn and the trustee to bill for any of the additional

 1  services that are listed and defined in the 9019 motion?

 2  A.  I would not agree with that statement, no.

 3  Q.  Okay.

 4  A.  I would say that there are -- as the additional services

 5  arose beginning in February of -- February 4th, I would

 6  conservatively say February 4th or October 4th, the trustee and

 7  Quinn communicated on a consistent basis regarding what was

 8  being done and what was not being done.  While there might not

 9  have been a formal, like pursuant to paragraph 4 of the order,

10  that -- requesting it to build is an hourly, I do think there

11  was writings that would evidence that the trustee was

12  authorizing these services.

13  Q.  Can you point to a single writing where there's a mutual

14  agreement that you all could bill hourly and that that

15  agreement was made before the work was done?

16  A.  No.  But I would say that there's writings that would

17  evidence that such -- that the trustee understood that these

18  services were being provided and were being provided on an

19  expedited basis.

20       As you have to understand, this is literally changing on a

21  daily basis about what the understanding says.  If you read my

22  declaration, literally, that late February and March and

23  throughout the mediation, every day we learned something new

24  and have to pivot and have to involve other insurance experts

25  and have to involve variety of other people at the firm and

1   marshal our resources in order to prevent -- to provide the

2   best defense that we could.  And the trustee was informed of

3   all of that as we undertook that work.

4   Q.  And my last question regarding paragraph 88, you understand

5   that any additional compensation that you sought on an hourly

6   basis would be filed under Section 7 -- I'm sorry, 327 of the

7   Code and would be subject to Section 330 review, correct?

8   A.  If we sought additional contingency hourly, we would have

9   sought it under 327 and 330 as we have in the past in this

10  case.

11  Q.  And you would be filing a fee application?

12  A.  For that -- for those, yes.

13          MS. MONTGOMERY:  Thank you.  I appreciate you

14  answering all my questions.  That's all I have.

15          THE COURT:  All right.  Thank you, Ms. Montgomery.

16          Does any other party wish to cross-examine this

17  witness?

18          Okay.  Hearing none, Ms. Morabito, do you have any

19  redirect?

20          MS. MORABITO:  Turn that over to my partner, Mr.

21  Grable, who is going to do redirect on Ms. Nelson.

22          Mr. Grable, do you have anything?

23          MR. GRABLE:  I guess I have maybe one or two

24  questions, Your Honor, if that's okay.

25          THE COURT:  All right, Mr. Grable.  Proceed.

1  REDIRECT EXAMINATION

2  BY MR. GRABLE:

3  Q.  Ms. Nelson, have you heard the term "Monday morning

4  quarterbacking" before?

5  A.  Absolutely.

6  Q.  And do you understand what that term means?

7  A.  Yes.  It means trying to second guess something that has

8  happened, you know, months later.

9  Q.  The counsel for the U.S. Trustee's office asked you a bunch

10  of questions about a motion to compel that was not filed.  Do

11  you remember that?

12  A.  Yeah.  Correct.  Yeah, absolutely.

13  Q. ███████████████████████████████████████

   ██ ████████████████████████████████  ██████

   ██ ████████████████

   ██ ██  ████

   ██ ██  ██████████████████████████████████

   ██ ██████████████████████████████████████

   ██ ███████████████████████████████████

   ██ ██  ██████████████

   ██ ██  █████████████████████████████████████████

   ██ ██████████████

   ██ ██  ██████  ████████████████████████████████

   ██ ████████████████████████████

25          MR. GRABLE:  I don't have any further questions, Your

1 | Honor.

2 | THE COURT:  Ms. Nelson, do you recall -- the Court has

3 | a couple of questions that I would like to direct, and then

4 | I'll give the parties an opportunity to clean up my mess.

1        ▇▇▇▇▇▇▇▇▇▇▇▇

▇        ▇▇▇▇▇▇▇     ▇▇▇▇▇▇▇▇▇▇▇▇▇

▇        ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇        ▇▇▇▇▇▇

▇        ▇▇▇▇▇▇▇    ▇▇    ▇▇▇▇▇▇▇▇▇▇

▇        ▇▇▇▇

▇        ▇▇▇▇▇▇▇    ▇▇▇▇▇▇▇▇▇▇

▇        ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇        ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇        ▇▇▇▇▇▇▇▇▇▇▇

▇        ▇▇▇▇▇▇▇    ▇▇▇▇

▇        ▇▇▇▇▇▇▇    ▇▇▇▇▇▇▇    ▇▇▇▇▇▇▇▇

▇        ▇▇▇▇▇▇

14              Now, I have asked some questions, and first of all,

15       Ms. Montgomery, do you have any further questions of this

16       witness in light of the Court's questions?

17              MS. MONTGOMERY:  No, Your Honor.  Thank you.

18              THE COURT:  Thank you, ma'am.

19              All right.  Mr. Grable, do you have any questions of

20       Ms. Nelson in light of the Court's questions?

21              MR. GRABLE:  No, Your Honor.  Thank you.

22              THE COURT:  Thank you.  All right.

23              Ms. Nelson, thank you very much for your testimony

24       this afternoon.  And you can step down, subject to recall.

25              MS. NELSON:  Of course.  Thank you, Your Honor.

1          THE COURT:  Thank you, ma'am.

2          All right.  Does any party wish to cross-examine Ms.

3   Tavenner?

4          MS. MONTGOMERY:  Your Honor, it's Katherine Montgomery

5   from the United States Trustee's office.  I have a brief cross-

6   examination.

7          THE COURT:  This has got to be the weirdest case I

8   have ever been involved in.

9          All right.  You may proceed, Ms. Montgomery.

10          MS. MONTGOMERY:  Okay.  Thank you.  Should we swear

11   the witness?

12          THE COURT:  Of course.  Ms. Tavenner, are you with us?

13          MS. TAVENNER:  I am.

14          THE COURT:  All right.  Thank you.  You already have

15   your hand raised.

16      (Witness sworn)

17          THE COURT:  Thank you.

18          Please proceed.

19   CROSS-EXAMINATION

20   BY MS. MONTGOMERY:

21   Q.  Ms. Tavenner, in terms of distribution to unsecured

22   creditors in this case, you are not expecting creditors to be

23   paid in full, are you?

24   A.  Good afternoon, Ms. Montgomery.  With respect to that

25   question, at this point in time, I have not completed a claims

1   analysis given where we are in this case.  I think you might

2   recall that an administrative bar date was just set, and I do

3   this systematically, as I do in all my cases.

4        But at this point in time, given the amount of funds that I

5   have in the estate, and add to that the amount that I am

6   expecting to come in once the settlement is approved, and then

7   looking at other additional recoveries and compare that to the

8   amount of claims that are currently on file, though I haven't

9   objected to them yet, there would not be a one-hundred-cents

10  recovery.

11  Q.  Okay.  And answer if you can.  I don't know if you can --

12  if you can answer this, but can you estimate whether you think

13  creditors will get more than, say, fifty percent?

14  A.  I cannot estimate that.

15       MS. MONTGOMERY:  Okay.  Thank you.  That's all the

16  questions I have.

17       THE COURT:  All right.  Does any other party have a

18  cross-examination for the trustee?

19       All right.  Hearing none, is there redirect?

20       I don't know if it's from Ms. --

21       MS. BERAN:  One --

22       THE COURT:  I don't know who's going to be doing this.

23  You know.

24       MS. BERAN:  Your Honor, it is me, and based on Ms.

25  Montgomery's two questions, there is no redirect.

Colloquy                                                              43

1            THE COURT:  Okay.  Thank you, Mr. Beran.

2            All right.  So the Court has no questions of the

3    trustee, so Ms. Tavenner, you may step down, subject to recall.

4            MS. TAVENNER:  Thank you, Your Honor.

5            THE COURT:  All right.  Now, Ms. Morabito, I

6    understand that you have no other evidence you wish to offer at

7    this time?

8            MS. MORABITO:  That's correct, Your Honor.

9            THE COURT:  Is there any other evidence that the

10   trustee wishes to offer?

11           MS. MORABITO:  No, Your Honor.  Can you hear me -- can

12   you hear me okay?

13           THE COURT:  Okay.  I'm having trouble hearing you.

14   Yes.

15           MS. MORABITO:  I'm sorry.  Can you hear me now?

16           THE COURT:  Now, I can hear you.  Yes.

17           MS. MORABITO:  Okay.  I feel like I'm screaming.  No,

18   the trustee has no other evidence to offer at this time, Your

19   Honor.

20           THE COURT:  Okay.  And thank you for screaming.  I

21   guess I'm heard of hearing.  All right.  Thank you.

22           All right.  Then at that point, then, does any other

23   party wish to offer any evidence?

24           MS. MONTGOMERY:  This is Kathryn Montgomery for the

25   United States Trustee.  We don't have any evidence to offer.

1            THE COURT:  All right.  Thank you, Ms. Montgomery.

2            All right.  Then the evidence will be closed.  All

3    right.  And then we can proceed with the arguments.

4            So Ms. Morabito, I know you wanted to start with this,

5    but now we're going to do this at this point in time, now that

6    I've got all the evidence before me.  So please make your

7    argument.

8            MS. MORABITO:  Thank you.  Given how you started, that

9    you've been on the bench at nine and haven't had a break, I'm

10   very sensitive to move as expeditiously as is possible.  And we

11   certainly appreciate your time.

12           So I'm going to do my very best to not repeat

13   arguments which were raised in the pleadings.  Instead, I'm

14   just going to try to highlight some of the key issues in

15   salient terms that were contained.  And of course, I'm always

16   happy to answer any questions that the Court may have at the

17   end of my presentation.

18           The terms of the comprehensive settlement -- as I

19   stated earlier, the settlement agreement is attached as Exhibit

20   A to the trustee's motion.  The key terms of that agreement,

21   however, are summarized, starting on page 13, which is

22   paragraph 37 of the 9019 motion.

23           I do want to state, Your Honor, that I did notice a

24   typo in this paragraph when I was preparing for today, and it's

25   in the first sentence of paragraph 37.  And that says that the

1  terms of the settlement that I'm about to walk the Court

2  through were put on the record on April 19th.  The pleading

3  indicates it was April 18th.  They were actually put on the

4  record on April 19th.  So we apologize for the mistake, but we

5  want to make sure that the record is accurate.

6       Your Honor, as we stated previously, if this

7  settlement is approved, which we think is an extraordinary

8  result for the estate, the defendants and the insurers are

9  going to pay the total sum of twenty-one million dollars to the

10 estate.  So let's start about how those payments break down.

11      First, you have insurance carriers contributing

12 12,750,000 dollars, and that would all take place on the

13 closing date, which is defined in the settlement agreement as

14 the fifteenth business day following the entry of a final and

15 nonappealable order.  Continental shall pay to the trustee

16 5,000,000 dollars, and Columbia shall pay 7,250,000.  Travelers

17 is going to pay 500,000 dollars on the closing date.  So that's

18 a significant amount of money that will come into the estate in

19 a relatively short time period, hopefully within the next

20 thirty days.

21      There will be additional payments made by the

22 defendants in this case, and that's going to total 8,250,000

23 dollars.  The first defendant payment is to be two million

24 dollars on the closing date.  The second defendant payment will

25 be three million dollars no later than one year from the

1    closing date.  And the third defendant's payment will be

2    3,250,000 dollars, and that would be no later than two years

3    from the closing date.

4           The settlement agreement also provides that interest

5    will accrue on these deferred payments from the defendant's

6    second and third payments at the rate of one percent annually.

7    These payments will also be fully secured by irrevocable

8    letters of credit.  The deferred second and third payment, Your

9    Honor, can be accelerated if any of the defendants receive any

10   proceeds from Star (ph.), which was another insurance carrier

11   in this case, under the Star-related policy.  And you will

12   note, Your Honor, that Star is not a released insurer under

13   this agreement for that reason.

14          The settlement also provides that Quinn Emanuel will

15   receive a total amount of 10,500,000 dollars from the total

16   settlement payment.  This is broken down as follows:  First,

17   consistent with the Quinn retention order, which was filed at

18   docket number 937, Quinn will receive 7,350,000 dollars from

19   the total settlement proceeds, and second, as directed by the

20   judicial mediator who lived this case for the past two and a

21   half months, Quinn shall be entitled to receive an additional

22   amount of 3,150,000 dollars, which has been described as the

23   improvident payment.  That is a number that was solely directed

24   by the mediator, and the improvident payment itself was solely

25   directed by the mediator when he took into account all the

1  facts and circumstances of this case, which I will get to in a

2  minute.

3         There is no question, given the lengthy declaration of

4  Ms. Nelson, and I don't think anything on her examination

5  changes that, as well as the declaration from Ms. Tavenner, and

6  given the terms of the Quinn retention order, they have proven

7  to be improvident in view of really unique circumstances in

8  this matter that were not capable of being anticipated.  And

9  those, in fact, changed the trajectory of this litigation.

10        The improvident payment, however, is subject to the

11  estate receiving the total settlement payment.  So that

12  improvident payment may not be paid to Quinn until the

13  conclusion of the following settlement payment, which could be

14  up to two years from the date of closing.  So it does not

15  impact dollars that are coming into the estate now.

16        The settlement also requires a waiver of the ULX

17  Partners' proof of claim.  While the claims themselves were

18  filed in total more than twelve million dollars, the ULX

19  defendants, not the trustee, estimate the value of those claims

20  to be 2.4 million dollars.

21        Also, and this is important, there is no Section 502

22  or any other claims under the Bankruptcy Code that will be

23  allowed by any of the defendants or the insurers.  And that has

24  not always been the case with respect to prior settlements that

25  have been negotiated and obtained in this case.  There have

1    been situations, as Your Honor knows, where shareholders have,

2    in fact, asserted 502(h) claims and reserved that right as part

3    of the settlement in terms of payments that were paid over to

4    the estate.  That will not happen in this case.

5              There will also be general releases by all of the

6    parties to the settlement agreement, and those can be more

7    specifically described in paragraphs 5 through 12 of the

8    settlement agreement.  These general releases were one of the

9    most negotiated terms and conditions of this settlement, and

10   that is because they are very broad because of what this

11   settlement represents by way of releases and settlements.

12             This was not just about the two adversary proceedings.

13   This settlement also resolved litigation that's pending before

14   the district court, ███████████████████████████

███████████████████████████████████████████

███████████████████████    ████████████████████

███████████████████████    ██████████████████

██████████████    ██████████████████████

██████████████████████████████████

██████████████████████████████    So it is, no

21   question, a very comprehensive and global settlement that, as a

22   result of that, all of the material terms of the settlement

23   agreement was the result of these very broad general release

24   that were given.

