UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

In re:

LeClairRyan, PLLC,1

Debtor

Case No.
19-34574-KRH

Chapter
7

## LaTonya Mallory's Opposition to the Trustee's Objection

## to Claim, 48-1, in the Instant Bankruptcy

Comes now the Creditor, LaTonya Mallory, and, by her counsel, files this her Opposition

to the Trustee's Objection to Claim 48-1, the claim asserted by Mallory against the Debtor in

Bankruptcy, LeClairRyan, and in support thereof states as follows:

1. The details of Ms. Mallory's Claim against Mr. Ryan and the Debtor Law Firm are set

   forth in detail in the Complaint attached hereto as Exhibit A. This Complaint has been a

   matter of public record since its filing on December 29, 2017.

2. The gravamen of Ms. Mallory's Claim is that she engaged the legal services of Dennis

   Ryan and the attorney staff at the Debtor Law Firm to assist her in the organization of her

   planned new company, Human Diagnostic Laboratories, (HDL) and to advise her

   specifically with respect to her plan to provide some reimbursement of the costs medical

   customers might incur in the special preparation and handling required to send specimens

   to her new laboratory to be tested.

3. She specifically engaged the services of Dennis Ryan and his attorney staff to review the

   proposed program and review it once again when the program was in place and operating

to ensure it did not violate any applicable federal regulations on inducement, specifically any provisions of the so-called Anti-Kickback Statute, 42 U.S.C. Section 1320a, *et seq.* or the so-called Stark Law, 42 U.S.C. Section 1385nn, *et seq.*

4. From the inception of her new company 2008 until 2014 the attorneys at LeClairRyan the Debtor Law Firm, reviewed the packaging and handling reimbursement program and reassured  Ms. Mallory that the expense reimbursement program passed all regulatory muster, despite the fact that the Debtor's internal documents reflected doubts and concerns about the advice it was giving, doubts and concerns it did not share with Ms. Mallory, doubts and concerns which ultimately were recognized by the Debtor Law firm to have been well founded, too late to save Ms. Mallory and the company she founded from  the devastation of a False Claims Act proceeding initiated and tried to conclusion in the District Court for South Carolina, a result that left Ms. Mallory damaged in the amount claimed in her legal malpractice claim, 48-1.

**The Trustee's Objection to the Mallory Claim, 48-1: The Applicable Law**

5.  In Response to the Complaint for Malpractice filed against it December 29, 2017, in the
    Circuit Court for the City of Richmond, LeClairRyan demurred on August 16, 2018, and
    on that same day removed the case to this Court under 28 U.S.C Section 1334 and Rule
    9027 of the Federal Rules of Bankruptcy Procedure.

6.  On Ms. Mallory's motion, this Court remanded the case to the Circuit Court of the City
    of Richmond on December 13, 2018 (Order Docketed December 18, 2018)

7.  While this case was before this Court, LeClairRyan moved to have it dismissed under
    Rule 12(b)(6) of the Federal Rules of Civil Procedure, but this Court ruled that the
    Motion to Dismiss was mooted by this Court's Order of Remand to the Circuit Court for
    the City of Richmond, Virginia.

8.  Following the remand, LeClairRyan reasserted its demurrer in the Circuit Court for the
    City of Richmond, asserting that the rulings in the South Carolina False Claims Act
    collaterally estopped her from asserting that she had made good faith reliance on the legal
    advice given her by LeClairRyan that the federal Anti-Kickback Statute and the Stark
    Law, supra, and the federal False Claims Act were not violated by HDLs.

9.  Under the decisions of the Virginia Supreme Court, which do not equivocate on this
    issue, the doctrine of collateral estoppel is not available to either party unless the parties
    are identical in both suits and there is mutuality.

10. The City of Richmond Circuit Court committed error and sustained the defendant
    LeClairRyan's demurrer, erroneously concluding that the outcome of the South Carolina
    False Claims Act case collaterally estopped Mallory from asserting her reliance on the
    defective advice of the LeClairRyan Law Firm.

11. It was error as a matter of law for the trial court to have sustained the demurrer in that the parties to the federal South Carolina False Claims Act proceeding were not identical to the parties in the Richmond Circuit Court, nor was their mutuality, i.e., LeClairRyan would not have been collaterally estopped from defending itself had the False Claims Act proceedings concluded in Ms. Mallory's favor.

12. On September 5, 2019, Ms. Mallory filed her notice of appeal of the decision of the Circuit Court for the City of Richmond with the Clerk of that Court.

13. All further proceedings in that appeal were stayed by LeClairRyan's filing of its Petition in Bankruptcy and remain stayed by this bankruptcy to this day.