25             Lastly, Your Honor, it does require a dismissal within

1    ten calendar days of receipt of the trustee's payment, which is
2    due on closing, and the notes and irrevocable letters of
3    credits.  These cases will be dismissed with prejudice of the
4    two adversary proceedings, and the proceeding pending before
5    the District Court that involves CVC will also be dismissed.
6           The amount of money that the estate will receive from
7    this deal, given what transpired in this case, I can't
8    emphasize enough is truly remarkable.  You don't need to look
9    any farther beyond the specific details of the declarations of
10   both Ms. Nelson and Ms. Tavenner to truly understand what has
11   unfolded in this case over the past year and a half.
12          I know I don't need to walk Your Honor through, and I
13   won't, the elements of Bankruptcy Rule 9019, as you know them
14   better than anyone and certainly better than me.  But they are
15   set forth in the pleadings.  I'm not going to address those,
16   but before addressing the arguments that were raised in the
17   objections, I do want to state the following in support of the
18   1919 motion.
19          The settlement, as documented, is fair and equitable
20   and was undoubtedly the product of good faith and arm's-length
21   negotiations.  It globally resolved the followings on terms
22   that were beneficial to the estate:  The complicated litigation
23   of the two adversarial proceedings, the litigation pending
24   before the District Court related to CVC, and the lingering
25   issues and ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

1   which would have necessitated future costly and time-consuming

2   litigation with no certainty of liability or recovery.

3            This settlement will further help expedite the

4   administration of this case, and it will reduce administrative

5   costs.  It will also allow the estate to proceed towards a more

6   expeditious resolution, rather than prolonged litigation and

7   potential appeals.

8            For the reasons set forth in our motion, as well as

9   the declarations of Ms. Nelson and Ms. Tavenner, the Chapter 7

10  trustee strongly believes, in the exercise of her business

11  judgment, having lived this case for a year and a half and

12  participated daily on the mediation that's occurred over the

13  past two and a half months, that the global and comprehensive

14  settlement before this Court is unquestionably in the best

15  interest of the estate and easily falls within the reasonable

16  range of outcomes.

17           This settlement is a culmination of more than several

18  months of negotiations among the parties and the mediator's

19  assistance and direction for more than a hundred hours.  It

20  represents a global resolution of the claims.  As the trustee

21  stated in her declaration, she firmly believes that the

22  settlement resulted in maximum value to the estate and

23  represents a result well above the lowest found of

24  reasonableness.

25           The settlement provides the trustee with a sum certain

1  that she believes is potentially greater than any recovery the

2  estate would ultimately receive, even if the two adversary

3  proceedings preceded to judgment.

4          While the amount right now is uncertain, the trustee

5  further believes that there is also a monetary value to the

6  waiver of the UnitedLex Partners' proofs of claims.  And Your

7  Honor, the trustee conducted, as she always does, due

8  diligence, both before and during the mediation, on the

9  enforcement and ultimate collectability of potential judgments

10 against the defendants.



18         Next, Your Honor, you have the improvident payment.

19 That's what we've heard all of the questioning about today.

20 Again, this is unilaterally directed by the mediator as part of

21 the mediator's proposal as a material and integral term of the

22 settlement.  And as such, the trustee believes it is in the

23 best interest of the estate.

24         Until receiving the mediator's proposal, neither the

25 Chapter 7 trustee or myself or anyone at Quinn that I spoke to

1    had ever heard or contemplated the improvident payment.  In

2    fact, the trustee states in her declaration at paragraph 41

3    that in the twenty-five years of her serving as a Chapter 7

4    trustee, that this is the very first time she has ever approved

5    of any such request.  For those of us that know Ms. Tavenner,

6    that's a pretty strong and compelling statement supporting the

7    improvident payment.

8           Of course, the improvident payment being directed by

9    the chief bankruptcy judge in this district, who lived this

10   case with us for more than two months, is also quite

11   compelling.

12          Finally, Your Honor, the trustee believes that the

13   settlement should allow her now to make a meaningful

14   distribution to creditors, subject, of course, to the ultimate

15   amount of allowed administrative expenses and pre-petition

16   claims.  For her to be able to do that, make a meaningful

17   distribution to creditors in this case, a defunct law firm,

18   based on its top executives' fall from grace, including one

19   that's now serving a lengthy sentence in federal prison related

20   to his own theft of millions of dollars in bankruptcy trust

21   funds, is truly an incredible result for the estates and for

22   its creditors.

23          With respect to the objections, Your Honor, I had

24   intended with starting with the Foley & Lardner objection, but

25   given the comments by the Court, as well as Ms. Poll Klaessy,

| | Colloquy | 53 |

1  we will reserve any comments.  We believe this is not properly

2  before the Court.  We'll reserve any response to any statements

3  that were made there, and we will intend on dealing with those

4  statements at the proper time as Foley puts the appropriate

5  matter before the Court so that it can be decided.

6         I will also state Ms. Poll Klaessy did make a

7  statement -- I didn't get a chance to respond -- I think

8  whereby she said she believes there is an attorney lien and

9  that funds should be held in trust.  The Quinn and the

10 trustee's position is that should not be the case.  There has

11 been no adjudication as to what Foley is or isn't entitled to.

12 All parties reserve right.  That's Foley.  That's Quinn.

13 That's the Chapter 7 trustee.  It's a mutual reservation of

14 rights.

15        We believe that if this settlement is granted and the

16 award is given, part of this relief requested is that those

17 moneys be paid to Quinn pursuant to how they've been paid in

18 the past.  And so there is a request here for authorization to

19 pay.  We don't believe there is any reason that those dollars

20 need to be held in escrow by the Chapter 7 trustee.  She should

21 be able to pay them in the ordinary course, as she has

22 previously.

23        Quinn is a large law firm.  We are going to remain

24 under the jurisdiction of this Court.  At the appropriate time

25 when these fees are decided, if there is a determination that

1     money that has been paid to Quinn should go back to Foley,

2     there's certainly no risk whatsoever that those funds wouldn't

3     be available.

4            So with that, Your Honor, there is one part of the

5     Foley motion that we do want to -- I want to address because it

6     does have to do with the relief that's being sought in the 9019

7     motion, and it does overlap somewhat with an argument that was

8     made by the United States Trustee.

9            Despite all these allegations to the contrary, the

10    motion does comply with Rule 2016.  While the motion is not a

11    traditional application brought under Rule 2016, numerous

12    courts have recognized that such a formal fee application is

13    not necessary as long as the Court has sufficient information

14    to assess the reasonableness of the fees.  In this case, the

15    motion, as supported by a very lengthy, detailed declaration of

16    Ms. Nelson and Ms. Tavenner, provide this Court with

17    sufficiently detailed explanation of the fees being sought to

18    satisfy the requirements of Rule 2016, especially while in this

19    case the amount is being sought for a contingency case.

20           The declaration of Ms. Nelson includes a detailed

21    narrative explaining the nature of the work performed and the

22    results achieved.  It also includes all the other pertinent

23    disclosures under Rule 2016 regarding the lack of sharing

24    agreements and the fact that no other compensation for the

25    amounts sought in this motion have been made.  Can see Nelson

Colloquy                                                   55

1    declaration at paragraph 83.

2            This information has been providing overwhelmingly

3    demonstrates that the contingency payment to Quinn is

4    consistent with the terms of the Quinn retention order and the

5    engagement letter, and the same is true as to the

6    reasonableness of the improvident payments.

7            Finally, Your Honor, the information furnished in the

8    motion and the Nelson declaration to substantiate the amounts

9    of the contingency and improvident payments are not only

10   consistent with, but are actually greater than what's required

11   in Rule 2016 submissions.  And that includes submissions that

12   have happened in this case and in this district, where people

13   on contingency fees have sought approval of contingency fees,

14   including previous applications for contingency payments in

15   this case.

16           And you don't need to look any further since I was

17   there and personally did those.  This is true when Foley filed

18   fee applications in this case.  Several of the Foley

19   applications that we point to in our reply at paragraph 37 are

20   exactly the same disclosures that Quinn is making now in the

21   Nelson and Tavenner declaration as it relates to these

22   particular requests for fees.

23           So for Foley to argue now that it somehow needs more

24   information than what it itself had previously provided to this

25   Court seems disingenuous.  We understand Foley's concerns.

1  Quinn understands them.  The Chapter 7 trustee understand them.

2  We believe we're going to be able to reach a reasonable

3  resolution.

4          That's always been our intent.  Nothing's changed.

5  We've maintained to offer the reservation of rights.  We do

6  want everybody to sit down, and hopefully this will be

7  something that's worked out directly between Quinn and Foley &

8  Lardner and doesn't even necessitate that the Chapter 7 trustee

9  and/or this court being involved.

10         But as Your Honor stated previously, for the reasons

11  stated in our pleadings, the Foley objection should be

12  overruled.  It's just simply not an objection to a 9019 motion.

13  It's an argument for them to be able to get quantum meruit

14  relief based on an opinion that they believe they're entitled

15  to fees, yet they need to seek affirmative relief by doing so,

16  and that should be in the form of either a fee application or

17  some other sort of complaint that needs to be file.

18         THE COURT:  And we're going to take all of that up at

19  a later date.  I promise.

20         MS. MONTGOMERY:  Okay.  All right, Your Honor.  Let me

21  turn to the U.S. Trustee's objection.

22         Well, Your Honor, you said this is a very interesting

23  case or one of the most interesting cases you've seen.  I do

24  want to echo Ms. Montgomery, and I see her -- it's hard for me

25  to see you on your screen.  I do appreciate, and I want to make

1   sure that that's clear, the United States Trustee working with

2   us.  I know sometimes it's difficult to agree on certain

3   things, but I think we tried to disagree without being

4   disagreeable and tried to maintain a level of professionalism

5   and respect.  And I think that's important.

6           But Your Honor, despite your best efforts, the

7   mediator's best efforts, and the Chapter 7 trustee and her

8   counsel's best efforts, as you saw today, the U.S. Trustee did

9   file an objection and obviously cross-examined Ms. Tavenner and

10  Ms. Nelson on their declarations.  But if you read the

11  conclusion section in their objection, which is at docket

12  1370 -- I think Ms. Montgomery said this herself -- it appears

13  what the U.S. Trustee is really asking for is for this Court to

14  make a material and integral change to a term of the settlement

15  agreement.

16          And we call that blue penciling.  They want to come in

17  now, I think Mr. Grable said in, as Monday morning quarterback

18  and strike out completely the improvident payment, which is a

19  term that was material and a part of the settlement agreement

20  and the 9019 motion.  The U.S. Trustee does ask, however, that

21  this Court approve the remainder of the settlement agreement

22  and the 9019 motion.

23          So because of that, I'm just going to address their

24  arguments with respect to the improvident payment.  Simply

25  stated, Your Honor, while the U.S. Trustee may not like it, it

1   is undisputed by all the parties to the settlement agreement,

2   and by the mediator who directed the improvident payments, that

3   it is, in fact, a material and integral term of the settlement.

4           In fact, all of the ULX-entity defendants filed a

5   statement in support that can be found at docket number 1389

6   that states exactly that.  That's because these defendants,

7   like the trustee, have been living this case for over a year

8   and a half.

9           We're engaged in a mediation for two and a half months

10  and are the people in the best position to understand the

11  unique facts and circumstances of this case better than anyone

12  else.  And so they know whether or not the improvident payment

13  should be warranted in this particular case.  While none of the

14  parties liked every aspect of the settlement, all of the

15  parties agreed to it in full in order to resolve the

16  significant and substantial claims and potential future claims

17  in exchange for mutual releases contained therein.

18          The ULX defendants' statement, which I just got to

19  read earlier this morning, states, "The settlement agreement

20  should be approved in its entirety and in the form presented to

21  the Court and without any provision thereof severed, as it is

22  the result of an extremely complex, intense, and confidential

23  arm's-length negotiation and was presented by the judicial

24  mediator and accepted by the parties as a comprehensive and

25  global resolution of all disputes among them."

1         That agreement was put on the record on April 19th.

2    It was put on the record by all of the parties to the

3    settlement agreement.  Everybody had an opportunity at that

4    time to say that they did not agree or did not want to accept

5    the mediator's proposal, and they didn't.  And they support it

6    here today.  The only people coming in are two people who did

7    not participate, and one of them had the option to participate

8    in the mediation.

9         The Chapter 7 trustee further confirmed in her

10   declaration that the improvident payment was a material and

11   integral term in the settlement agreement.

12        But most significantly, the mediator himself

13   recognized that this was a material and integral term of the

14   settlement.  He went so far as to state that if the improvident

15   payment was not included as part of the settlement and in the

16   amount proposed by the mediator, he would release all parties

17   to the settlement agreement from any and all obligations for

18   them to perform thereunder.  This is true in large part because

19   the settlement agreement resolved not only the two adversary

20   proceedings, but also disposed of everything else that we

21   talked about.

22        In the face of this overwhelming evidence, neither the

23   U.S. Trustee nor Foley should be allowed to strike the

24   improvident payment term from the settlement.

25        Second, Your Honor, the U.S. Trustee appears to adopt

1    a very narrow interpretation of Section 328(a), essentially

2    inviting this Court to formulate a bright-line rule concerning

3    professional fees being earned and awarded in unique and

4    extraordinary cases such as this.  It's critical, Your Honor,

5    that the bankruptcy court not accept this invitation to

6    renounce its very important, equitable discretion here, which

7    requires it to consider the unique facts and circumstances of

8    this particular case and the overall objectives of the

9    bankruptcy system in deciding important issues such as this.

10          The U.S. Trustee's advocation of an inflexible

11   position on Rule 328(a) has been repudiated by the Fourth

12   Circuit Court of Appeals in the In re: Lanbate (ph.) case,

13   which is cited in our reply on paragraph 12, and therefore

14   should not be validated here.  The Fourth Circuit specifically

15   recognized the Bankruptcy Code is not an area of absolutes or

16   bright-line rules, and rather should take the individual facts

17   and circumstances of each case into consideration.

18          And as held in the In re: Harold Williams Development

19   case, also a Fourth Circuit 1992 case cited at paragraph 12 of

20   our reply, it's simply not consistent with the Bankruptcy Code

21   for the U.S. Trustee in this case to elevate the standards of

22   328(a) and impose their stricter standards than that of the

23   Bankruptcy Code when it considers this improvident payment.  To

24   do so in this case, Your Honor, would create a slippery slope

25   and possibly dangerous precedent.

1        In our reply, we spend a considerable amount of time

2   addressing and/or distinguishing the facts in the case law that

3   was relied upon by the U.S. Trustee, and they do the same to

4   us.  So I'm not going to repeat what's in the pleadings.  But I

5   do think, Judge, that the briefing on this issue made one thing

6   clear.  It's probably going to be impossible, or near

7   impossible, for any party to ever find another case out there

8   that shares the exact same unique circumstances that existed in

9   this case.

10       In fact, the U.S. Trustee acknowledges this in their

11  objection at page 22, inciting to the Yablon case out of the

12  Southern District of New York, which acknowledged that there

13  "is ground for debate in virtually every case as to whether or

14  not there was improvident circumstances".  And that's probably

15  a good thing because the improvident payment, nobody disputes,

16  is an extraordinary request and one that only should be granted

17  after carefully considering all the facts and circumstances of

18  a particular case.