### The Trustee's Motion to Dismiss the Creditor's Claim of LaTonya Mallory

14. The Trustee asserts numerous grounds for dismissal of Ms. Mallory's claim as creditor. Little needs to be said in response to the grounds asserted, but to protect the record, the grounds asserted and Ms. Mallory's opposition to those grounds are:

   a. Contention: "The claim is a preempted state law claim seeking to evade the consequences of a Federal False Claims Act Judgment." Opposition: The claim is Latonya Mallory's claim as a creditor of LeClairRyan for its deviations from the standard of care as her attorney, deviations which caused her damage. The Trustee cites no authority for the proposition that malpractice actions for defective and deficient legal advice which mislead the client's company into False Claims Act violations are preempted by that act or the damages sustained under it.

   b. Contention: "That the Mallory Claim is an improper claim for contribution that falls outside the Virginia contribution statute." Opposition: Ms. Mallory's claim is not one brought for contribution. Under Virginia law a claim for contribution is a

claim by one wrongdoer against another wrongdoer or wrongdoers, absent acts of
moral turpitude. In the absence of identity of parties and mutuality, Ms. Mallory
is not collaterally estopped from asserting that she was the innocent client of a
negligent law firm and here seeks recovery for the damages caused by the law
firm's deficient advice.

c.  Contention: "The Mallory claim is barred by collateral estoppel and Mallory's
    contributory negligence." Opposition: Mallory's claim against LeClairRyan is
    one for the breach of its contract of representation. Under Virginia law "action
    against the Attorneys for their alleged negligence in the performance of their
    professional services is an action for breach of contract..." Cox v. Geary, 624
    S.E.2d 16, 271 Va. 141 (2006). Contributory negligence is not a defense to an
    action for breach of contract. Even were professional malpractice to be considered
    actions in tort, as noted supra, she is not collaterally estopped by the South
    Carlina Federal False Claims Act proceeding because LeClairRyan was not a
    party to the False Claims Act proceeding and had no mutuality with Ms. Mallory
    in that proceeding. Additionally, the government contended that Ms. Mallory
    knowingly and willingly ran afoul of the False Claims Act, not negligently
    violated that Act, so contributory negligence is not an issue before this Court.

d.  Contention: "Ms. Mallory cannot successfully allege an attorney-client
    relationship between herself and LeClairRyan." Opposition: The nature, extent
    and scope of the attorney - client relationship between Ms. Mallory and
    LeClairRyan are facts to be determined by the finder of face on the evidence
    presented.

e. Contention: "Ms. Mallory's claim is barred by res judicata." Opposition: Res judicata, as collateral estoppel, requires identity of parties and identity of claims. LeClairRyan was not a party to the South Carolina proceeding and the nothing in the South Carolina proceeding addressed LeClairRyan's performance measured against its professional standard of care.

f. Contention: "Ms. Mallory's claim is barred by laches." Opposition: Ms. Mallory's underlying claim against LeClairRyan is an action at law governed by a statute of limitations, not laches.

g. All documentation necessary to this claim for malpractice is attached here to and has been available to the Trusted requested since December 29, 2017.

h. The claim was timely filed with this Court during the appropriate time period and the underlying lawsuit was filed within the applicable statute of limitations.

i. What Orders does the Trustee contend were knowingly violated. This contention is impossible to respond to as phrased.

j. Does not require any response.

k. Does not require any response.

**Argument and Conclusion**

The attorney client relationship between LaTonya Mallory and the law firm LeClairRyan arose by operation of contract. (See Cox v. Geary, supra). Ms. Mallory was a resident of Virginia and LeClairRyan had its principal place of business in Virginia. All the discussions about the formation of an attorney-client relationship and all the attorney's advice provided the client occurred in Virginia. The lawsuit arising out of Ms. Mallory's contentions that the LeClairRyan firm had deviated from the Virginia standards of care in the advice rendered about the Antikickback Statute and the False Claims Act was filed in Virginia, and the appeal from the state trial court's decision in that case has been taken to the Virginia Supreme Court, where it is now pending.

Nothing about the advice requested and given "federalized" the relationship between the parties simply because it dealt with the applicability or inapplicability of federal enactments. Virginia licensed attorneys were permitted to give such advice without having to be members of any federal bar. Nor did the South Carolina False Claims Act proceeding, initiated years after the Virginia attorney-client relationship was created, divest the Virginia courts of their jurisdiction to resolve this purely state law issue between two private contractual parties.

Nor did the fact that when initially sued the defendant LeClairRyan removed the state law malpractice action to this Court to convert the underlying malpractice action to one to be determined under the federal common law.

Nevertheless, once the state law action had been removed to this Court, LeClairRyan moved to have the Mallory claim dismissed on grounds identical to those now urged on this

Court by the Trustee. (Defendant's Memorandum in Support of Motion to Dismiss Complaint – filed October 8, 2018, DOC 6, Case 1803082-KRH)

What became of that Motion?

Following the removal of Mallory's state law malpractice case to this Court, Mallory timely filed her Motion to Remand under 28 U.S.C. Section 1334(c)(2), i.e., that the state law claim must be remanded under the doctrine of Mandatory Abstention.