19  ████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████    ████████████████████

████████████████████████████████████████████████

██████████████████████



1          Under the standard the U.S. Trustee urges this Court

2    to apply, however, it appears that there would never be a

3    sufficient reason for the U.S. Trustee to support an increased

4    payment to a professional under Section 328 due to improvident

5    circumstances.  The trustee has provided a plethora of evidence

6    that the amount of the improvident payment is reasonable.  And

7    I didn't see any cross-examination as to those amounts and the

8    basis for those amounts that were clearly set forth as

9    conservative estimates in both the declarations of Ms. Tavenner

10   and Ms. Nelson.

11         Based on that evidence, Your Honor, the bankruptcy

12   court can use its own gatekeeping function to determine the

13   reasonableness of the improvident payment that was directed by

14   the mediator.  Here, Your Honor, we urge the Court to carefully

15   consider the facts and circumstances in this case, as you

16   always do.  And in doing so, we believe that, just as the

17   mediator and the Chapter 7 trustee concluded in the exercise of

18   her business judgment, that this Court, too, will find that the

19   improvident payment is warranted in this case and the amount

20   directed is reasonable.

21         Wherefore, Your Honor, we respectfully request that

22   the Court enter an order approving the settlement, authorizing

23   the effectiveness of the settlement agreement on behalf of the

24   estate, approving the contingency payment, and authorizing the

25   trustee to pay the same, as provided in the Quinn retention

Colloquy                                                              63

1    order, and approving the improvident payment in the amount of

2    3,150,000 dollars and authorizing the trustee to pay the same.

3              I have nothing further, Your Honor, but I'm happy to

4    answer any questions.  Thank you.

5              THE COURT:  Good because I have a couple.

6              MS. MORABITO:  Okay.

7              THE COURT:  And it concerns the retention agreement

8    that I approved, which said that Quinn was to receive thirty-

9    five percent contingency of funds received by the bankruptcy

10   estate.  And I want to drill down on that word "received"

11   because what I want you to address is the way that the math

12   works that you ran through for me earlier.

13             Quinn will be receiving thirty-five percent of the

14   full twenty-one million dollars, rather than including that the

15   3.15 million improvident payment, should I approve that.  I

16   mean, I don't see that the retention agreement would permit

17   when those funds are directed to be paid to the firm and are

18   not received by the bankruptcy estate why they would be subject

19   to the contingency.

20             The U.S. Trustee raises this in her brief as fees on

21   fees, and I noted that the response or the reply filed by the

22   trustee was notably silent on that point and I would like you

23   to address it for me, please.

24             MS. MORABITO:  Absolutely, Your Honor.  And I know

25   where you're talking about.  It's paragraph -- I'm sorry, it's

Colloquy                                                              64

1   page 29 of the U.S. Trustee's objection, and it's footnote 9.

2           And simply put, as you may recall, on April 19th, when

3   the settlement was put on the record, it was brought to us by

4   Judge Santoro as a twenty-million dollar recovery into the

5   estate, whereby Quinn would receive ten and a half and the

6   estate would receive ten and a half.  What the trustee did not

7   want to do, the Chapter 7 trustee did not want to do, and Quinn

8   agreed, was we did not want to go back in and alter the terms

9   and conditions of the current retention application that Your

10  Honor approved and all of a sudden have an increase whereby

11  Quinn would be getting fifty percent of fees going forward.

12          So what we tried to do then was say, okay, let's do

13  this as thirty-five percent, which is what it currently states.

14  That would give you the 7.3-million-dollar number.  And then

15  what would be the difference to get it up to the 10.5-million-

16  dollar number, and we'll characterize that as the improvident

17  payment.

18          That is how the math was calculated.  I understand,

19  under that example that Ms. Montgomery gives, where she breaks

20  it down and says the contingency would be as follows:  Twenty-

21  one million minus the improvident payment, which would be

22  17,850, multiplied by thirty-five percent equals 647, and then

23  you would add the 3150 and it would be a difference of

24  9,397,500.

25          We would state, as our declaration support, that we

Colloquy                                                            65

1    agreed the cap -- the improvident payment was also an amount

2    certain for the Chapter 7 trustee and the estate.  If we were

3    to go out and seek those fees on an hourly basis, based on the

4    declaration that was provided by Ms. Nelson, we believe that

5    those hourly fees could actually far exceed 3.1 million

6    dollars.

7            And so rather than try to modify application to an

8    increased amount, which is not what we want to do -- it's

9    unique for this particular case -- rather than seek these fees

10   on an hourly basis that we could then submit interim

11   applications for -- and arguably, the estate would pay those

12   much sooner than they would as it's structured here, where we

13   don't get them until a backend payment -- we did it in a way

14   which we thought was fair to the estate, put the estate in a

15   better position than if we were to assert them hourly, was

16   consistent with the amounts that Judge Santoro wanted, and

17   wouldn't set a precedence where Quinn was trying to seek fifty

18   percent of contingency fees going forward in other matters.

19   And that's just simply how it was calculated.

20           THE COURT:  Okay.  Thank you very much.

21           Ms. Montgomery, you want to make your argument?

22           MS. MONTGOMERY:  Yes, Your Honor.  Thank you very

23   much.

24           I'd like to say that, first of all, this Court may

25   approve the settlement without the improvident payment.  It

1    would not be blue lining.  In fact, as we quoted in our

2    opposition, the 9019 motion itself at paragraph 63 says,

3    pursuant to Section 105 of the Bankruptcy Code and Bankruptcy

4    Rule 9019, the bankruptcy court should approve the settlement

5    agreement regardless of whether the improvident payment

6    separately qualifies as a payment under Section 328(a) of the

7    Bankruptcy Code.

8        So it's not the United States Trustee that would be

9    striking the term from the settlement.  The settlement allows

10    for that term to fall away and the settlement to survive.  And

11    that would be not our role, but certainly your role, Your

12    Honor.

13        So we would move, as we have in our conclusion and in

14    our opening paragraph, that this settlement be approved without

15    the improvident payment because we do believe that is a

16    settlement.

17        However, should the Court disagree that the settlement

18    agreement cannot be approved -- pardon me, should the Court

19    disagree and believe that the settlement cannot be approved

20    unless the improvident payment is part of it, then we would

21    move for the Court to deny approval of the entire sum.

22        THE COURT:  I have been advised that the mediator has

23    said that if the improvident fee is not approved by this Court,

24    which of course I can approve or deny, that the mediator would

25    release the parties from the terms of the settlement and allow

 1   them to walk away from it.

 2          MS. MONTGOMERY:  Your Honor, to that I would say that

 3   the mediator has facilitated this settlement and that it's

 4   here, it's signed, and it's been presented to Your Honor for

 5   approval.  And in the 9019 motion, it makes it very clear at

 6   paragraph 63 that the settlement survives, even if the

 7   improvident payment does not.

 8          THE COURT:  Well, the agreement itself doesn't say

 9   that.  I mean, there are other parties to this agreement.

10   Well, go ahead.  Make your argument, please.

11          MS. MONTGOMERY:  Thank you, Your Honor.

12          I would also argue that 328(a) does apply to

13   improvident payment.  That should be the legal standard, not

14   9019.  As we cited, the rule can't -- rules of court can't

15   supplant substantive rights that are provided by the Code.  And

16   the Code is very specific in 328 as to when a fee that has been

17   agreed upon that is not subject to a reasonableness review can

18   be altered, and that's when it's improvident because of events

19   that are not capable of being anticipated.

20          And improvident is a unique word in the Code.  It's

21   defined in the dictionary as not having shown foresight,

22   spendthrift, or thoughtless.  That is a very precise and

23   specific term that should be governing this compensation of

24   professionals.  It should not be the more general and more

25   flexible standard of Rule 9019 that defers substantially to the

1    business judgment of the trustee.

2          And that's important here because as Ms. Morabito

3    said, it is a slippery slope, but it's a slippery slope in the

4    opposite direction because to allow the Rule 9019 standard to

5    swallow the Code Section 328(a) as it applies to professional

6    fees is a bad precedent and is a slippery slope.  And this

7    court will see further settlements attempting to alter

8    compensation in the end under 9019.  That would be inconsistent

9    with the Code.

10         So the United States Trustee implores this Court to

11   apply the standard under 328(a) to whether to approve the

12   improvident payment.

13         The Trustee would also argue that the requirements of

14   328(a) are not met.  This is a 7.35 million dollar, thirty-five

15   percent contingency fee on a case that settled before trial.

16   For most lawyers doing plaintiff's work, that's a win.  If you

17   can settle the case and not have to try it, the fee is not

18   improvident.

19         Your Honor, Ms. Morabito talked about having to

20   consider all the facts and circumstances under 328(a), and

21   that's why I cross-examined Ms. Nelson.  And it's just one of

22   many factors, but it's a factor that I wanted to point out to

23   the Court here, because under this improvident payment, Quinn

24   would stand to benefit, benefit greatly, three million dollars

25   in a case where the Court should consider whether its

1  judgments, its acts, or admissions contributed at all to 

8          And so, Your Honor, that's why I went into that line

9  of questioning, certainly not to antagonize you or Ms. Nelson

10  or Ms. Morabito, and certainly not Ms. Tavenner, but just so

11  that the Court has all of the facts here because the facts and

12  circumstances are very important.  This is extraordinary relief

13  that's being requested.  As Ms. Tavenner said, not in 25 years

14  has she's seen this.

15          Your Honor, I did not cross-examine Ms. Tavenner as to

16  the amount of the payments.  But Your Honor did ask the

17  question that was part of my argument, which is the fees on

18  fees.  And the United States Trustee would submit that Quinn

19  should not be allowed to earn a contingency fee on its own

20  improvident payment and for that reason would ask that any

21  improvident payment that is awarded not be a fees-on-fees

22  payment.

23          THE COURT:  That wouldn't be an adjustment of the

24  provident payment.  It would be an interpretation of the

25  engagement letter and how the thirty-five percent should be on

1    what it should be apply.

2              MS. MONTGOMERY:  Yes, I agree.

3              THE COURT:  Okay.

4              MS. MONTGOMERY:  Your Honor, Foley made points in its

5    objection, and I know that we're not considering that today,

6    but there are more facts --

7              THE COURT:  Good because we're arguing a lot about it.

8              MS. MONTGOMERY:  -- in our objection, and that's that

9    Ruled 2016 requires that any request for compensation be filed

10   with the Court, that there be transparency, and that the Court

11   receive enough information to determine the amount.  There

12   needs to be some sort of methodology to that, Your Honor.

13             If you look through the jurisprudence, not just

14   bankruptcy, but all federal jurisprudence, fees are awarded

15   pursuant to some sort of methodology.  The United States

16   Trustee submits here that that methodology should be the

17   Johnson factors.  And there is no evidence here -- there's been

18   no evidence or argument on any of those factors put in.

19             Now, I will concede that there has been evidence in

20   Ms. Tavenner's declaration and in Ms. Nelson's declaration as

21   to what the amount should be that the United States Trustee

22   submits that they have not met their burden of proof.

23             That's all the argument I have.  Thank you very much,

24   Your Honor.

25             THE COURT:  Okay.  I've got a question for you.

Colloquy                                                                    71

1          MS. MONTGOMERY:  Sure.

2          THE COURT: ████████████████████████████

   ████████████████████████████████████████

   ██████████████    █████████████████████████

   ████████████████████████████████████████████

   ███████████████████████

7          MS. MONTGOMERY: ████████████████   ██████

8          THE COURT: ████████████

9          MS. MONTGOMERY: ████████████████████   ████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ██████████████████████████████████████████

   ████████████████████

      ████████████████████████████████████   ████

      ██████████████████████   █████████████████████

      ████████████████████████   ███████████████████

      ████████████████   █████████████████████████

      █████████████████████████████████████

      █████████████████████

23          THE COURT:  All right.  And to what extent do you

24   think I can rely upon my mediator in this case, as far as his

25   analysis and recommendation in that regard?

1          MS. MONTGOMERY:  Well, Your Honor, certainly, it is

2     your discretion and your choice with whatever you rely on in

3     terms of approving this settlement.

4          I will say that a settlement by a mediator is a

5     voluntary act.  I've heard a lot today that the mediator

6     directed this settlement.  A mediator doesn't direct a

7     settlement.  A mediator facilitates a settlement, and it's the

8     parties that have to agree to it.

9          And so the parties have agreed to this.  This may be

10    how Judge Santoro got it done with the mediator's proposal, but

11    he's not the director of the proposal, and I think he's the

12    first one who would say he's a facilitator in this role.  We

13    all have different roles here.  He is the facilitator, they're

14    the parties that have to agree, and Judge, you're the party

15    that has to decide whether all of this should be approved.

16         THE COURT:  You've obviously never had Judge Santoro

17    mediate one of your cases.  He's rather forceful facilitator,

18    shall we say.  In any event, yeah, I thank you for that.

19    Anything further, Ms. Montgomery?

20         MS. MONTGOMERY:  No.  Thank you very much.

21         THE COURT:  Thank you very much.

22         Does any other party wish to make an argument?

23         MS. POLL KLAESSY:  Your Honor, Susan Poll Klaessy on

24    behalf of Foley & Lardner.  And I want to, first of all, thank

25    you again for graciously allowing me to make the preliminary

Colloquy                                                    73

1    statement we did before argument began.  And like you, Your

2    Honor, I thought that was going to be the end of the discussion

3    of Foley's objection because it was my understanding that you

4    had reserved their objection to be discussed at a later date.

5              THE COURT:  And I have, I promise you.

6              MS. POLL KLAESSY:  Thank you.  Thank you, Your Honor.

7    I just wanted to confirm.  I know Ms. Morabito asked for the

8    objection to be overruled.  I'd ask that it again be reserved.

9              And I'd ask, Your Honor, that the procedure for Foley

10   to be filing, whether it's a fee application, to obtain the

11   fees it earned from the estate, which we think is the proper

12   procedure, or whether we need to submit some sort of demand or

13   advisory complaint against Quinn to claw back whatever is

14   ultimately paid to Quinn, if that's what ends up happening with

15   the proceeds.

16             We just ask that the procedure be crystal clear in

17   Your Honor's order so that there is no guessing and that we

18   were able to promptly submit our fee application and be paid.

19   Again, as I said, we think more properly paid by the estate

20   rather than at Quinn's discretion.  But that's all, Your Honor.

21   Thank you.

22             THE COURT:  So here is what my thinking is on that is

23   that I would suggest that at some point in time, when it's

24   appropriate time, your firm and Quinn would agree on a

25   procedure.  Suggest that to the Court.  The Court could bless

1   that.

2          If you can't agree on a procedure, which I would be

3   shocked, then the Court will convene the parties and suggest a

4   procedure.  But it will be crystal clear.  We are not going to

5   be just flailing in the dark on what we're going to be doing

6   here.