On December 13, 2018, after oral argument held on November 15, 2018, this Honorable Court remanded Mallory's state law claim back to the Circuit Court for the City of Richmond and deemed LeClairRyan's Motion to Dismiss mooted and declined to hear oral argument on the Motion to Dismiss.

In summary, presented with the identical arguments now made by the Trustee in her objections to Mallory's Claim 48-1, this Court ordered the Mallory malpractice claim against LeClairRyan remanded for adjudication in the state court system, where it now sits, its appeal to the Supreme Court of Virginia having been stayed automatically by LeClairRyans on going bankruptcy.

The Trustee's Objections to Mallory's Claim 48-1 should be overruled. Ms. Mallory has made a proposal to the Trustee which would expedite further proceedings in the LeClairRyan bankruptcy. The Trustee has taken the proposal under advisement.

Even the bankruptcy court recognized this fundamental principle when it deferred to the

Virginia courts on LeClairRyans, Motion to Dismiss. (Order attached)

Wherefore the Trustee's Objections to the Mallory Notice of Claim 48-1 should be

overruled.

Respectfully submitted by Counsel

LaTonya Mallory,

By: */s/ Robert T. Hall*
Robert T. Hall, Esquire VSB #04826
Law Office of Robert T. Hall
11260 Roger Bacon Drive
Suite 400
Reston, VA  20190
703-925-9500
rth@rthallattorneys.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of January 2023, a true and correct copy of the foregoing was served via electronic delivery, through the Court's ECF system, and/or first-class mail, postage prepaid, to the following:

Paula S. Beran Esquire
(VSB No. 34679)
PBeran@TB-LawFirm.com
Tavenner & Beran PLC
20 North 8th Street
Richmond, VA 23219
Telephone: (804) 738-8300
Telecopier: (804) 783-0178
*Counsel for Lynn L. Tavenner, Chapter 7
Trustee*

Tyler P. Brown
Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, VA 23219
Email: tpbrown@huntonak.com
*Counsel for Debtor*

And all parties listed on Schedule A attached to the Objection filed with the Court.

/s/ Robert T. Hall
Counsel

# EXHIBIT A

Uploaded: 2017DEC29 16:44 Filed By:Bar# 04826 RHALL Reference: EF-33684

**VIRGINIA:**

IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

| | |
|---|---|
| LATONYA MALLORY, ) | |
| ) | |
| *Plaintiff*, ) | Case No. _____ |
| ) | |
| v. ) | |
| ) | |
| LECLAIRRYAN, A PROFESSIONAL ) | |
| CORPORATION, ) | |
| Serve: Dwight F. Hopewell, Registered Agent ) | |
| LeClairRyan, A Professional Corporation ) | |
| 919 East Main Street, 24th Floor ) | |
| Richmond, Virginia 23219 ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

## COMPLAINT

COMES NOW, Plaintiff, LaTonya Mallory, by and through her undersigned

counsel, and brings this Complaint against LeClairRyan, A Professional Corporation

("LeClairRyan"), and states as follows:

### Introduction

1.      This is an action by LaTonya Mallory ("Mallory"), a former long-time

client of LeClairRyan, who was provided and relied upon incorrect legal advice given

to her by several LeClairRyan lawyers over a several year period of time from 2008

through 2013.   The advice, as further described below, led to catastrophic results,

including the United States government suing Mallory and her business, Health

1

Diagnostic Laboratory, Inc. ("HDL" or the "Company") for violations of the federal False Claims Act and Anti-Kickback statutes amounting to more than $1 billion.

2.  Notwithstanding Mallory's long-time allegiance to LeClairRyan, when the federal claims were lodged, the firm attempted to distance itself from the situation. The written documents and communications made contemporaneously in time with the events giving rise to the claims, however, contain LeClairRyan's crystal clear advice to its clients Mallory and HDL – unwavering advice relied upon in good faith.

3.  Mallory was a healthcare industry pioneer who was awarded many business recognitions, including the Ernst & Young National Entrepreneur of the Year award in the Emerging Company category in 2012 and the Virginia Business Person of the Year in 2013.

4.  Prior to that success, Mallory left her job and cashed out her 401k retirement and kids' college savings accounts, and put a second mortgage on her home to develop her vision. Just prior to obtaining the necessary capital to keep the business plan moving forward, Mallory bounced an $11 check and planned to stock shelves at Wal-Mart overnight to continue her drive to establish a new medical laboratory in the Richmond area.

5.  Mallory ultimately obtained investors and founded HDL to be a diagnostic laboratory leader that offered unique, comprehensive test menus of risk factors and biomarkers for cardiovascular and related diseases. This novel testing approach identified factors contributing to diseases and provided for early diagnosis

2

and treatment, allowing physicians to effectively manage patients and their health issues, while at the same time reducing healthcare costs.