7          And of course, the most important person that's going

8   to weigh in on all of this, well, to the extent she wants to,

9   is the trustee.  She keeps saying that this is not her battle,

10  but I don't want anything that happens here to adversely impact

11  the estate.  So from that standpoint, I would certainly invite

12  her involvement.

13         So in any event, that's how I would proceed.  Does

14  that satisfy your concern?

15         MS. POLL KLAESSY:  Thank you, Your Honor.  Yes.  And

16  like you and like Ms. Morabito and I'm sure like the trustee,

17  we are very hopeful that we can reach agreement amongst us.

18  But appreciate your guidance on making sure we have a crystal-

19  clear procedure.

20         THE COURT:  Very good.  Thank you.

21         Does any other party wish to be heard?

22         MR. BARGER:  Your Honor, good afternoon.  David

23  Barger.  I did indicate earlier there were a few comments we

24  wanted to put on the record.

25         THE COURT:  Yes, please.

Colloquy                                                          75

1            MR. BARGER:  If this is the appropriate time, I would

2    ask leave to speak.

3            THE COURT:  You may.

4            MR. BARGER:  Thank you, Judge.

5            First, we do encourage the Court to approve the

6    settlement as we put in our brief statement that we filed

7    yesterday.  As part of that settlement, we specifically

8    committed to not objecting to the request for the improvident

9    payment.

10           I would also, as the parties have done, thank Judge

11   Santoro for his monumental efforts here.  My learned colleague

12   Mr. Milmoe put some comments on the record on May 25th about

13   his efforts, and so I won't repeat those.  I'll just echo

14   those.

15           And as part of that evidence, Your Honor, of Judge

16   Santoro's commitment, he's been available to all the parties,

17   even up to the last couple of days leading up to the hearing.

18   And in an effort to make sure I treaded appropriately here, I

19   conferred with the judge last week.  And what I wanted to also

20   put on the record is that, while we agreed to the settlement,

21   at the time of the settlement on April 19th, neither the

22   declarations nor the contents were known to us.  And they are

23   part of a litigation of an issue to which we, meaning my ULX

24   defendant clients, are not a party and any adverse findings are

25   not to be construed against them.

1          I would add to that comment that I covered with Judge

2    Santoro that certainly to the extent we can, we reserve our

3    rights, and our not filing objections to the declarations and

4    not making objections to the testimony today should not be

5    construed as an express or tacit admission or agreement with

6    them.  Indeed, we do have some disagreements, but we are not a

7    party from whom relief is sought in this hearing.

8          And so I was comfortable in taking the approach that

9    we've taken here, which is we are not questioning.  We are not

10   objecting.  We do think that this is the appropriate way to

11   proceed here.  And as this Court noted on April 19th, part of

12   the settlement was that there were no admissions of liability

13   or wrongdoing by any party.

14   

21         And so those are the key points I wanted to put on the

22   record.  I do want to address the sealing at a later time to

23   put a little bit more on the record on some of our reasons for

24   sealing, which I think will help the Court in making a fulsome

25   decision on that matter.  But I'll wait for the appropriate

1  time on that if the Court would permit.

2          THE COURT:  Yes, I will certainly permit that.  And we

3  will have an opportunity for all parties to put their concerns

4  on the record, and then the Court can make a determination.

5          As I said to Ms. Montgomery at the outset, I did want

6  to make sure this was sealed today because we can't unring the

7  bell.  And so I wanted to make sure that at a later time we can

8  look at it and see what we need to do.  And so we will have

9  that.  And I also --

10         MR. BARGER:  Good.

11         THE COURT:  -- want to emphasize your point, Mr.

12 Barger, that there are no admissions as to any liability on any

13 party.  I understand that.  I appreciate that.  This is a

14 settlement that allows the parties to be able to resolve the

15 dispute without having to reach that issue.

16         MR. BARGER:  Thank you, Your Honor.  If I could add

17 one additional sentence or thought along those lines, and that

18 is the Chapter 7 trustee's business judgment was exercised here

19 to approve the entire settlement, and no aspersions on any

20 other party, neither the U.S. Trustee or any party really

21 should be allowed after the fact -- I hate to -- I hate to give

22 a nod to Mr. Grable, but the Monday morning quarterback analogy

23 is a good one.

24         I'm teasing.  I give credit where credit is due, and I

25 do think that is an appropriate analogy here, that so much hard

1    work has gone into this.  And I mean no disrespect by those who

2    raised certain objections as part of their job, but we do think

3    it is a global resolution as a whole.  And I just wanted to

4    echo that point.

5              So thank you again, Your Honor.

6              THE COURT:  Thank you, sir.

7              Does any other party wish to be heard?

8              All right.  Mr. Morabito, as always, you get the last

9    word.

10             MS. MORABITO:  Not always in my house, Your Honor.  I

11   have two teenage girls, and I rarely get the last word.  But I

12   appreciate you giving it to me here today.

13             I don't want to belabor the point.  Again, I think

14   it's a global, comprehensive settlement.  I think the evidence

15   is clear that all the relief that's requested in this motion is

16   warranted.  This is an extraordinarily unique circumstance.  It

17   is a tremendous result from the estate.  It is a culmination of

18   efforts that I didn't think we'd ever get here.  I truly didn't

19   think that.

20             So I don't have any further to add.  Your Honor has

21   been here since 9 this morning.  I know we've said a lot about

22   Judge Santoro and appreciate his efforts, but Your Honor has

23   also kicked us in the can a couple times along the way and has

24   certainly been helpful, as well, in getting us to where we are.

25             So unless Your Honor has any other questions, we'll

1   rest on our pleadings, the evidence that was presented today,

2   and ask that the Court grant the motion in full.

3          THE COURT:  All right.  The Court has before it the

4   motion to approve the 9019 settlement that was mediated by the

5   judicial mediator.  The Court intends to write a memorandum of

6   opinion and issue its opinion and order in connection with that

7   once that is prepared.

8          It won't be a long task.  It will be -- I would

9   anticipate it would be fairly shortly that I'll be able to get

10  that out, so I won't keep everybody in suspense.  But do want

11  to make sure that I've got a proper foundation for the order

12  that I'm going to enter.

13         Now, I'm trying to remember back to the very beginning

14  when we started out and we had some things that were reserved.

15  Did we actually set those down for a time when we were going to

16  revisit those items?

17         MS. MORABITO:  We have not, Your Honor, set anything

18  down.  I don't believe -- Ms. Beran's on.  I don't think we

19  have an omnibus date for July.  I think the only thing really

20  left is the sealing issue, and I'm not sure how Your Honor

21  wants to handle that, but that would be the thing we'd be

22  seeking, I guess, to have a hearing for.  We don't have

23  anything else.

24         THE COURT:  Well, on all of these things, I want to

25  make sure that, the sealing thing, I've got a date at least

Colloquy                                                                    80

1  reserved so that it doesn't slip through the cracks that I can

2  get this done.  So I want to -- which is not to say that we

3  can't extended beyond that date if need be, but I would like to

4  find a time.

5          Ms. Beran, do we have another omnibus hearing date

6  scheduled in LeClair?

7          MS. BERAN:  Your Honor, we do have a hearing in June.

8  It was 21 days from yesterday.  So it was -- well, wait one

9  moment.  I don't have my calendar.

10         THE COURT:  June 28th, I'm thinking.

11         MS. MORABITO:  That's right.

12         MS. BERAN:  Yes, Your Honor.  It is June 28 at 11.

13         THE COURT:  Okay.  So --

14         MS. BERAN:  And so I was --

15         THE COURT:  I'm going to continue these matters to

16 that date.

17         MS. BERAN:  Thank you, Your Honor.  I will make sure

18 that that gets added to that omni agenda.

19         THE COURT:  Okay.  Very good.  And if we're not ready

20 to proceed at that time, we can set another specific time, but

21 I just want to make sure that we've got something on the record

22 that we'll all be aiming at.

23         Does any party have a problem with that scheduling?

24         MS. MONTGOMERY:  Your Honor, this is Kathryn

25 Montgomery.

1           THE COURT:  Yes.

2           MS. MONTGOMERY:  I'm just a little bit confused.  Are

3   you continuing the motion to seal your decision on that until

4   June 28, or is that the Foley objection?  Just make sure I'm

5   clear as to what --

6           THE COURT:  That will be the sealing.  I'll continue

7   the Foley objection to that date, too, but I'm going to set

8   that down at a separate time as I anticipated if the parties

9   don't resolve that, that there's going to have to be some --

10  that that might be a lengthy hearing, which nobody wants me to

11  conduct.  Let's just put it that way.  So let's hope that we

12  never get there.

13          MS. MONTGOMERY:  Thank you.

14          THE COURT:  Any other questions?

15          Okay.  I would like to thank the parties for their

16  very capable presentations today and for the significant

17  briefing and work that went into preparing for today's hearing.

18  There is obviously a lot of work that has gone into this, and I

19  appreciate what everybody has done.  And I will get an opinion

20  out shortly.

21          MR. BARGER:  Your Honor.

22          THE COURT:  Yes.

23          MR. BARGER:  Sorry.  We did not address briefly the

24  sealing -- I know we alluded to it, but can we address briefly

25  the sealing before we adjourn for the day?

1          THE COURT:  Yes.  That's what I thought I just
2   continued to the 28th, but maybe --
3          MR. BARGER:  Oh, okay.
4          THE COURT:  -- I didn't.
5          MR. BARGER:  If everything is still under seal until
6   the 28th --
7          THE COURT:  Yes.
8          MR. BARGER:  -- that's actually fine, Your Honor.  But
9   at some point, I wanted to put a little bit on the record to
10  give the Court a little bit of additional information that
11  could help in your decision making, and specifically referring
12  to conversations and emails that Judge Santoro provided to the
13  parties about some of this remaining under seal or off the
14  record.
15          But I can do that on the 28th.  In fact, that's more
16  desirable to me because now that the Court's ready to adjourn,
17  I'm ready to adjourn.
18          THE COURT:  Good.  That was the right answer, Mr.
19  Barger.
20          MR. BARGER:  Yes, sir.
21          THE COURT:  And so what we're going to do, I am going
22  to preserve the status quo between now and then.  And I think
23  that was your original question.
24          MS. KLAESSY:  Yes, sir.
25          THE COURT:  You want to make sure that we weren't now

1    opening the barn door, and we're not.  And then we will make a

2    considered decision on the sealing aspects of this and decide

3    that at that time.

4            MR. BARGER:  Oh, I apologize, Your Honor.  I know I

5    said I was done.

6            I did receive an email during the hearing from CNA's

7    lawyer.  They had gotten excluded from the hearing, and I just

8    didn't focus on asking if we could let them back in.  So

9    they've now asked if we can provide them a copy of the sealed

10   transcript.  We have a May 25th order, I believe, that -- or

11   not a May 25th order.  We have an order that allows us to give

12   them transcripts to the other ones that are under seal.

13           But to the extent there's any doubt, I would ask the

14   Court's permission for us to provide the sealed transcript to

15   Travelers and CNA's counsel with the same caveat that we

16   provided them, which is they have to honor the confidential and

17   sealing instructions and can only show it to their client.

18           THE COURT:  Right.  And that would be pursuant to the

19   FAO procedures provisions, right?

20           MR. BARGER:  I believe that's correct, Your Honor.

21           THE COURT:  Okay.  Very good.  All right.  Yeah, I

22   have no problem with that.  Do we want to let them back into

23   the courtroom right now so that you can put that on the record?

24           MR. BARGER:  I don't know that that they're even

25   around to be let back in --

1          MS. MORABITO:  Sorry.  I'm so sorry.  I do not mean

2   interrupt.  Mr. Rosenberg's on.

3          MR. BARGER:  Okay.

4          MS. MORABITO:  I can see her in my view.

5          MR. BARGER:  No, and I'm sorry.  No, I was talking

6   about CNA and Travelers, the insurers.

7          MS. MORABITO:  Oh.

8          MR. BARGER:  they wanted to try to get in.  We did let

9   Erin (ph.) and Mr. -- I didn't say we, but Erin and Michael

10  (ph.) were let back in.  But CNA suffered the same fate, and as

11  long as I can give them the transcript, they're satisfied with

12  that.

13         THE COURT:  Okay.  Very good.  All right.  Any other

14  business we need to take up before we adjourn?

15         MR. BARGER:  No, Your Honor.  Thank you.

16         THE CLERK:  Your Honor, we will need to unseal the

17  courtroom before we adjourn.

18         THE COURT:  Okay.  Let's unseal the courtroom, and

19  then we'll be adjourned.

20      (Whereupon the sealed portion of this hearing concluded at

21  3:14 PM)

22

23

24

25

1                          **I N D E X**

2                                                          VOIR
   WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS   DIRE

3  FOR THE TRUSTEE:

4  Brittany Nelson                  19         38

5  Lynn Tavenner                    41

6

7
   EXHIBITS:   DESCRIPTION                       MARK    ADMIT

8  FOR THE TRUSTEE:

9          Declaration of Brittany Nelson            13

10         Declaration of Lynn Tavenner             14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3          I, Michael Drake, the court-approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the proceedings

6    in the above-entitled matter.

7

8

9                                              June 9, 2022

10   _____    _____

11   MICHAEL DRAKE                       DATE

12   AAERT Certified Electronic Transcriber CER-513, CET-513

13

14

15

16

17

18

19

20

21

22

23

24

25

Attachment I

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Richmond Division)**

| | |
|---|---|
| In re: | **Chapter 7** |
| **LECLAIRRYAN PLLC,** | **Case No. 19-34574 (KRH)** |
| Debtor. | |
| Lynn L. Tavenner, as Chapter 7 Trustee, | |
| Plaintiff, | |
| vs. | **Adv. Proc. No. 20-03142-KRH** |
| ULX Partners, LLC, UnitedLex Corporation, and ULX Manager, LLC | |
| Defendants. | |

**ULX PARTNERS, LLC'S, UNITEDLEX CORPORATION'S, AND ULX MANAGER, LLC'S SUPPLEMENT TO THEIR PREVIOUSLY-FILED MOTION TO SEAL SETTLEMENT AGREEMENT AND RELATED DOCUMENTS, INFORMATION, AND HEARINGS**

ULX Partners, LLC ("**ULXP**"), UnitedLex Corporation ("**UnitedLex**"), and ULX Manager, LLC ("**ULXM**") (collectively, the "**Defendants**") by and through their undersigned counsel, pursuant to sections 105 and 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure, respectfully submit the following as supplemental authority and argument in support of their previously-filed Motion to Seal [Docket No. 207] due to the various

David G. Barger (VSB No. 21652)
Thomas J. McKee, Jr. (VSB No. 68427)
J. Gregory Milmoe (admitted *pro hac vice*)
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Telephone:  (703) 749-1300
Fax:           (703) 749-1301
Email:  mckeet@gtlaw.com

*Counsel to ULX Partners, LLC, UnitedLex Corp., and ULX Manager, LLC*

intervening and material events that have occurred since the Motion to Seal was originally filed

on May 11, 2022, and in light of the Court's instruction at the June 28, 2022 hearing that the Court

receive proposed redactions to various documents in advance of the final hearing of this matter

currently scheduled for July 14, 2022.[1]

### Supplemental Background[2]

1.       On May 11, 2022, the Defendants filed the Motion to Seal [AP Docket No. 207]

seeking the redaction and/or sealing of various documents and transcripts, including the April 19th

Transcript, relating to the settlement of the above-referenced adversary proceeding, among others.