6.    HDL's testing, however, was dependent upon it receiving blood samples from patients because it did not have a country-wide network of physical blood draw sites where patients would visit to have blood drawn.  One of the ways in which it would receive samples to test was from physicians who ordered various tests for their patients.  In those circumstances, the physician's staff as part of the sample process would provide services that may include, but are not limited to, apportioning the specimen into multiple vials specific to whole blood, serum, plasma, and urine testing requirements; loading, spinning and unloading the vials in a blood centrifuge; maintaining specimen integrity by cooling and packaging the vials in specially designed bio-hazard shipping containers in proper sleeves; labeling the vials specific to the category of testing to be performed; labeling shipping forms with proper disclosure; and coordinating shipment pickup to delivery to HDL.

7.    Pursuant to a legal analysis performed by LeClairRyan attorneys and a written agreement between physicians and HDL prepared by LeClairRyan, HDL would remit a process and handling ("P&H") fee to the physician to reimburse the physician for the cost of services the physician provided with respect to the blood sample.

8.    Prior to establishing the P&H reimbursement practice, Mallory sought advice from LeClairRyan to ensure that the reimbursement payment to physicians was

3

legal and consistent with the regulatory laws governing laboratories and the federal and state reimbursement systems, including Medicare, Medicaid, and Tricare.

9.      Starting in 2009 LeClairRyan opined that the HDL P&H process met the requirements of the law and neither violated the Stark Act nor The Anti-Kickback Statute nor exposed either HDL or Plaintiff Mallory to penalties or damages under the False Claims Act.

10.      On April 27, 2012 LeClairRyan ratified and confirmed its earlier opinions, expressing in a written legal opinion that its advice given in an earlier written legal was crystal clear: *"Based on this careful study, this arm's-length, fixed-in-advance fair market value fee will fall into the safe harbor exceptions under Anti-kickback statutes (and Civil False Claims Act) to alleviate any issue in that regard."*

11.      In fact, LeClairRyan consistently advised Mallory during the relevant time period that HDL's P&H payments to healthcare providers for blood collection services were consistent with law, including the anti-kickback statute and Personal Services and Management Contracts safe harbor.  In this regard, LeClairRyan told Mallory that ""We are on solid ground with the OIG advisory opinion that Pat is sending.  We will keep you posted."

12.      In addition, LeClairRyan repeatedly reviewed, drafted, edited, and approved P&H agreements with physicians and P&H position papers explaining that the P&H reimbursement was in compliance with the law.  Unequivocally, LeClairRyan stated: "The process and handling fee arrangement described above is consistent with

4

the 'arms length, fixed in advance, fair market value' requirements of the applicable Safe Harbor provisions of the federal Anti-kickback and the Stark Law. HDL will consistently evaluate this position and consult with external legal counsel as to its continued acceptability and we recommend all clients do the same."

13.    HDL drew considerable attention because it experienced an impressive ramp-up from the kitchen-table business plan to employing over 750 people, processing more than 60,000 tests per day, and expanding to a 280,000 square foot headquarters in Richmond's BioTechnology Research Park. In addition to the lab work, as part of Mallory's vision, HDL began offering patients free health coaching services, including smoking cessation, dietary, and behavioral change, in an effort to improve patient health and prevent heart attacks and diabetes. HDL also offered early detection and health coaching services to private companies so they could improve employees' health and keep medical insurance costs down.

14.    In 2013, the Department of Justice issued a subpoena to obtain records related to HDL's P&H reimbursement procedure. HDL and Mallory subsequently received information that suggested a contrary view of the safe harbor rules as applicable to HDL; yet, LeClairRyan did not waver from its prior opinions and confirmed to Mallory it was correct. Mallory later learned LeClairRyan's prior advice was in error. Subsequently, the government asserted claims against both Mallory personally and HDL.

15.    In the face of the government's claims against HDL and Mallory, HDL's board of directors sought to salvage the Company by agreeing to a settlement with the government for $47 million and continuing operations. Shortly thereafter, however, HDL suffered financial obstacles that it could not overcome and filed for bankruptcy on June 7, 2015. A trustee was appointed in the Company's bankruptcy to administer the Company's claims, and the trustee asserted claims against LeClairRyan for some of the same defective advice it gave to Mallory. LeClairRyan settled those claims for $20.3 million.

16.    In addition, the trustee of HDL also sued Mallory alleging that Mallory's conduct in operating the Company consistent with the advice provided by LeClairRyan damaged the Company by over $600 million. Thus, because of the repeated and steadfast advice of LeClairRyan, including its namesake, Dennis Ryan, to Mallory, Mallory faces multiple lawsuits seeking damages in excess of $1 billion. LeClairRyan is responsible for the claims and related damage.

### The Parties

17.    LaTonya Mallory is a resident of Goochland County, Virginia and transacted business in the City of Richmond, Virginia as the founder, Chief Executive Officer, and Chair of the Board of Directors of HDL, which was headquartered in Richmond, Virginia.

18.    LeClairRyan is a law firm that provides business counsel and client representation in corporate law and litigation. According to its website, "the firm

6

applies its knowledge, insight and skill to help clients achieve their business objectives while managing and minimizing their legal risks, difficulties and expenses." LeClairRyan has offices in Virginia, California, Connecticut, Delaware, Florida, Georgia, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Pennsylvania, Rhode Island, Texas, and Washington, D.C., with approximately 325 attorneys representing a wide variety of clients throughout the nation.