2.       At the direction of the Judicial Mediator, and in an effort to help facilitate the

settlement of the parties' dispute, the Motion to Seal was filed in advance of the Trustee filing her

9019 Motion and any supporting documents and/or evidence offered by the Trustee (or others)

relating to the same.  Accordingly, at the time the Motion to Seal was filed, the Defendants'

arguments focused primarily upon seeking to seal settlement-related information that constituted

confidential commercial information under Section 107(b) of the Bankruptcy Code, and that

"public disclosure of the terms of the Omnibus Settlement Agreement or other sensitive

information, including allegations in the litigation that Defendants contended are defamatory, has

the potential to be harmful to Defendant's ability to engage in future business dealings."  (Motion

to Seal, AP Docket No. 207, p.9-10).

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion to Seal and/or the 9019 Motion.

[2] References to "Docket No." means the main bankruptcy case, Case No. 19-34574, while references to "AP Docket No." means Adversary Proceeding Case No. 20-03142.  Multiple documents referenced herein apply in various case numbers relating to the main bankruptcy case, and thus Defendants' Motion to Seal applies to all instances where such documents/information appear.

3.      Shortly after the filing of the Motion to Seal, reports regarding the settlement as described at the April 19th hearing appeared in the press, publicly disclosing certain terms of the Omnibus Settlement Agreement.  *See* UST Objection, AP Docket No. 215, ¶22, fn.3.

4.      On May 18, 2022, the Court entered Defendants' Unopposed Bridge Order Restricting Public Access to the April 19th Transcript.  [AP Docket No. 210].  On May 18, 2022, the Trustee also filed her 9019 Motion [AP Docket No. 211].

5.      On May 23, 2022, the United States Trustee filed an objection to the Motion to Seal (the "**UST Objection**") [AP Docket No. 215].

6.      At the May 25th and 26th hearings on the Motion to Seal, and in light of certain terms being disclosed publicly through press reports, the Defendants ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████

7.      At the conclusions of the May hearings on the Motion to Seal, the Court granted the Motion to Seal on an interim basis pending a final hearing that would be held once the Court had all pleadings and evidence before it regarding the Trustee's 9019 Motion and the hearing thereon that was scheduled for June 8, 2022.

8.      On June 3, 2022, the Trustee filed Declarations by Lynn Tavenner and Brittany Nelson at Docket Nos. 1374 and 1380 in support of the 9019 Motion.  Pursuant to the Court's rulings and instructions at the May 25th and 26th hearings on the Motion to Seal, the Declarations were both filed under seal.

9.      On June 6, 2022, pursuant to its rulings at the May 25th and 26th hearings on the

Motion to Seal, the Court entered an *Order to Seal Omnibus Settlement Agreement and Related*

*Documents, Information, and Hearings* [AP Docket No. 250] (the "**Interim Sealing Order**"),

through which the Court sealed and/or redacted certain previously-filed pleadings from the

litigation on a final basis, but sealed certain pleadings, declarations, and transcripts on an interim

basis.

10.     With respect to settlement-related pleadings, the Interim Sealing Order provided,

among other things, that (i) the 9019 Motion shall be redacted as provided for therein on an interim

basis, (ii) that declarations and other evidence that the Trustee may offer in connection with her

9019 Motion shall be under seal on an interim basis, (iii) that any objections/responses to the 9019

Motion shall be filed under seal on an interim basis, (iv) the April 19th Transcript shall be redacted

as provided for therein on an interim basis, and (v) the transcripts of the hearings held by the Court

on May 25, 2022 and May 26, 2022 shall be sealed on an interim basis.

11.     As seen in the Attachments to the Interim Sealing Order, the redactions to the 9019

Motion and the April 19th Transcript were limited and narrowly tailored, with the material terms

of the Omnibus Settlement Agreement all still being placed on the public record – including,

without limitations, the amounts and payors of the settlement payments, the waiver of the ULXP

Proofs of Claim, the compensation of the Trustee's counsel through the Improvident Payment

(including the amount of such proposed payment), and the fact that the settlement included a

statement that no party admitted liability.  (*See* Interim Sealing Order, Attachments 1 & 2).

12.     Significantly, the Interim Sealing Order also provided that the unredacted versions

of the 9019 Motion (and the Omnibus Settlement Agreement), as well as objections/responses

could be provided, subject to an agreement of confidentiality, to estate creditors holding

undisputed proofs of claim pursuant.  (*See* Interim Sealing Order, ¶9).[3]  As relayed to the undersigned by the Trustee's counsel, only a single creditor – Foley & Lardner – requested copies of the same as provided for in the Interim Sealing Order.

13.     The Interim Sealing Order, however, limited the disclosure of the Trustee's Declarations in support of her 9019 Motion, which expanded on the allegations in the 9019 Motion, to those creditors who timely filed an objection to the 9019 Motion.  (*See* Interim Sealing Order, ¶10).  The only purported creditor to file an objection to the 9019 Motion, however, was Foley & Lardner [Docket No. 1365], which was provided a copy of the Declarations.

14.     On June 8, 2022, the Court held a hearing on the Trustee's 9019 Motion.  The Court admitted into evidence the Declarations, as well as the testimony of Brittany Nelson and Lynn Tavenner.  The June 8, 2022 hearing was held under seal, pending a final ruling on the Defendants' Motion to Seal which the Court continued until June 28, 2022.

15.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[3] As this process had been agreed to already by the parties in the Omnibus Settlement Agreement, the Trustee included instructions as to how such creditors could receive unredacted copies of such documents in the *Notice of Motion and Hearing Thereon* [Docket No. 1329] regrading the Trustee's 9019 Motion that she served on May 18, 2022 upon (i) all parties and counsel requesting service via the Court's ECF system, (ii) the Office of the US Trustee, (iii) the 20 largest unsecured creditors as listed in the Debtor's schedules, (iv) the Service List as defined by the governing Case Management Order, (v) Foley & Lardner, and (vi) all Persons identified in paragraph 4 of the FAO Procedures Order.  In other words, notification of this procedure was given to the appropriate parties well before entry of the Interim Sealing Order and well before the June 1, 2022 objection deadline for the Trustee's 9019 Motion.  *See* Docket No. 1329.



17.    At the conclusion of the June 8th Hearing, the Court continued the final hearing on the Motion to Seal until June 28, 2022.  At the June 28, 2022 hearing, the Court continued the hearing again until July 14, 2022, to allow time for the Court's ruling and memorandum opinion on the 9019 Motion to be issued.

18.    Also at the June 28, 2022 hearing, which was not under seal, the Court stated that Defendants should be prepared to submit to the Court at the July 14th hearing proposed redacted documents.    As set forth herein, Defendants have attached the proposed redactions to this Supplemental Memorandum.

19.     Later that same day on June 28, 2022, the Court issued its Order and accompanying Memorandum Opinion approving the Omnibus Settlement Agreement. [Docket Nos. 1452 and 1453]. The Court filed a redacted version of the Memorandum Opinion on the docket in light of the pending Motion to Seal. [Docket No. 1450].

<div align="center">**Relief Requested**</div>

20.     Through the Motion to Seal, as well as this Supplement and arguments made at the various hearings relating to this matter, the Defendants respectfully request that the following sealings and/or redactions be made by the Court on a final basis, and notwithstanding any prior order of this Court, shall remain sealed and not disclosed absent further order of the Court:

(i)     The 9019 Motion, as provided for in the Interim Sealing Order and as re-docketed in redacted form at Docket No. 1454, as well as its Exhibits A and B in the form attached collectively hereto as **Attachment 1**;

(ii)    The April 19th Transcript, as provided for in the Interim Sealing Order and as re-docketed in redacted form at AP Docket No. 266;

(iii)   The UST Objection to the 9019 Motion, in the proposed redacted form attached hereto as **Attachment 2**;

(iv)    The May 25th Transcript, in the proposed redacted form attached hereto as **Attachment 3**;

(v)     The May 26th Transcript, in the proposed redacted form attached here as **Attachment 4**;

(vi)    The Declaration of Lynn L. Tavenner, Trustee (the "**Tavenner Declaration**") [Docket No. 1374], in the proposed redacted form attached here as **Attachment 5**;

<div align="center">7</div>

(vii)     The Declaration of Brittany J. Nelson (the "**Nelson Declaration**") [Docket No.

1380], in the proposed redacted form attached here as **Attachment 6**, as well as all

exhibits thereto[4];

(viii)    The Trustees' Reply  in Support of the 9019 Motion [AP Docket No. 252], in the

proposed redacted form attached hereto as **Attachment 7**;

(ix)      The June 8, 2022 Transcript [AP Docket No. 259], in the proposed redacted form

attached hereto as **Attachment 8**;

(x)       The Court's Memorandum Opinion approving the 9019 Motion [Docket No. 1450]

(the "**Memorandum Opinion**"), in the redacted form already provided by the

Court.

(xi)      The instant Supplement to the Previously-Filed Motion to Seal in the redacted form

attached hereto as **Attachment 9**, and all exhibits/attachments thereto.

(xii)     The July 14th Transcript and proffered evidence regarding the hearing on the

Motion to Seal, which redactions will be proposed by Defendants following

completion of the July 14th hearing in the event the Court grants the Motion to Seal.[5]

---

[4] The Tavenner Declaration and the Nelson Declaration may be collectively referred to herein as
the "**Declarations**".

[5] All the materials that Defendants seek to seal through the Motion to Seal, this supplement, and
as discussed at the hearing on the same, shall be collectively referred to as the "**Subject
Materials**".  The proposed redactions in the Subject Materials are highlighted in yellow in the
Attachments and Exhibits.  In the event the Court grants the Motion to Seal, and due to the fact
that various documents appear in multiple case numbers, the Defendants will prepare an Order
addressing the sealing in the appropriate case numbers.

## BASIS FOR RELIEF REQUESTED

21.    The Motion to Seal is now primarily focused on the purported reasons underlying the Improvident Payment component of the Omnibus Settlement Agreement that had been directed by the Judicial Mediator. In addition to the reasons for sealing as set forth in Defendants' original Motion to Seal, subsequent filings and hearings in this case have made clear that the Subject Materials should be sealed because they are saturated with settlement/confidential mediation discussions and information, and because they contain scandalous and/or defamatory material.





**B.  Mediation Information Should be Redacted**

25.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ such information should remain under seal

anyway because the Subject Material contains significant descriptions of the mediation, and

mediation is sacrosanct. *See Herman v. Wells Fargo Bank, N.A.*, 2021 U.S. Dist. LEXIS 43321

(W.D.Va. Mar. 9, 2021) ("The guarantee of confidentiality is essential to the proper functioning

of a settlement conference program.") (citing *Clark v. Stapleton Corp.*, 957 F.2d 745 (10th Cir.

1992)); *see also Sheldone v. Pa. Tpk. Comm'n*, 104 F.Supp. 2d 511 (W.D.Pa. 2000) ("If

participants cannot rely on the confidential treatment of everything that transpires during

[mediation] sessions then counsel of necessity will feel constrained to conduct themselves in a

cautious, tightlipped, non-committal manner more suitable to poker players in a high-stakes game

than to adversaries attempting to arrive at a just resolution of a civil dispute.  This atmosphere if

allowed to exist would surely destroy the effectiveness of a program that has led to settlements . .

., thereby expediting cases at a time when . . . judicial resources . . . are sorely taxed."); *see also*

Fed. R. Evidence 408.

26.  This Court's Local Rules provide that the "[t]he substance of communications and

writings in the mediation process shall not be disclosed to any person other than participants in the

mediation process . . . ."  Local Rule 9019-1(J).  The Rule continues by stating that "unless

otherwise agreed to by the party, communications and writings between a party and the mediator

shall be considered privileged and confidential and shall not be subject to discovery."    *Id.*

27.    In addition to this Court's Local Rule regarding mediation, ███████████

████████████ the parties engaged in extensive discussions and negotiations to ensure the

confidentiality of the mediation that ultimately resulted in the entry of the *Mediation Order*

*Regarding Confidentiality* [AP Docket No. 195] (the "**Mediation Confidentiality Order**") that

was entered by the Judicial Mediator on April 11, 2012.

28.    The confidentiality provided for by FRE 408, the local rules, and the Mediation

Confidentiality Order, were all critical to the global resolution of this matter.  Indeed, over at least

a four-month period from February until the beginning of June 2022, the parties engaged in

settlement-related (protected by FRE 408) discussions leading up to the mediation, and countless

discussions during the course of the mediation and after the settlement was announced at the April

19th hearing while the parties negotiated the details and language of the Omnibus Settlement

Agreement with the assistance and direction of the Judicial Mediator.

29.    ███████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████

12

30.     All such information should remain under seal and not be publicly disclosed.  Not only would it be contrary to the local rules and the Mediation Confidentiality Order to hold otherwise, but such a holding would undoubtedly have a chilling-effect on mediation in this district.

### C.  The Subject Material is Scandalous and/or Defamatory Under Section 107(b)

31.     As noted in the Motion to Seal, Section 107(b) of the Bankruptcy Code authorizes the Court to issue orders to protect entities from potential harm caused by the disclosure of certain categories of information.  Section 107(b) states, in part:

> On request of a party in interest, the bankruptcy court shall . . .
>
> > (2)  Protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107(b)(2).

44.     Bankruptcy Rule 9018 also provides in relevant part:

> On motion or its own initiative, with or without notice, the court may make any order which justice requires . . . (2) to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code . . . .

Fed. R. Bank. P. 9018 (emphasis added).[8]

45.     In the case of *In re Gordon Props. LLC*, 536 B.R. 703 (Bank. E.D.Va. 2015), Judge Mayer discussed the standard for sealing under Section 107(b) and ultimately granted a motion to seal various letters containing scandalous statements about a debtor's manager.  *See id.*. at 712 ("if found to be scandalous, the court is <u>required</u> to protect the parties involved.") (emphasis added).

---

[8] The Court also has the inherent power to seal materials submitted to it.  *See In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984) ("The trial court has supervisory power over its own records and may, in its discretion, seal documents if the public's right of access is outweighed by competing interests.").