<u>Jurisdiction and Venue</u>

19.    This Court has jurisdiction over this claim pursuant to Va. Code § 17.1-513, and *in personam* jurisdiction over LeClairRyan pursuant to Va. Code § 8.01-328.1 in that LeClairRyan is headquartered in the City of Richmond, Virginia and the services and advice to Mallory were provided in the Commonwealth of Virginia.

20.    Venue in this Court is proper pursuant to Va. Code § 8.01-262 in that the Defendant maintains a registered office and has appointed an agent to receive process and a substantial part of the events and omissions giving rise to the claims occurred in the City of Richmond, Virginia.

<u>Facts Common to All Counts</u>

**Formation of HDL and Relationship Between LeClairRyan and Mallory**

21.    Mallory has had a long-standing relationship with Dennis Ryan of LeClairRyan since the early 2000s. In 2005, Mallory was employed at Berkeley HeartLab ("Berkeley"), where she was tasked with establishing a lab in Richmond.

When Berkeley was acquired, the Richmond lab project ended and Mallory left Berkeley in September 2008.

22.    Mallory retained LeClairRyan and sought personal counsel and advice from Ryan regarding her departure from Berkeley.   After leaving Berkeley, Mallory wrote a business plan for a new enterprise that would become HDL, and she retained Ryan and LeClairRyan to assist her with that endeavor.    During this period, LeClairRyan represented Ms. Mallory individually, as well as a business she established called T. Mallory & Associates, Inc.  As part of the business plan for which she sought and obtained advice from LeClairRyan, in November 2008, HDL was incorporated by LeClairRyan as a subchapter S corporation with the Virginia State Corporation Commission at Mallory's request.

23.    Mallory then had LeClairRyan participate in drafting, reviewing, and filing a Private Placement Memorandum ("PPM") related to HDL's business to attract investors.  In addition, Mallory had both Ryan and a CPA, Stephen Carroll, who later joined HDL as its CFO, review the financials in the PPM, consistent with Mallory's inclination to utilize and rely upon experienced advisors.

24.    Shortly after starting the HDL venture, on January 12, 2010, HDL and Mallory personally, along with others, were sued by Berkeley, Mallory's former employer, seeking to enjoin Mallory, HDL, and others from soliciting business from Berkeley's customers. *See* Civil Action No. 3:10cv00030-REP (E.D. Va.).

25.     Mallory promptly notified Ryan of the suit and inquired about representation in the matter. LeClairRyan confirmed that it continued to represent both Mallory, individually, and HDL. In fact, LeClairRyan entered its appearance in the case consistent with its dual representation of Mallory and HDL, and provided counsel for each during the entirety of the case, which ended in 2012.

26.     When HDL was formed, industry estimates were that Quest Diagnostics and LabCorp controlled as much as 80% of the diagnostic testing market. Both labs primarily utilized storefront draw sites to collect, process, and handle samples, as well as in-office phlebotomists. HDL, like many other clinical laboratories, did not have "brick and mortar" storefront blood drawing sites around the country. Instead, HDL utilized: (i) HDL phlebotomists in physician offices, (ii) arrangements with other labs that had draw sites, and (iii) agreements with physicians to draw blood in the physicians' facilities under with P&H fees would be paid to the physicians.

**Approval and Advice on P&H Fees**

27.     Consistent with Mallory's tendency to rely on professionals for business and legal matters in light of her clinical background, Mallory discussed these arrangements with LeClairRyan. Early in HDL's existence in October 2009, Mallory sought advice from LeClairRyan regarding a P&H agreement to be used with health care providers ("HCPs"). Mallory explained the proposed business use for the agreement to LeClairRyan and indicated that "the fee is designed to offset some of the HCP's labor cost associated with getting the sample ready for us." She further

requested that LeClairRyan "review it to make any changes that you think we need to make sure that it is not misconstrued as inducement" which might violate the Anti-Kickback Statute and trigger False Claims Act proceedings, exposing her personally and HDL to damages and civil penalties.

28.     At the time Ryan and the attorneys at LeClairRyan undertook their review of the HDL proposed P&H reimbursement plan and agreement, they well understood that if the practice implicated the False Claims Act, their advice, if given in error, could have significant adverse consequences not only to HDL, but to Mallory personally because the FCA provides for liability to entities that submit false claims *and of individuals who cause the submission of a false claim.*

29.     The significant risk and exposure to damages arising from improper advice was well-known by LeClairRyan, which held itself out as healthcare law experts. In addition to personal liability, the FCA also provides for mandatory trebling of damages and mandatory civil penalties of up to $11,000 per claim, which claim is considered to be a separate invoice.  As a result, the healthcare laws and industry were such that any legal professional providing healthcare advice, such as LeClairRyan, would undoubtedly be aware of the personal liability risks to Mallory.