More specifically, the Court in that matter evaluated the letters at issue against the "plain meaning of scandalous," and noted that a scandalous statement by itself qualified for sealing – with no need for the Court to determine the statement's veracity. *See id* (relying upon *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417 (9th Cir. 2011) (noting that the ordinary dictionary meaning of "scandalous" included "bringing discredit on one's class or position," "grossly disgraceful," "offensive to a sense of decency or shocking to the moral feelings of the community; shameful"); *see also Ballentine's Law Dictionary* (defining "scandalous matter" to be "[i]mpertinent allegations which are damaging to the reputation of the person aspersed."); *see also Robbins v. Tripp*, 510 B.R. 61, 69 (E.D.Va. 2014) (keeping a report sealed because it contained information that could harm counsel's professional reputation, and noting that the Ninth Circuit "found that the definition of scandalous included bringing discredit to one's profession," and further noting *In re Neal*, 461 F.3d 1048 (8th Cir. 2006) for "employing a test to determine if a matter is scandalous by asking 'whether a reasonable person could alter their opinion of Defendants based on the statements therein, taking those statements in the context in which they appear.'").

46.    The proposed redacted allegations and statements throughout the Subject Material fall within the exception provided for in Section 107(b) of the Bankruptcy Code, as such falls within the plain meaning of "scandalous". ███████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

47.    Further, the Court expressly held in its Memorandum Opinion that it was approving the Omnibus Settlement Agreement "in full, including the Improvident Payment" and that it could not consider the Improvident Payment as a separate clause. *See Memorandum Opinion* p.26. █

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

—————————————————

9 █████████████████████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████████

48.    To unseal or un-redact the Subject Material at this point would serve no useful

purpose ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████    The Omnibus Settlement Agreement has already been approved,

with actual creditors already having had the opportunity to, at a minimum, read the unredacted

9019 Motion that ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████    The press has already been following this case and has published

various articles regarding the settlement. ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████.[10]

49.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

WHEREFORE, Defendants respectfully request that the Court grant the Motion to Seal,

providing for the redactions of various settlement-related pleadings and transcripts in the form of

the Attachments to this Supplement or as otherwise referenced herein, and granting such other and

further relief as the Court deems just and proper.

---

[10] Defendants reserve the right to file and/or present additional evidence to the Court for the
hearing on the Motion to Seal, including submission of declarations as necessary.

16

Dated:  July 11, 2022

/s/ David G. Barger
David G. Barger (VSB No. 21652)
Thomas J. McKee, Jr. (VSB No. 68427)
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Telephone:  (703) 749-1300
Facsimile:   (703) 749-1301
Email: bargerd@gtlaw.com
        mckeet@gtlaw.com

J. Gregory Milmoe (*admitted pro hac vice*)
Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA 02110
Telephone:  (617) 310-6064
Email: milmoeg@gtlaw.com

*Counsel to ULX Partners, LLC, UnitedLex
Corporation, and ULX Manager, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of July, 2022, a true and accurate copy of the foregoing document was filed under seal in light of the Court's ongoing consideration of the Motion to Seal, but was served in unredacted form via email upon the following:

Paula Beran, Esq.
Tavenner & Beran
pberan@tb-lawfirm.com
*Counsel to the Chapter 7 Trustee*

Erika Morabito, Esq.
Brittany Nelson, Esq.
Quinn Emanuel
erikamorabito@quinnemanuel.com
brittanynelson@quinnemanuel.com
*Special Litigation Counsel to the Chapter 7 Trustee*

Kathryn Montgomery, Esq.
Shannon Pecoraro, Esq.
Office of the United States Trustee
Kathryn.montgomery@usdoj.gov
Shannon.pecoraro@usdoj.gov

*/s/ David G. Barger* .
David G. Barger (VSB No. 21652)
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Telephone: (703) 749-1300
Facsimile: (703) 749-1301
Email: bargerd@gtlaw.com

*Counsel to ULX Partners, LLC, UnitedLex Corporation, and ULX Manager, LLC*

18

# Exhibit 1

## McKee Jr., Thomas (Shld-NVA-LT-Bky)

**From:**
**Sent:**        Wednesday, April 27, 2022 11:04 AM
**To:**          Barger, David G. (Shld-NVA-LT); Milmoe, Greg (Shld-BOS-Bky); McKee Jr., Thomas (Shld-NVA-LT-Bky)
**Subject:**     Judge Santoro response

**\*EXTERNAL TO GT\***



Law Clerk to the Hon. Frank J. Santoro, Chief Judge
United States Bankruptcy Court – Eastern District of Virginia
600 Granby Street, 4th Floor
Norfol█ VA 23510

Attachment J

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Richmond Division)

|  |  |
|---|---|
| In re: | Chapter 7 |
| **LECLAIRRYAN PLLC,** | Case No. 19-34574 (KRH) |
| Debtor. |  |
| **Lynn L. Tavenner, as Chapter 7 Trustee,** |  |
| Plaintiff, |  |
| vs. | Adv. Proc. No. 20-03142-KRH |
| **ULX Partners, LLC, UnitedLex Corporation, and ULX Manager, LLC** |  |
| Defendants. |  |

## DECLARATION OF ULX PARTNERS, LLC, UNITEDLEX CORPORATION, AND ULX MANAGER, LLC IN SUPPORT OF MOTION TO SEAL

I, Eric Paul Kelly, on behalf of ULX Partners, LLC, UnitedLex Corporation, and ULX Manager, LLC (collectively, the "**ULX Entities**") hereby declare that the following is true to the best of my knowledge, information and belief:

1.     I am Vice President and Corporate Counsel of UnitedLex Corporation ("**UnitedLex**") and am authorized to make, and hereby submit, this declaration on behalf of the ULX Entities.

2.     In my role as Vice President and Corporate Counsel, I am regularly informed of and handle matters relating to the reputation of the ULX Entities – particularly UnitedLex – in the marketplace.  Indeed, protecting UnitedLex's reputation is an important component of our business as we are involved in sales and partnering with companies (including law firms).

1

Classified as Confidential-External

3.     Throughout this litigation, various news outlets published stories about this matter – many with negative headlines and inferences about UnitedLex.  By way of example, and without limitation, in July 2021, Virginia Business published an article entitled "UnitedLex still faces $128M lawsuit from LeClairRyan trustee," which noted allegations of unauthorized practice of law by UnitedLex and mismanagement by UnitedLex employees. Similarly, in November 2021, The American Lawyer published an article entitled "LeClairRyan Founder, UnitedLex Can't Dodge Bankruptcy Trustee's Claims".   More recently, various articles were written about the settlement of this adversary proceeding, including one in Richmond Bizsense on July 5, 2022, which alleged that UnitedLex "is now seen as having a hand in LeClairRyan's undoing," and that "Tavenner had alleged that ULX was a conspiracy to siphon millions out of the 30-year-old law firm as it was teetering toward collapse."  And on July 12, 2022, Law360 published an article entitled "US Trustee to Fight LeClairRyan Deal Over $3M Quinn Payout" that referenced allegations that "UnitedLex, along with former LeClairRyan leaders, used a 'back office' joint venture known as ULX Partners to drain the struggling firm and prolong its demise."  These are only a few examples of the many articles written about this matter that I have seen.

4.     During the course of the litigation, UnitedLex received numerous inquiries from UnitedLex clients, prospective clients, and current and prospective employees regarding the litigation.  UnitedLex's counsel also received numerous requests and inquiries from legal industry news outlets reporting on the litigation.  As a significant portion of UnitedLex's business is providing legal support services to law firms, and as UnitedLex continues efforts to grow its business and recruit professionals in the legal industry, such inquiries regarding allegations in the litigation are particularly sensitive and concerning for our business.

Classified as Confidential-External

5. Without waiving any privilege or protection █████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ the final Omnibus

Settlement Agreement contained a provision stating that in settling the adversary proceeding,

neither party was admitting any fault, wrongdoing, or liability.

6. When the Mediator's Proposal was presented to UnitedLex by the Judicial

Mediator, the discussion █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

7. Again, without waiving any privilege or protection, UnitedLex (and other parties

and insurers) ultimately agreed to the $21 million settlement. ████████████████

████████████████████████████████████████████████████████████████████

3

Classified as Confidential-External

8.      Only after the settlement was announced on the record, and during the long and tedious process of finalizing the language and mechanics of the Omnibus Settlement Agreement, and particularly once the Trustee filed her 9019 Motion on May 18, 2022, provided draft supporting declarations thereafter, and filed her final declarations on June 3, 2022, ███████████

██████████████████████████████████████████████
██████████████████████████████████████████████

9.      Presumably in light of prior discussions of settling this case ████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

_____

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

4

Classified as Confidential-External

10. Based upon my experience in this case to date and the press coverage, ▮▮▮▮▮



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 13, 2022

Respectfully submitted,

*Eric P. Kelly* (signature)