30.     Ryan's work for HDL and Mallory involved another LeClairRyan lawyer who, based on his public biography, was a "Legal Elite" for healthcare law and had significant and extensive healthcare experience representing healthcare systems and other organizations engaged in the delivery of healthcare services and products in

10

corporate, regulatory, and compliance matters, including in OIG, CMS, and other agency investigative matters such as Medicare billing and reimbursement issues. That LeClairRyan attorney, Patrick Hurd, expressed concerns to Ryan about the P&H proposal, which Ryan did not share with Mallory: ". . . I advise extreme caution in structuring the fee for services arrangement between the lab and physician offices . . . the difference between the $3.00 Medicare rate and the $15 physician fee gives me some concern."

31.    However, he did not share this information with Mallory; instead, he assured Mallory that "such a fee (as proposed by Ms. Mallory) for prep services and applied at the same amount for Fed and non-Fed beneficiaries does not run afoul of the Anti-kickback."

32.    In November 2009, LeClairRyan approved the use of P&H, and provided Mallory with a P&H agreement which HDL could use with HCPs, and HDL began processing blood samples under that plan.

33.    In May of 2010, Mallory requested LeClairRyan's input on an "HDL Position Statement on Process and Handling Fees" document to confirm that the Company's position was "acceptable," and to explain to HCPs the policy, fair market value, and HDL's position with respect to such fees. LeClairRyan approved the document, which was created for the express purpose of dissemination to third parties, and it contained the conclusion written by LeClairRyan: *"The process and handling fee arrangement described above is consistent with the 'arms length, fixed in advance, fair*

11

*market value' requirements of the applicable Safe Harbor provisions of the federal Anti-kickback and the Stark Law.* HDL will consistently evaluate this position and consult with external legal counsel as to *its continued acceptability* and we recommend all clients do the same."

34.    Thus, both Mallory and HDL as clients of LeClairRyan were once again assured by LeClairRyan that the P&H fees fell under an exception to laws prohibiting inducement and were acceptable under such laws.

35.    Consistent with the ongoing evaluation by LeClairRyan, Mallory sought insight on specific procedures of the P&H fee billing process as it related to the documentation of draw logs by physicians: "Can I move to a more streamlined system that is more efficient and is there anything you see that I should be careful of?" Just days later, Ryan provided his "suggested changes regarding the billing process."

36.    In October of 2010, Mallory received an email from the Tennessee Medical Association questioning the P&H fees. On the same day, Mallory forwarded the email to Ryan at LeClairRyan and wrote: "I could use some guidance on the best way to answer this question." The unequivocally clear response from Mr. Ryan was: "We are on solid ground with the OIG advisory opinion that Pat is sending. We will keep you posted."

37.    The following month, in November 2010, Mallory forwarded an email from an HDL client wanting information on how HDL validated the P&H fee, and relayed they want to hear from HDL's lawyer on the issue. Ryan responded, "Will do."

38.    In December 2010, Mallory received an email from the lawyer of a healthcare provider. Mallory promptly connected the lawyer with Ryan and the other healthcare lawyer at LeClairRyan and asked that one of them contact the client's lawyer. The client and his lawyer were apparently satisfied with the information they received from LeClairRyan because the physician signed the P&H agreement and continued to do business with HDL.

39.    In February of 2011, Mallory received a phone call about a competitor's plan to report HDL to the OIG based on a specific sentence in the P&H Agreement that had been approved by LeClairRyan. Mallory forwarded the agreement to a healthcare lawyer at LeClairRyan and raised the interpretation by the competitor of the sentence written by LeClairRyan, specifically directing: "You guys have reviewed this document in the past and did not have an issue with it then. However, in light of this new possible interpretation, I'd like you to take a look at it again." The LeClairRyan lawyer called Mallory and informed her that the language was fine and did not recommend any changes to the document.

40.    In July 2011, LeClairRyan's healthcare expert left LeClairRyan. In September 2011, LeClairRyan hired another healthcare lawyer, Michael Ruggio, and appointed him as the firm's healthcare practice chair. He was assigned to the HDL/Mallory client accounts. Upon the lawyer's arrival at LeClairRyan, Mallory sent him "Documents for review" including the P&H Agreement, P&H Position Statement, and Internal Time & Motion analysis. He emailed Mallory on October 5, 2011: "per

13

your request we have checked Florida law and the status has not changed since the [LeClairRyan lawyer's] memo of January 28, 2011."

41.    Mallory then worked closely with the LeClairRyan lawyer to obtain an external time and motion study from Exponent to establish the fair market value, and to have LeClairRyan participate in a training session with HDL's sales contractor, BlueWave Health Care Consultants, Inc. ("BlueWave") and the sales team to discuss topics such as anti-kickback rules and billing policies.