Eric P. Kelly
Vice President and Corporate Counsel
UnitedLex Corporation

5

Classified as Confidential-External

Attachment K

1

```
 1                 IN THE UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF VIRGINIA (RICHMOND)
 2
     In Re:                           )   Case No. 19-34574-KRH
 3   LECLAIRRYAN PLLC,                )   Richmond, Virginia
                                      )
 4           Debtor.                  )
                                      )   July 14, 2022
 5   TRANSCRIPT PORTION UNDER SEAL    )   2:28 p.m.
     ------------------------------   )
 6   LYNN L. TAVENNER, AS CHAPTER 7   )   Adv. Proc. 20-03142-KRH
     TRUSTEE,                         )
 7           Plaintiff,               )   SEALED PORTION
     v.                               )
 8                                    )
     ULX PARTNERS, LLC, ET AL.,       )
 9           Defendants.              )
     -------------------------------
10
                 TRANSCRIPT OF SEALED PORTION OF HEARING ON
11      MOTION TO SEAL SETTLEMENT AGREEMENT AND RELATED DOCUMENTS,
          INFORMATION, AND HEARINGS, FILED BY DAVID G. BARGER OF
12       GREENBERG TRAURIG, LLP ON BEHALF OF ULX PARTNERS, LLC,
                ULX MANAGER, LLC, AND UNITEDLEX CORPORATION
13       [ECF NO. 1325 AND ECF NO. 207 IN ADV. PRO. NO. 20-03142]

14
                    BEFORE THE HONORABLE KEVIN R. HUENNEKENS
15                      UNITED STATES BANKRUPTCY JUDGE

16   APPEARANCES:
     For the Chapter 7 Trustee:      PAULA S. BERAN, ESQ.
17                                    TAVENNER & BERAN, PLC
                                      20 North 8th Street
18                                    Second Floor
                                      Richmond, VA 23219
19
                                      BRITTANY J. NELSON, ESQ.
20                                    ERIKA L. MORABITO, ESQ.
                                      (Via Zoom)
21                                    QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP
22                                    1300 I Street NW
                                      Suite 900
23                                    Washington, DC 20005

24

25
```

```
 1
 2   For the Office of the U.S.     KATHERYN R. MONTGOMERY, ESQ.
     Trustee:                       (Via Zoom)
 3                                   DEPARTMENT OF JUSTICE
                                     701 East Broad Street
 4                                   Suite 4304
                                     Richmond, VA 23219

 5   For Foley & Lardner LLP:       SUSAN POLL KLAESSY, ESQ.
                                     (Via Zoom)
 6                                   FOLEY & LARDNER LLP
                                     3000 K Street, N.W.
 7                                   Suite 600
                                     Washington, D.C. 20007
 8
     For ULX Partners, LLC and      THOMAS J. MCKEE, ESQ.
 9   UnitedLex Corporation:         DAVID G. BARGER, ESQ.
                                     (Via Zoom)
10                                   GREENBERG TRAURIG, LLP
                                     1750 Tysons Boulevard
11                                   Suite 100
                                     McLean, VA 22102
12
                                     J. GREGORY MILMOE, ESQ.
13                                   (Via Zoom)
                                     GREENBERG TRAURIG, LLP
14                                   One International Place
                                     Suite 2000
15                                   Boston, MA 02110

16
     Also Present:                  Lynn L. Tavenner, Esq.
17                                   Plaintiff
                                     Eric Kelly, declarant and
18                                   corporate counsel to UnitedLex
                                     Corporation (Via Zoom)
19

20
21   Transcription Services:        eScribers, LLC
                                     7227 North 16th Street
22                                   Suite #207
                                     Phoenix, AZ 85020
23                                   (973) 406-2250

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

Colloquy 3

1         THE CLERK:  Are the doors to the Court room now

2    locked?

3         THE CLERK:  The doors are locked.

4         THE COURT:  Okay.  Let the record reflect that the

5    courtroom doors have been locked and that the only parties in

6    the courtroom physically are the trustee or counsel and members

7    of the Court's staff.

8         Ms. Greenleaf, have we sealed the virtual courtroom?

9         THE CLERK:  I believe the only participants are the

10   people that should be in the courtroom.

11        THE COURT:  All right.  So if any party -- you can see

12   the list of participants.  We believe that we've removed people

13   that should not be parties.  But if anybody sees somebody,

14   please bring it to the Court's attention.

15        All right.  So the virtual courtroom, as well as the

16   real courtroom, are now sealed.

17        Mr. Barger, you may proceed.

18        MR. BARGER:  Thank you, Your Honor.  Your Honor, may

19   it please the Court.  As I mentioned, David Barger, Tom McKee,

20   and Greg Milmoe, on behalf of the UnitedLex defendants.

21        Also present with us, Your Honor, in the virtual

22   courtroom, is Eric Kelly, who is vice president and corporate

23   counsel, essentially general counsel, to ULX, and he is present

24   as well, and is the declarant in our submission in support of

25   our motion to seal the various proceedings and documents.

Colloquy                                                                    4

 1           And Your Honor, I won't rehash the arguments in our

 2    motion and supplemental motion.  There are a couple of things I

 3    will attempt to emphasize or impress.  Let me start out by

 4    noting, in looking at the case law, I think it is important

 5    here that we are not seeking blanket sealing of any and all

 6    documents related to the settlement.  We have tried to be

 7    careful and provide proposed redacted versions of the

 8    transcripts and the relevant pleadings and relevant

 9    declarations.

10           Per the Court's request at our last hearing, I believe

11    the Court raised three questions at that hearing, one of which

12    Ms. Beran addressed, and that was the Court's question, I

13    believe, of why shouldn't the FAO procedures apply?  In

14    general, we agree that they should apply.  They provide a

15    good -- again, I apologize if there's thunder, Your Honor --

16    process for the Court determining whether the settlement

17    agreement is appropriate to approve, which this Court has

18    already done.  And it does provide -- the FAO procedures does

19    provide for a mechanism to seal, where appropriate, relevant

20    documents.

21           I know, from prior matters that have been resolved,

22    where there have been settlement agreements and items that have

23    been sealed, often it has been with the Chapter 7 trustee's

24    consent and endorsement.  In this case, we're close to that,

25    but not exactly the same, where they agreed not to object,

1  provided it didn't -- it didn't -- I may not phrase this

2  correctly, but provided it didn't interfere with your ability,

3  consistent with their reporting requirements, under Section

4  107(b), to make sure they can report it properly to the U.S.

5  Trustee.

6          And I think this Court even noted, in one of our prior

7  hearings, that that reporting requirement is also subject to

8  some relief if the Court determines that some of these matters

9  are to be placed under seal, and the appropriate standards, and

10  therefore protects the Chapter 7 trustee in their reporting

11  requirements.

12          So in terms of the three questions the Court asked

13  last time, one is the FAO procedures, which I mentioned.

14          The second, the Court asked us to be prepared to

15  provide evidence to support our motion to seal, which we have

16  done in our motion to seal, our supplemental motion to seal,

17  the exhibits attached to that, and in the declaration of Mr.

18  Kelly, which we filed.

19          And then the third question the Court asked was be

20  prepared, should there be some relief granted, to provide

21  redacted and unredacted documents, et cetera.  And I want to at

22  least extend my public thanks to Mr. McKee for the tireless

23  work he's done in providing those documents and exhibits to the

24  Court that are in our pleadings.  But I don't think I need to

25  belabor those, Your Honor.

1          But going back, again, to a couple of points I wanted

2     to emphasize that are made in our pleadings, and that is why

3     should the Court grant our request to seal various documents?

4     In essence, I think it comes down to, at this point in the

5     process, to sealing those -- or having remain sealed those

6     portions of the Court's under-seal opinion that the Court

7     issued in support of approving the settlement agreement.  And

8     those portions that the Court placed under seal generally

9     involve citing to the declarations of Quinn, of Brittany

10    Nelson, in specific, and then Ms. Tavenner as well, the two

11    declarants that were provided in support of approving the

12    settlement agreement.

13         And so the portions that we asked to remain sealed

14    really come back to some of those portions in the declarations

15    that we have provided for sealing.  And I would note, I don't

16    think anyone has filed a written objection to our supplement

17    this afternoon.

18         And the reason that those portions should be sealed,

19    and the Court's relevant under-seal opinion should be sealed,

20    come down to two general propositions that we make in our

21    motions, Your Honor.  One is that the declarations, our

22    pleadings, the arguments, indeed our conversations before the

23    Court are inextricably intertwined, to use my and one of my

24    colleague's favorite expressions here, to accurately describe

25    the relationship between the mediation and this settlement,

Colloquy                                                                  7

1   that all throughout the declarations, all throughout the

2   relevant pleadings, talking about why this settlement agreement

3   should have been approved, make reference to specific

4   discussions and negotiations in the mediation, specifically

5   involving the judicial mediator, and because there is indeed an

6   order, a specific order for confidentiality in this judicial

7   mediation.

8          And as the Court knows, there are local rules that

9   provide certain protections for the mediation that, because of

10  that relationship in this really somewhat unique judicial

11  mediation, which involved the take-it-or-leave-it proposal, the

12  amount of discussion of the mediation process, which should

13  remain confidential, which should remain sealed, I submit, does

14  support our request for the limited redactions.

15         I dare say, I'm not sure -- well, I guess I am sure

16  that to do otherwise would not send the right message for

17  parties contemplating mediation, and then judicial mediation,

18  in such a unique and complicated situation, such as the one

19  that we all found ourselves in, and through which Judge Santoro

20  guided us to a successful result, so the presence of the

21  mediation, discussions, negotiations, et cetera.

22         And then the second component is the protection of our

23  client's reputation moving forward and the need to keep some of

24  those discussions and rationales for the improvident payment.

25  And as the Court knows from the last time we were before the

Colloquy                                                                    8

1    Court, it really wasn't -- it wasn't our dog in the fight, in

2    terms of whether the improvident payment is granted, and if so,

3    how much.  We agreed not to object, and we didn't object.

4    Indeed, we supported the Court granting the motion to approve

5    the settlement agreement.

6           So going back to, sort of, the general rationale for

7    why our portion should be sealed, not only do we have a

8    mediation, but we have the suggestions by the Chapter 7 trustee

9    to justify the improvident payment, into which we really didn't

10   have a position or an objection, right?  We agreed to the

11   amount of money.  How it is apportioned is really for the Court

12   to make a determination.  So -- I'm sorry, Your Honor; I'm just

13   pausing because of the thunder storm.

14          THE COURT:  You can say that that's an exclamation

15   point.

16          MR. BARGER:  Yes, Your Honor.  I have to think about

17   my train of thought.  So because of the unique circumstances of

18   the request for improvident payment, we're really not a party

19   to it, and we did not contest it, and we did not attempt to put

20   on any countervailing evidence.

21          We have these allegations which, if they are unsealed,

22   we respectfully submit would reach the status of scandalous

23   material under Section 107(b), as in boy, and therefore the

24   Court would be justified in keeping those specific portions

25   under seal and redacted.

1          In looking at the case law in this area, basically,
2    the Courts recognize that we have to provide some evidence.  It
3    cannot be conclusory allegations and arguments.  And they
4    suggest that one way to do it is by affidavit or declaration.
5    And since we are not present in the courtroom, the way we've
6    agreed to proceed is through declaration.  And we have Mr.
7    Kelly here available, should the Court have any questions about
8    the declaration, in general.

9          And I suppose, as a housekeeping matter, just to be
10   safe, even though we've attached it to our motion, I would make
11   a motion to introduce Mr. Kelly's declaration as hearing
12   Exhibit Number 1.  It is attached to -- well, strike that.
13   It's not attached to our supplemental motion.  We filed it as a
14   separate document yesterday.  So we would make a specific
15   motion to introduce that declaration into evidence.

16         THE COURT:  All right.  Does any party object to the
17   admission of the declaration, at this time, or wish to cross-
18   examine the declarant?

19         Okay.  It's admitted.

20     (Declaration of Eric Kelly was hereby received into
21   evidence as UnitedLex defendants' Exhibit 1, as of this date)

22         MR. BARGER:  Thank you, Your Honor.

23         Your Honor, those are the key points I wanted to make.
24   I'll take a minute to review my notes to make sure I've not
25   missing anything.  But unless there are questions from the

 1   Court, we will rest on our papers and our submissions.

 2          Oh, I'm sorry.  There is one other matter that came to

 3   mind.  I knew if I thought about it, it would pop into my head.

 4   So one of the documents that we attached to our supplemental

 5   filing was an email dated April 27th, between us and Judge

 6   Santoro, which after we received a response, we did provide it

 7   to the relevant parties.

 8          I wanted to clarify to make sure I wasn't misleading

 9   the Court or saying something inappropriate about that.  That

10   was generally the email, ███████████████████████████████████

     ████████████████████████████████████████████████████████

     ████████████

13          And I wanted to make sure that my understanding of

14   what Judge Santoro was talking about ████████████████████████

     ████████████████       And as we've tried to explain, I think we even

16   elaborate in the declaration, I'm not suggesting that Judge

17   Santoro ███████████████████████████████        Indeed,

18   the judge made it perfectly clear to us, and probably, I

19   suspect, all parties -- in fact, I shouldn't say I suspect, I'm

20   confident of all parties, that ████████████████████████████████

     ████████████████████████████████████████████████████████

     ████████████████████████████████████████████████████████

     ██████████████████

24          But certainly his email █████████████████████████████

     ████████████████████████████████████████████████████████

1    ████████████████████████████████████████████████████████

2    █    ████████████████████████████████████████    And

3    ultimately, the settlement agreement, as finalized, provided

4    that the Chapter 7 trustee would not object.  And I've already

5    characterized and have -- where she could object.  At least, I

6    believe I've carefully responded to that.

7        So I wanted to make clear, ████████████████████

8    █    ████████████████████████████████████████████████

9    █    ████████████████████████████████████████████████

10   ██   ██████████████    ████████████████████████████

11   ██   ████████████████████████████████████████████████

12   ██   ████████████████████████████████████████████████

13   ██   ████████████████████

14       And that actually jogs my memory on one last point, in

15   terms of Ms. Beran pointing out that and Ms. Tavenner is

16   certainly hopeful about encouraging ULX in its successful

17   business.  We certainly do appreciate that.  I would also note

18   that, by way of protection, the carefully negotiated settlement

19   agreement provides for irrevocable letters of credit.  So

20   they're going to get their money, even if UnitedLex isn't

21   hitting a homerun.  But we do appreciate that sentiment.

22       Your Honor, I think that's all I have, unless the

23   Court has questions.

24       THE COURT:  Well, I do have some questions.  I want to

25   make sure I --

1          MR. BARGER:  Yes, sir.

2          THE COURT:  I understand exactly what we're doing.  So

3    you have submitted a number -- and you said Mr. McKee was to be

4    thanked for this -- of redacted versions of the various

5    documents that are under seal.  And as I understand it, what

6    you're asking for is to be able to file redacted versions now,

7    on the record, which would basically unseal quite a bit.  So

8    for instance --

9          MR. BARGER:  Yes, Your Honor.

10          THE COURT:  -- as I understand it, we've got the

11   redacted settlement agreement, and there, as I read through the

12   proposed redacted settlement agreement, I see the highlighted

13   portions that you've submitted to me, and that's what you're

14   asking would remain under seal, and everything else would be

15   filed not under seal.  Am I correct on that?

16          MR. BARGER:  Your Honor, you are correct.  Let me just

17   double check, if I can ask Mr. McKee, because as I said, he was

18   responsible for providing the drafted -- I mean, the unredacted

19   and the drafted -- the redacted documents.  If I could just

20   have him confirm that, but I think the answer, Your Honor, is

21   yes.

22          MR. MCKEE:  Hello, Your Honor.  Tom McKee on behalf of

23   ULX.

24          Yes, you are correct, Your Honor.  Those yellow

25   highlights are the portions that would be redacted.  So similar

1  to what Your Honor did with respect to the interim order in

2  early June, where certain of the highlights were redacted, and

3  it was re-docketed, that's what we were envisioning for this as

4  well, Your Honor.

5         THE COURT:  Okay.  And that's what I thought as well,

6  and I just wanted to clarify that for the record.

7         So now, if you would indulge me for just a minute

8  then, Mr. Barger or Mr. McKee --

9         MR. BARGER:  Of course, Your Honor.

10        THE COURT:  -- I just want to make sure that I

11  understand the other documents that you want.  So that is how

12  we're going to handle the redacted settlement agreement.

13        The second -- and that appears in a number of

14  different places where we'll have to do the same thing.  I

15  think I found it at docket ECF 78, docket 254, docket 1396,

16  docket number 56, 211, and 1328.  And so that would apply in

17  all of those instances, if I have that understanding.

18        The second is the document -- let's see, this is the

19  UST supplemental objection.  And now, based on the -- I'm

20  pulling it up as we speak, that's why I was delaying.  I don't

21  have thunder.

22        So once again, I've got highlights to that proposed

23  objection, and it would be the highlighted portions that would

24  be redacted, and the rest of the objection would be unsealed.

25  I have the same thing with the May 25 and the May 26

1    transcript.  I have the same with regard to Ms. Tavenner's June

2    3 declaration.  And I note that that is as revised.  I

3    understand that there was an agreement struck --

4           MR. MCKEE:  Your Honor, this is Tom McKee, if I could

5    yes, just clarify that point.  Yes, it's the revised versions

6    that were sent yesterday, and there were a few lines, that

7    we've highlighted in green, that we had originally requested be

8    redacted.  But per our discussion with Ms. Beran, those green

9    portions would not be redacted, Your Honor.