42.    In April of 2012, LeClairRyan completed yet another assessment of the P&H fees which was disseminated outside of HDL to third parties at or around the time of its preparation, concluding again: "Based on our recent analysis . . . a fair market value of up to, but not to exceed $36.03 per specimen for processing and handling tasks is appropriate and justifiable. HDL's current agreements with physicians in this regard are well below that amount. *Based on this careful study, this arm's-length, fixed-in-advance fair market value fee will fall into the safe harbor exceptions under Anti-kickback statutes (and Civil False Claims Act) to alleviate any issue in that regard.*" Emphasis added. Therefore, a third healthcare specialist at LeClairRyan yet again concluded to Mallory that the P&H fees were appropriate and not in violation of federal laws.

43.    As mentioned previously, LeClairRyan also continued to represent Mallory in other matters tangentially involving HDL. In the spring of 2012, LeClairRyan expanded its engagement with Mallory to include representation of her

with respect to estate planning.   As was commonly known in 2012, the federal estate, gift, and generation skipping tax provisions in place from 2010 through 2012 were set to expire on January 1, 2013, in what was generally referred to as the "fiscal cliff doomsday."   As a result, tax and estate professionals across the United States advised clients to utilize trusts as an ordinary estate planning device.

44.    In this regard, LeClairRyan advised Mallory to establish a trust, which she did, and the firm prepared certain estate planning documents for her.

45.    To fund certain of the components of Mallory's estate plan required approval of an HDL distribution to shareholders, and LeClairRyan reviewed and approved the proposed distribution so that Mallory's estate plan instruments could be funded.

46.    In addition, Mallory also sought and received advice from LeClairRyan regarding a personal investment she planned to make in another biotechnology company. She consulted with LeClairRyan in December 2012 on proper disclosures and process for her to be able to invest personally in the company without running afoul of her personal fiduciary duties.

47.    At the same time she was receiving this personal advice regarding the estate planning and her investment opportunity, LeClairRyan was continuing to advise her and HDL on the P&H practices. Neither LeClairRyan nor Ms. Mallory ever made a distinction between who was the client and who was not the client with respect to the multitude of advice provided by LeClairRyan.

48.    The attorney client relationship between did not end until February 29, 2016, when LeClairRyan wrote to Mallory with regard to her request to review yet another personal, non-HDL legal matter: "We always appreciate the opportunity to provide legal counsel, however, in light of other pending matters LeClairRyan will not be able to provide any advice or assistance with respect to this matter."  Prior to that communication, Mallory was unaware of any termination of representation by LeClairRyan of her.  Nor did Mallory ever received notice under the ethical rules governing LeClairRyan, specifically, Rule 1.16 of the Rules of Professional Conduct, which provides that the lawyer must give "reasonable notice to the client, allowing time for employment of other counsel . . . ."

**Relationship with BlueWave**

49.    In addition to the P&H fees, the government and trustee claims against Mallory arise from the relationship that Mallory established with BlueWave on behalf of HDL.  As evidenced by the PPM, an independent sales force model was not part of the initial HLD plan conceived by Mallory.  In fact, Mallory did not meet the founders of BlueWave until late 2009, long after she left Berkeley.

50.    Prior to that, in June 2009, having exhausted 401K accounts, college savings accounts, bank accounts, and securing a second mortgage on her home, Mallory obtained the first outside funding for HDL from Tipton Golias ("Golias").  In July 2009, G. Russell Warnick ("Warnick") joined HDL as the Chief Medical Officer, and in

October 2009, Joseph McConnell ("McConnell") joined HDL as its Chief Lab Officer. Mallory, McConnell, and Warnick constituted the Board of HDL.

51.     At that time, HDL employed three sales representatives who were focused on the Virginia market. One of those HDL-employed representatives learned that Floyd Calhoun Dent, III ("Dent") was terminating his employment at Berkeley. Warnick approached Dent about joining HDL's sales team. Because of concern about a potential strategic and protective lawsuit by Berkeley if Dent and his colleague, Robert Bradford Johnson ("Johnson"), joined HDL, LeClairRyan developed the concept of HDL establishing an independent relationship with an entity created by Dent and Johnson, *i.e.* BlueWave, to put HDL one step removed from Dent and Johnson.

52.     LeClairRyan then prepared the BlueWave/HDL agreement (Compl. at ¶ 207), which was then reviewed by attorneys for Golias and BlueWave. Dent, Johnson and others left Berkeley in December 2009, joined BlueWave, and began selling tests for HDL in January 2010. As an outside sales department for HDL, BlueWave was responsible for all costs of sales, not HDL. BlueWave was compensated for both a sales commission on the sale and the additional cost of sales generally for HDL.

53.     Sales arrangements involving compensation based on the volume or value the sales generated violate the AKS

**DOJ and Trustee Claims**

54.     In January 2013, the Department of Justice issued a subpoena to HDL seeking information about its billing practices.

17

55.    In June 2014, the Office of Inspector General issued a special fraud alert that indicated that payment of P&H fees represents a substantial risk of fraud and abuse under the anti-kickback statute.    With this guidance, Mallory caused HDL to immediately cease any payment of P&H fees.