10          THE COURT:  That was my understanding too, Mr. McKee.

11          MR. MCKEE:  Thank you.

12          THE COURT:  Thank you very much, sir.

13          All right.  So the next one was the Nelson

14   declaration, and specifically, again, we have the redacted

15   portions, and then we have the exhibits to that.  Are all of

16   the exhibits remaining sealed?

17          MR. MCKEE:  Yes, Your Honor, that was our request.

18          THE COURT:  So we're not having the redacted versions

19   of those exhibits.  Okay.

20          Then under the trustee's reply, we've got -- that's

21   the sealed answer response reply filed by Ms. Morabito.  And

22   again, there's a redacted version, and that's what you're

23   proposing everything else would be unsealed.

24          Then we have the June 8 transcript, and then, again,

25   as revised.  And then we have the ULX supplement, again, as

1    revised.

2              MR. BARGER:  Yes.

3              THE COURT:  Okay.  Now --

4              MR. MCKEE:  And Your Honor -- I'm sorry, Your Honor.

5              THE COURT:  Okay.  Now, there are a number of other

6    documents that are under seal right now with the Court that

7    have been filed, and I wanted to ask about those, because I

8    don't have any redactions with regard to these documents, what

9    the proposal is.

10             For instance, the motion to seal the settlement

11   documents itself, the various exhibits to the 9019 motion, the

12   Foley objection, the supplemental declaration -- this was Ms.

13   Tavenner's June 7 supplemental declaration, the exhibits --

14   well, there's a number of these.  What is the intention with

15   regard to these?  Do they all come out from under seal?

16             MR. MCKEE:  Your Honor, Tom McKee.

17             So the Foley objection, yes, we did not submit any

18   redactions for that, Your Honor.  I don't believe that really

19   had anything to do with us mentioning improvident payments,

20   but that's already a public record.

21             The supplemental declaration by Ms. Tavenner, I

22   believe, was also primarily focused just at the Foley

23   objection, and again, did not address things with respect to

24   us.  I'd have to double check -- I believe with respect to the

25   9019 motion, Your Honor, we did request, on page 7 of our

Colloquy                                                        16

1    supplement, where we list all of the relief we're seeking, we

2    did ask that Exhibits A and B, which I believe Your Honor

3    pointed out were the settlement agreement -- we highlighted

4    portions of that -- would remain sealed.  The other exhibit was

5    the list of the insurance policies and their policy numbers,

6    that those would also be sealed.  And then I'm --

7              THE COURT:  I'm looking; what paragraph are you

8    directing me to, sir?

9              MR. MCKEE:  On page 7 of paragraph 20, Your Honor, of

10   our supplement, which is located in docket 1479.

11             THE COURT:  I've got it right in front of me.

12             MR. MCKEE:  So 20, romanette (i).

13             THE COURT:  Okay, I see it.  Okay.

14             MR. MCKEE:  So we, there, Your Honor, requested

15   attachment 1, which was the 9019 motion, which has already been

16   redacted on an interim basis, pursuant to the Court's June

17   interim sealing work.

18             THE COURT:  Right.

19             MR. MCKEE:  So we requested that redaction remain in

20   place.

21             And then similarly, for number (ii) there, Your Honor,

22   the April 19th transcript, we had requested that it remain

23   sealed -- or redacted, I should say, as already redacted,

24   attached to the Court's interim sealing order.  That was also

25   one of our requests.

1            THE COURT:  Right.

2            MR. MCKEE:  And then, Your Honor, one other thing that

3    wasn't mentioned, and is not on this list, is we also provided

4    the Court yesterday with a highlighted version of ULX entities'

5    declaration, which is located at docket number 1486.  And we

6    would request that that highlighted version, again, be -- those

7    would be the redactions that we would request as well, Your

8    Honor.

9            THE COURT:  All right.  And then one that I failed to

10   mention earlier was the Kelly declaration, because I've

11   reviewed that, and I've seen the redacted version there.

12           MR. BARGER:  Your Honor, that's the one that --

13           MR. MCKEE:  Yes, that's the same.  I called it the ULX

14   declaration, but yes, it's by Mr. --

15           THE COURT:  Okay.  That's what --

16           MR. MCKEE:  -- Kelly --

17           THE COURT:  -- we're talking about.

18           MR. MCKEE:  -- at docket 1486, Your Honor, yes.

19           THE COURT:  Okay.  I understand.  Thank you very much.

20           MR. MCKEE:  Thank you.

21           THE COURT:  All right.  Now I'm going to ask does any

22   party wish to be heard in connection with, then, this sealing

23   motion?

24           MS. MONTGOMERY:  Yes.  This is Kathryn Montgomery for

25   the United States Trustee's office.

1          THE COURT:  All right, Ms. Montgomery, you may

2   proceed.

3          MS. MONTGOMERY:  Before proceeding, I am not clear

4   what the intention is with the United -- that you ULX proposes

5   to do with the U.S. Trustee's objection to the 9019 motion

6   which we were ordered to file under seal.  Would that remain

7   under seal in this proposal?

8          MR. MCKEE:  Your Honor, if I can address that?

9          THE COURT:  Yes, please do.

10          MR. MCKEE:  Yes, Ms. Montgomery, that was attached as

11   attachment number 2 to our supplement, which shows the

12   redactions that we propose.

13          MS. MONTGOMERY:  Okay.

14          THE COURT:  So that would be the supplemental

15   objection; is that what you're talking about?

16          MR. MCKEE:  The supplement that we filed on July 11th,

17   located at docket number 1479, and attached to that was

18   attachment 2, which was the U.S. Trustee's objection to the

19   9019 motion.  And we highlighted the provisions that we would

20   request be redacted.

21          THE COURT:  Okay.  That's romanette number (iii) of

22   paragraph 20.  Is that correct?

23          MR. MCKEE:  That's correct, Your Honor.

24          THE COURT:  Okay.  I got it.  Okay.  Do you see that,

25   Ms. Montgomery?

1            MS. MONTGOMERY:  I don't have that up on my screen --

2            THE COURT:  Oh, okay.

3            MS. MONTGOMERY:  -- at this time, but I can find it.

4    I just have what he sent yesterday.  I thought that was

5    everything.  But I see not everything was sent at once.  It was

6    sent in batches.  So I can look it up on the docket.

7            THE COURT:  Okay.  So now, do you have an objection to

8    that?  I mean, I guess that's -- I'm trying to figure --

9            MS. MONTGOMERY:  Yes, Your Honor.  We have an

10   objection to anything being sealed.  We did not participate in

11   any sort of negotiations with ULX regarding redactions, because

12   it's our position that nothing in this should be sealed.  And

13   I'm happy to go into that just a little bit, although you have

14   our objection, and I don't want to reiterate those arguments.

15           But I did want to address, because the Court

16   specifically asked us to address whether the FAO procedures are

17   applicable.  I would adopt what Ms. Beran said, in terms of the

18   FAO procedures not being applicable to a 9019 motion, which is

19   the posture that we're in, and would also submit that, at the

20   time the FAO procedures were adopted, there was certainly no

21   thought that compensation to the fiduciary, the attorney for

22   the fiduciary of the estate, would be part of a settlement, so

23   that that was never contemplated.

24           The entire motion for the FAO procedures was about

25   efficiency and preserving the privacy of innocent lawyers who

1    may have been wrapped up in the downfall of the LeClairRyan.

2    And that's certainly not the case here with regard to the

3    improvident payment.  So we don't think that the FAO procedures

4    do apply to these redactions.

5           THE COURT:  Okay.  Well, whether or not they apply, I

6    mean, it looks to me that what ULX has done here is heeded

7    exactly what I had suggested last time, that we needed to have

8    as much on the record as we possibly could --

9           MS. MONTGOMERY:  Right.

10          THE COURT:  -- because that's mandated by Section 109

11   of the Bankruptcy Code, but that there's also exceptions, and

12   the exceptions are for secret, confidential, or scandalous, or

13   defamatory matter.  And part of what was going on here, at

14   least as I see it and, you know, everybody can jump in and say,

15   no, I'm completely mistaken, but we had a settlement that

16   occurred, ██████████████████████████████████████████████████

     █████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

     ██████████████████████████████████████████████   ████████████

     ████████████████████████████████   ██████████████████████████

     ████████████████████████████████████████████████████████████

     ████████████████████████████████████████████████████████████

     ████████████████████████████████████████████████████████████

     ██████████████████████████████   ████████████████████████████

     ██████████████████████████████████████████████████████   And

1  that is supported by the declaration that we've just admitted.

2  Don't you think that that is something that the Court should

3  take into account?

4          MS. MONTGOMERY:  Well, Your Honor, I respectfully

5  disagree that the information is scandalous or defamatory.

Colloquy 22

22          THE COURT:  Well, let's look at it a little bit

23    differently, though.  I mean, we've got a situation where what

24    we did was approve a settlement, as you know, under Rule 9019.

25    And how parties reach a settlement is not something that

1    necessarily is litigated in court.  And in this case, it

2    certainly wasn't.  It was something that was mediated by a

3    judicial mediator and then presented to the Court about whether

4    or not it was above or below the lowest point of

5    reasonableness.

6            Now, getting into the weeds about that, why is the

7    public entitled to know the intricacies of the negotiations Mr.

8    Barger was alluding to earlier, between the parties and the

9    mediator, with regard to achieving the result that they've

10   achieved?

11           MS. MONTGOMERY:  Your Honor, I agree with that, and

12   certainly I'm prepared to address the confidentiality order

13   that Judge Santoro entered.  What was said at mediation can be

14   confidential, but what they are seeking to redact is far

15   broader than what was said at mediation.  They're seeking to

16   redact my entire -- large parts of our brief, large parts of

17   the 9019 settlement that talk about ███████████   ███

███  ████████████████████

19           And if you look at Judge Santoro's order, it says, in

20   paragraph 2, that "nothing in this order shall operate to

21   protect pre-existing documents, materials, or information

22   simply because it is shared with the mediator or otherwise

23   disclosed during mediation".

24           ████████████████████████████████

███  ████████████████████████

1    ████████████████████████    ████████████████████

     ███████████    ███████████████████████████    ████

     █████████████████████████████████████████████████

     █████████████████

5           And my whole cross-examination of Ms. Nelson,

6    regarding ██████████████████████████████████████████

     ████████████████████████████████████████████

     ███████████████    █████████████████████████    ████

     █████████████████

10          There may be points in this where there was a specific

11   thing said at the mediation.  For example, I could see their

12   argument that ██████████████████████████████████████████

     █████████████████████████████████████████████████████

     ██████████████████████████    ████████████████████████

     ██████████████████████████████████████████████████████

     ██████████████████████████████████████████████████████

     ███████████████████    ████████████████████████████

     ████████████████

19          THE COURT:  The concern I have, I guess, is the one

20   that I made earlier, and that is that none of these issues were

21   litigated, and so they're just allegations.  And that's what is

22   being -- and so that it won't be litigated and the parties can

23   settle and get things resolved that brings us to this result.

24          The difference in this case, which is unique, I admit,

25   Ms. Montgomery, is that ████████████████████████████████████



22    MS. MONTGOMERY:  But Your Honor,

1 ███████████████████████████████████

2          THE COURT:  Well, my opinion speaks for itself.  But

3 what I did was say that the settlement was above the lowest

4 point of reasonableness.  That's what I found.  As an

5 alternative, I did go through a 328 analysis on the improvident

6 payment, but that certainly wasn't the basis for my ruling.

7          My ruling was based on the 9019 and the standard there

8 and what the parties have been able to reach, because I do

9 think that this is a reasonable settlement -- was a reasonable

10 settlement, was in the best interest of the estate, and I think

11 that the Chapter 7 trustee did a fantastic job in achieving

12 this settlement for the estate.  But that was the basis of my

13 opinion.  I guess what you're saying is I wasn't very clear,

14 but that's okay; it speaks for itself.

15          As I'm looking through the objection that you filed,

16 the only things that have been redacted are the references to

17 ███████████████████████████████████████████

   ███   ████████████████████████████  I just can't see why that

19 makes any difference, as far as the public is concerned, about

20 whether or not this is a reasonable settlement.

21          MS. MONTGOMERY:  Well, Your Honor, I very respectfully

22 disagree.  And I think you know my position --

23          THE COURT:  I do.

24          MS. MONTGOMERY:  -- on that.  But we do feel that

25 these redactions are overly broad and that this should be part

 1  of the public record.

 2              THE COURT:  All right.  Are you objecting to any of

 3  the redactions in the -- or any of the proposed redactions in

 4  the settlement agreement?

 5              MS. MONTGOMERY:  Well, Your Honor, yes, we would

 6  object to all of the redactions.  Yes, in sum, yes.

 7              THE COURT:  Well, I mean, all they've redacted are

 8  references ███████████████ -- which they've already --

 9              MS. MONTGOMERY:  Oh, I apologize.  We did agree

10  earlier that we would not object to redactions regarding█

    ███████████████████████████████████████████████████████

    ███  ████████      So I think we did say we would not object to that.

13              THE COURT:  Okay.

14              MS. MONTGOMERY:  I apologize, Your Honor.

15              THE COURT:  What about the policy numbers?  Are you

16  objecting to that?

17              MS. MONTGOMERY:  I don't know that policy numbers are

18  considered PARTY-IN-INTEREST, or anything like that, but

19  certainly we would not object to the policy numbers being

20  redacted.

21              THE COURT:  All right.  Well, I guess I could go

22  through every one of these things and ask you about the basis

23  for it.  But I think I understand your position.

24              MS. MONTGOMERY:  Thank you, Your Honor.

25              THE COURT:  Does any other party wished to be heard?

1        MS. KLAESSY:  Your Honor, Susan Poll Klaessy, on

2    behalf of Foley & Lardner.

3        Just a brief point of clarification.  I believe, when

4    Your Honor was asking about certain documents that ULX had not

5    submitted redacted copies of, Mr. McKee, I believe, stated that

6    they did not have any objection to unsealing Foley's objection.

7    And I just wanted to clarify that, to the extent that is

8    unsealed, the declarations and supplemental declarations in

9    support of that objection would be treated similarly or the

10   same.

11       THE COURT:  Yes, that's my understanding.

12       MS. KLAESSY:  Thank you, Your Honor.

13       MR. BARGER:  Your Honor, this is Mr. Barger.

14       If we can just double check, to be safe, and take a

15   look at the attachments to the Foley submission.  I appreciate

16   Susan raising that.  Let us just double check that the

17   declarations as exhibits we wouldn't object to, and we will

18   promptly respond to them on that.

19       MS. KLAESSY:  Thank you, Mr. Barger.

20       THE COURT:  All right.  Now, does any other party wish

21   to be heard?

22       All right.  So the Court is going to grant the motion

23   to keep the versions of these -- some portions of the documents

24   under seal, that are identified in paragraph 20 of the ULX

25   response, the motion to seal, and then require redacted

1  versions of these documents to be filed on the record so that

2  we can unseal portions of all of these documents.  I think that

3  the mechanics of doing this -- let me ask how we go about doing

4  some of this stuff.

5          Mr. Barger, I'm going to put the onus on you, as far

6  as getting the redacted documents together for filing.  As far

7  as how they're actually filed, for instance, the U.S. Trustee's

8  objection that Ms. Montgomery and I have been discussing, that

9  you would provide Ms. Montgomery a redacted version of that, so

10  that she could file, because it needs to be filed, I would

11  assume, by her, and with your objections noted, Ms. Montgomery.

12          MR. BARGER:  Yes, Your Honor.

13          THE COURT:  As far as the transcripts are concerned, I

14  don't think you can file a redacted transcript.  And so what

15  you'll need to do is provide the redactions to my chambers, and

16  we can make arrangements to have the redacted transcripts then

17  filed on the record.

18          MR. BARGER:  Yes, Your Honor.

19          THE COURT:  The same thing with the declaration of Ms.

20  Tavenner.  I'd require you to provide to Ms. Tavenner the

21  redacted version, as you've agreed, so that she can file that

22  with the Court.

23          And I think that that's everything, is it not?

24          MR. BARGER:  Your Honor, I think it is, and I think

25  many of us we have provided in our submission, but Mr. McKee

Colloquy                                                30

 1  and I will get together.  Just as you've put the burden on me,
 2  I'm going to lateral into Mr. McKee, and we'll jointly carry
 3  the football and make sure we get it done.
 4          THE COURT:  Just as long as one you is blocking for
 5  the other, I'm fine.
 6          I guess I did Ms. Nelson's, but that would be the same
 7  thing, getting that to --
 8          MR. BARGER:  Yes.
 9          THE COURT:  -- Foley -- I mean, to Quinn.
10          MR. BARGER:  Yes, Your Honor.
11          I think there was something you wanted to say.
12          MR. MCKEE:  Yes, Your Honor.  Tom McKee.
13          So Your Honor, would you like us to prepare an order?
14          THE COURT:  Yes, please.
15          MR. MCKEE:  And then we will also -- we'd give them
16  highlights, but we'll provide them with the actual redacted
17  black box versions that they could then file.  We will
18  coordinate with everybody on that, Your Honor.
19          THE COURT:  Okay.  Thank you very much.
20          MR. MCKEE:  Yes.
21          THE COURT:  And yes, if you would, please submit an
22  order to this effect.
23          MR. BARGER:  We will do so.
24          THE COURT:  All right.  Does that take care of that
25  item, number 6?

1            All right.  Then we can move on to number 7.

2            Oh, can we unseal the courtroom?

3            MS. MONTGOMERY:  From the trustee's perspective, yes,

4    Your Honor.

5            MR. BARGER:  Yes, Your Honor.  No objection from us.

6            THE COURT:  Okay.  So I'm going to please unseal the

7    courtroom and the virtual courtroom.

8        (Whereupon the sealed portion of this hearing concluded at

9    3:16 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2
  EXHIBITS:  DESCRIPTION                        MARK    ADMIT
3
  FOR THE DEBTOR:
4
  1              Declaration of Eric Kelly              9
5

6

7  RULINGS:                                     PAGE   LINE

8  Motion to seal some portions of settlement      28      22
   agreement and related documents, information,
9  and hearings is granted

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

33

1          C E R T I F I C A T I O N

2

3          I, Sharona Shapiro, the Court-approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the proceedings

6    in the above-entitled matter.

7

8

9                                        July 17, 2022

10    _____     _____

11    SHARONA SHAPIRO                      DATE

12    AAERT Certified Electronic Transcriber CET-492

13

14

15

16

17

18

19

20

21

22

23

24

25