56.    Despite this, the government brought claims against Mallory and HDL alleging they violated the Anti-Kickback Statute because the government deemed the payment of P&H fees to be inducement for patient referrals.    The government also alleged that Mallory and HDL conspired with BlueWave to offer these inducements and that the agreement between BlueWave and HDL was not compliant under federal health care regulations.    HDL settled its case and within two months filed bankruptcy.

57.    On September 16, 2016, the Trustee filed suit against Mallory alleging claims related to the HDL P&H fees and other practices that were the subject of LeClairRyan's advice.    The Trustee's Complaint seeks over $600 million from Mallory.

## Count I
## Legal Malpractice

58.    Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

59.    There was an existing attorney client relationship and agreement between Mallory and LeClairRyan at all times relevant to this Complaint.  LeClairRyan agreed to provide legal representation to Mallory on numerous matters for which Mallory sought LeClairRyan's legal advice.

18

60.    The contractual attorney client relationship gave rise to a duty by LeCLairRyan to exercise the requisite reasonable degree of care and skill in rendering the services for which is was employed as attorney.

61.    By the acts and/or failures to act described in the preceding paragraphs, LeClairRyan has materially breached the engagement agreement's duty to exercise the requisite reasonable degree of care and skill in rendering the services for which is was employed as attorney and in in failing to exercise the required degree of care and skill has committed legal malpractice.

62.    LeClairRyan has breached the engagement agreement's duty of exercising reasonable skill and care by, among other things,

  a. Failing to adequately assess, understand and appreciate the requirements of the federal Anti Kickback Statute and its applicable Regulations;

  b. Failing to adequately assess, understand and appreciate the OIG Advisory Opinions as they related to the adoption and application of P&H reimbursement programs;

  c. Failing to adequately assess, understand and appreciate the "safe harbor" provisions of the Anti Kickback Statute; and

  d. Failing to adequately assess, understand, appreciate the federal government's position on P&H agreements as they relate to the "safe harbor" provisions and other provisions of the Anti Kickback Statute.

19

63.    As a direct and proximate cause of LeClairRyan's breach of its agreement and duties to exercise the requisite reasonable degree of care and skill in rendering the services for which is was employed as attorneys under the engagement agreement, Mallory has incurred expenses and has been damaged economically and will continue to suffer economic harm and loss for:

a.  Past, present and future attorneys' fees and litigation costs in an amount of $1.4 million, which amount continues to increase, that were incurred by the Plaintiff in the defense of the claims brought by the Liquidating Trustee in bankruptcy, claims which assert, *inter alia*, that HDL suffered injury and damage due to conduct of the Plaintiff, conduct which the Defendant LeClairRyan, in the course of its professional malpractice, had wrongfully assured the Plaintiff was lawful and consonant with all applicable federal laws;

b.  Past and present attorneys' fees and litigation costs in an amount of $2.2 million, which amount continues to increase, that were incurred by the Plaintiff in the defense of the claims brought by the United States, claims which assert, *inter alia*, that Plaintiff violated federal law based on the advice received from LeClairRyan;

c.  Claims against Mallory brought by the Liquidating Trustee in bankruptcy of $600 million, which amount may be reduced to judgment or settled by Mallory to end the litigation, in an amount yet

to be conclusively determined beyond the claim amount against Mallory. LeClairRyan is directly responsible for any such losses as damages herein and through a future potential contribution claim;

d. Claims against Mallory brought by the United States of more than $2 billion, which amount may be reduced to judgment or settled by Mallory to end the litigation, in an amount yet to be conclusively determined beyond the claim amount against Mallory. LeClairRyan is directly responsible for any such losses as damages and through a potential future contribution claim;

e. The loss of value of HDL owned by Mallory resulting from the malpractice of LeClairRyan; and

f. The loss of the use of funds and interest on such funds expended.

WHEREFORE, Mallory has incurred and continues to incur additional damages of legal fees and litigation costs to defend both the Trustee and government lawsuits, and is exposed to an award of damages and assessment of civil penalties, and prays that damages be awarded in her favor against LeClairRyan and judgment entered thereon in the amount of no less than Six Hundred and Three Million Dollars ($603,000,000), together with such pre-judgment interest as the Court or jury may award and post-judgment interest in accordance with law, and the costs of this proceeding together with such other and further relief as the Court deems appropriate, including

that the Plaintiff be granted liberal leave to amend the *ad damnum* of this action to reflect

any award of damages against her in either of the two pending proceedings.

   A JURY TRIAL IS DEMANDED.

Dated:  December 29, 2017

                                        LATONYA MALLORY,
                                        By Counsel,


                                        _____
                                        Robert T. Hall (VSB #4826)
                                        HALL & SETHI, PLC
                                        11260 Roger Bacon Drive, Suite 400
                                        Reston, Virginia 20190
                                        Telephone: (703) 925-9500
                                        Facsimile: (703) 925-9166
                                        rthall@hallandsethi.com
                                        *Counsel for Plaintiff*